UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------------------------

KIMBERLY GENEREUX,

Plaintiff,

v.

COLUMBIA SUSSEX CORPORATION          C.A. NO. 05-CV-10879-JLT
STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., WESTIN HOTEL
MANAGEMENT L.P.

Defendants.

-------------------------------------------------

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants

Columbia Sussex Corporation, Starwood Hotels & Resorts Worldwide, Inc. and Westin

Hotel Management, L.P. move that summary judgment be entered in their favor in this

case since there remain no genuine issues as to any material fact, and these defendants are

entitled to judgment as a matter of law.

In support of this motion, the defendants submit the attached Memorandum of

Law, LR 56.1 Statement of Material Facts, and supporting affidavits.

*Dated*:  March 11, 2008

*Yours respectfully,*

CORRIGAN JOHNSON & TUTOR
141 Tremont Street
Boston, MA  02111

*By*:

John B. Johnson (BBO#252580)

Robert J. Brown (RB7619)
MENDES & MOUNT, LLP
750 Seventh Avenue
New York, New York 10019
(212) 261-8000

Attorneys for Defendants
Columbia Sussex Corporation
Starwood Hotels & Resorts Worldwide, Inc.
Westin Hotel Management L.P.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------

KIMBERLY GENEREUX,

                   Plaintiff,

v.

COLUMBIA SUSSEX CORPORATION        C.A. NO. 05-CV-10879-JLT
STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., WESTIN HOTEL
MANAGEMENT L.P.

               Defendants.

------------------------------------------------

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Columbia Sussex Corporation ("Columbia Sussex"), Starwood Hotels and Resorts Worldwide, Inc. ("Starwood") and Westin Hotel Management, L.P. ("Westin") respectfully submit this Memorandum of Law in Support of their Motion for Summary Judgment seeking dismissal of plaintiff's Second Amended Complaint.

## STANDARD OF REVIEW

Summary Judgment is appropriate when the Record indicates that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary Judgment is proper against a party which fails to show the existence of an element essential to the party's case, and on which that party bears the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed 2d. 265, 106 S. Ct. 2578 (1986); Connell v. Bank of Boston, 924 F.2d 1169, 1172 (1st Cir. 1991).

## DEFENDANTS' MOTION

Defendants' Motion for Summary Judgment is grounded upon two incontrovertible bases: 1) None of the defendants are the owner, operator or manager of The Westin Casuarina Resort & Spa ("The Westin Casuarina") in Grand Cayman, where the plaintiff alleges she was

sexually molested; and 2) none of the Defendants can be held liable for the unforeseeable criminal acts of a third-party as plaintiff alleges occurred in the Cayman Islands.

## THE PARTIES

Plaintiff, Kimberly Genereux, a Massachusetts citizen, was on vacation in the Cayman Islands in May 2002, when she alleges that she was stalked on a public street and followed into a restroom located on the premises of The Westin Casuarina and raped.

Defendant Columbia Sussex, a Kentucky corporation, entered into a Service Agreement with Galleon Beach Resort, Ltd. ("Galleon Beach"), a Cayman corporation which is the owner and operator of The Westin Casuarina. The Service Agreement addresses financial and accounting matters and record keeping, and all services by Columbia Sussex are performed in Kentucky. Columbia Sussex has no ownership interest in The Westin Casuarina.

Defendant Westin Hotel Management, L.P. is a limited partnership organized under the laws of Delaware and the successor-in-interest to Westin License Company's interests in a License Agreement between Westin System License Company, as Licensor, and Galleon Beach, as Licensee, dated March 20, 1995. The License Agreement is commonly referred to as a "Franchise Agreement" and Westin is the "Franchisor", with Galleon Beach as the "Franchisee."

Defendant Starwood is a Maryland Corporation with its principal place of business in White Plains, New York, and is the General Partner of Westin Hotel Management, L.P. Starwood has no ties to Galleon Beach, nor to The Westin Casuarina, other than through that which is set forth in the Westin License Agreement.

The owner and operator of The Westin Casuarina is Galleon Beach. Galleon Beach is not a party to this civil action.[1]

---

[1] Plaintiff's Second Amended Complaint deletes Galleon Beach from the caption and Amended Complaint, as plaintiff never effected service of process upon Galleon Beach although she had previously named it as a defendant. Defendants Columbia Sussex and Starwood have repeatedly informed plaintiff that neither of them own or operate The Westin Casuarina and that all security operations at the Hotel were the responsibility of Galleon Beach.

## THE INCIDENT

Plaintiff, Kimberly Genereux, was not a hotel guest of The Westin Casuarina. Unbeknown to anyone at the Cayman Island hotel property, plaintiff sought to escape the pursuit of a stranger whom she encountered three times as she walked alone at night on a public street. Ms. Genereux entered The Westin Casuarina premises, but chose not to inform anyone of her presence or of her fear that she was being followed. Instead of entering the lobby, calling the police, or asking for help, she chose to use a restroom located in one of the Resort's outer buildings. Ms. Genereux then claims that someone entered the restroom shortly after her and raped her. The police investigated her Complaint but the criminal was never identified.

## PLAINTIFF'S ALLEGATIONS OF NEGLIGENCE

Plaintiff's Second Amended Complaint alleges that the Defendants owed a duty to the Plaintiff to exercise reasonable care in the operation of The Westin Casuarina in order to safeguard the plaintiff while she was lawfully on the Premises "which they owned, controlled, operated, managed, supervised, licensed and/or franchised." (Second Amended Complaint ¶ 62). Plaintiff also alleges that defendants breached a duty of care which they owed to the plaintiff by their "negligent security practices."[2]

## THE DEFENSES

None of the Defendants own, manage, operate or control The Westin Casuarina. In particular, security operations at The Westin Casuarina are distinctly something which are dictated by the owner and operator of the Hotel, Galleon Beach, the one entity which Plaintiff elected not to pursue through discovery or litigation. There is no evidence that Defendants Starwood, Westin or Columbia Sussex dictated how security on the premises was to be performed. There is also no evidence of any similar attack having been reported to any

---

[2] Please see Plaintiff's Second Amended Complaint at ¶ 63 for the specific allegations.

Defendant (or to Galleon Beach for that matter), involving The Westin Casuarina or occurring in its vicinity at any time prior to Plaintiff's incident.

Plaintiff alleges no conduct that involves any of the Defendants. Moreover, the alleged negligent conduct of Westin Casuarina employees occurring after the alleged rape, like all of the Plaintiff's claims, could only have involved employees of Galleon Beach, the solo owner and operator of the Resort. See Plaintiff's Second Amended Complaint at ¶¶ 45-58, 63(f), 63(i), and 63(j).

Also, under the law of The Cayman Islands, as well as the United States, an owner and occupier of premises is not liable for the unforeseeable criminal acts of third-parties perpetrated upon others on the premises, and in this instance, allegedly perpetrated upon one not even known to be on the premises and not a guest of the Hotel. Therefore, not only did Defendants not own, operate or manage the Hotel, but even if they had, there would be no basis to hold them liable for Plaintiff's injuries and claims, none of which were reasonably foreseeable.

## **CHOICE OF LAW**

A Massachusetts federal court must apply the choice of law principles of the Commonwealth of Massachusetts when, as here, it is hearing a case where jurisdiction is based upon diversity of citizenship. Bergin v. Dartmouth Pharmaceutical, Inc., 326 F.Supp.2d 179, 180-81 (D. Mass. 2004). Massachusetts Choice of Law Rules provide that tort claims for personal injuries are governed by the laws of the state where the alleged injury occurred, unless another state has a more significant relationship to the cause of action. Bergin, 326 F.Supp.2d at 183; Gianocostas v. RIU Hotels, S.A., 19 Mass. L. Rep. 42 (Mass. Super. 2005). The factors to be considered in determining whether another state has a more significant relationship to the cause of action are set forth in § 6 of the Restatement (Second) of Conflicts of Laws and include: (a) the relevant policies of the forum; (b) the relevant policies of other interested states and their relative interests in the determination of the particular issue; (c) the basic policies underlying the

particular field of law; (d) certainty, predictability and uniformity of result; and (e) ease in determination and application of the law to applied. Cosme v. Whitin Machine Works, Inc., 417 Mass. 643, 647 n. 6 (1994); Gianocostas, 19 Mass. L. Rep. 42.[3] In applying these factors, courts also consider: (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, place of incorporation and place of business of the parties; and (d) the place where the parties' relationship is centered . Cosme, 417 Mass. at 646-47 and n.3; Gianocostas, 19 Mass. L. Rep. 42.

The case of Gianocostas v. RIU Hotels, S.A., supports a conclusion that the law of the Cayman Islands would apply to this dispute. There, the plaintiff's estate brought an action in Massachusetts state court against Interface Group-Massachusetts, LLC d/b/a GWV International, a Massachusetts tour operator, when the plaintiff died as a result of inadequate medical care she received while on vacation at a hotel in the Dominican Republic. The Massachusetts court noted that the plaintiff and GWV were Massachusetts-based and that Massachusetts had a "significant interest" in applying its laws to ensure that Massachusetts residents booking hotels through GWV receive competent medical care. Nonetheless, the court concluded that the law of the Dominican Republic would apply to the dispute because the injury occurred there, the conduct giving rise to the claim occurred there, the parties' relationship was centered there, and finally the Dominican Republic has an interest in ensuring the safety of visiting tourists.

Like the case in Gianocostas, consideration of the relevant factors in the instant matter also supports a conclusion that the Court should apply the law of the Cayman Islands. The Cayman Islands is the place where the criminal attack and injury occurred; and also where the Defendants' allegedly negligent conduct occurred. For example, Defendants' alleged failure to perform proper security at the premises, the allegedly negligent design of the premises, and the

---

[3] Massachusetts courts rely heavily on the Restatement (Second) of Conflicts of Laws in analyzing choice of law influencing factors. See, e.g., Gianocostas, 19 Mass. L. Rep. 42 (citing § 146 of the Restatement); See also Tingley Systems, Inc. v. CSC Consulting, Inc., 152 F.Supp.2d 95, 114 (D. Mass. 2001).

alleged failure to respond adequately to the Plaintiff's requests for assistance all occurred in the Cayman Islands.

## DEFENDANTS CANNOT BE HELD LIABLE UNDER THE LAW OF THE CAYMAN ISLANDS

On behalf of the Defendants, an opinion was solicited from a Cayman law firm on Cayman Law as it relates to the Plaintiff's allegations of negligent security and the criminal assault. The Cayman Legal Opinion is annexed to the Affidavit of Robert J. Brown, sworn to March 10, 2008 as Ex. "8". This Honorable Court is respectfully invited to review the Opinion on Cayman Law in its entirety; this section will reiterate and highlight parts of that Opinion.

Defendants would not be held liable to the plaintiff under the law of the Cayman Islands.[4] To establish any claim of negligence, a plaintiff must first prove that the defendant has a duty of care which is owed to the plaintiff. Under the law of the Cayman Islands, the imposition of such a duty arises from a combination of factors, namely the reasonable foreseeability of risk of injury, the requisite proximity between the parties, and the absence of any statutory provision or common law rule which precludes a duty of care in the circumstances. Donoghue v. Stevenson [1932] A.C. 562, [1932] All E.R. Rep 1 (H.L.); Le Lievre v. Gould [1893] 1 Q.B. 491 (C.A.); Anns v. Merton London Borough Council [1978] A.C. 728, [1977] 2 All E.R. 492 (H.L.).[5] All three considerations must be satisfied if a duty is to be imposed by the law. The plaintiff must show that there is a real risk that injury of the kind sustained by the recipient would be sustained by him or her, either as an identified individual or as a member of a class which includes the plaintiff, as a result of the acts or omissions alleged to have occurred. Le Lievre v. Gould, [1893] 1 QB 491 (C.A.). This risk must not be one that is far fetched or fanciful. Wyong Shire Council v. Shirt, (1980) 146 CLR 40, (1980) 29 A.L.R 217 (H.C.A.).

---

[4] The Cayman Islands are a British Dependent Territory of the United Kingdom, and thus the Cayman Islands generally adopt the common law of the United Kingdom and other Commonwealth countries.

[5] Copies of all cases cited in the Opinion on Cayman Law are provided within an Appendix to Defendants' Motion, which has been served upon the Plaintiff with this Motion, and is available to the Court upon its request.

Error! Unknown document property name.                                    6

The enquiry by the courts as to foreseeability is a factual enquiry, which is undertaken either to determine whether a duty of care exists, or whether a duty of care has been breached. Bolton v. Stone, [1951] AC 850, 1 All E.R. 1078 (H.L.). The authorities warn of the danger of concluding that a circumstance is reasonably foreseeable when such a finding is essentially based upon the benefit of hindsight and is not based upon the state of knowledge at the time when the duty should have been performed. Rosenberg v. Percival, (2001) 205 CLR 434, (2001) 178 A.L.R. 577 (H.C.A.).

United Kingdom common law has established the importance of "proximity" as an essential element in determining whether a duty of care exists. Courts have determined that proximity is "a separate and general limitation upon the test of reasonable foreseeability in the form of relationships which must exist between plaintiff and defendant before a relevant duty of care will arise … ." See, e.g., San Sebastian Pty Ltd v. Minister Administering Environmental Planning and Assessment Act, (1986) 162 CLR 340, (1986) 68 A.L.R. 161 (H.C.A.). The general requirement of proximity involves an assessment of the degree of closeness of the relationship of the parties, and also a judgment of the legal consequences of that relationship. Jaensch v. Coffey, (1984) 155 CLR 549, (1984) 54 A.L.R. 417 (H.C.A.). To determine the existence of this requisite degree of closeness, courts examine the following factors between the parties: physical proximity (in a temporal sense); circumstantial proximity (such as an overriding relationship like employer and employee); and causal proximity between the plaintiff's injury and the defendant's actions. Id.

The House of Lords, which is the final court of appeal in the United Kingdom, addressed proximity and foreseeability in the leading case of Smith v. Littlewoods Organisation Ltd., [1987] A.C. 241, [1987] 1 All E.R. 710 (H.L.). In Littlewoods, third-party hooligans broke into a derelict cinema building and started a fire which spread to the adjoining plaintiff's property and destroyed the same. In finding for the defendant, the court held that, while the defendant might

be partly at fault for the plaintiff's damages, it cannot be held responsible for damages to a third party which were caused by the deliberate actions of strangers. Id. (citing Weld-Blundell v. Stephens, [1920] AC 956, [1920] All E.R. Rep 32 (H.L.) ("Even though A is in fault, he is not responsible for injury to C which B, a stranger, deliberately chooses to do.")

Courts under the United Kingdom common law regime are reluctant to imply negligence in cases where damage has been caused by third party intervention. The majority of these types of cases places no obligation on reasonable people to take steps to prevent unlikely events. See, e.g., Bolton v. Stone, [1951] A.C. 850, [1951] 1 All E.R. 1078 (H.L.). In Modbury Triangle Shopping Centre Pty Ltd v. Anzil, (2000) 205 C.L.R. 204, (2000) 176 A.L.R. 411, the High Court of Australia,[6] was asked to determine whether the defendant landowner was liable to a person who was attacked at night by three unidentified assailants in the unlit parking lot of its shopping center. The court reviewed the history of the applicable law in the United Kingdom and the United States[7] and elsewhere. The majority of the judges acknowledged that in certain limited and special relationships, a defendant had a duty of care to protect against damage caused by third parties and determined that on the facts of the particular case, there was no clear control by the defendant over the third party. The court further noted that there was no assumption of responsibility by the defendant for the safety of persons on its property from attack by third parties, and that although the defendant's failure to leave lights on may have facilitated the crime, its failure to leave the lights on did not cause the crime. The court went on to determine that the crime was not in a category of high foreseeability and thus came to the conclusion that the defendant was not liable to the plaintiff for the criminal act of this third-party assailant.

Defendants Columbia Sussex, Starwood and Westin had no relationship to the Plaintiff. Even more removed from the scene than the defendants in both Littlewoods and Modbury,

---

[6] Australia is a Commonwealth country and enjoys similar common law heritage as the United Kingdom. The Cayman Islands therefore find the law of that court to be very persuasive.
[7] Lillie v. Thompson, 332 U.S. 459, 68 S. Ct. 140 (1947).

Defendants at bar could not reasonably foresee the acts of the third-party rapist nor did Defendants cause the injuries to Plaintiff. Plaintiff was not employed by Defendants, she was not a paid guest of Defendants (or of The Westin Casuarina), and she failed to even notify The Westin Casuarina, much less, any of the Defendants, of her presence. The circumstantial proximity between Plaintiff and Defendants is non-existent. In the leading case of <u>Modbury</u>, the defendant owned and operated the shopping center where the plaintiff was employed, but was not liable to the plaintiff. Defendants herein were not in any proximity to create a "special relationship," nor were Defendants able to prevent the criminal acts of the third party rapist.

Because Defendants have no relationship to the Plaintiff and owe no duty to her, the inquiry ends there. Nonetheless, even if the Defendants were, for the sake of argument, found to stand in the shoes of the Operator of the Hotel, they would not be liable as none could reasonably foresee the possibility of this third-party criminal act, and none caused Plaintiff's injuries. Defendants cannot therefore be held liable under the law of the Cayman Islands.

### CRIMINAL ATTACK UPON PLAINTIFF NOT REASONABLY FORESEEABLE UNDER UNITED STATES LAW

Similar to the law of the Cayman Islands, the law of potentially relevant domestic jurisdictions supports a finding of summary judgment in favor of Defendants.[8]

In the first instance, none of the Defendants have any relationship with the Plaintiff. None of the Defendants own or operate The Westin Casuarina, and none owe the Plaintiff a duty regarding her safety. Taking it one step further, even if this Court were to find that a Defendant had a duty to the Plaintiff, (which Defendants do not concede and, in fact, expressly deny), the alleged third-party criminal assault upon the Plaintiff was not reasonably foreseeable to Galleon Beach, owner and operator of the Hotel. Because Galleon Beach cannot be found liable, Starwood, Westin, and Columbia Sussex cannot therefore be held liable for any unforeseeable

---

[8] The potentially relevant jurisdictions are each party's domicile and/or incorporation state (Massachusetts, New York, Kentucky, Maryland and Delaware).

Error! Unknown document property name.

third-party criminal acts.[9]  For example, the "common law [of Massachusetts] imposes on a commercial landowner a duty to take reasonable precautions to protect persons lawfully in common areas of [its property] against reasonably foreseeable risks." Whittaker v. Saraceno, 418 Mass. 196, 198, 635 N.E.2d 1185 (1994) (citing Restatement (Second) of Torts § 360 (1965), Restatement (Second) of Property, Landlord and Tenant, § 17.3 comment 1, at 197 (1977)).  A landowner's duty in Massachusetts is thus limited to reasonably foreseeable risks, and absent a finding of such a duty, there can be no liability in negligence.  By this reasoning, foreseeability plays a crucial role in limiting the extent of a defendant's liability. Whittaker, 418 Mass. at 198.

In Whittaker, the plaintiff was assaulted and raped in and around the defendant's parking garage.  In dismissing the complaint against the defendant, the court noted that there was no evidence of prior physical attacks in the building, and the building was located in a low-crime area.  The court, therefore, held that the attack on the plaintiff was not reasonably foreseeable to the defendant landowner, because "there was no evidence that the landlord knew or reasonably should have known that a physical attack might occur in the building." Id. at 200.  In dismissing the plaintiff's claim, the Supreme Judicial Court recognized that

> [t]he possibility of criminal conduct occurring is present in almost every aspect of daily life.  In that sense the possibility of a violent attack is always able to be foreseen.  However, society should not place the burden of all harm caused by random violent criminal conduct on the owner of the property where the harmful act occurred without proof that the landowner knew or had reason to know of a threat to the safety of persons lawfully on the premises against which the landowner could have taken reasonable preventive steps.

Id.

If a plaintiff cannot produce evidence that a landowner knew or had reason to know of a threat to the safety of people on its property, a defendant is therefore entitled to summary judgment, as he cannot be said to have owed a requisite duty of care to that plaintiff. Massachusetts courts no longer mandate a showing of prior similar criminal acts on the

---

[9] Even if Galleon Beach were found to be liable, there is no evidence that any of the Defendants would, or could, be liable.

defendant's property, but courts have nonetheless continued to find that prior similar criminal acts play a significant role in determining foreseeability. *See*, <u>Whittaker</u>, 418 Mass. at 199[10]; *See also*, <u>Rossacci v. Stop & Shop Companies, Inc.</u>, 7 Mass. L. Rep. 7 (1997) ("In deciding whether there was reasonable foreseeability of harm, all circumstances are to be examined by the [c]ourt … but a circumstance upon which courts often focus is the previous occurrence, *vel non*, of similar criminal acts on or near the premises." (internal citations omitted)).

Similar to the defendant in <u>Whittaker</u>, the defendant in <u>Rossacci</u> did not know of any previous similar incidents on his property and nothing in the record warranted the inference that his property constituted a "high-crime area" requiring security. In conclusion, the defendant could not reasonably foresee the harm caused by the third-party's criminal conduct, and thus could not be held liable to the plaintiff. <u>Id</u>. at 11.

Defendants at bar had no knowledge of prior similar criminal acts that would place them on notice of future cases of sexual assault or rape at The Westin Casuarina. The record is devoid of any evidence that might suggest that any serious, violent crimes have ever before occurred at The Westin Casuarina's common areas or bathrooms. Moreover, nothing in the record suggests that the area surrounding The Westin Casuarina property could be classified as a "high-crime" area. Therefore, as in both <u>Whittaker</u> and <u>Rossacci</u>, we respectfully submit that this Honorable Court should hold that the Defendants could not have reasonably foreseen the harm which is alleged to have occurred to the Plaintiff.

Further, by the Plaintiff's own admission, she was neither a guest at The Westin Casuarina, nor did she notify anyone at the Hotel of her entrance onto the property before allegedly being attacked by the unknown third-party assailant. Because she did not pay for a room, or even ask for assistance, it cannot be said that the operator of The Westin Casuarina in

---

[10] It should be noted that the court cited to <u>Ann M. v. Pacific Plaza Shopping Ctr.</u>, 6 Cal. 4th 666, 679 (1993), for holding that "the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises."

Error! Unknown document property name.

any way voluntarily assumed a duty to protect Plaintiff from third-party criminal acts. *See, e.g.,* Mullins v. Pine Manor College, 389 Mass. 47, 53-54 (college defendant voluntarily assumed a duty to protect its students from criminal acts when it charged its students for security). Even had Plaintiff been a guest of the Hotel, neither the operator of the Hotel, Galleon Beach, nor any of the Defendants could have reasonably foreseen such an attack on a guest of the Hotel.

This is not case where the property at issue *invited* criminal activity. *See, e.g.* Seron et al. v. Maltagliati et al., 1998 Mass. Super. LEXIS 46 (1998) (a landlord renting space to an abortion clinic should realize that such a clinic might attract violent protestors); *See also,* Mullins, 389 Mass. at 51 ("The concentration of young people, especially young women, on a college campus, creates favorable opportunities for criminal behavior."). In the instant matter, nothing about The Westin Casuarina invites controversy or violence by its pure nature and purpose.

The same conclusion results if the Court were to apply New York, Kentucky, Maryland or Delaware law. In each jurisdiction, a defendant's liability in negligence is limited to its duty to protect certain classes of people from reasonably foreseeable risks. For example, the court in Browne v. GMRI, Inc., 775 N.Y.S.2d 184 (2d Dep't 2004) restated the law of New York as follows:

> To recover damages from an owner of real property for injuries caused by the acts of third parties, a plaintiff must produce evidence indicating that the owner knew or should have known of the probability of conduct on the part of third persons which was likely to endanger the safety of those lawfully on the premises.

Id. at 184. The court in Browne explained that a defendant landowner cannot be held liable if it did not reasonably foresee the criminal acts of a third party assailant. It concluded that "spontaneous and unexpected criminal [actions] of a third party" cannot be foreseeable. Id.

The law of Maryland, Kentucky, and Delaware has developed in similar fashion to that of both Massachusetts and New York. Namely, a defendant will not be held liable to the plaintiff if

he could not reasonably foresee the criminal acts of a third party assailant. <u>Rhaney v. University of Maryland Eastern Shore</u>, 388 Md. 585, 880 A.2d 357 (2005) (Maryland law); <u>Grisham, et al. v. Wal-Mart Stores, Inc.</u>, 929 F. Supp. 1054 (E.D. KY 1995) (Kentucky law); <u>Delmarva Power & Light Co. v. Burrows</u>, 435 A.2d 716 (1981) (Delaware law).

As applied to this case, the Plaintiff's unsubstantiated suggestion of previous cases of sexual assault or rape on the Cayman Islands in general is entirely insufficient to create foreseeability of similar criminal activity at The Westin Casuarina or in its vicinity. Nothing in the record suggests that The Westin Casuarina was the location of previous third-party sexual assaults[11], nor does the record suggest that the surrounding community had experienced similar crimes. Moreover, nothing in the report recently produced by the plaintiff's purported "liability expert," Mr. Robert McCrie, suggests that Galleon Beach could reasonably anticipate or foresee the sexual assault which the plaintiff alleges occurred. Mr. McCrie cites to irrelevant authority post-dating the date of the incident by as much as two years; inadmissible hearsay and unsupported anonymous internet blog postings; and finally, he cites to broad and undefined crime statistics of the three Cayman Islands taken together. Such statistics are completely unavailing to the current analysis, as the Court cannot determine the specific nature of those crimes reported. <i>See</i>, <u>Grisham</u>, <i>supra</i>, 929 F.Supp. at 1058 (Statistics showing an increase in crime cannot establish foreseeability because bare statistics lack necessary detail). Thus, absent any evidence of similar criminal activity at The Westin Casuarina or in its vicinity, and known to The Westin Casuarina, Galleon Beach could not have reasonably foreseen this particular

---

[11] The plaintiff's purported "Liability Expert," Mr. McCrie, alludes to a Complaint in 1997 entitled <u>Louise Reynolds v. Columbia Sussex et al</u> which involved an allegation of sexual misconduct at The Westin Casuarina. The circumstances of that Complaint are entirely inapposite to the allegations before this Court. In <u>Reynolds</u>, the allegations involved three underage minors who were guests of The Westin Casuarina and one employee waiter of the Hotel. The particulars of that incident involved the service of alcohol to the underage guests and the subsequent alleged sexual misconduct within a guest room. (See, Affidavit of Niels Olsen at 18) That isolated incident involved alcohol service policies which were thereafter addressed and new procedures were implemented by Galleon Beach. (<u>Id.</u>) That incident did not create any reasonable foreseeability of a random third-party criminal sexual assault upon a trespasser in the restroom of one of the Hotel outer buildings.

criminal behavior on its property.  More to the point, there is absolutely no evidence that any of the Defendants, none of which have any relationship to the Plaintiff, could have reasonably foreseen such an incident occurring at The Westin Casuarina.

Plaintiff also attempts to establish liability on the Defendants by alleging a negligent design of The Westin Casuarina restroom in which the alleged incident transpired.  The defendants did not design the restroom.  Nonetheless, an alleged negligent design of a restroom does not speak to a defendant's alleged duty of care, but rather to the alleged proximate cause of a plaintiff's injuries.  A restroom designed in a particular manner does not create a duty of care on its owner and operator if such duty did not already exist.  As has been addressed previously, there was no reasonable foreseeability of sexual crime in the bathroom or the vicinity. Therefore, there was no duty on the owner and operator owing to the Plaintiff regarding the bathroom, and Defendants certainly had no such duty to the Plaintiff.  In any event, the alleged negligent acts of Defendants cannot be said to be the proximate cause of Plaintiff's alleged injuries which were directly caused by the alleged criminal assault by a third-party trespasser.

## STARWOOD, WESTIN,  AND COLUMBIA SUSSEX ARE NOT LIABLE FOR THE ALLEGED NEGLIGENCE OF GALLEON BEACH

Defendants Columbia Sussex, Starwood and Westin are entitled to summary judgment as a matter of law because none controlled or operated The Westin Casuarina  and none are in an agency relationship with Galleon Beach regarding security operations at the Hotel.  Thus, even if Galleon Beach were found to have been negligent, (and there is no evidence to suggest negligence on its part), Defendants could not be held liable for that negligence.

### A.  Starwood and Westin Cannot be Held Liable for the Alleged Negligence of Galleon Beach

1.  No Actual Agency Relationship

The Westin Casuarina  is a franchise operation.  Because no agency relationship existed between franchisor Westin and franchisee Galleon Beach, no liability should attach to the

agency relationship with Galleon Beach regarding security operations at the Hotel. Thus, even if Galleon Beach were found to have been negligent, (and there is no evidence to suggest negligence on its part), Defendants could not be held liable for that negligence.

**A.    Starwood and Westin Cannot be Held Liable for the Alleged Negligence of Galleon Beach**

1. No Actual Agency Relationship

The Westin Casuarina is a franchise operation. Because no agency relationship existed between franchisor Westin and franchisee Galleon Beach, no liability should attach to the defendant Westin or its parent corporation Starwood. The Restatement (Second) of Agency defines "Agency" as:

> the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.

Restatement (Second) of Agency § 1 (1958). "It is the element of continuous subjection to the will of the principal which distinguishes the agent from other fiduciaries and the agency agreement from other agreements." Id., comment (b). Here, Galleon Beach is *not* owned or operated by Starwood or Westin, and thus never manifested its consent to act on behalf Starwood or Westin. McGovern Aff at ¶¶ 4, 9, annexed as Ex. 4 to Aff of Robert Brown. The License Agreement between Westin and Galleon Beach makes clear that Galleon Beach is an independent contractor, and not an agent of Westin. McGovern Affidavit at ¶ 9.

However, courts have nonetheless held that "even where the parties have eschewed an agency relationship, an agency relationship may exist where 'there is mutual consent, express or implied, [that one party] is to act on behalf and for the benefit of [another], and subject to [such other party's] control.'" McLaughlin v McDonald's Corp et al., 2001 US Dist. LEXIS 23222, *21-22 [MA, Nov. 29, 2001] quoting Theos & Sons, Inc. v Mack Trucks, Inc., 431 Mass. 736, 742. The McLaughlin case is illustrative because it involved rape by a third party in a

McDonald's parking lot and later on hotel property. McDonald's, as franchisor, was dismissed from the case. The court held that no agency relationship existed between the franchisor and the franchisee despite the fact that the franchisor "dictated the manner in which [the franchisee] was required to operate the...restaurant." The Massachusetts court explained that the operational requirements imposed by McDonald's on its franchisee were merely "intended to ensure quality control." <u>McLaughlin</u>, *supra* at 24. The court found that the franchisor:

> did not exercise supervisory control over security measures utilized by [franchisee] at the...restaurant. Instead, [franchisor] issued an Operations and Training manual which addressed security issues and contained information that [franchisee] should consider...as company policy.

<u>Id</u>.

Similar to the franchise agreement in <u>McLaughlin</u>, the License Agreement between Westin and Galleon Beach notes that its Brand Standards are in place to ensure the "first-class high quality" of the Hotel. McGovern Affidavit at ¶ 10. Moreover, the manner by which Galleon Beach meets certain criteria promulgated in those standards is entirely up to Galleon Beach. McGovern Affidavit at ¶ 14.

In general, "[w]hether franchisor should be held vicariously liable for negligent conduct of its franchisee depends on whether the franchisor controls the day-to-day operations of the franchisee, and more specifically whether the franchisor exercises a considerable degree of control over the instrumentality at issue in a given case." <u>McLaughlin</u>, *supra* at 28, *quoting* <u>Wendy Hong Wu v. Dunkin' Donuts, Inc.</u>, 105 F. Supp.2d 83, 87 (2000). In <u>McLaughlin</u>, the franchisor did not control the day-to-day operations of its franchisee because, *inter alia*, the franchisor did not maintain the right to hire, fire or discipline employees of the franchisee; and most importantly, the franchisor did not control the security of its franchisee. The court specifically noted that, even if it were to find an agency relationship existed, the plaintiff "would have to establish that with respect to security matters, [the franchisee] operated with the actual or apparent authority of [the franchisor, McDonald's]." *See also*, <u>Kerl v. Dennis Rasmussen, Inc.</u>,

682 N.W.2d 328 (WI 2004) (a franchisor may only be held liable if it controlled or had the right to control the specific business operation alleged to have caused the plaintiff's harm).  The operating manual provided by McDonald's included advice and suggestions on providing proper security, but it did not *control* the activity as is necessary to establish an agency relationship.

Even further removed from the facts of <u>McLaughlin</u>, the Westin License Agreement and the Westin Manuals and Westin Brand Standards issued pursuant to that Agreement between Westin and Galleon Beach do *not* address day to day operational security measures.  Such decisions were left to the sole discretion of Galleon Beach.  McGovern Affidavit at ¶¶ 15, 16.  Westin did not control the security operations of Galleon Beach; no agency relationship can be said to exist between the separate and independent entities regarding security operations.

Westin did not control the daily operations of Galleon Beach.  Similar to the facts of <u>McLaughlin</u>, Westin had no authority to hire or fire Galleon Beach employees.  McGovern Affidavit at ¶ 14.  Various jurisdictions have ruled in similar fashion to that of the court in <u>McLaughlin</u>.  Namely, the standards depicted in a franchise agreement with respect to quality, marketing, and operation commonly included in franchise agreements cannot establish vicarious liability without a showing of close supervisory control over day-to-day activities.  *See, e.g.*, <u>Kerl v. Dennis Rasmussen Inc.</u>, 682 N.W.2d 328 (WI 2004).  Similarly, the Georgia Court of Appeals refused to hold a franchisor liable for a franchisee's allegedly tainted food despite the franchisor's manuals detailing standards related to food preparation and hygiene.  <u>Schlotzsky's, Inc. v. Hyde et al.</u>, 538 S.E.2d 561 (GA Court of Appeals 2000).  The franchisor simply did not retain control over the franchisee's daily activities.  The same should hold here.

Westin and its parent Starwood did not control, manage or supervise the daily operations at The Westin Casuarina and they cannot not be held liable for the alleged negligence of Galleon Beach.

2. <u>No Apparent Agency Relationship</u>

The court in McLaughlin also held that there was no *apparent* authority to establish an agency relationship between the franchisor and franchisee. The court defined apparent authority as the authority that exists "only if the plaintiff reasonably relied on the principal's words or conduct at the time he entered the transaction that the agent is authorized to act on the principal's behalf." McLaughlin, *supra* at 26, 27. After casting doubt on whether such authority could *ever* be found under circumstances of a third-party criminal assault, the court nonetheless held that the plaintiff victim could not have reasonably determined that the franchisee was acting as an agent of the franchisor, McDonald's. The Massachusetts court noted that

> the mere use of trademarks and logos by a franchisee does not raise a genuine issue of material fact as to whether [the franchisee] had apparent authority to act as [the franshisor's] agent. This is particularly true in situations involving businesses such as the McDonald's Restaurant, because the public is well aware that such entities are often operated as franchises.

Id. at 27 (internal citations omitted); *See also*, Mobil Oil Corp. v. Bransford, 648 So. 2d 119 (1995) (Supreme Court of Florida held that "the mere use of franchise logos and related advertisements does not necessarily indicate that the franchisor has actual or apparent control over any substantial aspect of the franchisee's business or employment decisions.")

Here, no apparent authority can be found to exist as between Galleon Beach and Starwood/Westin. The License Agreement provides that "no representation shall be made by either party to anyone that would create any apparent agency..." McGovern Affidavit at ¶ 9. In accordance with this restriction and to illustrate the independent relationship to Hotel guests, the Agreement further provides that signs shall be posted in the Hotel identifying Galleon Beach as independent contractor to Westin. Id. It also provides that all business stationary that contains Westin's Trademark must indicate that Galleon Beach is independently owned and operated. Id. Therefore, as the Massachusetts court noted in McLaughlin, the mere use of Westin's franchise logos and Trademark does not give rise to apparent authority. To hold otherwise would make Starwood and/or Westin liable for something of which it had no right to control. The use of a

franchisee's restroom by a stranger attempting to escape from a third party assailant without alerting the franchisee of her concerns and alarm should not somehow create a greater liability on the franchisor, when not even the franchisee knew of any potential danger generally or specifically.

## B. Columbia Sussex Cannot Be Held Liable for the Alleged Negligence of Galleon Beach

Similar to the analysis presented above, this Honorable Court should find that Columbia Sussex cannot be held liable for the alleged negligence of Galleon Beach, as the two corporations are wholly separate and neither is involved in an agency relationship regarding security operations at the Hotel.  Galleon Beach is not a subsidiary of Columbia Sussex, nor does Columbia Sussex own any stock or membership interest in Galleon Beach.  Mitchel Aff at ¶¶ 7, 11, annexed as Ex. 3 to Aff of Robert Brown.  The two corporations do not share corporate documents.  Each has its own independent Board of Directors and its own separate slate of Officers.  Id., ¶¶ 8,10.

For reasons only known to Plaintiff, she named Galleon Beach as a direct Defendant, failed to effect proper service upon Galleon Beach and has since amended her Complaint to delete Galleon Beach as a party.  She has done this despite the consistent admonitions from the other Defendants that Galleon Beach is the owner and operator of The Westin Casuarina.

The relationship between Columbia Sussex and Galleon Beach is set forth in the  Service Agreement whereby Columbia Sussex, as an independent contractor, has agreed to provide "accounting and business management services to Galleon Beach."  Mitchel Affidavit at ¶¶ 21 - 23.  Pursuant to that Agreement, Columbia Sussex performed in Kentucky certain bookkeeping, recordkeeping, some group sales and reporting functions for Galleon Beach.  Id.  Like the defendant in McLaughlin, Columbia Sussex did not control the day-to-day operations of Galleon

Beach; Columbia Sussex did not hire or fire Galleon Beach employees or have the authority to do so. Id., ¶¶ 17, 18. Columbia Sussex was never responsible for ensuring the security needs of Galleon Beach's Westin Casuarina. Id., ¶ 27. There was no agency relationship between Columbia Sussex and Galleon Beach regarding security operations at the Hotel. Therefore, since Columbia Sussex did not control the security operations of Galleon Beach, Columbia Sussex cannot be held liable for the type of negligence alleged herein. See, Kerl v. Dennis Rasmussen, Inc., 682 N.W.2d 328 (2004) (A franchisor may only be held liable if it controlled or had the right to control the specific business operation alleged to have caused the plaintiff's harm); See also, McLaughlin, supra at 28 (same).

## CONCLUSION

**FOR ALL THESE REASONS,** Defendants Columbia Sussex Corporation, Starwood Hotels & Resorts Worldwide, Inc. and Westin Hotel Management L.P. respectfully request that Summary Judgment be entered in their favor and that Plaintiff's Second Amended Complaint be dismissed in its entirety.

*Dated*: March 11, 2008

*Yours respectfully,*

CORRIGAN JOHNSON & TUTOR
141 Tremont Street
Boston, MA 02111

*By:*

John Johnson (BBO#252580)

Robert J. Brown (RB7619)
MENDES & MOUNT, LLP
750 Seventh Avenue
New York, New York 10019
(212) 261-8000

Attorneys for Defendants
Columbia Sussex Corporation
Starwood Hotels & Resorts Worldwide, Inc.
Westin Hotel Management L.P.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------------------------

KIMBERLY GENEREUX,

                                        Plaintiff,                    C.A. NO. 05-CV-10879-JLT

v.

COLUMBIA SUSSEX CORPORATION          **LR 56.1 STATEMENT OF**
STARWOOD HOTELS & RESORTS            **MATERIAL FACTS ON**
WORLDWIDE, INC., WESTIN HOTEL        **MOTION FOR SUMMARY**
MANAGEMENT L.P.                      **JUDGMENT**
                                        Defendants.

---------------------------------------------------

Defendants Columbia Sussex Corporation, Starwood Hotels & Resorts Worldwide, Inc. and Westin Hotel Management L.P. (hereafter "Defendants"), respectfully submit the following Statement of Material Facts on their Motion for Summary Judgment pursuant to LR 56.1 of the Local Rules of the United States District Court for the District of Massachusetts:

Defendants respectfully submit that the following material facts are not in dispute:

1.   Plaintiff Kimberly Genereux is a resident of Middlesex County, Commonwealth of Massachusetts. (Aff. of Robert J. Brown, Exhibit 1 Deposition of Kimberly Genereux at page 5 ("Genereux Depo.")).

2.   Columbia Sussex Corporation ("Columbia Sussex") is incorporated in the Commonwealth of Kentucky with its principle place of business in Crestview Hills, Kentucky. (Aff. of Robert J. Brown, Exhibit 3 Affidavit of Theodore Mitchel ("Mitchel Aff.") at ¶ 2).

3.      Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") is incorporated in the State of Maryland with its principal place of business in White Plains, New York. (Aff. of Robert J. Brown, Exhibit 2 Plaintiff's Second Amended Complaint at ¶ 3).

4.      Westin Hotel Management L.P. ("Westin") is a limited partnership organized under the laws of the State of Delaware with its principal place of business in White Plains, New York.  (Plaintiff's Second Amended Complaint at ¶ 4).

5.      Plaintiff was on vacation in the Cayman Islands in May 2002 and staying at the Plantana Condominiums located on Seven Mile Beach.  (Genereux Depo., pp. 30-31)

6.      Plaintiff left her condominium at about 5:45 p.m., on Friday, May 3, 2002 to begin a walk along the beach, visit with friends and shop.  (Id., at 32-35.)

7.      Sometime later at "dusk" plaintiff continued her walk intending to go shopping at Foster 's supermarket. (Id., at 37).

8.      Plaintiff walked around some stores including a pharmacy and ultimately purchased some food groceries at Foster's Supermarket.  (Id., at 42).

9.      Plaintiff left the supermarket carrying two plastic bags and her purse.  (Id., at 42-43).

10.     After shopping, plaintiff began walking back towards her condominium on West Bay Road, a well-lit main road. (Id., at 45)

11.     As she continued down West Bay Road, a man in a van stopped alongside of her and yelled "do you want a ride?"  Plaintiff responded, "no, I'm fine." (Id., at 45-46).

12.     The same van approached plaintiff for a second time.  As it slowly passed her location, the driver of the van hung his head outside his window to again ask plaintiff if she wanted a ride, to which plaintiff again declined.  (Id., at 48).

13.     Shortly thereafter, plaintiff spotted what she thought to be the exact same van approaching her for a third time from the opposite lane of traffic.  This made plaintiff nervous, as she continued her walk.  (Id., at 50).  It was about 10:45 p.m. (Id., at 51)

14.     In addition to the three encounters with a man in a van, plaintiff also noticed that a man on a balcony from across the street was watching her as she walked. (Id., at p.52).

15.     Because plaintiff felt unsafe and became increasingly nervous, she intended to walk along the beach to reach her condominium complex, rather than continuing along the road.  At that time plaintiff entered the private property of The Westin Casuarina Resort and Spa. ("The Westin Casuarina"). (Id., at p. 53).

16.     The Westin Casuarina is owned and operated by Galleon Beach Resort, Ltd. ("Galleon Beach").  (Aff. of Robert J. Brown, Exhibit 3 Mitchel Aff., ¶ 4; Exhibit 4 McGovern Aff., ¶ 4; Exhibit 7 Olsen Aff., ¶ 1).

17.     Plaintiff did not walk up to The Westin Casuarina and pass through its lobby to go to the beach.  Instead of walking through the hotel lobby, or alerting anyone of her being nervous about someone following her and pursuing her, she decided to enter a ladies restroom not located in the main building of the hotel, but in another building on the premises. (Genereux depo. at 58-60).

18.     Plaintiff claims that a man entered the restroom shortly after her, she told him to leave, he did, but then he returned immediately and raped her.  (Id. at 68-74).

19.    Plaintiff left the restroom and walked to the main building of The Westin Casuarina to report the crime. (Id., at 74).

20.    Personnel of The Westin Casuarina responded to the plaintiff's request for aid and notified the Royal Cayman Islands Police ("RCIP"). (Aff. of Robert J. Brown, Exhibit 10 Affidavit of Denzil Luke).

21.    The RCIP responded to the call for assistance and took the plaintiff from the scene. (Genereux Depo. p. 87).

22.    The RCIP also investigated plaintiff's criminal Complaint but her assailant was never identified. (Aff. of Robert J. Brown, Exhibit 9 RCIP Letter September 27, 2005).

23.    Plaintiff's friend, whom she visited only hours previously, lives in the condominiums adjacent to The Westin Casuarina. (Genereux Depo., p. 32-35).

24.    Plaintiff did not call upon her friend when she became nervous while walking on West Bay Road. She did not stop to see her friend to seek refuge with him, even though she walked directly past his condominium. (Id., at 51).

**COLUMBIA SUSSEX**

25.    Columbia Sussex does not own, operate, or manage The Westin Casuarina in Grand Cayman, Cayman Islands, B.W.I. (Mitchel Aff. at ¶ 4).

26.    The Westin Casuarina is owned by and operated by Galleon Beach, a Cayman Corporation. (Mitchel Aff. ¶ 4; McGovern Aff. ¶ 4)

27.    Galleon Beach is not a direct or an indirect subsidiary of Columbia Sussex. (Mitchel Aff. at ¶ 7).

28.     Columbia Sussex does not own any stock or membership interest in Galleon Beach. (Mitchel Aff. at ¶ 11).

29.     Columbia Sussex does not provide any facilities maintenance or security services to Galleon Beach nor does it control onsite operations at the Westin Casuarina. (Mitchel Aff. at ¶ 14).

30.     Any and all services performed by Columbia Sussex on behalf of Galleon Beach pursuant to the Service Agreement between the parties are performed in the Commonwealth of Kentucky. (Mitchel Aff. at ¶¶ 17, 21).

31.     Columbia Sussex does not provide direction to The Westin Casuarina on how to perform its on-site daily operations. Columbia Sussex does not evaluate the performance of employees at The Westin Casuarina, all of whom are employees of Galleon Beach. Columbia Sussex did not (and does not) hire or fire Galleon Beach employees, nor has it ever had the authority to do so. (Mitchel Aff. at ¶¶ 18, 27).

32.     Neither in 2002, nor at any time prior or since, has there been any employee at Columbia Sussex to oversee security measures at The Westin Casuarina. Rather, the operator of the property, Galleon Beach, is responsible for its own on-site security operations. (Mitchel Aff. at ¶ 20).

33.     No one at Columbia Sussex was ever advised, nor was anyone at Columbia Sussex ever informed, that the safety and security of guests at The Westin Casuarina were in jeopardy in 2002 or previously, such that the incident alleged by the plaintiff in her Complaint was never reasonably foreseeable to Columbia Sussex. (Mitchel Aff. at ¶ 36).

**STARWOOD AND WESTIN**

34.　Westin License Company issued various contracts over the years to franchisees establishing Westin franchises in various parts of the world.  In 1998, Starwood purchased Westin Hotel Company, which included Westin License Company.  For Westin franchisees that continued to operate under Westin License Company Agreements after this purchase, Starwood effectively carried out Westin License Company's part of The Agreement.  In 2006, Westin License Company's assets (including franchise agreements) were purchased and assumed by Westin Hotel Management, L.P. (hereinafter "Westin"), a limited partnership, of which Starwood is the General Partner. (McGovern Aff. at ¶ 3).

35.　Neither Starwood nor Westin Hotel Management, L.P. own, operate, or manage The Westin Casuarina in Grand Cayman, British West Indies.  (McGovern Aff. at ¶¶ 4, 9).

36.　The Westin Casuarina is a franchise operation owned and operated by Galleon Beach. (McGovern Aff. at ¶¶ 4, 9, 10).

37.　Neither Starwood nor Westin controls the day-to-day security operations at The Westin Casuarina.  Security policies of the resort remain the responsibility of Galleon Beach as franchisee.  (McGovern Aff. at ¶¶ 16, 21).

38.　Starwood did not, and could not, control the operations of franchise hotels, nor has Starwood had any authority to hire or fire employees of franchise operations like The Westin Casuarina.  (McGovern Aff. at ¶ 14, 20).

39.　There is no one at Starwood responsible for designing security policies for Westin Brand as a whole, nor is there any outside company to review security items for

Westin Brand.  (McGovern Aff. at ¶ 18).

**GALLEON BEACH**

40.     Galleon Beach, owner and operator of The Westin Casuarina, is not a party to this civil action (Mitchel Aff. at ¶ 4; see Plaintiff's Second Amended Complaint).

41.     During the time of the plaintiff's alleged incident, Mr. Niels R. Olsen served as Director of Security and Direct of Food and Beverage at The Westin Casuarina on behalf its owner and operator, Galleon Beach.  (Olsen Aff. at ¶ 1).

42.     The Westin Casuarina developed its own Security procedures and standards, independent from any other entity, including Westin and Columbia Sussex. (Olsen Aff. at ¶ 10).

43.     Neil Olsen, as Senior Manager of The Westin Casuarina, created the control systems and security procedures for the Resort.  For instance, he authored the Manual for Hurricane and Severe Storm Procedures, all of which were in use during Hurricane Ivan in 2004.  (Olsen Aff. at ¶ 12, 14).

44.     Managers of The Westin Casuarina performed security measures on a daily basis, including the periodical patrol of the property multiple times per day.  (Olsen Aff. at ¶¶ 15, 16).

45.     The Westin Casuarina did not prepare an Incident Report since a Hotel guest was not involved and the police were conducting their own investigation.  (Olsen Aff. at ¶ 4).

46.     No one from The Westin Casuarina was involved in the alleged assault to the plaintiff.  (Olsen Aff. at ¶ 22).

47.    From September 1997 through May 3, 2002 (the period from when Mr.

Olsen began at the property through the date of plaintiff's alleged incident), not one

complaint had been raised about anyone being attacked by strangers on the property or in

the vicinity of the Resort.  (Olsen Aff. at ¶¶ 17, 22).

*Dated*:  March 11, 2008

*Yours respectfully,*

CORRIGAN JOHNSON & TUTOR
141 Tremont Street
Boston, MA  02111

*By:*

John B. Johnson (BBO#252580)

Robert J. Brown (RB7619)
MENDES & MOUNT, LLP
750 Seventh Avenue
New York, New York 10019
(212) 261-8000

Attorneys for Defendants
Columbia Sussex Corporation
Starwood Hotels & Resorts Worldwide, Inc.
Westin Hotel Management L.P.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------------------

KIMBERLY GENEREUX,

                Plaintiff,

                v.

COLUMBIA SUSSEX CORPORATION, STARWOOD
HOTELS & RESORTS WORLDWIDE, INC., WESTIN
HOTEL MANAGEMENT, L.P.

                Defendants.

------------------------------------------------------------

C.A. NO. 05-CV-10879-JLT

**AFFIDAVIT OF
ROBERT J. BROWN IN
SUPPORT OF THE MOTION
FOR SUMMARY JUDGMENT**

**ROBERT J. BROWN**, being first duly sworn, deposes and says:

1.    I am a member of Mendes & Mount, LLP, attorneys for Defendants Columbia Sussex Corporation ("Columbia Sussex"), Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") and Westin Hotel Management LP. ("Westin"). I have participated in these proceedings throughout and respectfully submit this affidavit in support of Defendants' motion for summary judgment.

## DEFENDANTS' MOTION

2.    Defendants' motion for summary judgment is grounded upon two incontrovertible bases: 1) None of the Defendants is the owner, operator or manager of The Westin Casuarina Resort and Spa in the Cayman Islands where Plaintiff alleges to have been sexually molested; and 2) None of the Defendants can be held liable for the unforeseeable criminal acts of a third-party as Plaintiff alleges occurred in the Cayman Islands.

3.    Plaintiff, Kimberly Genereux, was not a hotel guest of The Westin Casuarina Resort and Spa ("The Westin Casuarina"), which is located in Grand

Cayman, Cayman Islands, British West Indies, where Plaintiff was vacationing. (Deposition of Kimberly Genereux, December 21, 2006, p. 30 (Exhibit "1"), hereinafter "Genereux Depo.")  Unbeknown to anyone at The Westin Casuarina, Ms. Genereux believed she was being stalked and pursued while walking on public streets on the evening of May 3, 2002.  She sought to escape the pursuit of this stranger.  Ms. Genereux entered The Westin Casuarina premises but chose not to inform anyone of her presence or of her fear that she was being followed.  Instead of entering the front door of the Hotel and speaking with anyone in the lobby, she chose to use a restroom located in one of the Resort's nearby buildings.  Ms. Genereux claims that someone entered the restroom immediately after her and raped her.  (Id., at 68-73).

4.    Galleon Beach Resort Ltd. ("Galleon Beach"), a Cayman corporation, is the sole owner and operator of The Westin Casuarina.  Galleon Beach is not a party to this civil action.[1]

5.    Plaintiff's Second Amended Complaint demands damages from the franchisor of The Westin Casuarina, Westin (and its affiliate, or parent company Starwood); and also damages from Columbia Sussex, a Kentucky corporation which performs financial, accounting and recordkeeping services in Kentucky for The Westin Casuarina.  (Second Amended Complaint, ¶ 2 – Exhibit 2).

6.    Plaintiff alleges that Westin, Starwood and Columbia Sussex are each liable for failing to provide adequate security to Plaintiff.  (Id., at ¶ 63).

7.    None of the Defendants control the daily operations of The Westin Casuarina.  In particular, security operations at The Westin Casuarina are distinctly something which are dictated by the owner and operator of that Hotel, Galleon Beach.

---

[1] Plaintiff's Second Amended Complaint deletes Galleon Beach from the caption and Complaint, as Plaintiff never effected service of process upon Galleon Beach, although she had identified and named it as a defendant in her Amended Complaint.  Plaintiff never pursued discovery of the owner and operator of The Westin Casuarina.
Error! Unknown document property name.

8. There is no evidence of the Defendants Starwood, Westin or Columbia Sussex dictating how security on the premises shall be performed. As representatives of each Defendant have attested at the depositions, and reiterate in their Affidavits which are annexed hereto, common sense would dictate that the operator of the Hotel is not only in the best position to determine its own security needs, if any, but also the implementation of such measures. (Affidavit of Theodore Mitchel (Exhibit "3"), at ¶ 32 ("Mitchel Aff."); Affidavit of John McGovern (Exhibit "4"), at ¶ 16 ("McGovern Aff.").

9. Plaintiff did not to pursue discovery of Galleon Beach, the one party in control of the franchise operation in the Cayman Islands, which she had previously named as a defendant. As a result, Plaintiff's so-called "liability expert," Mr. Robert McCrie, (who admits that he has never visited The Cayman Islands), bases his liability opinion upon three incorrect premises: that Columbia Sussex was the Operator of The Westin Casuarina—which it was not; that the franchisor Westin controlled operations at the Hotel—which it did not; and that The Westin Casuarina did not have a security policy in practice in 2002—which it did. (A copy of Mr. McCrie's Report "Concerning Security Practices and Procedures at the Westin Casuarinas Resort, Grand Cayman, The Cayman Islands On or About May 3, 2005" is annexed hereto as Exhibit "5".)

10. From the beginning of this litigation, Defendants Columbia Sussex and Starwood/Westin informed Plaintiff that neither of them owned, operated or controlled The Westin Casuarina and that the Cayman property was owned and operated by Galleon Beach. *See, e.g.*, Defendant Columbia Sussex Answer to Plaintiff's First Set of Interrogatories, November 6, 2006, a copy of which is annexed hereto as Exhibit "6".

11. Annexed to this Affidavit as Exhibit "7" is the Affidavit of Mr. Niels Olsen, the former Director of Security at The Westin Casuarina from 2001 – 2003, and a former employee of Galleon Beach. Mr. Olsen attests to the fact that The Westin Casuarina <u>did</u> have security procedures in place and that what Plaintiff Genereux

alleges as having occurred on May 3, 2002 was simply not foreseeable. She was not a guest of the Hotel when she trespassed onto The Westin Casuarina property to escape the pursuit of a stranger who followed her and raped her.

12.    There is no evidence that the attack upon the Plaintiff was perpetrated by an employee of any of the Defendants.

13.    There is no evidence of any similar attack occurring at the Hotel or in the vicinity having been reported to Defendant Columbia Sussex, Starwood or Westin (or the owner/operator of the Hotel, Galleon Beach, for that matter) at any time prior to Plaintiff's incident.   (Ex. 7, Olsen Aff. at ¶ 17; Ex. 3,  Mitchel Aff. at ¶ 36; Ex. 4, McGovern at ¶ 21).

14.    The law of The Cayman Islands should apply to this case because the alleged negligent conduct and the alleged incident both occurred in the Cayman Islands.  The law of the Cayman Islands would not hold an owner and occupier of premises to be liable for the unforeseeable criminal acts of third-parties perpetrated upon others on the premises.  On behalf of the Defendants, we solicited an opinion on Cayman Law from a Cayman Island law firm, Myers & Alberga.  A copy of that Legal Opinion is annexed hereto as Ex. "8", and copies of all cases cited in the Opinion will be made available to the Court upon request, and have been provided to the Plaintiff in an Appendix.

15.    Not only did Defendants not own, operate or manage The Westin Casuarina, but even if they had, there was no duty to protect Plaintiff from the unforeseeable criminal acts of a third party.  There is no basis to hold Defendants liable for Plaintiff's injuries and claims.

## **PLAINTIFF'S INCIDENT**

16.    Plaintiff's own description of the incident clearly shows why Defendants

are not liable and why the unfortunate incident was not caused by actions or omissions of the Defendants. Plaintiff's Deposition testimony sets forth a narrative of the alleged incident which will be quoted at length for the Court's benefit.

17. Plaintiff Kimberly Genereux was not a guest of The Westin Casuarina Hotel, but was staying at the Plantana Condominiums located on Seven Mile Beach. Ex. "1", Genereux Depo., at 30-31.

18. Ms. Genereux left her condominium at about 5:45 p.m., on Friday, May 3, 2002; she walked along the beach and visited with friends in front of the Villas of The Galleon Condominium "which is actually next door to The Westin." She had walked past The Governor's House, where the Governor of the Cayman Islands resides, past The Westin Casuarina and continued until she was at the Villas of The Galleon. (Id., at 32-35.)

19. Sometime later at "dusk" she continued her walk intending to go shopping at Foster's supermarket. (Id., at 37). She walked on the beach past The Beachcomber Hotel, past The Hyatt Hotel, crossed the main road to West Bay Road toward the shops. (Id., at 38-39). She walked around some stores including a pharmacy and ultimately purchased some food groceries at Foster's Supermarket (Id., at 42). She had two plastic bags in addition to her purse by the time she left Foster's Supermarket. (Id., at 42-43).

20. Ms. Genereux then began to return by walking the distance to her condominium. She went down the sidewalk "past Hagen Daz again and the Chinese Restaurant, went toward – to the sidewalk, crossed the cars . . . walking West toward West Bay Road." (Id., at 43-44). She crossed West Bay Road to be back on the beach side of the street. (Id. at 45). "I walked along the road and I saw a few people on the sidewalk and kept walking." (Id., at p. 45). It was a well lit main road. (Id., at 45).

21. Plaintiff's deposition continues:

Q.    ··· So you continued to walk along, and what happened next as you were walking home?

A.    I - - after I saw a gentlemen waiting in front of a condo complex smoking a cigarette, I walked - - I was approaching the Ritz Carlton construction site, which, at the time, consisted of a chain link fence and mostly a large pit and a few rebars and that sort of thing. **And as I was walking along there, a man in a car stopped his car and yelled "Do you want a ride?" and I said, "No. I'm fine."**

Q.    Was this a man you had ever seen before?

A.    No.

(Id., at 46).

22.    Plaintiff Genereux continued in her testimony:

Q.    ··· You passed the construction site of the Ritz, and as you were passing that and walking on the street, **someone in a van, a man in a van stopped and asked you if you wanted a ride?**

**A.    Yes**

Q.    And your response was "No, I don't need one"?

A.    Yes.

Q.    What happened next?

A.    **I kept walking and not much - - - not that much later, I was still in front of the Ritz construction site, the same van stopped**. So obviously, he had backtracked and came and **slowing down, hanging out the window asking me if I wanted a ride again. And I didn't want to make eye contact. I looked away and said, just said, "I don't want a ride."**

Q.    So you're sure that it was the same van, same man?

A.    Yes.

Q.    When you say "backtracked," what do you mean by that? For instance, the first time that he asked you if you wanted a ride, and you said no, did he then proceed on his way?

A.    I saw him proceed on.

Q.    Ok.    So now you walked a [short] distance and suddenly he was there again; is that right?

A.    Yes.

Q.    Was this man, for instance, did he appear to be a native of the Island?

A.    I don't know if he was a native of the Cayman Islands, but he had some kind of Caribbean accent.

Q.    And was he alone in the van as far as you could tell?

A.    I don't know.

**Q.    Alright, so after you said for the second time, "No, I don't want a ride," did you continue your walk back toward your condominium?**

A.    Yes.

(Id., at 48-49)

23.    She continued:

"Q.    And what happened as you continued your walk back?

**A.    I thought I saw the van that - - I thought I saw the same car coming back again in the other lane. And so that made me nervous.**

Q.    When you said - - was it a car or a van?

A.    **It was a van**.

Q.    Do you remember the color or anything like?

A.    I described it to the police as kind of a goldish color, maybe sort of bronzy or greenish.

Q.    So you thought you saw it coming back from the opposite direction driving towards you - -

A.    Again.

Q.    **- - on this third time, essentially, and when you saw that, what happened to you or what did you do?**

A.    **I just kept walking, hoping that possibly the man was a cab driver. . . . I continued on past the Villas of Galleon. . . . And I walked - - I was walking up along side The Westin.**

(Id., at 49-51).

24.    It was then about 10:45 p.m., or about five hours after she left her condominium to begin her walk on the beach and shopping.  (Id., at 51):

Q.    And what did you do when you got up to the area on West Bay Road to The Westin Casuarnia Hotel?

A.    Well, **I was starting to get nervous** because of **I wasn't feeling safe** as I walked past The Westin. And I decided to make a - - I made a plan that I should walk, you know, maybe I should consider walking, getting to the beach and walking to Plantana [her condominium complex] along the beach instead of the road.

Q.    And you were nervous, obviously because of the van and the man stopping twice, but were you also nervous because you thought you saw the van for a third time? Was that a concern of yours?

A.    No.  I was - - **I was worried because it looked really dark up ahead**, and I knew how dark it was next to the Governor's House. There's a small public beach, and one time I'd walked by there and almost

|   | sprained my angle in a rut.  There's no paving there. |
|---|---|
| Q. | You mean when you are walking in the street or on the sidewalk in that area? |
| A. | Yes, there's no sidewalk right there. |
| Q. | And the lighting there is pretty dim up in that area? |
| A. | **Lack of lighting.  I had also seen a man.**  I was walking by The Westin. **A man was watching me from the balcony across the street on the road smoking a cigarette.  And I just felt, like, nervous because of the cars, stopping twice, the man watching me from the balcony.  I just thought, well, I should walk along the beach.**  So I got up to the end of the property of The Westin thinking I would walk down to beach access road, beach access path. |
| Q. | And is that between The Westin and the Governor's House? |
| A. | Yes, the Governor's House.  And I looked down that path and it was very dark and overgrown.  And I could - - was – it looked like maybe some piece of machinery or something was in the path as well. But there was so many limbs and vines so that it was barely - - there was no light on that path, and the ground was over grown with weeds and grass. So I decided it didn't look like an access path at all, even though it had a little sign that had an arrow.  I just decided it looked scary. |
| Q. | Yep. |
| A. | So I backtracked, turned around, and decided it would be safer to walk up to The Westin Hotel and pass through the lobby of the hotel and go to the beach that way. |

(Id., at 51-53) (*emphasis added*).

25.    However, Ms. Genereux did not walk up to The Westin Casuarina and pass through its lobby to go to the beach.  Instead of walking through the hotel lobby, or alerting anyone of her being nervous about someone following her and pursuing her, she decided to enter a ladies restroom not located in the main building of the Hotel, but in another building on the premises.  (Id., at 58-59).  "Well, basically, I was nervous, and when I get nervous I suddenly have to use the restroom."  (Id., at 60).

|   |   |
|---|---|
| Q. | And so you walked down this walkway from the parking lot, and instead of going left [to the front lobby of the Westin Hotel], which was your original intention, you turned right to go to the bathroom; is that right? |

A.     Yes.

<u>Id</u>., at 61).

26.     According to the Plaintiff "[e]verything seemed normal in the restroom. The light was on.  Then I used the toilet - - I went to a toilet stall."  (<u>Id</u>., at 65).   There was no one else in the restroom.  (<u>Id</u>., at 65).  Then, suddenly, a man entered the restroom:

> A.     I was in the - - I was in the process of using the facility, I was in the - - I was sitting on the commode in the restroom.
> Q.     In one of the stalls?
> A.     In the stall, in the second stall.  **And I heard a noise which sounded like the door opening, and the next thing I heard was footsteps toward where I was sitting and I looked down and I could see the feet of a man and also his forearm, his legs and that he had a clinched fist.**
> Q.     How could you see that?  You saw that through the bottom of the door, of the stall there?
> A.     I saw through the louvers.  The door was a louvered wooden door, and I could see his legs and arm about mid-thigh down and feet.
> Q.     Could you tell if it was a black man or a white man?
> A.     It was a black man. . . .
> Q.     So you saw him come in and you - - what did you do next once he was in there?
> A.     I yelled something at him.
> Q.     What did you yell?
> A.     I said, "Sir, you're in the wrong room.  This is the ladies room."
> Q.     Did he respond?
> A.     Yes.
> Q.     What did he say?
> A.     "Oh, sorry."
> Q.     Okay.  Was the - - were there lights in the bathroom?
> A.     Yes.
> Q.     Was it well lit as far as you were concerned?
> A.     At that time, yes.
> Q.     After he responded and said, "Oh, I'm sorry,"  did he leave?
> A.     Yes.  He walked away, and I heard him - - the door open and shut.

<u>Id</u>., at 68-70).

27.     She continued in her testimony;

A.    **Very quickly, within seconds, split seconds, someone came in.**

Q.    And were you able to, for instance, by looking at his legs or his shoes or whatever, were you able to identify him as the same person who had been in the first time?

A.    I couldn't never be sure.    I could never be totally positive.

Q.    But it was almost - - it was very quickly when the door opened a second time and a man came back in?

A.    Yes.

Q.    And then once he was back in, did he knock the stall door down?

A.    Eventually, yes.  After - -

Q.    After what?  What did he do first before he knocked the stall door down?

A.    Turned off the light.

Q.    **So he came back, or someone came in a second time.  You heard the door open and close.  Did he - - did the person off the light immediately?**

A.    The light was turned off even before the door shut.

Q.    So you were in total darkness then?

A.    Total darkness, yes.

Q.    Did you yell or say anything at that point?

A.    Yes.

Q.    What did you say?

A.    I yelled, "I have a phone.  I'm calling the police."

Q.    Did you have a phone with you?

A.    Yes.

Q.    And had you tried to call the police, or were you just saying that to try to scare him off?

A.    I had the phone in my hand, obviously, trying to scare him off, but also trying to dial 911.

Q.    Were you able to dial 911.

A.    He - - I kept punching it, but nothing would happen. I couldn't get through."

Q.    Alright.  And at some point after the light was turned off and before you could get through, did this man knock the door down, the stall door, or did he do something else first before that happened?

A.    **As soon as - - before I even - - as soon as I said something about the police, the wood in the louver door was flying at my face. ...  After the door was broken down he attacked me.**

.  .  .

Q.    And he forced you to have oral sex and then he raped you; is that right?

A.    Yes.

Q.    And then, did he leave immediately?

A.    Not immediately.  He talked to me.

Q.    What did he say?

A.    He said he didn't mean to hurt me.  He was so high.

> And he said I needed to count to one hundred before
> I left the bathroom.
>
> Q.  And did he, at that point, then leave the ladies - -
>     leave the room?
> A.  Yes.
> Q.  And what did you do next?
> A.  I tried to pull down my skirt and find my bearings where I was in
>     the dark and then find the light. . . . and turn it on".

(Id., at 70-73).

28.    Thereafter, she left the ladies room and walked the short distance down the sidewalk to the entrance to The Westin Casuarina Hotel main building and lobby. (Id., at 74-75).  Ms. Genereux spoke with employees of The Westin Casaurina and requested that the police be contacted.

29.    The police performed an investigation and reportedly made certain arrests only to release the suspects because there were no DNA matches.  (A copy of a letter dated September 27, 2005 from the Royal Cayman Islands Police ("RCIP") outlining their police file is annexed as Exhibit "9").

30.    According to RCIP Detective Sergeant Eustace Joseph's Letter Report:

> She continued walking on the sidewalk, and decided as she
> arrived closer to Governor's Residence to walk through The
> Westin Parking Lot.  Ms. Genereux did so in efforts that the
> driver would not know where she was residing.  She then
> thought it best to remain in the restroom for a while, which
> she did.

(Ex. "9", RCIP letter report September 27, 2005).

31.    Not only did Ms. Genereux fail to inform anyone of her serious concerns for her own safety prior to the incident, she avoided people entirely and instead, wittingly or not, permitted her stranger/pursuer to follow her into a bathroom located in one of the Resort's outer buildings.

32.    Ms. Genereux acknowledges that she did not call upon her friends that she had visited earlier in the evening who live in the condominiums adjacent to The Westin Casuarina when she was walking on West Bay Road and nervous.  She did not

stop to see Mr. Elster who was staying in those condominiums or to seek refuge with his family when she was nervous. (Id. at 51).

33.    Mr. Denzil Luke, a former employee of Galleon Beach, was the Night Auditor working the front desk at The Westin Casuarina on May 3, 2002. He recalls seeing the Plaintiff when she was inside the Hotel after the incident and explaining what happened. Mr. Luke recalls that Ms. Genereux told him that she was going to pass through an "access way to the beach when a man dragged her into the restroom and attacked her." Mr. Luke provides an Affidavit attesting to what he was told by the Plaintiff Ms. Genereux; as well the attention paid to her requests for assistance following the alleged incident. (Affidavit of Mr. Denzil Luke, annexed hereto as Exhibit "10", ("Luke Aff.")).

## Cayman Law Supports Defendants' Motion

34.    The law of The Cayman Islands, where the alleged incident and all alleged negligence occurred, would not recognize a viable claim against the Hotel because the owner and operator of the premises could not control a third party's criminal acts. The Law Firm of Myers & Alberga of the Cayman Islands has provided an Opinion upon Cayman Law on the subject, which is annexed hereto as Exhibit "8."

35.    One of the cases discussed in the Cayman Law Opinion is an Australian Decision which the Plaintiff acknowledges in her own Notice of Foreign Law as one of the leading cases within the British Commonwealth countries, Modbury Triangle Shopping Centre v. Anzil, 205 C.L.R. 204; (2000) 176 A.L.R. 411; HCA.

36.    In the High Court of Australia, which is a Commonwealth country and enjoys similar common law heritage as the United Kingdom, the Modbury Triangle court had to determine whether the defendant was liable to a person attacked at night by three unidentified assailants in an unlit car park in a shopping center owned and operated by the defendant and for whom the plaintiff worked. The court reviewed the

history of the applicable law in the United Kingdom and the United States and elsewhere. The majority of the judges acknowledged that in certain limited and special relationships, a defendant could have a duty of care to protect against damage caused by third parties; but it determined that on the facts of the particular case, there was no liability on the defendant. The defendant did not have control over the third party; the defendant did not assume responsibility for the safety of persons on its property from attack by third parties; and that although the defendant's failure to leave lights on may have facilitated the crime, that failure had not caused the crime. The court went on to determine that the crime was not in the category of high foreseeability and came to the conclusion that the defendant was not liable to the plaintiff for the criminal act of a third party in those circumstances.

37.    The <u>Modbury Triangle</u> case is persuasive authority in the Cayman Islands. As the Opinion of the law firm of Myers & Alberga offers, Cayman Law would find that The Westin Casuarina owed no duty to the Plaintiff not only because the attack was not highly foreseeable, but also because it was the result of a criminal act of an uncontrollable third party.

38.    Under the circumstances presented in the <u>Modbury Triangle</u> case, the defendant owner and operator owed no duty to the plaintiff, and therefore was not held liable. In Ms. Genereux's case, the Defendants had no control over the criminal third-party assailant. Moreover, the Defendants at bar did not own or operate the property or have control over the security of the premises. Therefore, under Cayman Island law Defendants owed no duty to the Plaintiff and cannot be held liable.

## <u>U.S. Law Supports Defendants' Motion</u>

39.    Defendants' Motion is also supported by U.S. Law. This Court is respectfully invited to review the Defendants' Memorandum of Law submitted with this Motion.

## The Franchisor Is Not Responsible for Security Operations of Franchisee

40.    The Plaintiff seeks to hold Starwood and Westin liable because they are the franchisor.  However, Starwood and Westin readily acknowledge that they did not control the franchisee's operation.

41.    Mr. John McGovern has worked within the hotel industry for more than twenty-seven years becoming the Starwood Vice President of Franchise Operations for the Northeast Region from February 2001 – 2006.  Mr. McGovern submits an Affidavit on behalf of Starwood and Westin attesting to the fact that The Westin Casuarina operated under a license and that Starwood and Westin did not control that franchisee.

42.    Starwood has associations with two types of hotels: (1) owned and managed hotels, and (2) franchise hotels.  As the title suggests, Starwood may own and/or manage certain hotels; however, if the association is with a franchise operation, then there is a System License Agreement and the Licensee or franchisee manages and operates the property, not Starwood.  (Ex. "4," McGovern Aff. at 5).

43.    The System License Agreement dated March 20, 1995 grants to the Licensee, Galleon Beach, the rights to use The Westin trademark in conjunction with the Hotel and rights to use The Westin System, which includes reservation systems and marketing promotions.  As for "standards," the License Agreement further sets forth clearly that Galleon Beach

> understands the importance of maintaining first-class hotel standards, and desires to operate and maintain the hotel or resort facility in conformity with the specifications and standards for first-class hotels promulgated by Westin.

(Id., McGovern Aff., Ex. "A" pg. 2 (iv)).

43.    Exhibit 3 to The System License Agreement Addendum notes that the approved Management Company is <u>Galleon Beach</u> (Id., McGovern Aff., Ex. "A" exhibit

3 to Westin System License Agreement Addendum p. 1 [1]).  Neither Starwood nor Westin manages or operates The Westin Casuarina.

44.    The License Agreement also clearly states that the Licensee is the owner and operator of the Hotel, not Westin.  The License Agreement requires that Galleon Beach:

> **shall place interior signs and other statements in places reasonably designated by Westin that identify Licensee as the independent owner and operator of the Hotel**, and that identify WHC as the owner of the Westin Trademarks and that states that such are used by the Licensee under license from the owner.

(Id., Ex. "A" p. 11 [4.2] ((*emphasis added*).

45.    The License Agreement also clearly states that Galleon Beach and Westin are not joint venturers, partners or agents:

> **Licensee is and shall remain an independent contractor. Licensee and Westin are not and shall never be considered joint venturers, partners, employees, mandatory or agents one for the other**.  Neither shall have the power to bind or obligate the other except as otherwise outlined in this Agreement.  No representation shall be made by either party to anyone that would create any apparent agency, employment, mandate, or partnership.  **In all documents and contracts in which licensee to utilizes any of the Westin Trademarks, Licensee shall indicate that it is "independently owned and operated"). Licensee shall prominently indicate** on all letters and business forms on which licensee utilizes any of the Westin Trademarks **that it is a licensee of Westin and that the hotel is independently owned and operated**.  Licensee shall maintain employee records in such manner as to show clearly that licensee and **its employees are not employees of Westin**.

(Id., Ex. "A", p. 20[8.2](*emphasis added*)).

46.    In an effort to provide uniform recommendations as to how the hotels carrying the Westin trade name should look, and be marketed, Westin created and issued various manuals and standards.  Certain manuals were provided to franchisees; many are no longer available since the acquisition of Westin Hotel

Company in 1998 by Starwood. (McGovern Aff. at 11).

47.    In addition to the Westin Brand Standards are Quality Assurance Programs ("QAP"). The Westin Brand Standards in 2002, like the QAP in years prior to 2002, are a proprietary accumulation of "Standards, specifications, and requirements for the hotel to operate a first-class high quality hotel or resort under the Westin System." (License Agreement, p. 2 (iv)). For illustrative purposes, the Tables of Contents for the 2002 Westin Brand Standards and 2001 QAP, both with select pages referring to public restrooms, are attached to the McGovern Affidavit as Exhibit B and C, respectively (Ex. "4").

48.    Franchise operations which did not achieve adequate results on Guest Satisfaction Surveys could be "de-franchised". Nonetheless, Starwood could not, and did not control the operations of franchise hotels, nor did Starwood have any authority to hire or fire employees of a franchise hotel. (Ex. "4", McGovern Aff. at ¶ 14).

49.    Mr. McGovern attests to the fact that the Westin Brand Standards and Quality Assurance Programs do not address the manner in which hotel security is to be performed. The franchised hotels must do whatever they deem necessary in that regard. (Id., McGovern Aff. at ¶¶ 15-16)

50.    There is no one at Starwood responsible for designing security policies for the Westin Brand as a whole quite simply because all properties are not the same. These decisions are left to the Operator of the Hotel; and in this case, that was left to The Westin Casuarina (Galleon Beach) as Licensee and operator. As far as providing "on-property" security each day one must recognize that all locations are unique; it is up to the operator of each premises to address such considerations and concerns. (Id., McGovern Aff., at ¶ 18).

51.    The primary focus as to safety in the bathrooms, for instance, has to do with slips-and-falls, not criminal activity. Defendants did not design the restroom.

Mr. McGovern notes that proper signage should be placed in the restrooms when employees are mopping the floors. (Id., McGovern Aff., ¶ 20)

52.     There was no history of criminal trespass or similar incidents at the Resort or in the vicinity. No one at Starwood/Westin had any reason to anticipate that there would be any danger to guests at The Westin Casuarina in 2002. Nor was there any reason for Starwood/Westin to foresee an incident such as that alleged by the Plaintiff Genereux. (McGovern Aff. at ¶ 21).

53.     Neither Starwood nor Westin bear any responsibility or liability for the claims set forth in Plaintiff's Second Amended Complaint.

## Columbia Sussex is Not Liable For the Alleged Negligence of the Operator of the Hotel

54.     Columbia Sussex does not own, operate or manage The Westin Casuarina. Mr. Theodore Mitchel, the Vice President and Chief Financial Officer of Columbia Sussex, submits an Affidavit in support of Defendants' motion. (Ex. 3, Mitchel Aff.).

55.     As Mr. Mitchel attests, Columbia Sussex is a corporation involved in the hotel, casino and hospitality business. It owns certain properties in the United States; operates and manages certain hotel and casino properties; and, in some instances, it performs administrative services for certain hotel properties, which it neither owns nor operates nor manages. (Id., Mitchel Aff. at ¶ 3).

56.     Mr. Mitchel is also the Chief Financial Officer of Galleon Beach Resort, Ltd., the Cayman corporation which owns and operates The Westin Casuarina. He affirms that the two corporations do not share identities and each remains distinctly its own corporate entity. Galleon Beach is not a direct or an indirect subsidiary of Columbia Sussex; Columbia Sussex does not own any stock or membership interest in Galleon Beach; and, most significantly, Columbia Sussex does not manage, control or

operate The Westin Casuarina. (Id. at ¶¶ 5-7, 11, 16).

57.    Columbia Sussex does not provide any facilities maintenance or security services to Galleon Beach nor does it control on-site operations. (Id., at 17).

58.    There is a relationship and association between Columbia Sussex and Galleon Beach which is outlined in and based upon a Service Agreement dated January 1, 1996, as amended on January 1, 1999, a copy of which is annexed to the Mitchel Affidavit as Exhibit "A."

59.    Under the terms of the Service Agreement, Columbia Sussex, as an independent contractor, has agreed to provide "accounting and business management services" to Galleon Beach.    Columbia Sussex performs certain bookkeeping, group sales, recordkeeping and reporting functions for Galleon Beach pursuant to the Service Agreement.    Columbia Sussex performs its part of the Service Agreement in the State of Kentucky.    There are no other Agreements between Columbia Sussex and Galleon Beach.    (Mitchel Aff. at 22).

60.    In limited circumstances, certain documents relating to Galleon Beach are addressed to the Columbia Sussex location in Kentucky to allow Columbia Sussex to administer the Service Agreement.    (Id., at 26].

61.    Plaintiff has suggested that Columbia Sussex is the operator of The Westin Casuarina because it performs certain services, or includes the Cayman property among several others on a website.    As the Mitchel Affidavit attests, all services performed on behalf of Columbia Sussex are done in Kentucky.    As for the website, it indicates that Columbia Sussex has relationships with a number of hotels without defining those relationships.    As Mr. Mitchel explains in his Affidavit, it is well known within the hotel industry that many hotel properties and franchise operations are independently owned.    On the website there is a reference to The Westin Casuarina with Galleon Beach shown in the spot reserved for "company,"

indicating that Galleon Beach is the owner of that property. The reference to Galleon Beach on the website is the clear indication that The Westin Casuarina is not owned by Columbia Sussex. (Mitchel Aff. at 12).

62.    Columbia Sussex does not evaluate the performance of employees of The Westin Casuarina, all of whom are employees of Galleon Beach. Columbia Sussex did not (and does not) hire or fire Galleon Beach employees, nor has it ever had the authority to do so. (Id., at 18, 27).

63.    Columbia Sussex has a Manager's Manual, which Mr. Mitchel created to simplify and coordinate accounting practices for Columbia Sussex. Since Columbia Sussex is performing accounting services for Galleon Beach, he gave a copy of the Manager's Manual to Galleon Beach to follow. The Manager's Manual addresses accounting matters only; nothing in the Manager's Manual addresses property security measures or recommendations. (Id., at 27, 28).

64.    Columbia Sussex has its own Safety and Loss Prevention Manual which is a good source of safety suggestions. Mr. Mitchel approved much of The Safety and Loss Prevention Manual and was aware of its use as a general source of reference; and he recommended that it be used at Galleon Beach. (Mitchel Aff. at 30).

65.    The Safety and Loss Prevention Manual provides suggestions and recommendations. It does not mandate action, with the possible exception that incident reports should be made and quarterly inspection safety checklists performed. These last two items are things which have much to do with insurance issues and reporting and would fall within the services performed under the Service Agreement. (Id., at 31).

66.    When the Columbia Sussex Manager's Manual or the Columbia Sussex Safety And Loss Prevention Manual was given to Galleon Beach by Mr. Mitchel, he did so in his capacity as Treasurer/Secretary of Galleon Beach at that time, and they were

given to the General Manager of The Westin Casuarina as guidance. (Id., at 33).

67.    Mr. Mitchel attests to the fact that Columbia Sussex was not aware of any incident involving Ms. Kimberly Genereux at The Westin Casuarina prior to its receiving a copy of the Summons and Complaint nearly three years after the incident. After receiving the Plaintiff's Summons and Complaint at Columbia Sussex in 2005, inquiries were made as to why no incident report had been generated and he was informed that The Westin Casuarina considered it to have been a police matter involving a criminal trespass and a stranger who was not a guest of the Hotel. He was informed that Galleon Beach had not considered it necessary to create an incident report, and none was created or forwarded to Columbia Sussex. (Id., at 34).

68.    A written statement from Mr. Denzil Luke, a Galleon Beach employee in 2002 who spoke with the Plaintiff shortly after the incident occurred, was obtained in 2005 by Galleon Beach and forwarded to Columbia Sussex in response to Mr. Mitchel's inquiry about the incident. That 2005 statement (Mitchel Aff., Exhibit "D") and a 2005 police letter from the Royal Cayman Island Police (RCIP) (Mitchel Aff., Exhibit "E") in response to an inquiry in 2005, represent all Columbia Sussex was informed about the incident. (Mitchel Aff. at 35). Those documents and information were solicited after the Summons and Complaint had been delivered to Columbia Sussex; and those documents were long ago shared with Plaintiff's counsel.

69.    Contrary to the suggestions put forth by Plaintiff's so-called liability expert, Robert McCrie, it is the General Manager on site at the property day in and day out who has the ultimate responsibility for how the hotel is operated. For The Westin Casuarina in 2002 that individual was Mr. Daniel Szydlowski, the General Manager of The Westin Casuarina, and an employee of Galleon Beach (Mitchel Aff. at 19). Neither in 2002, nor at any time prior or since, has there been any one at Columbia Sussex to oversee security measures at The Westin Casuarina. Columbia Sussex does not have

such control. The operator of the property, Galleon Beach, is responsible for its own on-site security operations. (Mitchel Aff. at 20).

70.    As Mr. Mitchel attests, The Cayman Islands are a very safe resort destination. No one at Columbia Sussex was ever advised, nor was anyone at Columbia Sussex ever informed, that the safety and security of guests at The Westin Casuarina were in jeopardy in 2002 or previously, such that the incident alleged by the Plaintiff in her Complaint was never reasonably foreseeable to Columbia Sussex. (Mitchel Aff. at 36).

71.    Columbia Sussex does not bear any responsibility or liability for the claims set forth in Plaintiff's Second Amended Complaint.

## Not Even Galleon Beach, as Owner and Operator of the Hotel, Would be Liable

72.    The fact that Galleon Beach is the owner and operator of The Westin Casuarina was made known to Plaintiff throughout this litigation.  In fact, the Plaintiff originally named Galleon Beach as a Defendant.    Columbia Sussex and Starwood/Westin have always advised the Plaintiff that neither of them owned, operated or managed The Westin Casuarina at any time; and further that neither Starwood/Westin nor Columbia Sussex controlled or dictated the security operations of The Westin Casuarina.  The Plaintiff did not pursue discovery of Galleon Beach; did not serve Galleon Beach with the Summons and Complaint; and Galleon Beach has been deleted from the caption and Second Amended Complaint.

73.    Plaintiff cannot establish that Columbia Sussex and/or Starwood/Westin controlled the security operations at The Westin Casuarina, or that they should have controlled or supervised those operations.  The fact is that Galleon Beach created its own security procedures and controlled its own security.  Mr. Niels Olsen submits an Affidavit in support of Defendants' motion. (Exh. 7, Affidavit of Niels R. Olsen, ("Olsen Aff."). In 2002, Mr. Olsen was the Director of Security at The Westin Casuarina. Mr.

Olsen reported directly to the General Manager of The Westin Casuarina, Mr. Daniel Szydlowski, another Galleon Beach employee. (Olsen Aff. at 9).

74.    Mr. Olsen was familiar with the various Brand Standards provided to the Hotel by the franchisor, Westin Company; nonetheless, Galleon Beach operated under its own best practices. (Olsen Aff. at 10).

75.    Mr. Olsen also lived across the street from The Westin Casuarina throughout that period. He developed a very close relationship with the Royal Cayman Island Police ("RCIP") and became a member of the Cayman Islands Veterans Association. Mr. Olsen attests that he was also very familiar with the Island, the neighborhood and the fact that there was an extremely low crime rate on Grand Cayman. (Olsen Aff. at 8). Mr. Olsen is the individual who is intimately aware of the security operations which were in place at The Westin Casuarina. (Olsen Aff. at 10).

76.    In 2002, when Ms. Genereux alleges to have been involved in an incident at the Hotel, there were security measures in place and exercised by The Westin Casuarina.

77.    Mr. Olsen attests to the fact that there were no locks on the bathroom doors, just as there were no locks on the doors into the Resort in either the front or back of the buildings. (As with nearly everything asserted in the Plaintiff's Report of Robert McCrie dated February 29, 2008, there is no support for Mr. McCrie's statement that there were locks on the bathroom doors). It was not deemed necessary to have locks on the bathroom doors as there was no anticipation of crime in the area. In the period of time that Mr. Olsen worked at The Westin Casuarina not one complaint had been raised about any one being attacked on the property or in the vicinity of the Resort; and The Westin Casuarina had no reason to anticipate any harm would come to anyone in the bathrooms. (Olsen Aff. at 16-17).

78.    There is no similarity between the Reynolds case referred to by Plaintiff's

"liability expert,'" Mr. McCrie, and what Ms. Genereux is claiming. (Id., at 18). In the first instance, there was no rape involved in Reynolds. It was a case of two young girls asking a room service waiter for alcohol; that waiter improperly providing the alcohol; and another seventeen year old male guest and the waiter accepting the young girls' invitation to their rooms while their mothers were not at the Hotel. (Id.). That case did not involve strangers and trespassers on the property as does the Genereux Complaint.

79.     Galleon Beach had a very good relationship with the Royal Cayman Island Police (RCIP) and a community police officer was available daily to appear on the Hotel premises. The Westin Casuarina is located next to the Governor's House, which is routinely patrolled by the RCIP and has RCIP on premises 24 hours. Since the Governor's complex is adjacent to the Westin, their outside perimeter patrol includes the wall around the compound and includes a wall from the beach through Westin's right of way, the path that the Plaintiff, as she stated in her deposition, intended to take. (Olsen Aff. at 18-19).

80.     Although Mr. Olsen was off Island during the weekend of May 3, 2002, he spoke to people upon his return and learned about the incident. He and all others at the Hotel deemed it to be an unfortunate incident involving a trespasser perpetrating a heinous crime against a stranger who was neither a guest of the Hotel nor its facilities; and that it was a police matter. No incident report was created by the Hotel. (Olsen Aff. at 4).

81.     No one from The Westin Casuarina was involved in the assault; nor in anyway could The Westin Casuarina have reasonably anticipated such a criminal attack where there had never before been such an attack or claim; and there was no indication of any such crime in the area.

82.     As there was no way for The Westin Casuarina to have reasonably

anticipated such an alleged attack, there clearly was no greater responsibility upon Columbia Sussex, Starwood or Westin, none of which were managing, supervising or controlling the security operations of The Westin Casuarina.

### Plaintiff's So-Called Liability Expert Report Should Be Rejected As An Unsupportable Attempt To Admit Irrelevant Hearsay Into Evidence

83.     Plaintiff has no admissible evidence to support the allegations in her Complaint. The owner and operator of The Westin Casuarina is not a party defendant in this case. In its absence, Plaintiff now argues that the franchisor Westin (and its affiliate, or parent company, Starwood) is responsible (and liable) for the security operations of its franchise; and also that Columbia Sussex, which performs a Service Agreement in Kentucky for Gallon Beach, should be liable as if it were the operator of the Cayman Island property.

84.     Defendants have participated in full discovery and produced to the Plaintiff all manner of documents which may (or may not) have been given to The Westin Casuarina. Representatives of Defendants have appeared at depositions and explained (or reiterated) their respective non-ownership and non-operator status and roles.

85.     Unable to support her allegations against Defendants, Plaintiff has retained a purported "liability expert" to render an "opinion" asserting that corporate distinctions and contracts should be abandoned; and that Defendants should be found liable for not performing what they have always said they did not perform (i.e., security); or that they should be held to be insurers of the safety of the Plaintiff regardless of the facts and circumstances and absence of a relationship between the Plaintiff and any Defendant.

86.     Incredibly, Plaintiff's so-called expert does not support his opinion with relevant, applicable, admissible evidence. Mr. McCrie never visited The Westin

Casuarina or even the Cayman Islands (Ex. "5", p.7).  He never interviewed anyone from Galleon Beach.  One source quoted by Mr. McCrie calls the Cayman Islands "one of the safest places to live in the world." (Id., p. 4).

87.    Mr. McCrie makes several unsupported and completely presumptuous statements.  For instance, his inability to locate Cayman Island crime statistics for the years 2001 and 2002 leads him to the "reasonable conclusion" that the situation "had turned severely worse in the Cayman Islands..." (Id., at 18).  He attempts to support that conclusion by identifying the 109% jump in criminal cases heard by the Cayman Islands courts from 2000 to 2002. (Id., at 18).  However, Mr. McCrie does not identify the types of cases (e.g., petty crime, theft, sexual, etc.) that purportedly increased.

88.    Mr. McCrie even contradicts himself within his Report. He points to an increased police presence to prove his assumptions that crime has drastically increased, while at the same time, noting: "Normally, police might increase with the growth in population." (Id., p.19).  Mr. McCrie, in the very same report, conceded to a rapid population growth of the Cayman Islands, (Id., p.7); however, he then equates a greater police presence to significantly greater amount of crime.

89.    In a seemingly desperate attempt to find evidence of increased crime on the Islands, Mr. McCrie points to internet Blogs and irrelevant news headlines from 2004 (two full years after the Plaintiff's incident).   (Id., p.20).   His 2003 U.S. Department of State advisory warning even states that "Violent crime is rare in the Cayman Islands, but petty thefts occur." It goes on to address the reported presence of date-rape drugs and incidents, wholly inapposite to the violent situation alleged in Plaintiff's Complaint.

90.    Mr. McCrie's "Settled Matters and Findings" is beyond credibility.  He attempts to make a significant point in identifying the lack of detail spent on safety and security measures within the Westin License Agreement, and notes that Starwood

and Westin appeared to maintain significant control over minute details, mostly concerning aesthetic and quality aspects of the Hotel. There is no dispute that Starwood and Westin did <u>not</u> control the security operations of The Westin Casuarina. Security operations of a franchisee hotel are NOT the duty of the franchisor. It is the operator of the Hotel, the franchisee, that has the responsibility for its own security.

91.    Mr. McCrie suggests that The Westin Casuarina was aware of one prior incident of alleged improper sexual contact at the Hotel. As Mr. Olsen attests in his Affidavit, that alleged incident occurred five years prior to the Plaintiff's alleged rape and the facts of the prior incident are wholly inapposite. (<u>See</u> e.g., Olsen Aff. at 18).

92.    Mr. McCrie's small legal analysis of franchisor liability on page 36 of his Report serves to support Defendants' legal arguments. First, the article referenced by Mr. McCrie notes that a duty of an innkeeper will only arise to exercise reasonable care for its guests if the Hotel experiences an increase in crime in the surrounding neighborhood. Mr. McCrie has failed to make such a finding. In fact, all the statistics identified in his Report cover the three islands of the Cayman Island community as a whole (none address the neighborhood at issue with specificity). Moreover, the article reinforces the standard that an innkeeper is only liable for *reasonably foreseeable* injuries that might occur as a result of its conduct.

93.    When statistics and statements support a case for a safe Island culture, Mr. McCrie unilaterally discredits the data or statements. Instead he would have this Court adopt his own unreliable beliefs which are based upon United States crime statistics, an anonymous blogger and flippant comments regarding Defendants' recommendations and/or Brand standards as to how a first class hotel should be run.

94.    Plaintiff's failure to show the necessary elements essential to her case against the Defendants is not rectified by the submission of a Report from a purported "Liability Expert." Mr. McCrie's Report is not supported by reliable and admissible

evidence or relevant and reputable data and source material.  It should be rejected as an unqualified attempt to admit irrelevant hearsay into evidence.

95.    Plaintiff is unable to support her allegations of liability on the part of the Defendants with any admissible evidence.  The Defendants have no relationship with the Plaintiff; they owed her no duty on May 3, 2002; and there can be no possible liability on their part for the claims set forth in Plaintiff's Second Amended Complaint.

## CONCLUSION

For all of these reasons, Defendants Columbia Sussex, Starwood and Westin respectfully request that their Motion for Summary Judgment be granted in all respects and that the Plaintiff's Second Amended Complaint be dismissed with prejudice.

Respectfully,

ROBERT J. BROWN, ESQ.

Sworn to before me this 10th
day of March 2008

NOTARY PUBLIC

ANGEL . VALDERRAMA, JR.
Notary Public, State of New York
No. 01VA6116706
Qualified in Richmond County
Certificate Filed in New York County
Commission Expires October 4, 20

1

1    VOLUME:    I

2    PAGES:    1 - 124

3    EXHIBITS: 1 to 7

4        UNITED STATE DISTRICT COURT

5        DISTRICT OF MASSACHUSETTS

6        Civil Action No. 05-CV-10879-JLT

7    ----------------------------------------

8    KIMBERLY GENEREUX,                    )

9            Plaintiff              )

10   v.                                  )

11   COLUMBIA SUSSEX CORPORATION, Et al,   )

12           Defendants              )

13   ----------------------------------------

14

15        DEPOSITION OF KIMBERLY GENEREUX

16            December 21, 2006

17           11:07 a.m. to 2:43 p.m.

18           Corrigan Johnson & Tutor

19            141 Tremont Street

20           Boston, Massachusetts

21

22            *********

23

24        Reporter:  Amie D. Rumbo

Kimberly Genereux

5

1      Q.   I'll try to do it my best.  My name's John

2   Johnson.  I don't have problems with Johnson.  It's

3   easy to pronounce.  I represent the defendant in

4   this case.  And I'm going to ask you some questions

5   about this lawsuit, about the incident involved in

6   this lawsuit.  If I ask you any question that you

7   don't understand, let me know, and I'll try to make

8   the question clearer.  And if I ask you any question

9   to which you don't know the answer to, just tell us

10  that.  You don't have to guess.  Just tell us you

11  don't know and that's perfectly satisfactory answer.

12  And finally, if you're going to answer yes or no to

13  a question, it's best to say yes or no so that the

14  reporter can take that down, because they can't take

15  down a nod of the head?  All right?

16     A.   I understand.

17     Q.   Was your full name, please?

18     A.   My full name is Kimberly Ann Genereux.

19     Q.   And where do you presently live?

20     A.   I live at 63 Main Street, Unit Number 2,

21  Rockport, Massachusetts.

22     Q.   How long have you lived at that address?

23     A.   I've lived at that address since

24  approximately June 24th of this year.

Kimberly Genereux

30

1   do.  Okay?

2       A.  Okay.  Thanks.

3       Q.  I want to talk about the assault down in the

4   Cayman Islands.  Had you ever been to the Cayman

5   Islands before May of 2002?

6       A.  Yes.

7       Q.  How often had you been there?

8       A.  I'd been there five or six times.  I can't

9   remember now.

10      Q.  Did you find it to be a good vacation spot?

11      A.  Yes.

12      Q.  And when you went there the five or six

13  times, did you generally go alone, or did you go

14  with other people?

15      A.  About half and half.

16      Q.  And was there a particular place where you

17  would stay when you went there?

18      A.  I most liked to stay at Plantana

19  Condominiums.

20      Q.  Was that where you were staying in May of

21  2002?

22      A.  Yes.

23      Q.  And for that particular trip in May of 2002,

24  were you alone?

Kimberly Genereux

31

1      A.   Yes.

2      Q.   Where was Plantana Condominiums located?

3  Was it right on the beach, for instance?

4      A.   Yes.

5      Q.   And the beach we're talking about is

6  Seven --

7      A.   Seven Mile Beach.

8      Q.   Seven Mile Beach, okay.  Now, you had been

9  out to buy some groceries that night; is that right?

10     A.   Yes.

11     Q.   About what time did you leave your

12 condominium to go out to buy the groceries?

13     A.   I did -- My initial purpose for leaving was

14 not for the groceries.

15     Q.   Okay.  What did you go out for?

16     A.   I initially went out to take -- to take a

17 walk and, maybe, visit a friend at another

18 condominium.

19     Q.   Okay.  About what time did you go out?

20     A.   About 5:45.

21     Q.   Let me -- How long had you been on Grand

22 Cayman before the time of this assault?  For how

23 many days, for instance?

24     A.   About one week.

Kimberly Genereux

32

1    Q.  You had been there for about a week.  And

2  how long were you expecting to stay?

3    A.  I -- As of Friday, I had planned to stay

4  until, I believe, Monday.

5    Q.  Now, you say as of Friday, was that because

6  the attack was on a Friday?

7    A.  I say that because on Friday -- My plan was

8  to leave Saturday, but on Friday, I changed my plan

9  to Monday so that I could go bird watching on

10  Sunday.

11    Q.  So you were going to fly back then on

12  Monday?

13    A.  Yes.

14    Q.  What day of the week did the attack take

15  place on?

16    A.  On Friday.

17    Q.  And that was May 2nd, I believe, or was it

18  May 3rd?

19    A.  May 3rd.

20    Q.  May 3rd, 2002.  So you left your condominium

21  at about 5:45, and where did you go when you left

22  the condominium?

23    A.  I walked down the beach, actually toward the

24  Westin Hotel, past the Westin.

Kimberly Genereux

33

1     Q.   And you were walking on the beach?

2     A.   Yes, along the beach.  And I saw my friends,

3   who often were spending time at the beach in front

4   of the Villas of the Galleon Condominium, which is

5   actually next door to the Westin, and talked to them

6   for a while.

7     Q.   Who were your friends who were down there?

8     A.   My friend was Kenneth Elster.  He was a new

9   acquaintance.  I met him and his family when I was

10  visiting down there.

11    Q.   Okay.  Did they live down there, or were

12  they just visiting also?

13    A.   He was just visiting.

14    Q.   But he had family members who did live

15  there?

16    A.   Yes.

17    Q.   Had you met him during this particular trip

18  that you were on?

19    A.   Yes.

20    Q.   And who was he with when you went, took your

21  walk to go down and see him?

22    A.   I believe he was with his grandparents, but

23  they were farther away from us when we were talking.

24    Q.   So you actually met Mr. Elster on the beach

Kimberly Genereux

34

1    while you were taking a walk?

2        A.   Yes.

3        Q.   Was anyone else with him when you met him?

4        A.   No.

5        Q.   I just have -- I'm not sure if this will

6    help us or not, but I just printed this off of the

7    computer just trying to see if we could get an idea

8    of where you were walking that day.  Why don't go

9    off the record for a moment.

10           (Discussion was held off record.)

11       Q.   Ms. Genereux, I have in front of you a map

12   that I've printed off a computer that shows the

13   general area that we're talking about on Seven Mile

14   Beach.  And for instance, it shows the location of

15   the Westin Casuarina Resort, it shows the location

16   of the Villas of Galleon, and it shows the location

17   of the Government House.  Now, you said you were

18   staying at -- What was the name of the place you

19   were staying at?

20       A.   Plantana Condominium.

21       Q.   And that is not located on this map, and, in

22   fact, as you look at the map, it would be to the

23   left of the Government House; is that right, as I'm

24   looking at the map?

Kimberly Genereux

35

1    A.  To your left.

2    Q.  To my left.  Okay.  So for instance, that

3  night when you left your condominium, you would have

4  walked on the beach past the Government House, past

5  the Westin, and come down to the Villas of the

6  Galleon; is that right?

7    A.  Yes.

8        MR. ITZKOWITZ:  Can I just make a

9  comment, John, to make the record clear.

10        MR. JOHNSON:  Sure.

11        MR. ITZKOWITZ:  I think to your left, in

12  this case, would probably be north of the Government

13  House.

14        MR. JOHNSON:  Yeah, I'm wondering.

15    Q.  Do you know if it would be north or south of

16  the government house?  If you don't, just tell us

17  that.

18    A.  Yes.

19    Q.  It would be north?

20    A.  That would be north.

21    Q.  So your the condominium location where you

22  were staying would have been north of the Government

23  House and north of the Westin Casualina?

24    A.  Yes.

Kimberly Genereux

37

1    lives regularly?

2        A.  Los Angeles.

3        Q.  That's all you know?

4        A.  That's all.

5        Q.  So this particular night, Friday night, he

6    chose not to go shopping with you, because he was

7    going to attend a dinner with his family; is that

8    right?

9        A.  Yes.

10       Q.  So at some point you left him to go on and

11   to go to Fosters; is that right?

12       A.  I continued walking up the beach.

13       Q.  About how long -- Strike that question.  How

14   what time was it when you left Mr. Elster to

15   continue your walk on the beach, if you can give us

16   a time?

17       A.  I really don't recall.

18       Q.  Was it still light out, was it, at that

19   time?

20       A.  It was dusk.

21       Q.  So you continued then to walk on the beach

22   and about how far did you go on the beach after you

23   left Mr. Elster?

24       A.  I'm not sure of the mileage, but --

Kimberly Genereux

38

1    Q.  Any of the landmarks you can tell us about

2  that you would have pasted after you left

3  Mr. Elster?

4    A.  I just went up maybe past the Beachcomber

5  Hotel.

6    Q.  That's not shown on our map, but I'm sure we

7  can try to find that if we extend our map at some

8  point.  So you went past the Beachcomber continuing

9  to walk on the beach?

10    A.  Yes.

11    Q.  And after you got past the Beachcomber --

12    A.  Yes.  Past the Hyatt, I believe, and kept on

13  until I got to a hotel that had -- I mean a

14  condominium that had an access way, I believe, you

15  know, an easy way to cut across to the main road

16  again.

17    Q.  Do you remember which hotel that was?

18    A.  No, I don't remember to name of that.

19    Q.  And the main road you were going to walk

20  across would have been Bay Road?

21    A.  West Bay Road.

22    Q.  So you went past the Hyatt, you came to this

23  next hotel that had an access over to the main road,

24  and you took that, and you got out to West Bay Road;

Kimberly Genereux

39

1    is that correct?

2        A.  Yes.

3        Q.  And where was Fosters, the store that you

4    were going to do some grocery shopping at?

5        A.  Fosters is -- the location of Fosters is a

6    shopping plaza called The Strand.

7        Q.  Once you walked through the access road out

8    to West Bay Road, was Fosters close to that point,

9    or did you then have to walk along West Bay for a

10   distance?

11       A.  I walked along West Bay for a distance.  I

12   think I had gone past Fosters, so I had to start

13   walking north again.

14       Q.  So now you're walking on West Bay Road north

15   back in the direction of the condominium where you

16   were staying?

17       A.  Yes.

18       Q.  And you came to Fosters, and you did your

19   shopping; is that right?

20       A.  I crossed the street.

21       Q.  Okay.

22       A.  At the entrance to The Strand.

23       Q.  All right.

24       A.  Or near Burger King, near somewhere in

Kimberly Genereux

42

1      A.   No prescribed medication, no.

2      Q.   And they said you could purchase them where?

3      A.   I could purchase them when I bought

4  groceries next door.

5      Q.   At Fosters?

6      A.   So they were apparently connected.

7      Q.   And then did you go into Fosters?

8      A.   And then I went to the supermarket.

9      Q.   And what did you purchase at the

10 supermarket?

11     A.   I purchased a number of things.

12     Q.   Primarily food supplies?

13     A.   Primarily food.

14     Q.   Okay.  And when you left there, how many

15 bags were you carrying?

16     A.   I had two -- They gave me two -- one bag,

17 but I asked to put them in two to distribute the

18 weight.

19     Q.   Would these be plastic bags?

20     A.   Plastic bags.

21     Q.   So then you would have been carrying one in

22 each hand as you left to walk back to your

23 condominium?

24     A.   I was for a time, and then I put both of

Kimberly Genereux

43

1    them in my left hand.  I also had a purse.

2        Q.  What was the weather like that day?

3        A.  Clear.

4        Q.  And in terms of temperature, do you know

5    what the temperature would have been?

6        A.  In the 80s.

7        Q.  And so you were carrying the bags and your

8    purse, and you started -- Was it your intention when

9    you left Fosters to walk directly back to your

10   condominium?

11       A.  Yes.

12       Q.  And now we've talked about you did have to

13   cross West Bay Road to get to Fosters; is that

14   right?

15       A.  Yes.

16       Q.  So that was on the side of the street away

17   from the beach?

18       A.  Yes.

19       Q.  As you left Fosters, tell us about the path

20   you were going or you did take towards your home?

21       A.  I went down the sidewalk past Häagen Daz

22   again and the Chinese restaurant, went toward -- to

23   the sidewalk, crossed the cars --

24       Q.  Let me -- When you went -- was that walking

Kimberly Genereux

44

1    north when you went past Häagen Daz, or was that

2    south so that you crossed the street?

3        A.   Well, at that point, I was walking west

4    towards West Bay Road.

5        Q.   Okay.

6        A.   To get back to West Bay Road.

7        Q.   You mean when you came out of the shopping

8    center, you were walking west to get to West Bay

9    Road?

10       A.   Right.

11       Q.   Once you were on West Bay Road before you

12   crossed the street, did you walk north or south?

13       A.   Then I walked north.

14       Q.   Toward your condominium?

15       A.   Yes.

16       Q.   And where was it that you crossed the

17   street?

18       A.   It was very soon after, within about a block

19   from the entrance to the mall.

20       Q.   For instance, was it a designated crosswalk,

21   or did you just cross whenever the traffic allowed

22   you to?

23       A.   At that time, there were no crosswalks on

24   West Bay Road, unfortunately.

Kimberly Genereux

45

1    Q.  So you just had to cross when the

2  opportunity presented itself?

3    A.  Unfortunately, yes.

4    Q.  So once you were able, you crossed the

5  street so you were back on the beach side of the

6  street; is that right?

7    A.  Yes.

8    Q.  And then you started walking north again

9  toward your condominium?

10    A.  Yes.

11    Q.  And what happened as you continued the walk

12  along?

13    A.  I walked along the road, and I saw a few

14  people on the sidewalk and kept walking.

15    Q.  Is the street in that area lit?  Are there

16  street lights?

17    A.  Oh yes.

18    Q.  Would you consider it to be a well-lit area?

19    A.  It's a main road in Cayman Islands, yes.

20    Q.  Since I've never been there, I'm not sure if

21  that means yes or no, but yes it's well lit?

22    A.  Yes.  I walked by a lady waiting for a bus.

23    Q.  Okay.  Great.  So you continued to walk

24  along, and what happened next as you were walking

Kimberly Genereux

46

1  home?

2      A.  I -- After I saw a gentleman waiting in

3  front of a condo complex smoking a cigarette, I

4  walked -- I was approaching the Ritz Carlton

5  construction site, which, at the time, consisted of

6  a chain-link fence and mostly a large pit and a few

7  rebars and that sort of thing.  And as I was walking

8  along there, a man in a car stopped his car and

9  yelled "Do you want a ride?"  And I said, "No.  I'm

10  fine."

11      Q.  Was this a man you had ever seen before?

12      A.  No.

13      Q.  You mentioned a little bit, before we go on

14  from there, you mentioned a little bit earlier that

15  you passed someone smoking a cigarette out in front

16  of a condominium complex?

17      A.  Yes.

18      Q.  Did you have any conversation with that man?

19      A.  No.

20      Q.  That was just someone you noticed then; is

21  that right?

22      A.  Yes.  I mentioned him because I later

23  identified him with the police.

24      Q.  What do you mean you identified him with the

Kimberly Genereux

48

1      A.   Yes.

2      Q.   Did he have some sort of albi or excuse or

3   an explanation as to where he was during the

4   remaining part of the evening?

5      A.   I don't know.

6      Q.   You didn't participate in the conversation?

7      A.   No.  The initial one, but no additional one.

8      Q.   Okay.  Let's go back.  You passed the

9   construction site for the Ritz, and as you were

10  passing that and walking on the street, someone in a

11  van, a man in a van stopped and asked you if you

12  wanted a ride?

13     A.   Yes.

14     Q.   And your response was "No, I don't need

15  one"?

16     A.   Yes.

17     Q.   What happened next?

18     A.   I kept walking and not much -- not that much

19  later, I was still in front of the Ritz construction

20  site, the same van stopped.  So obviously, he had

21  backtracked and came and slowing down, hanging out

22  the window asking me if I wanted a ride again.  And

23  I didn't want to make eye contact.  I looked away

24  and said, just said, "I don't want a ride."

Kimberly Genereux

49

1    Q.  So you're sure it was the same van, same

2  man?

3    A.  Yes.

4    Q.  When you say "backtracked," what do you mean

5  by that?  For instance, the first time that he asked

6  you if you wanted a ride, and you said no, did he

7  then precede on his way?

8    A.  I saw him precede on.

9    Q.  Okay.  So now you walked a sort distance and

10  suddenly he was there again; is that right?

11    A.  Yes.

12    Q.  Was this man, for instance, did he appear to

13  be a native of the island?

14    A.  I don't know if he was a native of the

15  Cayman Islands, but he had some kind of Caribbean

16  accent.

17    Q.  And was he alone in the van as far as you

18  could tell?

19    A.  I don't know.

20    Q.  All right.  So after you said for the second

21  time, "No, I don't want a ride," did you continue

22  your walk back towards your condominium?

23    A.  Yes.

24    Q.  And what happened as you continued your walk

Kimberly Genereux

50

1    back?

2        A.   I thought I saw the van that -- I thought I

3    saw the same car coming back again in the other

4    lane.   And so that made me nervous.

5        Q.   When you said -- Was it a car or a van?

6        A.   It was a van.

7        Q.   Do you remember the color or anything like

8    that?

9        A.   I described it to the police as kind of a

10   goldish color, maybe sort of bronzy or greenish.

11       Q.   So you thought you saw it coming back from

12   the opposite direction driving towards you --

13       A.   Again.

14       Q.   -- on this third time, essentially, and when

15   you saw that, what happened to you or what did you

16   do?

17       A.   I just kept walking, hoping that possibly

18   the man was a cab driver.

19       Q.   Okay.   Did you talk to him again?   Did you

20   have any contact with him?

21       A.   No, not that I know of.

22       Q.   Right.   At some point, did you leave the

23   main road, the street?

24       A.   I continued on past the Villas of the

Kimberly Genereux

50

1    back?

2        A.  I thought I saw the van that -- I thought I

3    saw the same car coming back again in the other

4    lane.  And so that made me nervous.

5        Q.  When you said -- Was it a car or a van?

6        A.  It was a van.

7        Q.  Do you remember the color or anything like

8    that?

9        A.  I described it to the police as kind of a

10   goldish color, maybe sort of bronzy or greenish.

11       Q.  So you thought you saw it coming back from

12   the opposite direction driving towards you --

13       A.  Again.

14       Q.  -- on this third time, essentially, and when

15   you saw that, what happened to you or what did you

16   do?

17       A.  I just kept walking, hoping that possibly

18   the man was a cab driver.

19       Q.  Okay.  Did you talk to him again?  Did you

20   have any contact with him?

21       A.  No, not that I know of.

22       Q.  Right.  At some point, did you leave the

23   main road, the street?

24       A.  I continued on past the Villas of the

Kimberly Genereux

51

1    Galleon.

2        Q.   Okay.   Which is on our map here.

3        A.   Right.   And I walked -- I was walking up

4    along side the Westin.

5        Q.   Let me ask you, when you passed the Villas

6    of Galleon, did you stop in to see Mr. Elster again?

7        A.   No.

8        Q.   So you walked past there, and now you

9    continued --

10       A.   I considered it, but I decided it was too

11   late.

12       Q.   About what time was it at this point; do you

13   know?

14       A.   About 10:45.

15       Q.   So this was about five hours then after you

16   originally left your condominium to start your walk

17   on the beach?

18       A.   Yes.

19       Q.   So now you continued your walk, and I think

20   you said you got up to the Westin; is that right?

21       A.   Yes.

22       Q.   And what did you do when you got up to the

23   area on West Bay Road to the Westin Casualina Hotel?

24       A.   Well, I was starting to get nervous because

Kimberly Genereux

52

1    of I wasn't feeling safe as I walked past the

2    Westin.  And I decided to make a -- I made a plan

3    that I should walk, you know, maybe I should

4    consider walking, getting to the beach and walking

5    to Plantana along the beach instead of the road.

6        Q.  And you were nervous, obviously because of

7    the van and the man stopping twice, but were you

8    also nervous because you thought you saw the van for

9    a third time?  Was that a concern of yours?

10       A.  No.  I was -- I was worried because it

11   looked really dark up ahead, and I knew how dark it

12   was next to the Governor's House.  There's a small

13   public beach, and one time I'd walked by there and

14   almost sprained my ankle in a rut.  There's no

15   paving there.

16       Q.  You mean when you're walking in the street

17   or on the sidewalk in that area?

18       A.  Yes, there's no sidewalk right there.

19       Q.  And the lighting there is pretty dim up in

20   that area?

21       A.  Lack of lighting.  I also had seen a man.  I

22   was walking by the Westin.  A man was watching me

23   from a balcony across the street on the road smoking

24   a cigarette.  And I just felt, like, nervous because

Kimberly Genereux

52

1   of I wasn't feeling safe as I walked past the

2   Westin.  And I decided to make a -- I made a plan

3   that I should walk, you know, maybe I should

4   consider walking, getting to the beach and walking

5   to Plantana along the beach instead of the road.

6       Q.  And you were nervous, obviously because of

7   the van and the man stopping twice, but were you

8   also nervous because you thought you saw the van for

9   a third time?  Was that a concern of yours?

10      A.  No.  I was -- I was worried because it

11  looked really dark up ahead, and I knew how dark it

12  was next to the Governor's House.  There's a small

13  public beach, and one time I'd walked by there and

14  almost sprained my ankle in a rut.  There's no

15  paving there.

16      Q.  You mean when you're walking in the street

17  or on the sidewalk in that area?

18      A.  Yes, there's no sidewalk right there.

19      Q.  And the lighting there is pretty dim up in

20  that area?

21      A.  Lack of lighting.  I also had seen a man.  I

22  was walking by the Westin.  A man was watching me

23  from a balcony across the street on the road smoking

24  a cigarette.  And I just felt, like, nervous because

Kimberly Genereux

53

1    of the cars, stopping twice, the man watching me

2    from the balcony. I just thought, well, I should

3    walk along the beach. So I got up to the end of the

4    property of the Westin thinking I would walk down to

5    beach access road, beach access path.

6         Q. And is that between the Westin and the

7    Governor's House?

8         A. Yes, the Governor's House. And I looked

9    down that path, and it was very dark and overgrown.

10   And I could -- was -- it looked like maybe some

11   piece of machinery or something was in the path as

12   well. But there was so many limbs and vines so that

13   it was barely -- there was no light on that path,

14   and the ground was overgrown with weeds and grass.

15   So I decided it didn't look like an access path at

16   all, even though it had a little sign that had an

17   arrow. I just decided it looked scary.

18        Q. Yep.

19        A. So I backtracked, turned around, and decided

20   it would be safer to walk up to the Westin Hotel and

21   pass through the lobby of the hotel and go to the

22   beach that way.

23        Q. Are there lights along the beach?

24        A. The beach is well lit. The Governor's -- in

Kimberly Genereux

58

1    there?

2        A.  As you can see this, I was going to walk

3    along the sidewalk up to the front door of the

4    Westin.

5        Q.  So you didn't --

6        A.  I didn't want to cut through the parking lot

7    because there were a lot of cars in the parking lot.

8        Q.  Your intention was to walk down this walkway

9    that's in the very center of Exhibit 2?

10       A.  Yes.

11       Q.  And turn left and walk across to the front

12   entrance of the Westin Hotel; is that correct?

13       A.  Yes.

14       Q.  Okay.  Great.  Now let's see if we -- Let me

15   ask you this.  Did you do that?  Did you walk along

16   the walkway and then get to the front entrance of

17   the hotel?

18       A.  No.  I got to this point.

19       Q.  All right.  And that's right at the end of

20   that walkway that we're talking about?

21       A.  Yes.  And as I walked up here and started

22   to -- as I walked up here and thought I was going to

23   go going through the hotel.  First, thought I would

24   use the restroom, which was through this -- I knew

Kimberly Genereux

59

1    there was a restroom.  I had used it that afternoon

2    visiting the spa.  The spa was the building that you

3    mentioned was right next to the path, next to the

4    access path.

5        Q.  All right.

6        A.  I knew that was the spa.  I had visited

7    there that afternoon.

8        Q.  Is that this building over here?

9        A.  Yes.

10       Q.  So that's the building on the lower --

11       A.  The spa complex.

12       Q.  But that's in the lower right-hand corner of

13   what's going to be marked Exhibit Number 1?

14       A.  Yes.

15       Q.  You had been there that afternoon?

16       A.  Yes, I had.

17       Q.  Did you receive some sort of treatment

18   there?

19       A.  I discussed the treatment was I was

20   interested in.  And before I left, I asked to use

21   the restroom, and they said, I couldn't use their

22   restroom.  I would have to use the public restroom,

23   and they directed me to where that was.  And that

24   was the restroom I was headed to at that night.  I

Kimberly Genereux

60

1    knew I had just used it.  I knew it was a public

2    restroom.  So I went to it, because I hadn't used

3    the restroom in a number of hours, and I -- well,

4    basically, I was nervous, and when I get nervous, I

5    suddenly have to use the restroom.

6        Q.  So your reason for going to the restroom was

7    because you had to use the facility?

8        A.  Yeah.  Suddenly had an urgent need to use

9    the facility.

10       Q.  What I'm going to do is I'm going stop for a

11   moment.  I'm going to xerox these two photographs

12   and then we can mark those as Exhibits 1 and 2

13   before we get too far.  And, in fact, let's mark as

14   Exhibit 3, the map, the makeshift map that we've

15   looked at here.

16                    (Recess taken.)

17           (Exhibit 1 marked for identification.)

18           (Exhibit 2 marked for identification.)

19           (Exhibit 3 marked for identification.)

20       Q.  All right.  Let's get back to you were

21   telling us that you needed to use the restroom

22   because you had been out for a long time, you were

23   nervous, so you decided to use the restroom that you

24   knew about near the spa at the Westin; is that

Kimberly Genereux

61

1    right?

2        A.  I needed to use the restroom because I had

3    an urgent need to use the bathroom.

4        Q.  And because of the location where you were,

5    you decided to use the bathroom where you were

6    familiar with from earlier in the afternoon; is that

7    right?

8        A.  Yes.

9        Q.  And you told us it was located close to or

10   inside this building with a blue awning, which,

11   again, is in about the center of what's now been

12   marked as Exhibit 2; is that right?

13       A.  Yes.

14       Q.  And so you walked down this walkway from the

15   parking lot, and instead of going left, which was

16   your original intention, you turned right to go to

17   the bathroom; is that right?

18       A.  Yes.

19       Q.  What course did you take once you turned

20   right to go to the lady's room?

21       A.  I walked past the door of the spa, which is

22   a glass door just underneath this walkway, and

23   followed the route that leads toward the bathroom.

24   The route that the spa people had described to me.

Kimberly Genereux

65

1    Q.  What happened next, once you went through

2  there and headed for the restroom?

3    A.  I went down the corridor and went into the

4  restroom.  Everyone -- everything seemed normal in

5  the restroom.  The light was on.  Then I used the

6  toilet -- I went to a toilet stall.

7    Q.  Was there anyone else in the restroom when

8  you entered?

9    A.  No.

10    Q.  Let me show you two other photographs and

11  ask you if you recognize the areas shown in those

12  photographs?  For instance, do either of those show

13  the entrance to the ladies room that you used that

14  night?

15    A.  Westin -- This one and this one both show

16  the entrance to the ladies room.

17    Q.  So you're looking at photographs marked

18  Westin 2 and Westin 3.  They're smaller photographs

19  than the one's we've been looking at?

20    A.  Yeah.  It doesn't say eight.

21    Q.  Eight.  Maybe that's seven and eight.

22    A.  Two and eight.

23    Q.  It looks like two and eight.  There are two

24  pictures on the same page and they're marked Westin

Kimberly Genereux

68

1    door shown straight ahead here in Westin 5?

2        A.  Yes.

3        Q.  Okay.  Great.  So then these, as I'm looking

4    at this, it looks like, if, in fact, this is the

5    ladies room and if, in fact, this is the men's room,

6    they're recessed back a bit from this wall that

7    leads down this corridor; is that right?

8        A.  Yes.

9            (Exhibit 6 marked for identification.)

10            (Exhibit 7 marked for identification.)

11        Q.  All right.  Let's see now.  So you went into

12    the bathroom that we've -- through the entrance that

13    we've seen on these photographs, and you used the

14    facilities.  You used the toilet.  What happened

15    next when you were in there?

16        A.  I was in the -- I was in the process of

17    using the facility, I was in the -- I was sitting on

18    the commode in the restroom.

19        Q.  In one of the stalls?

20        A.  In the stall, in the second stall.  And I

21    heard a noise which sounded like the door opening,

22    and the next thing I heard was footsteps toward

23    where I was sitting and I looked down and I could

24    see the feet of a man and also his forearm, his legs

Kimberly Genereux

68

1  door shown straight ahead here in Westin 5?

2      A.  Yes.

3      Q.  Okay.  Great.  So then these, as I'm looking

4  at this, it looks like, if, in fact, this is the

5  ladies room and if, in fact, this is the men's room,

6  they're recessed back a bit from this wall that

7  leads down this corridor; is that right?

8      A.  Yes.

9          (Exhibit 6 marked for identification.)

10         (Exhibit 7 marked for identification.)

11     Q.  All right.  Let's see now.  So you went into

12  the bathroom that we've -- through the entrance that

13  we've seen on these photographs, and you used the

14  facilities.  You used the toilet.  What happened

15  next when you were in there?

16     A.  I was in the -- I was in the process of

17  using the facility, I was in the -- I was sitting on

18  the commode in the restroom.

19     Q.  In one of the stalls?

20     A.  In the stall, in the second stall.  And I

21  heard a noise which sounded like the door opening,

22  and the next thing I heard was footsteps toward

23  where I was sitting and I looked down and I could

24  see the feet of a man and also his forearm, his legs

Kimberly Genereux

69

1    and that he had a clinched fist.

2         Q.  How could you see that?  You saw that

3    through the bottom of the door, of the stall there?

4         A.  I saw it through the louvers.  The door was

5    a louvered wooden door, and I could see his legs and

6    arm about mid thigh down and feet.

7         Q.  Could you tell if it was a black man or a

8    white man?

9         A.  It was a black man.

10        Q.  How many stalls were there in the ladies

11   room?  You said, for instance, I think you said you

12   were using the second stalls?

13        A.  Two stalls and a handicapped stall, which

14   was a large, big stall.

15        Q.   Right so that a wheelchair could get

16   through.  At any time while you were in there before

17   this man entered, was there anyone else in that

18   restroom?

19        A.  No.

20        Q.  So you saw him come in, and you -- what did

21   you do next once he was in there?

22        A.  I yelled something at him.

23        Q.  What did you yell?

24        A.  I said, "Sir, you're in the wrong room.

Kimberly Genereux

70

1    This is the ladies room."

2        Q.  Did he respond?

3        A.  Yes.

4        Q.  What did he say?

5        A.  "Oh, sorry."

6        Q.  Okay.  Was the -- Were there lights in the

7    bathroom?

8        A.  Yes.

9        Q.  Was it well lit as far as you were

10   concerned?

11       A.  At that time, yes.

12       Q.  After he responded and said, "Oh, I'm

13   sorry," did he leave?

14       A.  Yes.  He walked away, and I heard him -- the

15   door open and shut.

16       Q.  And at some point he came back in the then,

17   or at some point someone came back in then?

18       A.  Very quickly, within seconds, split seconds,

19   someone came in.

20       Q.  And were you able to, for instance, by

21   looking at his legs or his shoes or whatever, were

22   you able to identify it as the same person who had

23   been in the first time?

24       A.  I couldn't never be sure.  I could never be

Kimberly Genereux

71

1    totally positive.

2        Q.  But it was almost -- It was very quickly

3    when the door opened a second time and a man came

4    back in?

5        A.  Yes.

6        Q.  And then once he was back in, did he knock

7    the stall door down?

8        A.  Eventually, yes.  After --

9        Q.  After what?  What did he do first before he

10   knocked the stall door down?

11       A.  Turned off the light.

12       Q.  So he came back, or someone came in a second

13   time.  You heard the door open and close.  Did he --

14   did the person off the light immediately?

15       A.  The light was turned off even before the

16   door shut.

17       Q.  So you were in total darkness then?

18       A.  Total darkness, yes.

19       Q.  Did you yell or say anything at that point?

20       A.  Yes.

21       Q.  What did you say?

22       A.  I yelled "I have a phone.  I'm calling the

23   police."

24       Q.  Did you have a phone with you?

Kimberly Genereux

71

1    totally positive.

2        Q.  But it was almost -- It was very quickly

3    when the door opened a second time and a man came

4    back in?

5        A.  Yes.

6        Q.  And then once he was back in, did he knock

7    the stall door down?

8        A.  Eventually, yes.  After --

9        Q.  After what?  What did he do first before he

10   knocked the stall door down?

11       A.  Turned off the light.

12       Q.  So he came back, or someone came in a second

13   time.  You heard the door open and close.  Did he --

14   did the person off the light immediately?

15       A.  The light was turned off even before the

16   door shut.

17       Q.  So you were in total darkness then?

18       A.  Total darkness, yes.

19       Q.  Did you yell or say anything at that point?

20       A.  Yes.

21       Q.  What did you say?

22       A.  I yelled "I have a phone.  I'm calling the

23   police."

24       Q.  Did you have a phone with you?

Kimberly Genereux

72

1    A.  Yes.

2    Q.  And had you tried to call the police, or

3    were you just saying that to try to scare him off?

4    A.  I had the phone in my hand, obviously,

5    trying to scare him off, but also trying to dial

6    911.

7    Q.  Were you able to dial 911?

8    A.  He -- I kept punching it, but nothing would

9    happen.  I couldn't get through.

10    Q.  All right.  And at some point after the

11    light was turned off and before you could get

12    through, did this man knock the door down, the stall

13    door, or did he do something else first before that

14    happened?

15    A.  As soon as -- Before I even -- As soon as I

16    said something about the police, the wood in the

17    louver door was flying at my face.

18    Q.  Could you see the man at all even in the

19    darkness?

20    A.  Could not.

21    Q.  And at that point he attacked you; is that

22    right?

23    A.  After the door was broken down, he attacked

24    me.

Kimberly Genereux

73

1     Q.   And he forced you to have oral sex and then

2    he raped you; is that right?

3     A.   Yes.

4     Q.   And then did he leave immediately?

5     A.   Not immediately.  He talked to me.

6     Q.   What did he say?

7     A.   He said he didn't mean to hurt me.  He was

8    so high.  And he said I needed to count to a hundred

9    before I left the bathroom.

10    Q.   And did he, at that point, then leave the

11   ladies -- leave the room?

12    A.   Yes.

13    Q.   And what did you do next?

14    A.   I tried to pull down my skirt and find my

15   bearings where I was in the dark and then find the

16   light.

17    Q.   Had he --

18    A.   And turn it on.

19    Q.   What were your wearing?  What had you been

20   wearing?

21    A.   I had a black top, a black skirt, black

22   undergarment, black shoes.

23    Q.   So did he take your clothes off, or did he,

24   he just went about this with your clothes on?

Kimberly Genereux

74

1    A.   He pulled my skirt up so that it was around
2  my waist, and he used a knife and cut my underwear.
3  I felt the knife blade against my hips, my right
4  hip, I remember it, and he cut it upwards with an
5  upward cutting motion.

6    Q.   Did he threaten you with a knife, also?

7    A.   He said he was going to kill me, and he said
8  he was going to cut my face up.  And the knife blade
9  was on my throat and very hard against my throat at
10 one point.

11   Q.   Were you cut at all?

12   A.   I had a large welt on my throat, and I was
13 cut.  I had a cut on my vagina.

14   Q.   Once he left the room, once he left the
15 lady's room, you said you pulled down your skirt and
16 where did -- Did you call anyone then, or did you
17 just leave the ladies room?

18   A.   I left the ladies room.

19   Q.   And where did you go?

20   A.   I walked directly to the hotel lobby, the
21 Westin Hotel lobby.

22   Q.   And to get to the lobby, did you retrace
23 your steps out to the parking lot that we were
24 looking at in those photographs, or did you go

Kimberly Genereux

75

1    through the building?

2        A.    I did not walk on the pavement.    I walked

3    down the sidewalk to the hotel.

4        Q.    And into the front entrance?

5        A.    Yes.

6        Q.    Or once you got into the front entrance --

7    Strike that.    Did you talk to anyone or tell anyone

8    about what had happened to you before you got to the

9    front entrance?

10        A.    No.

11        Q.    You went into the front entrance, what

12    happened to you next?

13        A.    I went into the front entrance, and I looked

14    to the desk, but no one was there.

15        Q.    This is the front desk?

16        A.    The front desk.    I looked -- there was a

17    large party going on, and I saw a bride in a bridal

18    gown of some kind, and I saw, suddenly, I saw a

19    doorman, a boy in a sort of a doorman's outfit, and

20    I asked him if someone was at the front desk.    And

21    he said, "No, you'll have to talk to the bartender."

22    And just adjacent to the front desk, I saw the

23    bartender.    There were a lot of people crowded

24    around because of the wedding party, and I saw her,

Kimberly Genereux

87

1    when you brought the police in there.

2        A.  Yes.

3        Q.  You talked earlier about going out with the

4    police and riding around the area.  For instance,

5    you mentioned a man who had been smoking a

6    cigarette, and you came upon him over in The Strand

7    parking lot.  I think the police officer talked to

8    him.  Was that on the night, the same night, or did

9    that happened the next day?

10       A.  That happened some days later.

11       Q.  So let's not jump ahead to that.  Let's stay

12   on the night in question.  After you brought the

13   police officer to the ladies room, did he do

14   anything else for you there, or were you transported

15   to the hospital?

16       A.  We went -- I think we went back into the

17   hotel, and he asked me more questions.

18       Q.  About the incident itself, about the attack?

19       A.  Yes, about the attack.

20       Q.  Did you, at any time that night before you

21   left the hotel -- I take it when you left the hotel,

22   you did go to the hospital; is that right?

23       A.  Yes.

24       Q.  At any time before you left the hotel that

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10879-JLT

KIMBERLY GENEREUX,  )
    Plaintiff  )
      )
      )
    v.  )  **SECOND AMENDED COMPLAINT**
      )  **AND JURY TRIAL DEMAND**
COLUMBIA SUSSEX CORPORATION,  )
STARWOOD HOTELS & RESORTS  )
WORLDWIDE, INC., and  )
WESTIN HOTEL MANAGEMENT, L.P.,  )
    Defendants  )

## PARTIES

1.   The plaintiff, Kimberly Genereux, is an individual residing in and a citizen of Cambridge, Middlesex County, Commonwealth of Massachusetts.

2.   The defendant, Columbia Sussex Corporation, is a corporation, duly organized under the laws of the Commonwealth of Kentucky, having a principal place of business at 207 Grandview Drive, Fort Mitchell, Commonwealth of Kentucky, and has been authorized, at all times material, to do business in the Commonwealth of Massachusetts.

3.   The defendant, Starwood Hotels & Resorts Worldwide, Inc., is a corporation, duly organized under the laws of the State of Maryland, having a principal place of business at 1111 Westchester Avenue, White Plains, State of New York, and has been authorized, at all times material, to do business in the Commonwealth of Massachusetts.

4.   The defendant, Westin Hotel Management, L.P., is a

limited partnership of which defendant, Starwood Hotels & Resorts Worldwide, Inc. is the general partner; is duly organized under the laws of the State of Delaware, having a principal place of business at 1111 Westchester Avenue, White Plains, State of New York; and acquired and assumed the assets of former defendants, Westin License Company, Westin License Company North, Westin Management Company North, Inc., Westin Management Company East, and Westin North America Management Company, Inc., subject to any present or future liabilities, by a series of Purchase and Sale Agreements and Bill(s) of Sale, Assignment(s) and Assumption Agreement(s), all dated January 12, 2006.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332, as all parties are diverse and the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of costs and interest.

6.    Venue is proper in this District, pursuant to 28 U.S.C. §1391(a), because the defendants are subject to personal jurisdiction and a substantial part of the events giving rise to this claim occurred within this District.

## FACTS COMMON TO ALL COUNTS

7.    At all times material, the defendants were engaged in the business of, and in the case of defendant, Westin Hotel Management, L.P. is the successor in interest to entities which

were engaged in the business of owning, controlling, operating, managing, supervising, licensing, and/or franchising hotels and hotel chains throughout the United States and in certain foreign countries, including without limitation those hotels known and doing business as "Westin Hotels & Resorts" (hereafter "Westin").

8.   At all times material, the defendants and/or their predecessors in interest owned, controlled, operated, managed, supervised, licensed and/or franchised approximately twenty (20) Westin hotels within the Commonwealth of Massachusetts.

9.   At all times material, the defendants and/or their predecessors in interest designed, created, adopted, implemented, supervised, and/or enforced policies, practices and procedures to ensure a uniform standard of high quality and service in the operation of all Westin hotels with which the defendants and/or their predecessors in interest were affiliated, wherever such hotels were located.

10.   At all times material, the defendants and/or their predecessors in interest owned, controlled, operated, managed, supervised, licensed and/or franchised a Westin hotel which was known as the Westin Casuarina Hotel (hereafter "the Premises"), which was located in George Town, Grand Cayman, Cayman Islands, British West Indies; which territory is an overseas dependency of the United Kingdom of Great Britain and Northern Ireland.

11.   At all times material, the defendants and/or their

3

predecessors in interest advertised the Premises in publications and electronic media intended to solicit citizens of the Commonwealth of Massachusetts to visit the Cayman Islands, in general, and to visit the Premises, in particular.

12. The plaintiff responded positively to such solicitations, visiting the Cayman Islands more than six times since the year 2000, and frequently visiting and utilizing the amenities of the Premises, including, without limitation, patronizing the restaurants, cafes, bars, shops, restrooms, ballroom, lounging, spa, and beach facilities of the Premises.

13. The plaintiff had visited the Premises on several occasions during her visits to the Cayman Islands for the purposes, *inter alia*, of shopping, touring, lounging, bathing, dining, and using the lavatory facilities of the Premises, which were held open for the use of the general public, including both persons who were registered as guests of the Premises and persons who were not registered as guests of the Premises.

14. On or about May 3, 2002, the plaintiff was lawfully present at the Premises as a guest of the defendants and/or their predecessors in interest.

15. At approximately 11:00 p.m. on or about May 3, 2002, after touring and shopping along Seven Mile Beach in George Town, Grand Cayman, Cayman Islands, British West Indies, the plaintiff was walking along West Bay Road, when she stopped to use the

4

public lavatory facilities of the Premises.

16.  At said time and place, public lavatory facilities were located, *inter alia*, in the building of the Premises which housed the Hibiscus Spa facility (hereafter the "spa building").

17.  At said time and place, the women's public restroom in the spa building was located at the end of a long corridor, adjacent to which was a men's public restroom and a locked door which led to an electrical equipment room or room which housed other equipment used to operate the Premises.

18.  There were no locks on the outer door of the women's public restroom in the spa building at said time.

19.  There were no cameras, security lights, security mirrors, security officers, or other equipment or personnel to safeguard the safety and security of guests and other persons lawfully using the women's public restroom in the spa building at said time and place.

20.  The corridor leading to the women's public restroom in the spa building was illuminated at said time and place.

21.  The women's public restroom in the spa building was illuminated at said time and place, was tidy and clean, and had a vase of flowers on the counter top of the washing facilities.

22.  The plaintiff entered one of the stalls of the women's public restroom in the spa building and locked the stall door.

23.  Shortly after the plaintiff had seated herself on the

commode, a person entered the women's public restroom in the spa building.

24.  Through the louvered doors of the stall, the plaintiff was able to discern the outline of a man's body and shoes.

25.  The man walked into the women's public restroom in the spa building and approached the stall in which the plaintiff was seated.

26.  The plaintiff asked the man to leave, stating that he had entered a women's restroom.

27.  The man apologized and walked away from the stall and out the restroom door.

28.  The plaintiff reached into a bag which she had carried with her, to locate her cell phone.

29.  As she looked for her cell phone, the restroom door opened again and the restroom lights suddenly were extinguished.

30.  The plaintiff was terrified, screamed for the person to leave the restroom, and "threatened" that she had a cell phone and that she was dialing the telephone number to obtain emergency assistance.

31.  Suddenly, the louver doors of the restroom stall were shattered by the force of a person violently breaking the doors in the direction of the plaintiff's face.

32.  As the plaintiff tried to protect her face from the flying pieces of broken wood, a man opened the stall door lock,

6

and grabbed the plaintiff by the throat and chest.

33. In an effort to dissuade her assailant, the plaintiff told the assailant that she had telephoned "911", although she had been unable successfully to complete her call before the assailant grabbed her throat and chest.

34. The assailant twisted the plaintiff's face away from him, put a knife to her throat, and threatened to kill her if she screamed.

35. The plaintiff told the assailant to take her money and her possessions but pleaded with him not to hurt her.

36. The assailant refused her property and instead lifted the plaintiff's skirt, ripped off the plaintiff's underwear, and orally raped her by forcing her to perform oral sex upon him.

37. The plaintiff begged the assailant not to penetrate her vaginally but he insisted and threatened to kill her if she screamed.

38. The plaintiff begged the assailant to wear a condom so that she would not catch AIDS and die, but he refused.

39. The assailant violently, forcefully and against her will vaginally penetrated and raped the plaintiff.

40. All during the assault and rape, the plaintiff was terrified and feared for her life.

41. After the assailant ejaculated, the plaintiff promised not to tell anyone what had happened in order to try to convince

7

the assailant not to stab and kill her.

42. The assailant told the plaintiff to count to 100 before leaving the restroom stall, and the assailant then proceeded to leave the women's public restroom of the spa building.

43. The plaintiff exited the restroom stall, turned on the lights in the women's public restroom in the spa building, picked up her underwear and her possessions, observed herself in the mirror and noted that she had blood on her neck, and waited until she thought that it was safe to leave the restroom.

44. The plaintiff exited from the women's public restroom in the spa building and walked into the main building of the Premises to obtain help.

45. The plaintiff could not locate any attendant or employee of the defendants at the front desk of the Premises, and walked into the bar area of the Premises, where she had observed guests.

46. The plaintiff called out loud for help, stating that she had just been raped.

47. People stared at her but did not render assistance.

48. The plaintiff approached a female bartender that the plaintiff believed to be an employee of the Premises, and asked her to call the police, stating that the plaintiff had just been raped at knife point in the women's public restroom in the Premises.

49. The bartender responded that she would have to call the manager of the Premises, and proceeded to do so.

50. After calling the manager, the bartender continued to serve beverages to guests but did not offer any assistance to the injured and upset plaintiff.

51. After some period of time, a person who identified himself as the manager of the Premises responded, apologized for having been detained, and inquired as to what had happened.

52. The plaintiff asked the manager of the Premises to call the police because she had just been raped at knife point in the women's public restroom of the spa building.

53. The manager refused to call the police unless and until the plaintiff escorted him back to the women's public restroom of the spa building to show him the scene of the crime.

54. Although the plaintiff continued to ask the manager to telephone police and medical assistance, he continued to refuse; so the plaintiff returned to the women's public restroom of the spa building with the manager of the Premises.

55. Upon entering the women's public restroom of the spa building, the Premises manager pointed to the plaintiff's possessions in the restroom, confirmed that they belonged to the plaintiff, and asked the plaintiff if she was "sure" that she had been raped.

56. The plaintiff pointed to the broken restroom stall door

9

and insisted that she had been raped at knife point.

57.    Only then, did the manager of the Premises escort the plaintiff back into the main building of the Premises to wait while he called the Royal Cayman Island Police ("RCIP").

58.    The manager of the Premises had the plaintiff wait in a room off the main lobby of the Premises until the RCIP arrived; during which time employees of the Premises failed to offer her any assistance.

59.    After the RCIP arrived, the plaintiff was questioned about the rape, forced to return to the women's public restroom of the spa building to recount the rape again, and finally was driven to the George Town Hospital to receive medical care.

60.    The plaintiff suffered severe and permanent physical and emotional injuries, required hospital, medical, and psychotherapeutic care and treatment, and will require additional medical and psychotherapeutic care and treatment in the future; incurred the reasonable and necessary costs of such care and treatment; suffered lost earnings and lost earning capacity; suffered loss of the pleasures and enjoyments of life; and sustained other and further injuries.

## COUNT I:  NEGLIGENCE

61.    The plaintiff adopts, repeats, realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though they were fully set forth herein.

62. All of the defendants owed a duty to the plaintiff to exercise reasonable care in the operation of their hotel in order to safeguard the person and property of the plaintiff while she was lawfully on the Premises which they owned, controlled, operated, managed, supervised, licensed and/or franchised.

63. All of the defendants breached the duty of care which they owed to the plaintiff by their negligent security practices, which included, *inter alia*:

a.   failing to design and construct the women's public restroom in the spa building in accordance with the principles and practices of crime prevention through environmental design and/or similar principles and practices to ensure adequate security arrangements for the protection of guests;

b.   failing to utilize proper working locks and security devices on the women's public restroom in the spa building;

c.   failing to monitor through proper security equipment and personnel conditions on the Premises to ensure adequate security arrangements for the protection of guests;

d.   failing to monitor through proper security equipment and personnel persons who entered the Premises;

e.   failing to monitor through proper security equipment and personnel persons who entered the facilities of the women's public restroom in the spa building;

f.   failing to respond timely, adequately, and courteously

11

to the plaintiff's requests for assistance, and particularly to
her requests that Premises' employees promptly obtain police and
medical assistance for her;

     g.   failing to hire and employ properly trained and
supervised personnel to design, implement and execute adequate
security practices for the protection of persons and property
lawfully present upon the Premises;

     h.   failing to properly train and supervise personnel to
design, implement and execute adequate security practices for the
protection of persons and property lawfully present upon the
Premises;

     i.   failing to hire and employ properly trained and
supervised personnel to courteously respond to reasonable
requests for assistance by persons lawfully present upon the
Premises;

     j.   failing to properly train and supervise personnel to
courteously respond to reasonable requests for assistance by
persons lawfully present upon the Premises; and

     k.   in other divers manners.

     64.  As a direct and proximate result of the defendants'
negligence, the plaintiff suffered the damages aforesaid.

### RELIEF SOUGHT

     WHEREFORE, the plaintiff respectfully demands judgment
against the defendants, jointly and severally, in the amount of

Five Million ($5,000,000.00) Dollars, plus costs, interest, and such other and further relief as this Court deems equitable and just.

### JURY TRIAL DEMAND

THE PLAINTIFF RESPECTFULLY DEMANDS A TRIAL BY JURY ON ALL COUNTS OF HER COMPLAINT.

Respectfully submitted,
The Plaintiff,
By her Attorney,

**Mark F. Itzkowitz**

Digitally signed by Mark F. Itzkowitz
DN: CN = Mark F. Itzkowitz, C = US, O = Mark F. Itzkowitz, Esquire
Date: 2008.02.13 16:02:48 -05'00'

MARK F. ITZKOWITZ (BBO #248130)
85 Devonshire Street
Suite 1000
Boston, MA    02109-3504
(617) 227-1848
February 13, 2008

### CERTIFICATE OF SERVICE

I, Mark F. Itzkowitz, counsel for the plaintiff, hereby certify that on this date, I made service of the within document by serving it electronically to registered ECF participants and/or by mailing/faxing/hand-delivering a copy of same to non-registered ECF participants as indicated on the Notice of Electronic Filing ("NEF"), upon the following counsel of record:

John B. Johnson, Esquire          Robert J. Brown, Esquire
Corrigan, Johnson & Tutor, P.A.   Mendes & Mount, LLP
141 Tremont Street                750 7th Avenue
Boston, MA 02111; and             New York, NY   10019-6829.

                                  /s/ Mark F. Itzkowitz
                                  MARK F. ITZKOWITZ (BBO #248130)

Dated:  February 13, 2008

13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------

KIMBERLY GENEREUX,

C.A. NO. 05-CV-10879-JLT

Plaintiff,

v.

**AFFIDAVIT OF
THEODORE MITCHEL**

COLUMBIA SUSSEX CORPORATION, STARWOOD
HOTELS & RESORTS WORLDWIDE, INC., WESTIN
HOTEL MANAGEMENT, L.P.

Defendants.

---------------------------------------------------------------

Mr. Theodore Mitchel, being first duly sworn, deposes and says of my personal knowledge:

1.     I am the Vice President and Chief Financial Officer of Defendant Columbia Sussex Corporation, ("Columbia Sussex"), 740 Centre View Boulevard, Crestview Hills, Kentucky.  I have been employed by Columbia Sussex since 1989 and until 2007 I was the Secretary and Treasurer of Columbia Sussex.  I respectfully submit this affidavit in support of the defendant Columbia Sussex motion for summary judgment.

2.     Columbia Sussex is incorporated in The Commonwealth of Kentucky with its principal place of business is in Crestview Hills, Kentucky.

3.     Columbia Sussex is a corporation involved in the hotel, casino and hospitality business.  It owns certain properties in the United States; operates and manages certain hotel and casino properties; and, in some instances, it performs administrative services for certain hotel properties, which it neither owns nor operates nor manages.

4.      Regarding The Westin Casuarina Resort and Spa ("The Westin Casuarina"), which is located in Grand Cayman, Cayman Islands, British West Indies, Columbia Sussex neither owns nor operates nor manages that property.  The Westin Casuarina  is owned and operated by Galleon Beach Resort, Ltd., a Cayman corporation.

5.      I am also the Chief Financial Officer of Galleon Beach Resort, Ltd., ("Galleon Beach"), a Cayman corporation which owns and operates The Westin Casuarina.   (I was Secretary and Treasurer of Galleon Beach in 2002).

### Columbia Sussex Does Not Control Galleon Beach

6.      I am an officer of each corporation.  The two corporations do not share identities and each remains distinctly its own corporate entity.  I have been informed by our counsel that the plaintiff is arguing that Columbia Sussex controls Galleon Beach, which is simply not true.  I have also read the Report of Robert McCrie dated February 29, 2008, and can attest that Mr. McCrie is wrong when states that the two companies are interchangeable or that I ever suggested as much.

7.      Galleon Beach is not a direct or an indirect subsidiary of Columbia Sussex.

8.      There was not in 2002, nor has there ever been a complete identity of officers between the two corporations.  In 2002 there were five officers of Galleon Beach: Mr. William Yung (President), Mr. Edward Rofes, (Vice President), Mr. Joseph Yung (Vice President), Mr. Ted Mitchel (Secretary/Treasurer) and the Assistant Secretary of Galleon Beach was International Corporate Services, a Cayman Corporation.  Only three of those officers held posts in both Galleon Beach and Columbia Sussex.

9.      The six officers of Columbia Sussex in 2002 (the year of plaintiff's incident) were: Mr. William Yung,  (President), Mr. Edward Rofes (Vice President of Finance), Mr. Ted

Mitchel (Secretary and Treasurer), Mr. Stan Clayton (Vice President, Operations), Bruce Rathje (Vice President, Sales and Marketing) and Roger Taylor (Vice President, Food and Beverage).

10.     The two corporations maintain separate and independent Boards of Directors, although one Director, Mr. William Yung, served on both Boards in 2002. The remaining Directors of the corporations at that time were all different: those in Columbia Sussex were Mr. Edward Rofes and Mr. Stan Clayton; the second Director in Galleon Beach was Mr. Joseph Yung..

11.     Columbia Sussex does not own any stock or membership interest in Galleon Beach.

12.     During my deposition, the plaintiff's attorney asked me questions about a Columbia Sussex website. The website indicates that Columbia Sussex has relationships with a number of hotels without defining what the relationship is. As I previously stated in paragraph 3 of this Affidavit, Columbia Sussex is involved in the hotel industry in a variety of ways and it has various relationship with properties. As to The Westin Casuarina there is clearly a designation on the website for "company" stating that Galleon Beach Resort, Ltd. is the owner of that property. Within the hotel industry, which frankly is the only audience which would find use for the website, it is well known that many hotel properties and/or franchise operations are independently owned. The reference to Galleon Beach on the website is the clear indication that The Westin Casuarina is not owned by Columbia Sussex.

13.     I am aware that the name of Columbia Sussex appears on certain architectural drawings of the Conference Center at The Westin Casuarina. My counsel has advised me that the plaintiff's attorney has referred to those drawings as evidence to suggest that Columbia Sussex owns and operates The Westin Casuarina. However, Galleon Beach alone paid for the

architectural drawings, design and construction of the conference center and bathroom in which the plaintiff was allegedly assaulted. Thus, any suggestion that those drawings, which were not drafted by Columbia Sussex nor even paid for by Columbia Sussex, somehow implicates Columbia Sussex as the owner and operator of the Hotel is wholly inappropriate.

14. The Corporate Office of Columbia Sussex is in Kentucky. Columbia Sussex is a U.S. corporation incorporated in The Commonwealth of Kentucky. Galleon Beach is a Cayman corporation. The corporate Office of Galleon Beach is in the Cayman Islands.

### Columbia Sussex Is Not The Operator of The Westin Casuarina

15. I am also informed that the plaintiff is arguing that Columbia Sussex is the operator of The Westin Casuarina, which is also not true. In Mr. McCrie's Report dated February 29, 2008, he states that "the daily care and control of the premises is the responsibility of the operator," that much is true. The fact remains that Columbia Sussex was not the operator of The Westin Casuarina.

16. Columbia Sussex does not manage, control or operate The Westin Casuarina. Nor does Columbia Sussex maintain a Hotel Management Agreement with Galleon Beach.

17. Columbia Sussex does not provide any facilities maintenance or security services to Galleon Beach nor does it control on-site operations at The Westin Casuarina.

18. Columbia Sussex did not (and does not) hire or fire Galleon Beach employees, nor has it ever had the authority to do so.

19. For a franchise operation like The Westin Causarina, it is the General Manager on site at the property day in and day out who has the ultimate responsibility for how the hotel is operated. As I stated at my deposition, for The Westin Casuarina in 2002 that individual was

Mr. Daniel Szydlowski, the General Manager of The Westin Casuarina, and an employee of Galleon Beach.

20.     Neither in 2002, nor at any time prior or since, has there been any one at Columbia Sussex to dictate security measures at The Westin Casuarina.. The operator of the property, Galleon Beach, is responsible for its own on-site security operations.

## Columbia Sussex Services Are Performed in Kentucky

21.     There is a relationship and association between Columbia Sussex and Galleon Beach which is outlined in and based upon a Service Agreement dated January 1, 1996, as amended on January 1, 1999, a copy of which is annexed hereto as Exhibit "A."

22.     Under the terms of the Service Agreement, Columbia Sussex, as an independent contractor, has agreed to provide "accounting and business management services" to Galleon Beach.  Columbia Sussex performs certain bookkeeping, group sales, recordkeeping and reporting functions for Galleon Beach pursuant to the Service Agreement. Columbia Sussex performs its part of the Service Agreement in the State of Kentucky.

23.     As the Service Agreement sets forth:

> . . .CSC [Columbia Sussex Corp.] shall provide to GBR [Galleon Beach Resort]. . . all services in accounting and tax matters required or requested in connection with their businesses including the preparation of monthly accounting statements and tax reports and returns. Within the limitations herein above provided, CSC will render such other services of a supervisory nature in the financial area of the corporation as may be requested from time-to-time by GBR without further compensation than that for which provision is made in this Agreement.

(Exhibit "A", para. 3).

24.     The Service Agreement also provides:

CSC is retained only for the purposes and the extent set forth in this Agreement, and its relationship to GBR . . . shall be that of a provider of services only and no other.

(Exhibit "A", para. 7).

24.    There are no other Agreements between Columbia Sussex and Galleon Beach.

25.    The Service Agreement between Columbia Sussex and Galleon Beach involves administrative services such as keeping track of records, paying bills, preparing for financial statements, purchasing certain products and some group sales.    The Westin Casuarina has its own bank accounts in the name of the owner/operator Galleon Beach.    Galleon Beach bills forwarded to Columbia Sussex for processing pursuant to the Service Agreement would be paid by funds from the Galleon Beach account, not from a Columbia Sussex account.    Galleon Beach Resort, Ltd. has its own bank accounts in United States Banks (from which funds are drawn in order to effect the Service Agreement on behalf of Galleon Beach) and also in the Cayman Islands.

26.    All services performed by Columbia Sussex for Galleon Beach are done in Kentucky.    In limited circumstances certain invoices relating to Galleon Beach may be made out to the Columbia Sussex location in Kentucky to allow Columbia Sussex to administer the Service Agreement.    As the Service Agreement between Galleon Beach and Columbia Sussex includes accounting and Columbia Sussex facilitating purchases, certain vendor notices may be directed to Galleon Beach at the Columbia Sussex address in Kentucky.    The Service Agreement does not create any operational security duties upon Columbia Sussex for The Westin Casuarina.

27.    Under the Service Agreement, Columbia Sussex does not provide direction to The Westin Casuarina on how to perform its on-site daily operations.    Columbia Sussex does not

evaluate the performance of employees at The Westin Casuarina, all of whom are employees of Galleon Beach.

28.    Columbia Sussex has a Manager's Manual, which to a large extent was prepared under my direction to simplify and coordinate accounting practices for Columbia Sussex. Since I approved it and did not see the need to prepare a separate one for Galleon Beach, and since Columbia Sussex is performing accounting services for Galleon Beach, I gave a copy of the Manager's Manual to Galleon Beach to follow. The Manager's Manual is available for the Court's inspection; however, as it is a three ring binder with many pages, only "Section A: Purpose and Use of Manual" and the Table of Contents are annexed hereto as Exhibit "B" for illustrative purposes.

29.    The Manager's Manual addresses accounting matters only; nothing in the Manager's Manual addresses property security measures or recommendations. "Section A" clearly sets forth the purpose of the Manual as follows:

<u>PURPOSE OF MANUAL</u>

This manual is designed to help the property manager understand and comply with the Policies, Procedures and Internal controls of Columbia Sussex Corporation and its affiliates. The manual is a detailed reference guide which explains the various reports submitted to the Corporate Office and various other policies and procedures. If an accounting problem arises, please refer to this manual; and if the situation is not addressed, advice should be sought from the Accounting Department at the Corporate Office. It is the responsibility of each property to read this manual and comply with all Columbia Sussex requirements. . . .

This manual . . . should be used as a reference tool by the General Manager and bookkeeper of the property.

(Exhibit "B", p. A-1.1).

30.    Columbia Sussex has its own Safety and Loss Prevention Manual which is a good source of safety suggestions. As I also approved much of The Safety and Loss Prevention

Manual and was aware of its use as a general source of reference, I recommended that it be used at Galleon Beach. The Safety and Loss Prevention Manual is simply something which, as it states, "provides guidance to the General Manager. . . in areas of safety, claim reporting, security and employee training." A copy of Section 1 (The "Safety Policy" and "The Big Picture"), the Table of Contents and certain select pages of the Columbia Sussex Safety and Loss Prevention Manual are annexed hereto as Exhibit "C", for illustrative purposes (The entire Manual may be made available to the Court for inspection if it so desires.)

31.    The Safety and Loss Prevention Manual provides suggestions and recommendations. It does not mandate action, with the possible exception that incident reports should be made and quarterly inspection safety checklists are recommended to be performed. These last two items are things which have much to do with insurance issues and reporting and would fall within the services performed under the Service Agreement.

32.    Nothing in the Safety and Loss Prevention Manual mandates how on-site security operations are to be performed. The Manual offers "suggested security precautions" such as: "All employees should be alert for suspicious people on the property." (See, e.g., Exhibit "C," Section 10, General Safety and Security Precautions, para. 10.) That is common sense, and something that is obviously left to the people in charge of the operation on site. In this instance, Galleon Beach.

33.    Of course, when the Columbia Sussex Manager's Manual or the Columbia Sussex Safety And Loss Prevention Manual was given to Galleon Beach by me in my capacity as Treasurer/Secretary of Galleon Beach, they were given to the General Manager as guidance. It would be up to the General Manager to take on the responsibility of modifying these recommendations to the extent that they need to be modified by local law. For instance,

employees of The Westin Casuarina were employees of Galleon Beach, not of Columbia Sussex. To the extent references in the Manager's Manual or the Safety and Loss Prevention Manual refer to Columbia Sussex employees, the work rules for The Westin Casuarina would have been modified to some extent by local Cayman law to deal with Galleon Beach employees.

34.    Prior to this litigation being commenced I was not aware of any incident involving Ms. Kimberly Genereux at The Westin Casuarina. Columbia Sussex had not received any incident report regarding Ms. Genereux's alleged incident on May 3, 2002; and no one informed me of any such incident in my capacity as Secretary/Treasurer of Galleon Beach. After receiving the plaintiff's Summons and Complaint at Columbia Sussex in 2005, inquiries were made as to why no incident report had been generated. I was informed that The Westin Casuarina considered it to be a police matter involving a criminal trespass and a stranger who was not a guest of the hotel. Galleon Beach therefore did not consider it necessary to create an incident report, and none was created or forwarded to Columbia Sussex.

35.    A written statement from Mr. Denzil Luke, a former Galleon Beach employee who spoke with the plaintiff shortly after the incident occurred, was obtained in 2005 by Galleon Beach and forwarded to me at Columbia Sussex in response to my inquiry about the incident. That statement (Exhibit "D") and a Royal Cayman Island Police letter (Exhibit "E") also obtained in response to an inquiry in 2005, represent the extent of information about the incident known to Columbia Sussex in 2005. Those documents and information were solicited after the Summons and Complaint had been delivered to Columbia Sussex, (and as a result of the litigation). I am advised by counsel that those documents were long ago shared with plaintiff's counsel.

36.    The Cayman Islands are a very safe resort destination. No one at Columbia Sussex was ever advised, nor was anyone at Columbia Sussex ever informed of any criminal incidents at the The Westin Casuarina or in the surrounding neighborhood such that the safety and security of guests at The Westin Casuarina would have been in jeopardy in 2002 or previously. The incident alleged by the plaintiff in her Complaint was not something which was ever reasonably foreseeable to Columbia Sussex.

37.    For all of these reasons, I would respectfully request that the plaintiff's Second Amended Complaint be dismissed.

Respectfully,

THEODORE MITCHEL

Sworn to before me this _7th_
day of March, 2008

NOTARY PUBLIC

MICHELLE STALLMEYER
Notary Public, Kentucky State at Large
My Commission Expires Oct. 24, 2010

# EXHIBIT A – AFFIDAVIT OF THEODORE MITCHEL

# CONFIDENTIAL INFORMATION DOCUMENT – REDACTED

# EXHIBIT B – AFFIDAVIT OF
# THEODORE MITCHEL

# CONFIDENTIAL INFORMATION
# DOCUMENT – REDACTED

# EXHIBIT C – AFFIDAVIT OF
# THEODORE MITCHEL

# CONFIDENTIAL INFORMATION
# DOCUMENT – REDACTED

2122618716    P.05

EXHIBIT

*mitchel 8*

May 3, 2005

On the night of May 3 2002, I was asked by the bartender to call the Manager on Duty for a young lady who said that she was molested. The Manager on Duty was called and he spoke to her in the lobby area of the hotel. After briefly speaking with the lady, he asked me to call the police because the lady said that she had been raped. The police was immediately called to investigate the matter.

While we were waiting for the police, we tried to calm the lady down since she appeared to be distraught. At this time we asked her what took placed. She said that on her way home from the supermarket she decided to make a diversion through an access way that leads to the beach since it would be a shorter route home. This access way is at the north end of the hotel and lies between the Governors Ball Room and the main hotel building. The lady said that as she proceeded through the access way a man held her and dragged her into the restroom located beside the ball room. The police arrived shortly after and they were escorted by the Manager on Duty and the lady to the scene of the crime.

Denzil Luke



# ROYAL CAYMAN ISLANDS POLICE



Tel No.  (345)-949-4222
Ext 2917

Fax No. (345)-949-6472

Our Ref: CACT00002266

Your Ref:MLA/ch

PO Box 909
Grand Cayman
Cayman Islands
British West Indies

September 27, 2005

**EXHIBIT**

MITCHEL 10

Michael Alberga
2nd Floor, Harbour Place
103 South Church Street
Grand Cayman

**Re: Westin Hotel Alleged Rape of Kim Generux**

Dear Sir,

I do acknowledge your request as it relates to the subject and do apologize for our late response.

A report was made on the 3rd may 2002 at 11:23PM by Kim Generux stating that she was raped by an unknown male while she was at the bathroom at the Westin Hotel.

According to the complainant she was returning from shopping at Fosters in the Strand. She was walking on the side walk heading to her Villa at # 20 Plantana Villa, on West Bay Road . As soon as she arrived at the first entrance to Westin Resort, she observed a vehicle which drove along side her. The male Driver asked her if she needed a ride. She told him no. She continued walking on the side walk, but decided as she arrived closer to Governor's Residence to walk through the Westin Parking Lot. Miss Generux did so in efforts that the driver would not know where she was residing. She then thought it was best to remain in the restroom for a while, which she did.



Shortly after while she was in the unit with the door closed she observed a male from the waist down. She couldn't have gotten much details of his face because of the type of doors, which had wooden type blades in the middle. This person left and returned minutes after. He switched off the lights and banged on the door eventually breaking it.

He then placed a sharp object to her neck and demanded that she performed him oral sex on him. He also told her not to scream and threatened he would kill her if he did. She then performed Oral Sex on him, after which he placed his penis inside her vagina and proceeded to rape.
After he was finished, he used her underwear to wipe himself off. The suspect then left, after which the victim turned on the lights and made her way to the Westin Lobby and made a complaint.

Subsequently the Police were notified, attended the scene and then transported Victim to the Georgetown Hospital where she was examined and a victim sex kit completed. Her clothing along with the underwear were also collected to be examined. A statement was recorded from victim giving details of the incident.

The Doctor who conducted the examination of victim confirmed bleeding in the vagina with a 1.5 CM laceration on vaginal floor. Two seminal fluid were detected on the interior section of her skirt and on the mid section of her underwear (crouch area). No seminal fluid was detected on the oral swabs.

Officers involved in the investigation, conducted door to door inquires, however no useful information was gathered. She was also taken on a drive along with officers with the hope of identifying a suspect.

Officers who attended the scene observed that when the light in the bathroom is turned off, it is so dark that one can't see the palm of the hands directly in front of their face.

This particular crime was fully investigated and several persons were arrested, interviewed, processed and later bailed. DNA results confirmed that those persons were cleared, subsequently, no charges have been laid. From since this

incident all persons who have been arrested on suspicion of rape have their DNA profile fed into the database for comparison. To date there have been no hits.

Supt. Randolph CPS
Detective Sergeant
Specialist Support Operation
Royal Cayman Island Police

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------------------

KIMBERLY GENEREUX,

                Plaintiff,

                  v.

COLUMBIA SUSSEX CORPORATION, STARWOOD
HOTELS & RESORTS WORLDWIDE, INC., WESTIN
HOTEL MANAGEMENT, L.P.

                Defendants.

------------------------------------------------------------

C.A. NO. 05-CV-10879-JLT

**AFFIDAVIT OF
JOHN McGOVERN**

     **JOHN McGOVERN,** being duly sworn, deposes and says upon personal knowledge:

     1.     I am the Vice President of Aloft & Element Operations for Starwood Hotels and Resorts Worldwide, Inc. ("Starwood"). I was previously a Director of Franchise Operations for Starwood and am submitting this Affidavit in Support of the Motion for Summary Judgment made on behalf of defendants Starwood and Westin Hotel Management L.P. ("Westin").

     2.     I have worked within the hotel industry for more than twenty-seven years, starting in 1981 with ITT/Sheraton. I have been a General Manager for Sheraton Hotels at the Sheraton Gateway Hotel Atlanta Airport. Among my jobs at Starwood, I have been Director of Franchise Operations initially covering the Southeast U.S. Region, and later the Northeast Region becoming the Vice President of Franchise Operations for the Northeast Region from February 2001 – 2006.

     3.     I am familiar with the corporate structure of Starwood sufficient to attest that Westin License Company was part of the purchase when Starwood bought Westin

Error! Unknown document property name.

Hotel Company in 1998. Westin License Company had issued various contracts over the years to franchisees establishing Westin franchises in various parts of the world. For Westin franchisees that continued to operate under Westin License Company agreements after Starwood purchased Westin Hotel Company, Westin License Company continued to carry out its responsibilities under the License Agreement. In 2006, Westin License Company's assets (including franchise agreements) were purchased and assumed by Westin Hotel Management, L.P., a limited partnership, of which Starwood is the General Partner.

### Neither Starwood nor Westin Own or Operate The Westin Casuarina

4.      The Westin Casuarina Resort and Spa ("The Westin Casuarina") in Grand Cayman, Cayman Islands, British West Indies, is not owned or operated by either Starwood or Westin. The Westin Casuarina is a franchise operation owned and operated by Galleon Beach Resort, Ltd. ("Galleon Beach"). A copy of the franchise agreement known as the System License Agreement by and between Westin License Company ("Licensor") and Galleon Beach Resort, Ltd. ("Licensee") is annexed hereto as Ex. "A", (referred to hereinafter as "The License Agreement" or "The Westin License Agreement").

5.      In 2002 Starwood had associations with two types of hotels: (1) owned and managed hotels, and (2) franchise hotels. As the title suggests, Starwood may own and/or manage certain hotels; however, if the association is with a franchise operation, then there is a License Agreement, and the licensee or franchisee manages and operates the property or designates a property manager/operator. However, Westin and Starwood never manage or operate franchise hotels.

6.    The Westin License Agreement dated March 20, 1995 grants to the Licensee, Galleon Beach, the rights to use the Westin trademark in conjunction with the hotel and rights to use the Westin System.  The Westin System includes reservation programs and brand marketing promotions.  See for instance Ex. "A" at p. 1 (1) and (21).

7.    As the Westin License Agreement states:

> Licensee desires to open a new or converted hotel or resort facility using the Westin name and pursuant to the Westin System, and Westin desires to grant to licensee the rights necessary to do so on certain terms and conditions.

( Ex. "A", p. 2 (iii)).

8.    Neither Starwood nor Westin manage The Westin Casuarina.  <u>Galleon Beach Resort, Ltd</u>. is identified as the approved Management Company in The Westin License Agreement. (Ex. "A", Addenda, Exhibit III, p. 1 [1])  The Westin License Agreement also clearly states that the Licensee (Galleon Beach) is the owner and operator of the Hotel, not Starwood or Westin.  To convey this fact to the general public, The License Agreement requires at page. 11 Section 4.2 as follows:

> Licensee shall install and maintain interior and exterior signage bearing the Westin Trademarks in accordance with the Trade Dress Requirements.  The Westin Trademarks shall appear in places and products throughout the hotel commonly used for such Trademarks at other Westin Hotels.  The hotel shall not display or utilize its own logo or signature, except in accordance with the Trade Dress Requirements for resorts.  **Licensee shall place interior signs or other statements in places reasonably designated by Westin that identify Licensee as the independent owner and operator of the Hotel**, and that identify WHC as the owner of the Westin Trademarks and that states that such are used by the Licensee under license from the owner.

(Ex. "A", p. 11 (4.2 *emphasis added*)).

9.    The Westin License Agreement further provides that Galleon Beach and Westin are not joint venturers, partners or agents:

> **Licensee is and shall remain an independent contractor. Licensee and Westin are not and shall never be considered joint venturers, partners, employees, mandatory or agents one for the other**.  Neither shall have the power to bind or obligate the other except as otherwise outlined in this Agreement.  No representation shall be made by either party to anyone that would create any apparent agency, employment, mandate, or partnership. **In all documents and contracts in which Licensee utilizes any of the Westin Trademarks, Licensee shall indicate that it is "independently owned and operated". Licensee shall prominently indicate** on all letters and business forms on which licensee utilizes any of the Westin Trademarks **that it is a licensee of Westin and that the hotel is independently owned and operated**.  Licensee shall maintain employee records in such a manner as to show clearly that Licensee and **its employees are not employees of Westin**.

(Ex. "A", p. 20[8.2] (*emphasis added*)).

10.    At Starwood, we focus on promoting first-class hotel brands.  Westin® is a premier brand which Starwood acquired and continues to promote as a first-class hotel brand.    The Westin License Agreement therefore provides that each Licensee acknowledges its "first class hotel standards":

> Licensee acknowledges that the Westin System includes detailed specifications and standards for operating first-class hotels using the Westin name, understands the importance of maintaining first-class hotel standards, and desires to operate and maintain the hotel or resort facility in conformity with the specifications and standards for first-class hotels promulgated by Westin.

(Ex. "A", p. 2 (iv)).

11.    Westin also created and issued various Westin brand manuals and Westin Brand Standards to its Licensees. However, many manuals are no longer in existence since the acquisition of Westin Hotel Company in 1998 by Starwood.

12.    Westin monitored its franchises through Guest Satisfaction Surveys and annual audits of the Quality Assurance Program ("QAP") and Brand Standards. (A copy of the 2002 Westin Brand Standards Table of Contents, and the standards related to restrooms are annexed as Ex. "B"; and a copy of the 2001 QAP Table of Contents and pages referring to public restrooms are annexed as Ex. "C").

13.    The Westin Brand Standards in 2002, like the QAP issued in years prior, are a proprietary accumulation of "standards, specifications, and requirements for the Hotel to operate a first-class, high quality hotel or resort under the Westin System. The Westin Hotel Standards contain a requirement that Licensee achieve adequate results on Guest Satisfaction Surveys and quality assurance inspections." (Ex. A, p. 4 , Westin Hotel Standards.)

14.    Franchise operations that did not achieve adequate results on the Guest Satisfaction Surveys and Quality Assurance Inspections could be "defranchised", but Westin and Starwood could not, and did not, control the operations of franchise hotels. Moreover, Westin and Starwood maintain no authority to hire or fire employees of franchise operations like The Westin Casuarina.

15.    As one can see from the Westin Brand Standards and QAP, none of them address security operations at a franchise property. It simply is not one of the elements of the QAP or Westin Brand Standards to dictate how a franchised hotel will perform its on-site security, if any. There are safety "standards" which recommend smoke detectors,

sprinklers, a plaque behind the guest room doors that tells you what to do in case of fire; but security operations are left to the operator of the property.

16.    Westin and Starwood did not have any Westin Brand Standards addressing security measures such as security personnel or guards, panic alarms, surveillance cameras or other potential elements of a security operation. Such decisions are up to the operator of the franchise hotel. I am aware that Robert McCrie, on behalf of the plaintiff, states that security at a franchised hotel such as The Westin Casuarina should be the responsibility of Starwood/Westin. However, Starwood/Westin has always found that the owner/operator of the franchise is in the best position to know, based upon local conditions, police information, crime reports, and the like what type of security is needed and best suited for the franchised hotel. Such decisions are part of the hotel owner/operator's day-to-day operation of and responsibility for the hotel.

17.    I also recognize that certain Westin Brand Standards or manuals identify an obligation on behalf the franchisee to safe guard the well being of hotel guests, patrons or associates. However, this general statement does not mandate the manner by which the franchisee should satisfy its obligation. How security is to be provided, including how it provides reasonable security depending on the location, the local jurisdiction and an assessment of the need, is part of the day-to-day operations of a property which are the franchisee's responsibility..

18.    As I stated at my deposition, Westin standards do recommend smoke detectors, reprogrammable key locks to get in and out of the guestroom doors, double locks on guest room doors, sliding door double locks, and markings on glass doors so people don't walk through them. However, as far as providing "on-property" security

each day, one must recognize that all locations are unique; and it is up to the operator of each premises to address such concerns.   For this reason there is no one at Starwood responsible for designing security policies for the Westin Brand as a whole.  Nor is there any outside company to review security items for the Westin Brand.

19.     I was asked in my deposition about the safety and security standards of public restrooms.  Any suggestion that Starwood/Westin was dictating how to perform (or whether to perform) security involving the restrooms at The Westin Casuarina is clearly without basis.  Any mention in Westin Brand Standards, or manuals, that access to bathroom areas by unauthorized persons must be restricted is a general term – any hotel operator may under certain circumstances make an attempt to keep certain people out.  For instance, if one was running the Westin in Times Square in New York City on New Year's Eve, and paying guests couldn't get to the restrooms because they were filled with celebrators coming in off the street; I would expect the hotel operator to monitor the area so that the paying guests would not be inconvenienced.  Westin and Starwood do not participate in the decision-making process concerning how to monitor such situations at franchised hotels.

20.     I was also asked in my deposition whether public area doors require high grade locks as is suggested in the QAP.  I have since re-examined the QAP, and I do not believe that the QAP recommends such high grade locks on public restroom doors. The decision whether to install locks on public restroom doors would be left to the operator of the hotel.  The focus of the QAP as to safety in the bathrooms has to do with slips and falls, not criminal activity.  To prevent the occurrence of slip and falls, the QAP

suggests that the hotel operator post warning signs when employees are mopping the restroom floors. (See, Ex. "C" p. 127)

21.     I have been made aware of plaintiff Genereux's claims through this litigation. This Affidavit is based upon my personal knowledge in the hotel industry and at Starwood. Neither I nor to my knowledge anyone at Starwood was involved in the plaintiff's incident on May 3, 2002. Moreover, Starwood and Westin had no reason to anticipate that any criminal sexual activity, trespass or rape would occur at The Westin Casuarina in 2002 or prior such as the plaintiff claims happened on May 3, 2002.

22.     For all these reasons, I respectfully submit this Affidavit in Support of the Starwood/Westin motion seeking dismissal of the plaintiff's Second Amended Complaint against them.

Respectfully,

JOHN McGOVERN

Sworn to before me this _11th_
day of March, 2008.

NOTARY PUBLIC

MICHAEL A. WEST
Notary Public
Commonwealth of Massachusetts
My Commission Expires
October 13, 2011

# EXHIBIT A – AFFIDAVIT OF
# JOHN MCGOVERN

# CONFIDENTIAL INFORMATION
# DOCUMENT – REDACTED

# EXHIBIT B – AFFIDAVIT OF
# JOHN MCGOVERN

# CONFIDENTIAL INFORMATION
# DOCUMENT – REDACTED

# EXHIBIT C – AFFIDAVIT OF
# JOHN MCGOVERN

# CONFIDENTIAL INFORMATION
# DOCUMENT – REDACTED

Expert Witness Report

In the Case of

*Kimberly Genereux v. Columbia Sussex Corporation, et als.*

*US District Court (D. Mass.)  No. 05-CV-10879-JLT*

**Concerning Security Practices and Procedures at the Westin Casuarina Resort, Grand Cayman, the Cayman Islands, on or about May 3, 2002**

**Robert D. McCrie, PhD, CPP**
rmccrie@verizon.net

**February 29, 2008**

# Table of Contents

Introduction                                                    1

Materials Evaluated                                             2

Visit to the Westin Casuarina Hotel                            7

Are the Cayman Island Hot Spots for Crimes?                   14

Settled Matters and Findings                                  22

Discussion                                                     35

References                                                     37

Curriculum Vitae of Robert D. McCrie

# Introduction

On May 3, 2002, at approximately 11 p.m., Kimberly Genereux, a Cambridge, Massachusetts resident, was returning to her vacation residence in Grand Cayman, the Cayman Islands. She had visited the Cayman Islands "more than six times since the year 2000." (Second Amended Complaint, p. 4; Genereux, p. 30) Nearing the Westin Casuarina Hotel on Seven Mile Beach Road, she stopped to use the restroom in the spa building, which was located in a separate facility just off the main hotel building.

She approached the spa building and entered the women's restroom. The light was on. She entered a toilet stall and locked the door. A few moments later a male entered which she was able to determine through the slats of the locked door. She told him that he was in the wrong lavatory area. He apologized and left. But moments later the man--presumably the same person--returned, switched off the lights, forcibly broke the slated wooden door to the toilet stall, and brutally sexually attacked Ms. Genereux. After waiting for a few moments as instructed by her departing assailant, Ms. Genereux left the spa building and entered the main hotel building where she eventually received assistance.

The plaintiff seeks civil damages from the operators of the hotel and from the franchisor/licensor of the property. The issue I shall seek to analyze is: Did Starwood Hotels & Resorts Worldwide, Inc. and Westin Hotel Management, LLP (Starwood/Westin), licensor, and Columbia Sussex Corporation, operator of the Westin Casuarina Hotel on Grand Cayman, have a duty to provide reasonable security measures for Ms. Genereux that were breached on this day and time resulting in grievous injury?

Materials Evaluated

*Kimberly Genereux v. Columbia Sussex Corporation, et als.*

## Court Filings

First Amended Complaint and Jury Trial Demand, August 23, 2005

Answer and Jury Claim of Defendant Columbia Sussex Corporation, October 14, 2005

Answer to Complaint by Starwood Hotels & Resorts Worldwide et als.,

     November 23, 2005

Answer of Defendant Starwood Hotels & Resorts Worldwide, Inc., to Plaintiff's First Set

     of Interrogatories, October 31, 2006

Answer of Defendant Columbia Sussex Corporation to Plaintiff's First Set of

     Interrogatories, November 6, 2006

Responses of Defendant Westin License Company to Plaintiff's First Set of

     Interrogatories, January 4, 2007

Answers of Defendant Starwood Hotels & Resorts Worldwide, Inc., to Interrogatories

     Posed by Plaintiff Kimberly Genereux, February 5, 2007

Answers of Defendant Westin License Company to Interrogatories Posed by Plaintiff

     Kimberly Genereux, February 6, 2007

Answer of Defendant Columbia Sussex Corporation to Interrogatories Posed by Plaintiff

     Kimberly Genereux, July 27, 2007

Second Amended Complaint & Jury Trial Demand, February 13, 2008

-2-

**Depositions**

Kimberly Genereux, December 21, 2006

Theodore R. Mitchel, September 7, 2007

John B. McGovern, September 17, 2007

**Legal**

The Tourism Law (10 of 1974) (1995 Revision) Supplement No. 8 published with

      Gazette No. 11 of May 29, 1995

The Tourism Law (1995 Revision) (1999 Revision) Supplement No. 6 published with

      Gazette No. 6 of March 15, 1995

The Tourism Law (1995 Revision) (2002 Revision) Supplement No. 12 published with

      Gazette No. 13 of July 2, 2002

**Police Reports**

Memo from Sgt. Eustace Joseph to Gail Duquesney RCIP, Criminal Investigations

      Department, May 7, 2002

Letter from Royal Cayman Islands Police (RCIP) to Michael L. Berga,

      September 27, 2005

Letter from Michael William Needham, RCIP, Joint Intelligence Unit, to Bruce Kraft, n.d.

**Westin Hotels & Resorts & Columbia Sussex Documents**

Westin Property Maintenance Reference Guide, Vol. 20, May 1994

Westin Garage Reference Guide, Vol. 15, revised May, 1994

Westin License Company, System License Agreement Between Westin and Galleon
Beach Resort, December 16, 1995 (redacted)

Westin Marketing & Sales Manual, Vol. 2, revised May, 1995

Service Agreement between Columbia Sussex Corporation and Galleon Beach Resort,
January 1, 1996

Deed between the Governor of the Cayman Islands and Galleon Beach Resort and
Nomura Asset Capital, October 3, 1997

Westin Corporate Identity Manual revised December 1997

Westin Comprehensive Checklist for Quality Assurance Program, QAP 2000, revised
January, 2000; Also QAP 2001

Westin Fitness Center/Pool Checklist, QAP 2001, revised January 2001

Starwood Design Review Memorandum, June 10, 2002

Lashner Rush Associates audit of 2002 of the Westin Casuarina, November 5, 2002

Certificate of Liability Insurance from Property Risk Services for the Insured, Columbia
Sussex Corporation, dated November 20, 2005

Associate Orientation Manual for Franchised Hotels, Vol. 30, Sections II & III received
January 30, 2008


**Columbia Sussex Documents**

Columbia Sussex Manager's Manual, revised December, 1997

Columbia Sussex and Affiliates Safety & Loss Prevention Manual, September 10, 2003

-4-

**Correspondence from Related Parties**

Letter from Mendes & Mount (M&M) to Mark F. Itzkowitz (MFI) on January 25, 2008

Letter from John B. Johnson at Corrigan, Johnson & Tutor to MFI on January 25, 2008

- Audit of the Westin Casuarina Resort by Westin Hotels & Resorts of August 30, 1999
- Audit of the Westin Casuarina Resort of September 24, 2000
- Hotel audit summary of Westin Casuarina Resort dated April 24, 2001

**Statements**

Denzil Luke, May 3, 2002

**Photographs & CD**

Color Photographs (14) of Westin Casuarina Resort Showing Entrance to the Restroom and Corridor

Photos from Kim Genereux to Mark Itzkowitz, May 11, 2004; Also Site Plan for the Westin Casaurina Conference Centre; Enlarged Portion of the Site Plan with Locations Illustrated and Marked by Ms. Genereux, May 11, 2004.

CD of Westin Showing Photos & Plan, March 6, 2005

**Miscellaneous Items**

Cayman Islands 1998 Annual Report and Official Handbook, George Town, Grand Cayman, British West Indies: August 1999, pp. 81-85, 173, 254-255, 280-289;

Also Cayman Island Annual Report & Official Handbooks for 1999-2001

"Police Report: Rape Allegation," Caymanian Compass, May 7, 2002

Sheena Carlen, "Police Appeal: Hunt for Rapist," Caymanian Compass, May 10, 2002,

    p. 2

"Some Government Officials Have Expressed Dismay that this Medium Carried News of

    the Recent Increase in Reported Crimes." www.caymannetnews.com accessed

    February 4, 2000

"Help Police Find Pervert," September 13, 2001, archived January 23, 2004; "RCIP 2000

    Report Reveals a 13 Percent Increase in Crime," January 15, 2002, archived

    January 23, 2004; "House Hears Report on Youth Violence in Cayman," January

    14, 2002, archived, January 23, 2004; "Crime Rate 'Unacceptable,'" February 17,

    2003, archived January 23, 2004.  All found in www.CayPolitics.com

"Cayman Islands" from Wikipedia, obtained October 15, 2007

*Leslie B. Reynolds et al. v. Westin Hotel Company , et al.* United States District Court,

    Eastern District of Kentucky, summons, case no. 97-77.


**Plus references at the end of the report**

## Visit to the Westin Casuarina Hotel

Normally, it is my procedure to visit locations where I evaluate circumstances. However, I have not visited so far the Westin Casuarina Hotel. But, 40 colored photographs of the location from all angles were available. Additionally, a CD of digital pictures was examined. Further, Google maps and the hotel's own website were used for orientation. Finally, maps showing properties along the Seven Mile Beach Road were examined.

The Cayman Islands are a British overseas territory located in the Western Caribbean Sea. They comprise the islands of Grand Cayman, Cayman Brac, and Little Cayman. They are a major global off-shore financial services center. The population of the Cayman Islands has grown rapidly from 38,000 in 1995 to 45,000 as of July 2006. About 60% of the population is mixed race, mostly mixed African European. The Caymanians enjoy the highest standard of living in the Caribbean. According to the *CIA World Factbook*, the GDP per capita is the eighth highest in the world. The Cayman Islands dollar is pegged to the US dollar at a fixed rate.

Tourism represents 70% to 75% of the annual GDP. The vast majority arrive at the capital, George Town on Grand Cayman. The great attraction there is Seven Mile Beach regarded as one of the best beaches in the world and a take-off point for countless SCUBA dives.

The Westin Casuarina Resort is located on a prominent stretch of the beach. Just to the south is the site of the Ritz-Carlton Resort. Just to the north is Government House

-7-

and beyond that a resort complex, The Pinnacle. Other prominent resorts, residential

structures and government buildings are located along a western stretch of the beach.

(See Figure 1.)

## Figure 1



To their east is West Bay Road beyond which commercial, retailing, and residential businesses are located.

The Westin Casuarina is composed of two structures. The first is the hotel itself which includes rooms, restaurants, bars, and a large swimming pool. Immediately to the north, just before Government House, the property was expanded in 2001 to create a spa with a ballroom capable of handling multiple functions. (See Figures 2 & 3.) In the daytime and evening the ballroom and spa could be the center of considerable activity. But if the ballroom is not in use and the spa has closed for the day, the activity would be

**Figure 2**



**Figure 3**



considerably diminished.

The plaintiff, Ms. Genereux, was attacked in the middle stall of the ladies lavatory.

The entrance is accessible from a terrace open to the outside. (See Figure 4.)  Access to

the lavatory facilities is not encumbered in any way.  On the pictures provided no

indication of signage occurs to deter the public from using a facility on this private

-10-

## Figure 4



property.  No gate is seen that would have allowed, quite easily, the securing of the

lavatory area when it would not be needed by guests of the hotel or the spa.  In a sense,

the hotel property was inviting the guests, staff, and public in general to use the facility.

Therefore, entrance to the toilets was located off a totally open foyer.  As one enters the

foyer, doors to the men's and women's restrooms are readily visible. (See Figures 5 & 6.)

### Figures 5 (upper) & 6 lower)



Figure 5 shows the entrance to the two restrooms from an outer perspective of the foyer. The doors contain a lockset by which management could have locked the doors if they had chosen to do so. To the left in Figure 5 is the door to an electrical room which one would assume would be locked. Figure 6 approaches the doors more closely. The two doors for the restrooms are near each other, separated by little more than one foot. The area appears to be well lighted and clear of any obstacles. No emergency phone or alarm was noted in these pictures or in any of the other photographic materials made available for inspection.

The Westin Casuarina Resort is described as a "first-class resort facility" including 350 deluxe guest rooms, 2,600 square feet of meeting place, two restaurants and a snack bar, a pool, and other amenities (Hotel's website).

-13-

## Are the Cayman Islands Hot Spots of Crime?

The 1998 *Annual Report & Official Handbook* of the Cayman Islands, entitled "Preparing for the New Millennium," states: "The Cayman Islands remains one of the safest places to live in the world. The year 1998, saw reduction of 10.6 percent on the previous year, bringing the total recorded crime down to 3,173. The detection rate is the envy of the civilised world" (p. 83). The 2002 *Annual Report* continued the same positivist outlook: "The Cayman Islands remains one of the most crime-free countries in the world. Crime in the Islands fell 4% during 2002, and the actual numbers remain very low. However, Cayman is a transshipment point for drug trafficking and large quantities of cocaine and cannabis (known locally as ganja) are recovered annually."

Indeed, the *CIA World Factbook* tersely states for the Caymans: "Offshore financial center; vulnerable to drug transshipment to the US and Europe."

The significance of such a query into the level of crime in an area relates to the controls managers in public and private institutions must install as conditions change. If crime is steady, the organization might seek to improve quality and, perhaps, experiment with systems improvement. If crime is increasing, however, the usual response is to increase security personnel and budgets, and search for new means to reverse a worsening trend. This usually means that significant commercial entities work closely with local law enforcement.

In this situation, serious crime increased substantially during the study period, 1998-2002. The trend was sufficiently clear that business owners and operators in this

-14-

action would have or should have apprized themselves of the changing risk pattern. They should then have called in an outside expert to conduct a comprehensive risk assessment. Alternatively, their own Chief Security Officer (CSO) or Director of Security should have conducted the risk assessment survey meeting with other concerned resort hotel operations and local law enforcement. The conclusions and recommendations would be considered by local, regional, and national management, and decisions would be made about the appropriate next steps in risk mitigation.

But all of this is predicated upon the reality that crime was changing, in this case new circumstances that would dictate that security needed to be tighter. What are the signs that a manager would see that should lead to the conclusion that Grand Cayman Island was (is) more dangerous than official rhetoric? Here is some evidence:

- The government reports a high clearance rate, but data are suspicious. For the years 1998-2000, the clearance rate was an impressive 75.3%, 73.0%, and 78% respectively. (See Table 1.) But these stunning figures are buttressed by marijuana and cocaine arrests which are high in the 90 percentile range. In other words 90-plus percent of all the cases involving these two drugs are solved. To believe that this is a credible reflection of success at fighting crime, one would have to be on cannabis at the time. That is, the number of drug offenses which occur but which do not reach the attention of police is vastly underreported. Note, too, that the clearance rate considers only those incidents which are reported to police. The true number of incidents could be 3- to 3.5-times higher.

According to Park Elliott Dietz, a professor of law and behavioral medicine and psychiatry at the University of Virginia: "The true rate of

-15-

occurrence is not known for any statutory category of sex offense. Only rape has been the subject of multiple and sophisticated efforts to measure true incidents...The best available data on rape incidents comes from victimization survey (most notably the national crime panel

## Table 1

### Crime and Vital Data Comparison for the Cayman Islands, 1998-2002 (Preliminary)

| | 1998 | | 1999 | | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Crime Category | Reported | Detected | Reported | Detected | Reported | Reported | Reported |
| Offences of sexual impropriety | 64 | | 43 | 50 | 30 | 61 | |
| Offences against the person | 316 | 251 | 282 | 207 | 342 | | |
| Offences against property | 998 | 481 | 963 | 446 | 948 | | |
| Marijuana (ganja) offences | 558 | 554 | 509 | 494 | 628 | | |
| Offenses involving cocaine | 490 | 465 | 355 | 338 | 363 | | |
| All reported crime | 2,957 | 2,228 | 2,877 | 2,101 | 3,254 | | |
| RCIP/Officers & Support | 250/50 | | 270/40 | | 295/40 | 332 total | 322/49 |
| Clearance Rate | 75.3% | | 73.0% | | 78% | | |
| Criminal Court Grand Cayman | 4,923 | | 4,929 | | 5,297 | 6,996 | 10,300 |

Source: *Cayman Island Annual Report and Official Handbook, Cayman Islands Government 1998-2002.*

-16-

surveys conducted by the United States Bureau of the Census), not from law enforcement data sources. (p. 1491)

Dietz doesn't indicate what the victimization surveys in the United States reveal. However, the National Crime Victimization Survey (NCVS), to which he refers, reveals that in 2003 only 38.5% of rape and sexual assault were reported to police.  (NCVS, p. 10)

But the incident in this action occurred in a country within Great Britain.  Could crime data be more reliably reported there?  In England and Wales, the equivalent to the NCVS is the British Crime Survey.  This research concentrates on property crime and confirms that, similar to the US, this type of crime usually is not reported to law enforcement. (Ditton and Farrall)

- <u>More serious crimes against the person have a lower clearance rate</u>. For two years of comparison, the rates were:  20.6% for 1998, and 26.6% for 1999. The rate for this type of crime in 2000 is not known as the RCIP aggregated the reported data and reported a rate of 78% without explaining what the percentages were for the various constituent parts.

- <u>The most relevant crime in this action—offenses of sexual impropriety—shows a weaker clearance rate</u>. In 1998, for this category of offense, the clearance rate was 67.2% and the next year it had dropped to 60%. (As mentioned above, nobody knows what the clearance rate was in 2000, and the subsequent years or and on, because the data were no longer reported.) Sexual offense is the category of crime which concerns this action.  Yet, a perusal of *Annual Reports* over these years does not reflect any innovations about dealing with sexual crimes. One would

-17-

expect for 2003 to see evidence of police program innovation to deal with sexual incidents and other criminal offenses. The number of women employed as sworn police officers is not recorded anywhere in the documentation for these years.

- Nobody knows what the crime pattern was for 2001-02. That's because the government stopped reporting detailed crime data as it had for so many years in the past. Why? This was a time when police departments in the United States were increasingly sharing crime data with the public. No explanation was provided by government. A reasonable conclusion is that the situation had turned severely worse in the Cayman Islands and the less said about it, the better considering the importance tourism has for the economic vitality of the islands.

- Criminal cases heard in court soared from 1998-2002. While the RCIP stopped providing specific crime data to the public with 1999, the courts continued to report on cases heard—criminal and civil. This provides some reflection on matters reaching the court's attention. Such criminal matters are likely to reflect cases of a grave nature. Criminal court cases heard in 1998 and 1999 were about the same. But then double digit increases occurred over the next three years. By 2002—the year of the incident involved in this case—the total cases had soared to 10,300, an astonishing increase of 109.0% in just three years. It is a reasonable deduction that by 2002 crime had reached the highest level ever in the Cayman Islands based on fragmented statistics published by the government.

- The RCIP responded by rapidly increasing police personnel. As mentioned above, when crime increases, the usual response is to throw personnel at the

-18-

problem. From 1998 to 2002, the number of police officers plus staff personnel

grew from 300 to 371, up 23.7%. (Normally, police might increase with the

growth in population.) The growth is especially strong between 2001 and 2002,

when the number of police personnel jumped 11.7 in one year. The RCIP

provides no explanation why from 1999 on the quantity of police and support

personnel grew to such an extent.

- The Cayman Islands government has decided to keep their actual crime statistics
  secret. As observed above, crime data from 2000 on have been reduced in detail
  and clarity while other information less important gushes forth. For example, full
  Fire Services statistics are provided including the number of brush fires (217 in
  2001). Interpol, the International Criminal Police Organization, includes 186
  countries as members, but not the Cayman Islands. If they were a member, they
  would be expected to publish crime data for the world to see. The Cayman Islands
  *are* included as a sub-unit member of Interpol under the United Kingdom. But in
  this category they are not obliged to provide crime data.

- Bloggers report that crime in the Islands is worse that the positive p.r.  On a blog
  managed by www.caymannetnews.com a picture emerges from experiences that
  indicate problems residents and visitors have had about crime.  Here are two
  postings (March 26, 2004), though not contemporaneous with the attack on the
  plaintiff, as they occurred just about two years after the attack on Ms. Genereux:

  > *Since crime statistics have not been submitted to Interpol for years, how*
  > *can anyone be sure that the government is not altering crime statistics in*
  > *Cayman? For example, the US State Department website states that rape*
  > *and sexual assaults are likely "underreported," etc. in Cayman. Also,*

-19-

*there is much more crime in Cayman than most US municipalities of 40,000 residents—that is a fact. Calling Cayman safe perpetuates a myth in my opinion—Anonymous.*

*As a former resident of Cayman...As I remember most of the crime committed in Cayman was aquisical, it fed a drug dependency or was gang related, the prison was full most of the time. Cayman needs to educate their young, having a zero tolerance on juvenile crime, setup a DTO (Detention Training Order), ASBO (Anti-Social Behaviour Orders) and insure the offender learns from the experience—John Newby.*

While these two reports post-date the attack in 2002, they reflect post-incident skepticism about the accuracy of Cayman crime data, in one case, and disillusionment generally with the criminal justice system there, in the other.

- <u>Cayman government officials themselves instituted a crime crackdown</u>. By 2004, the government had become concerned "as a result of the recent spate of violent crimes," reported Brian Buckley in Cayman Net News, Sept. 2, 2004. No statistics were provided on the extent of criminal activity. But the attorney general introduced a new Evidence Law to protect witnesses, the amendment of the Penal Code providing a "two strikes and you are out" provision, and funds to establish a DNA lab at the George Town Hospital. [This would be helpful in rape investigations.] The announcement came at a major press conference attended by the governor, the attorney general, and the acting chief secretary. Earlier that year in a period of a couple of month, violent crimes occurred in the Caymans involving two murders, and armed robbery of a tourist, and stabbings during a home invasion. (Cayman Net News, March 26, 2004)

- <u>Sexual attack risks in the Caymans are noted in travelers' advisories</u>. The US Department of State warn visitors to the Cayman Islands in 2003 that sexual

-20-

assault was one of the risks:

> *Violent crime is rare in the Cayman Islands, but petty thefts occur. There have been incidents of sexual assault, some reportedly involving the youths of so-called "date rape" drugs, such as ruhyonol. To avoid being victims of crime, Americans should exercise common sense and take basic precautions, including being aware of one's surroundings, not walking alone after dark or in remote areas, and using reasonable caution when offered food or beverages by persons unknown to them.*

## How Dangerous a Paradise?

By May 2, 2002, the chances of risks to members of the public in Grand Cayman, were growing substantially from the levels of earlier years. This was apparent from government reports even when government stopped to be so forthcoming with this information. The Caymans were attracting and developing a criminal class who sought easy spoils from the wealth created by tourism, the liberal banking and incorporation laws of the country, and the high economic standing relative to similar islands or the nearby mainland. The growing drug culture undoubtedly contributed to the loss of controls. The Caymans had become a paradise for offenders, which was recognized by the government with its exceptional proposal that occurred two years following the attack on Ms. Genereux. Business operators would have or should have noted the shifting risks to employees, customers, and the general public and make appropriate adjustments to their security endeavors.

## Settled Matters and Findings

The findings in this case flow from certain working assumptions made in the course of the fact-finding and the review of documents in the action. Some of these assumptions are to my mind settled matters. I offered them not with a legal opinion, because I am not a lawyer, but from an expert's perspective having consulted with businesses on security and managerial issues since 1970.

**Here are the settled matters**:

- Kimberly Genereux was grievously injured on or about May 3, 2002, by an unknown male, while she was in the women's restroom of the Westin Casuarina Hotel on Seven Mile Beach, Grand Cayman, the Cayman Islands.

- Genereux was legally present on the site at the time of the attack. She had visited the islands "more than six times since the year 2000." (Second Amended Complaint, p. 4; Genereux p. 30) She previously "had visited the Premises on several occasions...for the purposes, *inter alia*, of shopping, touring, lounging, bathing, dining, and using the lavatory facilities of the Premises." No signage indicated that the use of the facility was prohibited to someone such as the plaintiff. No gate, guard, alarm system, or physical barriers prevented a person from using the restroom facilities at any time they were open. Ms. Genereux had, in fact, been on the premises earlier in the day and was told by an employee of the Hibiscus Spa to use the restroom where she was attacked later the same day. (Genereux, pp. 58-60)

- The daily care and control of the premises is the responsibility of the operator

Columbia Sussex Corporation. This was (and is) a substantial business in the hospitality industry owning, operating, or managing approximately 58 properties in 2002. Operators hire, supervise, fire employees, care for the guests and property, and attend to the myriad details in operating such a facility. For all effective purposes Columbia Sussex Corporation and Galleon Beach Resorts are interchangeable. (McGovern, p. 101, 104-05; Mitchel, p. 82-83, 97-98)

- The ultimate responsibility for quality control and operations is that of the franchisor and licensor, Starwood Hotels & Resorts Worldwide, Inc., and Westin Hotel Management. The reason for this opinion is because of the extensive power held by the licensor. Starwood/Westin exercises, if it choose to, almost minute control over any licensee. This includes, but it is not limited to: exterior and interior design including colors used, landscaping maintenance, pool lounge furniture, signage, elevator cab decoration, and countless other issues. On a design review memorandum dated October 6, 2002, Starwood manager Steve Sherman provided approximately 23 "changes for compliance" that the Westin Casuarina Resort would be expected to implement. Despite the fact that the Governor's Ballroom had just been renovated, the memo called for replacing the carpet, lighting, and wall covering. Starwood/Westin monitored complaints and comments from patrons and its own visiting checkers. Additionally, an outside audit firm, Lashner Rush Associates (LRA), provided a trained, disinterested site audit to assure that standards were maintained according to the Starwood/Westin expectations. The LRA report for 2002 of the Westin Casuarina in Grand

-23-

Cayman, covers 27 pages of detail.  Additionally, as mentioned, the chain itself would send its own personnel to check the location and counsel local management on what needed to be done differently.  If Columbia Sussex failed to meet criteria established by Starwood/Westin, the licensor had all the cards.  Physical design, daily operations strategy, reservations, sales promotions, personnel decorum and performance, and the TV channels guests were able to access were specified from the Starwood/Westin system.  Starwood/Westin even dictates how many sheets (three) should be on the bed of an up-scale room and that "all rooms contain a 4-cup coffee brewer and service, auto shut-off per Brand OS&E. Standards."  It is common sense that the much larger and more experienced hospitality entity, Starwood/Westin, would have the first word and the last word when it comes to security.  It's the licensor that holds the big stick with almost four pages of single-spaced terms for termination. They call it "de-franchising." Liquidated damages also must be paid in circumstances where the licensee uses the Westin name or services upon termination or expiration of the agreement.

The System License Agreement between Westin License Company and

Galleon Beach Resort (licensee) states:

> (i) *Westin Hotel Company (WHC) has been in the business of owning and managing first-class, high quality, hotels for many years...throughout the world.  Based upon its experience, WHC has developed a system...of WHC's marketing, reservation and front-office systems, operations manual and guidelines, training with respect to the foregoing, and certain pre-opening activities (collectively, the "Westin System").*

Further...

> (iv) *Licensee acknowledges that the Westin System includes detailed*

-24-

> *specifications and standards for operating first-class hotels using the Westin name, understands the importance of maintaining first-class hotel standards...in conformity with the specifications and standards for first-class hotel promulgated by Westin.* (System License Agreement, p. 2)

Still later in the agreement:

> 1.11 *Westin Not Liable for Licensee's Obligations.  Westin shall not be responsible for any of Licensee's costs, expenses or obligations associated with the Hotel or its operations. Licensee may not perform any activity or incur any obligation or indebtedness in a manner that could result in making Westin liable for same.*

Westin has a particular interest in any legal actions:

> 4.7  *Notice of Court Action and Material Incident.  Licensee shall notify Westin as soon as practical but in any event within: (a) 24 hours of any incident, and (b) three days of commencement of any action, suit or proceeding, or of the issuance of any order, writ, injunction, award or decree of the court, agency or government instrumentality; that may materially affect the operation of financial condition of the Hotel, Westin, its affiliates, or Licensee.*

Security and life safety issues are not mentioned here in detail.  McGovern confirms that Starwood/Westin maintains a kind of security check of its licensees:

> Q. With respect to the security standards of the type you mentioned before, like double locks and the evacuation card on the back of the door, is there somebody from Starwood or from the Westin brand within Starwood that actually goes out to make sure that the individual hotels are in compliance with those particular standards?

> A. Yes.

> Q. And do they do that through the type of audit procedures that you were telling us about earlier?

> A. Yes. (McGovern, p. 74)

In this incident the license agreement began March 20, 1995, for a period of 20 years.  The licensee has an option of terminating the agreement if the licensee is in

-25-

agreement with the provisions but the licensor "substantially breaches any material provision of this Agreement" that is not remedied within 90-day period of being notified in writing.

**Here are the findings:**

**1. Supervision of security by Starwood/Westin was negligent.** It's expected for a facility operator like Columbia Sussex Corporation to turn to its licensor for guidance on security and life safety matters. However, though Starwood/Westin had good ideas about the thread count of sheets, they didn't provide much leadership about security and life safety. The LRA audit clearly indicates that security-related issues were (and are) part of the Brand Assurance Program. Under the heading Core Essential Standards, the location was required to meet:

**Life Safety (includes door locks, room access, etc.)**

While it is obvious that door locks for rooms are expected, there is no indication that the supervision might extend to public areas where security is required, like public restrooms. (In fact, the Westin Casuarina Resort received a high grade from the contemporaneous survey *except for* Life Safety where it received two negative citations weighted to a value deficit of 20 in the audit's survey.)

Why didn't Columbia Sussex Corporation get a more thorough critique on security and safety measures from its own professional traveling managers? The reason why is that Starwood/Westin has no in-house security director and had none in May 3, 2002. John Bernard McGovern, vice president of operations of a Starwood entity

-26-

currently and vice president of operations/franchise operations for the northeast region of

Starwood on May, 2002, testified:

> Q. Okay. In terms of Starwood's corporate structure, as it
> were, is there a – is there some division of some department
> within Starwood that handles security functions or loss
> prevention functions?
>
> A. No.
>
> Q. Who handles security functions within Starwood?
>      MR. JOHNSON: If anyone.
> BY MR. ITZKOWITZ:
> Q. Right; if anyone.
>
> A. I don't know. (pp. 60-61)

The matter was continued later in testimony.

> Q. Okay. Just as an example, there are different sorts of industry
> groups for the hotel and motel industry that address security
> functions, like Resort Security International or Hospitality Risk
> Controls.
>      Do you know whether Starwood or Westin brand within
> Starwood have people who are members of these organizations?
>
> A. I don't know.
>
> Q. Okay. Do you know if there's anybody that Starwood requires
> to be a member of these organizations as part of their job function?
>
> A. No.
>
> Q. No, they don't, or, no, you don't know?
>
> A. I don't know.
>
> Q. Is there anybody at Starwood or anybody within the Westin brand
> that reviews the security policies that individual Westin Hotels design for
> themselves?
>
> A. No.

Q. Is there anybody within Starwood or within the Westin brand of Starwood that is responsible for providing training to the people who actually operate Westin Hotels to make sure they have proper security training?

A. No. (McGovern, pp. 73-74)

In this circumstance, contrary to the industry trend, such a premium chain as Starwood/Westin cynically cut its chief security officer (CSO) position in the mid-90's as a cost savings measure. Starwood/Westin CSO's membership was dropped from ASIS International by 2001, and this point was confirmed telephonically with Richard Hudak, previously a security director with Sheraton, and a person who knew most of his security colleagues in the hospitality industry. (ASIS *Dynamics*)

Using a list of largest hotel chains from *Hotels Magazine*, I checked the largest organizations (excluding casinos) which are primarily hotel/motel chains to see which have senior security managers at corporate headquarters. The senior security position was determined by comparing membership with either or both of three organizations: the International Security Management Association (ISMA), ASIS International, or the British Security Industry Association. Here is the status of that inquiry:

| Hotel Chain | Senior Security Officer at Hqtrs. |
| --- | --- |
| InterContinental Hotels Group, Windsor, UK | Yes |
| Wyndham Hotel Group, Parsippany, NJ | Yes |
| Marriott International, Washington, DC | Yes |
| Hilton Hotels, Beverly Hills, CA | Yes |
| Accor, Paris, France | Yes |
| Choice Hotels International, Silver Spring, MD | ? |
| Best Western International Phoenix, AZ | Yes |
| Starwood Hotels & Resorts, White Plains, NY | No |
| Carlson Hospitality, Minneapolis, MN | ? |
| Global Hyatt, Chicago, IL | Yes |

-28-

Even many smaller domestic hotel chains have security directors at headquarters: Omni Hotels, Loews, Hospitality International, Ritz-Carlton, Manhattan East Suites, and many others. Of course simply having a competent security director with adequate support in a headquarters office does not translate into a national or global program that will mitigate security-related risks. That person must make a difference and all employees need to be part of the security program.

It is an industry practice that corporate security directors, including for hotel chains, set policies, conduct site visits, train subordinates and associates, advise the Board on progress, and evaluate technology. (McCrie, pp. 3-28)

Starwood/Westin does have security directors for a few of their properties but not the Westin Casuarina Resort, Grand Cayman. The corporation no longer has a CSO with support staff to assure that the latest procedures, legal advisories, and technologies are made available to the properties under their control. Starwood/Westin has not advised that local security services be in place.

Starwood/Westin particularly should be expected to have higher security consciousness because it charges higher rates for its properties. Their properties are above average in cost per room per night. Theodore R. Mitchel, Columbia Sussex Corporation secretary treasurer, testified that guests have an in-house high balance limit of $3,000 at the Westin Casuarina Resort, Grand Cayman. (p. 181) Places that charge more have higher expectation of investing more in all ways, including guest safety and security. In 2005, Starwood owned and operated a variety of properties: Sheraton®, Four Points® of Sheraton, W Hotels, aloft℠, The Luxury Collection®, Le Méridien®, Element,

-29-

Westin®, and St. Regis®. According to *Hotels Magazine* in 2005, Starwood owned or

controlled 257,889 rooms with 845 properties. Such an organization is large enough to

support a security program based at headquarters.

**2. Starwood/Westin puts attention disproportionately on guest comfort**

**issues at the expense of guest safety**. Extensive annual in-house audits of the Westin

Casuarina Resort were inspected for 1999, 2000, and 2001. (The LRA Audit was a

separate document.) These audits are in many ways laudable, designed to provide the

guest with a comfortable stay. However, security is egregiously overlooked. Doors and

door locks must meet Westin Quality Assurance Program requirements. Guests' in-house

room safes are required on a complimentary basis. "A sticker with door locking

instructions is placed just above the guest room/lanai/patio door lock. The notice advises

the guests to lock the door when not in use." Copious details like this occur throughout

the audit. However, major issues like locking facilities in public areas rate nary a word.

The design of the Hibiscus Spa building, constructed only in 2001, violates

principles of Crime Prevention Through Environmental Design (CPTED). Timothy

Crowe, a security consultant, cites nine major CPTED strategy that may be used in any

number of combinations. All of them have relevance—or should have had—in the

construction of the spa facility. One point that is most relevant in this situation:

> *Redesign or revamp space to increase the perception of natural*
> *surveillance*. In this situation the entrance to the waiting room is
> obscured by a pillared portico and a mechanical shed. Someone
> turning down the narrow corridor leading to doors for the restroom
> facilities cannot easily be seen by someone even a few feet away.
> Natural surveillance from the reception of the spa is impossible.
> The design facilitated the criminal occurrence. One doesn't need
> to be formally trained in CPTED to conclude that the design is
> illogical, unnecessary, and dangerous.

Other relevant CPTED principles:

*Provide clear border definition of control space*

*Provide clearly marked transitional zones*

*Redesign the use of space to provide natural barriers*

*Overcome distance and isolation.* In this situation the entrance to the restroom area is far from a spot where employees or guests might discourage or deter improper activity.

**3. Security procedures were negligent at the Westin Casuarina on May 3,**

**2002.** The attack to Ms. Genereux could not and would not have occurred if the facility had merely locked restroom doors after a given hour. The property had no obligation to keep the restrooms unlocked as they did, even in a "safe" island like Grand Cayman. If a customer like Ms. Genereux arrived at the restroom door and found it locked, she could have entered the main building just a few feet away and used a restroom facility there off the lobby.

Once accepting that the facility was unlocked, even though no customers were using the spa or ballrooms, Starwood/Westin had an obligation to provide reasonable security in or near the restrooms. While not a mandated legal consensual standard, industry practices require facilities built and fitted to contemporary circumstances typically have closed circuit television (CCTV) installed and operating to capture the images of persons entering or leaving the premises at all entrances and exits. Such a system is certainly beneficial to law enforcement in conducting an investigation. But CCTV is equally useful in deterring attackers because they know their images are being captured and stored in a secure location off-site. As Figure 3-6 indicate, CCTV was not

-31-

installed in or near the ballroom and spa building where the attack occurred.

**4. Security design was negligent at the Westin/Casuarina on May 3, 2002.**
Lighting appears to be adequate for the foyer leading to the restrooms. However, as shown by Figure 4, no line-of-sights occur from a distant area to the lavatory doors. Hence, no natural supervision was possible concerning people who would enter the restrooms.

Further, the doors to the restrooms as shown in Figures 5 & 6 are too close to each other, facilitating the entry of a male into a facility for females "by accident" is eased by this design flaw.

The lavatory should have had a user's lock inside the door of the restroom. This is an industry practice. It would have been a reasonable public safety measure in view of the accessibility of the restroom facility.

**5. The Westin Casuarina Resort failed to provide reasonable response to the victim after she was attacked.** The purpose of security practices and policies is to protect people first. Everything else is subordinate. This hospitality property which was so sensitive to any guest slight, whim, need, or desire, cold-shouldered someone who was quite obviously injured recently and in severe emotional and physical distress.

The victim testified that after she was injured when she asked the bartender to call police, she informed her that she couldn't:

> Q. What did she tell you?
>
> A. She told me that she couldn't call the police. She had to call the manager. Genereux, p. 76)

A trained security employee—or personnel trained in security—would have

-32-

initially comforted the victim, placed her in a private area, provided a female attendant, then immediately called police and emergency services, and then would have returned to cared for the victim in a sensitive way until authorities had arrived.  Starwood/Westin and Columbia Sussex required no such measures from its employees and no security employees were on site, despite a function taking place that evening.  (Genereux, 28-29) Instead, employees in a bar provided no aid.  The manager on duty arrived much later, apologized, but then provided no assistance until he had required the victim to leave the hotel building, return to the restroom in the spa building, and see for himself that the restroom was in disorder with the louvered doors broken.  Gratuitously, even then, the manager asked if she was "sure" that she had been raped.  When police arrived, the ordeal was continued.  By not calling police immediately—waiting until the manager was personally satisfied that a crime probably had been committed—the chances of arresting the attacker was diminished with a faster police response.

**6.  The attack on Kimberly Genereux should have been foreseeable due to an earlier incident.**  Criminal records produced by the RCIP in this incident are sparse.  No longitudinal study of individual calls for police service at The Westin Casuarina Resort were possible because police either do not have or did not produce the records.  However, in a deposition by Theodore R. Mitchel the following exchange occurred:

> Q. Okay. Earlier today you have mentioned that there was another allegation of a sexual assault at the Westin Casuarina involving a minor female named Reynolds.  Do you know whether any type of analysis was prepared involving her incident?
>
> A. There was an incident report prepared.

Q. Okay. And addition to the incident report was there an analysis of how the Reynolds' incident had occurred?

A. There wouldn't have been any additional report beyond that incident report. (pp. 149-50.)

In the Reynolds case two teenage girls were illegally served alcoholic beverages without the knowledge of the adults responsible for their care and then sexually assaulted by a hotel guest aided and abetted by a room service employee and other hotel employees. The incident occurred on the evening of March 22, 1997 and the following morning. (Reynolds, pp, 4-5)

No conclusion can be drawn about how security might have changed following the Reynolds' incident. It is suggestive, however, that some similarities between the two cases might have existed to the extent that security measures could have improved, but no evidence exists that any significant alterations in protective procedures were implemented. Columbia Sussex and Starwood/Westin didn't seemed to learn anything from this incident. Mitchel further testified:

A. It's my recollection that there wasn't any additional or change that was required to be made in connection with [the Genereux] incident. So I think the answer to your question is, no, we did not do anything to change policy or procedures because of the incident. (p. 151)

Mitchel testified that he was unaware if the Westin Casuarina did undertake quarterly safety meetings as required by internal policy. (p. 151-52)

-34-

## Discussion

The *Handbook on Security* notes: "Of all the specialized security functions, perhaps the most difficult to carry out is that of hotel security. The complex organization of a modern hotel, together with the necessarily ever changing population mix means that ensuring the safety of the guests, staff and the protection of the contents and fabric of the building is one of the most demanding jobs in security." (p. 5.24-01)  The publication further notes: "The fact that a hotel is open 24 hours a day lends it a unique position and those establishments…will suffer more from undesirables than other. Access to…toilet facilities and so on are the principal attractions and the essence of the security man's job is to prevent all non-residents from gaining access…." (p. 5.24-02)

Harry Smith, earlier director of security at Loews Hotels and a member of the National Committees on Security and Safety, American Hotel & Motel Association, notes the dangers when hotel managements fail to put priority on security. He writes:

> There has always been an implied understanding that the traveler stops at the inn not only for the comfort of a bed, a roof overhead, and a meal on the table, but also for the safe haven provided by the lodging. Guests automatically assume that security is high on a hotel's list of priorities, but unfortunately the opposite is often true. (p. vii)

The Westin Casuarina gave short-shrift to security at the expense of the plaintiff, for sure, and others before her. Security does entail a cost, but in a location like a Caribbean island, physical security is a reasonable expectation. Harvey Burstein writes that hotel security is considered a positive by guests:

> The overwhelming majority of guests are aware of the existence of lodging industry security problems of one sort or another. As a result they

-35-

welcome the idea that management is sufficiently concerned with their protection to have a security program. This does not mean that they welcome a security effort that projects the image of an iron camp or a police or military installation. Whether traveling on business or for pleasure, people prefer a relaxed, comfortable, but proper atmosphere, and this mandates that security programs be low-keyed and that a security staff's presence be known but unobtrusive. (p. 83)

The Westin Casuarina had no security program of significance: no proprietary security worker, no contract security service, no CCTV near the spa building, no alarms there, no records of security and safety training of hotel employees (Mitchel, p. 200), no incident report produced, no evidence of on-going liaison with local law enforcement, no reasonable and caring procedures for soothing someone who has been brutally attacked nearby.

So does a facility and its licensor/franchiser have a duty to those who might be injured through negligence?  Norman D. Bates, a lawyer and professor at Northeastern University, wrote:

> An innkeeper has the duty to exercise reasonable care for guests.  If A hotel is experiencing an increase in crime or if the surrounding neighborhood is having problems with crime in a way that could affect the hotel's guests, and the innkeeper fails to respond to that threat by improving or increasing security measures, the innkeeper may be liable for any injuries suffered by guests at the hands of a third party criminal. Even if the offender is not caught, providing that the injury occurred in or immediately adjacent to the hotel's property, the hotel may pay.

> Liability in these cases is predicted on the theory of negligence, in that it was reasonably foreseeable that the injury would occur if corrective action were not taken.  If the innkeeper knew or should have known of the threat, the *reasonable care* rule will apply, establishing that the innkeeper has a duty to protect a guest, failed to do so and as a result a guest was harmed. (p. 526)

-36-

# References

ASIS *Dynamics*. May/June, 2001. (This membership directory shows no CSO at headquarters for Starwood/Westin. An assistant security director of Sheraton, Edward P. Johnson, Jr., appears in this volume but not subsequent editions.)

Bates, Norman D. "Hotel Security" in *Handbook of Loss Prevention and Crime Prevention*, 2nd ed. Lawrence J. Fennelly, ed. Boston: Butterworth Publishers, 1989.

Burstein, Harvey. *Management of Hotel and Motel Security*. New York: Marcel Dekker, 1980.

Crowe, Timothy. "Crime Prevention Through Environmental Design Strategies and Applications. In *Effective Physical Security*, 2nd ed. Boston: Butterworth-Heinemann, 1997,

Dietz, Park Elliott. "Sex Offenses" in *Encyclopedia of Crime and Justice*. New York: The Free Press, 1983, vol. 3.

Ditton, Jason and Stephen Farrall. "The British Crime Survey and the Fear of Crime." In *Surveying Crime in the 21st Century. Crime Prevention Studies*, vol. 22, p. 223.

Hamilton, Peter (ed.). *Handbook of Security*. London: Kluwer Publishing, 1988.

McCrie, Robert. *Security Operations Management*, 2nd ed. Boston: Butterworth-Heinemann, 2007.

National Crime Victimization Survey. "Criminal Victimization, 2003," Washington, DC: Bureau of Justice Statistics, September, 2004.

Smith, Harry. *Hotel Security*. Springville, IL: Charles C Thomas, 1993.

# Robert D. McCrie

### Professor of Security Management

**Department of Law, Police Science & Criminal Justice Administration**
**John Jay College of Criminal Justice**
**The City University of New York (CUNY)**
**899 Tenth Avenue**
**New York, NY 10019**

*Telephone:*    212-237-8386 (Office)        *Faxes:*  212-237-8383 (JJC)
212-237-8032 (Assistant)                  212-534-2957 (Home)
212-348-1553 (Home Office)      E-mail: rmccrie@verizon.net
212-289-0093 (Mobile)

## EDUCATION

Ph.D.    Major: Urban History.  Minor: Criminal Justice History.
CUNY Graduate School & University Center, 1995. Dissertation:
"Crime in a City: Urban Disorder and Its Consequences in
New York, 1890-1990."

M.Phil. CUNY Graduate School & University Center, 1993.

M.A.    History. Hunter College, 1992.  Essay: "Peter Ramus as an Innovator of
Curricular Change in the Sixteenth-Century."

M.S.    Biology.  University of Toledo, 1964. Dissertation: "Physiological
Changes in *Oryzias latipes*."

Certificat D'Études Françaises, Université de Poitiers, Institute D'Études
Françaises de Touraine, 1964.

B.A.    Biology.  Ohio Wesleyan University, 1960.

## ACADEMIC WORK HISTORY

Assistant to full Professor, John Jay                    1986-present

Department Chair                                         1997-2003

| | |
|---|---|
| Adjunct Lecturer, John Jay | 1985-86 |
| Exchange Professor, National Centre for Police Excellence, National Crime and Operations Faculty, Centrex, Bramshill, UK | Sept.-Dec., 2004 |
| Visiting Professor, Chinese People's Public Security University | Oct., 2003 |
| Professeur Invité, DESS, Institut d'Etudes Politiques de Toulouse | 2000, -02,-04, -07 |
| Visiting Professor, Ministry of Public Security, Beijing, China Five College Lecture Series across China | December '00-January '01 |
| Guest Lecturer, Fashion Institute of Technology, Graduate School, Dean's Lecture Series. | 1993-1995 |
| Guest Lecturer, Central Connecticut State University | 1981-1983 |
| Guest Lecturer, Jersey City State University | 1978-1981 |
| Graduate Teaching Fellow. Biology. University of Toledo | 1960-1962 |

## TEACHING

*Courses taught since 1985*

Introduction to Criminal Justice (CRJ 101); American Legal History (HIS 277); Introduction to Security (SEC 101); Security Management (SEC 211); Security of Computers and Their Data (SEC 270); Emergency Planning (SEC 310); Internship supervision (CRJ 398); Independent Study (SEC/PSC/LAW 410); Radical Penology (COR 495); Protection Management Systems (PMT 701); Seminar in Protection Management Systems (PMT 753); Contemporary Issues in Security Management (PMT 754).

Developed and offered an undergraduate courses on Security Management, Emergency Planning, and Radical Penology; also developed and taught two graduate courses (PMT 701 and 754). Taught numerous classes and brief courses and led workshops for the Criminal Justice Institute and the Security Management Institute.

At Institut d'Etudes Politiques de Toulouse, Centre d'Etudes et de Recherches sur la Police, "Radical Penology: The Prison as Society's Most Failed Institution."

*Other Academic Responsibilities*

Served on Ph.D. dissertation, Master's thesis, and Internship committees. Supervised independent study for students in undergraduate and graduate programs. Coordinator of the Security Management undergraduate A.S. and B.S. major programs, 1986-97. Coordinator

of the MS in Protection Management degree program, 1995-98. Chair the Victor Herbert Memorial Scholarship and Richard and Madeleine Rockwell scholarship award panels. Involved in accrediting review committees of Middle States Association of Colleges and Secondary Schools; presidential performance review committee. Search committee for dean of graduate studies. External evaluator of the criminal justice programs for Tiffin University and Eastern Kentucky University. Serve on doctoral committees, Rutgers University and the University of Paris.

## RESEARCH AND PUBLICATIONS

### *Books*

In process **Of Crimes and of Punishments**

2007    **Security Operations Management**. Boston: Butterworth-Heinemann, 2nd ed.

   Reviewed: ☆☆☆☆☆ " The updated edition is well-suited for the experienced professional yet fundamentally enough for the novice or student. The result is an improvement of an already excellent work that will be a reliable resource in the classroom and possibly the corporate boardroom as well." Bob Sena, in *Security Management*, Sept. 2007, p. 208.

2002    **Readings in Security Management: Principles and Practices.** Alexandria, VA: ASIS International

   Reviewed: "It is a delight to finally see the kind of research available to the security industry that the law enforcement community has had access to for years. With its excellent presentation and content, this book is well suited for security practitioners with data-driven programs, for anyone wishing to know more about such programs, and for those participating in undergraduate and graduate security programs." Glen Kitteringham in *Security Management*, May, 2003, p. 128.

2001    **Security Operations Management.** Boston: Butterworth-Heinemann.

   Reviewed: "(M)anagers and management students would do well to analyze successful security departments to learn lessons for other business functions....McCrie masterfully discusses how to interweave security throughout an organizations...Exhaustively researched and well written, this book is an ideal addition to the library of any security management professional." Richard P. Wilson in *Security Management*, July, 2002, p. 152.

   Reviewed: "This book demonstrates the depth of insight that comes from true concentration on the engine of professional security operations—a management team and how it conducts its business....I recommend this book to all security management instructors and to all operational security managers." Jim Calder, in *Security Journal*, vol. 15 (4) p. 75.

### *Edited Publications*

1989-98       **Security Journal,** vetted research quarterly published by Elsevier Science, now published by Palgrave Macmillan

1970-present  **Security Letter**, semi-monthly newsletter published by Security Letter

1993          **Security Letter Source Book**, 5th edition. Boston: Butterworth-Heinemann

*Refereed Journal Articles and Book Chapters*

2006    "A History of Security." In Martin Gill (ed.) **Handbook of Security**, London: Palgrave Macmillan

2005    "Serving Security: A History of Security Management Education at John Jay College of Criminal Justice." **J. Security Education**, 1 (1), 83-93.

2005    "ASIS International." In Larry E. Sullivan (ed.). **Encyclopedia of Law Enforcement**, vol. 2. Thousand Oaks, CA: Sage Publications, pp. 547-49.

2004    "The History of Expertise in Security Management Practice and Litigation." **Security J.**, 17 (3), 11-19.

1999    "The First Murders in New Amsterdam/New York: Origins and Consequences." In Andrew Karman (ed.). **Crime and Justice in New York City.** New York: McGraw-Hill, pp. 13-22.

1998    "Some Notions about the Differences between Homicide in the United States and Turkey." **Polis Bilimleri Dergisi** 1(1): 35-40.

1997    "A Brief History of the Security Industry in the United States." In Marcus Felson and Ronald V. Clarke (eds.). **Business and Crime Prevention.** Monsey, NY: Criminal Justice Press, pp. 197-218.

1993    "Private Correction: The Delicate Balance." In Gary W. Bowman, Simon Hakim, and Paul Seidenstat (eds.) **Privatizing Correctional Institutions.** New Brunswick, NJ: Transaction Publishers, pp. 19-32.

1992    "Three Centuries of Criminal Justice Privatization in the United States." In Gary W. Bowman, Simon Hakim, and Paul Seidenstat (eds.). **Privatizing the United States Justice System.** Jefferson, NC: McFarland & Company, pp. 12-26.

1990    "Planning to Make Police Departments More Secure." **Security Journal** 1(2):95-100.

1988    "The Development of the US Security Industry." **Annals of the American Academy of Political and Social Sciences.** July, 498-23.

1983    Three chapters in Charles Schnabolk's **Physical Security: Practices + Technology.** Boston: Butterworth.


**Bibliographic Compilation**

1993    "Bibliographic Entries on Urban Crime and Policing: New York, London and Paris." Lloyd George Sealy Library.

### Conference Presentations (partial)

2007    "Mutations Securitaires et Appareils Policiers: Certaines Aspects de la Criminalité et de la Sécurité aux Etats Unis." Colloque International du Groupe Europeen de Recherche sur les Normalités (GERN), Institut d'Etudes Politiques de Toulouse, January 26.

2005    "Early Impressions: Positive Results from Response to Hurricane Katrina," Part of a workshop, Review of TOPOFF III and Other Maritime Security Exercises, 4th Annual Expo and Conference, New York, September 21.

2005    Panel member: "Homeland Security and the Academic World: An Evolving Partnership," 51st Annual Seminar and Exhibits, ASIS Intl., Orlando, September 14.

2003    The 'New York Miracle': The Decline in Crime in New York City and How Cooperation between Police and Public Security Helped," 40th Anniversary Convocation of the Police Administration program, Dongguk University, Seoul, South Korea, October 24.

2002    "The Law of Terrorism in the USA: Perspectives since 9/11," Faculty of Law, University of Padova, Italy, November 29.

2002    "Port Personnel Security Screening Requirements: Public and Private Sector Issues," US Maritime Security Conference, New York City, Sept. 18.

2002    "The English and Crime in the City of New York, 1609-1790," International Perspectives on Crime and Justice, London, England, June 18.

2002    "Tourism and Terrorism," conference at the MS in international travel management degree program, University of Toulouse, DESS, January 22.

2001    "Creating Materials to Improve the Teaching of Security Management in Business Schools." ASIS Educational Symposium. University of Maryland. August 2.

2000    "Italians and Crime Involvement in New York City: 1900-1980." International Perspectives on Crime, Justice and Public Order. Bologna, Italy. June 5-9.

2000    "What is the Body of Knowledge in Security Education?" ASIS Educational Symposium. University of Oklahoma. May 25.

1999    "New York and Singapore: What Matters in Policing." Senior Staff Convocation. Singapore Police Academy. January 19.

1998    "Prospects for Security Management Education at Undergraduate and Graduate Business Schools." Pinkerton lecture. ASIS Educational Symposium. John Jay College. October 4.

1998    "Hungarians and Crime in New York City: 1848 to World War I." International
        Perspective on Crime, Justice and Public Order.  Budapest, Hungary.  June 22.

1998    "The Prospects for Master's Degree Programs in Security Management within
        Criminal Justice Graduate Education."  Academy of Criminal Justice Sciences.
        Albuquerque, March 13.

1997    "The Irish and Crime in New York City: How 'We' Stopped Being Criminals."
        AIHS-CUNY Lecture Series.  American Irish Historical Society.  April 9.

1996    "Analyzing Crime Data Real-Time to Improve Performance."  Plenary speaker.
        Convocation.  National Police College.  Ankara, Turkey.  October 16.

1996    "Looking Back through History in Criminal Justice: Yesterday's Faces, Today's
        Problems." Also "Academic Perspectives on Security Management: Japan, Europe,
        and the US." 2nd Annual Conference on Criminal Justice Education, John Jay
        College.  October 5.

1996    "The Irish and Crime in New York City, 1850-1990."  International
        Perspectives on Crime, Justice and Public Order.  Dublin Castle, Dublin, Ireland.
        June 17.

1996    "Crime City?"  Public program series. New-York Historical Society.  March 23.

1994    "The Historian in Non-Academic Roles."  Tribute to Richard C. Wade at the
        Graduate School and University Center Conference at CUNY, October 27.

1992    "Evaluating Advanced Security Systems in a Post-Recessionary Economy."
        SecurTech Conference, Crystal City, VA, April 7.

1991    "Academic Security Programmes in the United States." The Security Profession in
        1991: An International Conference. Loughborough University of Technology,
        England, May 10.

1991    "Technological Advances in Identification and Its Management."  The International
        Security Systems Symposium and Exhibition, Crystal City, VA.  October 29.

1990    "Three Centuries of Criminal Justice Privatization in the United States."
        29th Annual Meeting. Western Regional Science Assn.  Molokai, Hawaii, Feb. 23.

1990    "Issues on Campus Security: Historical Origins and the Use of Security Personnel."
        At Campus Safety: A Colloquium on Policies, Practices, and Research, sponsored
        by the Research Foundation of CUNY, December 18.

1990    "The Privatization of Corrections: Making Profits from Prisons."  7th Annual
        Conference on Criminal Justice Statistics, American Statistical Assn., Dec. 7.

1989    "Integrity Testing—A Management Tool in Transition." Conference on Paper and
        Pencil Integrity Testing, Security Management Institute, February 10.


## *Articles*

2007    "Security Expertise."  In *Encyclopedia of Security Management*, 2nd ed., John J. Fay,
        ed. Boston: Butterworth-Heinemann, pp. 495-98..

2002    "Where Do We Go from Here? Top Corporate Security Chiefs Reflect on Today's
        Risks and Countermeasures," **Forbes**, September 30.


1995    "Law and Order: Should Nassau Cops Work 12-hour Shifts?"  **Newsday**, Op-ed page.
        January 29, p. A49.

1994    "The New Age in Security Communications." **International Security Review**,
        Spring. Pp. 44-46.

1993    "Every Generation: Corruption Hits the Fan." **New York Newsday**, Op-ed page.
        October 6, pp. 90-91.

1993    "Minimum standards for Security Products and Services. **World Security**, pp. 35-37.

1990    "The Vetting Game." **International Security Review**.  May/June, pp. 36-39.

1990    "America—A Market Profile." **Security Industry**, August, pp. 57-59.

1989    "Electronic Guard of Guards." **International Security Review**, March/April,
        pp.84-87.

1988    "Emergency Medical Services in the USA." **Ambulance Mgmt. International**,
        January, p. 21.

1988    With Gerald W. Lynch: "A Gunrunner's Right to Arms." **Newsday**, Op-ed page,
        January 29.

1986    "Terrorism Today and the Manager's Response. "**Mosler Today & Tomorrow**.
        Summer.

1982    "Vetting—Techniques in Britain, the USA, and Germany." **International Security
        Review**, September-October.

*Professional Development (partial)*

2005    Chair, panelist.  Security Day, Jacob Javits Center, May 25.

2002    Chair, panelist, and discussant.  ASIS Educational Symposium, University
of Cincinnati, May 29-31.

1999    Discussant "Corruption in Early America." Conference: Corruption—Public and
Private.  John Jay College. September 8.

2000    Chair, panelist, and discussant.  ASIS Educational Symposium.  University of
Oklahoma, Norman. May 21-23.

2000    "The New York Miracle." Convocation. Escola de Policia de Cataluña, Barcelona

1999    Chair, panelist, and discussant. ASIS Educational Symposium. University of Nevada,
Reno. May 21-23.

1999    Speaker, panelist. Annual Seminar and Exhibits. ASIS, Las Vegas. (And at most
previous annual meetings since 1980.)

1993    Alumni Career Conference, John Jay College. Opportunities in Private Security and
Public Safety Employment. November 5. Chair and speaker.

1992    "The Business Justification for Electronic Photoimaging Identification (EPI), in
Modern Security Systems." CardTech/SecurTech Conference, April 7. Hyatt Chrystal
City.

1992    Loss Prevention Colloquium II, Ft. Lauderdale. Prospects for Integrated Electronic
Systems Controls.

1992    Technical Management Conference, Madison Square Garden. Fraud and Counter-
measures in Telecommunications Systems, October 9.

1991    Keynote speaker. Intl. Assn. For Healthcare Security & Safety. Atlantic City. Oct. 14.

1990    Loss Prevention Colloquium Im Boca Raton. Shoplifting in Victorian Times and
Today.

1990    "What's Good About Hallcrest II? And Bad?"  International Security Conference,
Javits Center, August 28.

1990    "Art Security: The Good, the Bad, and the Indifferent." Museum, Library, and
Archive Security group of New York, June 12.

1988  An Analysis of Recent Security Guard Training Requirements in Major Urban States. Committee on National Security Companies. Boston, October 5.

### Legislative Testimony

2007  Risks from Non-performing Security Services Businesses, Legislative Group, Chicago Center, October 6.

2007  Procurement of Private Security Services for Chicago Area Airports, City of Chicago Council, Committees on Aviation and Finance, July 17.

2006  Concerning the need for higher security guard standards in the State. New York State Assembly Committee on Codes, October 12.

2005  Concerning the Enhanced Professional Security Act of 2005. Judiciary Committee of the City Council of the District of Columbia, June 30.

2005  Crisis in Private Security: Public Safety at Risk, Workshop at the 34th Annual Legislative Conference, New York State Association of Black and Puerto Rican Legislators, Assemblyman Clarence Norman, Jr., chair. February 19.

2003  Testimony re: Intro. No. 105 concerning revision of Section 14-109 of the Administrative Code (involving age of entry to the NYCPD) before the Committee on Civil Service and Labor of the Council of the City of New York. June 9. Also December 16, 2002, same committee.

1991  Legislation on Limit Length of Car Alarm Disturbances in New York City. Convened by Sen. Roy Goodman. June 17.

1990  Hearings on Violence and Security Measures in the Daily News Strike. Convened by Assemblyman Frank J. Barbaro. November 26.

1989  Hearings of the New York Senate Crime and Correction Committee relative to legislation on security guard regulation in the State. Convened by Sen. Christopher Mega. February 23. (S. 266 & A. 427)

## PROFESSIONAL (ACADEMIC) SERVICE

### Journal Reviewer/Consulting Editor

2003-  Advisory Board. **Journal of Security Education.** Haworth Press, Binghamton

1999-  Editor Emeritus; Editorial Board. **Security Journal.** Palgrave Macmillan

1996-  Advisory Board. **Polis Bilimleri Dergisi.** Ministry of Police, Ankara

1990-  International Board of Referees. **Computers & Security.** Elsevier Advanced Technology, Oxford.

1990-  Vet chapters and book submissions for various publishers including: Butterworth-Heinemann, McGraw-Hill, Prentice Hall, and West/Wadsworth.

1990-  Editorial Advisory Board, **The Journal of Asset Protection and Financial Crime,** Centre for Police and Criminal Justice Studies, University of Exeter.

### *Professional Organizations*

2007    American Criminal Justice Association. Section on corrections.

1995-  Academy of Criminal Justice Sciences. Members: Security/Crime Prevention Section.

1990-2001 ASIS International. Standing Committee on Crime/Loss Prevention.

1990-2001 American Society for Testing and Materials. Committee F-12 Security Products and Standards.

1990-2002, present   American Correctional Association.

1990-2004  American Historical Association.

1990-  Urban History Association. Life member.

1987-  American Association of University Professors.

## COLLEGE SERVICE (1990-)

2007-  Faculty and Student Judicial Committee

2003-  US Department of State, Overseas Security Advisory Council

1997-2002 Marshal at Commencement

1997-2003 College Personnel and Budget Committee. Subcommittees: Budget and Re-appointment

1995-98   Master of Science in Protection Management.  Program Coordinator

1994-2000   Martial Arts Society, Faculty Co-advisor

1992-  Faculty Senate Adopt-a-Precinct Program

1990- 1995   Middle States Association/Commission on Higher Education (MSA/CHE)
           Self-study Coordinating Committee

1990-  Faculty Senate and College Council.  Elected (1990-93; 95-96)
       Conducted College-wide evaluation of administrative and staff services by faculty.
       Executive Committee of the College Council, 1995-1996 (elected).

1990-  Student Advisement Program.  Semi-annual

1990-  College Security Committee, intermittent

1988-90   Committee on Student Standards and Retention.  Sub-committee on Retention and
          Academic Standards

1987-2001  Professional Staff Conference.  Alternative delegate to state convention.
           (Elected and re-elected over period)

1986-  Security Management Society.  Founder and Faculty Advisor of student club

1986-97  Security Management Major (A.S. and B.S.).  Coordinator


## DEPARTMENTAL SERVICE

1997-2003     Chair, Department of Law, Police Science and Criminal Justice
              Administration, Re-elected, May 2000.

1994-95       Personnel & Budget Committee

1990-95       Curriculum Committee.  Secretary 1989-90; chair 1990-92


## AWARDS & RECOGNITIONS

### *Institutional*

2001   Medal.  Ministry of Public Security, People's Republic of China

2000   Harvey J. Watson Award, National Association of Security Companies

1996   Security Service Accolade, the International Association of Professional Security Consultants

1992   The Breslin Award, International Security Management Association

1992   The John J. Duffy Award, National Council of Investigation and Security Services

1990   President's Award of Merit, ASIS International

*Collegiate*

2003        Honorary Professor. Zeijang Police College (Hangzhou) China.

1998-99     For "Your Vision and Drive for Perfection." John Jay Student Council

1998 et al.  Certificate of Appreciation in "Recognition of Your Many Significant Contributions as Faculty Advisor to the Security and Safety Society"

## MISCELLANEOUS

2006   "25 Most Influential Security Executives." *Security*, December, p. 39.

## HONORARIES

1960-   Pi Delta Epsilon, *journalism*

1960-   Delta Sigma Rho, *rhetoric*

## CERTIFICATION

1986-   **Certified Protection Professional**. Professional Certification Board of ASIS International. Re-certified each three years.  Current expiration: December 31, 2007.

## OTHER

1978-   **Who's Who in America**

1987-   **Who's Who in Finance and Industry**

1987   **Who's Who in US Writers, Editors, and Poets**

1989   **Who's Who in Security**

November 7, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KIMBERLY GENEREUX, )<br>Plaintiff, )<br> )<br>v. )<br> )<br>COLUMBIA SUSSEX CORPORATION )<br>d/b/a WESTIN CASUARINA HOTEL, )<br>STARWOOD HOTELS & RESORTS )<br>WORLDWIDE, INC., WESTIN LICENSE )<br>COMPANY, WESTIN LICENSE )<br>COMPANY NORTH, INC., WESTIN )<br>MANAGEMENT COMPANY NORTH, )<br>INC., WESTIN MANAGEMENT )<br>COMPANY EAST, WESTIN NORTH )<br>AMERICA MANAGEMENT COMPANY, )<br>INC., GALLEON BEACH RESORT, LTD.,)<br>and CORPORATE DEFENDANTS X1-100,)<br>Defendants. ) | C.A. NO. 05-CV-10879-JLT |

## ANSWER OF DEFENDANT COLUMBIA SUSSEX CORPORATION
## TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

NOW COMES DEFENDANT, COLUMBIA SUSSEX CORPORATION

("CSC") and submits the following responses to the First Set of Interrogatories

propounded to it in the within action by PLAINTIFF KIMBERLY GENEREUX.    In

responding, CSC does not in any way waive or intend to waive, but rather preserves and

intends to preserve, (a) all objections as to competency, relevancy, materiality, and

admissibility of any information provided; (b) all objections as to any infirmity in the

Interogatories; (c) all objections, on any ground, to the use of any identified information

or documents in any other proceeding; and (d) all objections to any further discovery

requests.  Any inadvertent disclosure of privileged information is not intended to and

shall not constitute a waiver of any applicable privilege.   CSC reserves the right to

amend, modify or supplement these responses and objections as necessary.

**Interrogatory No. 1**

Explain in full and complete detail the relationship, if any, between the defendant and (i)
each of the other defendants in this action, (ii) the Premises, and (iii) any persons not
identified in subsections (i) to (ii) who owned, controlled, managed, franchised and or
operated the Premises, detailing in particular:

> (a)    The type, nature and extent of involvement of each entity in the operation
> of the Premises, including without limitation, the ownership, management,
> control, supervision, licensing, and/or franchising of general hotel
> functions at the Premises;

> (b)    The type, nature and extent of involvement of each entity in security
> operations at the Premises, including without limitation, the management,
> control, and/or supervision of security operations at the Premises;

> (c)    The "identification", as defined in Local Rule 26.5(c), of any persons who
> were officers, directors, agents, or managerial employees of more than one
> of the above corporations or entities at the same time;

> (d)    The "identification", as defined in Local Rule 26.5(c), of any documents
> shared in common by the several entities, including, without limitation,
> reports to corporate directors, officers and/or shareholders;

> (e)    Whether any loss prevention, security departments or other departments
> which had as their function loss prevention, security and the prevention of
> crime utilized the same personnel, operating manuals, handbooks,
> guidelines, training procedures, quarterly or other reports, and/or any other
> security or loss prevention information, and, if so, "identify", as defined in
> Local Rule 26.5 (c), all such persons and documents.

**Answer No. 1**

　　　　CSC objects to this Interrogatory to the extent it assumes facts in issue, including
the existence of various "relationships" among the defendants or among one or more of
the defendants and unidentified "persons" who allegedly are associated with the
Premises.   CSC further objects to this Interrogatory to the extent that: (i) it poses
compound questions; (ii) it is overly broad, vague, ambiguous, redundant and unlimited
as to time and scope; (iii) it seeks information that is unrelated to the facts or issues in
this case and is not reasonably calculated to lead to the discovery of admissible evidence;
or, (iv) it seeks confidential and proprietary information or information that is protected
from disclosure by the attorney-client privilege, the attorney work product doctrine,

common interest privilege, or any other privilege or immunity that may be available to CSC.

Subject to the foregoing objections, and upon information and belief, the Westin Casuarina Resort & Spa was owned and operated by Galleon Beach Resort Ltd. on the date of the alleged incident.

CSC and Galleon Beach Resort, Ltd. are separate and unrelated entities. Galleon Beach Resort, Ltd. is not a direct or indirect subsidiary of CSC. CSC does not own any stock or membership interest in Galleon Beach Resort Ltd CSC does not maintain a hotel management agreement with Galleon Beach Resort Ltd.

CSC and Galleon Beach Resort Ltd. are parties to a Service Agreement dated January 1, 1996, as amended on January 1, 1999. Under the terms of the Service Agreement, CSC, as an independent contractor, agreed to provide financial services to Galleon Beach Resort, Ltd. CSC does not provide any facilities maintenance or security services to Galleon Beach Resort Ltd., nor does it control any on-site operations.

With respect to the particular information requested in Items (a) through (e) above, CSC responds as follows:

(a)     The type, nature and extent of involvement of each entity in the operation of the Premises, including without limitation, the ownership, management, control, supervision, licensing, and/or franchising of general hotel functions at the Premises;

See information provided above.

(b)     The type, nature and extent of involvement of each entity in security operations at the Premises, including without limitation, the management, control, and/or supervision of security operations at the Premises;

See information provided above. Galleon Beach Resorts Ltd. owns, operates, manages and controls the Westin Casuarina Resort & Spa. CSC does not manage, control or supervise security operations at the Premises.

(c)     The "identification," as defined in Local Rule 26.5(c), of any persons who were officers, directors, agents, or managerial employees of more than one of the above corporations or entities at the same time;

In 2002, of the six officers of CSC, the following persons held offices in both CSC and Galleon Beach Resort Ltd.: William J. Yung, III, President; Ed Rofes, Vice President of Finance; and Theodore R. Mitchel, Secretary & Treasurer. Of the three Directors of Columbia Sussex, only one was also a Director of Galleon Beach: Mr. William J. Yung, III.

(d)   The "identification," as defined in Local Rule 26.5(c), of any documents shared in common by the several entities, including, without limitation, reports to corporate directors, officers and/or shareholders;

See the foregoing discussion of the Service Agreement between CSC and Galleon Beach Resort Ltd.

CSC objects to this request because it is irrelevant, ambiguous, and overly broad. As explained above, CSC performs certain recordkeeping and reporting functions for Galleon Beach Resort, Ltd. pursuant to the Service Agreement described above. CSC objects to the characterization of any records it prepares or maintains for Galleon Beach Resort, Ltd. as "documents shared in common."

(e)   Whether any loss prevention, security departments or other departments which had as their function loss prevention, security and the prevention of crime utilized the same personnel, operating manuals, handbooks, guidelines, training procedures, quarterly or other reports, and/or any other security or loss prevention information, and, if so, "identify," as defined in Local Rule 26.5 (c), all such persons and documents.

This Interrogatory is not pertinent to the first set of discovery requests pertaining to issues of ownership of the premises.

## VERIFICATION

STATE OF KENTUCKY           )
                                     )    SS.
COUNTY OF KENTON         )

      Derek Haught, being first duly sworn upon his oath, deposes and says that he is the Vice President of Finance of Columbia Sussex Corporation; that he has reviewed the foregoing responses to the Interrogatories served upon Columbia Sussex Corporation in the above-captioned case; that, to the best of his knowledge, the responses are true and correct; that the responses are based upon and therefore necessarily limited by the records in existence, presently recollected, and thus far discovered in the course of the preparation of the responses; and that, consequently, he reserves the right to make changes in the responses if it appears at any time that omissions or errors have been made therein or that more information is available.

_____
Derek Haught
Vice President-Finance
Columbia Sussex Corporation

      SWORN TO AND ACKNOWLEDGED before me, the undersigned Notary Public, on this _6_ day of November, 2006.

_____
Notary Public

**LORI L. SCHENK**
Notary Public, Kentucky State at Large
My Commission Expires Sept. 19, 2008

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------------------------

KIMBERLY GENEREUX,

                     Plaintiff,

           v.

COLUMBIA SUSSEX CORPORATION
STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., WESTIN HOTEL
MANAGEMENT L.P.

                     Defendants.

-------------------------------------------------

C.A. NO. 05-CV-10879-JLT

**AFFIDAVIT OF
NIELS R. OLSEN**

I, Niels R. Olsen, being first duly sworn, depose and say upon personal knowledge:

1. I am the Director of Food and Beverage/Banquet Operations at the Hilton Charlotte Center City, 222 East 3rd Street, Charlotte, North Carolina. I was formerly Director of Food and Beverage at The Westin Casuarina Resort and Spa ("The Westin Casuarina"), operated by Galleon Beach Resort Ltd., in Grand Cayman from September 1997 through September 2003; and I was the Director of Security at The Westin Casuarina from 2001 – 2003.

2. I respectfully submit this affidavit in support of the defendants' motion for summary judgment. I was recently contacted by Robert Brown, the attorney representing the defendants in this case. He sent me a copy of the plaintiff's Second Amended Complaint and parts of her deposition describing her alleged incident on May 3, 2002, and a copy of a Report by Robert McCrie dated February 29, 2008.

3. In September 1997, I became employed by Galleon Beach as the Director of Food and Beverage. In 2001 I also became the Director of Security. I worked in those Senior Management positions through September 2003. Galleon Beach owns the property and operates The Westin Casuarina Resort under license. At all times that I was employed by Galleon Beach, there were signs at the front desk of the Hotel clearly stating that "The

Westin Casuarina Resort & Spa is independently owned and operated by Galleon Beach Resort Ltd. under a license issued by Westin ."

4. I was not on the Island at the time of the plaintiff's alleged incident on May 3, 2002. However, I do recall that when I returned to Grand Cayman later in the month, I was informed of the incident and it was determined to be a police matter involving an alleged criminal assault by a trespasser upon a stranger who was not a guest of the hotel. No incident report was created by the Hotel. While I was not a witness to the plaintiff's incident or the events that evening, I am aware of the security operations which were in place at The Westin Casuarina and why the claims which are made by the plaintiff against the defendants are simply not true and not supportable.

5. My entire career has been in the hotel industry. In 1963 I received a degree from the Copenhagen Institute of Technology, School of Hotel Management; and in 1974 I obtained a Master's of Business of Administration with a minor in Hotel Law from Copenhagen Business College, Copenhagen. I have worked in management positions at major international hotel companies, such as Scandinavian Airlines Hotel Division, Westin-Europe, Wagon Lits Hotels Europe, Scanticon Executive Conference Centers, Hilton Hotels and The Westin Casuarina Resort.

6. In 1985, I became a Certified Hotel Administrator ("CHA"), the highest accreditation level from The American Hotel & Lodging Association Educational Institute at Michigan State University. The "CHA" certification includes a comprehensive examination of all disciplines involved in Hotel Administration equal to a four year study.

7. From 1988 to 1996, I worked as Managing Director at Princeton Hotel Management, Ltd. a marketing and management service company; the largest clients of which were Princeton University, Hilton Hotels Corporation and New Jersey Hotel Motel Association. During that period I represented the New Jersey Lodging and Tourism Industry as a registered lobbyist to the N.J. Congressional delegation in Washington,

D.C., and had client representation as a Government Relations Consultant for Hilton Hotels Corporation in the State of New Jersey. In 1992 I was recognized by Thomas H. Kean, Governor of the State of New Jersey, with the annual Governor's Tourism Award, for my achievements on behalf of the Lodging and Tourism Industries in the State.

8.  In September 1997, I became employed by Galleon Beach. In 2001 I became a member of the American Society for Industrial Security (ASIS)and Director of Security. I also lived across the street from The Westin Casuarina from 1997-2003. I worked approximately twelve hours a day, six days a week and I was often on the hotel Hotel premises even on my day off. I developed a very close relationship with the Royal Cayman Island Police ("RCIP") and became a member of the Cayman Islands Veterans Association because of my military background. I was also very familiar with the Island, the neighborhood and the fact that there was an extremely low crime rate on Grand Cayman. For instance, the regular police do not carry weapons.

9.  I reported directly to the General Manager of The Westin Casuarina, Mr. Daniel Szydlowski, another Galleon Beach employee.

10. At The Westin Casuarina, we developed our own Security Department Procedures and Standards. No other entity dictated how security was to be performed at The Westin Casuarina. This was clearly an operational decision to be performed by the operator of the property. I was familiar with the various Brand Standards provided to the hotel by the franchisor, Westin; and we operated under our own best practices. Neither any recommendations from Westin, nor anything which may have been suggested in a Columbia Sussex Safety and Loss Prevention Manual, controlled how we at The Westin Casuarina would perform on-site security operations. For instance, I determined where we would place signs on the property, such as those related to trespassing.

11. The Westin Casuarina had signs clearly posted that the property was "A Private Resort" and that "All Facilities for Use of Registered Guest Only,", and "For Registered Guests Only."

12. In fact, a sign was posted at the entrance to the property from West Bay Road stating that the property was "For Registered Guests Only"; and another such sign was posted across from the mechanical room (pump room) twelve feet from the parking space curb which was on the pedestrian's left hand side of the walkway along the Governors Ballroom and bathrooms where Ms. Genereux claims to have been on May 3, 2002. The general public is not invited on the premises to use the bathrooms; or to use the Hotel facilities if they are not Hotel guests or patronizing one of the Hotel Restaurants or a Hotel function.

13. The Westin Casuarina property is reserved for registered guests of the resort and spa and guests of the restaurants or banquet functions. It is private property with public access. Access to the beach is permitted through the right of away to the beach front only. All property facilities, beach chairs and on premises services are reserved for the registered guests; and the restaurants, bars and banquet/meeting facilities are reserved for guests of those facilities.

14. As an example of how we at The Westin Casuarina created our own procedures and standards, I created the control systems for beverage control and for food production at The Westin Casuarina. I was aware that as Director of Food and Beverage for the Hotel, I had available to me various Westin manuals addressing food and beverage. Nonetheless, as a Senior Manager of The Westin Casuarina, I created the control systems for the Hotel. Similarly, I created security procedures. For instance, I was the author of the Manual for Hurricane and Severe Storm Procedures., all of which was in use during hurricane Ivan in 2004. Also, I was responsible for all Government visits, including the British Royal Family and the King of Sweden.

15. From 1997 through May 3, of 2002, when Ms. Genereux alleges to have been involved in an incident at the Hotel, there were security measures in place and exercised by The Westin Casuarina. All managers were instructed to periodically patrol the property and they were automatically deputized as security patrols.

16. For instance, during the evening the Manager on Duty would patrol the perimeter of the property which would include a walk around at least twice during the evening to see to it that, for instance, the doors to the Spa and service rooms were locked and one would look into the bathroom adjacent to the Governor's Ballroom. All active property floors were walked/inspected twice during 5 p.m. to midnight and twice again from midnight to morning. There were no locks on the bathroom doors, just as there were no locks on the doors into the Resort in either the front or back of the buildings. It was not deemed necessary to lock the bathroom doors as there was no anticipation of crime in the area or the bathroom.. (Mr. McCrie's February 29, 2008 "Report" is incorrect when it states that the bathroom doors in the Governor's Ballroom had lock sets on May 3, 2002. They did not.)

17. In the period of time that I worked at The Westin Casuarina not one complaint had been raised about any one being attacked on the property or in the vicinity of the Resort.

18. The attorney for the defendants, Mr. Brown, has told me that the attorney for the plaintiff Ms. Genereux has referred to a 1997 episode at the Hotel involving service of alcohol to two underage girls who were guests at the Hotel and a claim of sexual molestation. I also note that it is mentioned in the February 29, 2008 report by Mr. Robert McCrie. I am very familiar with that case, which involved a family named Reynolds. There is no similarity between the Reynolds case and what Ms. Genereux is claiming. In the first instance, there was no rape involved in Reynolds. It was a case of two young girls asking a room service waiter for beer; that waiter improperly providing the beer; and another seventeen year old male Hotel guest and the waiter accepting the young girls' invitation

to their rooms while their mothers were not at the Hotel. That case did not involve strangers and trespassers on the property as does the Genereux Complaint. Following the Reynolds case, I created for the Hotel a strict alcohol service policy.

19. During my years at The Westin Casuarina (including all times prior to May 3, 2002) we had a very good relationship with the Royal Cayman Island Police (RCIP) and a community police officer was available daily to appear on the hotel premises. We also assisted the RCIP International Financial Crimes Unit over a period of time to catch money laundering perpetrators. Police presence is not as noticeable in the Cayman Islands as it may be in America. Sometimes American guests seek reassurance by having police presence nearby. We would accommodate hotel guests' requests to meet the nearby RCIP officers by often introducing the RCIP, especially our Community Officers, to some of our guests to assure them of the safety in the area.

20. The Westin Casuarina is located next to the Governor's House, (where The Governor of the Cayman Islands resides), which is routinely patrolled by the RCIP and has RCIP on premises 24 hours. Since the Governor's complex is adjacent to the Westin, their outside perimeter patrol includes the wall around the compound and includes a wall from the beach through Westin's right of way, the path where the plaintiff stated in her deposition that she intended to take.

21. The Westin Casuarina remained a very safe resort area in 2002.

22. No one from The Westin Casuarina was involved in the criminal assault described by the plaintiff. Nor in anyway could The Westin Casuarina have reasonably anticipated such a criminal attack where there had never before been such an attack or claim; and there was no indication of any such crime in the area. As there was no way for The Westin Casuarina to have reasonably anticipated such an alleged attack, there clearly was no greater responsibility upon Columbia Sussex, Starwood or Westin, none of which were managing, supervising or controlling the security operations of The Westin Casuarina.

23. According to Ms. Genereux's deposition testimony, the unfortunate incident would have occurred in any spot where Ms. Genereux and her attacker were to meet alone.

Respectfully,

NIELS R. OLSEN, MBA, CHA,

Sworn to before me this 8ᵗʰ
Day of March 2008

NOTARY PUBLIC

My Commission Expires
September 10, 2012

7

# MYERS & ALBERGA

### ATTORNEYS-AT-LAW

P.O. BOX 472
HARBOUR PLACE, 2ND FLOOR
103 SOUTH CHURCH STREET
GRAND CAYMAN  KY1-1106
CAYMAN ISLANDS

TEL: (345) 949-0699
FAX: (345) 949-8171
EMAIL: info@myersandalberga.com
WEBSITE: www.myers-alberga.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No.:    05-CV-10879-JLT

KIMBERLEY GENEREUX

     Plaintiff

     v.

COLUMBIA SUSSEX CORPORATION,
STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., WESTIN HOTEL
MANAGEMENT L.P. ,

     Defendants

---

# OPINION

---

1.    We are attorneys-at-law admitted to practice in the Cayman Islands
and have been requested by Mendes & Mount LLP, a firm of
attorneys in the United States of America, to represent one or more of
the Defendants to provide an opinion on certain aspects of Cayman
Islands law.

2.      This opinion is confined to the laws of the Cayman Islands as at 2002 and as such laws are currently. This Opinion will express the law as applied by the courts of the Cayman Islands and we express no opinion as to the laws of any other country.

3.      The Cayman Islands are a British Dependant Territory of the United Kingdom with limited internal self Government.  The common law of the United Kingdom is generally applicable to the Cayman Islands. The final judicial body for the determination of disputes which arise in the courts of the Cayman Islands is Her Majesty's Privy Council.[1] Statutory enactments of the United Kingdom do not apply automatically to the Cayman Islands.  They may be extended by a specific act of the United Kingdom to the Cayman Islands.  The legislature of the Cayman Islands has constitutional power to pass laws applicable to the Cayman Islands subject to a power veto vested in the Governor of the Cayman Islands.

---

[1]      *Cayman Islands (Constitution) Order*, Schedule 2 to the Constitution, Order 58.

4.    The brief outline of the facts upon which we have been requested to give an opinion as to the applicable Cayman Islands law are as follows:

**The Plaintiff alleges that she was walking along West Bay Road in the Cayman Islands during the late hours of the evening. She was being followed by someone in a car, who approached her three times. The Plaintiff felt uncomfortable and nervous. The Plaintiff proceeded to pass over property owned and managed by Galleon Beach Resorts Limited ("Galleon Beach"), a Cayman Islands company, which is operated as hotel under the Westin flag, in order to cross from the West Bay Road on to the beach area of Seven Mile Beach. The Plaintiff after entering the Galleon Beach property, stopped to use restroom facilities located near the conference centre and while in those facilities, the Plaintiff alleges she was raped.**

5.    The question on which we have been requested to provide an opinion is as follows:

**What, if any, duty of care did the Owner and Operator of the Hotel owe to the Plaintiff pursuant to Cayman Islands law and whether that duty of care was breached to such an extent that the Hotel would be found to be liable to the Plaintiff for such a breach.**

6.  In providing the opinion, we have examined all relevant statutory provisions existing in the Cayman Islands, the case law of the Cayman Islands, the common law of the United Kingdom as applicable to the Cayman Islands, judicial decisions of Her Majesty's Privy Council and such other jurisprudence as we have deemed appropriate.

7.  There is no statutory regime in the Cayman Islands which applies to the facts of this case and in the circumstances; guidance for the applicable principles must be sought from the common law derived from the various decisions of courts in the United Kingdom and other commonwealth countries.

8.  In order to be successful in a negligence action, a Plaintiff must establish that the Defendant has a duty of care which is owed to the

Plaintiff and that that duty of care has been breached. The imposition of such a duty arises from a combination of factors, namely the reasonable foreseeability of risk of injury,[2] the requisite proximity between the parties,[3] and the absence of any statutory provision or common law rule which precludes a duty of care in the circumstances.[4] All three considerations must be satisfied if a duty is to be imposed by the law.

9.    The law recognises that a defendant's statutory or assumed obligations or control may create an obligation to protect a plaintiff from the risk of harm if he or she is a member of a class which the defendant knew or ought to have known was specially vulnerable.[5]

10.    The Plaintiff must show that there is a real risk that injury of the kind sustained by the recipient would be sustained by him or her, either as an identified individual or as a member of a class which includes the

---

[2]    *Donoghue v Stevenson* [1932] A.C. 562; [1932] All E.R. Rep 1; H.L. (S).
[3]    *Le Lievre v Gould* [1893] 1 Q.B. 491 C.A. (E).
[4]    *Anns v Merton London Borough Council* [1978] A.C. 728; [1977] 2 All E.R. 492; H.L. (E).
[5]    *Crimmins v Stevedoring Industry Finance Committee* (1999) 200 C.L.R. 1; (1999) 167 A.L.R. 1; H.C.A.

plaintiff, as a result of the acts or omissions alleged to have occurred.[6.]

The risk must not be one that is far fetched or fanciful, and it is not

necessary that its occurrence is probable.[7]

11.    It is not enough to show that the defendant knew or ought to have

known of the potential hazard to persons generally. The plaintiff must

establish that foreseeability of a real risk of injury to the plaintiff or a

class of persons of whom the plaintiff forms part existed at the

relevant time.[8]

12.    The test of whether a risk was reasonably foreseeable must be based

not only upon existing facts known to the defendant but also upon

those which the plaintiff had a reasonable opportunity to learn.

Neglect to avail oneself of an existing means of knowledge renders

one as much liable if damage results as would the failure, if the danger

were known, to take precautions necessary to guard against it.[9]

---

[6]    *Le Lievre v Gould* [1893] 1 QB 491 C.A. (E).
[7]    *Wyong Shire Council v Shirt* (1980) 146 CLR 40; (1980) 29 A.L.R 217; H.C.A.
[8]    *Bottomley v Bannister* [1932] 1 K.B. 458; [1931] All E.R. Rep 99 C.A. (E).
[9]    *Mersey Docks Trustees v Gibbs* (1861) LR 1 HL 93; [1861-73] All ER Rep 397; H.L. (E).

13.   The enquiry by the courts as to foreseeability is a factual enquiry, which is undertaken either to determine whether a duty of care exists, or whether a duty of care has been breached.[10]

14.   The authorities warn of the danger of concluding that a circumstance is reasonably foreseeable when such a finding is essentially based upon the benefit of hindsight and is not based upon the state of knowledge at the time when the duty should have been performed.[11]

15.   The applicable law has established the importance of "proximity" as an essential element in determining whether a duty of care exists. The courts have determined that proximity is an essential element in determining liability in negligence.   In addressing the issue of proximity, the court has determined that it is "... *a separate and general limitation upon the test of reasonable foreseeability in the form of relationships which must exist between plaintiff and defendant before a relevant duty of care will arise ... .*"[12]

---

[10]   *Bolton v Stone* [1951] AC 850; 1 All E.R. 1078; H.L. (E).
[11]   *Rosenberg v Percival* (2001) 205 CLR 434; (2001) 178 A.L.R. 577; H.C.A.
[12]   *San Sebastian Pty Ltd v Minister Administering Environmental Planning and Assessment Act 1979 (NSW)* (1986) 162 CLR 340; (1986) 68 A.L.R. 161; H.C.A.

16.    Reasonable foreseeability and proximity are important elements in

determining liability in negligence. If the act of one person can be

reasonably foreseen as likely to injure another, then this can

sometimes provide an adequate foundation to satisfy the requirement

of proximity. In some instances, the overall proximity of the

relationship between plaintiff and defendant may indicate that the

injury complained of by the plaintiff was reasonably foreseeable.[13]

17.    The general requirement of proximity involves an assessment of the

degree of closeness of the relationship of the parties, and also a

judgment of the legal consequences of that relationship.[14]

18.    Although, the degree of proximity will vary from case to case,

physical proximity (in a temporal sense); circumstantial proximity

(such as an overriding relationship of say employer and employee);

and causal proximity between the plaintiff's injury and the defendant's

---

[13]    *Jaensch v Coffey* (1984) 155 CLR 549; (1984) 54 A.L.R. 417; H.C.A.
[14]    *Jaensch v Coffey* (1984) 155 CLR 549; (1984) 54 A.L.R. 417; H.C.A.

actions provide relevant circumstances for a determination as to whether the requisite degree of proximity in law can be found.[15]

19.    Physical proximity provides the most obvious example of requisite legal proximity, for example, the discharge of a lethal weapon in the presence of someone who is reasonably foreseeable as being in the line of fire.[16] Examples of circumstantial proximity include an occupier's duty towards lawful visitors,[17] the duty owed by school authorities and teachers to pupils[18] and the duty owed by prison authorities to protect fellow inmates from dangerous prisoners.[19]

20.    The identity and the relative importance of the factors that are determinative of the issue of proximity will vary from case to case.[20]

---

[15]    *Jaensch v Coffey* (1984) 155 CLR 549; (1984) 54 A.L.R. 417; H.C.A.
[16]    *Hackshaw v Shaw* (1984) 155 CLR 614; (1984) 56 A.L.R. 417; H.C.A.
[17]    *Australian Safeway Stores Pty Ltd v Zaluzna* (1987) 162 CLR 479; (1987) A.L.R. 615; H.C.A.
[18]    *Barrett v London Borough of Enfield* [2001] 2 A.C. 550; [1999] 3 All E.R. 193 H.L. (E).
[19]    *Kirkham v Chief Constable of the Greater Manchester Police* [1990] 2 Q.B. 283; [1990] 3 All ER 246; C.A. (E).
[20]    *Sutherland Shire Council v Heyman* (1985) 157 CLR 424; H.C.A.

21.    The House of Lords which is the final court of appeal in the United Kingdom for matters coming before those courts, in determining the question of negligence in circumstances in which a defendant failed to prevent third parties (hooligans) from breaking into a derelict cinema building and starting a fire which spread to the adjoining plaintiff's property and destroyed the same, *(Smith v Littlewoods[21])* followed the long established principles of a 1920 case and established that a defendant even though it may be at fault, is not responsible for the injury to a third party which is caused by the deliberate act of a stranger. Lord Goff said:

> *"Even though A is in fault, he is not responsible for injury to C which B, a stranger, deliberately chooses to do."* [22]

22.    The courts are reluctant to imply negligence in cases where damage has been caused by third party intervention and have clearly established that the law applicable to the majority of these types of

---

[21]    *Smiths v Littlewoods Organisation Ltd* [1987] A.C. 241; [1987] 1 All E.R. 710; H.L. (E)

[22]    *Weld-Blundell v Stephens* [1920] AC 956; [1920] All E.R. Rep 32; H.L. (E) (referred to in the leading case of *Smith v Littlewoods Organization Ltd* [1987] 1 All E.R. 710, H.L. (E)

cases places no obligation on reasonable people to take steps to prevent unlikely events, *Bolton v Stone*.[23]

23.   There are special circumstances in which the court has established that a defendant may be responsible for injuries suffered as a result of a third parties' deliberate wrong doing (*Littlewoods*).[24] It has been determined, that a duty of care may arise from a contractual relationship between the parties, which give rise to an imposition or assumption of responsibility upon or by the defendant. In the case of *Stansbie v Troman*,[25] such responsibility was held to arise from a contract, where a decorator, left alone on the premises by the owner was held liable when he went out leaving the door on the latch, and a thief entered the house and stole property.

24.   In the High Court of Australia, which is a commonwealth country and enjoys similar common law heritage as the United Kingdom, the court in a leading case[26] had to determine whether the defendant was liable

---

[23]   *Bolton v Stone* [1951] A.C. 850; [1951] 1 All E.R. 1078; H.L. (E).

[24]   *Smiths v Littlewoods Organisation Ltd* [1987] A.C. 241; [1987] 1 All E.R. 710; H.L. (E)

[25]   *Stansbie v Troman* [1948] 2 K.B. 48; [1948] 1 All E.R. 599; C.A. (E).

[26]   *Modbury Triangle Shopping Centre Pty Ltd v Anzil* (2000) 205 C.L.R. 204; (2000) 176 A.L.R. 411; H.C.A.

to a person attacked at night by three unidentified assailants in an unlit car park in a shopping center owned and operated by the defendant and for whom the plaintiff worked. The court reviewed the history of the applicable law in the United Kingdom and the United States[27] and elsewhere. The majority of the judges acknowledged that in certain limited and special relationships, a defendant had a duty of care to protect against damage caused by third parties and determined that on the facts of the particular case, there was no clear control by the defendant over the third party, there was no assumption of responsibility by the defendant for the safety of persons on its property from attack by third parties, and that although the defendant's failure to leave lights on may have facilitated the crime, but that failure had not caused the crime. The court went on to determine that the crime was not in the category of high foreseeability as discussed in the decision of *Littlewoods*[28] and came to the conclusion that the defendant was not liable to the plaintiff for the criminal act of a third party in these circumstances.

---

[27] *Lillie v Thompson* 332 US 459 (1947).
[28] *Smiths v Littlewoods Organization Ltd* [1987] A.C. 241; [1987] 1 All E.R. 710; H.L. (E)

25.    Since 2004, although we note that the incident in this case occurred in 2002, that the highest Court in the Cayman Islands, i.e. the Privy Council, in facts that are not important to this case, affirmed the decision of the House of Lords in *Littlewoods*,[29] in *A-G v Hartwell*.[30] The effect of this decision makes *Littlewoods* binding authority on the Courts of the Cayman Islands at least since 2004 but it would be highly likely that the Courts of the Cayman Islands would have still followed *Littlewoods* if this case was before it in 2002.

26.    The court affirmed that *Littlewoods*[31] contained the applicable common law and found that although a duty of care was owed by the police force generally to the public at large, that the Constable armed with a police revolver which he had improperly taken had embarked upon a personal vendetta of his own and that the police authority was not responsible for the acts of the officer.[32]

---

[29]    *Smiths v Littlewoods Organization Ltd* [1987] A.C. 241; [1987] 1 All E.R. 710; H.L. (E)

[30]    *Attorney General of the British Virgin Island v Hartwell* [2004] All E.R. (D) 2; [2004] 1 W.L.R. 1273; P.C

[31]    *Smiths v Littlewoods Organization Ltd* [1987] A.C. 241; [1987] 1 All E.R. 710; H.L. (E)

[32]    *Attorney General of the British Virgin Island v Hartwell* [2004] All E.R. (D) 2; [2004] 1 W.L.R. 1273; P.C.

27.    In our opinion, the common law as set out in the cases of
       *Littlewoods*[33], *Modbury*[34], and *Hartwell*[35] is the applicable law in the
       Cayman Islands.  The Plaintiff in the present case would be unable to
       establish in the Cayman Islands that the Plaintiff was owed a duty of
       care which the Owner and Operator of the Hotel failed to fulfill as a
       result of which the Plaintiff suffered damage.  In our opinion, should
       current Cayman Islands law be applied to the facts of the Genereux
       matter by our courts, that the courts being properly directed, and
       applying the relevant law, would not conclude that the Hotel had a
       duty of care to the Plaintiff which it failed to meet resulting in harm to
       the Plaintiff for which the Hotel would be liable.  Both questions
       posed in the opinion in paragraph 5 are answered in the negative.

28.    This opinion is the joint opinion of Michael Alberga, Partner of the
       firm of Myers & Alberga who has been practicing law in the Cayman
       Islands since 1978, and Christopher McDuff, an Associate of the firm

---

[33]    *Smiths v Littlewoods Organisation Ltd* [1987] A.C. 241; [1987] 1 All E.R. 710;
        H.L. (E)
[34]    *Modbury Triangle Shopping Centre Pty Ltd v Anzil* (2000) 205 C.L.R. 204;
        (2000) 176 A.L.R. 411; H.C.A
[25]    *Attorney General of the British Virgin Island v Hartwell* [2004] All E.R. (D) 2;
        [2004] 1 W.L.R. 1273; P.C

of Myers & Alberga who qualified in Australia and is admitted to practice in the United Kingdom and the Cayman Islands.

29.    This opinion is provided solely to the firm of Mendes & Mount LLP, attorneys at law for the Defendants, whose address is 750 Seventh Avenue, New York, NY 10019, USA, and Corrigan, Johnson & Tutor, P.A. whose address is 141 Tremont Street, Boston, MA 02111, USA and with the exception of the relevant courts in the United States may not be relied upon by any third party without the expressed written consent of Myers & Alberga.

DATED:    *3/4/08*

SIGNED:    _____    _____

*Michael Alberga*    *Christopher McDuff*

Myers & Alberga
Attorneys-at-Law
Harbour Place
2nd Floor,
103 South Church Street,
P.O. Box 472 GT
Grand Cayman, KY1-1106
CAYMAN ISLANDS
B.W.I.




# ROYAL CAYMAN ISLANDS POLICE

Tel No. (345)-949-4222
Ext 2917

Fax No. (345)-949-6472

Our Ref: CACT00002266

Your Ref: MLA/ch



PO Box 909
Grand Cayman
Cayman Islands
British West Indies

September 27, 2005

**EXHIBIT**

MITCHEL 10

Michael Alberga
2nd Floor, Harbour Place
103 South Church Street
Grand Cayman

**Re: Westin Hotel Alleged Rape of Kim Generux**

Dear Sir,

I do acknowledge your request as it relates to the subject and do apologize for our late response.

A report was made on the 3rd may 2002 at 11:23PM by Kim Generux stating that she was raped by an unknown male while she was at the bathroom at the Westin Hotel.

According to the complainant she was returning from shopping at Fosters in the Strand. She was walking on the side walk heading to her Villa at # 20 Plantana Villa, on West Bay Road. As soon as she arrived at the first entrance to Westin Resort, she observed a vehicle which drove along side her. The male Driver asked her if she needed a ride. She told him no. She continued walking on the side walk, but decided as she arrived closer to Governor's Residence to walk through the Westin Parking Lot. Miss Generux did so in efforts that the driver would not know where she was residing. She then thought it was best to remain in the restroom for a while, which she did.



Shortly after while she was in the unit with the door closed she observed a male from the waist down. She couldn't have gotten much details of his face because of the type of doors, which had wooden type blades in the middle. This person left and returned minutes after. He switched off the lights and banged on the door eventually breaking it.

He then placed a sharp object to her neck and demanded that she performed him oral sex on him. He also told her not to scream and threatened he would kill her if he did. She then performed Oral Sex on him, after which he placed his penis inside her vagina and proceeded to rape.
After he was finished, he used her underwear to wipe himself off. The suspect then left, after which the victim turned on the lights and made her way to the Westin Lobby and made a complaint.

Subsequently the Police were notified, attended the scene and then transported Victim to the Georgetown Hospital where she was examined and a victim sex kit completed. Her clothing along with the underwear were also collected to be examined. A statement was recorded from victim giving details of the incident.

The Doctor who conducted the examination of victim confirmed bleeding in the vagina with a 1.5 CM laceration on vaginal floor. Two seminal fluid were detected on the interior section of her skirt and on the mid section of her underwear (crouch area). No seminal fluid was detected on the oral swabs.

Officers involved in the investigation, conducted door to door inquires, however no useful information was gathered. She was also taken on a drive along with officers with the hope of identifying a suspect.

Officers who attended the scene observed that when the light in the bathroom is turned off, it is so dark that one can't see the palm of the hands directly in front of their face.

This particular crime was fully investigated and several persons were arrested, interviewed, processed and later bailed. DNA results confirmed that those persons were cleared, subsequently, no charges have been laid. From since this

incident all persons who have been arrested on suspicion of rape have their DNA profile fed into the database for comparison. To date there have been no hits.

Eugene McLaughlin CPS
Detective Sergeant
Specialist Support Operation
Royal Cayman Island Police

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
----------------------------------------------------------------
```

KIMBERLY GENEREUX,

                                 Plaintiff,

                   v.

COLUMBIA SUSSEX CORPORATION, STARWOOD
HOTELS & RESORTS WORLDWIDE, INC., WESTIN
HOTEL MANAGEMENT L.P.

                                Defendants.

```
----------------------------------------------------------------
```

C.A. NO. 05-CV-10879-JLT

**AFFIDAVIT OF
DENZIL LUKE**

Mr. Denzil Luke, being first duly sworn, deposes and says upon personal knowledge:

1.    I am a Financial Accountant within the Accounts Department of the Westin St. Maarteen Dawn Beach Resort and Spa and my address is no. 144 Oyster Pond Road, Philipsburg, St. Maarteen, Netherland Antilles.

2.    I was formerly an employee of the Galleon Beach Resort, Ltd. working at The Westin Casuarina Resort and Spa ["The Westin Casuarina"] in Grand Cayman in 2002; and I respectfully submit this affidavit in support of the defendants' motion for summary judgment.

3.    I was the Night Auditor on duty on May 3, 2002 at The Westin Casuarina. I first encountered the plaintiff Ms. Genereux when one of the bartenders on duty that evening brought Ms. Genereux to the front desk and requested that I call the police on her behalf. As was the hotel policy, I immediately called the Hotel Manager on Duty who reported promptly.

Error! Unknown document property name.

4.    The Night Manager on Duty appeared and Ms. Genereux stated that she had been raped.  The Manager instructed me to call the police immediately and I did so.

5.    While we were waiting for the police to arrive we tried to calm Ms. Genereux down as she appeared to be distraught.

6.    I was present with the Manager on Duty when we asked Ms. Genereux what happened.  She stated that she was on her way home from the Foster's Supermarket in town when she decided to make a diversion through an access way that leads to the beach because that would be a shorter route home.  She explained that this access way was at the North end of the Hotel and lies between the Governor's Ballroom and the Hotel building.

7.    She said that as she proceeded through the access way a man held her and dragged her into the rest room located beside the Ballroom.

8.    She said that she was then raped inside the bathroom.

9.    By that time in her story, the police had arrived in response to our call. Together with the Manager on Duty, the police escorted the lady to where she said the crime took place.  Thereafter, the woman left with the police and I did not see her again.

10.   After Ms. Genereux left the area with the police, I went to the bathroom area, where she said the incident occurred.  I noticed that there was a Foster's grocery bag and groceries strewn about from the street entrance to the Hotel area leading in the direction of the bathrooms of the Governor's Ballroom.

11.   I did not create any incident report that evening or thereafter as I and others at the Hotel believed it to be a police matter involving a  stranger who was not a guest of the Hotel and  a criminal trespasser.

12. Three years after the incident I was asked by the General Manager of the Hotel, Mr. Daniel Szydlowski, to write down what I recalled of that evening. Attached as Exhibit "A" is the statement I created on May 3, 2005.

Respectfully,

DENZIL LUKE

SEEN FOR LEGALIZATION OF THE SIGNATURE OF DENZIL CYPRIAN LUKE, WHO IDENTIFIED HIMSELF WITH HIS BARBADOS PASSPORT NO.0526593, BY ME, FRANCIS EDGAR GIJSBERTHA, A CIVIL LAW NOTARY, ESTABLISHED ON SINT MAARTEN, ON THIS FOURTH DAY OF MARCH, TWO THOUSAND EIGHTH. THIS DECLARATION EXPRESSLY CONTAINS NO OPINION AS TO THE CONTENTS OF THIS DOCUMENT.

Sworn to before me this 4th day of March, 2008

NOTARY PUBLIC
a Civil Law Notary



This Passport contains 32 pages
Ce Passeport contient 32 pages
Este Pasaporte contiene 32 páginas

1

PASSPORT
PASSEPORT
PASAPORTE
BARBADOS

Passport Office
Fee of
$50.00
Paid
BARBADOS

No. of PASSPORT
No. du PASSEPORT
No. del PASAPORTE    0526593

NAME OF BEARER
NOM DU TITULAIRE    Mr. DENZIL
NOMBRE DEL TITULAR    CYPRIAN LUKE

ACCOMPANIED BY HIS WIFE
(Maiden Name)
ACCOMPAGNÉ DE SA FEMME
(Née)
ACOMPAÑADO DE SU ESPOSA
(Apellido de soltera)    SEE PAGE 5

and by
et de
y de    children
enfants
niños

NATIONAL STATUS    NATIONALITÉ    NACIONALIDAD
CITIZEN OF BARBADOS
NNR # 67091I-0057

These are to request and
require in the name of
the Governor General of Barbados all those
whom it may concern to allow the bearer to pass
freely without let or hindrance and to afford
him or her every assistance and protection
of which he or she may stand in need.

BARBADOS

Given at
this    14th    day of
April    1998



2

DESCRIPTION – SIGNALEMENT – SEÑAS PERSONALES

Bearer - Titulaire - Titular | Wife - Femme - Esposa

Profession    NIGHT AUDITOR
Place and date of birth    BARBADOS
Lieu et date de naissance    1967-09-11
Residence    BARBADOS
Height    5 ft 9½ ins    (176 cms)
Colour of eyes    BROWN
Colour of hair    BLACK
Special peculiarities

CHILDREN – ENFANTS – NIÑOS

Usual Signature    1998-04-16    Luke

3

14 APR 1998
BARBADOS


F.E. GUSBERINA, LLM
NOTARY

May 3, 2005

On the night of May 3 2002, I was asked by the bartender to call the Manager on Duty for a young lady who said that she was molested. The Manager on Duty was called and he spoke to her in the lobby area of the hotel. After briefly speaking with the lady, he asked me to call the police because the lady said that she had been raped. The police was immediately called to investigate the matter.

While we were waiting for the police, we tried to calm the lady down since she appeared to be distraught. At this time we asked her what took placed. She said that on her way home from the supermarket she decided to make a diversion through an access way that leads to the beach since it would be a shorter route home. This access way is at the north end of the hotel and lies between the Governors Ball Room and the main hotel building. The lady said that as she proceeded through the access way a man held her and dragged her into the restroom located beside the ball room. The police arrived shortly after and they were escorted by the Manager on Duty and the lady to the scene of the crime.

Denzil Luke