```
                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS

                              Civil Action No. 05-CV-10879-JLT

KIMBERLY GENEREUX,              )
     Plaintiff                  )
                                )
           v.                   )   SECOND AMENDED COMPLAINT
                                )   AND JURY TRIAL DEMAND
COLUMBIA SUSSEX CORPORATION,    )
STARWOOD HOTELS & RESORTS       )
WORLDWIDE, INC., and            )
WESTIN HOTEL MANAGEMENT, L.P.,  )
     Defendants                 )
```

## PARTIES

1.  The plaintiff, Kimberly Genereux, is an individual residing in and a citizen of Cambridge, Middlesex County, Commonwealth of Massachusetts.

2.  The defendant, Columbia Sussex Corporation, is a corporation, duly organized under the laws of the Commonwealth of Kentucky, having a principal place of business at 207 Grandview Drive, Fort Mitchell, Commonwealth of Kentucky, and has been authorized, at all times material, to do business in the Commonwealth of Massachusetts.

3.  The defendant, Starwood Hotels & Resorts Worldwide, Inc., is a corporation, duly organized under the laws of the State of Maryland, having a principal place of business at 1111 Westchester Avenue, White Plains, State of New York, and has been authorized, at all times material, to do business in the Commonwealth of Massachusetts.

4.  The defendant, Westin Hotel Management, L.P., is a

limited partnership of which defendant, Starwood Hotels & Resorts Worldwide, Inc. is the general partner; is duly organized under the laws of the State of Delaware, having a principal place of business at 1111 Westchester Avenue, White Plains, State of New York; and acquired and assumed the assets of former defendants, Westin License Company, Westin License Company North, Westin Management Company North, Inc., Westin Management Company East, and Westin North America Management Company, Inc., subject to any present or future liabilities, by a series of Purchase and Sale Agreements and Bill(s) of Sale, Assignment(s) and Assumption Agreement(s), all dated January 12, 2006.

## JURISDICTION AND VENUE

5.   This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332, as all parties are diverse and the amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of costs and interest.

6.   Venue is proper in this District, pursuant to 28 U.S.C. §1391(a), because the defendants are subject to personal jurisdiction and a substantial part of the events giving rise to this claim occurred within this District.

## FACTS COMMON TO ALL COUNTS

7.   At all times material, the defendants were engaged in the business of, and in the case of defendant, Westin Hotel Management, L.P. is the successor in interest to entities which

were engaged in the business of owning, controlling, operating, managing, supervising, licensing, and/or franchising hotels and hotel chains throughout the United States and in certain foreign countries, including without limitation those hotels known and doing business as "Westin Hotels & Resorts" (hereafter "Westin").

8. At all times material, the defendants and/or their predecessors in interest owned, controlled, operated, managed, supervised, licensed and/or franchised approximately twenty (20) Westin hotels within the Commonwealth of Massachusetts.

9. At all times material, the defendants and/or their predecessors in interest designed, created, adopted, implemented, supervised, and/or enforced policies, practices and procedures to ensure a uniform standard of high quality and service in the operation of all Westin hotels with which the defendants and/or their predecessors in interest were affiliated, wherever such hotels were located.

10. At all times material, the defendants and/or their predecessors in interest owned, controlled, operated, managed, supervised, licensed and/or franchised a Westin hotel which was known as the Westin Casuarina Hotel (hereafter "the Premises"), which was located in George Town, Grand Cayman, Cayman Islands, British West Indies; which territory is an overseas dependency of the United Kingdom of Great Britain and Northern Ireland.

11. At all times material, the defendants and/or their

predecessors in interest advertised the Premises in publications and electronic media intended to solicit citizens of the Commonwealth of Massachusetts to visit the Cayman Islands, in general, and to visit the Premises, in particular.

12. The plaintiff responded positively to such solicitations, visiting the Cayman Islands more than six times since the year 2000, and frequently visiting and utilizing the amenities of the Premises, including, without limitation, patronizing the restaurants, cafes, bars, shops, restrooms, ballroom, lounging, spa, and beach facilities of the Premises.

13. The plaintiff had visited the Premises on several occasions during her visits to the Cayman Islands for the purposes, *inter alia*, of shopping, touring, lounging, bathing, dining, and using the lavatory facilities of the Premises, which were held open for the use of the general public, including both persons who were registered as guests of the Premises and persons who were not registered as guests of the Premises.

14. On or about May 3, 2002, the plaintiff was lawfully present at the Premises as a guest of the defendants and/or their predecessors in interest.

15. At approximately 11:00 p.m. on or about May 3, 2002, after touring and shopping along Seven Mile Beach in George Town, Grand Cayman, Cayman Islands, British West Indies, the plaintiff was walking along West Bay Road, when she stopped to use the

public lavatory facilities of the Premises.

    16.  At said time and place, public lavatory facilities were located, *inter alia*, in the building of the Premises which housed the Hibiscus Spa facility (hereafter the "spa building").

    17.  At said time and place, the women's public restroom in the spa building was located at the end of a long corridor, adjacent to which was a men's public restroom and a locked door which led to an electrical equipment room or room which housed other equipment used to operate the Premises.

    18.  There were no locks on the outer door of the women's public restroom in the spa building at said time.

    19.  There were no cameras, security lights, security mirrors, security officers, or other equipment or personnel to safeguard the safety and security of guests and other persons lawfully using the women's public restroom in the spa building at said time and place.

    20.  The corridor leading to the women's public restroom in the spa building was illuminated at said time and place.

    21.  The women's public restroom in the spa building was illuminated at said time and place, was tidy and clean, and had a vase of flowers on the counter top of the washing facilities.

    22.  The plaintiff entered one of the stalls of the women's public restroom in the spa building and locked the stall door.

    23.  Shortly after the plaintiff had seated herself on the

commode, a person entered the women's public restroom in the spa building.

24. Through the louvered doors of the stall, the plaintiff was able to discern the outline of a man's body and shoes.

25. The man walked into the women's public restroom in the spa building and approached the stall in which the plaintiff was seated.

26. The plaintiff asked the man to leave, stating that he had entered a women's restroom.

27. The man apologized and walked away from the stall and out the restroom door.

28. The plaintiff reached into a bag which she had carried with her, to locate her cell phone.

29. As she looked for her cell phone, the restroom door opened again and the restroom lights suddenly were extinguished.

30. The plaintiff was terrified, screamed for the person to leave the restroom, and "threatened" that she had a cell phone and that she was dialing the telephone number to obtain emergency assistance.

31. Suddenly, the louver doors of the restroom stall were shattered by the force of a person violently breaking the doors in the direction of the plaintiff's face.

32. As the plaintiff tried to protect her face from the flying pieces of broken wood, a man opened the stall door lock,

and grabbed the plaintiff by the throat and chest.

33. In an effort to dissuade her assailant, the plaintiff told the assailant that she had telephoned "911", although she had been unable successfully to complete her call before the assailant grabbed her throat and chest.

34. The assailant twisted the plaintiff's face away from him, put a knife to her throat, and threatened to kill her if she screamed.

35. The plaintiff told the assailant to take her money and her possessions but pleaded with him not to hurt her.

36. The assailant refused her property and instead lifted the plaintiff's skirt, ripped off the plaintiff's underwear, and orally raped her by forcing her to perform oral sex upon him.

37. The plaintiff begged the assailant not to penetrate her vaginally but he insisted and threatened to kill her if she screamed.

38. The plaintiff begged the assailant to wear a condom so that she would not catch AIDS and die, but he refused.

39. The assailant violently, forcefully and against her will vaginally penetrated and raped the plaintiff.

40. All during the assault and rape, the plaintiff was terrified and feared for her life.

41. After the assailant ejaculated, the plaintiff promised not to tell anyone what had happened in order to try to convince

the assailant not to stab and kill her.

    42.   The assailant told the plaintiff to count to 100 before leaving the restroom stall, and the assailant then proceeded to leave the women's public restroom of the spa building.

    43.   The plaintiff exited the restroom stall, turned on the lights in the women's public restroom in the spa building, picked up her underwear and her possessions, observed herself in the mirror and noted that she had blood on her neck, and waited until she thought that it was safe to leave the restroom.

    44.   The plaintiff exited from the women's public restroom in the spa building and walked into the main building of the Premises to obtain help.

    45.   The plaintiff could not locate any attendant or employee of the defendants at the front desk of the Premises, and walked into the bar area of the Premises, where she had observed guests.

    46.   The plaintiff called out loud for help, stating that she had just been raped.

    47.   People stared at her but did not render assistance.

    48.   The plaintiff approached a female bartender that the plaintiff believed to be an employee of the Premises, and asked her to call the police, stating that the plaintiff had just been raped at knife point in the women's public restroom in the Premises.

49. The bartender responded that she would have to call the manager of the Premises, and proceeded to do so.

50. After calling the manager, the bartender continued to serve beverages to guests but did not offer any assistance to the injured and upset plaintiff.

51. After some period of time, a person who identified himself as the manager of the Premises responded, apologized for having been detained, and inquired as to what had happened.

52. The plaintiff asked the manager of the Premises to call the police because she had just been raped at knife point in the women's public restroom of the spa building.

53. The manager refused to call the police unless and until the plaintiff escorted him back to the women's public restroom of the spa building to show him the scene of the crime.

54. Although the plaintiff continued to ask the manager to telephone police and medical assistance, he continued to refuse; so the plaintiff returned to the women's public restroom of the spa building with the manager of the Premises.

55. Upon entering the women's public restroom of the spa building, the Premises manager pointed to the plaintiff's possessions in the restroom, confirmed that they belonged to the plaintiff, and asked the plaintiff if she was "sure" that she had been raped.

56. The plaintiff pointed to the broken restroom stall door

and insisted that she had been raped at knife point.

57.  Only then, did the manager of the Premises escort the plaintiff back into the main building of the Premises to wait while he called the Royal Cayman Island Police ("RCIP").

58.  The manager of the Premises had the plaintiff wait in a room off the main lobby of the Premises until the RCIP arrived; during which time employees of the Premises failed to offer her any assistance.

59.  After the RCIP arrived, the plaintiff was questioned about the rape, forced to return to the women's public restroom of the spa building to recount the rape again, and finally was driven to the George Town Hospital to receive medical care.

60.  The plaintiff suffered severe and permanent physical and emotional injuries, required hospital, medical, and psychotherapeutic care and treatment, and will require additional medical and psychotherapeutic care and treatment in the future; incurred the reasonable and necessary costs of such care and treatment; suffered lost earnings and lost earning capacity; suffered loss of the pleasures and enjoyments of life; and sustained other and further injuries.

### COUNT I:  NEGLIGENCE

61.  The plaintiff adopts, repeats, realleges and incorporates by reference the allegations set forth in the preceding paragraphs as though they were fully set forth herein.

62. All of the defendants owed a duty to the plaintiff to exercise reasonable care in the operation of their hotel in order to safeguard the person and property of the plaintiff while she was lawfully on the Premises which they owned, controlled, operated, managed, supervised, licensed and/or franchised.

63. All of the defendants breached the duty of care which they owed to the plaintiff by their negligent security practices, which included, *inter alia*:

    a. failing to design and construct the women's public restroom in the spa building in accordance with the principles and practices of crime prevention through environmental design and/or similar principles and practices to ensure adequate security arrangements for the protection of guests;

    b. failing to utilize proper working locks and security devices on the women's public restroom in the spa building;

    c. failing to monitor through proper security equipment and personnel conditions on the Premises to ensure adequate security arrangements for the protection of guests;

    d. failing to monitor through proper security equipment and personnel persons who entered the Premises;

    e. failing to monitor through proper security equipment and personnel persons who entered the facilities of the women's public restroom in the spa building;

    f. failing to respond timely, adequately, and courteously

to the plaintiff's requests for assistance, and particularly to her requests that Premises' employees promptly obtain police and medical assistance for her;

    g.    failing to hire and employ properly trained and supervised personnel to design, implement and execute adequate security practices for the protection of persons and property lawfully present upon the Premises;

    h.    failing to properly train and supervise personnel to design, implement and execute adequate security practices for the protection of persons and property lawfully present upon the Premises;

    i.    failing to hire and employ properly trained and supervised personnel to courteously respond to reasonable requests for assistance by persons lawfully present upon the Premises;

    j.    failing to properly train and supervise personnel to courteously respond to reasonable requests for assistance by persons lawfully present upon the Premises; and

    k.    in other divers manners.

    64.    As a direct and proximate result of the defendants' negligence, the plaintiff suffered the damages aforesaid.

## **RELIEF SOUGHT**

WHEREFORE, the plaintiff respectfully demands judgment against the defendants, jointly and severally, in the amount of

Five Million ($5,000,000.00) Dollars, plus costs, interest, and such other and further relief as this Court deems equitable and just.

### JURY TRIAL DEMAND

THE PLAINTIFF RESPECTFULLY DEMANDS A TRIAL BY JURY ON ALL COUNTS OF HER COMPLAINT.

                    Respectfully submitted,
                    The Plaintiff,
                    By her Attorney,


                    _____
                    MARK F. ITZKOWITZ (BBO #248130)
                    85 Devonshire Street
                    Suite 1000
                    Boston, MA   02109-3504
                    (617) 227-1848
                    February 13, 2008

### CERTIFICATE OF SERVICE

I, Mark F. Itzkowitz, counsel for the plaintiff, hereby certify that on this date, I made service of the within document by serving it electronically to registered ECF participants and/or by mailing/faxing/hand-delivering a copy of same to non-registered ECF participants as indicated on the Notice of Electronic Filing ("NEF"), upon the following counsel of record:

| | |
|---|---|
| John B. Johnson, Esquire | Robert J. Brown, Esquire |
| Corrigan, Johnson & Tutor, P.A. | Mendes & Mount, LLP |
| 141 Tremont Street | 750 7th Avenue |
| Boston, MA 02111; and | New York, NY   10019-6829. |

                    /s/ Mark F. Itzkowitz
                    MARK F. ITZKOWITZ (BBO #248130)

Dated:   February 13, 2008