UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10879-JLT

|  |  |  |
|---|---|---|
| KIMBERLY GENEREUX, | ) | |
| Plaintiff | ) | |
| | ) | **PLAINTIFF'S MEMORANDUM** |
| v. | ) | **IN OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTION** |
| COLUMBIA SUSSEX CORPORATION, | ) | **FOR SUMMARY JUDGMENT** |
| STARWOOD HOTELS & RESORTS | ) | |
| WORLDWIDE, INC., and | ) | |
| WESTIN HOTEL MANAGEMENT, L.P., | ) | |
| Defendants | ) | |

## STATEMENT OF THE FACTS

### THE RAPE

On Friday, May 3, 2002, 48 year old Kimberly Genereux was raped in the women's restroom of the Hibiscus Spa building of the Westin Casuarina Hotel and Resort on Seven Mile Beach, Grand Cayman, Cayman Islands.  She was visiting the Islands during a leave of absence from her work as an architect, related to the illness and untimely death of her sister.  Genereux dep.[1], p. 22-23, 96.  Ms. Genereux had visited the Caymans five or six times before 2002.  *Id.,* p. 30.  She was a frequent visitor to the Westin Casuarina, having eaten in its restaurants, shopped at its gift shop, had a drink in its bar, visited its spa, and attended two public conferences at the Governor's Ballroom which is located adjacent to the spa building, although she had not rented a room at the hotel.  *Id.,* p. 30-31, 58-60, 120-22.  She watched

---

[1]Exhibits either are attached to the Affidavit of Mark F. Itzkowitz or were attached to the Affidavit of Robert J. Brown.  They are referenced by description, not by exhibit letter or number.

the Twin Towers fall on September 11, 2001 on a Westin Casuarina lobby television. *Id.,* p. 121. She was well acquainted with the restroom since it was made available to attendees of Governor's Ballroom conferences, *Id.*, p. 122, and had been directed to it as "the public restroom" by spa employees on the afternoon of the rape. *Id.,* p. 59-60.

The evening of the rape, Ms. Genereux went for a walk along the beach, visited friends, shopped at Fosters in The Strand, and started walking back to her vacation condominium along West Bay Road, a "well-lit" "main road in Cayman Islands", carrying two plastic bags. *Id.,* p. 31-45; Map & Photo Key. She was wearing a black skirt, top and shoes. *Id.,* p. 73. At approximately 10:45 p.m., a man stopped his van and offered Ms. Genereux a ride. She declined. As she continued walking, he slowed, stopped and again offered her a ride. Again, she declined. A little further up the road, in the vicinity of the Westin Casuarina, Ms. Genereux believed she saw the van approach from the opposite direction. The driver did not make contact with her a third time. She did not know whether he was a cab driver but she started to get nervous. *Id.,* p. 45-53. Knowing that she was approaching a dark, unpaved area along the road, she decided that she would be safer walking along the well-lit beach. *Id.,* p. 51-54.

Ms. Genereux approached the beach access path located on the Westin Casuarina property, which was identified by a sign. She

2

found the path unlit, "very dark and overgrown", and partially blocked by a piece of machinery. *Id.,* p. 53. She considered it "scary" and felt that she would be safer walking along the hotel walkway through the hotel to the beach. *Id.* *See* Conference Centre at the Westin Casuarina Resort Site Plan ("Site Plan") and Site Plan Excerpt-Identifications for relative locations.

Ms. Genereux approached the spa building as she walked along the hotel walkway. Having been unnerved by the van driver, and not having used a restroom in several hours, Ms. Genereux felt "an urgent need to use the facility". *Id.,* p. 58-60, 95. She went to the same women's restroom to which she had been directed earlier that day. *Id.,* p. 58-62.

The women's restroom was located at a recessed end of a long corridor, adjacent to a mens room and near a storage or equipment room. *Id.,* p. 62-68. Photographs show the approach to the spa building, restroom and stall. It was open and well lit. None of the photographs shows a "no trespass" sign. No key was needed to enter. *Id.,* p. 65-66, 70. No one was in the restroom. "[E]verything seemed normal". *Id.,* p. 65. Ms. Genereux entered the second stall, locked the stall door, and sat on the commode. *Id.,* p. 68; Genereux Aff.

Shortly afterward, Ms. Genereux heard the restroom door open and someone enter. Through the louvered wooden stall door, she saw the lower torso and forearm of a man. Genereux dep., p. 68-

3

69.  She yelled out that he was in the wrong room.  The man apologized, walked away, and left, opening and shutting the door. She took out her cell phone.  *Id.,* p. 69-72.

"Very quickly", the door opened again, the lights were extinguished, plunging Ms. Genereux into "total darkness", and a man entered.  Ms. Genereux "[c]ould not" see the man, could not identify him as the man who had just entered and left, and could not identify him as the man who had driven the van or as another man she had seen along West Bay Road.  *Id.,* p. 70-71, 72.  The Royal Cayman Islands Police ("RCIP") never have identified the rapist although they claim to have investigated several leads, conducted DNA tests, and spoke with the man Ms. Genereux saw along the road[2].  *Id.,* p. 70-71, 87; RCIP Letter to Westin Casuarina Attorney Michael Alberga, September 27, 2005 (hereafter "RCIP Letter").  The RCIP Letter notes that the restroom is so dark when the lights are extinguished that officers could not see the palms of their hands in front of their faces.

Ms. Genereux yelled that she had a phone and was calling the police.  Her efforts to intimidate her assailant failed, as did her efforts to call the RCIP.  *Id.,* p. 71-72.  Wood from the louvered stall door flew at her face as her assailant smashed it.

---

[2]Ms. Genereux had no physical contact and no communication with anyone other than the driver who twice offered her a ride.  There is no evidence that anyone "stalked" her, "pursued" her or followed her from the road into the restroom.

4

*Id.,* p. 72.  The rapist pressed a knife hard against her throat, threatened to kill her and threatened "to cut [her] face up". *Id.,* p. 74.  He pulled her skirt up around her waist and cutting upwards against her right hip, cut her underwear with the knife. *Id.,* p. 73-74.  He raped her orally and vaginally.  *Id.*  He then ordered her to count to one hundred before she left the restroom. He left.  *Id.*

Ms. Genereux waited, left the restroom and walked directly to the Westin Casuarina lobby.  No one was at the front desk. *Id.,* p. 74-75.  A hotel guest directed her to a female bartender at a bar adjacent to the lobby.  Ms. Genereux told the bartender that she had just been raped in the spa restroom and asked the bartender to call the police and hotel security guards.  *Id.,* p. 75-76.  The bartender told her that there were no security guards, *Id.,* p. 84-85, and that "she couldn't call the police. She had to call the manager".  *Id.,* p. 76.  The bartender offered no assistance while Ms. Genereux waited for the manager.  When a hotel employee arrived, he again refused Ms. Genereux' requests that he call the police.  *Id.,* p. 76-78.  Instead, he insisted that Ms. Genereux return to the restroom to show him what had occurred.  *Id.*  After questioning her about the broken wooden louver, the hotel employee had Ms. Genereux follow him back to the hotel and left her standing in a room "alone for quite some time", without so much as a chair or a glass of water.  *Id.,* p.

5

80-83.  Hotel employees entered and left the room to conduct their business, but none would speak with her or respond to her requests for assistance.  One woman finally gave her a glass of water.  *Id.,* p. 81-83, 88-89.

RCIP officers finally responded, had Ms. Genereux return to the scene of the rape again, and finally took her for hospital treatment.  *Id.,* p. 82-89.

The rape has had a devastating impact upon Ms. Genereux. Unable to function emotionally, she was terminated by Flansburgh Associates, Inc., her employer of eighteen years, notwithstanding her professional accomplishments and the high regard in which her employer had held her before the rape.  *Id.,* p. 10-22.  She has been in in-patient and out-patient psychotherapy since the rape. She has been diagnosed as suffering debilitating post-traumatic stress disorder, major depressive disorder, and dissociative disorder.  Reports of Eleanor K. Egan, LHMC (February 21, 2005 and September 16, 2007).  She suffered physical injuries from the rape which have hindered her ability to defecate and which will require surgical repair.  Report of David S. Chapin, M.D. (February 29, 2007 [*sic*]).  She no longer has been able to perform even the function of a shop clerk in a small tourist town.  Her vocational abilities have been curtailed severely. Report of Norman C. Hursh, ScD, CRC, CVE (February 10, 2008). Her lost earning capacity nears one million dollars.  Report of

6

Allan M. Feldman, Ph.D. (February 27, 2008).

**STARWOOD/WESTIN CONTROL OF SECURITY AT THE WESTIN CASUARINA**

The Westin Casuarina Resort, Grand Cayman is a "first-class resort facility" operated pursuant to a 20 year System License Agreement ("SLA") executed in March 1995 by Westin License Company, *inter alia*.  SLA, Summary of Terms, p. 1, ¶1, ¶3.  It services a wealthier clientele than most other Columbia Sussex hotels.  Mitchel dep., p. 182-83.  Room rates of $350 per night during high season "are common".  *Id.*  Few other Columbia Sussex hotels command that high a rate.  *Id.*  Guests are permitted to incur charges of $3,000 before they are requested to pay down the charges.  *Id.,* p. 180-81.  Columbia Sussex Secretary Treasurer, Theodore Mitchel, *Id.,* p. 15-16, testified that the Westin Casuarina "has always been special".  "[I]t's one of the nicest properties we have and he's [Columbia Sussex president, William Yung] always taken a special interest in it."  Theodore Mitchel dep. in *Keppner v. Galleon Beach Resort, Ltd., et. als.,* Index No. 011724/2003 (N.Y. Sup. Ct., Erie County)(hereafter "Mitchel *Keppner* dep."), p. 34.

The SLA defines a "Westin hotel" as "any hotel or resort operated under the Westin name".  SLA, p. 4.  Defendant, Westin Hotel Management, L.P., is the successor in interest to the Westin License Company and the Westin Hotel Company.  Defendant Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") owns

7

Westin and operates it as a "brand" of hotel, having taken
control of Westin in approximately 1997 or 1998.  McGovern dep.,
p 44, 106.  Starwood owns several hotel brands/chains.  *Id.*, p.
44-45.  Starwood owns and operates some Westin hotels and
licenses others.  It is the only corporation with the ability to
license or franchise Westin hotels.  *Id.*, p. 53-55.  John
McGovern, Vice President of Aloft and Element Operations for
Starwood, designated to testify on behalf of both Starwood and
Westin, *Id.*, p. 5-6, testified that Starwood and Westin are "one
company, one license"; "I look at it as the same.  I mean, we own
Westin".  *Id.*, p. 104.  Starwood assumed control of Westin
franchise agreements when it took control of Westin.  *Id.*, p.
106.  Starwood is one of the ten largest hotel companies and was
at the time Ms. Genereux was raped.  American Hotel & Lodging
Association, DIRECTORY OF HOTEL & LODGING COMPANIES (74th ed.,
2005)("2005 HOTEL DIRECTORY"), p. 613; American Hotel & Lodging
Association, DIRECTORY OF HOTEL & LODGING COMPANIES (71st ed.,
2002)("2002 HOTEL DIRECTORY"), p. 689.

> The SLA, p. 2, paragraph (i), recites that:

> Westin Hotel Company ("WHC") has been in the business
> of owning and managing first-class, high quality,
> hotels for many years and has performed management
> services and related functions throughout the world.
> Based upon its experience, WHC has developed a system
> for hotel marketing and operations under the Westin
> name that includes access to certain of WHC's
> marketing, reservations and front-office systems,
> operations manuals and guidelines, training with
> respect to the foregoing, and certain pre-opening

activities (collectively, the "Westin System").

In paragraph iv, the licensee

> acknowledges that the Westin System includes detailed
> specifications and standards for operating first-class
> hotels using the Westin name, understands the
> importance of maintaining first-class hotel standards,
> and desires to operate and maintain the hotel or resort
> facility in conformity with the specifications and
> standards for first-class hotels promulgated by Westin.

"Westin Hotel Standards" are defined as "the minimum standards,

specifications, and requirements for the Hotel to operate a

first-class, high quality hotel or resort under the Westin

System. ... The Westin Hotel Standards are contained in Westin

Operations Manuals and in periodic directives".  SLA, p. 4.

"Westin Operations Manuals" are defined, in part, as "manuals and

guidelines prepared and revised from time to time by Westin for

use by licensees in operating the hotels and resorts in

accordance with the Westin System", and are identified in SLA

Exhibit 1 to include the Westin Quality Assurance Program Manual

for Franchised Hotels, the Facilities Standards Manual, and the

Property Maintenance Reference Guide,.

The licensee's use of the Westin Operations Manuals is

described as both a "right and obligation".  SLA, p. 5, ¶1.3.

The Licensee agrees that it

> shall operate the Hotel as a first-class facility and
> in a clean, orderly, and respectable manner in
> compliance with this Agreement and the Westin Hotel
> Standards. ... Licensee shall at all times implement
> all portions of the Westin System in its operation of
> the Hotel.  In operating the Hotel, Licensee shall use

9

> only ... services that conform to the Westin Hotel Standards.

SLA, p. 10, ¶4.1.  Licensees commit to maintaining the Westin Standards.  McGovern dep., p. 148.  Westin/Starwood retain the "right ... to inspect the Hotel for compliance with the terms of the Agreement and the Westin Hotel Standards".  SLA, p. 13, ¶4.8. Licensees agree to submit to inspection to determine conformity with the Westin Standards.  McGovern dep., p. 149.  Material non-compliance with the Agreement or with the Westin Hotel Standards gives Westin/Starwood the right to suspend the licensee's access to the Westin Reservations System[3], to send a quality assurance inspector to work with the Hotel at licensee's cost, to retrain licensee's employees at licensee's costs, to credit or rebate guests at licensee's cost, *Id.*, and, where the licensee fails to cure deficient compliance with the Westin Hotel Standards timely, to terminate the SLA.  *Id.*, p. 13-14, ¶5.3.  Columbia Sussex acknowledged that it was obliged to comply with Westin operating and brand standards and policies.  Mitchel dep., p. 52-53.

Westin/Starwood's rights to enforce the Westin Hotel Standards are not theoretical.  Starwood has been "committed to eliminating poor representation of the brand".  McGovern dep., p. 28.  Starwood "de-franchised" hotels that "didn't comply with the

---

[3]A significant penalty because the SLA guarantees the licensee 30,000 annual room nights for the Hotel in each calendar year commencing after the third full year of Hotel operations.  SLA, Exhibit III, ¶4.

particular brand standards". *Id.*, p. 28-29. Starwood
defranchised "many" hotels because "[t]hey didn't meet standards.
They weren't compliant.  They were in poor condition physically,
and they were bad representations for the brand". *Id.*, p. 259-
60.  When he was Starwood's Vice President of Franchised
Operations, Mr. McGovern was responsible for ensuring compliance
with brand standards. *Id.*, p. 30. Starwood regional directors
of operations would examine franchised hotels to enforce
compliance with brand standards. *Id.*, p. 74-76. Lashner Rush &
Associates ("LRA"), a third party auditing firm, would audit
franchise compliance with brand standards. *Id.*, p. 36-37, 74-75.
Action plans were prepared to bring offending hotels into
compliance. *Id.*, p. 114. Meetings, telephone calls, and related
follow up were designed to "drive compliance". *Id.*, p. 114-15.
Hotels that remained out of compliance with several standards
would face " a legal process outlined in the license that could
lead to termination". *Id.*, p. 115. Standards were set by the
brand.  Standards were mandatory:  "No ifs, ands, or butts [*sic*].
You have to have it". *Id.*, p. 116-17. The fact that hotel
employees who offended against mandatory Westin standards were
not Westin or Starwood employees but franchise employees made no
difference to the licensee's duty to comply with brand standards
or to the imposition of penalties for failing to comply.  The
Westin Casuarina was cited in LRA audits for the failure of its

employees to repeat its guest's name the required number of times in conversation and to say "thank you" often enough. LRA Audit (September 24, 2000), Executive Summary p. 8-10, Report "B" p. 1; LRA Audit (April 24, 2001), Executive Summary p. 8-9, Report "B", p. 1, Report "K", p. 1.

Westin brand standards included a number of standards related to hotel security. The Westin Quality Assurance Program/ QAP 2000, a comprehensive list of Westin brand standards in effect shortly before Ms. Genereux' rape, McGovern dep., p. 219, required the provision of security escorts to guest rooms and automobiles by a designated hotel employee. *Id.*, p. 220-21; QAP 2000, p. 83. A standard mandated the type of response franchise employees were to display to guests who had suffered loss or injury. McGovern dep., p. 222-24; QAP 2000, p. 73. Standards governed the types of locks required for guest room entry doors, balcony doors, and connecting doors to adjoining rooms. McGovern dep., p. 69; QAP 2000, p. 92. Most significantly, the Westin standard required locks that are "high grade and difficult to force" for "public area doors". McGovern dep., p. 225; QAP 2000, p. 126. Public area doors include public restroom doors. McGovern dep., p. 226. As a standard, "all Westin Hotels, whether franchised or owned and operated, had to have high grade locks that are difficult to force on public area doors". *Id.* The same standard applied in 2001 and 2002. *Id.*, p. 231-32. The

same review and audit procedures used to enforce other aspects of the Westin Hotel Standards are used to enforce compliance with those standards which govern hotel security. *Id.,* p. 74.

Columbia Sussex acknowledged Westin Casuarina's obligation to comply with Westin security standards. Mitchel dep., p. 56-57. Moreover, Columbia Sussex acknowledged that it was obliged to enforce Westin provisions relating to security which appeared in the Westin manuals even if Westin did not term such provisions "standards". Thus, the Westin Casuarina was obliged to enforce the requirements of keeping all interior and exterior areas and grounds safe and secure, of taking adequate safety and security precautions in all areas of the hotel, and of taking adequate safety/security precautions in all public restrooms, and restricting access by unauthorized persons to the restrooms. *Id.,* p. 204; Westin Hotels & Resorts Property Maintenance Reference Guide, p. I-31.

## COLUMBIA SUSSEX CONTROL OF SECURITY AT THE WESTIN CASUARINA

Galleon Beach Resort, Ltd. ("Galleon Beach"), a Cayman Islands corporation, formally is the other signatory to the SLA. Defendant Columbia Sussex, a Kentucky corporation, is in the business of owning and operating hotels and resorts. Mitchel *Keppner* dep., p. 6. Galleon Beach and Columbia Sussex are "affiliated companies", sharing a "common ownership string". Mitchel dep. in *Reynolds v. Westin Hotel Company, et. als.,*

13

U.S.D.C. E.D. Ky. Case No. 97-77 (March 16, 1998)(hereafter
"Mitchel *Reynolds* dep."), p. 66-67.  The officers of Columbia
Sussex hold identical offices in Galleon Beach.  Mitchel dep., p.
80-82.

    Although Columbia Sussex has a relationship with eight
Westin hotels, Mitchel dep., p. 50, 111, it has not executed
System License Agreements or any other type of agreement with
Westin for any of the hotels.  *Id.*, p. 54-55.  Instead, Columbia
Sussex has other entities execute the SLAs and then executes a
separate agreement between Columbia Sussex and the company which
executes the SLA.  *Id.*  Columbia Sussex executed a "Service
Agreement" with Galleon Beach, which ostensibly had Columbia
Sussex provide only limited services for Galleon Beach, including
maintaining records, paying bills and preparing financial
statements. *Id.*, p. 57; Service Agreement.  The Service Agreement
was executed by Theodore Mitchel as Secretary/Treasurer of
Galleon Beach and by Joseph Marquet as Vice President of Finance
for Columbia Sussex.  Service Agreement, p. 2.  The 1999
amendment to the Service Agreement was executed by the same men
holding the same offices for the opposite corporations:  Marquet
for Galleon Beach and Mitchel for Columbia Sussex.  *Id.*, p. 3.
The role reversal was not a typographical error.  Mitchel dep.,
p. 115-16.

    The defendants argue that the Service Agreement insulates

Columbia Sussex from liability on the grounds that it assumes no responsibility for operating the Westin Casuarina.  The evidence demonstrates that the Service Agreement is a convenience that Columbia Sussex asserts when it seeks to deny legal liability but ignores when it deals generally with the Westin Casuarina.

Columbia Sussex identifies the Westin Casuarina as one of its hotel properties on the Columbia Sussex website.  Mitchel dep., p. 109-111; Columbia Sussex website excerpt.  Industry publications list Columbia Sussex as owner of the Westin Casuarina and do not identify the resort as a franchise.  2005 HOTEL DIRECTORY, p. 220, 675; 2002 HOTEL DIRECTORY, p. 155. Galleon Beach does not appear in the 2002 or 2005 HOTEL DIRECTORY.  Advertising placed by Columbia Sussex for the Westin Casuarina does not identify a limited relationship between Columbia Sussex and the resort.  Mitchel dep., p. 106-08.  To the contrary, a press release originating at Columbia Sussex' office in Ft. Mitchell, Kentucky, announcing the opening of the Hibiscus Spa, stated:  "The Westin Casuarina Resort and Spa is owned and operated by Columbia Sussex Corporation".  *Westin Casuarina Opens Luxury Spa* (Hospitality Job Resource, Feb. 13, 2002).

Starwood/Westin understood Columbia Sussex to be the operator of the Westin Casuarina.  McGovern dep., p. 105. Columbia Sussex employees told Starwood Vice President McGovern that Columbia Sussex "had a hotel in the Cayman Islands and it

was the Westin Casuarina". *Id.*, p. 105-06.  McGovern testified
that the Columbia Sussex website accorded with his understanding
that Columbia Sussex owned or operated the Westin Casuarina.
*Id.*, p. 108.

In violation of Westin Corporate Identity Manual standards,
p. I2, I3, Columbia Sussex did not identify either itself or
Galleon Beach as the Westin Casuarina franchisee on printed hotel
documents which Westin required contain such identification.
McGovern dep., p. 124; Columbia Sussex' Manager's Manual, p.
I2.3.  Franchisee identification is mandated by Starwood/Westin
in order to distinguish franchisees from Westin itself, in part
so that guests will not hold any franchise deficiencies against
the Westin brand.  *Id.,* p. 118-23.  LRA Audits cited the Westin
Casuarina for violating corporate identity brand standards.  LRA
Audits (August 30, 1999; September 24, 2000).

Even Columbia Sussex employees are told of the so-called
"limited" relationship only "on a need-to-know basis".  Mitchel
dep., p. 108.  Accordingly, Westin Casuarina Service Express
Supervisor Kellie Ann Lowell, who had held that position since
the opening of the Westin Casuarina, testified that Columbia
Sussex controlled the Westin Casuarina by "doing business as
Galleon Beach".  Lowell dep. in *Reynolds*, p. 4-7.

The project manager for the construction of the Westin
Casuarina was a Columbia Sussex employee.  Mitchel *Keppner* dep.,

p. 11, 17-18.  Architectural diagrams for the construction of the Hibiscus Spa building, including the restroom where Ms. Genereux was raped, identify "[t]he Westin Casuarina Resort Grand Cayman Island [as] [a]nother successful property of Columbia Sussex Corporation".  *See* Site Plan.

The Westin Casuarina is referenced repeatedly in the Columbia Sussex Manager's Manual, a detailed guide prepared by Columbia Sussex to instruct Columbia Sussex managers how they should carry out certain practices at their hotels.  Mitchel dep., p. 173, 178-81, 183-86; Columbia Sussex Manager's Manual, p. B16.14, B16.16, B29.2, F7.1, I2.3, I11.1.  The Westin Casuarina is included among other Columbia Sussex insurance exposures when Columbia Sussex purchases insurance in order to increase Columbia Sussex' insurance buying power.  Mitchel dep., p. 63-64.  The Casuarina is part of Columbia Sussex' insurance claim history data base.  *Id.*, p. 41.  As the person in charge of Columbia Sussex' risk management, *Id.*, p. 25, Mr. Mitchel reviewed insurance claims to determine trends, *Id.*, p. 29, and included the Westin Casuarina as part of the Columbia Sussex analysis.  *Id.*, p. 41.

Most importantly for the case at bar, Mitchel ordered the Westin Casuarina to comply with the Columbia Sussex Corporation Safety & Loss Prevention Manual.  *Id.*, p. 93.  That Manual had been written by Columbia Sussex employees who answered to Mr.

17

Mitchel as the person in charge of Columbia Sussex' Risk Management Department. *Id.*, p. 139. Mitchel reviewed the Manual for Columbia Sussex Corporation before it was issued. *Id.*, p. 138-39. Columbia Sussex employees under Mitchel's direction updated the Manual and Mitchel reviewed and approved the updates as part of his responsibilities for Columbia Sussex. *Id.*, p. 140. The Manual is a proprietary document so secret that it was produced to plaintiff's counsel in this action only after a confidentiality agreement had been signed. Defendants' Motion to Supplement Exhibit 1 to their Motion to Redact - With Assent of Plaintiff (Doc. No. 54-2, March 6, 2008). Moreover, the defendants sought and received an Order from this Court that excerpts of the Manual not be filed in Court notwithstanding that the confidentiality agreement allowed their use with respect to motions in this action. Order Granting Motion to Redact Confidential Business Records (March 11, 2008). Nevertheless, Mitchel sent a copy of the Manual to a corporation other than Columbia Sussex (Galleon Beach) and instructed the Westin Casuarina to follow the Manual even though it applied to Columbia Sussex and not to Galleon Beach, Mitchel dep., p. 91-93, and even though Mitchel testified that he lacked authority to change hotel operations. *Id.*, p. 43-44. When reminded of the distinction that the defendants seek to make between the functions and duties of Columbia Sussex and Galleon Beach, Mitchel responded "we're

18

splitting hairs". *Id.*, p. 138.  He responded similarly in *Reynolds* when the distinction was pointed out to him: "getting caught up in semantics here".  Mitchel *Reynolds* dep., p. 72.

Similarly, Mitchel used Columbia Sussex employees, who were not employees or officers of Galleon Beach, to convey his instructions to the Westin Casuarina.  Mitchel dep., p. 96-97. Mitchel could not recall any occasion when the Westin Casuarina refused to carry out instructions conveyed by Columbia Sussex employees who were not Galleon Beach employees or officers. *Id.*, p. 100-01.

Mitchel testified that he held the "Corporate Management" and "Risk Manager" roles and performed the responsibilities designated in Section 2 of the Safety and Loss Prevention Manual at and before Ms. Genereux' rape. *Id.*, p. 137, 145-46.  Yet, he failed to carry out the responsibilities of those positions in any meaningful way. *Id.*, p. 140-43, 149, 150-55, 158-59.

**THE NEED FOR PROPER SECURITY AT THE WESTIN CASUARINA**

Hotel industry practice requires hotel security directors to set policies, train subordinates, monitor progress and evaluate technology, among their responsibilities.  Expert Witness Report of Robert J. McCrie, Ph.D., CPP[4], p. 29.  The starting point of any analysis is a review of crime and crime trends in the area of

---

[4]The defendants scanned Dr. McCrie's report so the plaintiff will not re-scan it but is filing an original.

the hotel.  *Id.*, p. 14.  Dr. McCrie's review concluded that
"serious crime increased substantially during the study period,
1998-2002" and the trend "was sufficiently clear that business
owners and operators" should have recognized it.  *Id.*, p. 14-15.

The Cayman Islands' two main industries are offshore banking
and tourism.  Both industries benefit from an elevated level of
secrecy, especially with respect to crime information.  Thus, the
parties in this case have been unable to obtain RCIP reports of
the rape of Ms. Genereux[5] or even her hospital emergency room
records.  Detailed RCIP crime reports are no more forthcoming.
Official government reports[6] obfuscate crime information and
since 2002 have all but omitted it.  The Cayman Islands does not
provide crime information to Interpol.

However, the limited information available was sufficient
for Dr. McCrie to identify the following evidence of a serious
crime problem.  Grand Cayman criminal court records, which are
reported and which do not include Cayman Brac or Little Cayman
islands, increased exponentially between 1999 and 2002:  109%
during the entire period, 32% from 2000 to 2001, and 47% from
2001 to 2002.  *Id.*, p. 16, 18; Cayman Islands Annual Report &
Official Handbook (2002), p. 74.  Sexual offenses more than

---

[5]The RCIP Letter is not an official report but one of three such
letters.

[6]Excerpts of Annual Reports referenced by Dr. McCrie are annexed.

doubled from 2000 to 2001 and were not reported in 2002.  McCrie report, p. 16, 17.  Criminal clearance rates for sexual offenses were dramatically below clearance rates for other offenses, particularly reported drug offenses.  *Id.*, p. 15-18.  The RCIP increased the size of its force by 11.7% between 2001 and 2002 alone and by 23.7% between 1998 and 2002.  *Id.*, p. 18-19.  By contrast, the population of the Cayman Islands grew by 18% between 1995 and 2006.  *Id.*, p. 7.  In 2003, the U.S. State Department issued a travel advisory warning American travelers of the danger of sexual assaults in the Caymans.  *Id.*, p. 20-21.  By 2004, the Cayman Islands government instituted a crime crackdown, increasing criminal penalties, modifying evidentiary standards, and adding DNA testing facilities.  *Id.*, p. 20.  Cayman citizens reported their concerns to Caymanian media.  *Id.*, p. 19-20.

While the crime statistics are insufficiently detailed to refer directly to the Westin Casuarina or its immediate vicinity, the defendants were aware of crime on their own premises.  Of the approximately 80 hotels owned and/or operated by Columbia Sussex, Secretary/Treasurer Mitchel could only recall two incidents of alleged sexual assaults.  *Id.*, p. 38.  Both incidents occurred at the Westin Casuarina.  *Id.*  One involved two teen age girls.  He was not designated to testify on behalf of Columbia Sussex in any case involving damages arising from criminal incidents other than those which arose at the Westin Casuarina.  *Id.*, p. 8.

21

**NEGLIGENT SECURITY PRACTICES AT THE WESTIN CASUARINA**

Ms. Genereux alleges that the three defendants were liable directly for their negligent security practices in addition to being liable vicariously for the negligent security practices at the Westin Casuarina.  Dr. Robert McCrie's report  outlines the defendants' negligence.

Security practices at Starwood/Westin were prepared by the Westin brand team; the same individuals who determined standards for bedding, shampoo varieties and location, and similar matters. McGovern dep., p. 65, 66-67.  No one within the Westin brand of Starwood is responsible for designing security standards, policies or practices.  *Id.,* p. 69-70.  There is no standard broadly governing security at Westin hotels.  *Id.,* p. 64.  There is no standard governing the use of security devices at Westin hotels, such as security guards/personnel, alarms, panic buttons, or closed circuit television systems.  *Id.,* p. 65.

Neither Starwood nor Westin review security policies established by individual Westin hotels.  *Id.,* p. 73, 199. Neither Starwood nor Westin make any body of consultants or experts available to Westin hotels to handle security functions. *Id.,* p. 72.  Neither Starwood nor Westin ever have conducted an analysis of crime levels in the area of a franchised Westin hotel.  *Id.,* p. 245.  Neither Starwood nor Westin provide any security training to the operators of individual Westin hotels to

ensure that they are properly knowledgeable regarding hotel
security. *Id.,* p. 73-74. No one at Starwood or Westin even is
responsible for ensuring that franchised hotels are developing
any security polces at all. *Id.,* p. 83. Starwood vice
presidents of franchised operations do not analyze or review
analyses prepared of crime levels in the areas of franchised
hotels within their jurisdiction. *Id.,* p. 246. Although brand
recognition is so important to Starwood and Westin that standards
govern the type of shampoo to be placed in bathtubs, Starwood/
Westin insist that they set no standards to insure that Starwood/
Westin hotels are safe and secure inside and out. *Id.,* p. 204-6.

No person, division or department at Starwood is responsible
for overseeing security at Starwood owned and licensed hotels.
*Id.,* p. 60-61, 63. Starwood vice presidents of franchise
operations do not review or design security policies. *Id.,* p.
79. They do not even have security consultants assigned to them
to help them review and enforce security standards at Starwood
hotels. *Id.,* p. 81. Starwood does not use outside consultants
to devise or review security standards. *Id.,* p. 70.

However, Starwood and Westin do acknowledge an obligation to
provide reasonable security for all persons lawfully on their
property. *Id.,* p. 201-02. Starwood/Westin expect that Westin
hotels will be kept safe and secure and will take adequate safety
and security precautions in all areas of the hotel, including

public restrooms. *Id.*, p. 208-09, 210-11. They draw no
distinction between owned/operated and franchised hotels. *Id.*,
p. 195-96. They draw no distinction between registered guests
and persons lawfully on their premises who are not registered
guests. *Id.*, p. 201-02. There is no evidence that unregistered
guests are required to notify Westin hotels when they enter
Westin property. There is no evidence that Ms. Genereux ever was
required to notify the Westin Casuarina of her presence when she
frequented its spa, gift shop, ballroom, restaurants, or lobby.
Photographs of the property do not show "no trespass" signs.

Yet, Starwood/Westin's designated deponent was unaware of
any situation where Starwood or Westin required a franchised
hotel to change its security practices. *Id.*, p. 242. None of
the many Starwood hotels defranchised for failing to comply with
Starwood brand standards were defranchised due to security
considerations. *Id.*, p. 260-61. LRA audit reports repeatedly
cite the Westin Casuarina for failing to adhere to Westin brand
standards relating to security. The 1999 audit which LRA
summarized as "somewhat disappointing", Letter to Hotel, p. 1,
cited failures to comply with Westin standards relating to the
use of secondary locking devices on guestroom patio doors, the
provision of security information, Report "D", p. 5, the absence
of door locking instructions on guest room entry doors, Executive
Summary, p. 8, employees publicly revealing guest room numbers

during the check-in process, *Id.*, p. 11, the absence of working locking mechanisms on public restroom stall doors, *Id.*, and the use of a recording to answer an emergency telephone. *Id.*, p. 12. Report "B", p. 1, 14, 19 (reciting standards). The 2000 Audit similarly reports breaches of various Westin security standards: the absence of locks on connecting room doors, Executive Summary p. 11, inconsistent use of secondary locking devices on patio doors, *Id.*, the absence of a deadbolt on the door to the safety deposit box room, *Id.*, p. 13, and connecting a caller directly to a guest room without confirming the caller's knowledge of the guest's identity, *Id.*, p. 7. Report "B", p. 2, 10, 12, 13, 15; Report "D", p. 4, 5; Report "H", p. 1; Report "K", p. 2, 8, 9, 10 (reciting standards). The 2001 Audit showed some improvement in limiting guest room access, Executive Summary, p. 11, 13, but cited hotel employee failure to explain guest room security features. Executive Summary, p. 10; Report "B", p. 6; Report "D", p. 2. Security breaches continue to be reported in the 2002 Audit: the absence of patio door locks, Summary Standards Compliance, p. 5 and Detail Report p. 14, the absence of security notices, *Id.*, and revealing room numbers during the check-in process, Detail Report, p. 7. A Starwood/Westin Design Review Memorandum concerning the Hibiscus Spa facility prepared three months after Ms. Genereux' rape cites more than 20 deficiencies in "public spaces" but fails to cite the absence of a lock on the

women's public restroom door despite the Westin standard
requiring one.  Design Review Memorandum; QAP 2000, p. 126.

Dr. McCrie concluded that Starwood/Westin violated the
hospitality industry standard of care.  McCrie rpt., p. 26-32.
Failing to maintain a security department was a violation of the
standard.  At least, seven of the ten largest hotel chains, and
all of the upscale chains, had a senior corporate security
officer.  Only Starwood did not.  *Id.,* 28.  Not only was the
absence of a corporate security officer a violation of the
industry standard, Starwood countered the industry trend because
Starwood had such a position in the 1990's and eliminated it as a
cost saving measure.  *Id.*

Nor did Columbia Sussex have a distinct security department.
Mitchel dep., p. 45, 76-77.  Security arrangements generally are
handled by Columbia Sussex' district manager of operations.  *Id.*
However, no Columbia Sussex employee analyzes crime levels in the
vicinity of Columbia Sussex hotels.  *Id.,* p. 197.  Columbia
Sussex has no district manager of operations for the Cayman
Islands.  *Id.,* p. 48-49.  The Westin Casuarina manager answered
directly to Columbia Sussex' owner/president, William Yung,
including with respect to the Westin Casuarina's security needs.
*Id.,* p. 49, 78.  Mitchel, Columbia Sussex' risk prevention
director, did not know if anything ever had been done by the
Westin Casuarina to collect information relating to crime in the

Cayman Islands. *Id.,* p. 196-97.

Although Columbia Sussex paid Westin Casuarina employees and maintained their personnel files and payroll records, *Id.*, p. 66-69, Columbia Sussex has no record of any Westin Casuarina employee whose function was to provide security, loss prevention or risk management services, *Id.*, p. 68-70; Response of Defendant Columbia Sussex Corporation to Plaintiff's Request for Production of Documents and follow-up correspondence between counsel dated September 10 and 19, 2007 (Mark F. Itzkowitz to Robert J. Brown and John B. Johnson) and September 28, 2007, January 8 and 25, 2008 (Robert J. Brown to Mark F. Itzkowitz). Nor does it have any record of an outside security company providing services at the Westin Casuarina, Mitchel dep., p. 66, although such services had been used before Ms. Genereux had been raped. *Id.*, p. 83-84. Neither of the Westin Casuarina employees who have submitted affidavits for the defense have testified that any security was called or even existed. Luke Aff.; Olsen Aff. Although Westin Casuarina's former Food and Beverage Director has proffered an affidavit claiming to be the Casuarina's security director at the time of Ms. Genereux' rape, his testimony is suspect in light of Columbia Sussex' and Mitchel's lack of knowledge about his existence. Moreover, membership directories of the American Society for Industrial Security do not list him as a member in 2000, 2001 or 2002, although he attested that he was. ASIS

*Dynamics* (May/June 2000), p. 318; ASIS *Dynamics* (May/June 2001), p. 319; ASIS *Dynamics* (May/June 2002), p. 328.  He is not identified as the Westin Casuarina security director until after Ms. Genereux' rape[7].  ASIS *Dynamics* (May/June 2003), p. 332.

There were no cameras, security lights, security mirrors, security officers, or other equipment or personnel to safeguard the safety and security of guests and other persons lawfully using the women's public restroom in the spa building when Ms. Genereux was raped.  Genereux Aff.; Second Amended Complaint, ¶19.  The Westin Casuarina did not employ closed circuit television.  Mitchel dep., p. 167.  There were no locks on the outer door of the women's public restroom in the spa building at the time of Ms. Genereux' rape.  Genereux Aff.; Second Amended Complaint, ¶18.  Photographs of the restroom taken since her rape show locks on the restroom doors, demonstrating feasability. Mitchel was unaware whether the Westin Casuarina locked doors on the spa building or elsewhere on the premises, although he "expect[ed]" that certain areas would be locked in the evening to limit access.  *Id.,* p. 169-70.

Dr. McCrie reports defects in the security procedures in place at the Westin Casuarina at the time of Ms. Genereux' rape

---

[7]Photographs of the hotel disprove his averments about "no trespassing" signs.  The Mitchel and McGovern depositions disprove his irrelevant non-expert opinions about the significance of the Westin Hotel Standards and Columbia Sussex Safety & Loss Prevention Manual.

which are attributable to Columbia Sussex.  McCrie rpt., p. 30-
34.  The failure to have a working lock and to lock the restroom
door on the isolated spa building was the simplest and most
obviously correctable defect.  *Id.,* p. 31.  However, the design
of the building, constructed only the year before Ms. Genereux'
rape, violated principles of Crime Prevention Through
Environmental Design ("CPTED") and created an attractive nuisance
for criminals by isolating and obscuring the spa restroom, by
blocking lines of sight to the restroom, by omitting crime
deterrent construction and security devices, and by placing
unlockable male and female restroom doors so close as to
facilitate "accident[al]" entry of males into female restrooms.
*Id.,* p. 30-32.  Contrary to the defendants' argument, Memorandum
p. 12, the defendants' violation of CPTED principles, developed
thirty years earlier in architect Oscar Newman's 1972 treatise,
DEFENSIBLE SPACE-CRIME PREVENTION THROUGH ENVIRONMENTAL DESIGN,
did invite criminal activity, and certainly enabled its success.
Security treatises prepared more than a decade before the
Hibiscus Spa was completed noted that "[a]ccess to ... toilet
facilities and so on are the principal attractions and the
essence of the security man's job is to prevent all non-residents
from gaining access".  McCrie rpt., p. 35, *quoting* Peter Hamilton
(ed.), HANDBOOK OF SECURITY (1988), p. 5.24-02.

　　　Finally, both Dr. McCrie and Starwood/Westin's designated

deponent, Mr. McGovern, agreed that the Westin Casuarina's response to Ms. Genereux' rape violated both industry and Westin standards.  McCrie rpt., p. 32-33; McGovern dep., p. 248-49.

**ARGUMENT**

**STANDARD OF REVIEW**

Summary judgment is only appropriate when "there is no genuine issue as to a material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. United States Department of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).  The moving party bears the burden of making the preliminary showing that there exists no genuine issue of material fact.  *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir. 1995).  Only then need an opposing party proffer specific facts demonstrating that there is a trial-worthy issue.  The Court must indulge all inferences in favor of the plaintiff as the non-moving party.  *Moody v. Boston and Maine Corp.*, 921 F.2d 1, 2 (1st Cir. 1990).  "[T]o survive summary judgment a plaintiff is not required to rely only on *uncontradicted* evidence".  *Calero-Cerezo*, 355 F.3d at 19 (emphasis in original).  The evidence in the case at bar more than suffices to defeat the defendants' motion.

30

## APPLICABLE LAW

A federal court sitting in diversity must apply the choice of law principles of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Massachusetts courts apply the law of the place of injury to determine the applicable duty of care and breach thereof unless another state is deemed to have a more compelling interest. *Cohen v. McDonnell Douglas Corp.,* 329 Mass. 327, 333-34 (1983).

Ms. Genereux alleges that each of the three defendants was negligent both directly and vicariously: "directly" for their independent failures to promulgate and enforce adequate security provisions for the various hotels under their control, and "vicariously" for the failure of the Westin Casuarina to provide adequate security at the time of the rape of Ms. Genereux. Arguably, direct liability occurred at the defendants' corporate headquarters, Ms. Genereux' domicile, and/or the locus of injury: New York or Delaware (Starwood/Westin); Kentucky (Columbia Sussex); Massachusetts (Ms. Genereux); and/or the Cayman Islands. Vicarious liability standards are determined by the law of the Cayman Islands. Negligence and premises liability laws are similar in all of those jurisdictions.

## LAW OF THE CAYMAN ISLANDS

There is no decision by a court of the Cayman Islands which definitively explicates the Cayman tort law of premises liability or negligent security.  In circumstances where there exist "no Cayman precedents nor any Privy Council authority on the point", and therefore,

> there is no binding authority in Cayman law, then ... the court must reason by analogy from principles reflected in binding precedents, or look to non-binding decisions from around the common law world to find persuasive statements of the law.  The importation of Lord Atkin's famous "neighbour principle" from the celebrated case of *M'Alister (or Donoghue) v. Stevenson* [[1932] A.C. 562; [1932] All E.R. Rep. 1; 1932 S.C. (H.L.) 31] (despite the fact it was a Scots law, not a common law case) into the law of torts of virtually every common law jurisdiction around the world, is an illustration of this process.

*R. v. Seymour*, 2003 CILR 53, 62-63 (Gr. Ct.)[citation added][8].

The common law elements of negligence which apply in the Cayman Islands and in the British Commonwealth generally are familiar to an American practitioner.

There are four requirements, namely:

(1) the existence in law of a duty of care situation, *i.e.* one in which the law attaches liability to carelessness.  There has to be recognition by law that the careless infliction of the kind of damage in question on the class of person to which the claimant belongs by the class of person to which the defendant belongs is actionable;

(2) breach of the duty of care by the defendant, *i.e.* that he failed to measure up to the standard set

---

[8]Foreign decisions not produced by the defendants will be supplied in an appendix.

```
                    by law;
     (3)    a causal connection between the defendant's
            careless conduct and the damage;
     (4)    that the particular kind of damage to the
            particular claimant is not so unforeseeable as to
            be too remote.
```

CLERK & LINDSELL ON TORTS (Anthony M. Dugdale, et. als. eds., 19th Edition 2006)(hereafter "CLERK & LINDSELL"), §8-04 at 383. "Negligence as a basis of liability is founded on the impersonal ("objective") standard of how a reasonable person should have acted in the circumstances." *Attorney General v. Hartwell,* [2004] UKPC 12, 6 [¶20].

The defendants contest that common law would impose a duty of care upon the defendants in favor of Ms. Genereux. As in American law, the existence of a duty of care depends upon a number of factors, summarized as the foreseeability of damage, the "proximity" or "neighbourhood" (relationship) of the parties, and policy considerations of fairness and reasonableness. CLERK & LINDSELL, §8-15 at 390, *citing Caparo Industries plc v. Dickman*, [1990] 2 A.C. 605 at 617-8. The "fundamental principles" which lead to the imposition of a duty of care were discussed in the recent Privy Council decision of *Attorney General v. Hartwell,* [2004] UKPC 12, 6 [¶20 and ¶21]. Decisions of the Privy Council are binding in the Cayman Islands. The Cayman Islands (Constitution) Order 1972, Sch. 2, §58.

```
     [O]ne of the necessary prerequisites for the existence
     of a duty of care is foresight that carelessness on the
     part of the defendant may cause damage of a particular
```

33

kind to the plaintiff.  Was it reasonably foreseeable
that, failing the exercise of reasonable care, harm of
the relevant description might be suffered by the
plaintiff or members of a class including the
plaintiff? ... Bearing in mind that the underlying
concept is fairness and reasonableness, the degree of
likelihood needed to satisfy this prerequisite depends
upon the circumstances of the case. ... There must be
reasonable foreseeability of a risk which a reasonable
person would not ignore.  The risk must be "real" in
the sense that a reasonable person "would not brush
[it] aside as far-fetched":  see Lord Reid in *Overseas
Tankship (UK) Ltd v. Miller Steamship Co Pty (The Wagon
Mound No 2)* [1976] 1 AC 617, 643.  As the possible
adverse consequence of carelessness increase in
seriousness, so will a lesser degree of likelihood of
occurrence suffice to satisfy the test of reasonable
foreseeability.
                        *  *  *
The nature and gravity of the damage foreseeable, the
likelihood of its occurrence, and the ease or
difficulty of eliminating the risk are all matters to
be taken into account in the round when deciding
whether as a matter of legal policy a duty of care was
owed by the defendant to the plaintiff in respect of
the damage suffered by him.

*Attorney General v. Hartwell,* at 6 and 8 [¶21 and ¶25](citation

omitted).  Applying that principle, Privy Council held that the

Royal Virgin Islands Police Force owed a duty of care to a

bystander in a bar who was shot when a police officer abandoned

his post, traversed two islands, and fired four shots from his

service revolver into the crowded bar in a "private frolic"

designed to maim his partner's lover[9].

---

[9]Myers & Alberga, the Westin Casuarina's Cayman Islands' counsel,
Mitchel dep., p. 86, misstate the results of *Hartwell* in their
"Opinion", p. 13.  The procedural history indicates that the trial
court summarily dismissed the plaintiff's claim, the Court of Appeal
reversed and granted judgment for the plaintiff, and Privy Council
dismissed the Government's appeal. [2004] UKPC at 13 [¶6] & 25 [¶47].

The common law views the law of premises ("occupier") liability as a distinct category of the law of negligence.  A defendant may be subject to duties of care under both general negligence law and distinct occupier liability law principles. *Carter v. Scott's Industries Limited,* 2001 CILR 355, 366-67 (analyzing liability under both principles).  "An invitee or licensee who enters upon the property of another does not thereby forfeit the benefit of having owed to him, by those who are in a state of proximity to him, and should foresee the consequences which their conduct may have upon him, the neighbourly duty to take reasonable care for his safety." *Public Transport Commission of New South Wales v. Perry*, [1975-1976] 137 C.L.R. 107, 138 (Stephen, J.).  "[T]he occupier may owe to a person lawfully on his land a general duty of care in addition to the special duty which is owed by an occupier to an invitee or a licensee". *Id.,* 137 C.L.R. at 132 (Austl.) (Gibbs, J.).  This is true particularly where liability is not "due simply to the condition of the premises" but to "the operation of [the defendant's] business". *Carter v. Scott's Industries Limited,* 2001 CILR at 367 (finding defendant motor vehicle repair shop liable under both negligence and occupier liability principles where plaintiff drove his van onto lift over mechanic's pit and fell into pit while exiting van where, *inter alia,* defendant's

35

employee did not warn plaintiff of danger from narrow lift).

The common law of premises liability was modified in England and Wales by Parliament's adoption of the Occupiers' Liability Act of 1957 and the Occupiers' Liability Act of 1984, which eliminated the common law distinctions between various classes of persons who entered a defendant's land (licensees, invitees, etc.) and established the duty of care owed to such persons. The 1957 Act extended a "common duty of care" to all visitors lawfully upon a defendant's premises "to take such care as in all the circumstances of the case is reasonable to see that the visitor will be reasonably safe in using the premises for the purposes for which he is invited or permitted by the occupier to be there". Occupiers' Liability Act [1957], §2(1) and (2). The 1984 Act extended to trespassers and other persons not within the scope of the 1957 Act a duty "to take such care as is reasonable in all the circumstances of the case to see that he does not suffer injury on the premises by reason of the danger concerned". Occupiers' Liability Act [1984], §1(4).

Notwithstanding the Cayman Islands status as a British overseas dependency, Acts of Parliament post-dating 1727 only have force in the Caymans Islands if specifically applied there. The Interpretation Law (1995 Revision), §40. The Consolidated Index of Laws and Subsidiary Legislation as at 1st January 2005[10]

_____

[10]Excerpts of the alphabetical index are included in the appendix.

indicates that the Cayman Islands had not adopted the two Occupiers' Liability Acts as of the date of Ms. Genereux' rape. Occupier liability in the Cayman Islands, therefore, is governed by common law occupier liability principles predating adoption of the 1957 Act. *Carter,* 2001 CILR at 366.

Although the "common duty of care" does not extend to the Cayman Islands as a matter of statute, common law decisions were applying a common duty of care to all persons lawfully present upon premises before the adoption of the 1957 Act.

> Counsel for the defendants stressed the fact that the plaintiff was only a licensee and urged that this was of special significance. I do not think so. The Law Reform Committee has recently recommended that the distinction between invitee and licensee should be abolished, but this result has already been virtually attained by the decisions of the courts. ... The duty of the occupier is nowadays simply to take reasonable care to see that the premises are reasonably safe for people lawfully coming on to them: and it makes no difference whether they are invitees or licensees. At any rate, the distinction has no relevance to cases such as the present where current operations are being carried out on the land. If a landowner is driving his car down his private drive and meets someone lawfully walking upon it, then he is under a duty to take reasonable care so as not to injure the walker; and his duty is the same no matter whether it is his gardener coming up with plants, a tradesman delivering goods, a friend coming to tea, or a flag seller seeking a charitable gift ... So here it seems to me that the Clay Cross Co., in carrying on their operations, were under a duty to take reasonable care not to injure anybody lawfully walking upon the railway, and they failed in that duty.

*Slater v. Clay Cross Co., Ltd.,* [1956] 2 Q.B. 264, 269-70, [1956] 2 All E.R. 625, 626-27 (Denning, L.J.) (affirming liability of

railroad for failure of driver to slow and signal before entering
tunnel where villagers were known to take shortcuts), *quoted in
Carter*, 2001 CILR at 368; *Allison v. Rank City Wall Canada Ltd.*,
6 D.L.R. 4th 144, 148 (Ont. 1984) (affirming judgment for tenant
against landlord for negligent security practices in parking
garage and observing that case law preceding adoption of the 1957
Act had gone far towards eliminating distinctions between persons
lawfully present upon land).  The Australian High Court, although
declining in a split decision to impose a duty upon an occupier
of land to take reasonable care to prevent injuries resulting
from the criminal behavior of third parties on land where the
alleged negligence consisted of failing to light a parking lot
rather than to prevent access, uniformly concluded that there is

> no material difference between the duty, if any, owed
> to employees of tenants and that owed to customers of
> tenants.  Since the car park was not closed to the
> public generally, [the trial judge] might have added a
> reference to members of the public who simply used the
> car park for their convenience, such as visitors to a
> nearby hospital.

*Modbury Triangle Shopping Centre Pty Ltd. v. Anzil,* [2000] HCA 61
(Austl.), 176 A.L.R. 411, 414 [¶9] (Gleeson, CJ).  "That an
occupier of land owes a duty of care to a person lawfully upon
the land is not in doubt".  *Id.*, 176 A.L.R. at 415 [¶17].  "There
can be no dispute that an occupier of land owes some duty of care
to those who enter it".  *Id.,* 176 A.L.R. at 436-37 [¶102] (Hayne,
J.).  The "requisite degree of proximity" between plaintiff and

defendant is satisfied by a plaintiff lawfully entering a
defendant's premises. *Public Transport Commission of New South
Wales*, 137 C.L.R. at 138 (Stephen, J.).  Massachusetts common law
similarly applies the duty of reasonable care uniformly to all
persons lawfully present upon premises. *Mounsey v. Ellard*, 363
Mass. 693, 707-08 (1973) (rejecting common law status
distinctions between persons lawfully present upon land in favor
of uniform duty of care).  Commonwealth decisions, including
those of the House of Lords, recognize the United States as a
common law jurisdiction and cite decisions of our state and
federal governments. *See citations to U.S. authorities in e.g.,
Reeves v. Commissioner of Police of the Metropolis,* [1999] 3
W.L.R. 363, 374 (Jauncey, L.); *Modbury Triangle Shopping Centre,*
176 A.L.R. 411.

Ms. Genereux lawfully was present on the defendants'
premises at the time of the rape.  She had entered the Westin
property to access the beach path to her condominium.  Such
access is permitted because the Westin is "private property with
public access".  Olsen Affidavit, ¶13.  She stopped to use the
same public restroom to which she had been directed by spa
employees earlier that day.  Genereux dep., p. 59-60, 122.  To
the extent that it matters, common law decisions to which the
Occupiers Liability Act of 1957 did not apply treated persons as
invitees and not as trespassers and imposed a duty of care when

they lawfully entered property and veered, either unintentionally or reasonably, from public access routes, even when they veered for purposes of using lavatory facilities.  *Gould v. McAuliffe,* [1941] 2 All E.R. 527, 528 (C.A.) (affirming award to plaintiff who entered unlocked gate leading into private yard in incorrect belief that path led to lavatory); *Public Transport Commission of New South Wales*, [1975-1976] 137 C.L.R. 107(affirming verdict for railroad passenger who became ill and fell from platform onto railway track).  The defendants themselves drew no distinction between the duty of care owed registered guests of their hotels and other persons lawfully present on their premises.  McGovern dep., p. 201-02; Mitchel dep., p. 134-35.  Realistically, Ms. Genereux' relationship with and proximity to the defendants was no different when she was in the restroom at the time of her rape than when she had been directed there by Westin Casuarina employees after inquiring about the cost of a spa treatment earlier that day.  Genereux dep., p. 59-60.

Moreover, even were Ms. Genereux to be treated as a "trespasser", a duty of care still would be extended to her because common law decisions take into account "the character of the intrusion.  A wandering child or a straying adult stands in a different position from a poacher or a burglar." *Veinot v. Kerr-Addison Mines Ltd.,* 51 D.L.R. 3d 533, 551 (Can. 1974) (Dickson, J.), *quoting Pannett v. McGuinness & Co., Ltd.* [1972] 3 W.L.R.

40

387, 390-91 (Denning, L.). *See also Hopkinson v. Chicago Transit Authority*, 211 Ill. App.3d 825, 156 Ill. Dec. 240, 570 N.E.2d 716, 725 (1991) (deeming it "unjust" and "ignor[ing] the circumstances surrounding this brutal crime" to deem rape victim anything other than an invitee where she entered train station but was dragged out by rapist and into different area of station where she was raped); *Nixon v. Mr. Property Management Company, Inc.*, 690 S.W.2d 546, 549 (Tex. 1985) (reversing summary judgment and holding it unnecessary to determine status of ten year old rape victim who was dragged into defendant's vacant, unsecured building and raped) and 554 (Spears, J., *concurring*)(calling it "manifestly unjust to classify [victim] as a trespasser"). The common law duty owed to such "trespassers" is "to take into account all the circumstances of the case and see then whether the occupier ought to have done more than he did". *Veinot*, 51 D.L.R. 3d at 551 (Dickson, J.). Characterized as the "test of common humanity",

> the question whether an occupier is liable in respect of an accident to a trespasser on his land would depend on whether a conscientious humane man with his knowledge, skill and resources could reasonably have been expected to have done or refrained from doing before the accident something which would have avoided it.

*Id.,* at 550 (Dickson, J.), *quoting British Railways Board v. Herrington,* [1972] A.C. 877, 899 (Reid, L.).

Contrary to the defendants' suggestion, common law

41

jurisdictions in the British Commonwealth and the United States
have imposed a common duty of care upon persons in control of
premises to exercise reasonable care to prevent foreseeable
criminal conduct by third persons and have imposed liability
where foreseeable crime occurred as a result of the defendant's
negligent security practices.  *Marshall v. Rubypoint Ltd.,* [1997]
EWCA 898 (Eng. & Wales C.A.) (affirming judgment for tenant
against landlord where landlord's failure to repair broken front
door of apartment building led to burglary during which plaintiff
was assaulted); *Stansbie v. Troman,* 1948 2 K.B. 48 (Eng. C.A.)
(affirming judgment for householder against contractor where
contractor failed to secure latch upon leaving premises and
property in home was stolen); *Thomas Graham & Co. Ltd. v. The
Church of Scotland General Trustees,* [1982] S.L.T. 26 (Scot.
Sheriff Ct.) (awarding damages to business damaged in fire set by
vandals in abandoned Church building which had been secured
inadequately against vandalism); *Jeffrey v. Commodore Cabaret
Ltd.,* 13 B.C.L.R. 3d 149 (B.C. Sup. Ct. 1995)(finding nightclub
operator liable for negligent security practices where patron
injured during altercation); *Q v. Minto Management Ltd.,* 15
D.L.R. 4th 581 (Ont. 1985) (awarding damages for tenant against
landlord for negligent security practices resulting in tenant's
rape in own apartment); *Allison v. Rank City Wall Canada Ltd.*, 6
D.L.R. 4th 144 (Ont. 1984) (affirming judgment for tenant against

landlord for negligent security practices in parking garage);
*Fund v. Hotel Lenox of Boston, Inc.*, 418 Mass. 191, 192-93 (1994)
(reversing summary judgment where decedent murdered in hotel by
unknown assailant); *Sharpe v. Peter Pan Bus Lines, Inc.*, 401
Mass. 788, 793 (1988) (affirming verdict for plaintiff where
decedent murdered in "sudden, unprovoked attack" caused by
defendants' negligent security practices); *Mullins v. Pine Manor
College*, 389 Mass. 47, 62 (1983) (holding college liable for
negligent security practices which resulted in foreseeable sexual
assault upon female student); *MacQuarrie v. Howard Johnson Co.*,
877 F.2d 126, 131 (1st Cir. 1989) (applying Delaware law and
reinstating jury verdict for plaintiff shot in motel parking lot
during robbery); *Jardel Co., Inc. v. Hughes,* 523 A.2d 518 (De.
1987) (reinstating verdict for rape victim abducted from parking
lot of shopping center where she worked); *Kahane v. Marriott
Hotel Corp.,* 249 A.D.2d 164, 672 N.Y.S.2d 55, 56 (1st Dept. 1998)
(reversing summary judgment for hotel against speaker
assassinated on its property, holding under New York law that
innkeeper owes a duty "to exercise reasonable care to protect
guests or tenants, while on the premises, against injury at the
hands of third persons who are not employees of the hotel ....
and is required to take reasonable protective measures, including
providing adequate security, to protect guests or tenants against
third-party criminal acts ...., particularly where the occurrence

of criminal activity on the premises was reasonably foreseeable"), *quoting Penchas v. Hilton Hotels Corp.,* 198 A.D.2d 10, 10-11, 603 N.Y.S.2d 48, 49-50 (1993); *Kukla v. Syfus Leasing Corp.*, 928 F.Supp. 1328, 1334 (S.D.N.Y. 1996) (denying hotel's motion for judgment as a matter of law and upholding modified [as to damages] verdict for rape victim); *Waldon v. Housing Authority of Paducah,* 854 S.W.2d 777, 779 (Ky. App. 1991) (reversing summary dismissal of negligent security claim).  Even those decisions which declined to impose liability based on the facts of the case acknowledged that on other facts, liability could be found.  *Smith v. Littlewoods Organisation Ltd.,* [1987] 1 A,C, 241, 251 (Griffiths, L.), 272-73 (Goff, L.); *Modbury Triangle Shopping Centre Pty Ltd.*, 176 A.L.R. at 440 [¶117] (Hayne, J., reserving for future consideration whether duty would have been imposed had plaintiff premised liability upon defendant's failure to control access to parking lot), and 176 A.L.R. at 418 [¶30] (Gleeson, C.J., reserving whether greater foreseeability would lead to imposition of duty of care).  There is more than adequate common law precedent for imposing a duty of care upon these defendants as to Ms. Genereux.

Cayman Islands legislation supports the imposition of a duty of care with respect to the safety of persons lawfully present upon hotel property.  Tourism is a major source of revenue in the Islands and the primary employing industry.  The Tourism Law

(1995 Revision) created a Department of Tourism as a Department
of Government, §5, with the purpose of assisting the Minister of
Tourism carry out his duties "to promote, foster and develop
tourism", §3, and a Hotels Licensing Board, §7, to license
hotels.  No hotel may operate in the Caymans unless duly
licensed.  *Id.,* §8(1).  The Law allows the Governor of the Cayman
Islands to make regulations "prescribing minimum requirements for
licensed tourist accommodation".  *Id.,* §15(d).

     The Tourism Law makes it a criminal offense for an operator
to "fail[] to take all reasonable security precautions for the
checking in of a tourist at the tourist accommodation which he is
licensed to operate".  *Id.,* §10(1).  Regulations promulgated
under §15(d) of The Tourism Law and in effect at the time of Ms.
Genereux' rape made "adequate security arrangements for the
protection of guests and their property and reasonable security
precautions for the checking in of guests" a minimum requirement
of a licensed tourist accommodation.  The Tourism Regulations
(1999 Revision), §5(i).  The regulations similarly required that
hotel employees "be properly trained, supervised and dressed, and
sufficient in number to carry out their duties efficiently" as a
minimum requirement of licensure.  *Id.,* §5(c).  Regulations
promulgated the month after Ms. Genereux' rape maintained these
requirements.  The Tourism Regulations (2002 Revision), §5(c) and
(i).  The adoption of laws so specific to tourist safety supports

the imposition of a common law duty of care owed to persons
lawfully present upon hotel premises in the Cayman Islands.

**THE EVIDENCE DEMONSTRATES THAT THERE ARE GENUINE ISSUES OF
MATERIAL FACT IN DISPUTE SUFFICIENT TO MERIT A TRIAL BY JURY.**

Operative laws of negligence and premises/occupiers
liability in the Cayman Islands and each relevant U.S.
jurisdiction impose upon all of the defendants a duty to exercise
reasonable care in the operation of Westin hotels in order to
safeguard the physical safety and property of persons lawfully on
premises which the defendants controlled and also which they
either owned, operated, managed, supervised, licensed or
franchised.  "[T]he critical test is who had the right to control
the property".  *McIntyre v. Boston Redevelopment Authority,* 33
Mass. App. Ct. 901, 903, *further app. rev. denied,* 413 Mass. 1105
(1992) (rescript) (rejecting argument that easement absolved
property owner of responsibility for maintaining property).  The
duty is premised upon the defendants' negligence in the operation
of their hotel businesses and upon their control of security at
the Westin Casuarina.  Neither relevant law nor the defendants'
own policies distinguish between registered hotel guests and
other persons lawfully present on hotel property.  Ms. Genereux
lawfully was on the premises of the Westin Casuarina when she was
raped.  Plaintiffs of her class were within the foreseeable,
reasonable contemplation of defendants which own and/or operate
first-class luxury hotels, particularly when those defendants are

46

among the world's largest multi-national hotel conglomerates.
Ms. Genereux was their "neighbour" within the meaning of "Lord
Atkin's famous 'neighbour principle' from the celebrated case of
*M'Alister (or Donoghue) v. Stevenson*".  *R. v. Seymour*, 2003 CILR
at 62-63.

There is sufficient evidence that each of the defendants
exercised pervasive control over security at the Westin Casuarina
to merit submission of the case to the jury.  There is evidence
that Columbia Sussex treated the Westin Casuarina as a hotel it
owned and/or operated and so represented it.  Starwood/Westin and
Columbia Sussex each promulgated and mandated specific security
practices to be followed at the Westin Casuarina, as indicated
above.  Each defendant enforced or had the ability to enforce
those practices.  Starwood had embarked on a campaign of
aggressive enforcement of hotel brand standards, defranchising
many hotels for failures to comply.  However, the evidence
indicates that none of the defendants meaningfully enforced the
security standards which they mandated, as proven by the numerous
deficiencies cited by LRA, the failures of Mr. Mitchel to comply
with the Columbia Sussex Safety & Loss Prevention Manual, and by
the absence of the security devices which the defendants' hotel
standards mandated; most importantly, the lock on the public
restroom in which Ms. Genereux was raped.  The dangers of absent
or deficient locks is recognized in common law jurisdictions.

47

*Marshall v. Rubypoint Ltd.,* [1997] EWCA 898 (Eng. & Wales C.A.);
*Stansbie v. Troman,* 1948 2 K.B. 48 (Eng. C.A.); *Q v. Minto
Management Ltd.,* 15 D.L.R. 4th 581, 593 ("If the landlord fails
to provide proper locks, the likelihood of criminal activity
increases.").  Such dangers not only were foreseeable, the
promulgation of specific Westin hotel security standards to
address them means that they actually were foreseen.  *Mullins v.
Pine Manor College,* 389 Mass. at 54-55.  There further is
evidence in Dr. McCrie's report that the defendants were
negligent in the means by which they promulgated and enforced
security practices and policies.  The testimony of a qualified
security expert witness is a matter for the jury to consider.
*MacQuarrie v. Howard Johnson Co.,* 877 F.2d at 129.

     There is sufficient evidence that criminal conduct by third
persons at the Westin Casuarina reasonably was foreseeable.  The
official crime statistic evidence, though limited, demonstrates a
tremendous increase in sex offenses and criminal prosecutions on
Grand Cayman in the years immediately preceding Ms. Genereux'
rape.  RCIP response, citizen complaints and U.S. State
Department advisories all support the evidence that crime had
increased exponentially.  The Westin Casuarina had been the scene
of previous sexual assaults upon two minor females.  To establish
foreseeability, previous criminal acts need not be identical in
type, location or violence to the type of crime perpetrated upon

a plaintiff.  *MacQuarrie*, 877 F.2d at 130 (evidence of property crimes sufficient to establish foreseeability of violent crime; "even a larceny of goods from a car could easily become violent if the car's owner unexpectedly appears"); *Marshall v. Rubypoint Ltd.,* [1997] EWCA at 902 ("burglary was a foreseeable consequence of an insecure front door. ...  In this day and age - and 1983 was not sufficiently different - assault in the course of burglary is, unhappily, not unusual.") (Buckley, J.).

There is evidence that negligent security practices by the entity controlling a hotel could and did in this case cause foreseeable catastrophic damages to an innocent person who lawfully was on the hotel premises.  There is evidence that the burden of avoiding such consequences was light by comparison; the cost of purchasing and installing the type of lock mandated by Westin Hotel Standards.

In addition to their direct negligence, the defendants are vicariously liable under agency principles for the negligent security practices of the Westin Casuarina.  To establish vicarious liability, "it is not necessary that the master have the right to control the details of the servant's activities or his exercise of judgment in carrying out the master's instructions".  *Hohenleitner v. Quorem Health Resources, Inc.,* 435 Mass. 424, 431-32 (2001).  The "'control needed to establish the relation of master and servant may be very attenuated....

[T]here may even be an understanding that the employer shall not exercise control'". *Id., quoting* Restatement (Second) of Agency §220(1) comment d (1958).

There is evidence that the Westin Casuarina complied with the security directives of Columbia Sussex even though Galleon Beach is argued to be a distinct and independent company.  Mr. Mitchel could not recall any instance when his or his Columbia Sussex' employees' directives were refused at the Westin Casuarina.  The defendants agreed that the Casuarina was bound to enact and enforce the Starwood/Westin hotel standards relating to security.  "[T]he jury could find, in reason, that [the Westin Casuarina] would have agreed [to comply with the defendants' security practices] if asked; as a practical matter, it could not refuse....  "The jury could find that a word [from the defendants] would suffice to get [the Westin Casuarina] to take the simple steps needed to make" the premises safe.  *Brighetti v. Consolidated Rail Corporation,* 20 Mass. App. Ct. 192, 199, *further app. rev. denied,* 395 Mass. 1103 (1985).

"[T]he principle that helps to rationalize" the many different contexts in which vicarious liability issues arise applies at bar:  "This is the principle that as between two innocent parties - the principal-master and the third party - the principal-master who for his own purposes places another in a position to do harm to a third party should bear the loss".

50

*Kansallis Finance Ltd. v. Fern,* 421 Mass. 659, 664 (1996).

## CONCLUSION

For all of the above reasons, this Court should deny the defendants' motion for summary judgment.

The Plaintiff,
By her Attorney,

_____
MARK F. ITZKOWITZ (BBO #248130)
85 Devonshire Street
Suite 1000
Boston, MA  02109-3504
(617) 227-1848
March 26, 2008

## CERTIFICATE OF SERVICE

I, Mark F. Itzkowitz, counsel for the plaintiff, hereby certify that on this date, I made service of the within document by serving it electronically to registered ECF participants and/or by mailing/faxing/hand-delivering a copy of same to non-registered ECF participants as indicated on the Notice of Electronic Filing ("NEF"), upon the following counsel of record:

John B. Johnson, Esquire          Robert J. Brown, Esquire
Corrigan, Johnson & Tutor, P.A.   Mendes & Mount, LLP
141 Tremont Street                750 7th Avenue
Boston, MA 02111; and             New York, NY   10019-6829.

 s/ Mark F. Itzkowitz
MARK F. ITZKOWITZ (BBO #248130)

Dated:  March 26, 2008