UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10879-JLT

KIMBERLY GENEREUX,              )
    Plaintiff                   )
                                )    **AFFIDAVIT OF MARK F. ITZKOWITZ**
    v.                          )    **IN OPPOSITION TO DEFENDANTS'**
                                )    **MOTION FOR SUMMARY JUDGMENT**
COLUMBIA SUSSEX CORPORATION,    )
STARWOOD HOTELS & RESORTS       )
WORLDWIDE, INC., and            )
WESTIN HOTEL MANAGEMENT, L.P.,  )
    Defendants                  )

1.   My name is Mark F. Itzkowitz.  I am an attorney licensed to practice law in the Commonwealth of Massachusetts (BBO #248130) and in the State of New York.  I am the attorney for the plaintiff herein.

2.   I make this Affidavit freely based upon my personal knowledge.

3.   Hereto annexed are true and accurate photocopies of the following documents:

    Exhibit "A"          Transcript of the Deposition of Kimberly
                         Genereux (excerpts)

    Exhibit "B"          Map & Photo Key

    Exhibit "C"          Conference Centre at the Westin
                         Casuarina Resort Site Plan

    Exhibit "D"          Site Plan Excerpt-Identifications

    Exhibit "E"          Photographs

    Exhibit "F"          Affidavit of Kimberly Genereux

Exhibit "G"          Royal Cayman Islands Police Service
                     Letter to Westin Casuarina Attorney
                     Michael Alberga, September 27, 2005

Exhibit "H"          Reports of Eleanor K. Egan, LHMC
                     (February 21, 2005 & September 16, 2007)

Exhibit "I"          Report of David S. Chapin, M.D.
                     (February 29, 2007 [*sic*])

Exhibit "J"          Report of Norman C. Hursh, ScD, CRC, CVE
                     (February 10, 2008)

Exhibit "K"          Report of Allan M. Feldman, Ph.D.
                     (February 27, 2008)

Exhibit "L"          System License Agreement

Exhibit "M"          Transcript of the Deposition of Theodore
                     Mitchel (excerpts)

Exhibit "N"          Transcript of the Deposition of Theodore
                     Mitchel (excerpts) in *Keppner v. Galleon
                     Beach Resort, Ltd., et. als.,* Index No.
                     011724/2003 (N.Y. Sup. Ct., Erie County)

Exhibit "O"          Transcript of the Deposition of John
                     McGovern (excerpts)

Exhibit "P"          American Hotel & Lodging Association,
                     DIRECTORY OF HOTEL & LODGING COMPANIES
                     (74th ed., 2005)(excerpts)

| | |
|---|---|
| Exhibit "Q" | American Hotel & Lodging Association, DIRECTORY OF HOTEL & LODGING COMPANIES (71st ed., 2002)(excerpts) |
| Exhibit "R" | Lashner Rush & Associates Audit (September 24, 2000) |
| Exhibit "S" | Lashner Rush & Associates Audit (April 24, 2001) |
| Exhibit "T" | Westin Quality Assurance Program/QAP 2000 |
| Exhibit "U" | Westin Hotels & Resorts Property Maintenance Reference Guide |
| Exhibit "V" | Transcript of the Deposition of Theodore Mitchel (excerpts) in *Reynolds v. Westin Hotel Company, et. als.,* U.S.D.C. E.D. Ky. Case No. 97-77 (March 16, 1998) |
| Exhibit "W" | Service Agreement |
| Exhibit "X" | Columbia Sussex website excerpt |
| Exhibit "Y" | *Westin Casuarina Opens Luxury Spa* (Hospitality Job Resource, February 13, 2002) |
| Exhibit "Z" | Westin Corporate Identity Manual |
| Exhibit "AA" | Columbia Sussex' Manager's Manual |
| Exhibit "BB" | Lashner Rush & Associates Audit (August 30, 1999) |

Exhibit "CC"          Transcript of the Deposition of Kellie
                      Ann Lowell (excerpts) in *Reynolds v.*
                      *Westin Hotel Company, et. als.,* U.S.D.C.
                      E.D. Ky. Case No. 97-77

Exhibit "DD"          Columbia Sussex Corporation Safety &
                      Loss Prevention Manual

Exhibit "EE"          Expert Witness Report of Robert J.
                      McCrie, Ph.D., CPP [filed but not
                      scanned because scanned by defense]

Exhibit "FF"          Cayman Islands Annual Report & Official
                      Handbook (1998)

Exhibit "GG"          Cayman Islands Annual Report & Official
                      Handbook (1999)

Exhibit "HH"          Cayman Islands Annual Report & Official
                      Handbook (2000)

Exhibit "II"          Cayman Islands Annual Report & Official
                      Handbook (2001)

Exhibit "JJ"          Cayman Islands Annual Report & Official
                      Handbook (2002)

Exhibit "KK"          Lashner Rush & Associates Audit
                      (November 5, 2002)

Exhibit "LL"          Starwood/Westin Design Review Memorandum

Exhibit "MM"        Response of Defendant Columbia Sussex
                    Corporation to Plaintiff's Request for
                    Production of Documents

Exhibit "NN"        Correspondence of Mark F. Itzkowitz to
                    Robert J. Brown and John B. Johnson
                    (September 10, 2007)

Exhibit "OO"        Correspondence of Mark F. Itzkowitz to
                    Robert J. Brown and John B. Johnson
                    (September 19, 2007)

Exhibit "PP"        Correspondence of Robert J. Brown to
                    Mark F. Itzkowitz (September 28, 2007)

Exhibit "QQ"        Correspondence of Robert J. Brown to
                    Mark F. Itzkowitz (January 8, 2008)

Exhibit "RR"        Correspondence of Robert J. Brown to
                    Mark F. Itzkowitz (January 25, 2008)

Exhibit "SS"        ASIS *Dynamics* (May/June 2000)

Exhibit "TT"        ASIS *Dynamics* (May/ June 2001)

Exhibit "UU"        ASIS *Dynamics* (May/June 2002)

Exhibit "VV"        ASIS *Dynamics* (May/June 2003).


Signed under the pains and penalties of perjury, this 26th
day of March, 2008.


_____
MARK F. ITZKOWITZ (BBO #248130)

<u>**CERTIFICATE OF SERVICE**</u>

    I, Mark F. Itzkowitz, counsel for the plaintiff, hereby certify that on this date, I made service of the within document by serving it electronically to registered ECF participants and/or by mailing/faxing/hand-delivering a copy of same to non-registered ECF participants as indicated on the Notice of Electronic Filing ("NEF"), upon the following counsel of record:

John B. Johnson, Esquire      Robert J. Brown, Esquire
Corrigan, Johnson & Tutor, P.A.  Mendes & Mount, LLP
141 Tremont Street          750 7th Avenue
Boston, MA 02111; and        New York, NY   10019-6829.


                   s/ Mark F. Itzkowitz
                  MARK F. ITZKOWITZ (BBO #248130)

Dated:  March 26, 2008

1

1                               VOLUME:   I

2                               PAGES:   1 - 124

3                               EXHIBITS: 1 to 7

4            UNITED STATE DISTRICT COURT

5            DISTRICT OF MASSACHUSETTS

6                Civil Action No. 05-CV-10879-JLT

7       ------------------------------------------

8    KIMBERLY GENEREUX,                    )

9                   Plaintiff             )

10   v.                                    )

11   COLUMBIA SUSSEX CORPORATION, Et al,   )

12                   Defendants            )

13      ------------------------------------------

14

15            DEPOSITION OF KIMBERLY GENEREUX

16                 December 21, 2006

17              11:07 a.m. to 2:43 p.m.

18              Corrigan Johnson & Tutor

19                141 Tremont Street

20               Boston, Massachusetts

21

22                  *********

23

24            Reporter:  Amie D. Rumbo

Kimberly Genereux

10

1    A.  Yes.

2    Q.  When did you do that?

3    A.  I did that in approximately 1983 or even

4    earlier.

5    Q.  All right.  So quite some time ago?

6    A.  Yes.

7    Q.  At the time that this incident occurred in

8    May of 2002, you were employed by a company called

9    Flansburgh and Associates?

10    A.  Flansburgh and Associates.

11    Q.  And that was an architectural firm?

12    A.  Yes.

13    Q.  For how long had you worked for them prior

14    to May of 2002?

15    A.  I had worked for them a solid seven years, I

16    believe.  Although, I had first been employed by

17    Flansburgh and had a working relationship with them

18    actually, since 1985.  So for many years.

19    Q.  So you first went to work for them in about

20    1985?

21    A.  1985.  Yes.  And I worked full time and went

22    to school for and worked part time and full time in

23    the summer for many years for Flansburgh.

24    Q.  Was this while you were going to college or

Kimberly Genereux

11

1    getting a graduate degree?

2        A.  It was more like a graduate degree.

3        Q.  In what field?

4        A.  A diploma in fine art.

5        Q.  When you say diploma, is that different from

6    say, a Master's Degree?

7        A.  It's the Studio Art Diploma that the school

8    of the Museum of Fine Arts in Boston gives for a

9    four year program.

10       Q.  And do you also have an undergraduate degree

11   from college?

12       A.  Yes, I do.

13       Q.  From what college is that?

14       A.  I have a Bachelor of Science from the

15   University of Virginia.

16       Q.  In what year was that?

17       A.  1976.

18       Q.  And what year did you obtain that diploma

19   from the Museum of Fine Arts?

20       A.  1988.

21       Q.  Do you have any other degrees in addition to

22   those two?

23       A.  No, I do not.

24       Q.  When you started working in 1985 with

12

1    Flansburgh, did you say it was on a part-time basis

2    or full-time basis?

3        A.  Full time.

4        Q.  At some point did you then go part time

5    while you were attending school?

6        A.  Yes.

7        Q.  And after you got your diploma from the

8    Museum of Fine Arts, did you then return to full

9    time work?

10       A.  Yes, I did.

11       Q.  And that would have been about 1988?

12       A.  Yes.

13       Q.  And did you continue to work full time from

14   1988 through 2002, when you were assaulted down on

15   the Cayman Islands?

16       A.  I did except for a few periods when I was

17   laid off but then would subsequently return to

18   Flansburgh when there was work, when work picked up.

19       Q.  So your only employer then during that

20   entire period of time, 1988, let's say through 2002,

21   was Flansburgh; is that correct?

22       A.  I worked as a volunteer at the MSPCA for the

23   -- with the -- doing research for, I think it was

24   the almost like the legal department of the MSPCA.

Kimberly Genereux

13

1     Q.  You didn't want to get mixed up with

2  lawyers, did you?

3     A.  No.

4     Q.  Who wouldn't?

5     A.  I was researching pet shop law in different

6  states of the United States.  And I also had a

7  part-time job at some point in there raising funds

8  for hospitals.

9     Q.  But that was just part-time work?

10    A.  Yes.  And I think that was during the layoff

11  period.

12    Q.  So then at least 95 to 99 percent of your

13  work during that twenty-year period was for

14  Flansburgh Associates?

15    A.  Yes.

16    Q.  And there were periods of time during that

17  time period where you were laid off because of lack

18  of work?

19    A.  Yes.

20    Q.  How often did that occur?

21    A.  I think it was two or three times.  I can't

22  recall exactly.  One of the times might have been

23  for a very short time, short period.

24    Q.  What was your position?  Why don't you tell

Kimberly Genereux

14

1   us the different positions you held, the different

2   titles you held at Flansburgh?

3       A.  I was -- When I was first hired, I was a job

4   captain.

5       Q.  And tell us what that involved?

6       A.  I was in charge of the production of the

7   construction documents for a museum that we were

8   designing for the National Park Service up in

9   Lowell, Boott Cotton Mill Museum.  And I saw that

10  project through for many years.  I think about eight

11  to ten years we worked on that.

12      Q.  What other jobs did you hold at Flansburgh?

13      A.  I was also Project Architect on a high

14  school project.  I was a co-architect on many, many

15  different projects.  I eventually became the

16  Director of Architectural Graphics at the firm.

17      Q.  This was before May of 2002 then?

18      A.  Yes.  That was a promotion overseeing the

19  output of project -- of the standard of -- I was

20  trying to ensure a standard of excellence for all

21  the drawings that were produced in the office.

22      Q.  Was the title Director of Architectural

23  Graphics, was that the title you held as of May

24  2002?

Kimberly Genereux

15

1      A.   I was also had been made an associate of the

2   firm, which was also a very large promotion.

3      Q.   How is the hierarchy charts conducted?  Are

4   there partners and associates and then others?

5      A.   There is President, Vice President, Senior

6   Associate, and Associate.

7      Q.   So you, for instance there are no partners,

8   such as a law firm might title people?

9      A.   No, no partners.

10      Q.   So there's a president, vice president,

11   senior associates, and then you were at the next

12   level by the time May 2002 came as an associate?

13      A.   Yes.

14      Q.   And as of May 2002, were your working full

15   time or part time?

16      A.   I was working full time.

17      Q.   And what would your annual salary have been

18   at that point?

19      A.   I think that would depend on whether that

20   would include bonuses.

21      Q.   Sure, if you can tell me.  Let's go back

22   then, say, in the year 2001, before anything had

23   happened.  You had worked a full fear, you were

24   Director of Architectural Graphics and associate at

Kimberly Genereux

16

1    that point.  Do you remember what your salary,

2    including bonuses, would have been for the year

3    2001?

4        A.  I think it was -- I know that -- I think it

5    was close to $58,000.  The year before, it was over

6    $60,000.

7        Q.  So then it would be dependant on the bonuses

8    you received?

9        A.  Yes.

10        Q.  To determine the differences; is that right?

11        A.  That was part of it, and also the year

12    before, I had also, I think I had worked an

13    exceptional number of hours.

14        Q.  As Director of Architectural Graphics, to

15    whom did you report in the firm?

16        A.  I reported to the president of the firm.

17        Q.  And who was that, let's say in 2001, 2002?

18        A.  David Soleau.

19        Q.  How do you spell that?

20        A.  S-o-l-e-a-u.

21        Q.  And did you have any employees working under

22    you in your position as director?

23        A.  Yes, I did.

24        Q.  How many?

Kimberly Genereux

17

1      A.  I would have -- I -- Basically everyone in

2  the firm worked, you know, did work for me at times.

3  I would choose people to help with the production of

4  special drawings.  However, I had one, only one

5  special assistant at all times.

6      Q.  At all times?

7      A.  At that time, it was Ankelata Nushi.

8      Q.  Please spell that if you're able?

9      A.  I wish I could.  She was from Albania.  It's

10  a difficult spelling.  N-u-s-h-i.

11      Q.  And then try the first name, if you would

12  please?  We're not going to count this as a spelling

13  bee.

14      A.  We called her Kela.  K-e-l-a.

15      Q.  Kela Nushi.  Do you know if she still works

16  for the firm, for instance?

17      A.  No she does not.

18      Q.  Have you worked at all since May of 2002?

19      A.  No.  I haven't.

20      Q.  Have you ever attempted to go back to

21  Flansburgh since May of 2002?

22      A.  Yes.  I wanted to, and they didn't want me

23  to go back.  And they -- I was laid off.

24      Q.  When was it that you wanted to go back?

Kimberly Genereux

18

1    A.  I think around June 2nd or 3rd.

2    Q.  Okay so this --

3    A.  I had a meeting with Mr. Soleau and

4  Ms. Brannelly, the Vice President, and Rose Fiore,

5  the office manager, to discuss returning.  I made it

6  clear that I wanted to return as soon as possible,

7  and they said they had come to the decision that I

8  needed -- that I was to be laid off.

9    Q.  Okay.  For instance, I've seen a form that

10  they filed, and it's been produced in this case,

11  which the company filed, I think with the Mass

12  Department -- Mass Division of Labor, I'm not sure,

13  concerning unemployment for you after that June

14  meeting.  And it says you were laid off because of

15  lack of work.  Was it your understanding that was

16  the reason for the layoff?

17    A.  It was my understanding that was the formal

18  reason.  I never would -- I never truly accepted

19  that reason, but...

20    Q.  Were you told anything different when you

21  met with them as to why you were being laid off?

22    A.  Yes.  Verbally, they said they didn't think

23  I would be ready to perform my job there within

24  three months.

Kimberly Genereux

19

1    Q.  Okay.  Who was it who said that?

2    A.  Ms. Brannelly.  She's no longer employed by

3 the firm.

4    Q.  Oh, she isn't?

5    A.  No.

6    Q.  She was the Vice President; is that right?

7    A.  Yes.

8    Q.  After that meeting and after the lay off

9 that occurred in about June of 2002, did you ever

10 again attempt to go back to employment with

11 Flansburgh, or did you ever seek to get further

12 employment with the company?

13    A.  I did stay in touch, and it was my

14 understanding that they were in no position to hire

15 anyone.

16    Q.  Because of lack of work?

17    A.  Due to lack of work.

18    Q.  In June of 2002, early June 2002 when you

19 had that meeting with the folks you just mentioned,

20 did you feel you were able to go back to work at

21 that point?

22    A.  I felt that I just -- I felt at that time

23 that I was not ready to go back to work.

24    Q.  At some point thereafter, did you come to

Kimberly Genereux

20

1    the point where you felt, yes, I am ready to go back

2    to work if I can find employment?

3         A.   That never happened, no.

4         Q.   As of today, do you feel you're capable of

5    going back to some sort of employment in your chosen

6    field?

7         A.   I want to as soon as possible, but I'm not

8    yet ready.

9         Q.   What do you mean by "your not yet ready"?

10        A.   I have too many symptoms of the problems

11   that I've had since being attacked, and I don't

12   always feel secure about being around people or I

13   don't feel I could hold a job.

14        Q.   So I take it then you haven't applied for

15   any other positions since June of 2002; is that

16   correct?

17        A.   For a period, I researched jobs, but I

18   didn't apply for any jobs.

19        Q.   Have you ever tried to run or manage your

20   own business of some kind?

21        A.   I tried to -- I had an idea that I could

22   possibly do photography and make a business out of

23   it.  It's a skill that I have.  And I did quite a

24   bit of photography at Flansburgh, but the

Kimberly Genereux

21

1    photography I did was mostly as a volunteer for a

2    ballet company, and I never could seem to make it

3    work.

4        Q.  So that --

5        A.  -- as a money making profession.

6        Q.  So that project never got off the ground, is

7    that what you're telling me?

8        A.  No, it never did.

9        Q.  Since 2002, have you had any sort of income,

10   including any social security?  Do you receive

11   social security benefits?

12       A.  Yes, I received social security benefits.

13       Q.  And any other income that you've had in

14   addition to the social security benefits?

15       A.  I -- No, I have no income outside of gifts

16   from my mother at Christmas.

17       Q.  You should be getting one then on Monday,

18   good.

19       A.  And I sold a few photographs for $25 each,

20   not a lot of money.  But it wasn't income as selling

21   art work.  I didn't -- but it never amounted -- this

22   was a couple of years ago -- never amounted to much.

23       Q.  How much do you receive on a monthly basis

24   in social security?

Kimberly Genereux

22

1      A.   $1,303 is the amount and then about $200 a

2   month is taken out for my insurance, medical

3   insurance and so forth.

4      Q.   And in terms of the therapy that you're

5   still undergoing, you've gone to since 2002, how is

6   that paid for?

7      A.   I paid for it out of my social security

8   check.

9      Q.   You said your mother is still alive.  Where

10  does she live?

11     A.   My mother lives in East Hartford,

12  Connecticut.

13     Q.   And is your father still alive?

14     A.   No.

15     Q.   Was is your mother's name?

16     A.   Jacqueline Generous.

17     Q.   And I know I asked you this before.  I can't

18  remember the answer.  In addition to your sister who

19  is deceased, do you have any other brothers or

20  sisters?

21     A.   My stepbrother who also died two years ago.

22     Q.   So you're the loan sibling who remains?

23     A.   Yes.

24     Q.   In terms of your sister's, Dawn's death, I

Kimberly Genereux

23

1  understand she died of an overdose of drugs; is that

2  right?  Maybe I'm wrong.  You tell me if I am.

3      A.  Well, I had a coroner's report, and he said

4  it was -- they said it was an accidental death; that

5  a number of drugs were in her system; that because

6  of her liver dysfunction had not cleared out of her

7  system.  So it wasn't called on overdose, no.

8      Q.  And in terms of your stepbrother's death, do

9  you know what cause of his death was?

10     A.  Plane crash.

11     Q.  Are you on any medications today?

12     A.  Yes.

13     Q.  What medications are you on?

14     A.  I take Effexor and Provigil.

15     Q.  And are both those for depression?

16     A.  Provigil is, yes -- Well, no.  Effexor is

17  for depression.  Provigil is to keep me from falling

18  asleep.

19     Q.  Can you tell me who are the doctors who

20  prescribed those two drugs for you?

21     A.  That is Dr. Martha Praught, P-r-a-u-g-h-t.

22     Q.  And I take it that the medications are not

23  interfering in any way with you're understanding my

24  questions today; is that right?  You're able to

Kimberly Genereux

30

1    do. Okay?

2        A. Okay. Thanks.

3        Q. I want to talk about the assault down in the

4    Cayman Islands. Had you ever been to the Cayman

5    Islands before May of 2002?

6        A. Yes.

7        Q. How often had you been there?

8        A. I'd been there five or six times. I can't

9    remember now.

10       Q. Did you find it to be a good vacation spot?

11       A. Yes.

12       Q. And when you went there the five or six

13   times, did you generally go alone, or did you go

14   with other people?

15       A. About half and half.

16       Q. And was there a particular place where you

17   would stay when you went there?

18       A. I most liked to stay at Plantana

19   Condominiums.

20       Q. Was that where you were staying in May of

21   2002?

22       A. Yes.

23       Q. And for that particular trip in May of 2002,

24   were you alone?

Kimberly Genereux

31

1      A.   Yes.

2      Q.   Where was Plantana Condominiums located?

3   Was it right on the beach, for instance?

4      A.   Yes.

5      Q.   And the beach we're talking about is

6   Seven --

7      A.   Seven Mile Beach.

8      Q.   Seven Mile Beach, okay.  Now, you had been

9   out to buy some groceries that night; is that right?

10     A.   Yes.

11     Q.   About what time did you leave your

12  condominium to go out to buy the groceries?

13     A.   I did -- My initial purpose for leaving was

14  not for the groceries.

15     Q.   Okay.  What did you go out for?

16     A.   I initially went out to take -- to take a

17  walk and, maybe, visit a friend at another

18  condominium.

19     Q.   Okay.  About what time did you go out?

20     A.   About 5:45.

21     Q.   Let me -- How long had you been on Grand

22  Cayman before the time of this assault?  For how

23  many days, for instance?

24     A.   About one week.

Kimberly Genereux

32

1    Q.  You had been there for about a week.  And
2    how long were you expecting to stay?
3    A.  I -- As of Friday, I had planned to stay
4    until, I believe, Monday.
5    Q.  Now, you say as of Friday, was that because
6    the attack was on a Friday?
7    A.  I say that because on Friday -- My plan was
8    to leave Saturday, but on Friday, I changed my plan
9    to Monday so that I could go bird watching on
10   Sunday.
11   Q.  So you were going to fly back then on
12   Monday?
13   A.  Yes.
14   Q.  What day of the week did the attack take
15   place on?
16   A.  On Friday.
17   Q.  And that was May 2nd, I believe, or was it
18   May 3rd?
19   A.  May 3rd.
20   Q.  May 3rd, 2002.  So you left your condominium
21   at about 5:45, and where did you go when you left
22   the condominium?
23   A.  I walked down the beach, actually toward the
24   Westin Hotel, past the Westin.

33

1    Q.   And you were walking on the beach?

2    A.   Yes, along the beach.  And I saw my friends,

3    who often were spending time at the beach in front

4    of the Villas of the Galleon Condominium, which is

5    actually next door to the Westin, and talked to them

6    for a while.

7    Q.   Who were your friends who were down there?

8    A.   My friend was Kenneth Elster.  He was a new

9    acquaintance.  I met him and his family when I was

10   visiting down there.

11   Q.   Okay.  Did they live down there, or were

12   they just visiting also?

13   A.   He was just visiting.

14   Q.   But he had family members who did live

15   there?

16   A.   Yes.

17   Q.   Had you met him during this particular trip

18   that you were on?

19   A.   Yes.

20   Q.   And who was he with when you went, took your

21   walk to go down and see him?

22   A.   I believe he was with his grandparents, but

23   they were farther away from us when we were talking.

24   Q.   So you actually met Mr. Elster on the beach

Kimberly Genereux

34

1    while you were taking a walk?

2        A.   Yes.

3        Q.   Was anyone else with him when you met him?

4        A.   No.

5        Q.   I just have -- I'm not sure if this will

6    help us or not, but I just printed this off of the

7    computer just trying to see if we could get an idea

8    of where you were walking that day.  Why don't go

9    off the record for a moment.

10            (Discussion was held off record.)

11       Q.   Ms. Genereux, I have in front of you a map

12   that I've printed off a computer that shows the

13   general area that we're talking about on Seven Mile

14   Beach.  And for instance, it shows the location of

15   the Westin Casuarina Resort, it shows the location

16   of the Villas of Galleon, and it shows the location

17   of the Government House.  Now, you said you were

18   staying at -- What was the name of the place you

19   were staying at?

20       A.   Plantana Condominium.

21       Q.   And that is not located on this map, and, in

22   fact, as you look at the map, it would be to the

23   left of the Government House; is that right, as I'm

24   looking at the map?

Kimberly Genereux

35

1      A.  To your left.

2      Q.  To my left.  Okay.  So for instance, that

3    night when you left your condominium, you would have

4    walked on the beach past the Government House, past

5    the Westin, and come down to the Villas of the

6    Galleon; is that right?

7      A.  Yes.

8          MR. ITZKOWITZ:  Can I just make a

9    comment, John, to make the record clear.

10         MR. JOHNSON:  Sure.

11         MR. ITZKOWITZ:  I think to your left, in

12    this case, would probably be north of the Government

13    House.

14         MR. JOHNSON:  Yeah, I'm wondering.

15     Q.  Do you know if it would be north or south of

16    the government house?  If you don't, just tell us

17    that.

18     A.  Yes.

19     Q.  It would be north?

20     A.  That would be north.

21     Q.  So your the condominium location where you

22    were staying would have been north of the Government

23    House and north of the Westin Casualina?

24     A.  Yes.

36

1    Q.  Okay.  That night, when you left at 5:45,

2    you walked down the beach past those landmarks that

3    we just referred to, and you met Mr. Elster on the

4    beach in front of the Villas of the Galleon; is that

5    right?

6    A.  Yes.

7    Q.  And did you talk with him for a while on the

8    beach?

9    A.  I don't recall how long we actually spoke,

10   but at some point he decided he needed to -- that he

11   would have dinner with his --

12              (Interruption.  Cell phone

13              ringing.)

14   Q.  So he said he had to leave to have dinner

15   with his family; is that what you said?

16   A.  Yes.  Because the night before we had taken

17   a walk and gone to Fosters Grocery Store, the same

18   thing.

19   Q.  Okay.

20   A.  About 10:30 in the evening, and I wondered

21   if he wanted to accompany me on another shopping

22   trip.  And he said he couldn't make it because they

23   were having a special dinner.

24   Q.  All right.  Do you know where Mr. Elster

Kimberly Genereux

37

1    lives regularly?

2        A.  Los Angeles.

3        Q.  That's all you know?

4        A.  That's all.

5        Q.  So this particular night, Friday night, he

6    chose not to go shopping with you, because he was

7    going to attend a dinner with his family; is that

8    right?

9        A.  Yes.

10       Q.  So at some point you left him to go on and

11   to go to Fosters; is that right?

12       A.  I continued walking up the beach.

13       Q.  About how long -- Strike that question.  How

14   what time was it when you left Mr. Elster to

15   continue your walk on the beach, if you can give us

16   a time?

17       A.  I really don't recall.

18       Q.  Was it still light out, was it, at that

19   time?

20       A.  It was dusk.

21       Q.  So you continued then to walk on the beach

22   and about how far did you go on the beach after you

23   left Mr. Elster?

24       A.  I'm not sure of the mileage, but --

38

1    Q.  Any of the landmarks you can tell us about

2  that you would have pasted after you left

3  Mr. Elster?

4    A.  I just went up maybe past the Beachcomber

5  Hotel.

6    Q.  That's not shown on our map, but I'm sure we

7  can try to find that if we extend our map at some

8  point.  So you went past the Beachcomber continuing

9  to walk on the beach?

10    A.  Yes.

11    Q.  And after you got past the Beachcomber --

12    A.  Yes.  Past the Hyatt, I believe, and kept on

13  until I got to a hotel that had -- I mean a

14  condominium that had an access way, I believe, you

15  know, an easy way to cut across to the main road

16  again.

17    Q.  Do you remember which hotel that was?

18    A.  No, I don't remember to name of that.

19    Q.  And the main road you were going to walk

20  across would have been Bay Road?

21    A.  West Bay Road.

22    Q.  So you went past the Hyatt, you came to this

23  next hotel that had an access over to the main road,

24  and you took that, and you got out to West Bay Road;

Kimberly Genereux

39

1   is that correct?

2      A.  Yes.

3      Q.  And where was Fosters, the store that you

4   were going to do some grocery shopping at?

5      A.  Fosters is -- the location of Fosters is a

6   shopping plaza called The Strand.

7      Q.  Once you walked through the access road out

8   to West Bay Road, was Fosters close to that point,

9   or did you then have to walk along West Bay for a

10  distance?

11     A.  I walked along West Bay for a distance.  I

12  think I had gone past Fosters, so I had to start

13  walking north again.

14     Q.  So now you're walking on West Bay Road north

15  back in the direction of the condominium where you

16  were staying?

17     A.  Yes.

18     Q.  And you came to Fosters, and you did your

19  shopping; is that right?

20     A.  I crossed the street.

21     Q.  Okay.

22     A.  At the entrance to The Strand.

23     Q.  All right.

24     A.  Or near Burger King, near somewhere in

Kimberly Genereux

40

1    there.

2        Q.   They have Burger Kings down on Seven Mile

3    Beach?

4        A.   Yes.

5        Q.   There goes Seven Mile.  All right.  I'm

6    sorry.  So anyway, Fosters was near the Burger King,

7    and you crossed at the entrance to The Strand Mall?

8        A.   Right.  And I preceded to walk around The

9    Strand Shopping Center.

10       Q.   There were other stores there?

11       A.   Lots of stores, yes.

12       Q.   So you didn't immediately go to Fosters, you

13   looked around at other stores first?

14       A.   I -- Yes.

15       Q.   But at some point -- Well, did you shop in

16   any other stores?  Did you purchase anything in any

17   other stores?

18       A.   I didn't purchase anything in any other

19   stores.

20       Q.   Okay.

21       A.   I think I might have gone into Häagen Daz

22   Ice Cream Shop for a minute to see what kind of ice

23   cream.

24       Q.   Now, you're going to get me hungry.

Kimberly Genereux

41

1      A.  And I also went into a gift shop when I saw

2  something in a window I was interested in and walked

3  around that plaza window shopping.

4      Q.  Do you have any idea of what time it was

5  when you were at the plaza window shopping?

6      A.  I don't know.  I don't know for sure.

7      Q.  Was it still dusk out or had it become dark?

8      A.  It was dark.

9      Q.  It was dark?

10      A.  But it was very light, because it was a

11  well-lit area with lots of shops and cars and

12  people.

13      Q.  Eventually you went into Fosters and you

14  made some purchases of food supplies there; is that

15  right?

16      A.  First, I went to the pharmacy next to

17  Fosters.

18      Q.  Okay.  Did you have to buy something there?

19      A.  I -- When I was at the pharmacy, I did find

20  a few things I wanted, but they said I could

21  purchase them at the grocery, on the grocery side if

22  I wanted to; some postcards and some medicine, some

23  kind of medicinal cream, and these kind of things.

24      Q.  No prescribed medication?

Kimberly Genereux

42

1    A.   No prescribed medication, no.

2    Q.   And they said you could purchase them where?

3    A.   I could purchase them when I bought

4    groceries next door.

5    Q.   At Fosters?

6    A.   So they were apparently connected.

7    Q.   And then did you go into Fosters?

8    A.   And then I went to the supermarket.

9    Q.   And what did you purchase at the

10   supermarket?

11   A.   I purchased a number of things.

12   Q.   Primarily food supplies?

13   A.   Primarily food.

14   Q.   Okay.  And when you left there, how many

15   bags were you carrying?

16   A.   I had two -- They gave me two -- one bag,

17   but I asked to put them in two to distribute the

18   weight.

19   Q.   Would these be plastic bags?

20   A.   Plastic bags.

21   Q.   So then you would have been carrying one in

22   each hand as you left to walk back to your

23   condominium?

24   A.   I was for a time, and then I put both of

Kimberly Genereux

43

1    them in my left hand.  I also had a purse.

2        Q.  What was the weather like that day?

3        A.  Clear.

4        Q.  And in terms of temperature, do you know

5    what the temperature would have been?

6        A.  In the 80s.

7        Q.  And so you were carrying the bags and your

8    purse, and you started -- Was it your intention when

9    you left Fosters to walk directly back to your

10   condominium?

11       A.  Yes.

12       Q.  And now we've talked about you did have to

13   cross West Bay Road to get to Fosters; is that

14   right?

15       A.  Yes.

16       Q.  So that was on the side of the street away

17   from the beach?

18       A.  Yes.

19       Q.  As you left Fosters, tell us about the path

20   you were going or you did take towards your home?

21       A.  I went down the sidewalk past Häagen Daz

22   again and the Chinese restaurant, went toward -- to

23   the sidewalk, crossed the cars --

24       Q.  Let me -- When you went -- was that walking

Kimberly Genereux

44

1  north when you went past Häagen Daz, or was that

2  south so that you crossed the street?

3      A.  Well, at that point, I was walking west

4  towards West Bay Road.

5      Q.  Okay.

6      A.  To get back to West Bay Road.

7      Q.  You mean when you came out of the shopping

8  center, you were walking west to get to West Bay

9  Road?

10     A.  Right.

11     Q.  Once you were on West Bay Road before you

12  crossed the street, did you walk north or south?

13     A.  Then I walked north.

14     Q.  Toward your condominium?

15     A.  Yes.

16     Q.  And where was it that you crossed the

17  street?

18     A.  It was very soon after, within about a block

19  from the entrance to the mall.

20     Q.  For instance, was it a designated crosswalk,

21  or did you just cross whenever the traffic allowed

22  you to?

23     A.  At that time, there were no crosswalks on

24  West Bay Road, unfortunately.

Kimberly Genereux

45

1    Q.  So you just had to cross when the

2    opportunity presented itself?

3    A.  Unfortunately, yes.

4    Q.  So once you were able, you crossed the

5    street so you were back on the beach side of the

6    street; is that right?

7    A.  Yes.

8    Q.  And then you started walking north again

9    toward your condominium?

10   A.  Yes.

11   Q.  And what happened as you continued the walk

12   along?

13   A.  I walked along the road, and I saw a few

14   people on the sidewalk and kept walking.

15   Q.  Is the street in that area lit?  Are there

16   street lights?

17   A.  Oh yes.

18   Q.  Would you consider it to be a well-lit area?

19   A.  It's a main road in Cayman Islands, yes.

20   Q.  Since I've never been there, I'm not sure if

21   that means yes or no, but yes it's well lit?

22   A.  Yes.  I walked by a lady waiting for a bus.

23   Q.  Okay.  Great.  So you continued to walk

24   along, and what happened next as you were walking

Kimberly Genereux

46

1   home?

2   A.  I -- After I saw a gentleman waiting in

3   front of a condo complex smoking a cigarette, I

4   walked -- I was approaching the Ritz Carlton

5   construction site, which, at the time, consisted of

6   a chain-link fence and mostly a large pit and a few

7   rebars and that sort of thing.  And as I was walking

8   along there, a man in a car stopped his car and

9   yelled "Do you want a ride?"  And I said, "No.  I'm

10  fine."

11  Q.  Was this a man you had ever seen before?

12  A.  No.

13  Q.  You mentioned a little bit, before we go on

14  from there, you mentioned a little bit earlier that

15  you passed someone smoking a cigarette out in front

16  of a condominium complex?

17  A.  Yes.

18  Q.  Did you have any conversation with that man?

19  A.  No.

20  Q.  That was just someone you noticed then; is

21  that right?

22  A.  Yes.  I mentioned him because I later

23  identified him with the police.

24  Q.  What do you mean you identified him with the

Kimberly Genereux

47

1    police?  When they were looking for suspects; is

2    that what you mean?

3        A.  Yes.

4        Q.  So you were able to -- Did you go back to

5    that particular area, and the man was still there?

6        A.  Detective Joseph drove me along the route to

7    go over my route and we happened to see this

8    particular man that I had described in detail in the

9    Foster's lot that very day.  And Detective Joseph

10   talked to him, and he remembered me as well.

11       Q.  So the man you saw in Fosters lot was the

12   man you had seen smoking a cigarette when you were

13   walking home?

14       A.  Yes.

15       Q.  And were you certain at that point that that

16   man was not the man who stopped in the van and asked

17   if you wanted a ride?

18       A.  Oh, yes, quite certain.

19       Q.  Different people?

20       A.  Yes.

21       Q.  But, at any rate, some time after the

22   assault, you and the detective went back and the

23   detective did question this man who had been smoking

24   a cigarette?

Kimberly Genereux

48

1     A.  Yes.

2     Q.  Did he have some sort of albi or excuse or

3  an explanation as to where he was during the

4  remaining part of the evening?

5     A.  I don't know.

6     Q.  You didn't participate in the conversation?

7     A.  No.  The initial one, but no additional one.

8     Q.  Okay.  Let's go back.  You passed the

9  construction site for the Ritz, and as you were

10  passing that and walking on the street, someone in a

11  van, a man in a van stopped and asked you if you

12  wanted a ride?

13     A.  Yes.

14     Q.  And your response was "No, I don't need

15  one"?

16     A.  Yes.

17     Q.  What happened next?

18     A.  I kept walking and not much -- not that much

19  later, I was still in front of the Ritz construction

20  site, the same van stopped.  So obviously, he had

21  backtracked and came and slowing down, hanging out

22  the window asking me if I wanted a ride again.  And

23  I didn't want to make eye contact.  I looked away

24  and said, just said, "I don't want a ride."

Kimberly Genereux

49

1    Q.  So you're sure it was the same van, same

2    man?

3    A.  Yes.

4    Q.  When you say "backtracked," what do you mean

5    by that?  For instance, the first time that he asked

6    you if you wanted a ride, and you said no, did he

7    then precede on his way?

8    A.  I saw him precede on.

9    Q.  Okay.  So now you walked a sort distance and

10   suddenly he was there again; is that right?

11   A.  Yes.

12   Q.  Was this man, for instance, did he appear to

13   be a native of the island?

14   A.  I don't know if he was a native of the

15   Cayman Islands, but he had some kind of Caribbean

16   accent.

17   Q.  And was he alone in the van as far as you

18   could tell?

19   A.  I don't know.

20   Q.  All right.  So after you said for the second

21   time, "No, I don't want a ride," did you continue

22   your walk back towards your condominium?

23   A.  Yes.

24   Q.  And what happened as you continued your walk

Kimberly Genereux

50

1    back?

2        A.   I thought I saw the van that -- I thought I

3    saw the same car coming back again in the other

4    lane.  And so that made me nervous.

5        Q.   When you said -- Was it a car or a van?

6        A.   It was a van.

7        Q.   Do you remember the color or anything like

8    that?

9        A.   I described it to the police as kind of a

10   goldish color, maybe sort of bronzy or greenish.

11       Q.   So you thought you saw it coming back from

12   the opposite direction driving towards you --

13       A.   Again.

14       Q.   -- on this third time, essentially, and when

15   you saw that, what happened to you or what did you

16   do?

17       A.   I just kept walking, hoping that possibly

18   the man was a cab driver.

19       Q.   Okay.  Did you talk to him again?  Did you

20   have any contact with him?

21       A.   No, not that I know of.

22       Q.   Right.  At some point, did you leave the

23   main road, the street?

24       A.   I continued on past the Villas of the

Kimberly Genereux

51

1    Galleon.

2        Q.  Okay.  Which is on our map here.

3        A.  Right.  And I walked -- I was walking up

4    along side the Westin.

5        Q.  Let me ask you, when you passed the Villas

6    of Galleon, did you stop in to see Mr. Elster again?

7        A.  No.

8        Q.  So you walked past there, and now you

9    continued --

10       A.  I considered it, but I decided it was too

11   late.

12       Q.  About what time was it at this point; do you

13   know?

14       A.  About 10:45.

15       Q.  So this was about five hours then after you

16   originally left your condominium to start your walk

17   on the beach?

18       A.  Yes.

19       Q.  So now you continued your walk, and I think

20   you said you got up to the Westin; is that right?

21       A.  Yes.

22       Q.  And what did you do when you got up to the

23   area on West Bay Road to the Westin Casualina Hotel?

24       A.  Well, I was starting to get nervous because

Kimberly Genereux

52

1    of I wasn't feeling safe as I walked past the

2    Westin.  And I decided to make a -- I made a plan

3    that I should walk, you know, maybe I should

4    consider walking, getting to the beach and walking

5    to Plantana along the beach instead of the road.

6         Q.  And you were nervous, obviously because of

7    the van and the man stopping twice, but were you

8    also nervous because you thought you saw the van for

9    a third time?  Was that a concern of yours?

10        A.  No.  I was -- I was worried because it

11   looked really dark up ahead, and I knew how dark it

12   was next to the Governor's House.  There's a small

13   public beach, and one time I'd walked by there and

14   almost sprained my ankle in a rut.  There's no

15   paving there.

16        Q.  You mean when you're walking in the street

17   or on the sidewalk in that area?

18        A.  Yes, there's no sidewalk right there.

19        Q.  And the lighting there is pretty dim up in

20   that area?

21        A.  Lack of lighting.  I also had seen a man.  I

22   was walking by the Westin.  A man was watching me

23   from a balcony across the street on the road smoking

24   a cigarette.  And I just felt, like, nervous because

Kimberly Genereux

53

1    of the cars, stopping twice, the man watching me

2    from the balcony.  I just thought, well, I should

3    walk along the beach.  So I got up to the end of the

4    property of the Westin thinking I would walk down to

5    beach access road, beach access path.

6        Q.  And is that between the Westin and the

7    Governor's House?

8        A.  Yes, the Governor's House.  And I looked

9    down that path, and it was very dark and overgrown.

10   And I could -- was -- it looked like maybe some

11   piece of machinery or something was in the path as

12   well.  But there was so many limbs and vines so that

13   it was barely -- there was no light on that path,

14   and the ground was overgrown with weeds and grass.

15   So I decided it didn't look like an access path at

16   all, even though it had a little sign that had an

17   arrow.  I just decided it looked scary.

18       Q.  Yep.

19       A.  So I backtracked, turned around, and decided

20   it would be safer to walk up to the Westin Hotel and

21   pass through the lobby of the hotel and go to the

22   beach that way.

23       Q.  Are there lights along the beach?

24       A.  The beach is well lit.  The Governor's -- in

Kimberly Genereux

54

1   front of the Governor's House, there's lots of

2   bright lights, and also the Pennicle, so it's a very

3   lit up area.

4        Q.   Okay.  So you came back to the main entrance

5   to the Westin; is that right?

6        A.   So I walked up the driveway toward the

7   sidewalk, which is on the side.  I was going to walk

8   up to the sidewalk and then walk up to the main

9   entrance of the Westin, yes.

10       Q.   Let me ask you if -- Your counsel has been

11  kind enough to bring with him the photographs.  I

12  only have xerox's copies of these.  Let me ask you,

13  if we look at these, maybe you can show me the area

14  that we're talking about now?

15       A.   I can.

16       Q.   Why don't I ask you, if you would look

17  through -- Why don't we go off the record?

18            (Discussion was held off record.)

19       Q.   Now, we have some other pictures that show

20  the area that I think we're talking about right now.

21  By looking at any of these additional pictures that

22  we have here, does this show the area where you

23  decided to enter into the Westin property?

24       A.   These don't.

Kimberly Genereux

58

1  there?

2      A.  As you can see this, I was going to walk

3  along the sidewalk up to the front door of the

4  Westin.

5      Q.  So you didn't --

6      A.  I didn't want to cut through the parking lot

7  because there were a lot of cars in the parking lot.

8      Q.  Your intention was to walk down this walkway

9  that's in the very center of Exhibit 2?

10      A.  Yes.

11      Q.  And turn left and walk across to the front

12  entrance of the Westin Hotel; is that correct?

13      A.  Yes.

14      Q.  Okay.  Great.  Now let's see if we -- Let me

15  ask you this.  Did you do that?  Did you walk along

16  the walkway and then get to the front entrance of

17  the hotel?

18      A.  No.  I got to this point.

19      Q.  All right.  And that's right at the end of

20  that walkway that we're talking about?

21      A.  Yes.  And as I walked up here and started

22  to -- as I walked up here and thought I was going to

23  go going through the hotel.  First, thought I would

24  use the restroom, which was through this -- I knew

Kimberly Genereux

59

1    there was a restroom.  I had used it that afternoon

2    visiting the spa.  The spa was the building that you

3    mentioned was right next to the path, next to the

4    access path.

5        Q.  All right.

6        A.  I knew that was the spa.  I had visited

7    there that afternoon.

8        Q.  Is that this building over here?

9        A.  Yes.

10       Q.  So that's the building on the lower --

11       A.  The spa complex.

12       Q.  But that's in the lower right-hand corner of

13   what's going to be marked Exhibit Number 1?

14       A.  Yes.

15       Q.  You had been there that afternoon?

16       A.  Yes, I had.

17       Q.  Did you receive some sort of treatment

18   there?

19       A.  I discussed the treatment was I was

20   interested in.  And before I left, I asked to use

21   the restroom, and they said, I couldn't use their

22   restroom.  I would have to use the public restroom,

23   and they directed me to where that was.  And that

24   was the restroom I was headed to at that night.  I

60

1    knew I had just used it.  I knew it was a public

2    restroom.  So I went to it, because I hadn't used

3    the restroom in a number of hours, and I -- well,

4    basically, I was nervous, and when I get nervous, I

5    suddenly have to use the restroom.

6         Q.  So your reason for going to the restroom was

7    because you had to use the facility?

8         A.  Yeah.  Suddenly had an urgent need to use

9    the facility.

10        Q.  What I'm going to do is I'm going stop for a

11   moment.  I'm going to xerox these two photographs

12   and then we can mark those as Exhibits 1 and 2

13   before we get too far.  And, in fact, let's mark as

14   Exhibit 3, the map, the makeshift map that we've

15   looked at here.

16                    (Recess taken.)

17          (Exhibit 1 marked for identification.)

18          (Exhibit 2 marked for identification.)

19          (Exhibit 3 marked for identification.)

20        Q.  All right.  Let's get back to you were

21   telling us that you needed to use the restroom

22   because you had been out for a long time, you were

23   nervous, so you decided to use the restroom that you

24   knew about near the spa at the Westin; is that

Kimberly Genereux

61

1    right?

2        A.   I needed to use the restroom because I had

3    an urgent need to use the bathroom.

4        Q.   And because of the location where you were,

5    you decided to use the bathroom where you were

6    familiar with from earlier in the afternoon; is that

7    right?

8        A.   Yes.

9        Q.   And you told us it was located close to or

10   inside this building with a blue awning, which,

11   again, is in about the center of what's now been

12   marked as Exhibit 2; is that right?

13       A.   Yes.

14       Q.   And so you walked down this walkway from the

15   parking lot, and instead of going left, which was

16   your original intention, you turned right to go to

17   the bathroom; is that right?

18       A.   Yes.

19       Q.   What course did you take once you turned

20   right to go to the lady's room?

21       A.   I walked past the door of the spa, which is

22   a glass door just underneath this walkway, and

23   followed the route that leads toward the bathroom.

24   The route that the spa people had described to me.

Kimberly Genereux

62

1      Q.  When you had been there earlier in the

2   afternoon?

3      A.  Yes.

4      Q.  Let's see if we can find any pictures of the

5   spa door or anything that's going to show us where

6   the restroom is.  All right.  Did you see one that

7   helps you?

8      A.  Yes.  The -- as you can see, this is where I

9   entered and there it says Hibiscus Spa.

10      Q.  Okay.  So what you're pointing to appears in

11   a photograph marked at the bottom as Westin 4, and

12   we will mark it as Exhibit 4.  And this essentially

13   also shows the same area that we see down here in

14   Exhibit Number 2; is that it?

15      A.  Um-hmm.

16         MR. ITZKOWITZ:  You have to say yes or

17   no for the reporter.

18      A.  Yes.

19      Q.  So you walked, looking at what's going to be

20   marked as Exhibit 4, you walked to the end of the

21   walkway and turned right, and you walked across

22   towards the sign that says Hibiscus Spa; is that

23   right?

24      A.  Yes.  The big sign.

Kimberly Genereux

63

1    Q.   Which is partially obscured by this poll

2    here?

3    A.   Yes.  And then I saw the sign that says

4    restroom.

5    Q.   That's a smaller sign.  It's, again, towards

6    the center of the picture, and apparently that

7    directs you to turn left and then walk down that

8    way; is that right?

9    A.   This gray thing is the corridor to the

10   restrooms.  You can also see it right here on this

11   picture.

12   Q.   All right then.  You've pointed to an area

13   on, which will be Exhibit 5, and that shows a hall

14   or a walkway, again, pointing towards, going towards

15   the restrooms; is that right?

16   A.   Yes.  There's --

17   Q.   For instance, right, somewhere here, close

18   to the center of the picture, there's a and near the

19   doorway entrance, there's a large sign for the

20   Hibiscus Spa, a smaller sign for restrooms; is that

21   right?

22   A.   Yes.

23   Q.   Is that directing you to go through this

24   doorway into that area; is that what you're saying?

64

1    A.  The restroom sign makes it clear that

2    that -- there's a rest -- that is the way.  And I

3    knew it was there.

4    Q.  All right.  So anyway, you came, you went to

5    the Hibiscus sign, turned left, and then turned

6    right, and went in through this entrance way; is

7    that right?

8    A.  Yes.

9         MR. JOHNSON:  Let's mark these, again,

10   I'll make copies of these because I don't want to

11   lose track of what we're doing?

12        MR. ITZKOWITZ:  John, at the bottom is

13   that marked Westin 3.

14        MR. JOHNSON:  Westin 3, yeah, which is

15   going to be Exhibit 5.

16        (Exhibit 4 marked for identification.)

17        (Exhibit 5 marked for identification.)

18   Q.  So that night you went, you took this

19   entrance way walking in the direction of the

20   restrooms; is that correct?

21   A.  Yes.

22   Q.  Was there both a men's restroom and a ladies

23   restroom down that corridor; do you know?

24   A.  Yes.

Kimberly Genereux

65

1    Q.  What happened next, once you went through

2  there and headed for the restroom?

3    A.  I went down the corridor and went into the

4  restroom.  Everyone -- everything seemed normal in

5  the restroom.  The light was on.  Then I used the

6  toilet -- I went to a toilet stall.

7    Q.  Was there anyone else in the restroom when

8  you entered?

9    A.  No.

10    Q.  Let me show you two other photographs and

11  ask you if you recognize the areas shown in those

12  photographs?  For instance, do either of those show

13  the entrance to the ladies room that you used that

14  night?

15    A.  Westin -- This one and this one both show

16  the entrance to the ladies room.

17    Q.  So you're looking at photographs marked

18  Westin 2 and Westin 3.  They're smaller photographs

19  than the one's we've been looking at?

20    A.  Yeah.  It doesn't say eight.

21    Q.  Eight.  Maybe that's seven and eight.

22    A.  Two and eight.

23    Q.  It looks like two and eight.  There are two

24  pictures on the same page and they're marked Westin

Kimberly Genereux

66

1    2 and Westin 8.  But those show, you say the

2    entrance to the ladies room; is that right?

3        A.  Yes.

4        Q.  The second door, is that the entrance to the

5    men's room; do you know?

6        A.  This one clearly says women's restroom on

7    it.

8        Q.  Is that the door you used that night as far

9    as you can recall?

10       A.  Yes.

11       Q.  All right.  Great.  So we're going to mark

12   as the next exhibit, which will be 6, this

13   photograph that shows entrance to -- it's photograph

14   Westin 2, and it shows two doors, one of which is

15   clearly marked women's restroom.  The other has a

16   marking on it, which I think says men's restroom,

17   but it's a little distant for me.  So you went in

18   there that night, and it looks like you just pulled

19   the door open and entered; is that right?

20       A.  I don't recall whether I pulled the door or

21   pushed the door.

22       Q.  But did you need a key of any sort?

23       A.  No.

24       Q.  And was this door at the end of the corridor

Kimberly Genereux

67

1    that you walked down that you've pointed to an

2    entrance way that led to the restrooms.  Is that --

3    Are these doors at the end of that corridor?

4         A.  They're the farthest point from -- They're

5    at the end to the right of this one.

6         Q.  So now you're pointing to a large eight by

7    eleven photograph marked Westin 5, and landmarks in

8    this photograph would be apparently a fire alarm box

9    on the right-hand wall and a door straight ahead

10   with three overhead lights.  And you're saying that

11   the entrances to the restrooms, particularly the

12   ladies restroom, was to the right of that door that

13   is shown in this Westin Number 5; is that right?

14        A.  Yes.

15        Q.  Okay.  So for instance, if we go back to the

16   other photographs that we've looked at, and we're

17   going to mark as exhibits, these two photographs on

18   one page, marked Westin 2 and Westin 8.

19   Particularly, in the photograph marked Westin 8, can

20   you see two doors on the right, well, in the center

21   right-hand side of the picture, and a partial

22   showing of another door on the left-hand side of

23   that picture.  Is it your memory that the partial

24   door shown on the left side would be to same as this

Kimberly Genereux

68

1     door shown straight ahead here in Westin 5?

2     A.  Yes.

3     Q.  Okay.  Great.  So then these, as I'm looking

4     at this, it looks like, if, in fact, this is the

5     ladies room and if, in fact, this is the men's room,

6     they're recessed back a bit from this wall that

7     leads down this corridor; is that right?

8     A.  Yes.

9         (Exhibit 6 marked for identification.)

10        (Exhibit 7 marked for identification.)

11     Q.  All right.  Let's see now.  So you went into

12     the bathroom that we've -- through the entrance that

13     we've seen on these photographs, and you used the

14     facilities.  You used the toilet.  What happened

15     next when you were in there?

16     A.  I was in the -- I was in the process of

17     using the facility, I was in the -- I was sitting on

18     the commode in the restroom.

19     Q.  In one of the stalls?

20     A.  In the stall, in the second stall.  And I

21     heard a noise which sounded like the door opening,

22     and the next thing I heard was footsteps toward

23     where I was sitting and I looked down and I could

24     see the feet of a man and also his forearm, his legs

Kimberly Genereux

69

1    and that he had a clinched fist.

2         Q.  How could you see that?  You saw that

3    through the bottom of the door, of the stall there?

4         A.  I saw it through the louvers.  The door was

5    a louvered wooden door, and I could see his legs and

6    arm about mid thigh down and feet.

7         Q.  Could you tell if it was a black man or a

8    white man?

9         A.  It was a black man.

10        Q.  How many stalls were there in the ladies

11   room?  You said, for instance, I think you said you

12   were using the second stalls?

13        A.  Two stalls and a handicapped stall, which

14   was a large, big stall.

15        Q.   Right so that a wheelchair could get

16   through.  At any time while you were in there before

17   this man entered, was there anyone else in that

18   restroom?

19        A.  No.

20        Q.  So you saw him come in, and you -- what did

21   you do next once he was in there?

22        A.  I yelled something at him.

23        Q.  What did you yell?

24        A.  I said, "Sir, you're in the wrong room.

Kimberly Genereux

70

1   This is the ladies room."

2       Q.  Did he respond?

3       A.  Yes.

4       Q.  What did he say?

5       A.  "Oh, sorry."

6       Q.  Okay.  Was the -- were there lights in the

7   bathroom?

8       A.  Yes.

9       Q.  Was it well lit as far as you were

10  concerned?

11      A.  At that time, yes.

12      Q.  After he responded and said, "Oh, I'm

13  sorry," did he leave?

14      A.  Yes.  He walked away, and I heard him -- the

15  door open and shut.

16      Q.  And at some point he came back in the then,

17  or at some point someone came back in then?

18      A.  Very quickly, within seconds, split seconds,

19  someone came in.

20      Q.  And were you able to, for instance, by

21  looking at his legs or his shoes or whatever, were

22  you able to identify it as the same person who had

23  been in the first time?

24      A.  I couldn't never be sure.  I could never be

Kimberly Genereux

71

1   totally positive.

2        Q.  But it was almost -- It was very quickly

3   when the door opened a second time and a man came

4   back in?

5        A.  Yes.

6        Q.  And then once he was back in, did he knock

7   the stall door down?

8        A.  Eventually, yes.  After --

9        Q.  After what?  What did he do first before he

10  knocked the stall door down?

11       A.  Turned off the light.

12       Q.  So he came back, or someone came in a second

13  time.  You heard the door open and close.  Did he --

14  did the person off the light immediately?

15       A.  The light was turned off even before the

16  door shut.

17       Q.  So you were in total darkness then?

18       A.  Total darkness, yes.

19       Q.  Did you yell or say anything at that point?

20       A.  Yes.

21       Q.  What did you say?

22       A.  I yelled "I have a phone.  I'm calling the

23  police."

24       Q.  Did you have a phone with you?

Kimberly Genereux

72

1      A.   Yes.

2      Q.   And had you tried to call the police, or

3   were you just saying that to try to scare him off?

4      A.   I had the phone in my hand, obviously,

5   trying to scare him off, but also trying to dial

6   911.

7      Q.   Were you able to dial 911?

8      A.   He -- I kept punching it, but nothing would

9   happen.  I couldn't get through.

10      Q.   All right.  And at some point after the

11   light was turned off and before you could get

12   through, did this man knock the door down, the stall

13   door, or did he do something else first before that

14   happened?

15      A.   As soon as -- Before I even -- As soon as I

16   said something about the police, the wood in the

17   louver door was flying at my face.

18      Q.   Could you see the man at all even in the

19   darkness?

20      A.   Could not.

21      Q.   And at that point he attacked you; is that

22   right?

23      A.   After the door was broken down, he attacked

24   me.

73

1    Q.  And he forced you to have oral sex and then

2  he raped you; is that right?

3    A.  Yes.

4    Q.  And then did he leave immediately?

5    A.  Not immediately.  He talked to me.

6    Q.  What did he say?

7    A.  He said he didn't mean to hurt me.  He was

8  so high.  And he said I needed to count to a hundred

9  before I left the bathroom.

10    Q.  And did he, at that point, then leave the

11  ladies -- leave the room?

12    A.  Yes.

13    Q.  And what did you do next?

14    A.  I tried to pull down my skirt and find my

15  bearings where I was in the dark and then find the

16  light.

17    Q.  Had he --

18    A.  And turn it on.

19    Q.  What were your wearing?  What had you been

20  wearing?

21    A.  I had a black top, a black skirt, black

22  undergarment, black shoes.

23    Q.  So did he take your clothes off, or did he,

24  he just went about this with your clothes on?

Kimberly Genereux

74

1      A.   He pulled my skirt up so that it was around

2   my waist, and he used a knife and cut my underwear.

3   I felt the knife blade against my hips, my right

4   hip, I remember it, and he cut it upwards with an

5   upward cutting motion.

6      Q.   Did he threaten you with a knife, also?

7      A.   He said he was going to kill me, and he said

8   he was going to cut my face up.  And the knife blade

9   was on my throat and very hard against my throat at

10  one point.

11     Q.   Were you cut at all?

12     A.   I had a large welt on my throat, and I was

13  cut.  I had a cut on my vagina.

14     Q.   Once he left the room, once he left the

15  lady's room, you said you pulled down your skirt and

16  where did -- Did you call anyone then, or did you

17  just leave the ladies room?

18     A.   I left the ladies room.

19     Q.   And where did you go?

20     A.   I walked directly to the hotel lobby, the

21  Westin Hotel lobby.

22     Q.   And to get to the lobby, did you retrace

23  your steps out to the parking lot that we were

24  looking at in those photographs, or did you go

Kimberly Genereux

75

1    through the building?

2        A.   I did not walk on the pavement.  I walked

3    down the sidewalk to the hotel.

4        Q.   And into the front entrance?

5        A.   Yes.

6        Q.   Or once you got into the front entrance --

7    Strike that.  Did you talk to anyone or tell anyone

8    about what had happened to you before you got to the

9    front entrance?

10       A.   No.

11       Q.   You went into the front entrance, what

12   happened to you next?

13       A.   I went into the front entrance, and I looked

14   to the desk, but no one was there.

15       Q.   This is the front desk?

16       A.   The front desk.  I looked -- there was a

17   large party going on, and I saw a bride in a bridal

18   gown of some kind, and I saw, suddenly, I saw a

19   doorman, a boy in a sort of a doorman's outfit, and

20   I asked him if someone was at the front desk.  And

21   he said, "No, you'll have to talk to the bartender."

22   And just adjacent to the front desk, I saw the

23   bartender.  There were a lot of people crowded

24   around because of the wedding party, and I saw her,

76

1    so I went directly up to her.

2        Q.  The bartender was a woman?

3        A.  A female.

4        Q.  And you went up to her and did you tell her

5    what had happened to you?

6        A.  I told her -- Yes.  I told her that I'd been

7    raped in the bathroom of the spa and could she call

8    the police.

9        Q.  And at some point, did she call the manager

10   of the hotel or did she call the police or do you

11   know.  Do you know what she did after you asked her

12   to call the police?

13       A.  I know according to what she told me.

14       Q.  What did she tell you?

15       A.  She told me that she couldn't call the

16   police.  She had to call the manager.

17       Q.  Do you know what the bartender's name was?

18   Did you ever get her name?

19       A.  No.

20       Q.  So she said she had to call the manager.

21   And eventually, did the manager come?

22       A.  I don't know.  Evenly someone came.

23       Q.  When you say "someone," is that someone you

24   associated with the hotel, or was it someone else

Kimberly Genereux

77

1    that you're talking about?

2        A.  She said, "Here he is."  So whoever it was,

3    was someone she was expecting.

4        Q.  Where were you at this point?

5        A.  Standing in front of the bar.

6        Q.  Standing in front of the bar in the lounge

7    just off the lobby?

8        A.  Near the party.

9        Q.  But was the lounge or the bar off of the

10   main lobby or close to the main lobby?

11       A.  It was in the main lobby.

12       Q.  It was in the main hobby.  Okay.  Do you

13   know about what time it was at this point when you

14   were in the main lobby at the bar?

15       A.  About five minutes after eleven.  Ten

16   minutes after eleven.

17       Q.  So this attack then would have happened

18   around eleven o'clock?

19       A.  Five minutes before eleven.

20       Q.  All right.  And then you -- When the manager

21   came, what happened next?  Or this person, assuming

22   he was the manager, what happened next?

23       A.  I saw the man come up.  He was rubbing his

24   eye.  He asked me what the problem was, or can I

78

1   help you.  And I asked him if he could call an

2   ambulance or the police, that I had been raped in

3   the bathroom by the spa.  And he said, he couldn't

4   call the police unless I showed him where this had

5   happened.  And I asked him -- I told him I didn't

6   want to go back in there.  Could he just please call

7   the police and have them take care of it.  And he

8   said "No."  He wouldn't call the police until I went

9   with him to the bathroom in the spa.

10      Q.  Do you know the name of this man who you

11  were talking do?

12      A.  I didn't know his name.

13      Q.  Have you ever learned his name since it

14  happened?

15      A.  Since it happened, I saw his name -- I was

16  under the impression that his name might have been

17  Denzel.

18      Q.  And how did you come by that information or

19  that understanding?

20      A.  Initially, when I was staying at Caroline

21  Parker's house, who was a friend of mine who was a

22  constable with the Cayman Police Department.  Some

23  police officers who were her friends came over to

24  her house.

Kimberly Genereux

80

1    debris of the door all over the place, and he said,

2    "Was that like this when you were in here?"  And I

3    said, "The man broke the stall door down before he

4    attacked me."  And he just said, "I see."  And then

5    he turned around and we -- he said, "Follow me."

6    And I followed him.  He walked ahead of me, and I

7    followed him, and he said, "Come with me."  And

8    he -- I went with him, and he brought me to a room

9    and he said, "Wait here."  And I said, "Are you

10   going to call the police?"  He said, "Just wait

11   here."  And he put me in a room, and I was in there

12   alone for quite some time.

13       Q.  Where was the room in relation to the lobby,

14   the main lobby?

15       A.  I was really scared and upset, so I wasn't

16   paying attention to where we were going, but I think

17   it might have been behind the front desk.

18       Q.  And to get to that room from the ladies room

19   where you were shown on the site, how did you get to

20   that room?  How did you walk there?  What path did

21   you follow?

22       A.  Well, we walked on that same sidewalk to the

23   door, we walked through the door, and that's at that

24   point, I was just following him, so I don't know how

Kimberly Genereux

81

1    we entered that room.

2        Q.  So when you said you walked through that

3    door, do you mean the door into the main lobby?

4        A.  Yeah, into the lobby.

5        Q.  So you were confuse as to where you went

6    from there?

7        A.  Yeah.  I don't know how we entered the room

8    or how far behind the desk it was.

9        Q.  And you say you were in that room alone for

10   quite some time.  Can you tell us or estimate for us

11   approximately how long you were alone in that room

12   before something else happened or someone came to

13   help you?

14       A.  No one came to help me.  All of a sudden,

15   women -- some women carrying cash box money came in,

16   and they were -- there must have been at least, I

17   think, three different women with money in cash

18   boxes or something, I thought, along the way.  But I

19   remember at least two, pretty sure.  And I asked

20   them if they could help me.  I didn't know where the

21   manager was.  I'd been raped.  Could someone please

22   call the police?  But they wouldn't talk to me.

23   They didn't say anything.  I acted like I hadn't

24   said anything.

82

1    Q.  Did the manager or this gentleman who had

2    been to the ladies room with you, eventually come

3    back to the room?

4    A.  I don't remember.

5    Q.  Who do you remember coming to your

6    assistance, the first people coming to your

7    assistance when you were in that room?  You've told

8    us about these ladies with the cash box not really

9    helping you.  Did someone else come after that to

10   help you?

11   A.  The police walked -- someone -- two

12   policemen walked in.

13   Q.  And you had been sitting in that room for

14   whatever period of time it was alone until the

15   ladies with the cash box came in and then the police

16   came in; is that right?

17   A.  They didn't give me a seat.  They made me

18   stand.

19   Q.  You were standing in the room?

20   A.  Yes.

21   Q.  Were there seats available?  Could you sit

22   at a desk or sit at a table?

23   A.  I don't think there were any seats.

24   Although, I begged someone -- I said to some lady

Kimberly Genereux

83

1    for a glass of water.

2        Q.   Did she give you one?

3        A.   And she did give me a glass of water.

4        Q.   So when the police came, what happened?

5        A.   They started to ask me questions.

6        Q.   About what had happened to you?

7        A.   At first -- No, not at first.

8        Q.   What did they ask you about first?

9        A.   They asked me first what my name was.

10       Q.   So they asked you to identify yourself and

11   give personal information as to who you were and

12   where you lived and things like that?

13       A.   Yes.

14       Q.   After they got that personal information

15   from you, did they then start to ask you about what

16   had happened to you?

17       A.   I believe so.

18       Q.   As far as you could tell, were these police

19   officers members of the Grand Cayman Island Police?

20       A.   Yes.

21       Q.   And what -- Did you say there were two of

22   them, or were there more than two?

23       A.   There were two.

24       Q.   Do you know their identities?

Kimberly Genereux

84

1    A.  No.

2    Q.  After they got your personal information and

3  asked you questions about the incident, the assault,

4  what happened next?

5    A.  Well, to backtrack, I forgot to tell you

6  that when you asked me about the bartender, what I

7  asked the bartender.  I forgot I did ask her if she

8  could get some security guard.  I remember that.

9  And she said there weren't any security guards.  She

10  had to call the manager.  I'm sorry.  I might be

11  upset and not remembering every single word.  I just

12  want to say that that was sometimes past.

13    Q.  No, that's all right.  If we go along and

14  you remember something from earlier, please let us

15  know.  Just bring it up.

16    A.  Yeah.  Because that jogged my memory because

17  when they first walked in, the two officers, at

18  first I thought maybe they were security guards.

19    Q.  From the hotel, you mean?

20    A.  Yeah.  And then I realized, only then when

21  they identified themselves, that they were the

22  Cayman Police.

23    Q.  So earlier, when you were with the

24  bartender, when you first entered the lobby, you had

Kimberly Genereux

85

1    asked her to bring some security guards down?

2        A.   Yeah.

3        Q.   And she said, "We don't have any."  What did

4    she say?  What was her response, as best as you can

5    recall?

6        A.   She said, "There's no security.  I have to

7    call the manager."

8        Q.   All right.  So now, moving ahead to where we

9    were where the police have finished asking you about

10   your personal information and asking you about what

11   happened to you, what happened next?  For instance,

12   did you go to show them the ladies room?  Did you go

13   to the hospital with them?  What was the next thing

14   that happened?

15       A.   The next thing that happened were some other

16   police came into the room, some other policemen.

17       Q.   So now, in addition to the first two, you

18   had at least two more who came into the room?

19       A.   At least two more, I saw.

20       Q.   And as far as you understood, were they also

21   members of the Island Police?

22       A.   Yes.

23       Q.   Do you know the names of the additional

24   officers who came into the room?

86

1     A.  NO.

2     Q.  I assume though, all of them identified

3  themselves for you at some point so you knew you

4  were dealing with the Island Police; is that right?

5     A.  Yes.

6     Q.  Once the additional officers came, what

7  happened?

8     A.  The -- There was one officer who identified

9  himself as the senior officer, and he took over the

10  questioning and apologized that he was going to have

11  to make me show -- make me show him, identify the

12  place where this event had happened.

13     Q.  So you had to go back to the ladies room

14  with this police officer; is that right?

15     A.  Yeah, just to say, yes, indeed this is where

16  it took place.

17     Q.  When you went back, was it in the same

18  condition as when you had been there earlier with

19  the gentleman from the hotel; that is, with the wood

20  all over the floor?

21     A.  The wood was on the floor.  I don't know if

22  anybody had altered the scene in any other way,

23  however.

24     Q.  Sure.  But the wood was still on the floor

Kimberly Genereux

87

1  when you brought the police in there.

2      A.  Yes.

3      Q.  You talked earlier about going out with the

4  police and riding around the area.  For instance,

5  you mentioned a man who had been smoking a

6  cigarette, and you came upon him over in The Strand

7  parking lot.  I think the police officer talked to

8  him.  Was that on the night, the same night, or did

9  that happened the next day?

10     A.  That happened some days later.

11     Q.  So let's not jump ahead to that.  Let's stay

12 on the night in question.  After you brought the

13 police officer to the ladies room, did he do

14 anything else for you there, or were you transported

15 to the hospital?

16     A.  We went -- I think we went back into the

17 hotel, and he asked me more questions.

18     Q.  About the incident itself, about the attack?

19     A.  Yes, about the attack.

20     Q.  Did you, at any time that night before you

21 left the hotel -- I take it when you left the hotel,

22 you did go to the hospital; is that right?

23     A.  Yes.

24     Q.  At any time before you left the hotel that

Kimberly Genereux

88

1    night, did you have any other conversations with

2    people whom you believed worked at the hotel?

3        A.  Before we -- While the senior officer was

4    questioning me, someone from the hotel came in and

5    made an objection about -- that why were we still

6    there.  That I should, you know, weren't they going

7    to take me to the hospital.

8        Q.  Do you know who that was or had you seen

9    that person before he or she -- Let me ask you.  Was

10   it a woman or a man who came into the room?

11       A.  A man.

12       Q.  Had you seen that man before that evening?

13       A.  I'm not sure if it was the same man that had

14   brought me into the restroom.  By that time I was --

15   I was --

16       Q.  Upset?

17       A.  Yeah.  Really in shock.  But it was a Cayman

18   man about the same coloring as the first man and the

19   same height.

20       Q.  But whether or not it was the same

21   gentleman, you don't know?

22       A.  No, I don't know.

23       Q.  So you've told us about your conversation

24   with the bartender when you first got into the

Kimberly Genereux

89

1    lobby, your conversation with the gentleman who came

2    down, apparently, from the call from the bartender,

3    and you had some brief conversations with the

4    people, the women who came in with cash boxes into

5    the room where you were standing?

6        A.  No, I had no conversations with them.

7        Q.  No conversations with them.  You had a

8    conversation with someone who came into that room

9    and got you a glass of water?

10       A.  I just said, can I -- I said something to

11   them that caused one of them to bring me a cup of

12   water.

13       Q.  And then you had a conversation -- well,

14   maybe you didn't even have a conversation, but you

15   heard this man who came into the room and ask the

16   police how come you hadn't been taken to the

17   hospital at that point?

18       A.  Yes.

19       Q.  Do you remember before you left the premises

20   that night, did you have conversations with anyone

21   else whom you associated with being part of the

22   hotel staff?

23       A.  No.  I had none.

24       Q.  At any time since that night, have you had

Kimberly Genereux

95

1    and drag you in the restroom?

2        A.   No.

3        Q.   And the reason is you went into the restroom

4    that night was because you told us you were nervous

5    and you had to use the facilities?

6        A.   I had to go to the bathroom.

7        Q.   But did you at any point tell anyone,

8    whether it be police or hotel representatives, that

9    a man was following you, and you went in there in

10   order to hide from him?

11       A.   Not in those words.  I said a man was

12   following me in a car, and it made me nervous.

13       Q.   And that's something you would have related

14   to the police probably when they were talking to you

15   after the attack?

16       A.   Yes.

17       Q.   Was the Governor's Residence or Governor's

18   House the next major building beyond the Westin

19   Hotel?

20       A.   It's right next door to the Westin.

21       Q.   And so, for instance, the access road that

22   you thought you would walk down, before you realized

23   it was blocked with shrubbery and so on, would have

24   been between the Westin Resort and the Governor's

96

1  House; is that right?

2      A.  Yes.

3      Q.  All right.  Can we take a ten minute break?

4              (Recess taken.)

5      Q.  I do have some questions.  I wanted to ask

6  you some questions about some of the employment

7  records that we got from Flansburgh Associates.

8  You, at the time this incident happened when you

9  were down in the Cayman Islands, you were on a leave

10  of absence; is that right?

11      A.  Yes.

12      Q.  All right.  And that leave of absence

13  started in January of 2002, and it was caused by or

14  needed because of the death of your sister; is that

15  right?

16      A.  I didn't request it because of the death of

17  my sister.

18      Q.  Why did you request it then?

19      A.  I requested it for personal reasons.  My

20  sister had been sick.  But I didn't tell them about

21  my personal problems.

22      Q.  But was the personal reason then, even

23  though I didn't tell your employer, was the personal

24  reason your sister's illness?

120

1    A.  That was really upsetting.  I don't know if

2  it was helpful.  It wasn't -- No, I don't know.  I

3  don't know.

4    Q.  You haven't resumed that after the five or

5  six weeks that you did go; is that correct?

6    A.  It was ended then.

7    Q.  Oh, it ended.  And then the -- In terms of

8  treatment for emotional problems before this

9  incident happened, you've told us about treating

10  with Dr. Praught since 1999?

11    A.  Um-hmm.

12    Q.  And then Dr. Palmer who you saw when you

13  were having your issues with your fiancé?

14    A.  Um-hmm.

15    Q.  And Dr. Campiola and Dr. Herb.  Those are

16  the only doctors that you saw for emotional problems

17  say from 1990 through 1999?

18    A.  Yes, that I can remember.

19    Q.  That you can remember.  That's all I can ask

20  you for.  Just a couple of other questions.  How

21  often had you been in the Westin Casualina -- if I'm

22  pronouncing it right -- Resort prior to the day of

23  this attack?  And I'm talking about during the

24  course of your three or four or five other visits to

Kimberly Genereux

121

1  the Cayman Islands?

2      A.   I had visited there a few times at least

3  every time I stayed at Plantana.  Also, I went to

4  two conferences at the Governor's Ballroom, tourism

5  conferences, that the public was invited to while I

6  was visiting.  And also, I was in the Cayman Islands

7  on September 11, 2001.  And I spent September --

8  quite a few hours on September 11th in the lobby of

9  the Westin Casualina with my friend Susanne Rivitz

10  watching television, watching the tower come down,

11  and so forth.  And we went to the Westin regularly

12  to try to newspapers during that visit.

13      Q.   Okay.  In addition to -- For instance, on

14  the other times, discounting the September 11 time

15  when you were there because of the events in New

16  York City and Washington, when you would go for a

17  casual visit, what would you do at the Westin

18  Casualina?  Would you shop?  Would you eat?  What

19  was your reason for going there?

20      A.   I ate.  I went shopping at the gift shop.  I

21  went to the ballroom for the tourism conferences.

22      Q.   Where was the ballroom in relation to --

23      A.   I had a drink at the bar.

24      Q.   I'm sorry.  Where was the ballroom in

Kimberly Genereux

122

1    relation to the ladies room that you've talked about

2    today?

3        A.  The ballroom is adjacent to the ladies --

4    right next to the spa.

5        Q.  So are these restrooms, as far as you know,

6    restrooms for the people using the Governor's

7    Ballroom?

8        A.  Yes.

9        Q.  That's all I have.  Thank you very much.  I

10   appreciate you coming in and spending time.  Thank

11   you.

12       A.  Thank you.

13           MR. ITZKOWITZ:  Thank you very much.

14           (Whereupon the deposition

15           was adjourned at 2:43)

16

17

18

19

20

21

22

23

24



Location of Westin Spa/Ballroom
2001 Addition

*Mile*

*Beach*

*Beach*

Scale 1:6 000

```
0   50  100 150 200 250  300 metres
0   50  100 150 200 250  300 yards
```

PHOTO KEY:

view direction arrow

photo Number

map source:
*Cayman Islands Official Atlas*
CIGIS 2003

OVERSIZED EXHIBIT - FILED SEPARATELY



↑ SEA ↑

PLAN SHOWING SPA

SCALE ⅟₁₆" = 1'-0"

WEST BAY RD

NORTH →

**WESTIN**
*CASUARINA*
*RESORT*

GRAND CAYMAN ISLAND

Another successful property of.

*Columbia Sussex*
CORPORATION

| A | 2/8/01 | FOR CONSTRUCTION |
|---|---|---|
| Revision | Date | Information |

Project **Conference Centre at The Westin Casurina Resort**

Title

**Site Plan**

| Drawn | . JAH | Checked | RJH |
|---|---|---|---|
| Scale | 1/16":1' | Date | 2/8/01 |











A



B



SUBJECT WESTIN



SUBJECT WESTIN 4

SUBJECT   WESTIN 6







SUBJECT WESTIN 7

WESTIN 3

SUBJECT Westin 5





SUBJECT  WESTIN  8



SUBJECT  WESTIN  2



Westin Bathroom 4.jpg



Westin Bathroom 1.jpg

Westin Bathroom 3.jpg



Westin Bathroom 2.jpg

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10879-JLT

KIMBERLY GENEREUX,          )
      Plaintiff             )
                            )    **AFFIDAVIT OF**
          v.                )    **KIMBERLY GENEREUX**
                            )    **IN OPPOSITION TO DEFENDANTS'**
COLUMBIA SUSSEX CORPORATION,)    **MOTION FOR SUMMARY JUDGMENT**
STARWOOD HOTELS & RESORTS    )
WORLDWIDE, INC., and        )
WESTIN HOTEL MANAGEMENT, L.P., )
      Defendants            )

1.   My name is Kimberly Genereux.  I am the plaintiff in
this action.

2.   I make this affidavit freely of my own personal
knowledge.

3.   I had reviewed and approved the factual statements set
forth in the original Complaint in this action as they related to
my rape.  Although they did not contain every detail, the facts
stated were true and accurate.

4.   I have reviewed the facts stated in the Second Amended
Complaint as they relate to my rape.

5.   The facts stated in paragraphs 12-60 of the Second
Amended Complaint are true and accurate as worded, except for the
following:

     a.   Paragraph 12 should read "five or six times"
     rather than "more than six times".

*KG*

b.   Paragraph 19 is correct but I did not know that when I entered the restroom.  I assumed that a major American resort like the Westin Casuarina had security although I did not see it.  I assumed that the security was designed so that it would not be observed by a criminal.  I found out later that there was no security, as indicated in the paragraph.

c.   With respect to paragraph 32, the stall door lock was open when I turned on the lights but I do not know if the rapist opened the lock before he entered the stall through the broken louver door or as he was leaving.

d.   Paragraph 36 should read "cut off" rather than "ripped off" my underwear.

6.   The facts stated in paragraphs 12-60 of the Second Amended Complaint do not contain every detail of the incident.  I supplied more detail in my deposition testimony to the extent that I was asked to do so.

7.   I have reviewed the legal allegations contained in paragraphs 62-64 of the Second Amended Complaint.

8.   To the extent that paragraphs 62-64 of the Second Amended Complaint state facts, I have personal knowledge of those facts and know them to be true and accurate.

Signed under the pains and penalties of perjury, this 23RD day of March, 2008.

KIMBERLY GENEREUX




# ROYAL CAYMAN ISLANDS POLICE

Tel No. (345) -949-4222
Ext 2917

Fax No. (345)-949-6472

Our Ref: CACT00002266

Your Ref: MLA/ch



PO Box 909
Grand Cayman
Cayman Islands
British West Indies

September 27, 2005

**Michael Alberga**
**2nd Floor, Harbour Place**
**103 South Church Street**
**Grand Cayman**

**Re: Westin Hotel Alleged Rape of Kim Generux**

Dear Sir,

I do acknowledge your request as it relates to the subject and do apologize for our late response.

A report was made on the 3rd may 2002 at 11:23PM by Kim Generux stating that she was raped by an unknown male while she was at the bathroom at the Westin Hotel.

According to the complainant she was returning from shopping at Fosters in the Strand. She was walking on the side walk heading to her Villa at # 20 Plantana Villa, on West Bay Road. As soon as she arrived at the first entrance to Westin Resort, she observed a vehicle which drove along side her. The male Driver asked her if she needed a ride. She told him no. She continued walking on the side walk, but decided as she arrived closer to Governer's Residence to walk through the Westin Parking Lot. Miss Generux did so in efforts that the driver would not know where she was residing. She then thought it was best to remain in the restroom for a while, which she did.

 

Shortly after while she was in the unit with the door closed she observed a male from the waist down. She couldn't have gotten much details of the type of his face because of the type of doors, which had wooden type blades in the middle. This person left and returned minutes after. He switched off the lights and banged on the door eventually breaking it.

He then placed a sharp object to her neck and demanded that she performed him oral sex on him. He also told her not to scream and threatened he would kill her if he did. She then performed Oral Sex on him, after which he placed his penis inside her vagina and proceeded to rape.
After he was finished, he used her underwear to wipe himself off. The suspect then left, after which the victim turned on the lights and made her way to the Westin Lobby and made a complaint.

Subsequently the Police were notified, attended the scene and then transported Victim to the Georgetown Hospital where she was examined and a victim sex kit completed. Her clothing along with the underwear were also collected to be examined. A statement was recorded from victim giving details of the incident.

The Doctor who conducted the examination of victim confirmed bleeding in the vagina with a 1.5 CM laceration on vaginal floor. Two seminal fluid were detected on the interior section of her skirt and on the mid section of her underwear (crouch area). No seminal fluid was detected on the oral swabs.

Officers involved in the investigation, conducted door to door inquires, however no useful information was gathered. She was also taken on a drive along with officers with the hope of identifying a suspect.

Officers who attended the scene observed that when the light in the bathroom is turned off, it is so dark that one can't see the palm of the hands directly in front of their face.

This particular crime was fully investigated and several persons were arrested, interviewed, processed and later bailed. DNA results confirmed that those persons were cleared, subsequently, no charges have been laid. From since this

incident all persons who have been arrested on suspicion of rape
have their DNA profile fed into the database for comparison. To
date there have been no hits.

Royal Cayman Island Police

Eugene Artburgh  CPS
Detective Sergeant
Specialist Support Operation
Royal Cayman Island Police

The Trauma Center
Out-patient Clinic
14 Fordham Road
Allston, MA 02134

Kimberly Genereux
Date of Birth: December 31, 1953
Date of Evaluation: February 21, 2005

**Identifying Information:**

Kimberly Genereux is a fifty-one year old single woman who lives in an apartment in Cambridge, MA. She grew up in East Hartford, CT., where her mother still resides. Ms. Genereux holds a degree in Architecture from the University of Virginia and worked at a Boston architecture firm for seventeen years where she held the position of Director of Architectural Graphics and attained the status of Associate. Ms. Genereux has been unemployed, unable to work, since shortly after being raped in the Cayman Islands at the end of April, 2002.

**Referral Information:**

Ms Genereux was referred to the Trauma Center for individual psychotherapy by the Women's Partial Hospitalization Program at Arbour/HRI Hospital, where she was in group treatment.

**Strengths:**

Ms. Genereux is extremely bright and articulate. Historically, she has had a strong sense of justice and has stood up for her beliefs, demonstrating courage and perseverance. Throughout her life, Ms. Genereux had demonstrated an ability to remain calm and analytical in threatening circumstances. In treatment, she is responsible, engaging consistently and keeping her therapy appointments.

sMs. Genereux functioned at a high level in her professional life, bringing her intelligence, creativity and ethical values to her work in architecture. Prior to her rape, she had many interests and was energetic in pursuing them, even while working full-time. She danced in local ballet companies. She graduated from a Fine Arts program in painting at the Boston Museum School, and later learned photography at another school. For years, she worked as a free-lance photographer for a local music magazine.

**Methods of Assessment:**

I have seen Kimberly Genereux twice weekly for individual, trauma-focused psychotherapy since August, 19, 2002. As part of my initial evaluation of Ms. Genereux, I reviewed her treatment records from the Women's Partial Hospitalization Program at Arbour/HRI Hospital and spoke to her Psycho-pharmacologist, Dr. Martha Praught. I performed an extensive trauma-focused evaluation over the course of several sessions, focusing on Ms. Genereux's remote and recent history, presenting problem, strengths and resources, and symptomatology. Ms. Genereux also completed a series of three trauma focused measures: the TAQ (Traumatic Antecedents Questionnaire), the SIDES (Structured Interview for Disorders of Extreme Stress N. O. S.) and the DES (Dissociative Experiences Scale). The results of the evaluation and the testing were presented for consideration to the Trauma Center treatment team, comprised of the therapists at the Trauma Center clinic, Trauma Center senior supervisors, and the management team: Medical Director Bessel van der Kolk, M.D., Clinic Director Kevin Becker, Psy.D., and Director of Education, Rosalyn Moore, Ph.D. The team supported Ms. Genereux's admission to the Trauma Center Clinic on the basis of her meeting admission criteria ( i.e. a diagnosis of PTSD), and made treatment recommendations.

**Description of Traumatic Experience:**

Based on Ms Genereux's description, my understanding of the assault is as follows: she was walking in the evening on Grand Cayman Island. It was dark, and she looked for routes that were well-lit and well-traveled. She encountered a man in a van who appeared to be following her and attempted to avoid him. She became fearful, and needed to use the bathroom. She intentionally chose the bathroom at the American-owned Westin Hotel, because she felt it would be safe. While she was in the stall, a man entered the bathroom, turned out the lights, and broke the stall door down. He grabbed Ms. Genereux, held a knife to her throat, and threatened to kill her if she screamed. She offered him money to leave her alone, but he refused, saying he wanted sex. She was extremely fearful of being infected with HIV, so she begged him to use a condom, and when he refused, she offered to perform oral sex in lieu of intercourse. When he was unable to reach climax in this way, he violently raped her, tearing her vagina. He held the knife to her throat throughout the ordeal, and said repeatedly that he would kill her should she not comply. Despite her fear, Ms. Genereux remained overtly calm and tried to persuade her assailant that she was interested in him and would leave with him willingly, hoping to avoid being raped or killed.

When she sought aid from the hotel staff, she found them suspicious and slow to respond, calling the manager, rather than complying with her request to summon an ambulance and the police. The manager appeared to disbelieve her as well, demanding that she first lead him to the scene of the rape. She reports feeling as if she were treated like a criminal rather than a victim. She also reports feeling that the police failed to listen closely to her, validating this by asking them to repeat what she had told them and hearing repeated factual errors.

It is clear to me that the rape itself was a terrifying and life changing experience for Ms. Genereux. Throughout the attack she believed that she might be killed; that awareness continues haunt her. The brutality and callousness of the act and its dehumanizing nature, and the indifference Ms Genereux experienced following the attack. have led to her loss of previously sustaining beliefs,: e.g., *1. People are basically decent and can be appealed to on a human level; 2. There are safe places in the world and one can protect oneself with caution, reasoned decisions and good instincts; and, 3. She has worth to others, and can count on people to help her when she is in distress or need.* That is to say, Ms. Genereux's way of understanding, experiencing and relating to the world was profoundly altered by the attack.

In addition, Ms. Genereux's ability to trust others and to engage in relationships has suffered considerably as a result of the rape. She continues to struggle with the powerful beliefs that no one cares what happened to her, no one will help her, and that there is no place for her in this world. Prior to the attack, Ms. Genereux had a circle of friends, dated often and attended cultural and recreational events regularly. In the two and a half years since the rape, she has had little social contact, has been to virtually no cultural or recreational events, and has not dated at all. She tells this writer that she is revolted by the thought of sex now, and has forsaken the idea of an intimate relationship, since sex is invariably a part of that. She feels that people avoid her because they want her to "get over it and move on."

Finding herself helpless to prevent the attack has profoundly damaged Ms. Genereux's sense of self efficacy, and particularly her confidence in her ability to protect herself. She continues to be obsessed with what she might have done differently to prevent the rape, and the catastrophic impact it has had on her life. She spends excessive time on the Internet reading about rapes and other events in the Cayman Islands. She has written to the Cayman police, asking to be allowed to identify her assailant (she was never permitted to look at "mug shots"), fearing he may be continuing to perpetrate. She has traveled to the Cayman Islands to collect information on her rape, lest "the bad guys get away with it." Ms. Genereux's tenacity, resourcefulness and commitment to justice, which have served her well throughout her life, have made it untenable for her to remain passive while imagining that those responsible for the sexual assault will not be accountable.

### Diagnosis and Symptoms

**DSM IV Diagnosis:**

**Axis I:** Posttraumatic Stress Disorder; Major Depressive Disorder, Recurrent, Severe, with Psychotic Features, in Partial Remission; Dissociative Disorder Not Otherwise Specified
**Axis II:** Deferred
**Axis III:** Sleep Apnea; Viral Meningitis, in Remission; S/P surgery for Melanoma
**Axis IV:** Moderate: psychiatric symptoms, history of violent assault, paucity of social supports, problems with primary support group, unemployment/no income

**Axis V:** Global Assessment of Functioning: Current = 52; Highest past year = 52

Ms. Genereux experiences classic symptoms of PTSD, which fall in to the broad categories of hyper-arousal, intrusions, avoidance and psychic numbing. She experiences the following symptoms of hyper-arousal and hypervigilance: fear of men resembling the rapist, fear of being out after dark, and fear of public bathrooms; anxiety; increased vigilance, and difficulty trusting. Her intrusive symptoms include: vivid, intrusive memories of the rape, flashbacks of the rape, nightmares, and intrusive thoughts relating to the assault. Ms. Genereux experiences the following avoidant symptoms: she avoids going out at night, stays away from men who generally resemble the rapist, and avoids social contact. Her symptoms of psychic numbing include: feeling emotionally "dead" or "numb."

Ms. Genereux experiences symptoms of a Major Depressive Episode, characterized by: loss of function (social and occupational), depressed mood, loss of interest, decreased motivation, diminished ability to experience pleasure, loss of energy, diminished ability to think or concentrate, and suicidal ideation. Ms. Genereux has worked hard and used her therapy well. She is experiencing a partial remission of her depressive symptoms just recently. Her mood is less severely depressed than earlier in treatment, and her psychotic symptoms have remitted. She is beginning to feel motivated to look to the future. She is experiencing some increase in her energy level. Most significant to her is the gradual return of her cognitive abilities. Also important is the decrease in the frequency of her suicidal ideation, which is now intermittent, rather than constant.

Ms. Genereux also experiences significant Dissociative symptoms: disorientation, confusion, the experience of "losing" time, the experience of being unaware of her surroundings. At the beginning of our treatment in August, 2002 she reported that she occasionally lost time, forgetting important appointments, for example. At that time, she frequently exhibited dissociative symptoms in sessions. Currently, she occasionally arrives at sessions appearing dissociated, talking in a rambling manner, with her eyes closed, pinching her arm and reporting feeling numb. At such times, she does not appear to hear or register this writer's comments, but speaks over them. She has reported missing her stop on the train, and failing to seeing the bus come while she is standing at the bus stop. When she has been late to appointments, it has often been related to doing research on the Cayman Islands, or writing to government officials to advocate on her behalf; she has been "triggered" by exposure to the traumatic material and has "lost" time.

At this time Ms. Genereux is not capable of maintaining employment. It is my clinical opinion that she is not able to assume her previous responsibilities because of her psychiatric symptoms. Were she to attempt to do so, I would be concerned that she would decompensate psychiatrically. Premature return to work would only jeopardize the gains she has made thus far. She is currently exploring what is needed for her to start a small photography business. This project allows her to take small steps, working as her symptoms permit, at her own pace. Involvement in this project is therapeutic for Ms. Genereux, as it orients her toward the future, engages her strengths, and gives her hope.

**Recommendations:**

There are a number of services could which I feel could help Ms. Genereux recover from the sequelae of her rape: She needs to continue individual trauma-focused treatment. She has been working on the stabilization phase (the first of three stages) of trauma treatment since starting at the Trauma Center. She has been attending sessions twice weekly, and should be supported in doing so until she feels ready to decrease to weekly sessions. It is difficult to assess the duration of treatment, but I could imagine her requiring 3 or more years to return to her level of function prior to the rape. The fee for individual therapy in the Boston area generally ranges from $120 to $150 for a 50 minute session, and 50% more for the ninety minute sessions required for some trauma modalities.

Ms. Genereux needs regular psycho-pharmacology visits. She sees Dr. Martha Praught approximately every two weeks at present. The frequency of visits varies with the stability of the patient and of the medication regimen (i.e., when new medications are being tried, more frequent visits are scheduled).

Ms. Genereux would benefit from Women's Psychotherapy group. Such a group would help her reconnect with peers, repair her ability to trust, and hone her social skills. The fee for groups varies widely. I would recommend her attending such a group for two years. Fees for groups often range from $50- $60 a session.

Ms. Genereux reports she is sex aversive since the rape, and consequently has forsaken the idea of having an intimate relationship. I feel she might benefit from individual or group counseling from a therapist specializing in women's sexual health for survivors of sexual trauma. I would estimate that this treatment would require years. The cost of individual therapy would likely be in the $120 to $150 range.

Ms. Genereux could benefit from vocational rehabilitation counseling as well. Getting laid off from her job of 17 years following the rape has led to her inability to consider returning to architecture or to working in a corporate setting again. An assessment by a Vocational Rehabilitation specialist would determine the duration and cost of treatment.

**Prognosis:**

Ms. Genereux has strength, courage and perseverance. She has worked hard in psychotherapy and is motivated to recover from the sexual assault and its sequelae. Based on my observations, I am confident that she will do everything in her power to heal and move on with her life. In order to be successful, however, she will need the professional supports and services I have delineated in the section on "Recommendations." She will also need to re-integrate herself into the world: she must find or create a means of financial support: she needs to establish a new social support network; she needs to

reconnect with a source of meaning in her life. If she receives the necessary help and negotiates these tasks, I feel that she has a reasonable chance of returning to her level of functioning prior to the assault. The remission of her symptoms notwithstanding. Ms. Gencreux has been permanently changed by the rape, and will bear the scars of this event for the rest of her life.

Signature: _____    Date: _____

Eleanor K. Egan, LMHC

**Eleanor K. Egan, LMHC**
**23 Main Street**
**Watertown, MA 02472**

Re: Kimberly Genereux
Date of Birth: December 31, 1953
Date: September 16, 2007

## UPDATED PSYCHOLOGICAL ASSESSMENT

**Identifying Information:**

Kimberly Genereux is a fifty-three year old, single woman who lives in an apartment in Rockport, MA. She grew up in East Hartford, Connecticut. Her mother died this summer, leaving her with no first-degree relatives and no extended family to speak of. Ms. Genereux holds a degree in Architecture from the University of Virginia and worked for seventeen years at a Boston architecture firm, where she held the position of Director of Architectural Graphics, and attained the status of Associate. Ms. Genereux has been unemployed, unable to work, since shortly after being raped in the Cayman Islands at the end of April, 2002.

**Strengths:**

Ms. Genereux is extremely bright and articulate. Historically, she has had a strong sense of justice and has stood up for her beliefs, demonstrating courage and perseverance. Throughout her life, Ms. Genereux had demonstrated an ability to remain calm and analytical in threatening circumstances. In treatment, she is responsible, engaging consistently and keeping her therapy appointments, except occasionally when extremely "triggered" and dissociated.

Ms. Genereux functioned at a high level in her professional life, bringing her intelligence, creativity and ethical values to her work in architecture. Prior to her rape, she had many interests and was energetic in pursuing them, even while working full-time. She danced in local ballet companies. She graduated from a Fine Arts program in painting at the Boston Museum School, and later learned photography at another school. For years, she worked as a free-lance photographer for a local music magazine.

**Assessments:** No formal psychological instruments have been administered since Ms. Genereux's admission to the Trauma Center in August, 2002. Her therapist has continued

Updated Psychological Assessment of Kimberly Genereux
Date of Birth: December 31, 1953
September 16, 2007

to assess her symptomotology and progress informally, and to document these in her progress notes.

## Description of Traumatic Experience:

Based on Ms Genereux's description, which has remained consistent over five and one half years, my understanding of the assault is as follows: she was walking in the evening on Grand Cayman Island. It was dark, and she looked for routes that were well-lit and well-traveled. She encountered a man in a van who appeared to be following her and attempted to avoid him. She became fearful, and needed to use the bathroom. She intentionally chose the bathroom at the American-owned Westin Hotel, because she felt it would be safe. While she was in the stall, a man entered the bathroom, turned out the lights, and broke the stall door down. He grabbed Ms. Genereux, held a knife to her throat, and threatened to kill her if she screamed. She offered him money to leave her alone, but he refused, saying he wanted sex. She was extremely fearful of being infected with HIV, so she begged him to use a condom, and when he refused, she offered to perform oral sex in lieu of intercourse. When he was unable to reach climax in this way, he violently raped her, tearing her vagina. He held the knife to her throat throughout the ordeal, and said repeatedly that he would kill her should she not comply. Despite her fear, Ms. Genereux remained overtly calm and tried to persuade her assailant that she was interested in him and would leave with him willingly, hoping to avoid being raped or killed.

When she sought aid from the hotel staff, she found them suspicious and slow to respond, calling the manager, rather than complying with her request to summon an ambulance and the police. The manager appeared to disbelieve her as well, demanding that she first lead him to the scene of the rape. She reports feeling as if she were treated like a criminal rather than a victim. She also reports feeling that the police failed to listen closely to her, validating this by asking them to repeat what she had told them and hearing repeated factual errors.

It is clear to this writer that the rape itself was a terrifying and life-changing experience for Ms. Genereux. Throughout the attack she believed that she might be killed; that awareness continues haunt her. The brutality and callousness of the act and its dehumanizing nature, and the indifference Ms. Genereux experienced following the attack, have led to her loss of previously sustaining beliefs: e.g., *1. People are basically decent and can be appealed to on a human level; 2. There are safe places in the world and one can protect oneself with caution, reasoned decisions and good instincts; and, 3. She has worth to others, and can count on people to help her when she is in distress or need.* That is to say, Ms. Genereux's way of understanding, experiencing and relating to the world was profoundly altered by the attack.

In addition, Ms. Genereux's ability to trust others and to engage in relationships has suffered considerably as a result of the rape. She continues to struggle with the powerful beliefs that no one cares what happened to her, no one will help her, and that there is no

Updated Psychological Assessment of Kimberly Genereux
Date of Birth: December 31, 1953
September 16, 2007

place for her in this world. Prior to the attack, Ms. Genereux had a circle of friends, dated often and attended cultural and recreational events regularly. In the five and a half years since the rape, she has had little social contact, has been to virtually no cultural or recreational events, and has not dated at all. She tells this writer that she is revolted by the thought of sex now, and has forsaken the idea of an intimate relationship, since sex is invariably a part of that. She feels that people avoid her because they want her to "get over it and move on" or that they think she is "a zero."

Finding herself helpless to prevent the attack profoundly damaged Ms. Genereux's sense of self efficacy, and particularly her confidence in her ability to protect herself. She continues to be obsessed with what she might have done differently to prevent the rape and the catastrophic impact it has had on her life. For several years following the assault she spent excessive time on the Internet reading about rapes and other events in the Cayman Islands. She wrote to the Cayman police, asking to be allowed to identify her assailant (she was never permitted to look at "mug shots"), fearing he may be continuing to perpetrate. She traveled to the Cayman Islands to collect information on her rape, lest "the bad guys get away with it." Ms. Genereux's tenacity, resourcefulness and commitment to justice, which have served her well throughout her life, have made it untenable for her to remain passive while imagining that those responsible for the sexual assault will not be accountable.

## Diagnosis and Symptoms

### DSM IV Diagnosis:

**Axis I:** Posttraumatic Stress Disorder; Major Depressive Disorder, Recurrent, Moderate, in Partial Remission, Dissociative Disorder Not Otherwise Specified
**Axis II:** Deferred
**Axis III:** Viral Meningitis, S/P surgery for Melanoma
**Axis IV:** Moderate: recent death of mother, psychiatric symptoms, history of violent assault, paucity of social supports, unemployment and loss of career
**Axis V:** Global Assessment of Functioning: Current = 48; Highest past year = 53*

*N.B.: In reviewing and updating the earlier assessment this writer realized that the GAF cited in the previous assessment was erroneous and should have been "32" instead of "52."

Ms. Genereux continues to experience symptoms of PTSD, though the intensity, frequency, and duration of her symptoms had lessened prior to the recent death of her mother. It is this writer's opinion that she will return to that higher level of function once she has grieved that death and fulfilled her responsibilities as executrix of the estate; however, in the future, she is likely to regress temporarily under any appreciable stress. Ms. Genereux is currently experiencing psychic numbing, with an expressed inability to experience pleasure or pain, and an exacerbation of other symptoms, such as nightmares, dissociation, and hypervigilence. Though her "intrusive" symptoms, such as nightmares,

3

Updated Psychological Assessment of Kimberly Genereux
Date of Birth: December 31, 1953
September 16, 2007

and intrusive memories, had decreased in severity and frequency over the past six months, the stress of Ms. Genereux's mother's death has caused an increase in these symptoms. Her ability to focus, concentrate, and retain new information has improved. Her hyper-vigilance has diminished in general, though she has demonstrated episodes of paranoia recently, under stress. She continues to fear and dislike men, but wants to work on this as soon as she feels ready.

Until the illness and death of her mother, Ms. Genereux had been significantly less depressed over the past six months. She reports she no longer wants to die, and has hope for the future. This is a significant improvement for her. Ms. Genereux continues to experience episodic dissociative symptoms, under stress, including disorientation, confusion, the experience of "losing" time, and the experience of being unaware of her surroundings. Recently she has had to reschedule appointments on several occasions because she became confused and disoriented and did not leave home in time. She also failed to recall an hour long conversation with this writer the day of her mother's death. Ms. Genereux has demonstrated a general decrease in paranoid ideation, which is now precipitated by discrete stressful events. She has also demonstrated a decrease in "black and white" thinking. With increased self-awareness, Ms. Genereux has consciously, and conscientiously, worked to hold ambivalence in considering people, situations, and the nature of the world. She remarks that she wants to "like people" and to challenge the fears and biases (e.g.: toward men) resulting from her assault.

**Recommendations:**

The fees cited for all recommended services are considered by this writer to represent the general range among well-trained, experienced clinicians in the greater Boston area.

It is this writer's opinion that Ms. Genereux requires on-going Trauma-focused therapy, at least once weekly, as she tries to maintain psychiatric stability, integrate some of her new attitudes and feelings, and re-integrate into the world. Ms. Genereux has increased her therapy sessions from once a week to twice since the death of her mother; she is hoping to decrease to weekly sessions soon. The fee for individual therapy starts at approximately $100 and goes up to $200 or more per 50 minute session.

Ms. Genereux needs regular psycho-pharmacology visits. She sees Dr. Martha Praught monthly at present. It is this writer's experience that this service starts at $75 per 15 minute segment, and rises from there. Dr. Praught will be able to report on her fee schedule.

It is likely that Ms. Genereux will need to take psychotropic medication for the rest of her life. The prices and co-pays for these medications vary, and can be costly.

Ms. Genereux could benefit from psychodynamic group psychotherapy. She has lost her ability to trust others, and has come to see others as uncaring and unkind as a result of both her assault and her experience of trying to enlist the support of others. Her

4

Updated Psychological Assessment of Kimberly Genereux
Date of Birth: December 31, 1953
September 16, 2007

perceptions of how others regard her have also become quite distorted since the rape, and have affected her way of relating to others. She needs to learn to be more open to others, to begin to trust again, and to entertain alternative perspectives on the feelings, thoughts and motivations of others. It would be helpful for her to learn to give and receive interpersonal feedback effectively. She could also benefit from improving her interpersonal communication skills. She has suggested starting with a women's psychotherapy group and graduating to a mixed group, which makes sense to this writer. Ms. Genereux continues to experience significant anger and mistrust toward men, and sees addressing this as central to returning to the work-world. Group therapy typically costs between $30 and $60 a session, and groups meet weekly.

Ms. Genereux might also benefit from individual or group counseling from a therapist specializing in women's sexual health for survivors of sexual trauma, since sexuality has become repellant to her, and this has caused her to rule out future romantic relationships. The fee for such a group is in the same range of psychodynamic group therapy: $30 to $60 a session.

Ms Genereux has expressed an interest in obtaining advanced training in a new field, which seems feasible considering her high level of intelligence and tenacity. She has decided not to return to her former profession, architecture, which she sees as a stressful, harsh, male-dominated field. She wants to work in an area where she feels she can "give something to the world instead of to a corporation." Vocational counseling might be helpful to her as she decides what area to pursue. She is leaning toward veterinary medicine at present. This writer has no information on the fee range for vocational counseling, but would assume that it would be generally comparable to that of individual psychotherapy. The cost of training for a new career would clearly depend on a number of currently unknown variables.

**Prognosis:**

For five and a half years Ms. Genereux has worked diligently to recover from her traumatic experience. She has just begun to experience hope and pleasure in the past six months, feeling interest and considering the future. She reports feeling less pervasively angry and reactive, and more able to face being around people now. She also demonstrates more capacity for reality-testing, and an increased ability to manage her trauma symptoms. Her cognitive abilities continue to return to their former level, as her ability to remain grounded, and concentrate, and her memory improve.

It is this writer's opinion that Ms. Genereux may be ready to start a training program within six to twelve months, if no other major stressful events occur. It is this writer's judgment that she will continue to be affected by the experience of her assault and its aftermath for the rest of her life, but that it will dominate her experience less as she feels less damaged and reconnects to her strengths and aptitudes, and as her capacity for human connection is restored.

Updated Psychological Assessment of Kimberly Genereux
Date of Birth: December 31, 1953
September 16, 2007

**Signature:** _____          **Date:** September 16, 2007
          Eleanor K. Egan, LMHC

# Beth Israel Deaconess
# Medical Center

A teaching hospital of
Harvard Medical School

**David S. Chapin, M.D.**
*Department of Obstetrics
& Gynecology*

*Director, Division of
Gynecology*

*Assistant Professor,
Obstetrics, Gynecology
and Reproductive Biology*

February 29, 2007

Mr. Mark F. Itzkowitz
85 Devonshire Street, Suite 1000
Boston, MA 02109-3504

Re:  Kimberly Ann Genereux

Dear Mr. Itzkowitz,

I interviewed and examined Kimberly Genereux on February 22, 2008. She reported to me that since she was raped about five years ago she has suffered increasingly serious symptoms related to defecation. She is unable to completely empty her rectum without pushing in on an area of the vagina into which the rectum is prolapsed, a rectocele. Even when she feels she has emptied completely, she often soils her underwear shortly thereafter. A defogram performed February 14, 2008 showed an anterior rectocele causing incomplete rectal emptying.

My examination confirmed that indeed there is a rectocele originating high in the posterior vagina and prolapsed almost down to the hymen. This examination and a defogram indicate that the connective tissue between the vagina and the rectum has been torn.

The patient told me that she was assaulted from behind with one leg up on the toilet in a public restroom. The man's thrusting caused her to feel as if she were being ripped apart inside.

Rectoceles such as Ms. Genereux's are usually caused by childbirth injury or chronic constipation. Ms. Genereux has not experienced either of these. I must conclude then, to a reasonable degree of certainty that her injury was caused by the rape.

I have proposed to Ms. Genereux that at a time of convenience in the future we could perform a reparative operation called a posterior colporrhaphy. This procedure has a high likelihood of restoring her normal defecatory function. It would involve about one hour in the operating room and one or two nights in the hospital, as well as a six-week recovery period during which exercise and heavy lifting would be prohibited.

I would be happy to answer any further questions.

Sincerely,

David S. Chapin, MD
DSC:zs

330 Brookline Avenue
Boston, MA 02215

(617) 667-4316
fax (617) 667-4173
dchapin@caregroup.harvard.edu

Affiliated with Joslin Clinic  |  A Research Partner of Dana-Farber/Harvard Cancer Center  |  Official Hospital of the Boston Red Sox



**Boston University**

Sargent College of Health
and Rehabilitation Sciences
Department of Occupational Therapy
and Rehabilitation Counseling

635 Commonwealth Avenue
Boston, Massachusetts 02215
617-353-2000
Fax: 617-353-7500
www.bu.edu/sargent/

February 10, 2008

Mark F. Itzkowitz, Esquire
85 Devonshire Street
Suite 1000
Boston, Massachusetts 02109-3504

Re:   **Kimberly A. Genereux v. Columbia Sussex Corporation, et. als.**
      DOI:   May 3, 2002
      Occupation:  Disabled Architect (DOT #001.061-010)

Dear Mr. Itzkowitz:

At your request, I am summarizing the results of an independent vocational rehabilitation
evaluation of the employability, vocational potential, and earning capacity of Ms. Kimberly A.
Genereux.  Ms. Genereux experienced severe psychological trauma as a result of a brutal attack
and rape while vacationing on the Cayman Islands in May 2002.  As a result of the attack and
forcible rape, Ms. Genereux experienced a major depression disorder, complex Post-Traumatic
Stress Disorder, psychotic features, Dissociative Disorder NOS, has participated in treatment and
therapy from multiple sources, and continues to experience persistent disabling psychological
trauma.  Ms. Genereux has not been able to continue with her career or to work in any capacity,
to participate in her normal daily activities and recreation, and has had a significantly diminished
quality of life since her attack.  Ms. Genereux continues with medication and psychotherapy.

In forming my opinions about Ms. Genereux's career potential and earning capacity, I reviewed
available records and materials including Ms. Genereux's deposition, her psychiatrist's office
notes, psychological treatment reports, hospital records, employment records, salary and earnings
records, and Social Security Administration records.  In addition, I met with Ms. Genereux to
conduct an independent evaluation and to obtain information about her education, her work
history, and her medication treatment and current status.  I also conducted a vocational
examination of select vocational areas.  I utilized information from records reviewed and from
my vocational rehabilitation examination to develop an objective opinion, based on a reasonable
degree of vocational rehabilitation certainty, of Ms. Genereux's employability and earnings
capacity.

**Meeting with Ms. Genereux (1/30/08).**  I met with Ms. Genereux on January 30, 2008 at my
office in Boston for a four and ¼ hour interview and partial assessment.  Ms. Genereux related
that she had taken the train and public transportation to my office.  I explained the purpose of the
meeting and that the usual practices of confidentiality may not be maintained as I might be asked
to render a report and to discuss my opinions.  Ms. Genereux indicated that she understood the

Page 2 - Genereux

reasons for the evaluation and that she was free to ask questions. During the interview, I reviewed her educational background, her work history, and her medical treatment.

## Education & Employment History

Education. Ms. Genereux is a 54-year-old (DOB 12/31/53) single woman who is currently living in a subsidized apartment in Rockport, MA. Ms. Genereux grew up in Manchester, CT and attended East Catholic High School, graduating in 1971. Ms. Genereux received honors grades and was near the top of her class. She then attended the University of Virginia and earned a Bachelor of Science degree in Architecture in 1976. She enjoyed both math and science courses, as well as art and poetry. Ms. Genereux is proud of her college achievement as the architecture program was demanding and had a strong reputation. Later in the 1980s, Ms. Genereux attended the Boston School of the Museum of Fine Arts where she studied studio art and photography. She earned a Diploma in Fine Arts in 1988.

Employment.  After graduating from the University of Virginia, Ms. Genereux worked as an architect for the firm of TR Wyant Associates where she developed technical calculations such as strength of beam and weight load, and developed designs for heating and ventilation layout. After approximately one year, she moved to Boston where she fulfilled a longstanding interest in dance by taking ballet classes. She then spent approximately one year in Europe, mostly in Germany. She learned German, continued with her ballet lessons, traveled, and did fashion modeling.

Around 1980, Ms. Genereux moved back to Boston where she initially worked as a part-time librarian at the Boston Architectural Center, and also resumed fashion modeling for different department stores in the Boston area. Ms. Genereux then obtained full-time work as an architect for Mr. Phinneas Alpers. The firm was a small firm employing around six individuals. The architectural work involved designing residences and group homes for handicapped children. The work was highly satisfying for her as she was able to design and develop buildings and residences where she knew children would benefit. She performed this work for approximately one and one-half years.

Ms. Genereux next worked as an architect for United Engineering & Contractors, a subsidiary of Raytheon Corporation. In this position, she worked on large building designs, roof details, and floor plans. The firm designed buildings and plants for other large companies and for the government.

Ms. Genereux began work with Flansburgh Associates Inc. (FAI) around 1984. She worked full and part-time for FAI over the next few years while she earned her diploma from the Museum of Fine Arts School. This was a busy time for her as she was also involved with her interest in dancing. After she completed her diploma program, she began full-time employment at Flansburgh. Ms. Genereux worked on several large projects connected with Flansburgh, including public and private schools, designing for small colleges, and developing designs for the National Park Services such as the Boott Cotton Mills in Lawrence, MA. Ms. Genereux and the firm worked on historical projects, restorations, and new building designs. As an architect (DOT #001.061-010) Ms. Genereux researched, planned, and designed building projects for

companies and towns, applying her knowledge of design, construction, and building materials. In her work on schools, she consulted with teachers and administration to determine the functional and spatial requirements of the new school or renovation, and then prepared designs, specifications, estimated costs, and construction time. Based on her background working with United Engineering, she had experience designing labs and interfacing with engineers. For some projects, her interactions with teachers and her designing activity lasted over 8 years. She was the Project Architect on several facilities and worked with design teams for public school projects including the Malden Public Schools, Mascenic Regional High School (addition/renovation), Lynn English High School, and others. She also worked on private schools including the Hammond School in South Carolina, Thayer Academy, and the Moses Brown School in Rhode Island. Her work also included commercial office buildings such as the John Hancock tower building renovations.

In between projects, and during schooling, Ms. Genereux was laid off for short periods or took brief sabbaticals while she took additional college courses consistent with her varied interests.

Based on her years of experience and her specialization, Ms. Genereux was promoted to Director of Architectural Graphics in 2000. Ms. Genereux was promoted again and became an Associate of the firm and a member of the firm's management team. A business promotional narrative noted that her work "...combines her talents in architecture, graphic and fine arts, with her technical proficiency in computer-aided design." She assumed responsibility for developing design and production of the new corporate identity for FAI and reported directly to the president of FAI. FAI was a large firm at the time, having approximately 115 employees.

Performance evaluations are available and consistently document Ms. Genereux's contributions and high performance level. One review notes "...you are an outstanding contributor to our firm in the areas of graphics, writing, design, and consistently raising the quality of new work..." Another evaluation notes "...unique talents & abilities that are extremely valuable to our firm – writing skills are outstanding – graphics are outstanding – handle diverse tasks & products very high quality..." In 2001, an evaluation notes "...you are in full bloom, irreplaceable...your presence, talent and creativity gives the firm a special edge..."

While she was working at Flansburgh, Ms. Genereux took occasional photography courses at the New England School of Photography. Consistent with her interest in music, she took photographs of several bands and of ballets, including photographs that were published in music magazines. She did not take pictures for financial reimbursement or contracts, but for her own interest and enjoyment. Ms. Genereux also took unpaid leave to pursue interests in dance, writing, photography and other creative areas.

At the time of her assault and rape, Ms. Genereux was on a leave of absence due to the death of her sister. When she returned, it was evident that Ms. Genereux was experiencing significant and disabling trauma resulting from her assault and rape, and she was notified that she was terminated from the firm. At the time of her termination, Ms. Genereux was earning a base salary of approximately $56,700, exclusive of bonuses and benefits.

Page 4 - Genereux

## Medical Treatment and Status

Prior History. Ms. Genereux has had a history of depression since childhood for which she has sought therapy. Apparently she and her sister experienced neglect and harsh treatment from her parents. Despite the dysfunctional family environment, Ms. Genereux was successful in school, graduated high school with honors, graduated from a rigorous college program, and had a successful career in architecture. Ms. Genereux has been receiving treatment from Dr. M. Praught for depression since 1998.

Present disability. While on leave from Flansburgh Associates (FAI), Ms. Genereux was in the Cayman Islands on and around May 3, 2002. In the evening, she was walking along a resort road when she observed an individual following her. She subsequently entered a public hotel restroom and was forcibly assaulted and raped at knife-point. As the details of the assault, rape, and contact with the local hotel staff, management, and police are well known to you, I will only summarize the events that followed. After she was raped in the hotel rest-room, Ms. Genereux sought assistance from hotel staff. A hotel bartending staff then called the hotel manager. After a period, an apparent manager spoke with her, did not readily contact police or medical help as asked by Ms. Genereux, asked to be shown where the rape occurred, then escorted Ms. Genereux back to the main building and called local police. Ms. Genereux remembers feeling like a criminal herself by the way she was treated by the staff. After the police came, Ms. Genereux was taken to the local hospital.

Ms. Genereux has suffered severe emotional and physically disabling injuries that required hospital and medical care and ongoing psychological treatment, including medication. When Ms. Genereux returned to Massachusetts, she contacted Flansburgh who supported her through referral to the Wellness Center and provided her with an attorney in the Cayman Islands. Records indicate how distraught, distressed, angry, and fragile Ms. Genereux was in her interactions with FAI human resources staff.

Ms. Genereux began receiving day treatment at McLean Hospital in June, 2002. She was diagnosed with Major Depression, severe and Post Traumatic Stress Disorder. Ms. Genereux participated in individual therapy, and varied group modalities oriented around grief and loss, ADLs, and cognitive coping strategies.

While in treatment at McLean Hospital, Ms. Genereux was treated by her psychiatrist, Dr. M. Praught. Dr. Praught had been treating Ms. Genereux for depression since 1998. Dr. Praught was concerned about depression, flashbacks and nightmares, Ms. Genereux isolating herself in her apartment, that she was becoming overwhelmed easily, was not eating then was over-eating, was excessively sleeping, was expressing occasional suicidal thoughts, was hypervigilant, and was leaving her apartment in disarray. She also noted dissociative states, anger, inability to concentrate, and passivity. Over the next months, Dr. Praught noted that the depression and PTSD were not responding to medication. Ms. Genereux began treating with a therapist twice a week, and Dr. Praught treated her only for medications.

In January 2003, Dr. Praught discussed Ms. Genereux with Ms. Genrereux's therapist, Ms. E. Egan, who reported that Ms. Genereux had regressed, was at risk for suicide and had contracted

02/08/2008  12:03   6173592926        BOSTON LADY BAR-DT                    PAGE  05

Page 5 - Genereux

for safety steps. Dr. Praught noted in October, that Ms. Genereux had regressed but she did not feel she was suicidal. In January 2004, Ms. Genereux continued to be isolated and feeling victimized.

Ms. Genereux followed treatment at McLean with treatment at Arbour Counseling Services and the Trauma Center Clinic. She started receiving therapy twice a week from E. Egan, Mental Health Counselor, in 2002. After comprehensive assessment, Ms. Egan provided a diagnosis of Post Traumatic Stress Disorder, Major Depressive disorder with psychotic features, and Dissociative Disorder NOS. Ms. Genereux does not have either general or specific memory of her treatment at McLean or her early treatment at Arbour Trauma Center.

Ms. Egan treated Ms. Genereux for depression symptoms that included loss of social and occupational function, depressed mood, loss of interest and decreased motivation, diminished ability to think or concentrate, and for suicidal ideation. Ms. Genereux also had significant dissociated symptoms including disorientation, confusion, and lack of awareness of her surroundings. In 2005, Ms. Egan concluded that Ms. Genereux was not able to assume her work as an architect. She recommended continued individual trauma-focused treatment and medication, as well as a women's therapy group to help her to begin to interact with women, to resolve issues of trust of others, and to redevelop her social skills.

Ms. Egan continues to provide therapy for Ms. Genereux. In 2007, Ms. Egan reported that Ms. Genereux continues to engage in relationships, finds it difficult to trust others, feels that no one cares about her situation, and interacts little with others. Ms. Egan notes that Ms. Genereux continues to experience PTSD symptoms, but that she is improving. Her recent loss of her mother has been a setback, but Ms. Egan feels that Ms. Genereux will improve after resolving her reactions of loss. Ms. Egan reports that Ms. Genereux continues to deal with stress poorly, continues to fear and not trust others, especially men, and continues to experience episodic dissociated symptoms.

Ms. Egan confirms that over the past six months, Ms. Genereux has been able to develop interest in her future and to think about realistic plans. She finds that Ms. Genereux is recently more able to be around people, has more capacity for reality-testing, and is better able to manage her trauma symptoms. Although Ms. Genereux has less interest in resuming her prior career in architecture, and the competitive environment that is male-dominated, she has expressed interest in exploring training and has increasing ability to utilize her cognitive abilities and intellect.

Dr. Praught reported in May 2007, that Ms. Genereux was feeling hopeful but continues to have nightmares if she misses medication.

Ms. Genereux was found to have a significant disability by the Social Security Administration and to be disabled from gainful employment.

Current Status. In May 2006, Ms. Genereux moved from Cambridge to Rockport, MA, and currently lives in a subsidized apartment. During the move, she stayed with a friend in Rockport, but was not able to remain due to strained relationships. Ms. Genereux reports that she has few friends, does not participate in cultural or recreational activities, does not date or go out to dinner

with friends, and remains relatively isolated. She relates that she has recently attempted to socialize and to make a friend around Rockport, but had difficulty, and the friendship may not develop. She also was offered training for a part-time cashiering position with a local shop. After attempting a day of customer relations/sales/cashiering at the shop, the owner told her it would "take time" to learn, and has not asked her back.

Ms. Genereux considers that after five years, she is finally making a "transition" toward more healthy behaviors. She is reading more, taking an interest in getting out of her house, and looking into different potential jobs such as veterinary assistant, photographer, seamstress, and others. However, she indicates that small events immobilize her and cause lengthy emotional "shutdowns." She remembers how she enjoyed the challenge of work, how she took pleasure in showcasing her abilities, and how she found satisfaction in competition. Now she is not able to compete, to associate with others whether socially or intimately, or to find satisfaction in any part of life or living. Her energy level is low and she fatigues quickly. She finds that she has difficulty processing, that she is slow in figuring, and that her "brain is slow." At the same time, she recognizes that things that were important in her past life, such as status in her work, are not as important as finding satisfaction in activity.

Ms. Genereux concludes that she is finally able to trust her therapist as a person who is trying to help her. She is seeing Ms. Egan twice a week and will be seen for evaluation by Dr. Praught once a month. She is currently taking Effexor and Provigil for medication.. She is also taking medication for her meningitis.

Ms. Genereux experiences intestinal disorder that she will discuss with her primary care physician. She believes that the disorder results from her rape and will seek treatment.

## Vocational Evaluation

During this session, I administered select vocational evaluation tests and inventories in order to understand Ms. Genereux's vocational interests and select abilities. Ms. Genereux demonstrated adequate ability to focus attention, concentrate, sustain effort, and to analyze her abilities. Performance represents a valid effort and measure of her abilities on the assessment measures utilized:

> Harrington-O'Shea Career Decision Making System-R
> Revised Minnesota Paper Form-Board Test-AA
> Myers-Briggs Inventory – Form M

Vocational Interests. The Harrington-O'Shea Career Decision Making System is a career interest inventory used to identify and detail interests, values, and self-identified vocational abilities. In formal career interest measurement, Ms. Genereux demonstrated highest interests in Scientific and Artistic areas. People who relate closely to the Scientific area enjoy analytical and intellectual activity, learn by reading, studying or investigating. They value independence, achievement, and inventiveness and are usually curious, reserved, and analytical. People who relate closely to the Artistic area enjoy creative activity associated with writing, painting, sculpting and intellectual work. They value beauty, self-expression, imagination, and creativity.

Expressed interests by Ms. Genereux involve veterinary assistance, photography, and research. She has a strong and long-standing interest in working with animals. When asked to identify present abilities or strengths, Ms. Genereux had difficulty identifying any strength other than Language ability (she learned to speak German easily) and Spatial ability, ability consistent with architecture. Highest work values involved independence in her work, variety, opportunity to utilize mental abilities, and creativity or opportunity to use her imagination in her work.

Spatial Aptitude. Ms. Genereux performed at a high ability in non-verbal problem solving abilities pertaining to spatial relations. Strengths were noted in visual organization and mechanical/spatial ability requiring the capacity to visualize and manipulate objects in space. Individuals with high scores in spatial ability tend to perform well on tasks requiring the mental transformation, manipulation, and analysis of dimensional objects. The task requires concentration and ability to analyze problems quickly. This ability is often associated with performance or non-verbal intellectual ability. Careers are found in areas such as architect, engineering, computer-aided design, mechanics, and designers.

Coping Strategies. People address learning, employment, and challenges in their daily lives through different approaches. Ms. Genereux is a person who seeks logical explanations in her approach to life, social, and work challenges. She is interested more in ideas than in social interaction and can be described as quiet, contained, flexible and adaptable in her approach. She approaches questions through research and analysis in solving problems, and can be skeptical, critical, and questioning in her view of the world.

**Vocational Summary and Opinion**

During my interview and evaluation session, Ms. Genereux demonstrated ability to discuss her education and work history, and speak with pride about her education and employment accomplishments. Ms. Genereux notes that she had to overcome many hardships growing up, but that she achieved many satisfying goals in her field. She speaks with pride about her past educational and career accomplishments. Ms. Genereux speaks slowly, deliberately, maintaining sporadic eye contact, and demonstrating cautious but thoughtful discussion about her past and questionable future.

She continues to be highly discouraged, angry, and confused about her inability to make friends, socialize, have confidence in her ability, and to have any satisfaction with her quality of life. She accurately concludes that she is in a "transition" phase of her recovery, but continues to be discouraged by episodes of "shutting down" and of emotional trauma when stressful situations develop. She is confused and discouraged by her lack of ability to meet and make female friends and is often openly suspicious of people.

Ms. Genereux acknowledges that she will never be able to cope with the stresses and challenges of a competitive work environment similar to that at FAI or in the architectural field. At the same time, she is confused by her inability to judge her skills and coping ability to perform entry level work such as her recent attempt to try cashiering/sales in a local shop. In this instance, the shop owner did not ask her back, and related to her that it would take time to learn the job.

**Pre-Trauma Career Options**.  Prior to her assault and rape, Ms. Genereux was a successful college graduate who had a 20 year career as an architect.  She had worked for FAI for the past 15 years, had increased her pay several times, was promoted to Director of Architectural Design and to an Associate position within the firm, and was part of the management team.  Ms. Genereux had demonstrated a unique set of skills that set her apart from other architects within the firm and within the field.  In addition, Ms. Genereux had many and varied interests, including dance, photography, writing, travel, and animals.  Ms. Genereux had an active social and leisure life and was involved in cultural activities.  At the time of her rape in 2002, she was earning $56,700 base salary exclusive of benefits and bonuses.

Ms. Genereux was positioned to have an extended career in architectural design, and found enjoyment in her work and the challenges of the job.

**Post-Trauma Career Options**.  Since her trauma in May 2002, Ms. Genereux has been unable to work as an architect or in any other capacity.  She has been diagnosed with Major Depression, severe; with Post Traumatic Stress Disorder; and with Dissociative Disorder NOS.  She has received therapy, group work, and medication for the past five years for multiple symptoms.  Her psychological disorders have resulted in ongoing and persistent functional limitations affecting her social and vocational life.  Her treating physicians and therapists, as well as Social Security disability determination examiners, have found her to be disabled from employment.

Based on her present limitations and residual abilities, and consistent with her treating physician's and therapist's current assessment, it is my opinion that Ms. Genereux is not able to perform her past career as an architect.  An architect must be able to manage ongoing and high level demands for independent decision making, to work under demanding time limits, to demonstrate ability to manage and cope with stress, and to interact in a competitive environment with men.  Ms. Genereux does not possess these abilities as a result of her current disabilities.  Based on her five year disability, and considering her gains and improvement to date, it is my opinion that she is permanently disabled from the architectural field.

Ms. Genereux has periodically indicated that she has interest in studying for other professional careers, such as veterinary medicine or law.  When questioned about the demands and requirements for training and professional practice, she admits knowing that she is unable to perform at the professional career level.

Based on her recent therapy gains, in consideration that she is developing coping skills in some areas of her life, in consideration of her own recent motivation and increasing confidence, and in agreement with her treating therapist, it is likely that Ms. Genereux will be able to participate in a training program or education program in the future.  It is clear that Ms. Genereux must develop functional skills in areas of social and independent living, prior to addressing training and employment.  It is promising that Ms. Genereux is taking interest in her physical health, and sees herself in "transition" in her recovery.  Her therapist has outlined recommended therapies that are consistent with progress in these areas.  At the same time, Ms. Genereux's coping abilities are not well established and stress or trauma can result in significant setbacks.  It is likely that Ms. Genereux will need a minimum of 12 months additional therapy and transitional experiences before she could initiate successful employment.

Page 9 - Genereux

It is likely that Ms. Genereux will not be able to perform in highly technical, professional, or skilled career levels. However, she appears to have accepted the reality that "career status" is not as critical to her as is slowly engaging in work that is meaningful to her, or that brings a level of satisfaction and accomplishment. Her future employment positions are in areas of entry level and semi-skilled work consistent with assistant, aide, or support individuals.

**Expected Future Wage Capacity**. Ms. Genereux has the intellectual abilities to learn and perform at a high level. However, her residual psychological limitations, her social and independent coping skills, and her lack of ability to respond in a consistent, reliable, and effective manner to stress and challenge significantly limit her employment potential and earnings capacity. Her current limitations impact her future earning capacity in two ways. First, it is likely that she will be able to function effectively in entry level or semi-skilled positions that are associated with select assistant, aide, or support individuals. Salary for such individuals range from $7.88 to $10.33 per hour in 2006 dollars in Massachusetts (Bureau of Labor Statistics, Occupational Employment Statistics Survey, Massachusetts Wage Information). In addition, it is likely that Ms. Genereux will experience periodic stressful events, situations, or experiences that will result in a need for treatment and in periods of unemployment. Based on current employment/unemployment figures for people with disabilities, it is reasonable to project that Ms. Genereux will experience approximately 25 percent of her time unemployed due to her disability. It is my opinion that these periods will decrease as she develops effective coping abilities and satisfaction in a job.

As she has been out of work for five years, continues to have ongoing and persistent psychological symptoms, and functions best in select environments, Ms. Genereux will benefit from vocational rehabilitation services including, but not limited to, career exploration, retraining, job development, and follow up services.

My opinions are made to a reasonable degree of vocational rehabilitation certainty and I would like to reserve my right to review additional information that may become available and to amend my opinions if needed.

Norman C. Hursh, ScD, CRC, CVE
Vocational Rehabilitation

# Allan M. Feldman Ph.D.
## Consulting Economist

Please reply to:
17 Irving Avenue
Providence, Rhode Island  02906
Telephone: (401) 751 1281  - Fax: (401) 751-1413

Department of Economics, Brown University
Providence, Rhode Island  02912
Telephone: (401) 863 2415   Fax: (401) 863-1970

February 27, 2008

Economic Losses Due to the Disability of

Kimberly Genereux

Kimberly Genereux was born on December 31, 1953 (1954.00).
She was assaulted and raped on May 3, 2002 (2002.34), on the
premises of the Westin Casuarina Hotel, a resort in the Cayman
Islands.  She was then 48.34 years old.

At the date of the rape Ms. Genereux was on a short leave
from her employment as a designer, at Flansburgh Associates,
Inc., Boston, Massachusetts.  The rape resulted in severe
psychological injuries which precluded her returning to her job.
She has been on Social Security disability since September of
2004.

For the purposes of this report, Kimberly Genereux is
assumed to be permanently partially or totally disabled from
employment, starting on May 3, 2002.

According to tables published in the 2007 *Statistical
Abstract of the United States,* the life expectancy of a white
female at age 48 is 34.4 years.  According to tables published in
the 2001 *Journal of Forensic Economics,* the worklife expectancy

of a woman with a bachelor's degree, in the active workforce at age 48, is 13.4 years (Hunt, Pickersgill and Rutemiller, "Recent Trends in Median years to Retirement and Worklife Expectancy for the Civilian U.S. Population").

Kimberly Genereux received a bachelor of science degree in architecture in 1976 from the University of Virginia. She subsequently received a diploma in studio arts, from the Boston Museum of Fine Arts. Ms. Genereux is unmarried, and currently lives in Rockport, Massachusetts.

Kimberly Genereux worked for Flansburgh Associates, starting around 1984, and continuing until she was terminated on or around June 6, 2002. She began work for Flansburgh part-time, on a contract basis, and became a full-time employee by some time in the early 1990's. When she was terminated she was an associate of the firm, and was its director of architectural graphics. She reported to the president of the firm, Mr. David Soleau, and her performance evaluations (in 2001) were generally commendable to outstanding. At the date of the rape, Ms. Genereux was on a 3-month leave from the firm, scheduled to end April 15, 2002. She had taken similar breaks previously.

Ms. Genereux's employment file from Flansburgh Associates shows a salary of $56,700, effective March 5, 2001, plus benefits, including health insurance, delta dental, disability and life insurance, and 3 weeks vacation.

Kimberly Genereux's Social Security statement shows the following recent history of earnings subject to Social Security taxes:

| Year | Her Soc. Sec. Earnings |
|------|------------------------|
| 1997 | $37,598 |
| 1998 | $44,833 |
| 1999 | $38,071 |
| 2000 | $62,022 |
| 2001 | $59,866 |
| 2002 | $19,064 |
| 2003 | - |
| 2004 | - |
| 2005 | - |

Averaging her earnings in the 3 calendar years prior to the rape, 1999 through 2001, gives $53,320 per year, in 2000 dollars. This figure is the basis for projections of pre-disability earning capacity made in this report.

In addition to her wages, Ms. Genereux's employment at Flansburgh Associates provided several fringe benefits. I estimate these to be worth roughly 15 percent of wages. Adding the 15 percent for fringe benefits to the pre-disability earning capacity of $53,320 per year gives:

    Gross Annual Earnings Plus Fringe Benefits,
        2000 Dollars ............................$61,318.

To convert the $61,318 in 2000 dollars into equivalent amounts for the years 2002 through 2008, it is multiplied by factors that represent the increases in gross average weekly

earnings in the private sector of the economy, between 2000 and the respective years. These factors are based on statistics published in the U.S. Department of Labor's *Employment and Earnings,* various issues (Series CEU0500000030). The results are:

| Year | Pre-Disability Potential Gross Earnings Plus Fringe Benefits |
|------|-------------------------------------------------------------|
| 2002 | $42,827 |
| 2003 | $66,041 |
| 2004 | $67,447 |
| 2005 | $69,389 |
| 2006 | $72,390 |
| 2007 | $75,946 |
| 2008 | $78,603 |

Note that the figure for 2002 is prorated for the period of that year after the rape on May 3rd. Adding over the years 2002 through 2008 gives:

Total Pre-Disability Potential Gross Earnings
        Plus Fringe Benefits, 2002-2008 ........ $472,646.

The next step in this analysis is to project gross annual earnings plus fringe benefits over the remainder of the worklife expectancy, a period of 13.4 - 6.7 = 6.7 years. The future projection period starts in the year 2009 and ends in the year 2015. In this projection, adjustments are made for expected future inflation and expected future productivity growth. Also,

in order to find the present value of the stream of gross earnings, future amounts are discounted with an appropriate discount or interest rate.

The inflation factor is 2.5 percent per year.  This is based on the average rate of inflation over the last 5 years, and over other recent periods.  The productivity growth factor is 1.0 percent per year.  This is the approximate average rate of increase in real compensation per hour over the period 1975-2005. The discount rate is 4.5 percent per year, the approximate average yield on long-term U.S. Treasury bonds, as of February 22, 2008.  Combining these three rates gives a real interest rate adjusted for productivity growth of 0.94 percent per year.

It follows that the 2008 present value of future pre-disability potential gross earnings plus fringe benefits is:

Present Value of Future Pre-Disability Potential
        Gross Earnings Plus Fringe Benefits ..... $510,707.

Adding together total pre-disability potential gross earnings plus fringe benefits, 2002-2008, and the present value of future potential gross earnings plus fringe benefits, gives the following:

Lifetime Potential Earnings Plus Benefits .... $983,353.

Lifetime potential earnings represents what Ms. Genereux would have earned if she had not become disabled.  She has not worked since the attack, but she may be able to work in the future.

In a report dated February 10, 2008, Norman Hursch, Sc.D., a vocational expert, indicates that Ms. Genereux has been unable to work as an architect since her rape, but that she will be able to participate in a training program or education program in the future. He opines that it is likely she will be able to work in the future, but at entry level or semi-skilled positions, paying $7.88 to $10.33 dollars per hour (in 2006 dollars, in Massachusetts). However, according to Dr. Hursch, "it is reasonable to project that Ms. Genereux will experience approximately 25 percent of her time unemployed due to her disability." Multiplying $10.33 per hour by 40 hours per week and 52 weeks per year would give $21,486 per year; reducing by 25 percent for unemployment would give $16,115 per year. Converting to 2008 dollars and adding an assumed 15 percent for benefits would then give $20,123 per year, in 2008 dollars.

Comparing $20,123 per year, post-disability, to the corresponding 2008 pre-disability figure, of $78,603, suggests a 74 percent loss of earning capacity.

Based on all the above, I make 2 estimates of losses in this report. Both assume total loss of earning capacity in the 2002-2008 period. The first estimate further assumes that Kimberly Genereux has lost 74 percent of her future earning capacity. The second estimate assumes that she has lost 100 percent of her future earning capacity. The results are:

Economic Losses

    @ 74% Loss of Future Earning Capacity ... $727,681.

    @ 100% Loss of Future Earning Capacity .. $983,353.

Allan M. Feldman

DOCUMENT REDACTED PER COURT ORDER