UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10879-JLT

KIMBERLY GENEREUX,                )
    Plaintiff                )
                        )  **APPENDIX OF**
      v.                    )  **FOREIGN AUTHORITIES**
                        )
COLUMBIA SUSSEX CORPORATION,     )
STARWOOD HOTELS & RESORTS         )
WORLDWIDE, INC., and              )
WESTIN HOTEL MANAGEMENT, L.P.,    )
    Defendants                )

**CAYMAN ISLANDS LEGISLATION**

A    The Consolidated Index of Laws and Subsidiary Legislation as at 1st January 2005

B    The Interpretation Law (1995 Revision)

C    The Tourism Law (1995 Revision)

D    The Tourism Regulations (1999 Revision)

E    The Tourism Regulations (2002 Revision)

**CAYMAN ISLANDS CASES**

F    *Carter v. Scott's Industries Limited,* 2001 CILR 355

G    *R. v. Seymour*, 2003 CILR 53 (Gr. Ct.)

**BRITISH COMMONWEALTH LEGISLATION**

H    Occupiers' Liability Act of 1957

I    Occupiers' Liability Act of 1984

**BRITISH COMMONWEALTH CASES**

J    *Allison v. Rank City Wall Canada Ltd.*, 6 D.L.R. 4th 144 (Ont. 1984)

K    *Gould v. McAuliffe,* [1941] 2 All E.R. 527 (C.A.)

L    *Jeffrey v. Commodore Cabaret Ltd.,* 13 B.C.L.R. 3d 149 (B.C. Sup. Ct. 1995)

M    *Marshall v. Rubypoint Ltd.,* [1997] EWCA 898 (Eng. & Wales C.A.)

N    *Public Transport Commission of New South Wales v. Perry*, [1975-1976] 137 C.L.R. 107

O    *Q v. Minto Management Ltd.,* 15 D.L.R. 4th 581 (Ont. 1985)

P    *Reeves v. Commissioner of Police of the Metropolis,* [1999] 3 W.L.R. 363

Q    *Slater v. Clay Cross Co., Ltd.,* [1956] 2 Q.B. 264, [1956] 2 All E.R. 625

R    *Thomas Graham & Co. Ltd. v. The Church of Scotland General Trustees,* [1982] S.L.T. 26 (Scot. Sheriff Ct.)

S    *Veinot v. Kerr-Addison Mines Ltd.,* 51 D.L.R. 3d 533 (Can. 1974)


**TREATISES**

T    CLERK & LINDSELL ON TORTS (Anthony M. Dugdale, et. als. eds., 19th Edition 2006), §8-04, §8-15

                          The Plaintiff,
                          By her Attorney,



                          _____
                          MARK F. ITZKOWITZ (BBO #248130)
                          85 Devonshire Street
                          Suite 1000
                          Boston, MA  02109-3504
                          (617) 227-1848
                          March 26, 2008

## CERTIFICATE OF SERVICE

    I, Mark F. Itzkowitz, counsel for the plaintiff, hereby certify that on this date, I made service of the within document by serving it electronically to registered ECF participants and/or by mailing/faxing/hand-delivering a copy of same to non-registered ECF participants as indicated on the Notice of Electronic Filing ("NEF"), upon the following counsel of record:

John B. Johnson, Esquire         Robert J. Brown, Esquire
Corrigan, Johnson & Tutor, P.A.   Mendes & Mount, LLP
141 Tremont Street             750 7th Avenue
Boston, MA 02111; and         New York, NY  10019-6829.


                 s/ Mark F. Itzkowitz
                MARK F. ITZKOWITZ (BBO #248130)

Dated:  March 26, 2008

CAYMAN ISLANDS



Supplement No. 1 published with Gazette No. 6 of
21st March, 2005.

# CONSOLIDATED INDEX

## OF

## LAWS AND SUBSIDIARY LEGISLATION

## As At

## 1st January, 2005

Compiled by the Law Revision Commissioner

Cayman Islands Government

2005

See important note 2 on page 2.

## NOTE 1

This Index is published for the information of users and is not intended to be an authoritative statement of locally enacted legislation nor of United Kingdom Acts and Orders in Council in force in, or applying to, the Cayman Islands. However, every care has been taken to ensure that it is as accurate as possible. If any errors or omissions appear therein, they should be drawn to the attention of the Law Revision Commissioner, P.O. Box 2394 GT, Grand Cayman, Cayman Islands, Telephone (1-345)-945-4731, in order that they may be corrected or included in the next annual Index.

## NOTE 2

Since 12 September, 2004 the damage cause by Hurricane Ivan has meant that it has not been possible to produce all Laws, Subsidiary legislation and Revisions in printed form as Supplements to the Government Gazette.  An asterisk (*) preceding an entry in the Index indicates that it has not been published in printed form but may be perused on the Government website - www.gov.ky - under "Gazette".

## **CONTENTS**

The legislation listed in this Index is in three Parts.

1.      Part 1, at pages 7 to 35, consists of-

(a)      Laws made by the Legislative Assembly of the Cayman Islands which are in force or which have not yet been brought into force, and which have not been consolidated and revised.

(b)      Subsidiary legislation made by the Governor in Council which is in force or which has not yet been brought into force, and which has not been consolidated and revised.

(c)      Consolidated and revised editions of Cayman Islands Laws and subsidiary legislation which have been published under the authority of the Law Revision Law (1999 Revision) and which have neither been repealed nor been replaced by a subsequent revision.

2.      Part 2, at page 36 and 37, consists of the Constitution of the Cayman Islands, Royal Instructions and various measures made by the Governor or the Legislative Assembly.

3.      Part 3, at pages 38 to 47, consists of Statutory Instruments made in the United Kingdom under an Imperial Act which have been published in the Gazette since 1974 or which have been referred to in Statutory Instruments so published and includes subsidiary legislation made by the Governor or the Governor in Council under the authority of an Act or Statutory Instrument of the United Kingdom.

## GUIDE TO REFERENCES

1.    **Laws (which have not been revised):**
These are referred to by their number and year of enactment and are indexed according to the number of the Gazette, the year of publication and the number assigned to the supplement containing the law-
eg "G17/1999 s3" means issued as supplement No. 3 with Gazette No. 17 of 1999.

2.    **Subsidiary Legislation (which has not been revised):**
These are referred to by their citation and are indexed according to the number of the Gazette, the year of publication, the number assigned to the Supplement containing such subsidiary legislation or, where it does not appear as a Supplement to the Gazette, the page of the Gazette on which it is. They are listed under the law or revised law under which they were made or by virtue of which they remain in force.

3.    **Revised laws and revised subsidiary legislation:**
These contain in their short title a calendar year which indicates the year in which the revision took place. In respect of laws and subsidiary legislation which have been revised more than once, only the current revision is listed. The first page of each revision sets out the short title of the original law or subsidiary legislation and the number and year of the original law and of each amending enactment or the citation of the amending subsidiary legislation. Where such number or citation is followed by the word "(part)", this indicates that the amending enactment contains other provisions not relevant to and not included in that particular revision.
Each revision is referred to in the same manner as laws and subsidiary legislation.

4.    **Citation of dates:**
Where a date is given, reference is made to the day, month and year in that order-
eg 10.05.97 means 10th May 1997.

5.    **United Kingdom Acts of Parliament and United Kingdom Statutory Instruments**
The UK Acts are referred to by a calendar year which indicates the year of enactment followed, in brackets, by a chapter number which indicates the manner in

which they are cited in the United Kingdom. United Kingdom Statutory Instruments are referred to by a calendar year followed by a number which indicates the year in which they were made and the reference number by which they are cited.

6.  **Abbreviations:**

"C." means the chapter number of a United Kingdom Act of Parliament;

"G" means the Official Gazette of the Cayman Islands;

"GE" means an Extraordinary Gazette and is followed either by its number (1995 on) or by the date on which it was published (up to 1995);

"GN" means Government Notice;

"p" means a page of the Gazette;

"s" means a supplement to the Gazette; and

"UKSI" means a United Kingdom Statutory Instrument.

7.  All Laws and Acts are, in each Part, listed alphabetically, and immediately following each such Law, the subsidiary legislation made under it is also listed alphabetically.

# PART 1

## LAWS AND SUBSIDIARY LEGISLATION

### OF THE

### CAYMAN ISLANDS

| TITLE | REFERENCE |
|---|---|
| **Abandoned Wreck Law (1997 Revision)** | G5/1997 s1 |
| **Adoption of Children Law (2003 Revision)** | G11/2003 s1 |
| **Aerial Spraying Protection Law (1997 Revision)** | G5/1997 s2 |
| **Affiliation Law (1995 Revision)** | G18/1995 s1 |
| **Age of Majority Law (1999 Revision)** | G13/1999 s1 |
| **Airports Authority Law (Law 7 of 2004)** | G9/2004 s8 |
| *Amendment by Law 26 of 2004 | G24/2004 s8 |
| **Animals Law (2003 Revision)** | G17/2003 s1 |
| Animals (Disposal) Regulations, 1997 | G15/1997 s4 |
| Animals (Exportation, Importation, Protection and Control) Regulations (2004 Revision) | G15/2004 s1 |
| Animals (Prohibited Dogs) Regulations (2004 Revision) | G15/2004 s2 |
| Animals (Restrictions on Riding) Order (1996 Revision) | G11/1996 s3 |
| *Note: The following regulations made under the repealed Animals Importation Law (Cap. 4 of the 1963 Revised Edition of the Laws) have been preserved-* | |
| Importation of Animals Regulations, 1961 | GN/1961 |
| Amendment by amending regulations 1965 | GN93/1965 |
| **Appropriation (July 2004 to June 2005) Law, 2004 (Law 9 of 2004)** | G16/2004 s11 |

| | |
|---|---|
| Amendment by amending regulations | G19/2003 s4 |
| **Health Practice Law, 2002 (Law 25 of 2002)** | GE8/2003 s2 |
| Amendment by Law 12 of 2004 | G16/2004 s10 |
| *Amendment by Law 22 of 2004 | G24/2004 s7 |
| Health Practice Registration Regulations, 2004 | G13/2004 s4 |
| **Health Services Authority Law (2003 Revision)** | G16/2003 s3 |
| **Health Services (Fees) Law (2002 Revision)** | G13/2002 s3 |
| Health Services (Fees and Charges) Regulations (2003 Revision) | G13/2003 s6 |
| **Higher Education (Loan) Law (Law 5 of 1975)** | G15/1975 s3 |
| **Hotel Keepers Liability Law (1997 Revision)** | G21/1997 s5 |
| **Hotels Aid Law (1995 Revision)** | G9/1995 s1 |
| Hotels Aid Regulations (1996 Revision) | G9/1996 s1 |
| **Immigration Law, 2003 (Law 34 of 2003)** | GE33/2003 s1 |
| *Immigration (Emergency) Regulations, 2004-*spent* | G20/2004 s1 |
| Notice-extending period-*spent* | GE33/2004 p1 |
| Immigration (Exempted Persons) Order 1992 | GE 15.10.92 s1 |
| Immigration Regulations, 2004 | GE16/2004 s1 |
| **Information and Communications Technology Authority Law (2004 Revision)** | G15/2004 s9 |
| Commencement Order (except ss.38 to 43) | GE17/2002 s1 |
| Notice | G17/2002 s4 |
| Notice | G24/2003 s6 |
| Information and Communications Technology Authority(Confidentiality) Regulations, 2003 | G24/2003 s7 |
| Information and Communications Technology Authority (Determination of Turnover) Order, 2004 | G12/2004 s1 |
| Information and Communications | |

**Oaths Law (1996 Revision)**                      G26/1996 s1

**Official Gazette Law (1997 Revision)**           G6/1998 s13
   Official Gazette Regulations
   (1995 Revision)                             G18/1995 s6
     Appointment of Editor              G1/1988 p1
     Appointment of Printer             G8/1982 p1

**Parliamentary Pensions Law, 2004 (Law 20
  of 2004)**                                     G17/2004 s17

**Partition Law (1997 Revision)**                  G6/1998 s14

**Partnership Law (2002 Revision)**                G12/2002 s11
   Partnership (Fees) Regulations (2003
   Revision)                                 G15/2003 s7

**Passport Law (2004 Revision)**                   G17/2004 s5
   Passport Regulations (2003 Revision)      G16/2003 s7

**Patents and Trademarks Law (1999
  Revision)**                                    G4/1999 s3
   Patents and Trademarks
    Regulations,1999                      G18/1999 s5
    Notice re facsimile certificates      G12/1976 p2

**Pawnbrokers Law  (1998 Revision)**               G3/1998 s6

**Penal Code (1995 Revision)**                     G16/1995 s1
   Amendment 1995-by Errata                  G19/1995 p1
   Amendment by Law 8 of 1995 (part)         GE20/1995 s1
   Amendment by Law 18 of 1997 (part)        G23/1997 s2
   Amendment by Law 15 of 1998               GE27/2004 s1
                       (sic)
   Amendment by Law 16 of 2000               G24/2000 s7
   Amendment by Law 16 of 2001               G21/2001 s1
   Amendment by Law 16 of 2004               GE27/2004 s2
    Penal Code (Sale of Foodstuff)
     Prohibition Order (1998 Revision)      G20/1998 s8
    Prohibited Publications Order (1998
     Revision)                              G20/1998 s9
    Scheme of Arrangement for
     Community Service by Offenders in
     the Cayman Islands-*made pursuant to
     s.42(3).*                              G13/2000 s1

| | |
|---|---|
| Seal of Summary Courts Notice | G21/1983 p2 |
| Criminal Evidence Rules (2001 Revision) | G4/2001 s3 |
| Summary Court Rules 2004 | G16/2004 s12 |
| Summary Courts (Sittings) Order (1999 Revision) | G6/1999 s3 |
| Summary Jurisdiction (Forms) Rules | G21/1976 s4 |
| Order appointing places for sittings | G5/1989 p1 |

**Summary Jurisdiction (Domestic Violence) Law (1998 Revision)** — G7/1998 s6

**Sunday Trading Law (2003 Revision)** — G14/2003 s9

**Supplementary Appropriation Laws, 2003 and 2004**
Law 9 of 2003. — GE24/2003 s8
*Note: Only Supplementary Appropriation Laws for the two preceding years are listed. All previous Supplementary Appropriation laws are omitted as spent. No such Law was enacted in 2004.*

**Tax Collection Law (1998 Revision)** — G5/1998 s8

**Tax Concessions Law (1999 Revision)** — G6/1999 s5

**Terrorism Law, 2003 (14 of 2003)** — G9/2004 s1

**Tobacco Product and Intoxicating Liquor Advertising Law (1998 Revision)** — G7/1998 s7

**Torts (Reform) Law (1996 Revision)** — G15/1996 s5

**Tourism Law (1995 Revision)** — G11/1995 s8
Tourism Regulations (2002 Revision) — G13/2002 s12

**Tourism Attraction Board Law, 1996 (Law 17 of 1996)** — G24/1996 s2

**Tourist Accommodation (Taxation) Law (2003 Revision)** — G16/2003 s12

**Towns and Communities Law (1995 Revision)** — G6/1995 s9

# PART 3

## UNITED KINGDOM STATUTORY INSTRUMENTS

made under United Kingdom Acts of Parliament, applying to or relevant to the Islands, which have been published in the Official Gazette or which are referred to in other United Kingdom Statutory Instruments published in the Official Gazette. Also listed are Orders made in the Islands under the authority of United Kingdom Statutory Instruments.

**Administration of Justice Act, 1920 (C.81)**
as amended by the Civil Jurisdiction and Judgements Act 1982 (C. 27)
Reciprocal Enforcement of Judgements (Administration of Justice Act, 1920
Part II) (Consolidation Order) 1984-UKSI 1984/129
Amendment by amending Order 1994-UKSI 1985/1994                    G9/1986
s4

**Antarctic Act 1994 (C.15)**
Antarctic Act 1994 (Overseas Territories) Order 1995-UKSI 1995/1030
Antarctic Act (Commencement-Cayman Islands) Order 1998
*-made by the Governor in Council*                    G8/1998 s5
Antarctic Regulations, 1998-*made by the Governor in Council*        G8/1998 s6

**Arms Control and Disarmament (Privileges and Immunities)**
**Act 1988 (C.2)**
Arms Control and Disarmament (Privileges and Immunities) Act 1988
(Overseas Territories) Order 1992-UKSI 1992/1727                    G15/1992 s1

**Aviation and Maritime Security Act 1990 (C.31)**
Aviation Security and Piracy (Overseas Territories) Order 2000-
UKSI 2000/3059                                        GE23/2001 s1

**Aviation Security Act 1982 (C.36)**
Aviation Security and Piracy (Overseas Territories) Order 2000-
UKSI 2000/3059                                        G23/2001 s1

**British Nationality Act 1981 (C. 61)**
British Nationality (Dependent Territories) Regulations
1982-UKSI 1982/987
Amendment by amending regulations 2003-UKSI 2003/539            G9/2003
s9
Amendment by amending regulations 2003-UKSI 2003/3159            G4/2004
s1

**British Settlements Acts 1887 and 1945 (C.s 54 and 7)**
*Burma (Restrictive Measures) (Overseas Territories) Order 2004-

37

Aviation Security and Piracy (Overseas Territories) Order 2000-
UKSI 2000/3059                                                        GE23/2001 s1

**Merchant Shipping (Oil Pollution) Act 1971(C.59)**
Merchant Shipping (Oil Pollution) (Cayman Islands) Order 1975-
UKSI 1975/-
Merchant Shipping (Oil Pollution) (Compulsory Insurance)
Regulations-*made by HE the Governor*                                G7/1976 s5

**Outer Space Act 1986 (C.38)**
Outer Space Act 1986 (Cayman Islands) Order 1988-
UKSI 1998/2563                                                       G5/1999 s10
Outer Space (Sea Launch LDC) Order 1999
-*made by HE the Governor*                                            G9/1999 s1
Outer Space (Sea Launch LDC) (ICO FI Satellite) Order 2000
-*made by HE the Governor*                                            G8/2000 s1

**Repatriation of Prisoners Act 1984 (C.47)**
Repatriation of Prisoners (Overseas Territories) Order 1986-
UKSI 1996/2226
Notice of extension to Cayman Islands                                 G11/1987
p1
Notice of coming into force-*made by HE the Governor*                 G22/1988 p1

**State Immunity Act 1979 (C)**
State Immunity (Overseas Territories) Order-UKSI 1971/458

**United Nations Act 1946 (C.45)**
Afghanistan (United Nations Sanctions) Order 1999-UKSI 1999/3133
Amendment by amending Order 2000-UKSI 2000/1106                       G11/2000 s1
Afghanistan (United Nations Sanctions) (Overseas Territories)
Order 2001-UKSI 2001/392                                             GE23/2001 s2
Amendment by amending Order 2001- UKSI 2001/2558                     GE23/2001 s7
Designation of entities and persons subject to sanctions             G24/2001 p84

Al-Qa'ida and Taliban (United Nations Measures)
(Overseas Territories) Order 2002-UKSI 2002/112                      G12/2002 s15
Amendment by amending Order-UKSI 2002/266                            G12/2002 s16

Eritrea and Ethiopia (United Nations Sanctions) (Dependent Territories)
Order 2000-UKSI 2000/1557                                            G15/2000 s1
Amendment by amending Order 2000-UKSI 2000/1821                      G17/2000 s2

Federal Republic of Yugoslavia (United Nations Sanctions)
(Dependent Territories) Order 1998-UKSI 1998/1064                    G19/1998 s7
Amendment by amending Order 1999-UKSI 1998/281                       G6/1999 s10

*Interpretation Law (1995 Revision)*

Supplement No. 5 published with Gazette No. 6 of 20th March, 1995.

# THE INTERPRETATION LAW

## (CAP. 70)

## (1995 Revision)

Consolidated with Laws 8 of 1975 (part), 10 of 1975 (part), 15 of 1983, 6 of 1985, 1 of 1987 and 20 of 1990 (part).

Revised under the authority of the Law Revision Law (19 of 1975).

Originally enacted—

Cap. 70 (as Law 17 of 1963)-12th December, 1963
Law 8 of 1975-3rd September, 1975
Law 10 of 1975-3rd September, 1975
Law 15 of 1983-21st June, 1983
Law 6 of 1985-25th March, 1985
Law 1 of 1987-25th February, 1987
Law 20 of 1990-6th September, 1990

Consolidated and revised this 7th day of February, 1995.

1

(Price $5.60)

# INTERPRETATION LAW

## (1995 Revision)

### ARRANGEMENT OF SECTIONS

#### Preliminary

1.  Short title
2.  Definition

#### General principles of interpretation

3.  Interpretation of terms applicable generally
4.  General interpretation of gender and number
5.  References to public officers by title of office
6.  References to the Crown
7.  References to time means standard time; power to declare standard time
8.  Computation of time
9.  Provisions where no time prescribed
10. Measurement of distances
11. References to the number of a line
12. Definitions subject to context and to apply to regulations, etc.

#### Commencement and citation of Laws

13. Authenticated copy and assent to Bills
14. Notification of assent to be published
15. Commencement of Law on publication of assent, etc.
16. Moment when Law or regulations comes into operation
17. Laws to be public Laws and judicially noticed
18. Sections to be substantive enactments
19. Mode of citing Laws
20. References in Laws
21. Collective titles.
22. Words to be included in citation of portion of Law

### Provisions as to repeals

23. Repeal of a repealing enactment
24. Repeal and substitution
25. Effect of repeal
26. Effect of repeal and re-enactment of regulation making section

### Provisions as to regulations

27. Provisions as to making of regulations
28. Definitions for legislative purposes
29. Commencement and proof of regulations
30. Acts done under regulations deemed done under Law

### Provisions as to powers

31. Exercise of powers between passing and commencement of Law
32. Construction of provisions as to exercise of powers, etc.
33. Power to appoint includes power to suspend or dismiss
34. Power to fill vacancy temporarily
35. Power to make overlapping appointments
36. Power to appoint chairman
37. Power to appoint by official designation
38. Construction of enabling words
39. Power of Governor to delegate authority

### Provisions as to Imperial Acts and Orders in Council

40. English Laws in force in the Islands
41. Reference in Law to provision of Imperial Act
42. Imperial Acts, etc., to be read with necessary modifications

### Provisions as to penalties

43. Statement of penalty means maximum penalty
44. Penalty at foot of section indicates maximum penalty for contravention of section
45. Payment of portion of penalty by direction of Governor
46. Disposal of forfeits
47. Imposition of penalty not to bar civil action

### Provisions as to offences

48. Provision as to offences under two or more Laws
49. Attempt to commit an offence to be deemed an offence
50. Remission of penalties

### Miscellaneous

51. Change in title of public office
52. Appointment to statutory public office
53. Meaning of service by post
54. Signification of orders of Governor
55. Power of majority
56. Division of Law into Parts
57. Construction of preamble and Schedules to Law
58. Deviations in forms
59. Construction of amending Law with amended Law
60. Reprint of amended Laws
61. Notification of enactment and sale of regulations, etc.
62. Evidence of signature of Governor
63. Saving of rights of the Crown
64. Law binding on Crown

## INTERPRETATION LAW (Cap.70)

### (1995 Revision)

#### Preliminary

1.  This Law may be cited as the Interpretation Law (1995 Revision).

    Short title

2.  In this Law—

"Law" means any Law and any regulations made thereunder, and any prerogative Order of the Sovereign in Council applicable exclusively to the Islands, whether enacted before or after the commencement of this Law.

Definition

#### General principles of interpretation

3.  (1)  In this Law and in all Orders in Council, Laws, proclamations, regulations, rules, bye-laws, orders, directions, notices, forms and other instruments of a public character relating to the Islands, now in force or hereafter to be made, the following words and expressions shall have the meanings hereby assigned to them respectively, unless there is something in the subject or context inconsistent with such construction, or unless it is therein otherwise expressly provided–

Interpretation of terms, applicable generally.

"Act" used with reference to legislation includes an Act of the Imperial Parliament;

"act" used with reference to an offence or civil wrong, includes a series of acts, and words which refer to acts done extend to illegal omissions;

"affidavit" includes any document in relation to which an affirmation or declaration has been made by any person allowed by law to affirm or to declare instead of swearing;

"British possession" means any British Dependent Territory, Colony or protectorate, or any protected state, or any territory in respect of which a Mandate is being exercised by Her Majesty's Government in the United Kingdom or the Government of any part of Her Majesty's dominions;

"Christian name" means any name prefixed to a surname, whether received in Christian baptism or otherwise;

7

6

*Interpretation Law (1995 Revision)*

"coin" means any coin legally current in the Islands;

"commencement", used with reference to a Law, means the time at which the Law comes into operation;

"common law" means the common law of England;

"constable" means any officer, sub-officer or member of the Royal Cayman Islands Police Force;

"consul" or "consular officer" includes Consul-General, Consul, Vice-Consul, Consular Agent and any person for the time being authorised to discharge the duties of a Consul-General, Consul or Vice-Consul;

"contravene", in relation to any requirement or condition prescribed in any Law, or in any permit, licence or other authority granted under any law, includes a failure to comply with that requirement or condition;

"court" means any court of the Islands of competent jurisdiction;

Law 10 of 1975

"court of summary jurisdiction" means a court established by section 3 of the Summary Jurisdiction Law;

"Crown Agents" means the persons for the time being acting as Crown Agents for Overseas Governments and Administrations in England, or any of them;

"Dependent Territory" or "Colony", used with reference to any place other than the Islands, includes a British Protectorate or protected state and any territory under British mandate;

"financial year" means the twelve months ending the 31st December in any year;

"Gazette" means a Government Notice;

"gazetted" means published by Government Notice;

"Government" means the Government of the Islands;

"Governor" means the person for the time being holding the office of Governor of the Islands, and includes any person for the time being lawfully performing the functions of that office under section 1 of Schedule 2 to the Cayman Islands (Constitution) Orders 1972 to 1993, and to the extent to which a Deputy

U.K.S.I.'S 1972/1101, 1984/126,1987/2196, 1992/226 and 1993/3143

8

---

*Interpretation Law (1995 Revision)*

appointed under section 4 of Schedule 2 to the Cayman Islands (Constitution) Orders 1972 to 1993 is authorised to act, that Deputy;

"Governor in Council" means the Governor acting in accordance with the advice of the Executive Council of the Islands;

"Grand Court" means the Grand Court constituted under section 49H of Schedule 2 to the Cayman Islands(Constitution) Orders 1972 to 1993;

"His Majesty", "Her Majesty", "the King", "the Queen" or "the Crown" means His Majesty the King or Her Majesty the Queen, the Sovereign for the time being of Great Britain and Northern Ireland and the British dominions beyond the seas, and includes the predecessors and the heirs and successors of such King or Queen;

"house" includes every messuage, house, part of a house, building or other construction, whether wholly or in part above or below the surface of the ground, inhabited or occupied either by day or by night by man, whether beneficially or otherwise, or intended to be so inhabited or occupied;

"Imperial Act" means an Act passed by the Imperial Parliament and assented to by Her Majesty;

"Imperial Parliament" or "Parliament" means the Parliament of the United Kingdom;

"the Islands" means the Cayman Islands;

"a Justice" or "a Justice of the Peace" means a person appointed by the Governor to be a justice of the peace for the Islands;

"land" and "premises" includes all tenements or hereditaments, and also all messuages, houses, buildings or other constructions, whether the property of Her Majesty, her heirs or successors, or of any corporation or private individual, except where there are words to exclude houses and other buildings;

"Law" includes any Order in Council;

"Magistrate" has the meaning assigned to it in the Summary Jurisdiction Law;

"oath" includes affirmation or declaration in the case of persons by law allowed to affirm or declare instead of swearing;

Law 10 of 1975

9

"regulations" include rules, bye-laws, proclamations, orders, schemes, notifications, directions, notices and forms;

"rules of court" when used in relation to any court, means rules made by the authority having for the time being power to makes rules or orders regulating the practice and procedure of such court;

"sell" includes exchange and barter;

"Secretary of State" means one of Her Majesty's Principal Secretaries of State for the time being;

"ship" means every description of vessel used in navigation not exclusively propelled by oars;

"sign", with reference to a person who is unable to write his name, includes "mark";

"Statute" includes an Act of the Imperial Parliament;

"street" or "road" includes any public highway, street, road, thoroughfare, square, court, alley, lane, bridleway, footway, parade, passage, or open place used or frequented by the public, or to which the public have or are permitted to have access;

"summarily" "in a summary manner" or "on summary conviction" means respectively before a court of summary jurisdiction;

"swear" includes to affirm or to declare in the case of any person allowed by law to affirm or to declare instead of swearing;

"United Kingdom" means Great Britain and Northern Ireland;

"vessel" includes any ship, boat, lighter or other floating craft used for transport by water;

"voluntary declaration" or "statutory declaration" if made-
(a) in the Islands means a declaration made under the Voluntary Declarations Law (Revised);
(b) in the United Kingdom or any British possession beyond the Islands means a declaration made before a justice of the peace, notary public or other person having authority therein under any

11

1978 Revision

---

"to occupy" includes, in addition to its ordinary signification, to use, inhabit, possess or enjoy the premises in respect whereof that verb is used, otherwise than as a mere servant and for the mere purpose of the care, custody and charge thereof;

"Order in Council" means any prerogative Order of the Sovereign in Council applicable exclusively to the Islands;

"person" includes any corporation, either aggregate or sole, and any club, society, association or other body, of one or more persons;

"prescribed" means prescribed by the Law in which the word occurs or by any regulations made thereunder, and, in relation to any regulations, where no other authority is empowered in that behalf in the Law, prescribed by the Governor in Council;

"proclamation" means a proclamation of the Governor under the Public Seal;

"property" includes money, goods, things in action, land and every description of property, whether real or personal; also obligations, easements and every description of estate, interest and profit, present or future, vested or contingent, arising out of or incident to property as above defined;

"public general holiday" means any day which under the provisions of any Law for the time being in force is, or is declared to be or is proclaimed as a public general holiday;

"public place" includes every public highway, street, road, square, court, alley, lane, bridleway, footway, parade, wharf, jetty, quay, bridge, public garden or open space and every theatre, place of public entertainment of any kind or other place of general resort, admission to which is obtained by payment, or to which the public have access;

"recorded", used with reference to a document, means recorded under the provisions of the Law applicable to the recording of such document;

"Public Seal" means the Public Seal of the Islands;

"registered", used with reference to a document, means recorded under the provisions of the Law applicable to the registration of such document;

10

*Interpretation Law (1995 Revision)*

law for the time being in force to take or receive a declaration; and

(c) in any other place, means a declaration made before a British Consul or Vice-Consul, or before any person having authority under any Act of Parliament for the time being in force to take or receive a declaration;

"will" includes codicil;

"writing" includes printing, lithography, typewriting, photography and other modes of representing or reproducing words or figures in visible form; and

"year" and "month" mean respectively a year or a month reckoned according to the British calendar.

(2) Every local law of the Islands shall be carried out and applied according to the plain reading, and not according to any private construction, and any private construction influencing a decision in any case shall be deemed a sufficient cause for appeal or new trial or counter prosecution.

(3) It is hereby declared that the Cayman Islands are comprised of Grand Cayman, Cayman Brac and Little Cayman; and any reference in any Law, enactment or other instrument of a public nature to the Islands or any of them shall be a reference to them or it by name, and by no other designation.

**General interpretation of gender and number**

4. In this Law and in all Laws and other instruments of a public character relating to the Islands now in force or hereafter to be made, unless there is something in the subject or context inconsistent with such construction, or unless it is therein otherwise expressly provided-

(a) words importing the masculine gender include females; and
(b) words in the singular include the plural, and words in the plural include the singular.

**References to public officers by title of office**

5. A reference in any Law to any public officer by the usual title of his office shall, if there be such an office customarily in the Islands and unless the contrary intention appears, be read and construed as referring to the person for the time being holding or carrying out the duties of that office in the Islands.

**References to the Crown**

6. In any Law references to the Sovereign reigning at the time of the passing of the Law or to the Crown shall, unless the contrary appears, be construed as references to the Sovereign for the time being.

12

---

*Interpretation Law (1995 Revision)*

**References to time means standard time, power to declare standard time**

7. Whenever any expression of time occurs in any Law, deed or other legal instrument, the time referred to shall, unless it is otherwise expressly provided, be held to signify the standard time adopted for the Islands; and for such purpose the Governor in Council may by order declare the standard time for the Islands.

**Computation of time**

8. In computing time for the purpose of any Law, unless the contrary intention appears-

(a) a period of days from the happening of an event or the doing of any act or thing shall be deemed to be exclusive of the day in which the event happens or the act or thing is done;

(b) if the last day of the period is Sunday or a public general holiday (which days are in this section referred to as excluded days) the period shall include the next following day, not being an excluded day;

(c) when any act or proceeding is directed or allowed to be done or taken on a certain day, then if that day happens to be an excluded day, the act or proceeding shall be considered as done or taken in due time if it is done or taken on the next day afterwards, not being an excluded day; and

(d) when an act or proceeding is directed or allowed to be done or taken within any time not exceeding six days, excluded days shall not be reckoned in the computation of the time.

**Provisions where no time prescribed**

9. Where no time is prescribed or allowed within which anything shall be done, such thing shall be done with all convenient speed, and as often as the prescribed occasion arises.

**Measurement of distances**

10. In the measurement of any distance for the purpose of any Law, that distance shall, unless the contrary intention appears, be measured in a straight line on a horizontal plane.

**References to the number of a line**

11. A reference in any Law to the number of a line of any section of any Law means such line in the latest official printed copy of such Law at the time of the passing of the Law containing such reference.

**Definitions subject to context and to apply to regulations, etc.**

12. (1) Where expressions are defined in any Law, such expressions shall have the meanings assigned to them, unless there is anything in the subject or context repugnant to, or inconsistent with, such meaning.

(2) Where expressions defined in any Law are used in any regulations or instrument made under such Law such expressions shall have the respective

13

*Interpretation Law (1995 Revision)*

meanings assigned to them by the Law, unless there is anything in the subject or context repugnant to, or inconsistent with, such meaning

(3) Where a word is defined in a Law or any regulations, other parts of speech and grammatical variations of that word, and cognate expressions, shall have corresponding meanings in that Law or those regulations.

**Commencement and citation of Laws**

*Authenticated copy and assent to Bills*
13. (1) A copy of every Bill which may hereafter be passed by the Legislature of the Islands shall immediately after it is so passed be printed by any person authorised by the Governor, on vellum or some durable paper and shall, if such be the case, be authenticated by the Clerk of the Legislative Assembly as being a true and correct copy of the Bill which passed.

(2) Where—

    (a) the Governor assents to any Bill so passed, his assent shall be made on the authenticated copy; or

    (b) Her Majesty assents to any Bill so passed, a notification of Her assent shall be made on the authenticated copy,

and in either case one authenticated copy shall then be forwarded to the Clerk of the Legislative Assembly, to the Secretary of State and to the authorised printer as aforesaid for the purposes of record.

*Notification of assent to be published*
14. In the case of every Bill which may hereafter be passed in the Islands, the Governor shall, on assenting thereto, or on to receiving official intimation that the Bill has been duly assented to, cause a notification of such assent to be gazetted.

*Commencement of Law on publication of assent, etc.*
15. (1) Every Law shall, unless it is otherwise therein expressly provided, come into operation on the day of the publication of the notification of assent.

(2) The date on which a Law comes into operation, whether under the provisions of this section or according to the express provisions contained in the Law, shall be written on the original of the Law and on all copies thereof in some convenient place.

*Moment when Law or regulations comes into operation*
16. Where any Law, part of a Law or any regulations made thereunder came or comes into operation on a particular day, it shall be deemed to have come or shall come into operation immediately on the expiration of the day next preceding such day.

14

*Interpretation Law (1995 Revision)*

*Laws to be public Laws and judicially noticed*
17. Every Law (which expression in this section does not include regulations) shall be a public Law and shall be judicially noticed as such, unless the contrary is expressly provided by the Law.

*Sections to be substantive enactments*
18. Every section of any Law shall have effect as a substantive enactment without introductory words.

*Mode of citing Laws*
19. When any Law is referred to, it shall be sufficient for all purposes to cite such Law either by the short title (if any) by which it is made citable, or by the year in which it was made and its number among the Laws of that year, or in the case of a revised edition of the Laws issued under any Law providing for the issue of a revised edition, by its short title or its chapter number, and the reference may in all cases be made according to the copies of Laws printed in England or by any person authorised to print copies by the Governor.

*References in Laws*
20. (1) A reference in a Law by number or letter to a Part, section, subsection, paragraph, sub-paragraph or other division of another Law or enactment shall be construed as a reference to such Part, section, subsection, paragraph, sub-paragraph or other division of such other Law or enactment as printed by authority of Law.

(2) Where in a Law reference is made to a Part, division, section, schedule or form without anything in the context to indicate that a reference to a Part, division, section, schedule or form of some other Law is intended, the reference shall be construed as a reference to a Part, division, section, schedule or form of the Law in which the reference is made.

(3) Where in a section of a Law reference is made to a subsection, paragraph, sub-paragraph or other division without anything in the context to indicate that a reference to a subsection, paragraph, sub-paragraph or other division of some other section or provision is intended, the reference shall be construed as a reference to a subsection, paragraph, sub-paragraph or other division of the section in which the reference is made.

(4) Where in a schedule or Part of a schedule to a Law reference is made to a paragraph, sub-paragraph or other division without anything in the context to indicate that a reference to a paragraph, sub-paragraph or other division of some other provision is intended, the reference shall be construed as a reference to the paragraph, sub-paragraph or other division of the schedule or the Part of the schedule to which the reference is made.

15

(b) affect the previous operation of any enactment so repealed or anything duly done or suffered under any enactment so repealed;

(c) affect any right, privilege, obligation or liability acquired, accrued or incurred under any enactment so repealed;

(d) affect any penalty, fine, forfeiture or punishment incurred in respect of any offence committed against any enactment so repealed; or

(e) affect any investigation, legal proceeding or remedy in respect of any such right, privilege, obligation, liability, penalty, fine, forfeiture or punishment as aforesaid; and any such investigation, legal proceedings or remedy may be instituted, continued, or enforced, and any such penalty, fine, forfeiture or punishment may be imposed as if the repealing Law had not been passed.

*Effect of repeal and re-enactment of regulation making section*

26. Where any section conferring a power to make regulations is repealed (whether before or after the coming into operation of this Law) and other provisions, which include a power to make regulations, are substituted therefor, but the Law of which such section formed a part is not itself repealed, then all regulations made under the repealed section and in force at the time of such repeal, shall continue good and valid as if made under substituted provisions in so far as they are not inconsistent with the Law as amended.

## Provisions as to regulations

*Provisions as to making of regulations*

27. Where a Law confers power on any authority to make or issue regulations, the following provisions shall, unless the contrary intention appears, have effect with reference to the making, issue and operation of such regulations-

(a) a regulation may, at any time, be amended, varied, suspended, rescinded or revoked by the same authority and in the same manner by and in which it was made;

(b) the regulations may provide in respect of a breach of any of the provisions thereof that the offender shall, unless the Law otherwise provides, be liable to such fine not exceeding one thousand dollars, or to such term of imprisonment with hard labour not exceeding twelve months, or to both such fine and imprisonment, as may be therein prescribed;

(c) where any Law confers power on any authority to make regulations for any general purpose, and also for any special purposes incidental thereto, the enumeration of the special purposes shall not be deemed to derogate from the generality of the powers conferred with reference to the general purpose;

---

(5) Where in a Law reference is made to any regulations, without anything in the context to indicate that a reference to regulations made under some other Law is intended, the reference shall be construed as a reference to regulations made under the Law in which the reference occurs.

*Collective titles*

21. If it is provided that any Law may, as to the whole or any part thereof, be cited-

(a) with any other Law to form a group of Laws; or

(b) with any group of Laws,

that group shall be construed as including that Law or part, and the collective title of the group shall state the year of the first Law in the group and the year of last Law in the group; and as often as any subsequent Law is added to that group the year in which the subsequent Law is passed shall be substituted for the last year of the group.

*Words to be included in citation of portion of Law*

22. In any Law a description or citation of a portion of another Law shall, unless the contrary intention appears, be construed as including the word, section or other part mentioned or referred to as forming the beginning and as forming the end of the portion comprised in the description or citation.

## Provisions as to repeals

*Repeal of a repealing enactment*

23. Where a Law, whether before or after the commencement of this Law, repeals a repealing enactment, it shall not be construed as reviving any enactment previously repealed, unless words are added reviving that enactment.

*Repeal and substitution*

24. Where a Law repeals wholly or partially any former Law and substitutes provisions for the Law repealed, the repealed Law shall remain in force until the substituted provisions come into operation.

*Effect of repeal*

25. (1) Where any Law repeals and re-enacts, with or without modification, any provision of any Law in force, reference in any other Law to the provision so repealed shall, unless the contrary intention appears, be construed as references to the provisions so re-enacted.

(2) Where any Law repeals any other enactment, then, unless the contrary intention appears, the repeal shall not-

(a) revive anything not in force or existing at the time at which the repeal takes effect;

*Interpretation Law (1995 Revision)*

(d) no regulation shall be inconsistent with the provisions of any Law;

(e) any breach of any regulation may, unless the Law otherwise provides, be prosecuted in a summary manner; and

(f) any reference in any regulation to "the Law" shall be read and construed as meaning the Law conferring the power to make or issue such regulations.

*Definitions for legislative purposes*

28. (1) In this section the expression "statutory period" means, in relation to any regulations, a period of twenty-one days beginning on the day on which the regulations were laid before the Legislative Assembly and reckoned without regard to—

(a) any period during which the Legislative Assembly is dissolved or prorogued;

(b) any period during which the Legislative Assembly is adjourned for more than six days; or

(c) whether the days are comprised—
(i) in one or more than one Session of the Legislative Assembly; or
(ii) partly in a Session of the Legislative Assembly which is dissolved and partly in a Session of the succeeding Legislative Assembly.

(2) The expression "subject to affirmative resolution" when used in relation to any regulations shall mean that those regulations are not to come into operation unless and until affirmed by a resolution of the Legislative Assembly.

(3) The expression "subject to negative resolution" when used in relation to any regulations shall mean that those regulations, as soon as may be after they are made, are to be laid before the Legislative Assembly, and if the Legislative Assembly within the statutory period next after any such regulations have been so laid resolves that the regulations be annulled, the regulations shall be void as from the date of the resolution, but without prejudice to the validity of anything done thereunder or to the making of new regulations.

*Commencement and proof of regulations*

29. (1) All regulations made under any Law or other lawful authority and having legislative effect shall be published in the *Gazette* and unless it be otherwise provided shall take effect and come into operation as law on the date of such publication.

18

*Interpretation Law (1995 Revision)*

(2) The production of a copy of the *Gazette* containing any regulations shall be *prima facie* evidence in all courts and for all purposes of the due making and tenor of such regulations.

*Acts done under regulations deemed done under Law*

30. An act shall be deemed to be done under a Law by virtue of the powers conferred by a Law or in pursuance or execution of the powers of, or under the authority of, a Law if it is done under or by virtue of or in pursuance of any regulation made or issued under any power contained in such Law.

### Provisions as to powers

*Exercise of powers between passing and commencement of Law*

31. Where any Law is not to come into operation immediately on the passing thereof, and confers powers to make any appointment, or to make, grant or issue any regulations or instruments, or to do any other thing for the purpose of the Law, that power may, unless the contrary intention appears, be exercised at any time after the passing of the Law, so far as may be necessary or expedient for the purpose of bringing the Law into operation at the date of the commencement thereof, subject to the restriction that any regulations or instrument made, granted or issued under the power shall not, unless the contrary intention appears in the Law, or the regulations or instruments are necessary for bringing the Law into operation, have any effect until the Law comes into operation.

*Construction of provisions as to exercise of powers, etc.*

32. (1) Where any Law confers a power or imposes a duty, then, unless the contrary intention appears, the power may be exercised and the duty shall be performed from time to time as occasion requires.

(2) Where any Law confers a power or imposes a duty on the holder of an office as such, then, unless the contrary intention appears, the power may be exercised and the duty shall be performed by the holder for the time being of the office or by a person appointed to act for him.

*Power to appoint includes power to suspend or dismiss*

33. Where by or under any Law a power to make any appointment is conferred, then, unless the contrary intention appears, the authority having power to make the appointment shall also have power to remove, suspend, re-appoint or reinstate any person appointed in exercise of the power.

*Power to fill vacancy temporarily*

34. Where, by or under any Law, any powers are conferred or any duties are imposed upon a public officer, the Governor may direct, if from any cause the office of such public officer is vacant or if during any period, owing to absence or inability to act from illness or any other cause, such public officer is unable to exercise the powers or perform the duties of his office, that such powers shall be

19

had and may be exercised and such duties shall be performed by the person named by, or by the public officer holding the office designated by, the Governor; and thereupon such person or public officer, during any such period, shall have and may exercise such powers and shall perform such duties, subject to such conditions, exceptions and qualifications as the Governor may direct.

**Power to make overlapping appointments**

35. Where the provisions of any Law either expressly or by implication limit the number of persons who may at any time be appointed to or hold an office, such provisions shall not, if any substantive holder of the office is on leave of absence pending relinquishment of office, prevent the substantive appointment of another person to such office or the discharge by such other person of the functions of the office; and, if such an appointment is made the fact that temporarily there is more than one holder of such office shall not prevent both the period of leave of the retiring holder of the office and the period of service of his successor during such leave from being treated as pensionable service for the purposes of any Law permitting the grant of retiring benefits in respect of service in such office.

**Power to appoint chairman**

36. Where, under any Law, power is given to the Governor in Council, to the Governor or to any public officer or body to appoint any board, tribunal, commission, committee or similar body, it shall be lawful for the Governor in Council, the Governor or such public officer or body, in the absence of any provision to the contrary, to appoint a chairman of such board, tribunal, commission, committee or similar body.

**Power to appoint by official designation**

37. Where, by or under any Law, the Governor in Council, the Governor or any public officer or body is empowered to appoint or name a person to be a member of any board, tribunal, commission, committee or similar body, or to have and exercise any powers or perform any duties, the Governor in Council, the Governor or such public officer or body may either appoint a person by name or direct the person for the time being holding the office designated by the Governor in Council, the Governor or such public officer or body to be a member of such board, tribunal, commission, committee or similar body or to have and exercise such powers and perform such duties; and thereupon, or from the date specified by the Governor in Council, the Governor or such public officer or body, the person appointed by name or the person for the time being holding such office shall be a member of such board, tribunal, commission, committee or similar body, or shall have and may exercise such powers and perform such duties accordingly.

**Construction of enabling words**

38. Where, in any Law, power is given to any person to do or enforce the doing of any act or thing, all such powers shall be understood to be also given as are

20

reasonably necessary to enable the person to do or enforce the doing of the act or thing.

**Powers of Governor to delegate authority**

39. When, by any Law, the Governor is empowered to exercise any powers or perform any duties, he may, unless by law expressly prohibited from so doing, depute any person by name, or the person for the time being holding the office designated by him, to exercise such powers or perform such duties on his behalf, subject to such conditions, exceptions and qualifications as the Governor may direct; and thereupon, or from the date specified by the Governor, the person so deputed shall have and exercise such powers and perform such duties subject as aforesaid:

Provided that nothing herein contained shall authorise the Governor to depute any person to hear any appeal or to make regulations under the power in that behalf conferred upon him by any Law.

## Provisions as to Imperial Acts and Orders in Council

**English Laws in force in the Islands**

40. All such laws and Statutes of England as were, prior to the commencement of 1 George II Cap. 1, esteemed, introduced, used, accepted or received as laws in the Islands shall continue to be laws in the Islands save in so far as any such laws or Statutes have been, or may be, repealed or amended by any Law of the Islands.

**Reference in Law to provision of Imperial Act**

41. Where, in any Law, reference is made to any provision of an Imperial Act or Order in Council and that provision is subsequently repealed and re-enacted without substantial modification, the reference in such Law to the provision of the Act or Order in Council so repealed shall, if the context so requires and unless the contrary intention appears, be construed as a reference to the provision so re-enacted.

**Imperial Acts, etc., to be read with necessary modifications**

42. Whenever any Imperial Act is extended or applied to the Islands, such Act shall be read with such formal alterations as to names, localities, courts, officers, persons, moneys, penalties and otherwise as may be to make it applicable to the circumstances.

## Provisions as to penalties

**Statement of penalty means maximum penalty**

43. Where any fine or penalty is imposed by or under the authority of any Law it shall be implied that the amount of such fine or penalty is the maximum amount; and where by any Law any person may be sentenced to any term of

21

*Interpretation Law (1995 Revision)*

imprisonment it shall be implied that such term of imprisonment is the maximum term.

**Penalty at foot of section indicates maximum penalty for contravention of section**

44.  Where in any Law any fine, penalty or term of imprisonment is set out at the foot of any section it shall indicate that any contravention of the section, whether by act or omission, shall be an offence against that Law and shall, unless the contrary intention appears, be punishable by a fine, penalty or term of imprisonment not exceeding the amount or term stated.

**Payment of portion of penalty by direction of Governor**

45.  Subject to the express provisions of any Law, where any fine or penalty is imposed by or under the authority of any Law, every such fine or penalty shall be payable into the general revenues of the Islands, but the Governor in Council may direct the payment to any aggrieved person, or to any person whose information or evidence has led to the conviction of the offender or to the recovery of the fine or penalty, of such proportion of the fine or penalty as he may think fit.

**Disposal of forfeits**

46.  (1) Where, under any Law, any animal or thing is adjudged by any court or other authority to be forfeited, it shall, unless the contrary is otherwise provided or unless it is expressed by law to be forfeited to any person, be forfeited to the Crown, and the net proceeds thereof, if it is ordered by competent authority to be sold, shall be paid into the general revenues of the Islands, unless other provision is made.

(2) Nothing in this section shall affect any provision in any Law whereby any portion of any fine or forfeit or of the proceeds of any forfeit is expressed to be recoverable by any person or may be granted by any authority to any person.

**Imposition of penalty not to bar civil action**

47.  The imposition of a penalty or fine by any Law, in the absence of express provision to the contrary, shall not relieve any person from liability to answer for damages to a person injured.

## Provisions as to offences

**Provision as to offences under two or more Laws**

48.  Where any act or omission constitutes an offence under two or more Laws, or both under a Law and under the common law, the offender shall, unless the contrary intention appears, be liable to be prosecuted and punished under either or any of those Laws or under the common law, but shall not be liable to be punished twice for the same offence.

**Attempt to commit an offence to be deemed an offence**

49.  A provision which constitutes an offence shall, unless the contrary intention appears, be deemed to provide also that an attempt to commit such offence shall

22

---

*Interpretation Law (1995 Revision)*

be an offence against such provision, punishable as if the offence itself had been committed.

**Remission of penalties**

50.  It shall be lawful for the Governor in the name of Her Majesty to remit in whole or in part any sum of money which under any Law may be imposed as a penalty, fine or forfeiture on a convicted offender, although such money may be in whole or in part payable to some person other than the Crown, and to extend the Royal mercy to any person who may be imprisoned for non-payment of any sum of money so imposed, although such sum may be in whole or in part payable to some person other than the Crown.

## Miscellaneous

**Change in title of public office, etc.**

51.  Whenever any change in title of any public office or department, branch, agency or organ of Government occurs, the Governor, if occasion requires, may by notice in the Gazette declare that such change of title shall take effect from a date specified in such notice, and, with effect from such date, any reference in any Law to the former title of such office or department, branch, agency or organ of Government shall be read and construed as a reference to that office or department, branch, agency or organ of Government by such new title as the Governor may declare in such notice.

**Appointment to statutory public office**

52.  Notwithstanding the provisions of this or any other Law, where provision is made in a law for a public officer to be appointed to an office under that Law which involves the exercise of functions, powers or duties pursuant to any Law or regulations and where no such appointment of such person has been made under that Law prior to the date when an appointment was made to such public office, the person appointed to such public office shall, for the purposes of any such Law or regulations, be deemed to have been appointed under that Law on the date when he was appointed to such public office.

**Meaning of service by post**

53.  Where any Law authorises or requires any document to be served by post, whether the expression "serve", "give" or "send" or any other expression is used, then, unless a contrary intention appears, the service shall be deemed to be effected by properly addressing, prepaying and posting a letter containing the document, and, unless the contrary is proved, to have been effected at the time at which the letter would be delivered in the ordinary course of post.

23

*Interpretation Law (1995 Revision)*

| | |
|---|---|
| Signification of orders of Governor | 54.   Where power is given to the Governor or Governor in Council to make regulations, it shall be sufficient, unless it is otherwise expressed, for such regulations to be signified under the hand of the Clerk of the Executive Council:<br><br>Provided that any proclamation, warrant, or other instrument issued under the Public Seal shall be issued under the hand of the Governor himself. |
| Power of majority | 55.   Save as is otherwise expressly provided by any Law, whenever any act or thing is required to be done by more than two persons, a majority of them may do it. |
| Division of Law into Parts | 56.   Where any Law is divided into Parts, Titles or other divisions, the fact and particulars of such division shall with or without express mention thereof in any Law, be taken notice of in all courts and for all other purposes whatsoever. |
| Construction of preamble and Schedules to Law | 57.   (1)  The preamble of any Law may be referred to for assistance in explaining the scope and object of the Law.<br><br>(2)  Every Schedule or Table to any Law, or part of any Law, shall, together with any notes thereto, be construed and have effect as part of the Law. |
| Deviations in forms | 58.   Whenever forms are prescribed in any Law, slight deviations therefrom, not affecting the substance or calculated to mislead, shall not invalidate them. |
| Construction of amending Law with amended Law | 59.   Where one Law amends another Law the amending Law shall, so far as it is consistent with the tenor thereof, and unless the contrary intention appears, be construed as one with the amended Law. |
| Reprint of amended Laws | 60.   When any Law is amended it shall be lawful for any person with the authority of the Governor to print copies of the Law with all the necessary additions, omissions, substitutions and amendments effected by the amending Law or Laws and such copies shall be deemed to be authentic copies of the Law so amended. |
| Notification of enactment and sale of regulations, etc. | 61.   Where any regulation or other instrument of a public character is required either expressly or by implication to be published or notified in the *Gazette*, a Government Notice that such regulation or other instrument has been made and of the place where copies thereof can be purchased or perused shall be sufficient compliance with such requirement. |
| Evidence of signature of Governor | 62.   Whenever the fiat of the Governor is necessary before any prosecution or action is commenced, any document purporting to bear the fiat of the Governor |

24

*Interpretation Law (1995 Revision)*

| | |
|---|---|
| | shall be received as *prima facie* evidence in any proceeding without proof being given that the signature to such fiat is that of the Governor. |
| Saving of rights of the Crown | 63.   No Law shall in any manner whatsoever affect the right of the Crown, unless it is therein expressly stated, or unless it appears by necessary implication, that the Crown is bound thereby. |
| Law binding on Crown | 64.   This Law shall be binding on the Crown. |

Publication in consolidated and revised form authorised by the Governor in Council this 7th day of February, 1995.

Carmena H. Parsons
Acting Clerk of Executive Council

25

*Tourism Law (1995 Revision)*

Supplement No. 8 published with Gazette No. 11 of 29th May, 1995.

RECEIVED

JUN 12 1995

SCHOOL OF GOVERNMENT
HARVARD LAW SCHOOL LIBRARY

**THE TOURISM LAW (10 OF 1974)**

**(1995 Revision)**

Consolidated with Laws 3 of 1979, 11 of 1988, 6 of 1990 and 6 of 1994.

Revised under the Law Revision Law (19 of 1975).

Originally enacted-
Law 10 of 1974-19th March, 1974
Law 3 of 1979-9th April, 1979
Law 11 of 1988-9th September, 1988
Law 6 of 1990-20th February, 1990
Law 6 of 1994-14th September, 1994

Consolidated and revised this 4th day of April, 1995.

(Price $3.20)

# TOURISM LAW

## (1995 Revision)

### ARRANGEMENT OF SECTIONS

Section

1. Short title
2. Definitions
3. Functions of Minister
4. Scope of Minister's function
5. Department of Tourism
6. Tourism Advisory Council
7. Hotels Licensing Board
8. Operators to be licensed
9. Board's power of inspection and control
10. Security at checking in
11. Appeals against decision of Board under section 9
12. Minister may object to applications for planning permission
13. Governor may declare a moratorium on construction of new hotels
14. Offences and penalties
15. Regulations
16. Application of Trade and Business Licensing Law (Revised)

# TOURISM LAW

## (1995 Revision)

1. This may be cited as the Tourism Law (1995 Revision).

2. In this Law, unless the context otherwise requires—

"apartments" means tourist accommodation having the character of separate flats or dwelling units situated on a common site or on contiguous sites whether or not held as strata titles under the Strata Titles Registration Law, 1973;

"Board" means the Hotels Licensing Board established by section 7;

"cottage colony" means tourist accommodation having the character of a group of cottages or beach dwellings;

"Council" means the Tourism Advisory Council established under section 6;

"Department" means the Department of Tourism established under section 5(1);

"Director" means the Director of Tourism referred to in section 5(2);

"Governor" means the Governor in Council;

"guesthouse" means tourist accommodation having the character of a private dwelling house or more than one such dwelling house situated on a common site or on contiguous sites;

"hotel" means tourist accommodation consisting of not less than ten guest rooms and providing for food and beverage facilities for its resident guests;

"licence" and its cognates refers to a licence under this Law;

"Minister" means the Member of Executive Council for the time being charged with responsibility for tourism in accordance with section 9 of the Constitution;

"officer" means an officer of the Department;

"operator" and its cognates has reference to one or more persons having the sole or joint control of tourist accommodation;

"prescribed" means prescribed by this Law or any Regulations;

Law 13 of 1990

"tourist" means a visitor to the Islands for the purposes of section 44(1) of the Immigration Law 1990; and

"tourist accommodation" means overnight or day to day accommodation available to tourists which is provided in the course of a business and is under the management of an operator and includes a guest house, a cottage colony, a group of apartments and a hotel.

Functions of Minister

3. The function of the Minister is to promote, foster and develop tourism.

Scope of Minister's function

4. (1) In the discharge of his function the Minister may take all measures he deems fit for promoting the Islands as a year round tourist resort and for that purpose shall use his best endeavours to-

(a) promote and secure such increased travel facilities for tourists as may be required;

(b) secure the most favourable arrangements for the entry of visitors in the Islands;

(c) encourage the development of amenities calculated to attract visitors to the Islands;

(d) promote research, experiments and operations to improve the basis of tourism and to control factors which may affect it adversely;

(e) increase understanding of the economic benefits of tourism; and

(f) collect and collate information calculated to enable him to discharge the above functions effectively.

(2) Where power is conferred upon the Minister by subsection (1) to undertake or promote any measure, it includes a power to assist or cooperate with any person or body of persons for that purpose.

Department of Tourism

5. (1) There is hereby established a Department of Government called the Department of Tourism charged with the duty of assisting the Minister in the performance of his functions under this Law.

(2) The Department shall, subject to the direction and control of the Minister, be under the supervision of a public officer known as the Director of Tourism who, together with such officers as may be considered necessary, shall

be appointed by the Governor from time to time, and the Department shall be maintained out of such funds as may be provided by the Legislative Assembly.

Tourism Advisory Council

6. (1) There is hereby established the Tourism Advisory Council to be appointed by the Governor on the first day of January in each year and from time to time at his discretion, which shall consist of a chairman and not more than eight nor less than six other members who shall hold office until the end of each calendar year or at the pleasure of the Governor.

(2) No public servant shall be a member of the Council.

(3) The Council shall keep under review the situation in the Islands with respect to tourism matters, and shall give to the Minister, where it considers it expedient to do so, advice on measures which in its opinion ought to be taken thereon.

(4) The Council shall meet *inter alia* at least once in each quarter of every year with the Director in attendance.

(5) In connection with the performance of his functions, the Minister may consult the Council from time to time and may call meetings of the Council for that purpose but shall not be bound by its advice.

(6) Four members present shall form a quorum for the conduct of the business of the Council.

(7) In all other matters the Council may regulate its own procedure.

Hotels Licensing Board

7. (1) There is hereby established a Board called the Hotels Licensing Board which shall consist of -

(a) the Minister (as chairman);

(b) four other members (none of whom shall be a public servant) to be appointed from time to time by the Governor to hold office at the pleasure of the Governor; and

(c) the Director who shall act as chairman in the absence of the Minister.

(2) The Board shall perform its functions through the Director.

(3) The Board shall-

*Tourism Law (1995 Revision)*

(a) meet from time to time as necessary for the purpose of discharging its duties under this Law;

(b) keep records of its proceedings, decisions and reasons for the latter;

(c) if so requested in that behalf, give an opportunity of audience to applicants or their representatives before reaching its decisions concerning them; and

(d) arrive at its decisions by a majority vote,

and may in all other respects regulate its own procedure.

Operators to be licensed

8. (1) No person shall operate tourist accommodation unless licensed in that behalf by the Board.

(2) On or before the prescribed day in each year every operator desiring to be licensed shall make application to the Board through the Director in the prescribed form and shall tender with such application the prescribed fee.

(3) For the purposes of subsection (2) "the prescribed day" means-

(a) in respect of an application for a licence to operate a group of apartments, a cottage colony or a guesthouse, 1st August; and

(b) in respect of an application to operate a hotel, 1st October.

(4) Licences granted under this section shall, subject to section 9(3) expire-

(a) on 31st August in each year, in respect of a licence to operate a group of apartments, a cottage colony or a guesthouse; and

(b) on 31st October in each year, in respect of a licence to operate a hotel.

(5) Licences shall be renewable upon application made to the Board through the Director in the prescribed form accompanied by the prescribed fee.

(6) Subject to section 13, the Board shall grant or renew licences, as the case may be, to those operators who make application in that behalf in the prescribed manner, pay the prescribed fee and conform with the prescribed minimum requirements.

(7) Before granting or renewing a licence under subsection (6), the Board shall require and have regard to reports about the tourist accommodation from or on behalf of -

*Tourism Law (1995 Revision)*

(a) the Chief Environmental Health Officer appointed under section 3(1) of the Public Health Law, 1981;  *Law 6 of 1981*

(b) the Chief Fire Officer appointed under section 3 of the Fire Brigade Law (1995 Revision);  *1995 Revision*

(c) the Director; and

(d) such other public servant as it considers desirable.

(8) Any person mentioned in paragraphs (a) to (d) of subsection (7) may enter on and inspect any tourist accommodation or any place within the curtilage thereof at any reasonable time for the purpose of making the report to the Board required by subsection (7), and shall forthwith after such entry and inspection make his report.

(9) Whoever prevents or obstructs the entry onto tourist accommodation or any place within the curtilage thereof of any person in the execution of his duty under subsection (8) is guilty of an offence and liable on summary conviction to a fine of one thousand dollars and to imprisonment for six months.

(10) The grant or renewal of a licence under this section shall be made by the Board-

(a) on or before 1st September in each year in respect of a licence to operate a group of apartments, a cottage colony or a guesthouse; and

(b) on or before 1st November in each year in respect of a licence to operate a hotel.

(11) In granting licences the Board shall classify the tourist accommodation in respect of which the licence is granted in the category of a guesthouse, a cottage colony, a group of apartments or a hotel, as the case may be, and shall issue the licence in the prescribed form to the operator who shall, in a conspicuous place and so that it is easily legible, display it in the office from which the management of the relevant tourist accommodation is carried on.

Board's power of inspection and control

9. (1) The Board or any officer may at any reasonable time inspect any tourist accommodation in order to ascertain whether or not the prescribed minimum requirements are being complied with.

(2) The Board or any officer shall, at any reasonable time and in order to ascertain whether or not the prescribed minimum requirements are being complied with, inspect at least once in every year-

(a) all licensed apartments, cottage colonies and guesthouses, on or before 1st July; and

(b) all licensed hotels, on or before 1st September.

(3) If, in the opinion of the Board, any operator has failed to comply with the prescribed minimum requirements the Board may withhold, revoke, suspend or refuse to renew such operator's licence, or may impose conditions subject to which such licence shall be granted or continued, by giving seven days notice to the operator to that effect in the prescribed form.

(4) In any case where the Board has withheld, revoked, suspended or refused to renew a licence, it may, at any time, post and keep posted on the tourist accommodation a notice thereof in the prescribed form.

*Security at checking in*

10. (1) An operator who fails to take all reasonable security precautions for the checking in of a tourist at the tourist accommodation which he is licensed to operate shall be guilty of an offence.

(2) For the purposes of this section-

(a) an operator fails to take all reasonable security precautions if-

(i) he has not been present at the checking in of the tourist and has not delegated supervision of the checking in to an authorised person; or

(ii) he or an authorised person has left the keys to any part of the licensed tourist accommodation in a place which is not under the immediate supervision of the operator or an authorised person; and

(b) a person is authorised to supervise the checking in of a tourist at licensed tourist accommodation-

(i) if he has been authorised in writing by the operator of that tourist accommodation in respect of the checking in there of tourists; and

(ii) the operator has sent a return to the Board giving the prescribed details of each such authorised person.

(3) A person guilty of an offence under this section is liable on summary conviction to a fine of one thousand dollars and to imprisonment for six months.

(4) In any proceedings for an offence under this section, it shall be a defence for the operator charged to prove that he took all reasonable precautions and exercised all due diligence to avoid the commission of the offence.

10

*Appeal against decision of Board under section 9*

11. (1) An operator or prospective operator who is aggrieved by a decision of the Board made under section 9 may, within fifteen days of service upon him of notification of the decision, appeal to the Governor by notice in writing in the prescribed manner and in accordance with the prescribed procedure and the decision of the Governor shall be final and binding upon the operator.

(2) Notwithstanding any appeal under subsection (1), the decision of the Board shall, until the decision of the Governor is given, remain in full force and effect.

*Minister may object to applications for planning permission*

12. Whoever makes application to the Central Planning Authority or, in the case of Cayman Brac and Little Cayman, the Development Control Board for planning permission in respect of accommodation intended wholly or partly for the use of tourists, whether by way of new development or modification of existing development, shall notify the Minister of the said application in the manner prescribed and enclose a copy of such notification with his application to such Authority or Board and, if the Minister gives notice to such Authority or Board of his objection to the said application, the Authority shall not grant such application until it has given the Minister a reasonable opportunity of objecting thereto:

Provided that if no objection is made by the Minister within twenty-one days of the receipt by such Authority or Board of the application for planning permission accompanied by the copy of the notification, the Authority or Board shall proceed upon the assumption that the Minister has no objection to the application.

*Governor may declare a moratorium on construction of new hotels*

13. (1) Notwithstanding section 8, the Governor may, having regard to the economic, social and all other interests of the Islands, by order, declare that for a specified period not exceeding five years the construction of any new hotel in Grand Cayman or any part thereof is prohibited:

Provided that at any time during the specified period he may, having regard to any changes in the said economic, social and other interests of the Islands, by notice published in the Gazette, rescind the order.

*1978 Revision*

(2) Where an application is made to the Central Planning Authority for permission to construct a hotel during the period specified in any order made pursuant to subsection (1), the Central Planning Authority shall refuse the application, so however that the Central Planning Authority shall not be liable for payment of compensation under Part IV of the Development and Planning Law (Revised) or any other enactment in respect of any such refusal:

11

*Tourism Law (1995 Revision)*

Provided that any such refusal shall be without prejudice to the right of the applicant to re-apply at any time after the period prescribed in the order has expired or the order has been rescinded.

(3)  An order made under subsection (1) shall not affect any permission granted prior to the effective date of the order but in respect of which work has not been completed or commenced at that date, except that in any such case, an application for renewal or extension of such permission shall not be granted.

**Offences and penalties**

14.  (1)  Whoever fails to make any return required of him to be made under this Law or any Regulation or who fails to comply with any order or direction of the Board acting under its powers under this Law or to submit to any inspection under section 9(1) is guilty of an offence and liable upon summary conviction to a fine of one thousand dollars and to imprisonment for six months.

(2)  Whoever operates or attempts or offers to operate any tourist accommodation when not licensed in that behalf is guilty of an offence and is liable upon summary conviction to a fine of one hundred dollars per day in respect of every tourist to whom such accommodation is provided or offered.

**Regulations**

15.  The Governor may make regulations -

(a)  providing for the registration of tourist facilities offered or made available to visitors to the Islands;

(b)  for the keeping of records relating to tourists;

(c)  for the registration and control of facilities offered or made available to visitors to the Islands within the Islands and within territorial waters;

(d)  prescribing minimum requirements for licensed tourist accommodation;

(e)  prescribing anything required to be prescribed under this Law;

(f)  for the internal regulation of the Department; and

(g)  for procedural requirements of this Law.

**Application of Trade and Business Licensing Law (Revised)**

16.  For the removal of doubt it is hereby declared that no licence is required under the Trade and Business Licensing Law (Revised) in respect of tourist accommodation licensed under this Law and, upon first obtaining a licence under this Law, an operator shall be entitled to receive a *pro rata* rebate for each complete month in respect of which a relevant licence held under the Trade and Business Licensing Law (Revised) remains unexpired.

12

---

*Tourism Law (1995 Revision)*

Publication in consolidated and revised form authorised by the Governor in Council this 4th day of April, 1995.

Mona N. Banks-Jackson
Clerk of Executive Council

13

*Tourism Regulations (1999 Revision)*

Supplement No. 6 published with Gazette No. 6 of 15th March, 1999.

**TOURISM LAW**

**(1995 Revision)**

**TOURISM REGULATIONS**

**(1999 Revision)**

Revised under the authority of the Law Revision Law (19 of 1975).

The Tourism Regulations, 1974 (G.N.114 of 1974) made the 25th June, 1974.

Consolidated with the-

Tourism (Amendment) Regulations, 1985 made the 19th February, 1985
Tourism (Amendment) Law 1994 (Law 6 of 1994) (part) enacted the 14th September, 1994
Tourism (Amendment) Regulations, 1996 made the 19th November, 1996.

Consolidated and revised this 5th day of January, 1999.

*Note (not forming part of the Regulations): This revision replaces the 1996 Revision which should now be discarded.*

(Price $3.20 Cents)

# TOURISM REGULATIONS

## (1999 Revision)

## ARRANGEMENT OF REGULATIONS

1.  Citation
2.  Fees
3.  Forms
4.  Register of licences
5.  Minimum requirements
6.  Specific minimum requirements in respect of the advertising, etc., of locally owned facilities
7.  Travelling expenses
8.  Hospitality expenses
9.  Appeals
    Schedule: Forms

## TOURISM REGULATIONS

### (1999 Revision)

**Citation**

1. These regulations may be cited as the Tourism Regulations (1999 Revision).

**Fees**

2. The fees required to be prescribed by section 8(2) and (5) are ten dollars in respect of each bedroom maintained for the accommodation of guests, with a minimum of one hundred and twenty dollars for each category of tourist accommodation.

**Forms**

3. The forms required to be prescribed by section 8(2), (5) and (11), section 9(3) and section 12 are contained in the Schedule hereto as forms TL1, TL2, TL3, TL4 and TL6.

**Register of licences**

4. The Director shall maintain a register of licences currently issued under this Law and records of all other information collected for the purpose of the function of the Minister and of the Department in such manner and by such methods as appear to him expedient, and shall in his discretion disseminate such information by advertisement and other media for the promotion and benefit of the tourist industry, and shall furnish such statistics and other guidance to persons engaged in the tourist industry as are likely to benefit therefrom.

**Minimum requirements**

5. The minimum requirements in respect of accommodation for the purposes of section 15 (d) are—

   (a) bedrooms and public spaces to be adequately furnished and provided with reasonable floor covering;

   (b) premises, including the curtilage, to be maintained in good order and condition;

   (c) employees to be properly trained, supervised and dressed, and sufficient in number to carry out their duties efficiently;

   (d) food supplied to be wholesome and adequate;

   (e) toilet facilities to be of modern design, maintained in a condition of scrupulous cleanliness and properly equipped and serviced;

   (f) an adequate supply of ablution and drinking water to be provided and (in the case of hotels) running water in all bedrooms;

   (g) hygiene arrangements (including pest control) to be of a high standard;

   (h) guests in bedrooms not to be exposed to unreasonable noise;

(i) adequate security arrangements for the protection of guests and their property and reasonable security precautions for the checking in of guests;

(j) telephone facilities provided at reasonable charge;

(k) priced menus supplied for all meals, describing the fare in English in addition to any other language used;

(l) price lists of soft and alcoholic drinks displayed in rooms where such drinks are served to the public; and

(m) printed rates of charges for all rooms or other units available in the reception area.

(2) Further general minimum requirements for the purpose of section 15(d) are-

(a) no discrimination against any prospective guest on grounds of race, origin, political opinion, creed or membership of any club or other organised body;

(b) no entertainment provided that is calculated to offend normal standards or decorum;

(c) operators to give all reasonable assistance in the promotion of such training schemes as the Director may institute, from time to time, for the purpose of improving the skill and efficiency of staff generally;

(d) no misleading or inaccurate statement to be made to the public in or by any advertisement or other medium for the purpose of attracting guests;

(e) the display in suitable public rooms of such information on public transport and such brochures and other literature as may be supplied for the purpose by the Director from time to time;

(f) bars on the premises to be furnished to reasonable standards of comfort and prices to be commensurate with the portions of drink sold and the amenities provided;

(g) in describing accommodation the following symbols to have the meanings ascribed to them-

a= air-conditioned (with reference to a bedroom);
A= all bedrooms air-conditioned;
B= bathtubs and toilet facilities in all bedrooms;
E= public entertainment or dancing at least once a week;
F= direct access to the beach for bathing;
H= hot water provided in all bedrooms and washrooms;
L= liquor licence;
R= restaurant available to non-residents;
S= swimming pool; and

6

T= tennis court;

(h) as and when required by the Director, returns to be made to the Department under the following heads-

(i) in May and November, returns of accommodation charges for the next succeeding six months period from December to May and from June to November respectively;

(ii) immediate returns of any change of rates quoted in (i);

(iii) monthly returns of occupancy of accommodation;

(iv) monthly returns of advance bookings covering a period of four months from the beginning of the next month succeeding the return;

(v) an annual return, in each July, showing a percentage breakdown of income and expenditure for the past year in respect of accounts which have been completed;

(vi) a return of persons employed at the quarter year periods ending on 31st March, 30th June, 30th September and 31st December;

(vii) such other returns (not being of a confidential financial nature) as the Director may, from time to time, require; and

(viii) every change in proprietorship or in the capacity or nature of accommodation or amenities offered to the public;

(i) operators to observe conditions fixed from time to time by the Director governing the making of deposits by prospective guests and the circumstances in which such deposits shall be refundable; and

(j) operators to conduct their business with courtesy to the public and to make no excessive charges.

(3) The requirements in subsections (1) and (2) are independent of and not in derogation of the requirements of any other law.

6. (1) In addition to the minimum requirements in respect of accommodation and the further general minimum requirements set out in regulation 5(1) and (2), the following are the minimum requirements in respect of the advertising, promotion and sale of locally owned tourism related tours and facilities within the precincts of a tourist accommodation holding a licence under the principal Law-

Specific minimum requirements in respect of the advertising, etc of locally owned facilities

(a) the provision, in a prominent place in the main foyer or entrance hall of the tourist accommodation, of a display rack of not less than five feet by three feet in dimensions wherein the operators of locally owned tourism related tours and facilities may place brochures of the services that they offer;

7

(b) operators of the tourist accommodation to permit, at all reasonable times, representatives of locally owned tourism related tours and facilities to enter the area wherein brochures are displayed under paragraph (a) for the purpose of contacting, meeting and collecting visitors who have pre-booked such tours or facilities; and for such purposes to permit such representatives to remain on the premises for such period, not exceeding twenty minutes, as may be required, and to use, free of charge, the internal telephone system within the tourist accommodation for the purpose of contacting such visitors.

(2) In this regulation-

"locally owned tourism related tour and facility" means any fishing, snorkelling, diving, scuba diving or similar boating operation, car hire business or sight-seeing tour bus operation which is owned either by a person having Caymanian Status or by a local company as defined in the Local Companies(Control) Law (1998 Revision).

*1998 Revision*

*Travelling expenses*

7. Where the Minister or any officer has incurred travelling expenses (including expenses of board and lodging in the course of his duties under this Law he may be reimbursed out of public funds:

Provided that-

(a) the reimbursement is specifically approved in writing by the responsible Permanent Secretary;

(b) the reimbursement is made from funds expressly allocated for the purpose by the Legislative Assembly; and

(c) the expenses are not incurred in connection with the attendance at the premises of the Department or upon the Council at a meeting held in Grand Cayman.

*Hospitality expenses*

8. Where the Minister or any officer has incurred expense in extending hospitality to any person in the course of the performance of his duties under this Law he may be reimbursed such expense:

Provided that-

(a) the reimbursement is specifically approved in writing by the responsible Permanent Secretary; and

(b) the reimbursement is made from funds specifically allocated for that purpose by the Legislative Assembly.

*Appeals*

9. (1) An appeal under section 11 shall be initiated by the appellant serving upon the Clerk of the Executive Council and the Director the completed Form TLS in the Schedule together with originals or, in the absence of originals, copies of all documents which, in the opinion of the appellant, are relevant to the appeal.

(2) In considering the appeal the Governor may, at his discretion, hear the appellant in person or by his representative who may or may not be an attorney-at-law.

(3) In the event of the Governor deciding to hear the appellant in person or by his representative he shall cause a notice to be served upon the appellant with copy to the Director of the date, time and place where the hearing shall take place, which date shall be within twenty-eight days of the service upon the Clerk of the Executive Council of Form TLS in the Schedule.

(4) At the hearing of the appeal the Governor shall permit the appellant or his representative to address him, and thereafter may call upon the Director to reply and may then, at his discretion, allow either or both parties to address him further.

(5) The Governor shall, within twenty-eight days of service of the notice of appeal or termination of the hearing under these regulations, whichever is the later, communicate his decision to the appellant and may, but shall not be bound, to give reasons in writing for such decision.

(6) If the Governor's decision is unfavourable to the appellant the Governor may appoint a day before which the appellant shall not be permitted to make further application for a licence under this Law with respect to the relevant premises.

(7) The Governor may allow an appeal in whole or in part upon such conditions, if any, as he may decide to impose.

*Tourism Regulations (1999 Revision)*

**Form TL1**

**SCHEDULE**

**FORMS**

**TOURISM LAW**

**(1995 Revision)**

(section 8(2))

### APPLICATION FOR A LICENCE TO OPERATE TOURIST ACCOMMODATION

To the Hotels Licensing Board
through the Director of Tourism.

From _____(Operator)
I apply for a licence under the above Law.
Address for service of licence _____
Name and location of accommodation _____
Category for which licence is sought-
(a) guesthouse (b) cottage colony (c) apartments (d) hotel* ( *Delete as necessary.)
Maximum number of persons for whom accommodation is offered. _____
Fee tendered herewith _____ $_____
Name of manager in residence _____

If granted a licence I undertake to conform with the Tourism Law (1995 Revision) and the regulations and in particular with the minimum requirements therein set forth.

Signed _____

Date _____

10

---

*Tourism Regulations (1999 Revision)*

**Form TL2**

**TOURISM LAW**

**(1995 Revision)**

(section 8(5))

### APPLICATION FOR RENEWAL OF A LICENCE

To the Hotels Licensing Board
through the Director of Tourism.

I apply for a renewal of the licence referred to below:
From _____(Operator)
Licence No. _____
Address _____
Name and location of accommodation _____

Enclosed is the licence now about to expire.

* No relevant change has been made in the accommodation since the issue of the above licence; or

* The following alterations have been made to the accommodation since the issue of the above licence:

Fee tendered herewith _____ $_____
Signed _____
Date _____
* Delete as appropriate.

11

*Tourism Regulations (1999 Revision)*

**Form TL3**

**TOURISM LAW**

**(1995 Revision)**

(section 8(11))

## LICENCE TO OPERATE A TOURIST ACCOMMODATION

This is to certify that _____ of _____
is licensed by the Hotels Licensing Board to operate the (a) guesthouse (b)
cottage colony (c) apartments (d) hotel* known as _____

located at _____
for the accommodation of a maximum of _____ persons in compliance with
the Tourism Law (1995 Revision) and the Tourism Regulations (1999 Revision).

*Delete as necessary.*

Date of expiry _____

Signed _____
    (Space for renewals)

Hotels Licensing Board
by Director of Tourism

---

**Form TL4**

**TOURISM LAW**

**(1995 Revision)**

(section 9(3))

This is to give notice that by reason of your non-compliance with the minimum
requirements of the Tourism Regulations (1999 Revision) as specified on the
back hereof, your licence No. _____ to operate the tourist
accommodation known as _____
located at _____
    is *revoked
    *suspended
    *Delete as applicable
by the Hotels Licensing Board with effect from _____ ;

12

---

*Tourism Regulations (1999 Revision)*

Provided that if, by the _____ day of _____, 199_____ you have complied
with the conditions annexed hereto, such suspension shall not be put into effect.

You are further informed that if you are aggrieved by this decision you have,
under section 11, a right to appeal to the Governor in Council, and a form of
appeal is enclosed for your use should you wish to avail yourself of the said right.

To _____

From _____        Date _____

    Hotels Licensing Board
    by Director of Tourism

Served by _____        Date _____

---

**FORM TL5**

**TOURISM LAW**

**(1995 Revision)**

**NOTICE OF APPEAL**

(section 11)

To the Clerk of the Executive Council
From _____ Operator of Licence No. _____
I, _____ of _____
operator of the above licence, being aggrieved by the decision of the Hotels
Licensing Board withholding/revoking/suspending/failing to renew* my above
licence, *Delete as necessary.

hereby appeal thereagainst upon the grounds set forth in the memorandum
annexed hereto and signed by me.

I enclose herewith a copy of the notice of suspension/revocation. *
*Delete as necessary.*

* I desire to appear in person.
*Delete if inappropriate.*

13

*Tourism Regulations (1999 Revision)*

Signed _____     Operator _____     Date _____

**Form TL6**

## TOURISM LAW

### (1995 Revision)

(section 12)

To the Minister of Tourism (per the Director of Tourism)

This is to give notice that I intend to apply to the Central Planning Authority/Development Control Board under the Development and Planning Law (1998 Revision) for planning permission the carry out the development specified in the application, a copy of which is enclosed, and that the application, if granted, would affect the availability of tourist accommodation in the Islands in the manner shown in the said application.

Signed _____     Date _____

Copy to the Central Planning Authority/Development Control Board.

I certify that the original of this notice was served upon the Director of Tourism on the _____ day of _____, 199__.

Signed _____     Date _____

Publication in consolidated and revised form authorised by the Governor in Council this 5th day of January, 1999.

Carmena H. Parsons
Clerk of Executive Council

14

Supplement No. 12 published with Gazette No. 13 of 2nd July, 2002.

# TOURISM LAW
## (1995 Revision)

# TOURISM REGULATIONS
## (2002 Revision)

Revised under the authority of the Law Revision Law (1999 Revision ).

The Tourism Regulations, 1974 (G.N.114 of 1974) made the 25th June, 1974.

Consolidated with the-

Tourism (Amendment) Regulations, 1985 made the 19th February, 1985
Tourism (Amendment) Law 1994 (Law 6 of 1994) (part) enacted the 14th September, 1994
Tourism (Amendment) Regulations, 1996 made the 19th November, 1996.
Tourism (Amendment) (Variation of Tourist Accommodation Licence Fees) Regulations, 2001 made the 29th May 2001.

Consolidated and revised this 4th day of June, 2002.

*Note (not forming part of the Regulations): This revision replaces the 1999 Revision which should now be discarded.*

16

Price: $3.20

# TOURISM REGULATIONS

## (2002 Revision)

## ARRANGEMENT OF REGULATIONS

1.  Citation
2.  Fees
3.  Forms
4.  Register of licences
5.  Minimum requirements
6.  Specific minimum requirements in respect of the advertising, etc., of locally owned facilities
7.  Travelling expenses
8.  Hospitality expenses
9.  Appeals
    Schedule: Forms

3

2

*Tourism Regulations (2002 Revision)*

## TOURISM REGULATIONS

### (2002 Revision)

1. These regulations may be cited as the Tourism Regulations (2002 Revision).    Citation

2. The fees required to be prescribed by section 8(2) and (5) are twenty-five dollars in respect of each bedroom maintained for the accommodation of guests, with a minimum of two hundred and fifty dollars for each category of tourist accommodation.    Fees

3. The forms required to be prescribed by section 8(2), (5) and (11), section 9(3) and section 12 are contained in the Schedule herein as forms TL1, TL2, TL3, TL4 and TL6.    Forms

4. The Director shall maintain a register of licences currently issued under this Law and records of all other information collected for the purpose of the function of the Minister and of the Department in such manner and by such methods, as appear to him expedient, and shall in his discretion disseminate such information by advertisement and other media for the promotion and benefit of the tourist industry, and shall furnish such statistics and other guidance to persons engaged in the tourist industry as are likely to benefit therefrom.    Register of licences

5. The minimum requirements in respect of accommodation for the purpose of section 15 (d) are:    Minimum requirements

    (a) bedrooms and public spaces to be adequately furnished and provided with reasonable floor covering;

    (b) premises, including the curtilage, to be maintained in good order and condition;

    (c) employees to be properly trained, supervised and dressed, and sufficient in number to carry out their duties efficiently;

    (d) food supplied to be wholesome and adequate;

    (e) toilet facilities to be of modern design, maintained in a condition of scrupulous cleanliness and properly equipped and serviced;

    (f) an adequate supply of ablution and drinking water to be provided and (in the case of hotels) running water in all bedrooms;

    (g) hygiene arrangements (including pest control) to be of a high standard;

    (h) guests in bedrooms not to be exposed to unreasonable noise;

    (i) adequate security arrangements for the protection of guests and their property and reasonable security precautions for the checking in of guests;

    (j) telephone facilities provided at reasonable charge;

5

*Tourism Regulations (2002 Revision)*

(k) priced menus supplied for all meals, describing the fare in English in addition to any other language used;

(l) price lists of soft and alcoholic drinks displayed in rooms where such drinks are served to the public; and

(m) printed rates of charges for all rooms or other units available in the reception area.

(2) Further general minimum requirements for the purpose of section 15(d) are—

(a) no discrimination against any prospective guest on grounds of race, origin, political opinion, creed or membership or otherwise of any club or other organised body;

(b) no entertainment provided that is calculated to offend normal standards or decorum;

(c) operators to give all reasonable assistance in the promotion of such training schemes as the Director may institute, from time to time, for the purpose of improving the skill and efficiency of staff generally;

(d) no misleading or inaccurate statement to be made to the public in or by any advertisement or other medium for the purpose of attracting guests;

(e) the display in suitable public rooms of such information on public transport and such brochures and other literature as may be supplied for the purpose by the Director from time to time;

(f) bars on the premises to be furnished to reasonable standards of comfort and prices to be commensurate with the portions of drink sold and the amenities provided;

(g) in describing accommodation the following symbols to have the meanings ascribed to them—

a=air-conditioned (with reference to a bedroom);

A=all bedrooms air-conditioned;

B=bathtubs and toilet facilities in all bedrooms;

E=public entertainment or dancing at least once a week;

F=direct access to the beach for bathing;

H=hot water provided in all bedrooms and washrooms;

L=liquor licence;

R=restaurant available to non-residents;

6

S=swimming pool; and

T=tennis court;

(h) as and when required by the Director, returns to be made to the Department under the following heads—

(i) in May and November, returns of accommodation charges for the next succeeding six months period from December to May and from June to November respectively;

(ii) immediate returns of any change of rates quoted in (i);

(iii) monthly returns of occupancy of accommodation;

(iv) monthly returns of advance bookings covering a period of four months from the beginning of the next month succeeding the return;

(v) an annual return, in each July, showing a percentage breakdown of income and expenditure for the past year in respect of accounts which have been completed;

(vi) a return of persons employed at the quarter year periods ending on 31st March, 30th June, 30th September and 31st December;

(vii) such other returns (not being of a confidential financial nature) as the Director may, from time to time, require; and

(viii) every change in proprietorship or in the capacity or nature of accommodation or amenities offered to the public;

(i) operators to observe conditions fixed from time to time by the Director governing the making of deposits by prospective guests and the circumstances in which such deposits shall be refundable; and

(j) operators to conduct their business with courtesy to the public and to make no excessive charges.

(3) The requirements in subsections (1) and (2) are independent of and not in derogation of the requirements of any other law.

6. (1) In addition to the minimum requirements in respect of accommodation and the further general minimum requirements set out in regulation 5(1) and (2), the following are the minimum requirements in respect of the advertising, promotion and sale of locally owned tourism related tours and facilities within the precincts of a tourist accommodation holding a licence under the principal Law—

(a) the provision, in a prominent place in the main foyer or entrance hall of the tourist accommodation, of a display rack of not less than five feet by three feet in dimensions wherein the operators of locally owned tourism related tours and facilities may place brochures of the services that they offer;

*Specific minimum requirements in respect of the advertising, etc., of locally owned facilities*

7

TLS in the Schedule together with originals or, in the absence of originals, copies of all documents which, in the opinion of the appellant, are relevant to the appeal.

(2) In considering the appeal the Governor may, at his discretion, hear the appellant in person or by his representative who may or may not be an attorney-at-law.

(3) In the event of the Governor deciding to hear the appellant in person or by his representative he shall cause a notice to be served upon the appellant with copy to the Director of the date, time and place where the hearing shall take place, which date shall be within twenty-eight days of the service upon the Clerk of the Executive Council of Form TLS in the Schedule.

(4) At the hearing of the appeal the Governor shall permit the appellant or his representative to address him, and thereafter may call upon the Director to reply and may then, at his discretion, allow either or both parties to address him further.

(5) The Governor shall, within twenty-eight days of service of the notice of appeal or termination of the hearing under these regulations, whichever is the later, communicate his decision to the appellant and may, but shall not be bound, to give reasons in writing for such decision.

(6) If the Governor's decision is unfavourable to the appellant the Governor may appoint a day before which the appellant shall not be permitted to make further application for a licence under this Law with respect to the relevant premises.

(7) The Governor may allow an appeal in whole or in part upon such conditions, if any, as he may decide to impose.

---

(b) operators of the tourist accommodation to permit, at all reasonable times, representatives of locally owned tourism related tours and facilities to enter the area wherein brochures are displayed under paragraph (a) for the purpose of contacting, meeting and collecting visitors who have pre-booked such tours or facilities; and for such purposes to permit such representatives to remain on the premises for such period, not exceeding twenty minutes, as may be required, and to use, free of charge, the internal telephone system within the tourist accommodation for the purpose of contacting such visitors.

(2) In this regulation.

1999 Revision

"locally owned tourism related tour and facility" means any fishing, snorkelling, diving, scuba diving or similar boating operation, car hire business or sight-seeing tour bus operation which is owned either by a person having Caymanian Status or by a local company as defined in the Local Companies (Control) Law (1999 Revision).

Travelling expenses

7. Where the Minister or any officer has incurred travelling expenses (including expenses of board and lodging) in the course of his duties under this Law he may be reimbursed out of public funds:

Provided that—

(a) the reimbursement is specifically approved in writing by the responsible Permanent Secretary;

(b) the reimbursement is made from funds expressly allocated for the purpose by the Legislative Assembly; and

(c) the expenses are not incurred in connection with the attendance at the premises of the Department or upon the Council at a meeting held in Grand Cayman.

Hospitality expenses

8. Where the Minister or any officer has incurred expense in extending hospitality to any person in the course of the performance of his duties under this Law he may be reimbursed such expense:

Provided that—

(a) the reimbursement is specifically approved in writing by the responsible Permanent Secretary; and

(b) the reimbursement is made from funds specifically allocated for that purpose by the Legislative Assembly.

Appeals

9. (1) An appeal under section 11 shall be initiated by the appellant serving upon the Clerk of the Executive Council and the Director the completed Form

SCHEDULE

FORMS

Form TL1

**TOURISM LAW**
**(1995 Revision)**

(section 8(2))

## APPLICATION FOR A LICENCE TO OPERATE TOURIST ACCOMMODATION

To the Hotels Licensing Board

through the Director of Tourism.

From _____(Operator)
I apply for a licence under the above Law.
Address for service of licence _____
Name and location of accommodation _____

Category for which licence is sought-

(a) guesthouse (b) cottage colony (c) apartments (d) hotel* (*Delete as necessary.)

Maximum number of persons for whom accommodation is offered. _____
Fee tendered herewith. _____ $
Name of manager in residence _____
If granted a licence I undertake to conform with the Tourism Law (1995 Revision) and the regulations and in particular with the minimum requirements therein set forth.

Signed _____

Date _____

Form TL2

**TOURISM LAW**
**(1995 Revision)**

(section 8(5))

## APPLICATION FOR RENEWAL OF A LICENCE

10

---

To the Hotels Licensing Board

through the Director of Tourism.

I apply for a renewal of the licence referred to below:
From _____(Operator)
Licence No. _____
Address _____
Name and location of accommodation _____

Enclosed is the licence now about to expire.
* No relevant change has been made in the accommodation since the issue of the above licence; or
* The following alterations have been made to the accommodation since the issue of the above licence:
Fee tendered herewith. _____ $
Signed _____
Date _____
* Delete as appropriate.

Form TL3

**TOURISM LAW**
**(1995 Revision)**

(section 8(11))

## LICENCE TO OPERATE A TOURIST ACCOMMODATION

This is to certify that _____ of _____
is licensed by the Hotels Licensing Board to operate the (a) guesthouse (b) cottage colony (c) apartments (d) hotel* known as, _____

located at _____
for the accommodation of a maximum of _____ persons in compliance with the Tourism Law (1995 Revision) and the Tourism Regulations (2002 Revision).
*Delete as necessary.

Date of expiry _____

Signed _____

11

_Tourism Regulations (2002 Revision)_

**FORM TL5**

**TOURISM LAW**

**(1995 Revision)**

**NOTICE OF APPEAL**

To the Clerk of the Executive Council

From _____ Operator of Licence No. _____

I, _____ of _____

operator of the above licence, being aggrieved by the decision of the Hotels Licensing Board withholding/revoking/suspending/failing to renew* my above licence, _____ * Delete as necessary.

hereby appeal thereagainst upon the grounds set forth in the memorandum annexed hereto and signed by me.

I enclose herewith a copy of the notice of suspension/revocation. *

*Delete as applicable.

* I desire to appear in person.

*Delete if inappropriate.

Signed _____ Operator _____ Date _____



Form TL6

**TOURISM LAW**

**(1995 Revision)**

(section 12)

To the Minister of Tourism (per the Director of Tourism)

This is to give notice that I intend to apply to the Central Planning Authority/Development Control Board under the Development and Planning Law (2002 Revision) for planning permission the carry out the development specified in the application, a copy of which is enclosed, and that the application, if granted,

13

---

_Tourism Regulations (2002 Revision)_

Hotels Licensing Board

by Director of Tourism

(Space for renewals)

Form TL4

**TOURISM LAW**

**(1995 Revision)**

(section 9(3))

This is to give notice that by reason of your non-compliance with the minimum requirements of the Tourism Regulations (2002 Revision) as specified on the back hereof, your licence No. _____ to operate the tourist accommodation known as _____
located at _____ is *revoked *suspended

*Delete as applicable

by the Hotels Licensing Board with effect from _____:

Provided that if, by the _____ day of _____ 20___ you have complied with the conditions annexed hereto, such suspension shall not be put into effect.

You are further informed that if you are aggrieved by this decision you have, under section 11, a right to appeal to the Governor in Council, and a form of appeal is enclosed for your use should you wish to avail yourself of the said right.

To _____
From _____ Date _____
Hotels Licensing Board
by Director of Tourism
Served by _____ Date _____



12

*Tourism Regulations (2002 Revision)*

*Tourism Regulations (2002 Revision)*

would affect the availability of tourist accommodation in the Islands in the manner shown in the said application.

Signed _____ Date _____

Copy to the Central Planning Authority/Development Control Board.

I certify that the original of this notice was served upon the Director of Tourism on the _____ day of _____, 20____ .

Signed _____ Date _____

Publication in consolidated and revised form authorised by the Governor in Council this 4th day of June, 2002.

Carmena Watler

Clerk of Executive Council

14

15

THE CAYMAN ISLANDS LAW REPORTS                    2001 CILR

### R. v. Junior Mark A. Dixon (Summary Court Appeal No. 23/01)

24  Mr. Dixon was a courier charged with importing 388g. or more than 14 oz. of cocaine. He pleaded guilty and testified against others. His testimony at trial contradicted his statements to the police, which perhaps resulted in an acquittal of the accused in the other case. Prior to this charge he was a man of good character. The learned Magistrate sentenced him to 9 years.

25  Again I can see no error in her sentence. At the last sitting of the Court of Appeal in August, 2001, that court imposed sentences of 9 years in three different importing or trafficking in cocaine cases, 8 years in one case. 7 years in two cases and 5½ years for Denise McKay. It appears that 9 years is within the appropriate range and, accordingly, the appeal is dismissed.

### R. v. Howard Antonio Edwards (Summary Court Appeal No. 51/99)

26  Mr. Edwards was charged with and convicted of being concerned with possession of cocaine with intent to supply. He pleaded not guilty but was proved to have been involved in setting up a drug buy for approximately $13,000 of cocaine. Essentially, he put the buyer and seller together. He did not have any prior convictions. The learned Magistrate sentenced him to 8½ years.

27  I do not think his crime can be viewed in the same light as Mr. McBean's or Mr. Dixon's. He played a minor role. There is no evidence that he would profit. This case is more similar to that of Denise McKay's, except that Ms. McKay did not plead guilty and I cannot see the Court of Appeal imposing a much greater sentence against him than they did against her. Accordingly, I allow the appeal, substituting a sentence of 6 years.

### R. v. Shawn Marshall Barnes (Summary Court Appeal No. 5/01)

28  Mr. Barnes was charged with possession of cocaine with intent to supply. He was described as a street dealer rather than an importer or supplier. He had 5.4g. which was 53 rocks or 0.2 oz. of cocaine. He had 36 prior convictions and pleaded guilty. He admitted to having sold drugs for the previous 12 months. The learned Magistrate sentenced him to 7 years.

29  His counsel argued that if 9 years was appropriate for the supplier then it should be 3-4 years for the dealer and he referred to three decisions, two in the Summary Court and one in the Grand Court.

30  Again, I cannot see any error in the sentence imposed by the learned Magistrate. If Mr. Barnes had no criminal record a sentence of 4 years

GRAND CT.                    CARTER v. SCOTT'S INDUS., LTD.

might have been appropriate but he has 36 prior convictions and I conclude that the sentence was a proper one. I am not persuaded that the Court of Appeal in these circumstances would be likely to decrease his sentence. Therefore, his appeal is dismissed.

*Orders accordingly.*

*Attorneys: Hunter & Hunter for the first appellant; Keith Collins & Co. for the second, third and fourth appellants.*

## [2001 CILR 355]

# CARTER v. SCOTT'S INDUSTRIES LIMITED

GRAND COURT (Kellock, Ag. J): October 11th, 2001

*Tort—occupiers' liability—duty to invitees—common law duty to prevent injury to invitees from unusual danger on premises—ordinary principles of negligence also apply if injury results from business occupier's involving customer in operation of business, e.g. driving own vehicle on premises for servicing, rather than from condition of premises*

*Tort—negligence—duty of care—test requires relationship of such proximity that likelihood of damage to plaintiff through defendant's carelessness reasonably foreseeable by defendant, and absence of carelessness negating or limiting liability—business liable for injury to customer negligently involved in operation of business*

The plaintiff brought an action to recover damages for personal injury sustained on the defendant's premises.

The plaintiff visited the defendant's car-repair business to have his van's exhaust system repaired. He alleged that he was instructed to drive the van on to a ramp and directed to position it over one of the inspection pits. On previous occasions he had taken both left- and right-hand drive vehicles to the defendant's premises and each time had been directed on to a ramp over a pit with a concrete platform on the driver's side, on to which he had stepped from the vehicle. On this occasion, the platform was on the passenger side of the vehicle, with only a 12 in. wide metal channel on the driver's side on which the wheels rested, and when he climbed from the driver's side, he fell into the pit, injuring his knee. The

employee who had directed him on to the ramp then walked from the pit. The plaintiff was lifted out and driven to hospital. The plaintiff claimed that he had been unable to see the platform of the metal channel whilst driving on to the ramp.

The defendant gave evidence that its policy was not to permit visitors to drive their vehicles on to the ramps, but to require them to obtain a work order from the office, where an available employee would be assigned to the vehicle. There were signs located near the pits to this effect. Its employee claimed that he had refused the plaintiff access to one of the pits which had already been allocated, that the plaintiff falsely claimed to have obtained a work order and, instead of waiting to be assigned a different pit as requested, began to drive his vehicle on to a ramp over a pit with a concrete platform on the driver's side. The employee said he guided him on to the ramp before returning to another pit. The plaintiff got out of his van and whilst walking alongside it, bumped into the wing mirror, lost his balance, and fell into the adjacent pit. The plaintiff denied this version of events.

The defendant admitted that it had in the past had to reprimand staff for permitting customers to drive their own vehicles on to the ramps and that the particular employee had been reprimanded and still faced further disciplinary action. It submitted that (a) the plaintiff had assumed the risk of driving on to ramp and therefore it was not liable for his injury on the basis of the doctrine of *volenti non fit injuria*, or (b) the plaintiff had been contributorily negligent to such an extent as to negate its own liability.

**Held**, making the following ruling:

(1) The court did not accept that the plaintiff had been unaware that his van was positioned on a concrete platform on one side and a metal channel on the driver's side. From his own evidence and the video evidence produced by the defendant, re-enacting the manoeuvre performed by the plaintiff, it was clear that he could not have driven the van on to the ramp without noticing this, even if only with his peripheral vision whilst concentrating on the employee directing him. He had clearly not borne this fact in mind when he exited from the van by the driver's door instead of the passenger door, with the consequence that he fell into the pit (paras. 8–11, para. 39).

(2) The court also rejected the version of events put forward by the defendant's employee, which was illogical and inconsistent with the evidence of other witnesses. The employee was an unconvincing witness and had invented a story to conceal (a) the fact that he had placed the plaintiff in a hazardous situation, and (b) the defendant's non-compliance with its own alleged policy of not permitting customers to drive on to the ramps. If such a policy existed, it had not been enforced on a day-to-day basis and certainly not on the day in question. Customers were obviously regularly invited to drive their own vehicles on to the ramps, and in those

circumstances the presence of signs prohibiting it would understandably have been ignored (paras. 15–19, paras. 22–25, para. 38).

(3) In the absence of occupier's liability legislation in the Cayman Islands, the defendant had a common law duty to prevent injury to the plaintiff from unusual danger whilst on its premises. Since the plaintiff's injury resulted not simply from the condition of the premises, but from the defendant's involving him in the operation of its business, the result would be no different if the ordinary principles of liability in negligence were applied. The defendant stood in such a relationship of proximity to the plaintiff whilst he was on its premises that it should reasonably have contemplated that its carelessness or that of its employees might cause danger to him. Furthermore (leaving aside the issue of contributory negligence) there were no circumstances present which would negative or limit that liability (paras. 29–35).

(4) The defendant was not relieved of its liability to the plaintiff by the operation of the doctrine of *volenti non fit injuria*, since although the evidence indicated that the plaintiff was aware of the dangerous position in which he had been placed, it did not show that he had agreed to accept the risk. Whilst he was undoubtedly contributorily negligent, that did not absolve the defendant. It had been foreseeable on the employee's part that the plaintiff might not appreciate the need to exit by the passenger door when positioned over the particular pit used, and little effort would have been required to warn him of this. Having invited the plaintiff into this situation, the defendant's employee took no steps to extricate him from it and simply left him there. The injury would probably not have occurred had the plaintiff been warned of the danger (para. 25, paras. 36–37, para. 40).

(5) The plaintiff was entitled to judgment against the defendant for the injury he had sustained, but his damages (which had yet to be quantified) would be reduced by one-half under s.3 of the Torts (Reform) Law (1996 Revision) due to contributory negligence. The plaintiff would be entitled to the whole of his costs in view of the fact that the defendant's main witness had concocted a false story and the defendant had colluded in this (paras. 27–28, paras. 41–44).

**Cases cited:**

(1) *Anns v. Merton London Borough Council*, [1978] A.C. 728; *sub nom. Anns v. London Borough of Merton*, [1977] 2 All E.R. 492, applied.

(2) *British Rys. Bd. v. Herrington*, [1972] A.C. 877; [1972] 1 All E.R. 749.

(3) *Indermaur v. Dames* (1866), L.R. 1 C.P. 274; 35 L.J.C.P. 184, on appeal (1867), L.R. 2 C.P. 311; 36 L.J.C.P. 181; *sub nom. Indermann v. Dames*, 31 J.P. 390.

THE CAYMAN ISLANDS LAW REPORTS                    2001 CILR

(4) London Graving Dock Co. Ltd. v. Horton, [1951] A.C. 737, [1951] 2 All E.R. ; dicta of Lord Porter applied.
(5) M'Alister (or Donoghue) v. Stevenson, [1932] A.C. 562, [1932] All E.R. Rep. 1; [1932] S.C. (H.L.) 31, applied.
(6) Miraflores (Owners) v. George Livanos (Owners), The Miraflores, [1967] 1 A.C. 826; [1967] 1 All E.R. 672, dicta of Lord Pearce applied.
(7) Slater v. Clay Cross Co. Ltd. [1956] 2 Q.B. 264, [1956] 2 All E.R. 625, followed.
(48) Sole v. Hallt (W.J.) Ltd., [1973] Q.B. 574, [1973] 1 All E.R. 1032, followed

**Legislation construed:**
Torts (Reform) Law (1996 Revision), s.8(1): The relevant terms of this sub-section are set out at para. 43.

H.G. Robinson for the plaintiff;
J.S. Turboton and W.A. Sykes for the defendant.

1 KELLOCK, Ag. J.: The plaintiff, William Lorence Carter ("Carter"), was injured at the defendant's ("Scott's") premises on October 8th, 1998 and as a result claims damages as against Scott's for personal injuries including lost income and out-of-pocket expenses. On March 1st, 2001 Graham, J. ordered that there should "be a trial on the issue of liability and if liability is decided in favour of the plaintiff and there is no agreement between the parties as to the amount of compensation payable, the matter may be listed for assessment of damages." Accordingly, my task is to determine only the liability issues.

2 The circumstances are as follows: On October 8th, 1998 Carter drove his Ford Econoline van to Scott's premises, which can be described as a muffler shop on North Sound Road, George Town, for the purpose of having the exhaust system repaired. From that point forward the plaintiff and the defendant's versions of what happened are quite different.

3 In order to understand the evidence I was referred to a sketch entitled "Inspection site plan—Scott's Industries Ltd. Premises." The sketch is a plan view of the inspection pits (so-called) which are approximately 5 ft. deep. I numbered these pits from 1 to 7. Vehicles are driven on to these pits so that a mechanic may work on the undercarriage and, more particularly, the muffler system of the vehicle above him. The mechanics enter the pits by three sets of stairs located between the pit and the "work area." In all cases except in the case of pit 6 a vehicle parked over a pit will have either its right or left wheels on a metal channel with the other wheels (i.e. the front and back wheels on the other side) on a concrete pad. The metal channels are approximately 1 ft. wide. This arrangement can be

GRAND CT.           CARTER v. SCOTT'S INDIES LTD. (Kellock, Ag. J.)

seen in the photographs adduced in evidence at the trial as well as in the video exhibited.

4 Carter's evidence was that on the day in question he arrived at Scott's premises at about 4 p.m. He drove his vehicle over the sloping driveway area but stopped short of the pits. Carter had been to Scott's for repairs to his vehicles on many occasions since 1980 and on every occasion he had been directed by an employee of Scott's on to the pit area (which he called a "ramp"). On the day in question (October 8th, 1998) he stopped his van before the ramp because there was no one there to direct him over the pits.

5 Carter's evidence was that he had taken both right-hand and left-hand drive vehicles for repairs in the past and on every occasion he had been directed on to a ramp where the driver's door would be located over a concrete pad. In other words, he had never found himself in a vehicle over a pit with the driver's door over a metal channel. Carter's evidence, which is contained in a witness statement which he adopted at trial, contains the following statement:

"10. On October 8th, 1998 at about 4 p.m. I drove the same vehicle to Scott's to have the exhaust repaired. I drove up and stopped facing the ramps. At the time there were no other vehicles on the ramps. There was no fence or other obstruction to prevent me from driving into the area where the ramps are located.

11. I saw three persons standing and talking. They were in front of my vehicle to the left. There was a lady with a mop and other cleaning items, a man about my height, which is 5 ft. 11 ins., or taller, and a man who was of darker complexion and shorter than the other man. All three appeared to be workers employed by Scott's. There was another worker sitting on a chair reading a newspaper.

12 The shorter of the two men speaking to the lady said: 'Go up, Sir' and indicated that I go to the right. I had to reverse the vehicle to go in the direction he was pointing. By the time I started to drive forward he was standing on the opposite end of the ramp facing the vehicle. He was on ground level, in line with the vehicle but to my left. He directed me to drive up on to the ramp. The workman stood in the same position and directed me until he signalled me to stop.

13. Where I sat in the vehicle I could not see where the wheels of the vehicle were positioned. In order to drive on to the ramp I had to concentrate on the worker directing me. It would have been impossible for me to drive that vehicle on to the ramp if I had no one directing me. This is the same when I drive a car on to the ramp

14. I had to drive up an elevation immediately before going on to the ramp. As I drove towards where the worker was directing me,

the front of the vehicle was pointed at an angle upwards and then the vehicle went on to the ramp which is that. My eyes were focused on the worker directing me.

15. When the vehicle stopped the worker stepped down into the pit under the vehicle. The engine was still running. I opened my passenger door and stepped out and fell into the inspection pit. When I looked up I noticed that I had been directed on to a ramp where the driver's side of my vehicle was placed on a narrow metal plank, no more than about 12 ins. wide. There was no space for me to step when leaving the vehicle.

16. The floor of the inspection pit was made of cement and was very hard. I received a severe blow to my right knee. I immediately felt a severe pain and weakness to the right leg and could not stand up. After I fell into the pit the worker under the vehicle said 'Wha happen, Sir?' I said: 'Man, you don't see I just fall from the truck into the pit?' Why you put me on that ramp?' His reply was something about which side of vehicle the exhaust was situated. He then went out of the pit and left me there."

6. After reciting how he got out of the pit the plaintiff's witness statement continues:

"19. Mr. Anthony [Scott], with the assistance of three other persons, lifted me up and took me to his car. He then drove me to the hospital. On our way to the hospital we had a conversation in which he told me that life was so uncertain, at one moment you are alive and the next you could be dead. Twice during the conversation he told me that they had told their employees not to let the customers drive on to the ramps.

20. Before driving on to the ramp I did not see any sign saying that customers should not drive on to the ramp. In any event, I was concentrating on the fellow who was directing me.

21. I was unaware that there was any area on the defendant's premises to which access by customers was restricted. On all the previous occasions that I had visited Scott's for the purpose of having exhaust repairs done to my vehicles I had been allowed into the area where the ramps are located and I had been directed by a worker to drive my vehicle on to the ramps.

22. It is totally untrue that I was ordered away from the ramp by one of the defendant's employees. I only proceeded to the ramp when the worker directed me to do so and it would have been impossible for me to have driven the vehicle on to the ramp without some assistance as I was unable to see the driver's seat to see the ramp to position the vehicle so that it did not fall from the ramp."

GRAND CT. CARTER v. SCOTT'S INDUS. LTD. (Kellock, Ag. J.)

7. Carter was vigorously cross-examined. He refused to acknowledge that he knew he was required to go to Scott's office and obtain a work order before driving inwards the pits. He also refused to acknowledge that he could see that the driver's side of his van was being positioned over a metal channel and his left wheels were being guided on to the 4 ft.-wide concrete pad to the right of pit 4. During his cross-examination he was asked about the height of the driver's seat in his van and the fact that the van had a step to assist the driver in getting into the van or exiting from the van. He said that his vantage point in the driver's seat of the van was higher than it would be in a car and that from there he could see the "cement" but not the "plank" (meaning the metal channel)].

8. Carter was shown the video which contains a re-enactment of Carter's approach to and entry on to and over the pit. A person giving hand signals is shown at the top of pit 4. It was said that the camera was positioned inside the van pointing forward where the driver's eyes would be located. This statement was not challenged by counsel for the plaintiff. Carter asserted again in his oral evidence that he was focusing on the man giving him hand signals and that he did not or could not see either the metal channel or the concrete plank as he drove on to and over the pit.

9. However, my note of his evidence indicates that he was clear in his mind that this driver's door was in fact over the steel plank, that is to say the metal channel. In any event, it is my finding that it would have been impossible for Carter to have placed his van on that pit without knowing that his driver's door was located over the steel channel. Even if it was focusing on the man giving him hand signals his peripheral vision would have been sufficient to indicate that the driver's side of the vehicle was located over the channel and not over a concrete pad.

10. It was therefore extremely foolish for Carter to open his driver's door and step off into space. Having said that, I must immediately acknowledge that few of us can say that we have never been guilty of similar foolish acts or omissions. Unfortunately, such acts or omissions may sometimes and in certain circumstances be visited with undesirable consequences. That is the case here.

11. I have no hesitation in finding that Carter could not have driven his van over the pit without knowing that this driver's door was located over the metal channel and, consequently, he ought not to have attempted to exit his van on the driver's side. Carter was well aware of the pits at Scott's premises as a result of his previous visits there and would have been well aware of the risk of injury should he fail to pay close attention to what he was doing when driving his vehicle over the pits and exiting from that vehicle.

THE CAYMAN ISLANDS LAW REPORTS                    2001 CILR

12    Mr. Turboton submitted that should I make such a finding that would be the end of the plaintiff's case. For the reasons I will explain in due course, I do not agree.

13    The defendant called as witnesses Neville Anthony Scott Snr. and Neville Anthony Scott Jnr. The former is known as Anthony and the latter as Neville. Anthony Scott is a shareholder and the managing director of Scott's, while Neville Scott is an assistant manager. Neither of these witnesses observed Carter drive over the pits or fall from his van into the pit.

14    The witness called by the defendant to testify to these critical circumstances was an employee of Scott's, one Ancel Goulbourne, popularly known as "Pablo," Mr. Goulbourne is 37 years old and is a welder. His evidence is contained in the witness statement he adopted at trial and the relevant parts of that statement read as follows:

"3    On Thursday, October 8th, 1998, at approximately 4 p.m., I was working in the muffler repair shop at Scott's Industries Ltd. when a van drove up to one of the pits for vehicle inspection and repairs.

4    The driver, whom I later learned to be a Mr. William Carter, was informed by myself that he could not drive his van on to the access ramp that he was on, as another vehicle was about to use that ramp for access to the inspection pit for welding purposes. In addition, we employees in the pit area had been given instructions not to allow any customers to drive on to the access ramp, but that customers should check in at the office for a work order, which would then be assigned to one of the available employees. I then enquired from the gentleman if he had already obtained a work order from the office and he answered that he had. (I later learned from the office staff that this was not true.) As a result, I assumed that he must have been given permission to drive from the office up to the work area.

5    I then ordered Mr. Carter away from the ramp and advised him that he would have to wait to use a different inspection pit. However, he then began driving his vehicle on to a service ramp which was not in use, without permission. As a result, and in order to avoid the possibility of his wheels going over the edge of the steel channel, I ran to guide him properly on to the service ramp over the inspection pit. For the purposes of clarification, I attach ... a photograph showing the steel channel and 4 ft.-wide concrete landing on to which Mr. Carter drove. It is apparent from the photograph that a vehicle which is left-hand drive would drive over the pit so that the driver's door would open on to the concrete

GRAND CT.       CARTER v. SCOTT'S INDUS. LTD. (Kellock, Ag. J.)

landing comprising the service ramp, and this is what Mr. Carter did.

6    After guiding, Mr. Carter on to the service ramp, I then went back to directing a truck on the ramp which I had initially ordered Mr. Carter away from, while Mr. Carter remained seated in his vehicle. At no time did he request or indicate that he required assistance in alighting from his vehicle, and it appeared to me that he had more than ample room on the concrete landing between his vehicle and the adjacent pit on which to alight and walk.

7    A short while later, Mr. Carter proceeded to exit his vehicle of his own accord. He got out of the vehicle on to the concrete landing and pushed his door closed, but the lock obviously did not catch. As he proceeded to walk from the side towards the front of his vehicle, he carelessly neglected to watch where he was going. As a result, he struck the door wing-mirror of his vehicle with his shoulder and stumbled off balance, grasping for balance on to his door, which, however swung open and carried him over the lip of the adjacent pit. He then lost his footing and let go of the door and fell into the pit."

15    Goulbourne expanded somewhat in this statement in his evidence at trial. He indicated that when Carter arrived at Scott's premises that fateful afternoon he drove up to and partially over pit number 2. This is inconsistent with his witness statement which states that he "drove up to one of the pits." The witness statement does not indicate that Carter had placed his vehicle partially over the pit.

16    I did not believe Mr. Goulbourne's testimony with respect to many of the important areas of disagreement between his evidence and Carter's evidence. It was abundantly clear, given Mr. Goulbourne's lack of ability to speak clearly and precisely, that he could not have prepared his witness statement but he would not admit that this was the case. While he acknowledged having given a written statement of the events of October 8th, 1998, which was, he said, left in the office (i.e. Scott's office), Goulbourne was most reluctant to disclose this fact also and it emerged only after repeated questions and long periods of unexplained silence. That statement was never produced if, indeed, it exists.

17    In any event, Goulbourne said at trial that pit number 2 was to be used to install a trailer hitch on a vehicle which was being backed up from the parking lot area to the pit area by Anthony Scott Snr. at the time Carter drove up in his van. As a result of Goulbourne's instructions, Carter reversed his van away from pit 2 and drove it to pit 5. Goulbourne said that Carter once again drove his vehicle partially over that pit and Goulbourne heard the right front tyre of Carter's van strike the metal channel. At that point in time Goulbourne was in the work area at the top

362                                                                        363

THE CAYMAN ISLANDS LAW REPORTS    2001 CILR

of pit 2. He thereupon proceeded to the work area at the top of pit 5 to direct Carter so that Carter could position his vehicle fully over that pit. Goulbourne then left the area of pit 5 and returned to pit 2 to assist Scott to put the vehicle he was driving partially over pit 2 rear end first.

18  Goulbourne then observed from that location (or so he testified) that Carter emerged from his van on the driver's side, stepped on to the concrete pad and closed or partially closed the driver's door to the van. Carter then proceeded to walk towards the work area (from which there was no exit) rather than back to the parking lot. Goulbourne did not hear Carter say anything which would explain why Carter would proceed in that direction. Goulbourne suggested that Carter wanted to enter the pit to look underneath his van. There is no evidence whatever to support that assumption and Carter denied it. The evidence does not disclose any reason why Carter would have walked in that direction. In any event, Goulbourne said that Carter, in proceeding toward the work area, bumped into the van's wing-mirror with the consequences stated in para. 7 of his witness statement.

19  In my judgment, this evidence is quite simply false. There is no evidence whatever to corroborate it. Indeed, it is contradicted by the evidence of Anthony Scott. He did not see Carter in his van either before or after the accident, although he was at the crucial time allegedly driving a vehicle backwards on to pit number 2 and was told to stop by Goulbourne in order to allow Carter to remove his vehicle from the area. Scott's evidence is that after the manoeuvered the vehicle he was driving over pit 2 he got out of that vehicle and went to his office where he later received word of the accident from his brother Annie. Anthony Scott then went out to the pit area and saw Carter who had been injured and drove him to the hospital. Scott did not see Carter's van located over the pits at any time.

20  There was evidence that Carter's van was removed from the pit because it was leaking gasoline. However, no one was able to say who removed it. It was Goulbourne's evidence that the van remained over the pits for 20-25 minutes.

21  If Goulbourne's account of those significant events were true, Anthony Scott Snr. could not have failed to observe Carter or his van at some point in time before or after the accident. I should also note that neither Anthony Scott's brother Annie, nor the other mechanic who was on duty that afternoon, were called as witnesses.

22  Goulbourne and Anthony Scott both testified that customers were not allowed in the pit area and were not allowed to drive their vehicles over the pits with or without the guidance of Scott's employees. There were signs erected on the post, the location of which is shown on the

GRAND CT.    CARTER v. SCOTT'S INDUS., LTD. (Kellock, Ag. J.)

sketch plan, and those signs may be seen in photographs attached to Anthony Scott's witness statement. The top sign ("No Parking on Ramp") was not in place on October 8th, 1998. There was no evidence as to the distance or locations at which these signs could be read by Scott's customers.

23  I entirely reject the evidence adduced by the defendant to the effect that customers were not allowed to drive vehicles on to the pits. Carter's evidence was to the opposite effect, as was the evidence given by the witnesses Herbert Byrd (also known as "Blinky") and Fred Seymour. In addition, the defendant's witnesses contended that in all cases the placing of a vehicle over the pits required the intervention of two of Scott's employees, one to drive the vehicle and the other to guide the driver. If true, that scheme would require that one of the mechanics on duty would have to interrupt his work in the pits to participate in that process whenever a customer's vehicle was to be positioned over the pits.

24  I have no doubt that the usual modus operandi was the procedure adopted on the afternoon of October 8th, 1998 when Mr. Carter arrived at Scott's premises. In other words, I find that customers would, on a regular basis, be invited by Scott's employees to drive their vehicles up and on to the pits. In these circumstances, even if a customer noticed a sign on the post, he or she would pay it little or no attention when actively invited by a Scott's employee to drive up to and over the pits.

25  I therefore have no doubt whatever that Carter was directed by Scott's employee to drive his van on to and over pit 4 on the afternoon of October 8th, 1998. Carter was thereby placed in a hazardous situation by the defendant, Scott's. It must have been obvious to Goulbourne that Carter's van was a left-hand drive vehicle and it was therefore clearly foreseeable on Goulbourne's part that Carter might not fully appreciate the need to exit the vehicle by crawling over to the passenger side and using the passenger's door in order to alight safely on to the concrete pad.

26  Whether or not Goulbourne failed to appreciate the significance of the circumstances because he was concerned that Anthony Scott might back a vehicle into pit 2 unless he rushed back to stop him cannot be ascertained, because Goulbourne chose to conduct a false account of what occurred rather than offer an explanation as to what actually happened. Goulbourne insisted that Carter had parked his vehicle over pit 5 so that his driver's door was located over the 4 ft.-wide concrete slab. It is clear to me that Goulbourne not only invited Carter into a position of danger but left him there.

27  I cannot leave the subject of the credibility of the defence witnesses without mentioning Anthony Scott's evidence concerning his and his company's alleged policy of preventing customers from having access to

the pit area. Scott admitted under cross-examination that he knew customers were driving their vehicles on to the pits and that he was therefore required on occasion to reprimand his employees for failing to carry out the company policy. He also admitted that whatever discipline Scott's had imposed on its employees in this regard has in the past had not served to eliminate the alleged prohibited practice. He then acknowledged that Goulbourne had been reprimanded as a result of Carter's accident and that Goulbourne was still, almost three years later, under the threat of further disciplinary action on the part of his employer, Scott's. What that disciplinary action might be was not disclosed but the court was told that Mr. Goulbourne was a Jamaican who was working in Grand Cayman on the basis of a revocable work permit.

28  I can only conclude from this evidence that Scott's wished to have the benefit of Goulbourne's favourable testimony at the trial and consequently it was not in the interest of Scott's to enforce its policy concerning customer access to the pit area by terminating Goulbourne's employment before the trial. I cannot draw any inferences from this evidence that would in any way be favourable to the defendant's case.

29  The task now is to determine how the question of liability for Carter's injuries is to be resolved in the light of these facts. I should first note that because there is no occupiers' liability legislation in force in the Cayman Islands, the law as laid down by the House of Lords in *London Graving Dock Co. Ltd. v. Horton* (4) is the governing authority with respect to Scott's liability as the occupier of the muffler shop premises. I have noted in particular the language employed by Lord Porter ([1951] 2 All E.R. at 4) as follows: "I am not conscious that it has been stated in plain terms, but it is noticeable that what is declared to be the duty is, not to prevent unusual danger, but to prevent damage from unusual danger while on its premises. Clearly the law relating to occupier's liability is relevant to the resolution of the issues raised in this case, as is the law relating to contributory negligence.

30  Before discussing these principles I propose to consider whether or not the case can be resolved on the basis that the plaintiff's claim is a claim grounded in the law of negligence, that is to say upon the principles laid down by the House of Lords in *M'Alister (or Donoghue) v. Stevenson* (5). In *London Graving Dock Co. Ltd. v. Horton* both Lord Porter and Lord Normand considered the plaintiff's claim in that case on the basis of *M'Alister (or Donoghue) v. Stevenson*. Neither Lord Porter nor Lord Normand suggested that the law of occupiers' liability, as stated in *Indermaur v. Dames* (3), had occupied the field so that the principles laid down by *M'Alister (or Donoghue) v. Stevenson* could not be applied (In this regard see *British Rys. Bd. v. Herrington* (2).)

31  It seems to me that quite apart from the fact that Carter was injured on premises owned and occupied by the defendant, Scott's, Scott's enticed Carter into a dangerous predicament and left him there to fend for himself. In these circumstances, Lord Atkin's famous statement in *M'Alister (or Donoghue) v. Stevenson* bears repeating. It is as follows ([1932] A.C. at 580):

"The rule that you are to love your neighbour becomes in law, you must not injure your neighbour, and the lawyer's question, Who is my neighbour? receives a restricted reply. You must take reasonable care to avoid acts or omissions which you can reasonably foresee would be likely to injure your neighbour. Who, then, in law is my neighbour? The answer seems to be— persons who are so closely and directly affected by my act that I ought reasonably to have them in contemplation as being so affected when I am directing my mind to the acts or omissions which are called in question."

32  As explained by Lord Wilberforce in *Anns v. Merton London Borough Council* (1) ([1978] A.C. at 751–752), the test for liability in negligence is twofold:

1. Is there "as between the alleged wrongdoer and the person who has suffered damage ... a sufficient relationship of proximity ... such that, in the reasonable contemplation of the former, carelessness on his part may be likely to cause damage to the latter ...";?

2. If the answer to the first question is in the affirmative, are there "any considerations which ought to negative or to reduce or limit the scope of the duty" of care, such as the prospect of potential unlimited liability in favour of an unlimited class of person?

In the case at bar the first question can be answered in the affirmative and the second in the negative.

33  Even if this case ought to be resolved in accordance with the common law applicable to occupiers' liability, the result, in my judgment, is the same. This is not a case involving injury to an invitee (i.e. a business visitor) due simply to the condition of the premises. In this case Scott's involved Carter in the operation of its business.

34  In *Slater v. Clay Cross Co. Ltd.* (7) the plaintiff, while walking along a tunnel on a railway track over land owned and occupied by the defendant's company, was struck and injured by a train driven by the company's servant. In an action for negligence against the company the trial judge held that the plaintiff was a licensee on the land and the track, and that the driver had been negligent in failing to observe instructions to whistle and to slow down when entering the tunnel which the company knew was used by members of the public. He gave judgment for the

THE CAYMAN ISLANDS LAW REPORTS                     2001 CILR

plaintiff, though finding her guilty of contributory negligence. An appeal was taken to the Court of Appeal. Denning, L.J had this to say ([1956] 2 Q.B. at 269–270):

"The duty of the occupier is nowadays simply to take reasonable care to see that the premises are reasonably safe for people lawfully coming on to them: and it makes no difference whether they are invitees or licensees. At any rate, the distinction has no relevance to cases such as the present where current operations are being carried out on the land. If a landowner is driving his car down his private drive and meets someone lawfully walking upon it, then he is under a duty to take reasonable care so as not to injure the walker, and his duty is the same no matter whether it is his gardener coming up with plants, a tradesman delivering goods, a friend coming to tea, or a flag-seller seeking a charitable gift . . . So here it seems to me that the Clay Cross Co., in carrying on their operations, were under a duty to take reasonable care not to injure anybody lawfully walking upon the railway, and they failed in that duty."

35   In the case at bar, Scott's involved Carter in the operation of its muffler shop business and thereby assumed at least the degree of responsibility to Carter that the railway company owed to the plaintiff in the *Slater* case. Consequently, Scott's is responsible in law for Carter's injuries.

36   As for the question whether the defendant should be relieved of liability by reason of the doctrine of *volenti non fit injuria*, Denning, L.J said (*ibid.*, at 271):

". . .[I]t seems to me that when this lady walked in the tunnel, although it may be said that she voluntarily took the risk of danger from the running of the railway in the ordinary and accustomed way, nevertheless she did not take the risk of negligence by the driver. Her knowledge of the danger is a factor in contributory negligence, but is not a bar to the action."

In order for the defendant in this case to succeed on the basis of *volenti non fit injuria*, I would have to be persuaded to find not only that Carter was aware the he was in a position of danger but also that the circumstances were such that he not only knew of the risk of injury but, by necessary implication, agreed to assume it (see Buckley, *The Modern Law of Negligence*, 2nd ed., paras. 4-01 – 4-06, at 61–65 (1993)). I cannot make that finding.

37   In this connection the speech of Lord Pearce in *Miraflores (Owners) v. George Livanos (Owners)* (6) should be noted ([1967] 1 A.C. at 847–848):

368

GRAND CT.        CARTER v. SCOTT'S INDUS. LTD. (Kellock, Ag. J.)

"It is axiomatic that a person who embarks on a deliberate act of negligence should, in general, bear a greater degree of fault than one who fails to cope adequately with the resulting crisis which is thus, thrust upon him. This generality is subject, of course, to the particular facts. It may be that the initial act was so slight or so easily avoidable and the subsequent failure to take avoiding action so gross that the blame for the accident falls more largely or even (if the interval and opportunity for avoidance are sufficiently great) wholly upon the person who failed to avoid the consequences of another's negligence. Between the extremes in which a man is either wholly excused for a foolish act done in the agony of the moment as a result of another's negligence or is wholly to blame because he had plenty of opportunity to avoid it, lies a wide area where his proportion of fault in failing to react properly to a crisis thrust upon him by another must be assessed as a question of degree."

38   There can be no doubt that the policy that Anthony Scott alleged was in place at Scott's muffler shop of preventing customers having access to the pit area was driven by the obvious danger to which customers would be exposed in the absence of such a policy. As I have found, it is abundantly clear that whether or not there was such a policy, it was most definitely not enforced and not observed on the afternoon of October 8th, 1998, and, as a result the plaintiff, Carter, sustained injuries when he fell into the pit.

39   There can also be no doubt that Carter ought not to have exited from his van by the driver's door, and why he did so is not explained Carter's evidence was that he thought he was stepping down on to a concrete pad, which, of course, would have been the case had his van had been located over pit 5. As I have said, I cannot accept that evidence. Carter was aware at some point in time that he was being led by Goulbourne over pit 4 and that it was his left wheels (not his right wheels) that were located over the concrete pad. Unfortunately, when it was time to exit from the van that fact was clearly not present in Carter's mind.

40   There is no doubt that Carter was contributorily negligent but I do not accept the proposition that that puts an end to his case. If Goulbourne had given the matter a moment's thought he would have had as much reason to appreciate Carter's difficulty as Carter should have had. In those circumstances, it would have taken very little effort indeed to warn Carter that he should not exit from the left side of the van. It is always possible that had Goulbourne attempted to warn Carter, Carter would not have heeded that warning and would have fallen into the pit notwithstanding the warning. However, it was Scott's and its employee that were responsible for Carter being put in that position in the first place and for failing to take any steps whatever to extricate him from that predicament.

369

THE CAYMAN ISLANDS LAW REPORTS      2001 CILR

In those circumstances, it is more likely than not that had Goulbourne realized the problem Carter would not have been injured.

41 The situation was not unlike that dealt with by Swanwick, J. in *Sole v. W.J. Hallt Ltd.* (8). In that case, according to the headnote in the *Law Reports* ([1973] Q.B. at 574)—

"by a labour only oral contract, the plaintiff, an experienced plasterer, and his son agreed with the defendants to fix plasterboards to form ceilings in one of the houses being built by the defendants on their own land. Although the stair well had no guard rails and there were boards readily available for the plaintiff and his son to use to cover the well, they began to fix the plasterboards. The plaintiff, while looking up at the ceiling, stepped back and fell into the stair well, thereby injuring himself. He claimed damages for breach of contract and for negligence on the part of the defendants."

Swanwick, J said (*ibid.*, at 582):

"My finding is that it was negligent of the plaintiff to walk backwards in the direction of what he knew, if he thought about it, was an unguarded stairwell, and while looking at the ceiling. If his claim had to be pleaded in contract, I would have felt compelled by the authority of *Quinn v. Burch Bros. (Builders) Ltd.* ... to hold that his contributory negligence was such as to amount to a novus actus interveniens and a break in the chain of causation, particularly as it occurred after the defendants' negligent act in breach of their contract. But holding as I do that it is open to him to found his claim in tort under the Act of 1957, I find that he was one-third to blame. He is, therefore, entitled to recover two-thirds of his total damages."

42 The legislation there mentioned is the English Occupier's Liability Act 1957, which provided that the defendant owed a common duty of care to the plaintiff in the circumstances of that case. The important point is that Swanwick, J. was not persuaded that the plaintiff's contributory negligence was sufficient to absolve the defendant from all liability for its negligence.

43 Section 8 of the Law of Torts (Reform) Law (1996 Revision) provides:

"(1) Where any person suffers damage as the result partly of his own fault and partly of the fault of any other person or persons, a claim in respect of that damage shall not be defeated by reason of the fault of the person suffering the damage, but the damages recoverable in respect thereof shall be reduced to such extent as the court thinks just and equitable having regard to the claimant's share in the responsibility for the damage. ..."

---

NAZARY v. R

Taking all of the relevant circumstances into account, I would hold that the plaintiff is entitled to judgment against the defendant for the injuries he has sustained (damages for which must, of course, be assessed) but that those damages, once assessed, should be reduced by one-half, having regard to the plaintiff's share of the responsibility for such injuries and damage. Judgment will therefore issue declaring that the plaintiff is entitled to one-half of the damages to be assessed, together with the costs of the trial of the liability issue.

44 In order to avoid any controversy, the plaintiff is to have his entire costs of the action to date including the trial of the liability issues. These are not to be reduced by reason of his contributory negligence. I make that order as a result of the nature of the evidence adduced on behalf of the defendant which I have already commented on. I am prepared to fix the costs if asked, otherwise they will be taxed.

*Order accordingly.*

Attorneys: *Quin & Hampson* for the plaintiff; *Hunter & Hunter* for the defendant.

[2001 CILR 371]

NAZARY, HUSSAINI and YUSUFI v. R.

GRAND COURT (Smellie, C.J., Sanderson, J. and Kellock, Ag. J.): October 10th and 25th, 2001

*Immigration and Status—permission to land—detention—persons released following temporary detention may be redetained under Immigration Law, s.52(1)(b), as persons to whom permission to land deemed refused under s.52(4), if material change of circumstances occurs or new evidence discovered*

*Immigration and Status—permission to land—detention—discretion to detain temporarily under Immigration Law, s.52(1) to be exercised by Chief Immigration Officer personally, not on direction of Governor-in-Council—Governor-in-Council to approve place of detention once decision taken*

GRAND CT.

R. v. SEYMOUR

## [2003 CILR 53]

## R. v. SEYMOUR

GRAND COURT (Edwards, Ag. J.): March 14th, 2003

*Evidence—character—criminal associations—evidence admissible if more probative of charge (e.g. disclosing motive to commit crime to assist associate) than prejudicial to accused—probative value assessed by cogency; strength of inference to be drawn and relevance to charge—cogency may be assumed, and weight and credibility of evidence determined at trial—inadmissible simply to show propensity to offend*

*Evidence—computer-generated records—criminal proceedings—admissible in criminal proceedings at common law if conditions in Evidence Law (1995 Revision), s.35 (civil proceedings) met*

The accused was charged with murder.

The evidence against the accused on a charge of murder was circumstantial. He was reported to have called at the home of the deceased and been given a glass of water, from which his fingerprint was recovered. Shortly afterwards neighbours heard what may have been a gunshot and the deceased was found shot dead an hour later. The accused was apprehended in a car from which he had made or received a telephone call from a third party with whom, it was alleged, he had been communicating frequently during the preceding hours. He had a close association with B, a prisoner serving a sentence in Northward Prison, with whom he had been imprisoned in Jamaica for jointly-committed drugs offences and against whom the deceased, a prison guard, had been about to give evidence in connection with a further large-scale drugs distribution scheme. There was evidence that B had acted as the accused's protector whilst in prison in Jamaica, and that the accused would have been willing to assist him in avoiding a lengthy custodial sentence upon conviction.

The accused filed an alibi notice stating that he had not been in the vicinity of the deceased's house at the time of the shooting. He elected for trial by judge alone.

The Crown applied for a ruling that the evidence of the relationship between the accused, B, and the deceased was admissible at the trial to prove the accused's identity as the killer by showing that he had not only been in the vicinity but also had a motive to kill the deceased. It also sought leave to adduce computer-generated records as the basis for expert evidence as to the timing, location and origin of the telephone calls made on the day in question.

---

THE CAYMAN ISLANDS LAW REPORTS        2003 CILR

are wanting in bona fides or which are frivolous, vexatious, or oppressive. In such cases the court has extensive alternative powers to prevent an abuse of its process by striking out or staying proceedings or by prohibiting the taking of further proceedings without leave. Where the court, by exercising its statutory powers, its powers under rules of court or its inherent jurisdiction, can give an adequate remedy, it will not in general punish the abuse as a contempt of court. On the other hand, where an irregularity or misuse of process amounts to an interference with the course of justice, extending its influence beyond the parties to the action, it may be punished as a contempt."

29  The question of whether a contempt of court has been committed by officers of the defendant or others, should be left to be considered and determined at the conclusion of these trials. A summons launching that inquiry will be issued by this court in due course.

30  Finally, it is important to observe that Mr. Myers, who assisted Mr. Hall-Jones in this application, was specifically asked for his views on this matter. He felt he could not make any comment in the circumstances. However, the very next day after it was heard, Mr. Myers appeared before me on a different matter involving the H.S.A. The H.S.A. was trying to collect payment from a defendant for certain medical services provided. I was obliged to ask Mr. Myers if he felt there was any reason why I should disqualify myself from matters involving the H.S.A. He said: "No." He is to be commended for his candour and integrity.

*Orders accordingly.*

Attorneys: *Quin & Hampson* for the plaintiffs; *Government Legal Dept.*

THE CAYMAN ISLANDS LAW REPORTS                                    2003 CILR

The Crown submitted that (a) the evidence of the accused's criminal connection and his willingness to assist his friend in any way was not to be tendered as "similar fact" evidence, nor as evidence of criminal propensity, nor as evidence of enmity toward the deceased, but to prove their close affinity; (b) the evidence was cogent, relevant and strongly probative of the charge and the inferences of bad character to be drawn from that evidence were incidental and not significantly prejudicial to the accused; (c) although the Evidence Law contained no provision in respect of criminal proceedings equivalent to s.35 governing the admissibility of computer-generated records in civil proceedings, the legislature had intended that the common law should provide for their admission as part of the general class of business records referred to in s.23; and (d) in the absence of local authority on the issue, under s.40 of the Interpretation Law, the common law of England provided for the admission of the records.

The accused submitted in reply that (a) the evidence connecting him to a third party with a motive to kill the deceased was inadmissible, since his involvement in drugs offences was evidence of bad character which had no bearing on the present charge and was, accordingly, more prejudicial than probative; (b) there was no provision in the Evidence Law for the admission of computer-generated records in criminal cases because the legislature had not intended such evidence to be used to prove criminal charges, and had made the limited provision for admitting business records that it wished to make in s.23; s.35 contained detailed safeguards to be applied in civil cases, and similar provision for criminal cases could not simply be implied; and (c) the common law of England did not assist in interpreting the Evidence Law, or filling the gaps for which it failed to provide, since the English law applicable under s.40 of the Interpretation Law had been extensively modified by statute.

**Held,** ruling that the evidence was admissible:

(1) The Crown would be permitted to adduce evidence of the close affinity between the accused and B, notwithstanding that it arose from a criminal association and that it involved convictions for drugs offences. Such evidence could be excluded if its prejudicial effect on the court's assessment of the case outweighed its probative value. Its probative value was to be measured having regard to its cogency, the strength of the inference to be drawn from it, and its relevance to the charge. For the purposes of deciding admissibility, the cogency of the evidence of the bond between the accused and B and the criminal association could be assumed; the issue of witnesses' credibility and the weight to be assigned to the evidence being determined at trial. The proposed inference, rather than that applicable in a similar facts case, was that the accused, having a close association with some one who would benefit from the deceased's death, was more likely than otherwise to be motivated to kill. The evidence was relevant because it went to prove the central issues of motive and ultimately identity, and was not of merely peripheral sig-

GRAND CT.                                                        R. v. SEYMOUR

nificance. Accordingly, the high probative value of the evidence distinguished it from simple evidence of bad character, and the potential for prejudicial reasoning was low, as the criminality involved different and unrelated offences, and the trial was to be by a judge alone. The judge would not permit the accused to be cross-examined on irrelevant details concerning his criminal record (paras. 12–23).

(2) The computer-generated mobile telephone records were also admissible at common law, subject to the conditions set out in s.35 of the Evidence Law (1995 Revision). Section 23 did not provide for their admission, since business records could be admitted under that section only if they were produced by humans. However, by omitting to make equivalent provision to that already made under s.35 for civil cases, the legislature had not necessarily intended to prohibit the admission of computer-generated records in criminal cases. To do so would have required express words. It had simply chosen not to address the issue and to leave it to the common law of criminal evidence. In the absence of binding local authority on the subject, the court would normally look to the historic common law of England, as applicable by the Interpretation Law. However, English common law was heavily overlaid with statute and therefore unlikely to provide a clear statement of the law to be applied here in the absence of that legislation. Instead, the court would develop Cayman law by presuming that s.35 represented the law relating to civil cases and extending the same rules and safeguards to cover criminal proceedings. Additional conditions could be developed on a case-by-case basis if deemed appropriate, *e.g.* in view of the higher standard of proof applicable in criminal cases (paras. 28–31; paras. 33–34).

**Cases cited:**
(1) *M'Alister (or Donoghue) v. Stevenson*, [1932] A.C. 562; [1932] All E.R. Rep. 1; 1932 S.C. (H.L.) 31, referred to.
(2) *R. v. Shepherd*, [1993] A.C. 380; [1993] 1 All E.R. 225, distinguished.

**Legislation construed:**
Criminal Procedure Code (1995 Revision) (Law 13 of 1975, revised 1995), s.111:
"Subject to this Code and to any other law for the time being in force in the Islands, the practice of the Grand Court in the exercise of its criminal jurisdiction and the mode of conduct and procedure at trial of any person upon indictment shall be assimilated so far as circumstances admit to the practice of the courts of equivalent jurisdiction in England."

Evidence Law (1995 Revision) (Law 13 of 1978, revised 1995), s.23:
"In criminal proceedings where direct oral evidence of a fact would be admissible, a statement contained in a document tending

to establish that fact shall, on production of the document, be admissible as evidence of that fact if—

(a) the document is, or forms part of, a record relating to any trade or business and compiled, in the course of that trade or business, from information supplied (whether directly or indirectly) by persons who have, or may reasonably be supposed to have, personal knowledge of the matters dealt with in the information they supply. . . ."

s.35: "In any civil proceedings a statement contained in a document produced by a computer, is, subject to Rules of Court, admissible as evidence of any fact stated therein of which direct oral evidence would be admissible, if it is shown—

(a) that the document containing the statement was produced by the computer during a period over which the computer was used regularly to store and process information . . . ;

(b) that over that period there was regularly supplied to the computer in the ordinary course of those activities information of the kind contained in the statement or of the kind from which the information so contained is derived;

(c) that throughout the material part of that period the computer was operating properly . . . ;

(d) that the information contained in the statement reproduces or is derived from information supplied to the computer in the ordinary course of those activities."

Interpretation Law (1995 Revision) (Laws of the Cayman Islands, 1963, cap. 70, revised 1995), s.40:

"All such laws and statutes of England as were, prior to the commencement of 1 George II Cap. I, esteemed, introduced, used, accepted or received as laws in the Islands shall continue to be laws in the Islands save in so far as any such laws or statutes have been, or may be, repealed or amended by any law of the Islands."

A.A. Mon Desir, Crown Counsel, and S. Wilson, Crown Counsel, for the Crown;
C. Miskin, Q.C. and L. Aiolfi for the accused.

1 EDWARDS, Ag. J.: The defendant is charged with the murder of Franklyn Lake. The prosecution case is entirely circumstantial. The deceased was found shot dead in a bedroom of his home at 55 Spice Lane, Bodden Town, on April 14th, 2000. He was last seen alive in his home by family members at around 3 p.m. that day. The defendant was at the door of the deceased's home between 2 and 3 p.m., where he asked for and was given a glass of water. The defendant's finger print was taken from the glass. The occupants of the deceased's house other than the deceased all left at around 3 p.m. A possible gunshot was heard by neighbours around 3 p.m. The defendant was picked up on a nearby road. While in the car he made or received a cellular telephone call somewhere

between 3 and 4 p.m. The body was discovered around 4 p.m. that same day.

2 On January 2nd, 2003, the defendant filed an alibi notice stating that he "was not at 55 Spice Drive, Bodden Town at the time of the shooting of Franklyn Lake on Sunday, April 14th."

3 The Crown evidence of opportunity amounts to evidence that the defendant was in the vicinity of the deceased's home at about the time of the murder. There is no forensic evidence of a scientific nature which links the defendant to that room. A hair found on a towel on the bed in that room matched the defendant's hair under microscopic analysis, but DNA testing showed it was not his hair. Footprints and fingerprints unaccounted for at the scene also potentially point away from the defendant. The fact that he presented himself to a member of the defendant's family just before the murder is potentially exculpatory.

4 The theory of the Crown as to motive is that the defendant killed the deceased to prevent him from testifying against Sheldon Brown. The deceased was a jail guard who admitted to police that he had attempted to smuggle narcotics into the prison for Brown, a prisoner, and was scheduled to testify against Brown. The Crown theory is that because the defendant had served time in jail in Jamaica where Brown, a fellow inmate, had acted as his protector, the defendant owed Brown a favour and therefore killed the deceased to spare Brown from a conviction, on the deceased's evidence, for having narcotics smuggled into the jail by the deceased.

5 The Crown acknowledges that it does not have evidence to support a charge against Brown as a party to the murder, yet it is ultimately Brown's motive for the homicide which it seeks to attribute to the defendant. If the Crown had evidence to prove that Brown instructed the defendant to kill the deceased, logically, Brown would also be charged with the murder.

6 The alternative Crown theory is that although Brown did not ask or encourage the defendant to kill the deceased, the defendant, knowing Brown's peril of conviction based on the deceased's evidence, decided on his own to kill the deceased to help Brown. The evidence which the Crown seeks to introduce to prove motive is set out in the Crown's skeleton arguments as follows:

"(a) The deceased was a vital witness, and was to give evidence in the case of R. v. Sheldon Brown, where it was alleged that Brown was the mastermind behind a relatively large-scale distribution of illegal drugs (cocaine and ganja) in Northward Prison (see evidence of Det. Const. Gordon, Det. Const. Melvin Brown, court records, e.g. charges etc.).

THE CAYMAN ISLANDS LAW REPORTS                    2003 CILR

(b) Sheldon Brown was already serving a sentence in relation to the distribution of cocaine (three years) and would therefore have been at risk of a lengthy custodial sentence had he been convicted.

(c) The sentence that Brown was serving was imposed in relation to a charge to which Damean Seymour was a co-accused.

(d) Brown and Seymour fled the jurisdiction to Jamaica and were incarcerated in prison in Jamaica. They were escorted back by Det. Const. Gordon, who gives evidence as to Seymour's willingness to do "anything" for Sheldon Brown.

(e) There was a large amount of telephone traffic between Sheldon Brown and Damean Seymour on April 14th, 2002. The court can draw the inference (if indeed it is a matter of inference; the Crown would suggest that there is clear evidence linking telephone No. 9178520 to Brown) that Brown and Seymour were talking to each other extensively during that day."

7  The defence seeks to have the court rule inadmissible evidence in categories (c) and (d) on the basis that it is evidence of bad character, as it relates to the defendant's criminal record. The Crown seeks to lead this evidence as evidence going to the issue of identity; that is, to prove that the defendant, a person in the vicinity of the murder at the relevant time, had a reason to kill the deceased. That reason was to eliminate the deceased as a witness whose testimony could convict Sheldon Brown and result in Sheldon Brown's being sentenced to a lengthy prison term.

8  The evidence of the defendant's association in drug-related crime with Sheldon Brown is not what is often called "similar fact" evidence, namely, evidence that the defendant had committed other crimes so similar that it could be inferred he was the perpetrator of this murder; nor is it evidence of propensity; nor is it evidence of enmity of the defendant toward the deceased as reflected in earlier criminal activity directed at or threatened against the deceased. The purpose of the evidence of criminal association between the defendant and Sheldon Brown is to prove their close affinity. The criminal nature of their misdeeds together, while it may go to the depth of their affinity, is really incidental.

9  Conceptually, evidence of affinity going to motive could range from benevolent ties such as those of blood and kinship, to malevolent ties such as, in an extreme hypothetical case, being involved together in a series of murders strikingly similar to that which is the subject of the charge. For example, if the Crown sought to show the defendant and Brown were lovers who were so close that one had donated a life-saving kidney to the other, such evidence would permit an inference of close affinity, but could not be objected to as showing bad character. At the other extreme, if the defendant had committed a series of ritual Sunday

GRAND CT.                    R. v. SEYMOUR (Edwards, Ag. J.)

afternoon murders in the same area, because the defendant was in thrall to Brown, the leader of some pseudo-religious cult, there would similarly be no doubt as to the admissibility of such evidence, which would have elements of both affinity and similarity of the crime committed.

10  There is a second component of criminality to the evidence in issue here: It is the fact that Brown was in peril because he was under charge (categories (a) and (b) in the Crown's skeleton arguments quoted above). That is not evidence of the defendant's bad character, but it is relevant to the motive alleged by the Crown and is necessary background to understand that allegation.

11  The real issue is whether, when the Crown seeks to prove an affinity so close as to motivate the defendant to kill on behalf of his associate, it should be precluded from doing so because that affinity derives from criminal association.

12  Evidence of criminal association could be as probative of close affinity as evidence of benevolent association. The only reason evidence of criminal association, in contrast to benevolent friendship or kinship, might be excluded is on the basis that its prejudicial effect outweighs its probative value. The law is that the probative value of evidence of bad character must outweigh its prejudicial effect if it is to be admitted. Probative value is assessed on the basis of three criteria: cogency, strength of inference and the nature and degree of relevance.

13  As to "cogency," it would seem in this case that the evidence of the criminal association of the defendant and Brown is only the underlying support for the inference of the defendant and Brown is directly supported by the anticipated evidence of Det. Const. Clement Gordon. He will say that the defendant told him, after serving time in prison in Jamaica with Brown, that he could not have survived the incarceration without Brown and that he owed his life to Brown, who was his "godfather," for whom he would do anything.

14  The cogency of that direct evidence of affinity to prove motive of course turns on the credibility of Det. Const. Gordon. Phipson on Evidence, 15th ed., para. 17-30, at 378 (2000) suggests where that is the case the judge ruling on admissibility should "take the evidence to be 100% cogent," leaving credibility to be assessed by the finder of fact after hearing the witness.

15  The evidence of the criminal association of the defendant and Brown, that is, their joint charge, flight to Jamaica, incarceration there, etc., which underlies the statements made to Det. Const. Gordon, merely serves potentially to corroborate them by setting out the background against which the statements were made. In my view, this evidence of criminal association must also be regarded as cogent.

16  As to the "strength of the inference" criterion, it seems to refer to an analysis of the similarity of so-called "similar fact evidence," which has no application here. Here the line of inferential reasoning must be that there is evidence of an affinity so close as to motivate the defendant to kill on behalf of Brown. According to *Phipson* (*op. cit.*, para. 17-38, at 384), high probative value may be based on "commonsense speculation about probabilities." That being so, it is open to infer that the defendant, if he had a close affinity to Brown, a person who stood to benefit from the deceased's death, was more probably motivated to kill the deceased than someone who had no relationship with or affinity to Brown.

17  Criminals acting together must share potentially incriminating confidences. They need to trust and rely on one another to avoid the consequences of their criminality. The notoriety or probability that criminal association can give rise to close affinity is reflected in the fact that the colloquial expression "as thick as (two) thieves," meaning "close in confidence and association: intimate, familiar" has been part of the vernacular since 1756, according to the *Oxford English Dictionary*.

18  The degree of probability that affinity could supply a motive to kill depends on the cogency of the evidence of affinity, which in turn depends on credibility, to be assessed after hearing the evidence. Here, the evidence of criminal association merely underlies the direct evidence of affinity in statements by the accused to Det. Const. Gordon. The former could be highly probative, depending on the credibility of Det. Const. Gordon's evidence and the weight ultimately assigned to it.

19  As to the criterion of "nature and degree of relevance," the evidence of affinity arising from criminal association goes to prove motive and the key issue of identity, and not to rebut some fanciful defence unlikely to be advanced.

20  In short, the evidence of bad character goes to the key issue of identity. In deciding what probative value it has on that issue, I must consider all the other evidence in the case. In this case that is the evidence of opportunity outlined above which puts the defendant in the vicinity of the murder at the relevant time.

21  Defence counsel characterized the evidence of bad character as merely putting a "bad boy" in the vicinity of the murder at the relevant time. With respect, that over-simplifies the effect of the evidence of criminal association the Crown seeks to introduce. If it were merely evidence that the defendant had convictions for drug-related offences with Brown, it would amount to nothing but evidence of bad character and have no probative value. But the evidence in question seeks to establish a link, through a permissible chain of reasoning, between the defendant and the murder. If the defendant knew Brown, who would

GRAND CT.    R. v. SEYMOUR (Edwards, Ag. J.)

benefit from the murder, then evidence of the origin and degree of the affinity arising from the defendant's criminal association with Brown is probative. It is relevant to the weight to be given to evidence going to motive as a basis for proving the identity of the defendant as the perpetrator.

22  As to prejudicial effect, in my view it is low. The impermissible line of reasoning, that because the defendant committed other different and unrelated offences he is more likely to have committed the murder, does not present the risk here that it would in a more typical case in which the Crown, say, was seeking to introduce evidence that the defendant had committed similar murders or other offences against the deceased, reflecting enmity against the deceased. The defence's acceptance of a judge-alone trial suggests a degree of confidence that the court will not convict the defendant on the basis he is a "bad person" who should be off the streets, as a jury might. I have already indicated that should the defendant testify, I would not permit cross-examination on the irrelevant details of his criminal past, aimed at undermining his credibility, and the Crown has indicated no intention to pursue such a line.

23  I find that evidence of the defendant's criminal association with Sheldon Brown and of Brown's pending charge set out in categories (a) to (d) quoted in para. 6 above is admissible.

24  In order to prove the telephone traffic between the defendant and Brown, referred to category (e) quoted at para. 6 above, the Crown seeks to introduce computer-generated records of cellular telephone traffic which is the basis for expert opinion evidence setting out the times at which the calls were made, the locale of the calls and the identity of the telephones involved. The defence seeks to have the computer-generated records excluded on the basis there is no basis for their admission in Cayman law.

25  The Crown relies on s.23 of the Evidence Law, s.111 of the Criminal Procedure Code and s.40 of the Interpretation Law, as the bases for its submission that the current common law of England is the law of the Cayman Islands. According to the Crown submission, that law is as stated in *R. v. Shepherd* (2) ([1993] A.C. at 386–387).

26  The defence submission is that with the simultaneous enactment, in the Evidence Law, 1978, of s.23 relating to admissibility of "certain records in criminal cases" [marginal note] and s.35 relating to admissibility of documents "produced by a computer" in civil cases, the Cayman legislature must be taken, by the omission of any provision parallel to s.35 for criminal cases, to have implicitly prohibited the admission of computer-generated records in criminal cases, by failing to make provision for it. Further, the defence submits it would be "an absurdity" to

THE CAYMAN ISLANDS LAW REPORTS        2003 CILR

conclude that the legislature intended to impose the reliability and authenticity safeguards in s.35 regarding the admission of such records in civil cases while imposing none in criminal cases.

27  As I understand the Crown's response to this submission, it is that the Grand Court Rules provided for admission of certain types of records and documents in civil cases at the time of the enactment of s.35, so it can be taken to be an amendment to those Rules, whereas the legislature was content to leave the common law in place as regards the admission of computer-generated records in criminal cases as part of the wider class of business records embraced by s.23.

28  Section 23 cannot, on my reading of it, encompass automatically generated records from a computer of the type in issue in this case. Section 23 is limited to "a record … compiled … by persons," not machines. Section 35 by contrast, specifically deals with "a document produced by a computer," whether the information reflected in the document is supplied to the computer "with or without human intervention" and whether the document itself is produced by the computer with or without such human intervention. If, as I find, s.23 does not address the admissibility of computer-generated records in criminal cases, then it must be assumed that the legislature chose not to address the issue at all in 1978.

29  I am not, however, persuaded that the legislature omitted reference to admissibility of such records because it regarded their admission as a prospect too horrible to contemplate, which it intended to prohibit by failing to enact any provision. That would be just as absurd, in my view, as providing safeguards with regard to admission in civil cases but none in criminal cases. Rather, I find that the legislative omission of any provision regarding admissibility of computer-generated records in criminal cases does not imply that the legislature intended to prohibit such admission under any circumstances. Such a sweeping prohibition surely would require an express legislative expression of intent. I conclude that the legislature was content to allow the common law of criminal evidence, as developed by the courts, to impose any necessary safeguards regarding the admissibility of such evidence.

30  What, then, is the Cayman common law on the admissibility of computer-generated records in criminal cases today? The starting point must be the general adoption of English law, as reflected by s.40 of the Interpretation Law. There are no Cayman precedents nor any Privy Council authority on the point which counsel have been able to find. Assuming that there is no binding authority in Cayman law, then applying the tried and true adage that in the common law nothing ever happens for the first time, the court must reason by analogy from principles reflected in binding precedents, or look to non-binding decisions from around the

GRAND CT.        R. v. SEYMOUR (Edwards, Ag. J.)

common law world to find persuasive statements of the law. The importation of Lord Atkin's famous "neighbour principle" from the celebrated case of M'Alister (or Donoghue) v. Stevenson (1) (despite the fact it was a Scots law, not a common law case) into the law of torts of virtually every common law jurisdiction around the world, is an illustration of this process.

31  In the short time available, counsel have not had time to canvass the common law world to assist with persuasive statements of the common law position on the admission of computer-generated records in criminal cases. That being so, I accept the Crown's submission that Cayman practice, in the light of the Cayman Islands' status as a dependent territory, is to look to the common law of England.

32  Both Crown and defence counsel referred to the same passages in R. v. Shepherd (2) noted above, albeit that defence counsel added a caution that this court should be slow to adopt as Cayman common law that which has been extensively modified by statute in England.

33  I decline to adopt, as Cayman law, English common law which, since it has an overlay of UK legislation, is unlikely to be clearly stated without that overlay in any judicial decision. Rather, I think it fair to presume that s.35 of the Evidence Law, as re-enacted in the 1995 Revision, represents the Cayman legislature's current view of what local circumstances require in respect of the admission of computer-generated records in civil cases.

34  Taking the usual incremental approach to the development of the common law, I find that computer-generated records may be admitted in a criminal case where, at minimum, the provisions of s.35 are met. It may be that additional safeguards as to reliability and authenticity are appropriate in the light of special considerations arising in a criminal case. Any such safeguards may be developed on a case-by-case basis, including in this case. In short, I find that computer-generated records are admissible, subject to the requirements of s.35. I am open to submissions that more rigorous requirements are appropriate because of the different burden of proof in a criminal case.

35  I find that, subject to what I have said in para. 34, evidence in all categories quoted in para. 6 is admissible.

*Order accordingly.*

Attorneys: *Government Legal Dept.; Walkers* for the accused.

NOTES

**Sub-s (2): Passing of this Act** This Act was passed, ie received royal assent, on 15 June 1945.

**Maritime Conventions Act 1911, s 1** Repealed by the Merchant Shipping Act 1995, s 314(1), Sch 12; see now s 187 of that Act, Vol 39, title Shipping and Navigation.

### 4 Interpretation

The following expressions have the meanings hereby respectively assigned to them, that is to say—

"court" means, in relation to any claim, the court or arbitrator by or before whom the claim falls to be determined;

"damage" includes loss of life and personal injury;

"fault" means negligence, breach of statutory duty or other act or omission which gives rise to a liability in tort or would, apart from this Act, give rise to the defence of contributory negligence;

NOTES

**Amendments**

Words omitted repealed by the National Insurance (Industrial Injuries) Act 1946, s 89(1), Sch 9, and by the Fatal Accidents Act 1976, s 6(2), Sch 2.

**Cases relating to this section**

*Basildon District Council v J E Lesser (Properties) Ltd* [1985] QB 839, [1985] 1 All ER 20

*Quinn v Burch Bros (Builders) Ltd* [1966] 2 All ER 283, [1966] 2 WLR 1017, CA

*Reeves v Metropolitan Police Comr* [2000] 1 AC 360, [1999] 3 All ER 897, HL

*Standard Chartered Bank v Pakistan National Shipping Corp (No 4)* [2001] QB 167, [2000] 3 WLR 1692, CA

### 5 *(Applies to Scotland only.)*

### 6 Provisions as to Northern Ireland

(1) . . .

(2) This Act, . . . shall not extend to Northern Ireland.

NOTES

**Amendments**

Sub-s (1): repealed by the Carriage by Air Act 1961, s 14(3), Sch 2.

Sub-s (2): words omitted repealed by the Carriage by Air Act 1961, s 14(3), Sch 2.

### 7 Short title and extent

This Act may be cited as the Law Reform (Contributory Negligence) Act 1945.

# OCCUPIERS' LIABILITY ACT 1957

(5 & 6 Eliz 2 c 31)

## ARRANGEMENT OF SECTIONS

*Liability in tort*

| Section | | Page |
| --- | --- | --- |
| 1 | Preliminary | 573 |
| 2 | Extent of occupier's ordinary duty | 575 |
| 3 | Effect of contract on occupier's liability to third party | 576 |

*Liability in contract*

| 5 | Implied term in contracts | 577 |
| --- | --- | --- |

*General*

| 6 | Application to Crown | 577 |
| --- | --- | --- |
| 7 | Powers of Parliament of Northern Ireland | 578 |
| 8 | Short title etc | 578 |

An Act to amend the law of England and Wales as to the liability of occupiers and others for injury or damage resulting to persons or goods lawfully on any land or other property from dangers due to the state of the property or to things done or omitted to be done there, to make provision as to the operation in relation to the Crown of laws made by the Parliament of Northern Ireland for similar purposes or otherwise amending the law of tort, and for purposes connected therewith [6 June 1957]

**Northern Ireland** Except for s 7 post, this Act does not apply; see s 8(2) post.

*Liability in tort*

### 1 Preliminary

(1) The rules enacted by the two next following sections shall have effect, in place of the rules of the common law, to regulate the duty which an occupier of premises owes to his visitors in respect of dangers due to the state of the premises or to things done or omitted to be done on them.

(2) The rules so enacted shall regulate the nature of the duty imposed by law in consequence of a person's occupation or control of premises and of any invitation or permission he gives (or is to be treated as giving) to another to enter or use the premises, but they shall not alter the rules of the common law as to the persons on whom a duty is so imposed or to whom it is owed, and accordingly for the purpose of the rules so enacted the persons who are to be treated as an occupier and as his visitors are the same (subject to subsection (4) of this section) as the persons who would at common law be treated as an occupier and as his invitees or licensees.

(3) The rules so enacted in relation to an occupier of premises and his visitors shall also apply, in like manner and to the like extent as the principles applicable at common law to an occupier of premises and his invitees or licensees would apply, to regulate—

(a) the obligations of a person occupying or having control over any fixed or movable structure, including any vessel, vehicle or aircraft; and

(b) the obligations of a person occupying or having control over any premises or structure in respect of damage to property, including the property of persons who are not themselves his visitors.

(4) A person entering any premises in exercise of rights conferred by virtue of an access agreement or order under the National Parks and Access to the Countryside Act 1949, is not, for the purposes of this Act, a visitor of the occupier of those premises.

## NOTES

### Prospective amendments

Sub-s (4): substituted by the Countryside and Rights of Way Act 2000, s 13(1), as from a day to be appointed under s 103(3) of that Act, Vol 32, title Open Spaces and National Heritage (Pt 1), as follows:

"(4) A person entering any premises in exercise of rights conferred by virtue of—

(a) section 2(1) of the Countryside and Rights of Way Act 2000, or

(b) an access agreement or order under the National Parks and Access to the Countryside Act 1949,

is not, for the purposes of this Act, a visitor of the occupier of the premises.".

**General Note** The common law recognised that the occupier of premises owed a certain duty of care with regard to the safety of the premises to persons entering them, lawfully though not under a contract entitling them to use the premises for some purpose. The standard of care required towards such visitors depended upon the category into which the visitor fell; persons entering by the occupier's "invitation" or "permission", express or implied, were divided into the two corresponding categories of "invitees" and "licensees"; see especially, *Indermaur v Dames* (1866) LR 1 CP 274, at 288; affd (1867) LR 2 CP 311, [1861–73] All ER Rep 15, per Willis J, Broadly speaking the occupier had a greater interest in the purpose for which the visitor came, the inter duty of the occupier to the invitee was usually stated as the duty to use reasonable care to prevent injury from unusual dangers of which the occupier knew or ought to have known, and his duty to the licensee was usually said to be to warn him of concealed dangers or traps known to the occupier. The above-mentioned rules applied only where the plaintiff was injured because of the condition of the premises themselves. The ordinary rules of negligence applied to actions against an occupier of premises where a visitor was injured as a result of operations or activities carried on in the premises: see *Slater v Clay Cross Co Ltd* [1956] 2 QB 264, [1956] 2 All ER 625, and *A C Billings & Sons Ltd v Riden* [1958] AC 240, [1957] 3 All ER 1, HL.

This section substitutes for the rules of the common law the rule enacted by s 2, 3 post, which regulate the duty which an occupier of premises owes to his visitors in respect of dangers due to the state of the premises or to things done or omitted to be done on them (sub-s (1) above). The main effect of the substitution of the new rule was to abolish the distinction between the duty owed by the occupier to the invitee and that owed to the licensee, and to assimilate the duty owed in such circumstances to the occupier's liability in land without the consent of the owner but with lawful authority. For the occupier's liability in such circumstances, see the Occupiers' Liability Act 1984, s 1 post.

**Sub-s (2): Persons who would . . . be treated as . . . invitees or licensees** As to persons who are or to be treated as invitees or licensees and the distinction between the two categories, whom the duty of care is owed, and, accordingly, for purposes of the new rules the expression "visitors" includes only those categories who would at common law be treated as invitees or licensees (sub-s (2) above).

The duty which an occupier of premises owes to persons other than his visitors is governed by the Occupiers' Liability Act 1984, s 1 post.

**Sub-s (3): Having control over any fixed or moveable structure, etc** As to who are occupiers and visitors, see 33 Halsbury's Laws (4th edn reissue) para 629, notes 2 and 6.

**Sub-s (1): Occupiers, visitors** As to who are occupiers and visitor, see Vol 32, title Open Spaces and National Heritage (Pt 1). As to access agreements and orders under that Act, see ss 64, 65 thereof, and for the right of the public where such an agreement or order is in force, and the effect of such agreements or orders on the rights and liabilities of owners, see ss 60, 66 thereof, respectively.

**Cases relating to this section**

*Billings (A C) & Sons Ltd v Riden* [1958] AC 240, [1957] 3 All ER 1, HL.

*Dunster v Abbot* [1953] 2 All ER 1572, [1954] 1 WLR 58

*Holden v White* [1982] QB 679, [1982] 2 All ER 328, CA

*National Parks and Access to the Countryside Act 1949*

*Slade v Battersea and Putney Group Hospital Management Committee* [1955] 1 All ER 429, [1955] 1 WLR 207

*Slater v Clay Cross Co Ltd* [1956] 2 QB 264, [1956] 2 All ER 625

*Wheat v Lacon & Co Ltd* [1966] AC 552, [1966] 1 All ER 582, HL.

---

## 2 Extent of occupier's ordinary duty

(1) An occupier of premises owes the same duty, the "common duty of care", to all his visitors, except in so far as he is free to and does extend, restrict, modify or exclude his duty to any visitor or visitors by agreement or otherwise.

(2) The common duty of care is a duty to take such care as in all the circumstances of the case is reasonable to see that the visitor will be reasonably safe in using the premises for the purposes for which he is invited or permitted by the occupier to be there.

(3) The circumstances relevant for the present purpose include the degree of care, and of want of care, which would ordinarily be looked for in such a visitor, so that (for example) in proper cases—

(a) an occupier must be prepared for children to be less careful than adults; and

(b) an occupier may expect that a person, in the exercise of his calling, will appreciate and guard against any special risks ordinarily incident to it, so far as the occupier leaves him free to do so.

(4) In determining whether the occupier of premises has discharged the common duty of care to a visitor, regard is to be had to all the circumstances, so that (for example)—

(a) where damage is caused to a visitor by a danger of which he had been warned by the occupier, the warning is not to be treated without more as absolving the occupier from liability, unless in all the circumstances it was enough to enable the visitor to be reasonably safe; and

(b) where damage is caused to a visitor by a danger due to the faulty execution of any work of construction, maintenance or repair by an independent contractor employed by the occupier, the occupier is not to be treated without more as answerable for the danger if in all the circumstances he had acted reasonably in entrusting the work to an independent contractor and had taken such steps (if any) as he reasonably ought in order to satisfy himself that the contractor was competent and that the work had been properly done.

(5) The common duty of care does not impose on an occupier any obligation to a visitor in respect of risks willingly accepted as his by the visitor (the question whether a risk was so accepted to be decided on the same principles as in other cases in which one person owes a duty of care to another).

(6) For the purposes of this section, persons who enter premises for any purpose in the exercise of a right conferred by law are to be treated as permitted by the occupier to be there for that purpose, whether they in fact have his permission or not.

## NOTES

**Sub-s (1): Occupier, visitors** As to the persons who are to be treated as an occupier and his visitors, see s 1(2) ante. Any person who owes in relation to premises the duty referred to in this section and those who are his visitors for the purposes of that duty are the persons who are to be treated respectively as an occupier and as his visitors for the purposes of the Occupiers' Liability Act 1984, s 1; see sub-s (2) thereof post. With regard to damage to property, see s 1(3)(b) ante.

**Sub-s (1): Except in so far as he is free to and does extend, restrict . . . by agreement or otherwise** The freedom of an occupier to exclude or restrict this common duty of care is severely curtailed by the Unfair Contract Terms Act 1977, Vol 11, title Contract. By ss 1(3), 2 of that Act, the occupier is prohibited in the cases there stated from excluding or restricting his liability for death or personal injury resulting from negligence where such liability arises in the course of business, or from the occupation of premises used for business purposes of the occupier. See also 33 Halsbury's Laws (4th edn reissue) para 674.

For a case in which the duty of care cannot be restricted or excluded, see s 3(1) post.

576   *Vol 31 Negligence*

**Sub-s (2): Duty to take such care as . . . is reasonable**   As to the standard of care, see 33 Halsbury's Law (4th edn reissue) para 653 and the cases noted thereto.

**Sub-s (4): Risks willingly accepted**   This subsection preserves the common law rules concerning the application of the maxim *volenti non fit injuria*; see 33 Halsbury's Law (4th edn reissue) paras 669–672.

**Cases relating to this section**

*AMF International Ltd v Magnet Bowling Ltd* [1968] 2 All ER 789, [1968] 1 WLR 1028 (sub-s (4)(b))
*Ashdown v Samuel Williams & Sons Ltd* [1957] 1 QB 409, [1957] 1 All ER 35, CA (sub-s (1))
*Bishop v JS Starnes & Sons Ltd* [1971] 1 Lloyd's Rep 162 (sub-s (4)(a))
*Cook v Broderip* (1968) 206 Estates Gazette 128, 112 Sol Jo 193 (sub-s (4)(b))
*Coupland v Eagle Bros Ltd* (1969) 210 Estates Gazette 581 (sub-s (4))
*Cullen v McFie & Sons Ltd* [1939] 3 All ER 613 (sub-s (3)(b))
*Eden v West & Co* (27 June 2002, unreported), CA (sub-s (3))
*Ferguson v Welsh* [1987] 3 All ER 777, [1987] 1 WLR 1553, HL (sub-s (2))
*Greenhalgh v British Railways Board* [1969] 2 QB 286, [1969] 2 All ER 114, CA (sub-s (6))
*Guilliani v West Hertfordshire Hospital NHS Trust* [2002] EWCA Civ 1041, [2003] QB 443, [2003] 3 WLR 1425
*Haseldine v Daw & Son Ltd* [1941] 2 KB 343, [1941] 3 All ER 156, CA (sub-s (4)(b))
*Laverton v Kiapasha (t/a Takeaway Supreme)* [2002] EWCA Civ 1656
*London Graving Dock Co Ltd v Horton* [1951] AC 737, [1951] 2 All ER 1, HL (sub-s (4))
*McGowan v Northern Ireland Housing Executive* [1995] 1 AC 233, [1994] 3 All ER 53, HL
*Parker v South Eastern Ry Co* (1877) 2 CPD 416, [1874–80] All ER Rep 166 (sub-s (3))
*Roles v Nathan, Roles v Carney* [1963] 2 All ER 908, [1963] 1 WLR 1264 (sub-s (3)(b))
*Salmon v Seafarer Restaurants Ltd* [1983] 3 All ER 729, [1983] 1 WLR 1264 (sub-ss (2), (3)(b))
*Simms v Leigh Rugby Football Club Ltd* [1969] 2 All ER 923 (sub-s (5))
*Titchener v British Railways Board* [1983] 3 All ER 770, [1983] 1 WLR 1427, HL (sub-ss (2), (5))
*White v Blackmore* [1972] 2 QB 651, [1972] 3 All ER 158, CA (sub-s (1))
*Yachuk v Oliver Blais Co Ltd* [1949] AC 386, [1949] 2 All ER 150, PC (sub-s (3)(a))

## 3 Effect of contract on occupier's liability to third party

(1) Where an occupier of premises is bound by contract to permit persons who are strangers to the contract to use or use the premises, the duty of care which he owes to them as his visitors cannot be restricted or excluded by that contract, but (subject to any provision of the contract to the contrary) shall include the duty to perform his obligations under the contract, whether undertaken for their protection or not, in so far as those obligations go beyond the obligations otherwise involved in that duty.

(2) A contract shall not by virtue of this section have the effect, unless it expressly so provides, of making an occupier who has taken all reasonable care answerable to strangers to the contract for dangers due to the faulty execution of any work of construction, maintenance or repair or other like operation by persons other than himself, his servants and persons acting under his direction and control.

(3) In this section "stranger to the contract" means a person not for the time being entitled to the benefit of the contract as a party to it or as the successor by assignment or otherwise of a party to it, and accordingly includes a party to the contract who has ceased to be so entitled.

(4) Where by the terms or conditions governing any tenancy (including a statutory tenancy which does not in law amount to a tenancy) either the landlord or the tenant is bound, though not by contract, to permit persons to enter or use premises of which he is the occupier, this section shall apply as if the tenancy were a contract between the landlord and the tenant.

(5) This section, in so far as it prevents the common duty of care from being restricted or excluded, applies to contracts entered into and tenancies created before the commencement of this Act, as well as to those entered into or created after its commencement; but, in so far as it enlarges the duty owed by an

*Occupiers' Liability Act 1957 s 6*   577

occupier beyond the common duty of care, it shall have effect only in relation to obligations which are undertaken after that commencement or which are renewed by agreement (whether express or implied) after that commencement.

**NOTES**

**Sub-s (1): Occupier, visitors**   As to the persons who are to be treated as an occupier and his visitors, see s 1(2) ante. With regard to property, see s 1(3)(b) ante.

**Sub-s (1): Premises**   As to fixed and moveable structures, see s 1(3)(a) ante.

**Sub-s (1): Duty of care which he owes to them as his visitors**   The duty of care which an occupier owes to persons whom he is bound by contract (or under the terms of a tenancy) to permit to enter, but who are strangers to the contract, is (subject to the provisions of this section) the common duty of care, as defined by s 2(2) ante; see s 2(1) ante.

**Sub-s (3): Common duty of care**   See s 2(2)–(5) ante.

**Sub-s (5): Commencement of this Act**   This Act came into force on 1 January 1958; see s 8(3) post.

## 4 *(Repealed by the Defective Premises Act 1972, s 6(4).)*

*Liability in contract*

## 5 Implied term in contracts

(1) Where persons enter or use, or bring or send goods to, any premises in exercise of a right conferred by contract with a person occupying or having control of the premises, the duty they owe them in respect of dangers due to the state of the premises or to things done or omitted to be done on them, in so far as the duty depends on a term to be implied in the contract by reason of its conferring that right, shall be the common duty of care.

(2) The foregoing subsection shall apply to fixed and moveable structures as it applies to premises.

(3) This section does not affect the obligations imposed on a person by or by virtue of any contract for the hire of, or for the carriage for reward of persons or goods in, any vehicle, vessel, aircraft or other means of transport, or by or by virtue of any contract of bailment.

(4) This section does not apply to contracts entered into before the commencement of this Act.

**NOTES**

**Sub-s (1): Duty he owes . . . shall be the common duty of care**   This section provides that in all cases where the contract is silent on this question the duty implied shall be the common duty of care.

**Sub-s (4): Commencement of this Act**   This Act came into force on 1 January 1958; see s 8(3) post.

**Cases relating to this section**

*Francis v Cockrell* (1870) LR 5 QB 501, 18 B & S 950 (sub-s (1))
*Gillmore v LCC* [1938] 4 All ER 331, 37 LGR 40 (sub-s (1))
*Sole v WJ Hallt Ltd* [1973] QB 574, [1973] 1 All ER 1032 (sub-s (1))

*General*

## 6 Application to Crown

This Act shall bind the Crown, but as regards the Crown's liability in tort shall not bind the Crown further than the Crown is made liable in tort by the Crown Proceedings Act 1947, and that Act and in particular section two of it shall apply in relation to duties under sections two to four of this Act as statutory duties.

**NOTES**

**Shall bind the Crown.** The Crown already owes the same duties to visitors as any other occupier by virtue of the Crown Proceedings Act 1947, s 2(1)(c), Vol 13, title Crown Proceedings, which provides that the Crown shall be subject to all those liabilities in tort to which, if it were a person of full age and capacity, it would be subject in respect of any breach of the duties attaching at common law to the ownership, occupation, possession or control of property. See, generally, as to the application of statutes to the Crown, 8(2) Halsbury's Laws (4th edn reissue) para 384.

**Shall apply in relation to duties under sections two to four ... as statutory duties.** It is provided by the Crown Proceedings Act 1947, s 2(2), Vol 13, title Crown Proceedings, that where the Crown is bound by a statutory duty which is binding also upon persons other than the Crown and its officers, the Crown shall, in respect of a failure to comply with that duty, be subject to all those liabilities in tort (if any) to which it would be so subject if it were a private person of full age and capacity.

**Crown Proceedings Act 1947.** See Vol 13, title Crown Proceedings.

## 7 Powers of Parliament of Northern Ireland

The limitation imposed by paragraph (1) of section four of the Government of Ireland Act 1920, precluding the Parliament of Northern Ireland from making laws in respect of the Crown or property of the Crown (including foreshore vested in the Crown) shall not extend to prevent that Parliament from amending the law of tort, or enacting provisions similar to section five of this Act, so as to bind the Crown in common with private persons; but as regards the Crown's liability in tort, no such amendments shall bind the Crown further than the Crown Proceedings Act 1947, s 53 See Vol 13, title Crown Proceedings.

**NOTES**

**Parliament of Northern Ireland.** As to the construction of references to the Parliament of Northern Ireland (abolished), see the Northern Ireland Act 1998, s 95(5), Sch 12, paras 2, 6, title Northern Ireland (Pt 2) post.

**Shall bind the Crown.** See the note to s 6 ante.

**Government of Ireland Act 1920, s 4** Repealed by the Northern Ireland Constitution Act 1973, s 41(1), Sch 6, Pt I.

**Crown Proceedings Act 1947, s 53** See Vol 13, title Crown Proceedings.

## 8 Short title etc

(1) This Act may be cited as the Occupiers' Liability Act 1957.

(2) This Act shall not extend to Scotland, nor to Northern Ireland except in so far as it extends the powers of the Parliament of Northern Ireland.

(3) This Act shall come into force on the first day of January, nineteen hundred and fifty-eight.

**NOTES**

**Sub-s (2):** Extends the powers of the Parliament of Northern Ireland    See s 7 ante.

---

# LAW REFORM (MISCELLANEOUS PROVISIONS) ACT 1971

(1971 c 43)

An Act to extend in certain cases the time limit for bringing legal proceedings where damages are claimed which consist of or include damages for personal injuries or in respect of a person's death, and to amend accordingly the Limitation Act 1963; to provide that in assessing damages for widows in actions arising from the death of their husbands, remarriage and prospects of remarriage shall be left out of account; to repeal section 19 of the Administration of Justice Act 1965; and for purposes connected therewith

[1 July 1971]

### PART III
### GENERAL

**1–5** (Ss 1–3 repealed by the Limitation Act 1975, s 4(5), Sch 2, ss 4, 5(1), (2) repealed (with a saving in respect of s 5(2)) by the Fatal Accidents Act 1976, s 6(2), Sch 2 post; s 5(3) repealed by the Northern Ireland Constitution Act 1973, s 41(1), Sch 6, Pt I.)

## 6 Short title, commencement and extent

(1) This Act may be cited as the Law Reform (Miscellaneous Provisions) Act 1971.

(2) This Act shall come into operation at the expiration of the period of one month beginning with the date on which it is passed.

(3) ... this Act does not extend to Northern Ireland.

**NOTES**

**Amendments**

**Sub-s (3):** words omitted repealed by the Northern Ireland Constitution Act 1973, s 41(1), Sch 6, Pt I.

**Sub-s (2): One month beginning with, etc** "Months" means calendar months; see the Interpretation Act 1978, s 5, Sch 1, Vol 41, title Statutes. In calculating this period the day (ie 1 July 1971) on which this Act received royal assent is reckoned; see Hare v Gocher [1962] 2 QB 641, [1962] 2 All ER 763, and Trow v Ind Coope (West Midlands) Ltd [1967] 2 QB 899 at 909, [1967] 2 All ER 900, CA. Accordingly this Act came into force on 1 August 1971.

**Northern Ireland.** This Act does not apply; see s 6(3) post.

---

# DEFECTIVE PREMISES ACT 1972

(1972 c 35)

## ARRANGEMENT OF SECTIONS

| Section | | Page |
| --- | --- | --- |
| 1 | Duty to build dwellings properly | 580 |
| 2 | Cases excluded from the remedy under section 1 | 581 |
| 3 | Duty of care with respect to work done on premises not abated by disposal of premises | 583 |
| 4 | Landlord's duty of care in virtue of obligation or right to repair premises demised | 583 |

SCHEDULES 1, 2

*Repealed by the Limitation Act 1975, s 4(5), Sch 2*

Section 6

## CONSEQUENTIAL AMENDMENTS

## SCHEDULES

### SCHEDULE 1

#### General

1.—(1) Any enactment or other document whatsoever referring to any enactment repealed by this Act shall, unless the contrary intention appears, be construed as referring (or as including a reference) to the corresponding enactment in this Act.

(2) This paragraph applies whether or not the enactment or other document was enacted, made, served or issued before the passing of this Act.

(3) This paragraph is without prejudice to section 38 of the Interpretation Act 1889 (effect of repeals), and the following provisions of this Schedule are without prejudice to the generality of this paragraph.

2.—(1) In the following enactments references to the Fatal Accidents Acts, or to the Fatal Accidents Act 1846, or to section 1 of that Act, include references to this Act.

(2) The said enactments are—

section 1(5) of the Law Reform (Miscellaneous Provisions) Act 1934 (cause of action surviving death),

section 3 of the Carriage by Air Act 1961 (civil liability under Convention implemented by that Act),

section 14(2) of the Gas Act 1965 (civil liability under that Act),

section 10 of the Animals Act 1971 (civil liability under that Act),

section 11(2) of the Mineral Workings (Offshore Installations) Act 1971 (civil liability under that Act),

section 88(4)(a) of the Control of Pollution Act 1974 (civil liability under that Act),

section 6(1)(d) of the Industrial Injuries and Diseases (Old Cases) Act 1975,

3, 4 . . . . . .

### NOTES

**Amendments**
Para 2(2): words omitted in the first place repealed by the Coal Mining Subsidence Act 1991, s 53(2), Sch 8; words omitted in the second place repealed by the Administration of Justice Act 1982, s 75, Sch 9, Pt I; words omitted in the third place repealed by the Petroleum Act 1998, s 51(1), Sch 5, Pt I.
Para 3: repealed by the Limitation Act 1980, s 40(3), Sch 4.
Para 4: repealed by the International Transport Conventions Act 1983, s 11(2), Sch 3.

**Animals Act 1971, s 10**    See Vol 2, title Animals.
**Carriage by Air Act 1961, s 3**    See Vol 4, title Aviation.
**Control of Pollution Act 1974, s 88(4)(a)**    See Vol 35, title Public Health and Environmental Protection.
**Fatal Accidents Act 1846**    Repealed by s 6(2) ante and Sch 2 post.
**Gas Act 1965, s 14(2)**    See Vol 19, title Gas.
**Industrial Injuries and Diseases (Old Cases) Act 1975, s 6(1)(d)**    Repealed by the Social Security (Consequential Provisions) Act 1992, s 3, Sch 1.
**Interpretation Act 1889, s 38**    Repealed by the Interpretation Act 1978, s 25(1), Sch 3, and replaced by s 16(1), 17(2)(a) of, and Sch 2, para 3 to, that Act, Vol 41, title Statutes.
**Law Reform (Miscellaneous Provisions) Act 1934, s 1(5)**    See Vol 17, title Executors and Administrators.
**Mineral Workings (Offshore Installations) Act 1971, s 11(2)**    See Vol 29, title Mines, Minerals and Quarries.

### SCHEDULE 2

#### REPEALS

Section 6

| Chapter | Short Title | Extent of Repeal |
| --- | --- | --- |
| 9 & 10 Vict c 93 | Fatal Accidents Act 1846 | The whole Act. |
| 27 & 28 Vict c 95 | Fatal Accidents Act 1864 | The whole Act. |
| 24 & 25 Geo 5 c 41 | Law Reform (Miscellaneous Provisions) Act 1934 | Section 2. |
| 8 & 9 Geo 6 c 28 | Law Reform (Contributory Negligence) Act 1945 | In section 1(4), the definition of "dependant". |
| 7 & 8 Eliz 2 c 65 | Fatal Accidents Act 1959 | The whole of section 1 except for subsection (4). Section 2. |
| 1971 c 43 | Law Reform (Miscellaneous Provisions) Act 1971 | Part II, but not so as to affect a right to make an application under section 5(2). |
| 1973 c 38 | Social Security Act 1973 | In Schedule 27 paragraph 20. |
| 1975 c 54 | Limitation Act 1975 | In Schedule 1 paragraph 1. |

**Northern Ireland**    This Act does not apply; see s 4(3) post.

## OCCUPIERS' LIABILITY ACT 1984

### (1984 c 3)

*An Act to amend the law of England and Wales as to the liability of persons as occupiers of premises for injury suffered by persons other than their visitors; and to amend the Unfair Contract Terms Act 1977, as it applies to England and Wales, in relation to persons obtaining access to premises for recreational or educational purposes*

[13 March 1984]

### 1 Duty of occupier to persons other than his visitors

(1) The rules enacted by this section shall have effect, in place of the rules of the common law, to determine—

(a) whether any duty is owed by a person as occupier of premises to persons other than his visitors in respect of any risk of their suffering injury on the premises by reason of any danger due to the state of the premises or to things done or omitted to be done on them; and

(b) if so, what that duty is.

(2) For the purposes of this section, the persons who are to be treated respectively as an occupier of any premises (which, for those purposes, include any fixed or movable structure) and as his visitors are—

(a) any person who owes in relation to the premises the duty referred to in section 2 of the Occupiers' Liability Act 1957 (the common duty of care), and

(b) those who are his visitors for the purposes of that duty.

(3) An occupier of premises owes a duty to another (not being his visitor) in respect of any such risk as is referred to in subsection (1) above if—

596   Vol 31 Negligence

(a) he is aware of the danger or has reasonable grounds to believe that it exists;

(b) he knows or has reasonable grounds to believe that the other is in the vicinity of the danger concerned or that he may come into the vicinity of the danger (in either case, whether the other has lawful authority for being in that vicinity or not); and

(c) the risk is one against which, in all the circumstances of the case, he may reasonably be expected to offer the other some protection.

(4) Where, by virtue of this section, an occupier of premises owes a duty to another in respect of such a risk, the duty is to take such care as is reasonable in all the circumstances of the case to see that he does not suffer injury on the premises by reason of the danger concerned.

(5) Any duty owed by virtue of this section in respect of a risk may, in an appropriate case, be discharged by taking such steps as are reasonable in all the circumstances of the case to give warning of the danger concerned or to discourage persons from incurring the risk.

(6) No duty is owed by virtue of this section to any person in respect of risks willingly accepted as his by that person (the question whether a risk was so accepted to be decided on the same principles as in other cases in which one person owes a duty of care to another).

(7) No duty is owed by virtue of this section to any person using the highway, and this section does not affect any duty owed to such persons.

(8) Where a person owes a duty by virtue of this section, he does not, by reason of any breach of that duty, incur any liability in respect of any loss of or damage to property.

(9) In this section—

"highway" means any part of a highway other than a ferry or waterway;

"injury" means anything resulting in death or personal injury, including any disease and any impairment of physical or mental condition; and

"movable structure" includes any vessel, vehicle or aircraft.

NOTES

Prospective amendments

Sub-ss (6A)–(6C): inserted after sub-s (6) by the Countryside and Rights of Way Act 2000, s 1302, as from a day to be appointed under s 103(3) of that Act, title Open Spaces and National Heritage (Pt 1), as follows:

"(6A) At any time when the right conferred by section 2(1) of the Countryside and Rights of Way Act 2000 is exercisable in relation to any land which is access land for the purposes of Part I of that Act, an occupier of the land owes (subject to subsection (6C) below) no liability by virtue of this section in respect of—

(a) a risk resulting from the existence of any natural feature of the landscape, or any river, stream, ditch or pond whether or not a natural feature, or

(b) a risk of ... that person suffering injury when passing over, under or through any wall, fence or gate, except by proper use of the gate or of a stile.

(6B) For the purposes of subsection (6A) above, any plant, shrub or tree, of whatever origin, is to be regarded as a natural feature of the landscape.

(6C) Subsection (6A) does not prevent an occupier from owing a duty by virtue of this section in respect of any risk where the danger concerned is due to anything done by the occupier—

(a) with the intention of creating that risk, or

(b) being reckless as to whether that risk is created."

General Note   The object of this section is to introduce ... statutory duty of care in place of the rules of common law to trespassers and other entrants outside the scope of the Occupiers' Liability Act 1957 ante. The common law had become uncertain following the case of British Railways Board v Herrington [1972] AC 877, [1972] 1 All ER 749, HL, which modified the law relating to liability for damage or injury suffered by a trespasser but did not provide a clear principle applicable to the generality of cases. The judgments did not give a consistent answer to the question when a duty of care towards a trespasser can be said to arise and, when this is established, what the

---

Occupiers' Liability Act 1984 s 1   597

content of that duty may be said to be. References were made to the duty of common humanity, either than reasonable care, but it was not entirely clear what standard of duty the concept of humanity imposed.

The aim of this section is therefore to help to resolve the points of doubt that arose following the Herrington case and to combine in a single set of propositions the slightly different principles adopted in that case. (See further the concept ... decided on in that case "below" and replaces it with a "duty to care" ... for being in that vicinity ... in this section). In addition the new statutory duty is to apply not only to those who enter land without permission but with lawful authority, and are therefore not trespassers but also to those who enter without permission but with lawful authority. It does, however, exclude all persons using the highway, whether or not maintained at public expense (sub-s (7) above). The provisions of this section follow the Law Commission's recommendations in paras 2, 51 and 59 of their Report on Liability for Damage or Injury to Trespassers and Related Questions of Occupiers' Liability (Law Com No 75, Cmnd 6428).

Sub-s (1): Person   Unless the contrary intention appears this includes a body of persons corporate or unincorporate; see the Interpretation Act 1978, s 5, Sch 1, Vol 41, title Statutes.

Sub-s (2)(a): Occupier   As to the persons who are to be treated as an occupier of any premises, see by virtue of sub-s (2)(a) above, the reference to the Occupiers' Liability Act 1957, s 1(2) ante, ie the persons who would at common law be treated as an occupier. See further, 33 Halsbury's Laws (4th edn reissue) para 630.

Sub-s (2)(a): Person   As to the persons who are to be treated as an occupier of premises, see Occupiers' Liability Act 1957, s 1(2) above; the Occupiers' Liability Act 1957, s 1(2) ante, embraces those persons who are invitees or licensees at common law, for the purposes of that Act, without authority and are thereby continue to ... those who are anyone to whom the consent of the owner but with lawful the premises; see the note "Persons who would ... be treated as ... invitees or licensees" to the Occupiers' Liability Act 1957, s 1 ante, and see also 33 Halsbury's Laws (4th edn reissue) para 633.

A duty owed by an occupier to "persons other than his visitors" covers those persons outside the scope of the Occupiers' Liability Act 1957, who may enter land without authority and are thereby invitation or permission, such as those who enter without the consent of the owner but with lawful technically trespassers; or example, in exercise of a private right of way or of a right of public access. However, for example, in exercise of a private right of way or of a right of public access. However, ... other person using the highway, whether or not the way is maintained at public expense (sub-s (7) above; see also the recommendation in para 51 of their Report (Law Com No 75, Cmnd 6428).

Sub-s (3): If any danger due to the state of the premises or to things done or omitted to be done on them   This phraseology is similar to that used in the Occupiers' Liability Act 1957, s 1(2) ante; see the General Note to that section and consequently this new provision has the effect, like the Act of 1957, of applying in relation to the liability of an occupier towards a visitor.

Therefore the precise effect of those words in the 1957 Act has been the subject of some dispute in that they could cover all claims for injuries on the occupier's premises arising from every kind of activity or omission on them irrespective of whether they are connected with the state ... (Law Com No 75, Cmnd 6428) as such. But the view of the Law Commission in their report on Liability for ... Trespassers etc is that regard having regard to s 1(2) of the ... the scope of the 1957 Act, so that the liability in respect of such an activity that falls ... be determined by general principles of negligence at common law.

Sub-s (3): The risk is one against which in all the circumstances ... reasonably be expected to offer the other some protection   It will be noted that the words used here follow the words used in the character different from that of the "common duty of care" under the Occupiers' Liability Act 1957 ante where the duty is owed to all visitors and the occupier must take reasonable care to see they are reasonably safe.

Sub-s (4): The duty ... is suggested (in para 29 of their report (Law Com No 75, Cmnd 6428)) that regard would have to be had to certain circumstances common to all cases involving trespassers. These circumstances ... include the age and character of the trespasser, the nature and character of a criminal purpose) and the occupier's property (whether ... taking precautions, although they pointed out that they did not regard the financial resources of the individual occupier as being a matter which should be taken into consideration. For cases involving the common law duty of care see, generally, 33 Halsbury's Laws (4th edn reissue) para 601 et seq.

Sub-s (5): Risks willingly accepted   Sub-s (6) above, which is similar to the Occupiers' Liability Act 1957, s 2(5) ante, preserves the rules of common law concerning the application of the maxim volenti non fit injuria; see 33 Halsbury's Laws (4th edn reissue) para 669–672.

Occupiers' Liability Act 1957, s 2   See this title ante.

598    Vol 31 Negligence

**Cases relating to this section**

British Railways Board v Herrington [1972] AC 877, [1972] 1 All ER 749, HL
Donoghue v Folkestone Properties Ltd [2003] EWCA Civ 231, [2003] 2 WLR 1138, 147 Sol Jo LB 265 (sub-s (3)(b))
Greenhalgh v British Railways Board [1969] 2 QB 286, [1969] 2 All ER 114, CA (sub-s (1))
Harris v Birkenhead Corpn [1976] 1 All ER 341, [1976] 1 WLR 279
Holden v White [1982] QB 679, [1982] 2 All ER 328, CA (sub-s (1))
Pannett v P McGuinness & Co Ltd [1972] 2 QB 599, [1972] 3 All ER 137, CA
Penny v Northampton Borough Council (1974) 72 LGR 733, 118 Sol Jo 628, CA
Revill v Newbery [1996] QB 567, [1996] 1 All ER 291, CA (sub-s (1))
Southern Portland Cement Ltd v Cooper [1974] AC 623, [1974] 1 All ER 87 (sub-s (3))
Tomlinson v Congleton Borough Council [2003] UKHL 47
Westwood v Post Office [1974] AC 1, [1973] 3 All ER 184, HL

**[1A Special considerations relating to access land**

In determining whether any, and if so what, duty is owed by virtue of section 1 by an occupier of land at any time when the right conferred by section 2(1) of the Countryside and Rights of Way Act 2000 is exercisable in relation to the land, regard is to be had, in particular, to—

(a) the fact that the existence of that right ought not to place an undue burden (whether financial or otherwise) on the occupier,
(b) the importance of maintaining the character of the countryside, including features of historic, traditional or archaeological interest, and
(c) any relevant guidance given under section 20 of that Act.]

NOTES

**Amendments**

Inserted by the Countryside and Rights of Way Act 2000, s 13(3), as from a day to be appointed under s 103(3) of that Act. Vol 32, title Open Spaces and National Heritage (Pt 1).

**Occupier** See the note to s 1 ante.

**Land** For meaning, see the Interpretation Act 1978, s 5, Sch 1, Vol 41, title Statutes.

**Countryside and Rights of Way Act 2000, ss 2(1), 20** See Vol 32, title Open Spaces and National Heritage (Pt 1).

**2** (Amends the Unfair Contract Terms Act 1977, s 1(3), Vol 11, title Contract.)

**3 Application to Crown**

Section 1 of this Act shall bind the Crown, but as regards the Crown's liability in tort shall not bind the Crown further than the Crown is made liable in tort by the Crown Proceedings Act 1947.

NOTES

**Shall bind the Crown** See, generally, as to the application of statutes to the Crown, 8(2) Halsbury's Laws (4th edn reissue) para 384.

**Crown Proceedings Act 1947** See Vol 13, title Crown Proceedings. As to the Crown's liability in tort under that Act, see s 2 thereof.

**4 Short title, commencement and extent**

(1) This Act may be cited as the Occupiers' Liability Act 1984.
(2) This Act shall come into force at the end of the period of two months beginning with the day on which it is passed.
(3) This Act extends to England and Wales only.

NOTES

**Sub-s (2): Two months beginning with, etc** "Months" means calendar months; see the Interpretation Act 1978, s 5, Sch 1, Vol 41, title Statutes. In calculating this period the day (5 March 1984) on which this Act was passed (ie received royal assent) is reckoned: see Hare v Gocher [1962] 2 QB 641, [1962] 2 All ER 763, and Trow v Ind Coope (West Midlands) Ltd [1967] 2 QB 899 at 909, [1967] 2 All ER 900, CA. Accordingly this Act came into force on 13 May 1984.

**Sub-s (3): England; Wales** For meanings, see the Interpretation Act 1978, s 5, Sch 1, Vol 41, title Statutes.

## ALLISON V. RANK CITY WALL CANADA LTD.

*Ontario High Court of Justice, Smith J. February 8, 1984.*

Torts — Negligence — Occupiers' liability — Statutory duty — Plaintiff attacked and injured by stranger in parking garage of her apartment building — Before leasing apartment defendant landlord assuring plaintiff parking garage secure — Whether defendant in breach of statutory duty to take care to see that plaintiff was reasonably safe while on premises — Occupier's Liability Act, R.S.O. 1980, c. 322, s. 3(1).

Torts — Negligence — Occupiers' liability — Restriction of liability — Plaintiff attacked and injured by stranger in parking garage of her apartment building — Defendant landlord negligent in failing to provide proper security — Lease exempting landlord from liability for personal injury suffered by tenant "in any way" — Whether exemption clause relieving defendant from liability — Occupier's Liability Act, R.S.O. 1980, c. 322, s. 3(3).

The plaintiff was brutally attacked and injured by a stranger in the parking garage of her apartment building. Before leasing the apartment from the defendant landlord the plaintiff had been assured by the defendant that the parking garage was secure. In fact, it was not. It was quite easy for the person who attacked the plaintiff to gain access to the garage. The lease contained a general exemption clause relieving the landlord from liability for personal injury suffered by the tenant "in any way". In an action by the plaintiff against the defendant for damages for personal injuries, *held*, there should be judgment for the plaintiff.

The defendant was in breach of its duty under s. 3(1) of the *Occupier's Liability Act*, R.S.O. 1980, c. 322, since the defendant had failed in its obligation to make the premises safe for the plaintiff. The assault was reasonably foreseeable and ought to have been guarded against. The representations about security placed a heavier burden upon the defendant than might otherwise have been the case. The defendant was obligated to make good on its assurances and it failed to do so. The security measures were totally inadequate; patrolling was insufficient; lighting was dim; there was no television monitoring of the parking area. The negligence of the defendant consisted of failing reasonably to operate the garage premises once having represented their safe condition, or, alternatively of allowing the plaintiff to be lulled into a false sense of security. The probabilities were that proper security would have prevented this unfortunate assault as would a warning to the plaintiff. A knowing and conscientious plaintiff could have requested escort service as others had on occasion or exercised greater care or taken up residence elsewhere.

Under s. 3(3) of the *Occupier's Liability Act* liability can be restricted, but the restriction must be specific and brought to the attention of the person whom the legislation intends to protect. The exclusionary clause in the lease did not purport to limit liability in respect of negligence. The defendant's manager admitted that the defendant had not intended by use of that clause to be exonerated from a breach of a duty to take care. The plaintiff admitted that she read the lease from beginning to end, but did not think the exemption clause derogated in any way from the representations made to her that she would be safe. The exclusionary clause must be construed against the defendant.

**Cases referred to**

*M'Alister (or Donoghue) v. Stevenson*, [1932] A.C. 562; *Canada Steamship Lines Ltd. v. The King*, [1952] A.C. 192

**Statutes referred to**

*Occupiers' Liability Act*, R.S.O. 1980, c. 322, s. 3

ACTION for damages for personal injuries.

*E. Allen*, for plaintiff.
*W. T. McGrenere, Q.C.*, for defendant.

SMITH J.:—This action can be described as involving occupier liability whether it is made to sound in contract, tort or is based on the *Occupiers' Liability Act*, R.S.O. 1980, c. 322. The plaintiff, a registered nurse, was a tenant of the defendant under a written lease. She was residing alone in apartment No. 2410 in the Sheppard Centre at 2 Forest Laneway. She was also renting parking facilities in the underground garage adjacent to and being a part of the premises.

On May 12, 1981, at about 8:45 p.m., while parking her car, she was brutally attacked by one Howell who was later apprehended and confessed to the crime. He was not in any way connected with the defendant.

The lease makes no specific mention of the kind of security the lessor was to provide. There is, however, a general exemption clause which reads as follows:

21. The Landlord shall not in any event whatsoever be liable or responsible in any way for

(a) any personal injury or death that may be suffered or sustained by the Tenant or any employee of the Tenant or any member of the Tenant's family, his agents or guests, or any other person who may be upon the rented premises or the premises of the Landlord; or

(b) any loss of damage or injury to any property including cars and contents thereof belonging to the Tenant or any member of the Tenant's family, or to any other person while such property is on the rented premises or on the premises of the Landlord; or

(c) without limiting the generality of the foregoing, any damages to any such property caused by steam, water, rain or snow which may leak into, issue or flow from any part of the rented premises or the premises of the Landlord or from the water, steam, sprinkler or drainage pipes or plumbing works of the same or from any other place or quarter; or

(d) any damage caused by or attributable to the condition or arrangement of any electrical or other wiring; or

(e) any damage caused by anything done or omitted to be done by any tenants of the Landlord.

The plaintiff was security conscious. She said she discussed with Mr. Brown, an authorized representative of the defendant, the fact that she was looking for secure accommodation and that her work would require her to return home at all hours of the evening. Mr. Brown took her on a tour of the parking area, of the laundry room and of the front entrance. He stated that the defendant company had cameras installed. It is not clear whether he was referring to the garage area specifically. The plaintiff may well have thought that he was. She did not observe any cameras in the garage in the four months that she occupied the apartment. In other words, it can be assumed that she knew at some point that there was no monitoring in the garage through cameras, although there were security men on staff. She was told by Brown that there was *only one entrance* to the P1 parking area which she thought was reserved for residential parking. She always understood that there was only one door into the garage. There were a number of exit doors through which entry could not be gained unless they were for some reason left open.

The plaintiff was not allotted a specific parking spot on the P1 level of the garage. She could use any one of the spaces provided.

The sole outside entrance for cars to the P1 area, was equipped with a device whose mechanism for the opening of the door was triggered by a card in the possession of tenants only. Once inside the parking premises, there was no designation, either for the residential or for commercial parking, separating one from the other. There had been a barrier between the two prior to the plaintiff's occupation of the premises. There was none at the time. The plaintiff was in the habit of going straight to a parking space near the door through which she could only gain entry to her building with a key. She followed her normal practice on the day of the assault.

It is clear that in a strict sense, or indeed in any sense, the parking garage was not secure. In addition to the fact that there were exit doors that were not always closed, there were a few commercial vehicle entrances. Access to the garage could also be had with the greatest of ease by anyone walking through the mall and making use of the shuttle area shown on diagram ex. 5. It was equipped with elevators and stairs. The access was available at all times except after 2:00 a.m. when the mall closed. There was no evidence of how the attacker came to be on the premises that evening. But it is clear from the above summary that very little ingenuity on his part was required.

The manager, Mr. Bennett, candidly admitted that there were

representations regarding security made in the form of advertisements and orally when the plaintiff applied. He admitted that security was a selling point; that the majority of residents were single women and senior citizens who were attracted to the complex in part because of the security arrangements. In fact, the defendant can be seen to have been clearly security conscious in its installation of some 38 television-monitoring devices. They were mostly focused on the commercial entrances and exits. The front entrances to the residential towers were and are fairly well secured. The panels in the entranceway contain the name of each tenant only, without a corresponding apartment number. The plaintiff said she decided to apply to reside in the complex because her security fears had been allayed by what was represented to her at her initial encounter with the defendant's representative. The court has no reason to doubt her evidence in this regard.

The defendant recognizes a duty to secure. It argues that the obligation was to secure within reasonable limits thereby giving security a limited meaning. It went on to contend that the complex had been free of problems in six years. There was consequently no reason to foresee what occurred or to think that the system would prove inadequate.

The total parking area, as the plaintiff later learned, was huge. It included 30,000 sq. ft. of parking on P1, P2 and P3 levels and additional parking facilities on the concourse level which coincided with the mall level. The total parking area served the occupants of two commercial towers, of two residential ones, including the plaintiff's and the patrons of the mall.

One security guard only was assigned to patrol the entire parking area every hour. It was a large area to be sure, to be patrolled by one guard in the space of one hour. He did not always complete his tour of inspection in any case for he was called elsewhere on occasion and also had to check all the exit doors to make certain that they were securely shut.

The question now relates to the standard of care to be applied in the circumstances existing here.

The relevant provisions of the *Occupiers' Liability Act* are as follows:

3(1) An occupier of premises owes a duty to take such care as in *all the circumstances of the case* is reasonable to see that persons entering on the premises, and the property brought on the premises by those persons are reasonably safe while on the premises.

(2) The duty of care provided for in subsection (1) applies whether the danger is caused by the condition of the premises or by an activity carried on on the premises.

(3) The duty of care provided for in subsection (1) applies except in so far as the occupier of premises is free to and does restrict, modify or exclude his duty.

(My emphasis.)

I will turn to the defendant's duty in contract in the course of disposing of the questions raised by the exclusionary clause. As far as the common law is concerned, it may be said to have been superseded by the Act, but only in the sense of the Act having abolished the distinction between invitees and licensees. The case-law had of itself gone a long way in that direction. The question which s-s. 3(1) directs the court to ask itself, "Did the defendant take reasonable care *in all the circumstances* to ensure that persons were reasonably safe while on the premises both in respect to their condition and regarding the activities carried on therein", is not at all different from the questions based upon *M'Alister (or Donoghue) v. Stevenson*, [1932] A.C. 562, and the cases following it. Who is my neighbour? Foreseeability and causation remain with us as well.

I have concluded, not without some difficulty, for the argument advanced by the defendant was not devoid of merit — it was urged with some force that the net result of a finding of liability against the landlord would be to make it an insurer — that the landlord failed in its obligation to this plaintiff to make the premises safe for her. The assault in my view was a reasonably foreseeable one and ought to have been guarded against in this case.

The court must place itself in the position of the landlord. The company knew it was dealing with an underground garage in a large urban centre in which the unwary in recent years have fallen prey in more than a number of isolated cases, to sexual and other kinds of assaults. To the knowledge of the landlord, the garage premises were virtually and indiscriminately wide open to the public at large. The plaintiff was concerned about safety. She received certain assurances which she accepted and upon which she acted. In the circumstances, a high obligation was fixed upon the landlord. If that obligation were standing alone and there was a total absence of representations, given the particular conditions obtaining at this complex and given the kind of security provided by the landlord, it might conceivably be difficult to find acts or omissions that would attract liability. That is not the situation that presents itself to me.

The representations distinctly placed a higher burden upon the landlord. It was obligated to make good on its assurances and it

failed in this regard. It took no effective steps to protect the residential tenants entering from the garage. I repeat that the plaintiff's concerns had been clearly expressed. She was enticed to these premises and drawn into a contractual relationship by reason of the representations made in the advertisements, by reason of the reputation acquired by the complex and of the oral conversations at the time the plaintiff made her application to lease. The security measures were totally inadequate. Patrolling was insufficient. Lighting was dim. There was no television monitoring of the parking area.

It almost seems as if the security of the residential tenants entering their premises from the garage, was lost in the shuffle. The shuttle itself was designed for the convenience of the patrons of the mall. Most of the television-monitoring devices were mainly directed to commercial areas as stated, as well as the front entrances to the residential buildings. The parking garage was neglected.

The plaintiff testified that she did not know of the unsafe condition of the garage. That is sought to impute such knowledge to her. In my view she was only really aware of one entrance. I accept her evidence in that regard. At any rate, she most certainly did not have the kind of appreciation of the risk that would permit *volenti* to apply.

The negligence of the defendant consisted of failing to reasonably secure the garage premises once having represented their safe condition or alternatively, of allowing the plaintiff to be lulled into a false sense of security. "You are safe." The fact that security, such as it was, had worked for six years, was due to chance. I do not accept that the evidence fell short of proving that the aggressor's presence was due to lack of security. The plaintiff does not need to show precisely how Howell came to be on the premises. He was bent on criminal activity. He engaged in further and similar criminal activity before he was apprehended at or near the premises some months later. The probabilities are that proper security would have prevented this unfortunate assault as would have a warning to the plaintiff. A knowing and conscious plaintiff could have requested escort services as others had on occasion or exercised greater care or taken up residence elsewhere.

Liability under the *Occupier's Liability Act* can be restricted according to its terms but the restriction must be specific and brought to the attention of the person whom the legislation intends to protect. There is no reason why cases such as *Canada Steamship Lines Ltd. v. The King*, [1952] A.C. 192, should not continue to apply.

The exclusionary clause in this lease did not purport to limit liability in respect of negligence and certainly not in respect of negligence alone. Mr. Bennett, the defendant's manager, accepted counsel's suggestion that the landlord had not intended by use of that clause to be exonerated from a breach of duty to take care. The plaintiff admits that she read the lease from beginning to end. She did not think the exemption clause derogated in any way from the representations made to her that she would be safe. The exclusionary clause must be construed against the defendant.

I have chosen thus far to found liability upon the conduct of the landlord which in my view fell below the standard dictated by the circumstances and particularly by the representations that induced the plaintiff to reside at this complex. The court can easily choose to resort to the defendant's contractual obligations it assumed when these parties were brought together as the parties both understand the obligations to be.

The three obligations, i.e., as they arise at common law under statute or in contract, are not mutually exclusive. In this instance, it might be well to emphasize the contractual relationship and I do so. The circumstances, however, in my view, give rise to tortious (in the common law definition) and to statutory liability as well. There is no need to make neat distinctions when defining the nature of the obligations. It is quite sufficient that they did exist and that they were breached.

I now proceed to assess the damages. The specials have not been disputed. They are made up of moving expenses, including transfer of telephone, cleaning of ear, some prescription drugs and lost clothing. The evidence supports the total claimed of $363.90.

The incident has already been described. It lasted about five minutes. The plaintiff was struck several times about the head with a blunt instrument. She bled profusely from several scalp wounds.

There were three lacerations across the top of the scalp measuring 1½, 2½ and ¾ ins., respectively, which required 20 nylon sutures. These were inserted at Sunnybrook Hospital to which the plaintiff was transported by ambulance on the night in question. There were other smaller lacerations. There was also a large area that was observed behind her left ear and down her left neck with obvious swelling, tenderness and discoloration. A dorsal contusion to the right hand of some proportion was evident, with swelling and tenderness, especially over the right third finger. Fortunately, there were no fractures.

Understandably, there was a great deal of pain and suffering.

The scalp remained extremely tender for some time. The finger hurt. There were headaches. Miss Allison plays squash and still experiences a tingling sensation on the crown of the head when she plays. Her injured finger gets cold quickly in the winter-time.

This 36-year-old lady is fortunate indeed that she escaped with her life. The attack was vicious. The circumstances surrounding it must have been terribly frightening. One week following it, she was still emotionally upset, tremulous, shaky, weeping easily and speaking with an anxious cracking voice. Although she spent only a few hours in hospital, and lost only two days' work, there remains a certain relatively slight residual damage which will last for an extended period. It is relatively mild or perhaps it should be described as being mild to moderate. The psychological shock, though, was severe and here we are dealing with a weaker and less brave lady. She, in turn, had we be dealing emotional scars. These would be more serious. The defendant is fortunate to have to deal with a thick-skulled plaintiff. The assault I should say, was in part, at least, sexual in nature, although no intercourse or attempt at intercourse took place. She became a recluse, she said, fearing underground garages and elevators. Her heart palpitates when she hears running behind her. She found her ability to relate in a normal way to men to have been impaired. What remains of the psychological sequelae was estimated by the plaintiff at 75%. I appreciate that percentages in this kind of situation are but a convenient way of describing in a global sense how one still feels and reacts as a result of an experience of the kind which I have described. I am confident she will survive the ordeal well in the long term.

I have determined that her general damages ought to be fixed at $18,000.

There is nothing in the evidence to justify aggravated or exemplary damages against the landlord. The author of this crime, of course, is not a party to these proceedings. There will be judgment for $18,363.90. It seems to me that costs should follow the event.

*Judgment for plaintiff.*

---

**392980 ONTARIO LTD. v. CITY OF WELLAND et al.**

*Ontario High Court of Justice, Southey J. January 9, 1984.*

Torts — Negligence — Misrepresentation — City solicitor making negligent misrepresentation in letter to developer about zoning of land — Developer not

AND LAW REPORTS ANNOTATED [Vol.

GOULD v. McAULIFFE    527

e settlement itself was not until the bank was to be defeated in the event of the prevented the application of the section opinion, the disposition of the settlement ren, and not until they ceased to be British ovides for defeasance if any child should efore becoming absolutely entitled.  It is Court of Session decided *Levitt* v. *Inland son's Trustees* (2) had been decided by nly member of the Court of Session who gument had not been fully presented to o has had the advantage of listening to cult to accept.  For these reasons, I hold *ns* v. *Watson's Trustees* (2) rather than express no opinion on the argument that nose cases in which the disposition provides the settlor.  The appeal will be allowed

s (for the appellant) ; *Solicitor of Inland*

d by D. K. BELCHER, *Barrister-at-Law.*]

---

[CA.]

## GOULD v. McAULIFFE.

[COURT OF APPEAL (Scott and Goddard, L.JJ., and Stable, J.), **May 2,** 1941.]

*Animals—Injuries by animals—Dog known to be dangerous—Customer of public-house acting reasonably—Invitee—Duty of person keeping dangerous animal.*

The plaintiff went to a public-house to meet her husband, and, while waiting for him, she had occasion to look for a lavatory.  She did not inquire where she could find one, but went to a garden at the side of the public-house.  Some years before, there had been a lavatory there, and the plaintiff had used it, but it had since been removed.  Not finding this lavatory, the plaintiff passed to the other side of the garden and through a gate which was open at the time.  She had proceeded only a step or two beyond the gate when she was attacked and injured by a dog belonging to the licensee of the premises, the defendant.  In the court below, it was found (i) that there was an invitation to the plaintiff to enter the garden but not to pass beyond it through the gate, (ii) that the plaintiff intended to be a customer of the public-house, and (iii) that the dog was one which the defendant knew had previously attacked at least two persons.  The plaintiff based her claim on the negligent keeping of the dog, and the defendant contended that, in the place where she was attacked, the plaintiff was a trespasser, and also that her negligence had contributed to her accident :—

HELD : the defendant was an invitee, not only when she went into the garden, but also when she went through the gate into the yard where she was bitten.

*Decision of* SINGLETON, J. ( [1941] 1 All E.R. 515) *affirmed.*

[EDITORIAL NOTE.  In the court below, it was held that, although the invitation to the plaintiff did not extend beyond the garden to the yard, nevertheless, in passing through the gate into the yard, the plaintiff was acting reasonably.  On appeal, it is held that the plaintiff was an invitee, not only when she was in the garden, but also when she went through the gate into the yard.  Both courts have based their decisions on the duty of a person keeping a dangerous animal.  It was at one time suggested that the keeping of a dangerous animal was unlawful in itself, but later authorities have made it clear that, while it is not unlawful to keep such an animal, to allow it an opportunity to harm anyone is unlawful.  Such animals are kept at the peril of the owner, and, if they do harm, the owner will be responsible.  This, however, is always subject to the exception that, if the injured person brings his injury on himself, the owner will escape that responsibility.

AS TO LIABILITY FOR INJURIES BY DANGEROUS ANIMALS, see HALSBURY, Hailsham Edn., Vol. 1, pp. 543, 544, paras. 933, 934 ; and FOR CASES, see DIGEST, Vol. 2, pp. 238-241, Nos. 245-262.]

Cases referred to :
(1) *Lowery* v. *Walker*, [1911] A.C. 10 ;  2 Digest 241, *261* ;  80 L.J.K.B. 138 ; 103 L.T. 674.
(2) *Walker* v. *Midland Ry. Co.* (1886), 55 L.T. 489 ;  29 Digest 9, *118.*
(3) *Campbell* v. *Shelbourne Hotel, Ltd.*, [1939] 2 K.B. 534 ;  [1939] 2 All E.R. 351 ; Digest Supp. ;  108 L.J.K.B. 607 ;  160 L.T. 436.
(4) *Deane* v. *Clayton* (1817), 7 Taunt. 489 ;  2 Digest 215, *113.*

APPEAL by the defendant from a judgment of SINGLETON, J., dated Feb. 27, 1941, and reported [1941] 1 All E.R. 515, where the facts are fully set out.  SINGLETON, J., awarded the plaintiff £150 damages for personal injuries sustained when she was bitten by the defendant's dog.

*Linton Thorp*, K.C., and *Alban Gordon* for the appellant.

*J. Davidson* for the respondent.

*Thorp*, K.C.: The respondent was a trespasser when she opened the gate and passed from the garden to the yard in which the dog was confined. The defendant was not obliged to abstain from having a dangerous dog on a private part of his premises. There was nothing to indicate that the gate through which the plaintiff passed led to a lavatory. [Counsel referred to *Walker* v. *Midland Ry. Co.* (2), *Campbell* v. *Shelbourne Hotel, Ltd.* (3), *Deane* v. *Clayton* (4) and *Lowery* v. *Walker* (1).]

Scott, L.J. [after stating the facts]: In the court below, it was contended that the plaintiff became a trespasser when she passed through the gate because the licensee of the house did not intend the public to use the yard. The gate was not locked, nor was there any notice on it that the yard was private, or that trespassers were forbidden, or that there was a dangerous dog there. Singleton, J., held that the plaintiff was acting quite reasonably. In my view, the facts constitute an invitation by the defendant to persons on his premises. The plaintiff was, therefore, an invitee, not only to enter the garden, but also to use the gate leading, as she mistakenly thought, to a lavatory. In the view of the court, that disposes of the whole case. The only possible view is that by implication the plaintiff was invited to do what, in fact, she did do, and the defendant was, therefore, under an absolute duty to keep her safe from an animal which he knew to be savage. It is a pure question of fact, and there is no need to refer to authorities, except to mention the words of the Earl of Halsbury in *Lowery* v. *Walker* (1), at pp. 12, 13. In my view, that is conclusive on the law. The judge below was right in his decision and the appeal must be dismissed with costs.

Goddard, L.J.: It has been said that this is a borderline case, but, in my view, it is a very clear one. There was nothing to show that an invitee to this garden ought not to go through the gate in question.

Stable, J.: I agree.

*Appeal dismissed with costs.*

Solicitors: *Oswald Hanson & Smith* (for the appellant); *A. A. Terry & Co.* (for the respondent).

[*Reported by* C. St.J. Nicholson, Esq., *Barrister-at-Law.*]

Macdonald J.    149

**Jeffrey v. Commodore Cabaret Ltd.**

36    There will be a declaration that the exercise of discretion by Central Guaranty Trust in January of 1990 and subsequently in July of 1990 was made in breach of its duty as trustee under the will of George Frederick Wevill and a further declaration that the sum of $93,200, being the total amount of the encroachment, be repaid to the estate of George Frederick Wevill with interest pursuant to the *Court Order Interest Act* on the amounts encroached from time to time.

37    As the plaintiffs were successful, they will have costs at Scale 3 unless either of the parties wishes to speak to the issue in which case there will be liberty to either party to apply with respect to the question of costs.

*Judgment for plaintiffs.*

---

[Indexed as: **Jeffrey v. COMMODORE CABARET LIMITED and JOHN DOE**]

JOHN JEFFREY v. COMMODORE CABARET LIMITED and JOHN DOE

Supreme Court
Macdonald J. [In Chambers]

Heard – September 7, 1995.
Judgment – September 25, 1995.

**Occupiers' liability – Liability in particular cases – Hotels, restaurants and licensed premises – Activities of third parties – Plaintiff injured when intervening on behalf of friend in fight at defendant nightclub – Nightclub's failure to intervene amounting to breach of duty under Occupiers Liability Act, s. 3 – Plaintiff contributorily negligent for knowingly exposing himself to possibility of injury – Trial judge apportioning fault equally between parties.**

The plaintiff went to the defendant nightclub with a party of friends. During a break in the music, one of the plaintiff's friends was attacked by two men in the middle of the dance floor. Another of the plaintiff's party ran to the victim's aid. Two more men attacked him within one minute. A third member of the plaintiff's party intervened and was attacked by two more men. When no help materialized within another minute, even though five members of the nightclub's security staff were stationed with a clear view of the dance floor, the plaintiff intervened. He was immediately struck from behind with a chair and then punched in the jaw. He sued the nightclub for damages for personal injuries, alleging that it was in breach of its duty to him under s. 3 of the *Occupiers Liability Act*. The parties applied for judgment on the issue of liability under R. 18A.

**Held** – Parties equally liable.

---

148    BRITISH COLUMBIA LAW REPORTS    13 B.C.L.R. (3d)

was likely an application would be made to encroach on capital and had identified the information it required in order to make a reasoned decision with respect to the question of encroachment per se and the extent of encroachment, keeping in mind its duty to all the beneficiaries. The trustees relied on Mrs. Wevill's son to provide them with information from her doctors and with respect to alternative care arrangements available for her when it was clear to them that he had no concern for the interests of the residuary beneficiaries in the estate of Mr. Wevill. The result of the failure of the trustee to obtain the necessary information in a timely fashion allowed the situation to become urgent and the trustee was then required to make the decision based on a situation of its own making in January 1990.

33    The fact that the trustee was under pressure from Upjohn to approve the encroachment in order to ensure the continuation of private nursing care for Mrs. Wevill was the direct result of a lack of attention and care by the trustee in ensuring they had the information required to make the decision, namely, the opinion of Mrs. Wevill's physician or physicians as to the quality and level of care required and the availability of alternate forms of care. The trustee was aware for many months before the application was considered that it would require that information in order to make a considered and careful decision, keeping in mind the interests of all of the beneficiaries. The trustee did not act as a "man of ordinary prudence in managing his own affairs" would have when it neglected to obtain the information it knew was required before the situation became so urgent that it felt compelled to make the decision in the absence of information that would enable it to determine the reasonableness of the encroachment in light of the provisions of the will.

34    Having determined that the trustee did not act with care in exercising its discretion, the burden shifts to the trustee to establish that some or all of the encroachments were justified in accordance with the provisions of the will. There is nothing in the evidence to indicate that at any relevant time Mrs. Wevill required private nursing care at the level it was being provided, or at all. Although there is evidence that Mrs. Wevill was elderly and in poor health, that fact does not support a decision that the level of private nursing care being provided was required in the context of the limitations in the will and the interests of the residuary beneficiaries.

35    It is apparent that after the decision to encroach was made in January of 1990 and objection was received from the solicitor for the residuary beneficiaries, the trustee made efforts to try to gather evidence to confirm the correctness of the decision, without success.

The nightclub did not take reasonable steps to protect the plaintiff from a danger which it ought to have recognized once the first man was attacked on the dance floor. There was more than adequate time for the security staff to intervene before the plaintiff found it necessary to go to the third friend's aid. Their failure to do so was a breach of the nightclub's duty under s. 3. Simply calling the police was not an adequate response in the circumstances. The fact that the plaintiff felt obliged to go to the assistance of his friend, due to the inactivity of the nightclub security staff in circumstances where some of them must have been aware of the series of assaults, put him into the rescuer category. He did not intervene to "get into the fight," nor did he willingly accept the risk as his own. However, he did knowingly expose himself to the possibility of injury and, accordingly, was contributorily negligent. The parties were equally at fault and liability should be divided equally.

### Cases considered

*Fultus v. Bazel* (1990), 73 Alta. L.R. (2d) 75, (sub nom. *Fultus v. Thomson*) 106 A.R. 14 (Q.B.) – not followed.

*Hesse v. Laurie* (1962), 38 W.W.R. (N.S.) 321, 35 D.L.R. (2d) 413 (Alta. T.D.) – distinguished.

*Johnson v. Grandview Royal Canadian Legion Branch 179* (sub nom. *Johnson v. Royal Canadian Legion Grandview Branch No. 179*) 26 B.C.L.R. (2d) 124, [1988] 5 W.W.R. 267 (C.A.) – distinguished.

*McKenna v. Greco* (1985), 52 O.R. (2d) 85 (H.C.) [affirmed (1986), 58 O.R. (2d) 63n (C.A.)] – distinguished.

*Penney v. Fort Nelson Hotel (1974) Ltd.* (June 17, 1988), Doc. Vancouver C866153, Legg J. (S.C.), [1989] B.C.W.L.D. 489 – distinguished.

*Wagner v. International Railway Co.*, 232 N.Y. 176, 133 N.E. 437, 19 A.L.R. 1 (1921) – applied.

### Statutes considered

Occupiers Liability Act, R.S.B.C. 1979, c. 303
s. 3(1) – considered.
s. 3(2)(c) – considered.
s. 3(3)(a) [am. 1989, c. 64, s. 31] – considered.

### Rules considered

British Columbia, Rules of Court (1990)
R. 18A – pursuant to.

APPLICATION for judgment under R. 18A in action alleging breach of *Occupiers Liability Act*.

*Eric Rice, Q.C.*, for plaintiff.
*Ross E. McLarty*, for defendant Commodore Cabaret Limited.

(Doc. Vancouver C932919)

1   September 25, 1995. MACDONALD J.: The plaintiff was injured in an altercation in the premises of the corporate defendant (the Commodore) on July 25, 1992. His assailant has never been identified or located. The action against the Commodore is based on the *Occupiers Liability Act*, R.S.B.C. 1979, c. 303 (the "Act").

2   By agreement, counsel seek to obtain judgment on liability issues under R. 18A of the *Rules of Court*. I agree that this is an appropriate case for disposition of those issues by summary trial. Both the liability case for disposition of those issues by summary trial. Both the liability (if any) of the Commodore under s. 3 of the Act and an allegation of contributory negligence against the plaintiff are before me.

3   Section 3 of the Act reads, in part, as follows:

  3. (1) An occupier ... owes a duty to take that care that in all the circumstances of the case is reasonable to see that a person ... on the premises ... will be reasonably safe in using the premises.

  (2) The duty of care ... applies in relation to the

  (c) conduct of third parties on the premises.

  (3) Notwithstanding subsection (1), an occupier has no duty of care to a person

  (a) in respect of risks willingly accepted by that person as his own risks ...

4   In the result, I have concluded that the Commodore is in breach of its duty to the plaintiff under s. 3 of the Act. While the plaintiff was aware of the risk he took in becoming involved in the altercation, he cannot be said to have "willingly accepted" those risks as his own in the circumstances set out below. On the other hand, his decision to do so, with such knowledge, amounted to contributory negligence. I find the Commodore and the plaintiff to be equally at fault for whatever damages he suffered in the altercation.

*The Facts*

5   These liability issues are particularly suitable for disposition by summary trial under R. 18A because there is no real conflict in the affidavit material as to what occurred. That lack of conflict exists because none of the security personnel employed by the Commodore that evening recall seeing the series of altercations which the plaintiff describes. That is so despite the evidence of the president of the corporate defendant that he was informed in his office of the incidents by a member of his staff, and brought the evening to an end by turning up the house lights. Presumably, it was also a staff member who called police.

6   I confess to considerable difficulty with that silence from the Commodore regarding the events which resulted in the plaintiff's injuries. On the other hand, it leaves the plaintiff's version of the events unchallenged, and it is on that basis that I have reached my conclusion on the liability issues.

SOCIAL LAW LIBRARY

7    There is one further basis for my decision, to be found in the evidence of the president of the Commodore on examination for discovery (January 27, 1994) at questions 170 to 176. He conceded that the responsibility of the 7 security personnel on duty that night, 5 of whom were stationed where they would have a view of the events which unfolded, was to "get into it" and "break it up".

8    The plaintiff attended the Commodore that evening to watch a "competition" of 6 or 7 local bands. He knew two people in the bands, as well as the master of ceremonies. There is no suggestion that alcohol played a part in the events which unfolded. The plaintiff is an unmarried, 48-year-old probation officer.

9    About 11:30 p.m., during a break in the music, the master of ceremonies (McKenzie) was attacked by two men in the middle of the dance floor, which was not crowded at the time. One of the men at the plaintiff's table (Cal) was a good friend of McKenzie. He got up and hurried onto the dance floor to go to McKenzie's aid. Just as he reached McKenzie, two other men appeared, grabbed Cal and begun punching him. The plaintiff estimates that about 30 seconds to 1 minute elapsed between the attack on McKenzie being brought to his attention and the assault on Cal.

10    Another 30 seconds to a minute elapsed before Richard, a third occupant of the table at which the plaintiff was seated, went to Cal's assistance. Richard was waylaid by two more men. By this time, all three of McKenzie, Cal and Richard were under assault, with the latter two on the floor. The women at the plaintiff's table (two of whom were accompanying Cal and Richard) were "very upset and . . . shrieking for help".

11    When no help materialized in another minute, the plaintiff got up and went over to where Richard was on the floor. He pulled one of the assailants off Richard, and was immediately struck from behind with a chair. As he turned, a smiling "John Doe" punched him on the jaw. It is that last blow which resulted in the T.M.J. problems which are the plaintiff's primary complaint.

12    The attack on the plaintiff was the last in the sequence. The fighting ended, McKenzie having escaped backstage and Richard having rolled away due to the plaintiff's intervention. Cal's head was bleeding profusely from a cut. The plaintiff's party got together and left for hospital emergency. As they were leaving, the police arrived.

13    It is the plaintiff's "impression" that the unprovoked attack on McKenzie and the subsequent assaults on the successive "rescuers" were well orchestrated. All of the assailants were distinguishable by their dress and hair style from "most of the audience" that night. While there is no "hard proof" to support that impression, the fact that each fresh pair of assailants came onto the dance floor to engage Cal, Richard and the plaintiff in succession, with impeccable timing, does lend some credence to that belief.

*Position of the Plaintiff*

14    The plaintiff argues that the security staff on duty were expected to stay alert and prevent fights from breaking out or spreading. Their duty in such situations, as the Commodore concedes, is to "get there quickly and intervene physically". On this occasion there were five such staff stationed with a clear view of the dance floor, one or more of them very near the table where the plaintiff was sitting with Cal and Richard when the initial assault on McKenzie occurred.

15    In an establishment such as this, the plaintiff argues, where security staff are on duty for that express purpose, the Commodore's duty under s. 3 of the Act can only be fulfilled by prompt intervention. The series of incidents described by the plaintiff, up to his own involvement, left plenty of time for intervention by security staff, even in the absence of any prior incident or behaviour which might have alerted them to trouble ahead.

16    The submission is that the Commodore's s. 3 duty, in the circumstances, could only be fulfilled by intervention. Its failure to do so, either because security staff failed to observe the series of altercations, or because they chose not to intervene, was a breach of that duty. In this situation, the Commodore must exercise "anxious care", by maintaining a watch to guard against attack or take action as swiftly as is reasonably possible in the event that trouble does occur.

17    In large part, I accept those submissions in the circumstances of this case.

*Position of the Commodore*

18    The defendant, the Commodore, responds with two arguments:

1. On the authorities, the brief time interval between the initial attack on McKenzie and the decision of the plaintiff to intervene (some 3 minutes) was insufficient to trigger the Commodore's obligation to intervene.

154     BRITISH COLUMBIA LAW REPORTS     13 B.C.L.R. (3d)

2. The plaintiff was well aware of the physical risk to himself of intervention, yet did so instead of seeking help from the security staff he knew were present. Thus, he "willingly accepted" that risk as his own.

19     The authorities cited by the Commodore include:

(a) *Johnson v. Grandview Royal Canadian Legion Branch 179*, [1988] 5 W.W.R. 267 [26 B.C.L.R. (2d) 124] (B.C.C.A.), where the occupier was held not liable because the plaintiff's decision to stand "up into the jaws of certain defeat" [p. 269] by an opponent known by him to have a capability and propensity for sudden violence when drinking, was the "predominant causal nexus between negligence and injury" [p. 269] and absolved the occupier.

(b) *Penney v. Fort Nelson Hotel (1974) Ltd.* (unreported; June 14, 1988; B.C.S.C. No. C866153, Vancouver Registry – [1988] B.C.J. No. 2506), in which the claim against the occupier was dismissed because "...the fight occurred so quickly and with such little warning ... that the staff ... were not in a position to anticipate it occurring or ... prevent it continuing" [pp. 11-12]. Less than two minutes elapsed before the altercation in that case, which lasted an even shorter time. There had been no advance warning, but there were no security staff on duty as in this case.

(c) *Faltus v. Bazel* (1990), 73 Alta. L.R. (2d) 75 (Q.B.), where the absence of prior warning or any knowledge in the hotel staff of such propensities on the part of the assailant, coupled with the short duration of the assault, relieved the occupier from liability. This decision goes far beyond what I understand to be the ratio of the earlier decision of that same court in *Hesse v. Laurie*, which I refer to below. *Faltus v. Bazel* purports to negate any obligation on employees to "risk injury to themselves by attempting to break up a physical confrontation" and to endorse a practice of "obtain[ing] police assistance" in such a situation [p. 83]. I do not endorse those statements as applicable to all situations.

(d) *McKenna v. Greco* (1985), 52 O.R. (2d) 85 (H.C.), where the decision was that "... the injury was caused solely by one of the individual defendants, whose actions could not be apprehended, reasonably anticipated or prevented by the hotel" [p. 85].

(e) *Hesse v. Laurie* (1962), 35 D.L.R. (2d) 413 [38 W.W.R. (N.S.) 321] (Alta. T.D.), where the attack on the plaintiff "could not have been anticipated nor prevented" [p. 44] by the occupier, and the plaintiff had interceded without reason.

*Jeffrey v. Commodore Cabaret Ltd.*     Macdonald J.     155

20     *Hesse v. Laurie* does, however, have broader application here. The plaintiff in that case was held not to be a rescuer. While the hotel employee attempting to eject the assailant in that case was "being bullied [and] shoved back" [p. 416], he was not in any grave danger of injury. I find the situation to be different in this case.

21     The fact that the plaintiff felt obliged to go to the assistance of Richard, due to the inactivity of the security staff of the Commodore in circumstances where some of them must have been aware of the series of assaults which he described, puts him into the rescuer category.

22     As Mr. Justice Cardozo said in *Wagner v. International Railway Co.*, 133 N.E. (2d) 437 (1921) (cited in *Hesse v. Laurie* [p. 327]):

"Danger invites rescue ... The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal ... The risk of rescue if only it be not wanton, is born of occasion."

That statement is particularly applicable here. The Commodore is not an insurer of the plaintiff's safety, but the question remains whether or not, under s. 3 of the Act, it took reasonable steps to protect the plaintiff from a danger when it ought to have recognized once McKenzie was attacked on the dance floor. I find that it did not.

23     On the uncontradicted evidence of the plaintiff, there was more than adequate time for security staff to intervene before he found it necessary to go to Richard's aid. Their failure to do so, for whatever reason, was a breach of the Commodore's s. 3 duty. Simply calling the police was not an adequate response in these circumstances.

24     The second branch of the Commodore's argument on s. 3 arises from the several acknowledgements by the plaintiff in the course of his examination for discovery on January 27, 1994, that he was assuming a risk of injury by going to Richard's aid. He "knew that if he went over there and intervened by himself, there was a possibility that he would be injured". That possibility, the plaintiff says, is why he "... stayed out of the fight for so long".

25     Had the plaintiff been in Cal's position (injured in an effort to rescue McKenzie), I would likely give effect to that submission on the decisions outlined above. However, the succession of assaults which the plaintiff describes (the one on himself being the fourth in the series) justified his conclusion that the security staff would not intervene, and nullifies the Commodore's suggestion that he should have sought his assistance before intervening himself.

156    BRITISH COLUMBIA LAW REPORTS    13 B.C.L.R. (3d)

26   I find that the plaintiff's intentions were limited to the rescue of Richard. He did not intervene to "get into the fight". I am satisfied that, in his mind, his own intervention was necessary to protect his friend, despite the risk of which he was aware. In the circumstances, he did not willingly accept that risk as his own. Rather, he felt obliged to accept that risk due to the inaction of the security staff. I have already found that inaction to be a breach of the Commodore's duty to him under s. 3 of the Act.

*Contributory Negligence*

27   My finding against the defendant, the Commodore, on s. 3(3) of the Act does not dispose of the contributory negligence allegation against the plaintiff. Had the plaintiff chosen not to intervene, he would not have been injured, despite the Commodore's breach of its s. 3 duty.

28   This is not an "innocent bystander" case. The plaintiff got up from his table and travelled some 35 feet to where he was struck while assisting Richard. He knew there was a risk of injury if he intervened.

29   While the plaintiff did not "willingly accept" the risk, he knowingly exposed himself to the possibility of injury. I find that to be contributory negligence. I consider the plaintiff and the Commodore to be equally at fault, and divide liability evenly between them.

*Costs*

30   The issue of costs was not addressed. There will be liberty to apply in that regard. For the benefit of the parties, I should say that my present inclination would be to award the costs of this application to the plaintiff and ignore the fact that liability has been split.

*Judgment*

31   The defendant, the Commodore, is in breach of its duty to the plaintiff under s. 3 of the Act. The plaintiff is contributorily negligent. Liability is divided equally between them.

*Order accordingly.*

---

**Chung Estate v. Chan**                                    Wood J.A. ]

[Indexed as: **Chung Estate v. Chan**]

SUSANNE WAI-FAN CHAN and WAI-LING CHANG
(in their capacity as Administrators of the Estate of WAI
TUNG CHUNG, deceased) v. PHYLLIS SHUET YING CHAN

Court of Appeal
Wood, Prowse and Donald JJ.A.

Heard – September 22, 1995.
Judgment – October 23, 1995.

**Real property – Registration of interests in land – Registrable instrument – Deceased executing transfers of real property from himself to himself and spondent as joint tenants – Notary submitting transfers for registration one after deceased's death – Trial judge finding registration valid – Deceas administratrices raising validity of transfers for first time on appeal – Cour Appeal quashing appeal.**

The deceased executed freehold transfers of three pieces of real property fr... himself to himself and his companion, the respondent, as joint tenants. On Jul... the deceased instructed his notary to register the transfers by the end of that mo... On July 21, the deceased died intestate. The notary submitted the transfers ... registration the next day. The deceased's administratrices applied for an order set... aside the registrations. The parties agreed that the only issue was whether or not ... registrations were illegal. The trial judge found that they were not. The ... ministratrices appealed raising, for the first time, an argument that the trans... themselves were invalid. The respondent applied under s. 9(4) of the *Cour... Appeal Act* for an order quashing the appeal.

**Held** – Application allowed.

While counsel for the administratrices might now wish he had challenged ... validity of the freehold transfers from the outset, or that he had not agreed before ... trial judge that their validity was not in issue, it was now too late to do so. ... administratrices should not be permitted to raise, for the first time on appeal, an is... which they expressly chose not to raise, and which they expressly agreed was ... raised, in the proceedings which they commenced in the court below. There being ... other error alleged, the application to quash the appeal should be allowed.

**Statutes considered**
Court of Appeal Act, S.B.C. 1982, c. 7
   s. 9(4) – pursuant to.
Estate Administration Act, R.S.B.C. 1979, c. 114
   s. 3 – referred to.
   s. 90(1) – referred to.
Land Title Act, R.S.B.C. 1979, c. 219
   s. 1 "transmission" – referred to.
   s. 20 – considered.
   s. 243 – referred to.
   s. 245(1)(a) – considered.



[Home] [Databases] [World Law] [Search] [Copyright] [Privacy] [Disclaimers] [Feedback]

# England and Wales Court of Appeal (Civil Division) Decisions



**You are here:** BAILII >> Databases >> England and Wales Court of Appeal (Civil Division) Decisions >> [1997] EWCA Civ 898

[Database Home Page] [Database Search] [Database Case Name Search] [Recent Cases] [Noteup] [Download RTF] [Context] [Help]

## DAVID LESTER MARSHALL v. RUBYPOINT LTD [1997] EWCA Civ 898 (31st January, 1997)

IN THE SUPREME COURT OF JUDICATURE No CCRTF 96/0152/E
IN THE COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM ORDER OF HER HONOUR JUDGE VINER CBE QC

Royal Courts of Justice
Strand
London WC2

Friday, 31st January 1997

B e f o r e :

LORD JUSTICE KENNEDY

LORD JUSTICE PETER GIBSON

MR JUSTICE BUCKLEY

DAVID LESTER MARSHALL
Plaintiff/Respondent
- v -

RUBYPOINT LTD
Defendants/Appellants

(Computer Aided Transcript of the Palantype Notes of
Smith Bernal Reporting Limited, 180 Fleet Street,
London EC4A 2HD
Tel: 0171 831 3183

Official Shorthand Writers to the Court)

MR DAVID DABBS (Instructed by Sharpe Pritchard of London - London Agents for Grant Bolt & Co of Findon, West Sussex) appeared on behalf of the Appellant

MR DARREN HOWE (Instructed by Fitzhugh Gates of Brighton) appeared on behalf of the Respondent

J U D G M E N T
(As Approved by the Court )
(Crown Copyright)

LORD JUSTICE KENNEDY: I will ask Mr Justice Buckley to give the first judgment of the court.

MR JUSTICE BUCKLEY: In 1993 Mr Marshall, the respondent to this appeal, lived in a flat at 47C West Hill Street, Brighton. On 17th August, 10th September and again on 23rd September 1993 the premises were burgled. On each occasion property was stolen, but, more seriously, Mr Marshall was assaulted during the burglary on 10th September. Proceedings were instituted in Brighton County Court against Rubypoint Ltd, the lessors of the flat, claiming damages to compensate Mr Marshall for his personal injuries, consequential expenses and the items stolen. By her judgment dated 10th January 1996 Her Honour Judge Viner CBE QC awarded damages and interest totalling £6,123.19. It is against that judgment that
Rubypoint now appeals.

The original lease in respect of Mr Marshall's flat was in 1993. By its terms, the original lessors demised the premises therein described to the lessee for 99 years in return for payment of rent, but reserved from the demise certain parts of the building. By clause 5 (4) the lessor covenanted to "maintain, repair, re-decorate and renew", inter alia, the common parts. It is agreed that the common parts included the front door of the building. It is apparent from the recitals in the lease that the premises as a whole, which were owned by the lessor, were or were to be divided into flats and let separately. Each flat had its own internal front door. Mr Marshall took an assignment of the remainder of the lease in respect of Flat C on 30th November 1984. Rubypoint acquired the reversion in 1992, so that by 1993 Mr Marshall occupied Flat C as lessee of ↳Rubypoint,↴ the lessor.

In the county court, Mr Marshall contended that the front door was in a state of disrepair which amounted to a breach of the covenant to repair and was sufficiently causative of the burglaries. ↳Rubypoint,↴ in effect, denied everything. However, it seems from the judgment, that the main issues were whether Mr Marshall's loss and damage was too remote and or whether there was a break in the chain of causation or a novus actus interveniens. As to the state of the front door, the learned judge found that in April 1993 someone forced the door open, there was a hole in the glass top half of it and a piece of cardboard had been stuck on with packing tape. Further, that the lock was hanging loose and one only had to push the door to gain entrance. Mr Marshall was the only tenant at the time. Squatters had moved into the premises some time in April and subsequently refitted the lock, but apparently not securely. Mr Dabbs, counsel for ↳Rubypoint,↴ told us that the door could be pushed open. As a more general indication, the learned judge found that the premises were dilapidated in 1992 when Rubypoint purchased the reversion. A specification for external decoration and repairs was prepared by Peter Overill & Associates, Chartered Building Surveyors, and dated 21st April 1993. It concluded at para 18 of Part 3:

"Strip out front entrance door complete with frame and cart away. Supply and fix new front entrance door and frame to match existing in all respects complete with glazing, letterbox 3 No 100mm steel hinges and Yale night latch complete with cylinder pull."

No repairs had been carried out by the date of the first burglary on 17th August. There is a photograph of the front door taken on 3rd October which, the learned judge found, showed its condition as from 20th August onwards. It is a sorry sight. Although a carpenter attended on 20th August, after the first burglary, and fitted a new Chubb lock to the front door and replaced Mr Marshall's front door, the Chubb lock was gouged out within a couple of days. Thereafter, there was no lock and the door could only be pulled to. That was the state of affairs at the time of the second and third burglaries.

There can be no doubt that Rubypoint was in breach of clause 5 (4). Mr Dabbs has accepted that. There can equally be no doubt to my mind that the breach of covenant was a substantial cause of the burglaries although Mr Dabbs did not accept that. He submitted that, looking fairly and objectively at the lease and at the circumstances at the time of lease, the tenant had a duty to protect himself, that the front door was only the first line of defence and the learned judge should have balanced the obligations of both parties. Mr Dabbs' difficulty was the finding of fact, which he could not challenge, to the effect that Mr Marshall's door was the same as at the time of the lease save that he had added a security lock and chain after the first burglary at the behest of his insurers. In other words, no sensible criticisms or breach of obligation could be laid at his door. He had improved it.

One of the main purposes of a front door is to provide security. A door which is obviously broken and dilapidated, as this one was, and which can easily be pushed open is an invitation to would-be burglars. Once inside the premises, they are likely to use such force as is necessary to enter the flats.

I conclude that the disrepair of the door, and hence the breach of covenant by **Rubypoint,** was causative of the burglary.

Mr Dabbs also submitted that the damages were too remote and the acts of the burglars broke the chain of causation.

I turn to those issues. Loss from burglary in this case is not too remote in law if at the time of contracting it was within the reasonable contemplation of the parties as a not unlikely result of the disrepair of the front door. Mr Dabbs submitted that the learned judge had applied that test and considered the question of novus actus at the wrong time, that is during the period April to September 1993 as opposed to the time of contracting. Indeed, he made the same submission on causation. With respect to the learned judge, for whose careful and full judgment I am grateful, it is not clear to me what time she had in mind when applying the relevant tests. Certainly, she made several findings touching the question of foreseeability based on the April to September period. Perhaps that was because those matters were the subject of evidence and argued forcefully by counsel.

However, even if Mr Dabbs could make good that submission it would not avail him because it is clear to me that if one goes back to the date of the original lease, which I accept is the correct approach, the answer would be the same. The relevant circumstances at that time may be ascertained from the lease itself:
(i) the lessor reserved from the demise certain parts of the premises including the front door;
(ii) by clause 5 (4) he covenanted to maintain and repair it;
(iii) the premises were divided into 6 flats each with its own internal front door;
(iv) the front door of Flat C was only 10' from the main front door;
(v) the date of the lease was 1983 and the premises in Brighton.

I would only add the obvious, that the main purpose of a front door, apart from affording access and egress, is to keep out uninvited visitors and that includes burglars.

In my judgment, it would have been within the contemplation of the parties that if the front door fell into disrepair and did not provide any real obstacle to a would-be intruder, a burglary was not unlikely. I do not consider the fact that Flat C had its own front door alters the position. A burglar, having gained easy access through the main front door would be out of sight of passers-by and feel more secure. He would be unlikely to baulk at the prospect of forcing an internal door.

I conclude that damages for burglary are not too remote, even without drawing on the various findings by the learned judge which undoubtedly enhanced Rubypoint's culpability. Those findings included that actual notice was given by Miss Marshall, Mr Marshall's sister, to Rubypoint of the state of the front door and the first burglary. To put it euphemistically, the learned judge preferred the evidence of Mr and Miss Marshall to the witnesses called on behalf of the defendant.

Mr Dabbs' submissions aimed at establishing a break in the chain of causation run into insuperable obstacles in law and on the facts. Rubypoint's duty to repair the front door was, at least in part, so as to secure the premises against intruders. It was in breach of that duty and cannot set up the burglar's acts as breaking the chain of causation. Alternatively, if it be any different, it can be said that burglary was a foreseeable consequence of the breach with the same result.

Mr Dabbs recognised his difficulties and, quite properly, reminded us of several of the well known cases in that area of the law. The first was London Joint Stock Bank Ltd v MacMillan and Arthur [1918] AC 777. That was the case which dealt with the duty of a customer of a bank to draw cheques in a sensible manner. Two very short citations may suffice, the first from the speech of Lord Finlay LC (page 789):
"It has been often said that no one is bound
to anticipate the commission of a crime, and that to take advantage of blank spaces left in a cheque for the purpose of increasing the amount is forgery, which the customer is not bound to guard against. It has been suggested that prevention of forgery must be left to the criminal law. I am unable to accept any such proposition without very great qualification. Every-day experience shows that advantage is taken of negligence for the purpose of perpetrating frauds. A warehouseman is bound to take precautions against theft, and if he fails to do so he will be liable to the owner if the goods are stolen."
At page 794 (also in the speech of Lord Finlay):
"The fact that a crime was necessary to bring about the loss does not prevent its being the natural consequence of the carelessness."

Stansbie v Troman [1948] 2 KB 48 was a case concerning a contractual duty to take care. There, the contractor was carrying out decorations to the house in question which was burgled. Tucker LJ said this (page 52):
"The reason why the decorator owed a duty to the householder to leave the premises in a reasonably secure state was because otherwise, thieves or dishonest persons might gain access to them and it seems to me that if the decorator was, as I think he was, negligent in leaving the house in this condition it was as a direct result of negligence that the thief entered by the front door, which was left unlocked, and stole those valuable goods."
It is clear from those authorities that the fact that a crime is
committed does not, of itself, break the chain of causation. Iron and Steel Holdings and Realisation Agency v Compensation Appeal Tribunal [1966] 1 WLR 480 is a case which illustrates again that an intervening event, if foreseeable, is not or does not constitute a novus actus interveniens. Winn LJ said this (page 492):
"In my opinion, wherever any intervening factor was itself foreseen or reasonably foreseeable by the actor, the person responsible for the act which initiated the chain of causes leading to the final result,

that intervening cause is not itself, in the legal sense, novus actus interveniens breaking the chain of causation and isolating the initial act from the final result."

Mr Dabbs also referred us to Tucker v Linger [1882] 21 Ch D 18. I do not derive any assistance from that case. It was one that turned on its own special facts where a tenant's corn was damaged when rainwater came in through the roof. The tenant attempted to recover damages against the landlord for his breach of obligation to supply materials to the tenant. The court held that under the terms of the lease it was the tenant's obligation to carry out the repairs and that obligation was not conditional on the landlord's obligation to supply the materials. It is not surprising that the tenant failed.

The learned judge considered the cases to which she was referred carefully. She concluded, as have I, that burglary was a foreseeable consequence of an insecure front door. The chain of causation was not broken. In this day and age - and 1983 was not sufficiently different - assault in the course of burglary is, unhappily, not unusual. Mr Dabbs did not submit the contrary.

Finally, Mr Dabbs submitted that Mr Marshall had failed to mitigate his loss in the sense that after the first burglary, in particular, he should have realised the situation was unsafe and taken it upon himself to repair the front door. The learned judge's findings of fact upon that were that Mr Marshall did not have the necessary skills or money to do so. Having notified Rubypoint of the situation and been assured that something would be done, he could not reasonably be criticised. I entirely agree.

In the end the learned judge carefully weighed all the evidence before her. I can find no basis for criticising any of her findings. This was a blatant breach of the landlord's duty to maintain or repair the front door at 47 West Hill with the result that Mr Marshall was burgled on three occasions in a short space of time and seriously assaulted. That outcome was not unlikely in the circumstances. It was readily foreseeable by the parties to the lease at all times.

While I am grateful to Mr Dabbs, and sorry not to have heard from Mr Howe, I would dismiss the appeal.

LORD JUSTICE PETER GIBSON: It is elementary in the law of contract that a defendant in breach of contract is not liable for loss that is too remote and is not caused by that breach. Whether a loss is too remote depends on whether the loss was within the reasonable contemplation of the parties to the contract at the time of the contract. In the present case the contract was the lease between the respective predecessors in title to the plaintiff as tenant and the defendant as landlord. Mr Dabbs, for the landlord, criticised the judge for failing to distinguish between what was foreseeable at the time of the lease and subsequent events which occurred. It seems to me that there is a good deal of force in that criticism. However, despite Mr Dabbs's well sustained arguments, I am not persuaded that any of the judge's conclusions were wrong.

It is not in dispute that there was a breach of contract by the defendant at all material times in failing to observe the covenant on the landlord's part to repair, redecorate and renew the common parts, including the outer door to the street. The questions that, therefore, arise are (1) whether the loss suffered by the plaintiff through the burglaries was within the reasonable contemplation of the parties to the lease at the time of the lease, and (2) whether the breach of contract was causative of the loss suffered by the plaintiff.

On the first question Mr Dabbs accepted (a) at the commencement of the lease, in the event of a breach by the landlord of the covenant to keep in repair the outer door, it was reasonably foreseeable that a trespasser might thereby gain access to the common parts and (b) if a trespasser could gain access to the common parts, it was reasonably foreseeable that he might commit a burglary. Mr Dabbs went on to submit that it was also reasonably foreseeable by both landlord and tenant that a trespasser might gain

access without a breach of the covenant by the landlord and that therefore the tenant was well advised to prepare for either eventuality by taking reasonable security precautions for the protection of himself and his own property. Those further submissions seem to me not to be of great materiality on the question of remoteness. Conceivably they may be relevant to causation. It seems to me obvious that it was, at the date of the lease, foreseeable by the parties to the lease that if the outer door was not kept in proper repair so that a trespasser such as a burglar might enter, loss, through burglary of the plaintiff's premises, was not unlikely.

On the second question it is sufficient that the breach of contract should be a (and I stress that indefinite article) substantial cause of the loss. But if there is a new intervening act by a third party, that may negative any liability on the defendant. I take the relevant principle to be that where loss results partly from a breach of contract and partly from an intervening act of a third party, the party in breach will be liable for the loss if, but only if, the intervening act was reasonably foreseeable by the parties at the time of the contract.

Mr Dabbs stressed that the outer door was only the first line of defence. He suggested that the plaintiff had failed to take sufficient security precautions to protect himself in his property. He said that the judge should have asked the question whether the level of security provided by the plaintiff tenant was reasonable. That seems to me to approach the matter from the wrong end. The question is whether the defendant, by his breach of contract, caused the loss. If the plaintiff acts in such a way as to leave the original breach of contract a matter of irrelevance to the loss, for example, if the plaintiff had left the outer door wide open, then the defendant would not be liable for the loss which in such a case would have been caused by the plaintiff. That is not this case. The court has always answered questions of causation by the test of common sense. In my judgment, by that test, the judge was entirely right to find that the breach of contract was a substantial cause of the loss to the plaintiff. This was not a case where the doctrine of novus actus interveniens applied because the loss, through burglary, was foreseeable.

For those reasons, as well as those given by my Lord, I, too, would dismiss this appeal.

LORD JUSTICE KENNEDY: I agree with both judgments. The appeal will, therefore, be dismissed.

Order: Appeal dismissed. The sum in court to be paid out to plaintiff's solicitors in satisfaction of judgment debt. Plaintiff to recover costs of proceedings at Court of Appeal. Legal aid taxation.

© 1997 Crown Copyright

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback
URL: *http://www.bailii.org/ew/cases/EWCA/Civ/1997/898.html*

**ECF FILING ERROR - WILL BE AMENDED**

## 580    DOMINION LAW REPORTS    15 D.L.R. (4th)

agent if the decision was later appealed to the Law Enforcement Appeal Board. Shannon J. allowed the application "the discipline code notwithstanding". He said at p. 106:

> I am satisfied that the trend in our law is towards enlargement and entrenchment of the right to counsel. However, that right is not yet absolute with respect to proceedings before *quasi-judicial* tribunals. The common law position is that it must be considered in the larger context of natural justice. Therefore, I must consider the facts and circumstances of this individual case and decide whether or not there will be a denial of natural justice if the applicants are not permitted to have their counsel represent them at the hearing before Inspector Brown. For the reasons already mentioned I am of the opinion that such a denial will occur and consequently on common law principles the application for prohibition should be granted.

*Chisholm* was an application for an injunction to restrain a "trial committee" from proceeding until after the disposition of the plaintiff's action. Unlike the present hearing an action had been commenced but, as in the instant hearing, the applicant had been denied his request for counsel before the trial committee. Andrews J. quoted with approval the above statement of Shannon J. and said at p. 759:

> In the matter at hand what concerns me most is the fact that the plaintiff's very livelihood is at stake. If he is expelled from membership in the association he cannot be employed as a police officer by the municipality.

The most recent case is *Joplin*. It concerned a police officer and his right to counsel at a disciplinary hearing. The court prohibited the proceeding unless the petitioner "is allowed to be represented by counsel, if he wishes".

In the instant case the constitution gives the applicant the right to retain counsel of her own choosing then forthwith restricts that selection to counsel who are members of a trade union.

In *Pett* at p. 549 Lord Denning said:

> Once it is seen that a man has a right to appear by an agent, then I see no reason why that agent should not be a lawyer.

In my opinion this can only mean independent counsel, one without any possible obligation to the trade union movement.

Article B.6.2 of the constitution states that "every member of the local Union shall be entitled to a fair and impartial trial". Unions have become large and powerful and by many are viewed as nearly public institutions. It has been stated that trade unions are not expected to be autocratic or dictatorial but to reflect in their actions the principles of social order that they seek to achieve for their members. In my opinion, the principles of natural justice should apply to the hearing before the trial committee especially where the right of the accused to employment is

## Q v. MINTO MANAGEMENT LTD.    581

involved. It has often been stated that "natural justice" contemplates and requires that "fair play" be afforded to all parties.

At the opening of this hearing, Mr. Breen questioned the right of the applicant to proceed by notice of application. In my opinion, this hearing is justified under Rule 16.04(e) and/or (j).

As requested, it is declared that the applicant has the right to be represented by counsel of her own choosing before the trial committee. However, counsel has not the right to be present at the local union meeting when the trial committee is selected and the chairman chosen.

*Application granted.*

---

### Q et al. v. MINTO MANAGEMENT LTD. et al.

*Ontario High Court of Justice, Gray J.   January 31, 1985.*

**Torts — Negligence — Standard of care — Tenant raped in her apartment by landlord's employee — Employee probably gaining access by use of master key — Master keys available to employees — Employee having raped another woman in apartment complex three months earlier — Landlord aware of earlier rape and that it was probably committed by someone with master key — Landlord negligent in supervision of master keys and in failing to provide additional security following first rape. — Landlord liable to plaintiff.**

The plaintiff was raped in her apartment by an employee of her landlord who had probably gained access to the apartment by means of a master key. Master keys were available to many employees, including the one who committed the rape. Three months earlier another woman in the same apartment complex had been raped and, subsequently, the same employee was found guilty of both offences. Although the landlord knew about the earlier rape and knew it likely had been committed by someone with a master key, it did not warn the tenants or take any additional security steps. The plaintiff brought an action for damages for personal injuries against the landlord and the employee.

*Held*, there should be judgment for the plaintiff. The landlord was negligent. Its supervision of the master keys was inadequate, particularly in light of its knowledge of the earlier rape. The landlord was not, however, negligent in failing to give a general warning to all its tenants following the first rape. The investigation was still under way and it was asked to keep things quiet. However, it should have provided additional security following the first incident. The risk of what happened to the plaintiff was reasonably foreseeable.

*Allison v. Rank City Wall (Canada) Ltd.* (1984), 45 O.R. (2d) 141, 6 D.L.R. (4th) 144, 29 C.C.L.T. 50, consd

Other cases referred to

*Fleischmann et al. v. Grossman Holdings Ltd. et al.* (1976), 16 O.R. (2d) 746, 79 D.L.R. (3d) 142, *Arland et al. v. Taylor*, [1955] O.R. 131, [1955] 3 D.L.R. 358

582      DOMINION LAW REPORTS      15 D.L.R. (4th)

Torts — Negligence — Vicarious liability — Scope of employment — Employee of landlord raping tenant in her apartment — Independent wrongful act not within scope of employment — Landlord not vicariously liable to tenant.

Torts — Joint and concurrent torts — Common purpose — Employee of landlord raping tenant in her apartment — Tenant suing landlord and employee — Landlord negligent in, inter alia, failing to supervise use of master keys — No common purpose between defendants — Landlord and employee independent, not joint, tortfeasors.

Damages — Personal injuries — Non-pecuniary loss — Quantum — Plaintiff raped in her apartment due to negligence of landlord — $40,000 general damages awarded.

Statutes referred to

Family Law Reform Act, R.S.O. 1980, c. 152, Part V
Landlord and Tenant Act, R.S.O. 1980, c. 232, ss. 95, 96
Occupiers' Liability Act, R.S.O. 1980, c. 322, s. 3

ACTION for damages for personal injuries.

J. R. Maurice Gautreau, Q.C., and James B. Chadwick, Q.C., for plaintiffs.

Wayne B. Spooner, Q.C., and Margaret Ross, for defendants, Minto Management Ltd. and Greenberg.

Bruce Simpson, for defendant, Carl Allan Halliday.

GRAY J.—In this action, the plaintiff Q claims against the defendant Halliday for assault and battery and against the other defendants in negligence, breach of contract and for violation of s. 96 of the Landlord and Tenant Act, R.S.O. 1980, c. 232, and s. 3 of the Occupiers' Liability Act, R.S.O. 1980, c. 322. The infant plaintiff claims against the defendants pursuant to the provisions of Part V of the Family Law Reform Act, R.S.O. 1980, c. 152, and the plaintiffs claim punitive and exemplary damages against the defendant Minto and the defendants Greenberg.

I propose to divide the facts into two parts: first, those which were said to be subject to agreement on a previous motion in these proceedings, and secondly, those which were established in evidence during the course of this trial.

Facts (Part I)

1. The plaintiff Q, is the mother of the infant plaintiff Q, who was born on the 8th day of August, 1969. They both reside in the City of Nepean in the Province of Ontario and at all material times occupied rented premises known as Apartment 110 at 47 Deerfield Drive in the City of Nepean pursuant to a lease in writing between the plaintiff Q, and the defendant Minto Management Limited dated 7 October 1980. The said lease was for two terms: January 1st to December 21st, 1981 and 1982. Clause 9A reads as follows:

Q v. MINTO MANAGEMENT LTD.      583

"Neither the Landlord nor the Tenant shall, without first obtaining the written consent of the other, alter or cause to be altered the lock on any entry door to the rented premises or affix a night latch upon any entry door to the rented premises, provided, however, the Landlord may, without the Tenant's consent, change locks in the apartment building in which the rented premises are located other than those upon the door giving entry to the rented premises."

2. The defendant Minto Management Limited is a duly incorporated company and at all material times managed the rented premises which are part of a large rental complex known as Navaho Place which was at all material times owned by the Defendants Irving Greenberg and the estate of Gilbert Greenberg.

3. The defendant Carl Allan Halliday at all material times was employed by the defendant Minto as a maintenance man for the rental complex, and presently is confined to one of Her Majesty's federal prisons.

4. On or about August 21, 1982, in the early morning hours the plaintiff Q, while in her above-mentioned apartment with her son, was sexually assaulted and raped.

5. The defendant Halliday was tried and convicted of two offences under section 144 of the Criminal Code. The particulars of the offences were that Halliday had sexual intercourse on or about May 10th, 1982 with B., a female person who was not his wife, without her consent, at 12 Deerfield Drive, Unit 114, Navaho Place, in the City of Nepean and the Province of Ontario, and of having sexual intercourse on or about August 21st, 1982 with Q., a female person who was not his wife, without her consent, at 42 Deerfield Drive, Unit 110, in the City of Nepean and the Province of Ontario.

6. The defendant Halliday was convicted after a six-day trial by Judge and Jury in the Supreme Court of Ontario on February 23, 1983 and was sentenced to seven years in penitentiary. The defendant did not appeal.

Facts (Part II)

Many of the facts referred to in Part I were, of course, provided during the course of the trial. I now propose in Part II to deal with factual evidence adduced at the trial in addition to the foregoing. For the present, I will only deal with evidence which might be said to be connected with the liability issue and evidence concerning Q's damages and those claimed for the infant plaintiff will be dealt with later.

Detective Robertson of the Nepean Police Force attended at the apartment of Q, who will hereafter be referred to as "the plaintiff" and whose son will hereafter be referred to as "the infant plaintiff". On the morning of August 21, 1982, Detective Robertson examined the front door and the balcony door of the rented premises and found no signs of forced entry. Exhibit 3 was a photostatic copy of a sketch of the ground-floor layout of the premises of the superintendent of the defendant Minto Management which will hereafter be referred to as "Minto".

Master keys to the various 417 rental units were on pegs on the wall of the small office shown on ex. 3. Detective Robertson had a discussion with the superintendent, Mr. John McIntyre, in which Detective Robertson indicated that the police were of the opinion that both rapes were "inside jobs". McIntyre on this occasion, admitted that he knew that the May 10, 1982 incident had taken place. It was Detective Robertson's opinion that entry to the plaintiff's premises was gained by someone who had possession of a key; either a master key or a duplicate from a master key. By August of 1982, the May incident was still under investigation and the locking mechanism for the front door was what is called a deadbolt. The police opinion was again said to have been that the door was opened by a key. After the May incident, there were said to have been two suspects; one, an employee of Minto (not the defendant Halliday) and the other, another individual. McIntyre, we are told, was aware that Minto employees had been investigated.

Certain portions of the examination for discovery of the defendant, Halliday, were read into the record. His duties with Minto were those of a cleaner and maintenance man and he had been employed for seven and a half or eight years without problems. Halliday confirmed that there were seven to nine sets of master keys, that there was no signing system for the keys, that he had a key to the garage door shown in ex. 3 which would give access to the place where the keys were situated and that he had an earlier criminal record.

Detective Whitehorn of the Nepean Police was one of the officers who investigated the May incident. It was his view that since there were no signs of forced entry, entry had been gained through the door of the B residence. Through the victim, the police concluded that her assailant had a key.

By the same token, Detective Sabourin, a very experienced officer in the Nepean Police Force examined the plaintiff's unit for signs of a break-in and concluded that the assailant in August entered by means of a key. He also confirmed earlier evidence that Mr. McIntyre was aware of the May incident and that one of the Minto employees was suspect. He also confirmed that the master keys in the superintendent's office hung in an unlocked position on the wall of the office. He could not, of course, be certain that it was a Minto master key which opened the door but he was present when a voice test of the defendant Halliday was conducted in Mr. McIntyre's office with the result that the plaintiff identified Halliday's voice. The latter, who never admitted anything, was arrested nine days after August 21, 1982.

I will now deal with the evidence of the plaintiff, leaving the evidence concerning her damages, her career and the infant plaintiff's claim until a later time.

The plaintiff is a 34-year-old single parent of a 15-year-old son. The building in which her unit is placed is a four-storey building with direct access from outside. On August 21, 1982, the plaintiff returned to her residence about 9 p.m. and retired at about 11 or 11:30 p.m., after checking the doors. The front door was locked by turning the latch and the balcony door is locked by pushing in the lock and turning the handle.

She was awakened a few hours later when she felt something cold being held against her neck. She was told not to move or make any noise. She did not see her assailant's face but he taped her wrists, tied a covering over her eyes in the dark, told her to lie on the bed and then after involving her in circumstances which I do not choose to relate, had intercourse with her against her will for a period of three-quarters of an hour or an hour and left by the front door. She thought she heard keys being pulled out before he left but she did not hear the bolt turn before he left. She freed herself and locked the front door. She closed the blinds and checked on her son, then 13 years old, who was asleep in another room and then shortly after, telephoned the police who arrived five minutes later. Around 11 a.m. she was taken to the hospital. The infant plaintiff was aware of the entry but not the rape.

Two or three things should be noted about the period before August 21, 1982. In April, 1981, the front door blew open during windy days. Following a service call to Minto, a second striker plate as shown on ex. 20 was added to the front-door frame to assist the locking device. The plaintiff did not know of the earlier May incident. She received no communication or memorandum as to internal security from Minto and was of the opinion that a lock would have been added by her if she had known of this prior event. She had made no previous complaints to Minto about the locks and has now added an additional door chain lock and window locks.

No good purpose would be served by a lengthy examination of the May incident victim, B. Suffice it to say that she is a 35-year-old single parent with a 14-year-old daughter. Some years before the incident, she testified that she wished to add an additional lock but Minto was negative to the suggestion. When she retired around 11 p.m. on the May evening, she was sure that the door was locked and that the chain was on. Again, I am not going to relate the revolting circumstances which took place after this lady

became aware of a rattling sound which may have been the night chain being "jimmied". The sexual assault on this lady was very, very similar to that which occurred to the plaintiff. Apparently, B was told by a female Minto employee in the main office that she, however, add additional locking protection without any problems arising from Minto and she spoke with Mr. McIntyre a day or two after the incident. No communiqué was put out by Minto to warn the tenants in the 417 units.

Evidence concerning the security at the Minto units was given by Mr. Michael Limberger, Constable Marshall of the Nepean Police Force, Mr. John McIntyre the Minto superintendent, Mr. William McNeely and Mr. Gilles Chenier, Minto's vice-president — accounts and administration.

Mr. Michael Limberger is now a security consultant having spent 36 years in the lock business itself. He was well qualified to give opinion evidence as to locks and security and he attended at the plaintiff's unit to make an examination in September, 1983. Exhibit 20 was a photograph which showed that wood had deteriorated around the front-door frame and that to close the gap between the door and the frame, three striker plates, one on top of the other, had been added. This, according to Mr. Limberger, is not a common practice. The length of the bolt was one-half inch and the type of lock involved was said to have been similar to the lock (ex. 9). In the circumstances, the effective amount of the bolt was probably three-sixteenths of an inch in length. This witness's evidence was that the particular situation was bad by reason of the gap so that this locking device would be of little use if someone tried to gain forceable entry. His view was that a lock with a one-inch bolt was required and that the door frame required replacement. It was his further view that the plug in the lock itself was extremely worn and that a number of keys other than the required key would probably open the lock.

When "master-keying" is involved, that too reduces the security because the lower pins in the lock become less solid. There are, of course, opportunities to have master keys cut, for example, in hardware stores, unless one of the four-lock systems is installed which requires registration to have a key copied. This man has recommended to tenants that, in these insecure times, they install their own locks. It was his view that today the public is much more aware of break-in problems and that people are prepared to pay for increased security. The lock in question might have been considered "an acceptable lock" ten years ago. The conclusion

reached by this witness was that the lock on the plaintiff's unit was unsatisfactory since a one-inch bolt was not being used and further that the use of the master-key system at the present time is a security liability.

I turn now to the evidence of Constable Marshall of the Nepean Police Force, a crime prevention officer whose work involves the appraisal of crime risks and the production of programmes to meet them. This officer's evidence was that he recalled meetings with Mr. Chenier of Minto at the company's head office in 1980 and 1981 wherein the types of locks being used at the Minto properties was the subject of discussion. His recollection was that although he advised that the locks were not adequate, the company's attitude was that it was concerned about the cost factor. One of the tenants in the Navaho project (wherein the plaintiff's unit was located) arranged a meeting attended by Constable Marshall and about 30 other persons on September 29, 1982. The purpose of this meeting which was held after the August incident was to provide a lecture on improved security. Further meetings were held between Constable Marshall and the Minto representatives in late 1982, 1983 and 1984, with more interest being shown by Minto.

Constable Marshall's recommendation even before the August incident was that the proper lock would have a bolt throw of one inch and that the lock collar would be crush resistant. Costs including installation were discussed. To his knowledge, no changes were made at the Navaho project. On cross-examination, Constable Marshall conceded that notwithstanding the public distribution of "home security flyers" like ex. 27, some tenants take security advice and some do not. He also conceded that the general municipal lock standard in the Ottawa area would be less adequate than the lock in question (ex. 9).

The relevant portion of the evidence of the Minto project superintendent, Mr. John McIntyre, may be summarized thus: The plaintiff lived in what he described as a walk-up block unit; there are 417 units in the Navaho project which was built in 1971-72 with the plaintiff's locking device being a lock similar to ex. 9. The defendant, Halliday, was hired by Mr. McIntyre's predecessor and Mr. McIntyre never had any difficulties with Halliday, whom he described as a quiet man who carried out his cleaning and maintenance duties reasonably well.

Mr. McIntyre stated that if tenants wished to install additional locks or chains this would be done either by a service call or by a lock installer. Some tenants did their own installations and permission to install extra locks, bolts or chains was never

refused. His project had had break-ins but they were no more numerous than anywhere else. He had been advised of the May incident by the Nepean Police Force but had been told "to play it down". The police told him a week later that they suspected an employee and indicated someone other than the defendant, Halliday. There was no suggestion that this person should be taken off service calls or have the master key taken away. There was no change in the operation system after the May incident. It is important to note, however, that after that time "he probably thought something should be done".

Between the May and August incidents, the police cleared one suspect and told him they had another suspect but they did not indicate it was Halliday until after the August incident.

He learned of the attack on the plaintiff the day following August 21, 1982. It is interesting to note that the police did not tell them to take extra steps after the rapes in order to provide extra protection for other tenants' locks. Mr. McIntyre, of course, had no knowledge of whether the tenants were aware of the May incident although some of the Minto employees may have known.

What were the details of the Minto security system? There is a nightly security guard patrolling the project in a vehicle; there were service calls to tenants, including the plaintiff, in which permission to enter was obtained from the tenant. It was on one of these service calls that a striker plate was replaced on the plaintiff's front-door lock in April, 1981. The extra tenants' keys were kept in his office as shown on ex. 3 and the master keys were kept on pegs in what was described as "the small office". Eight employees including Mr. McIntyre had access to the master keys which at times simply hung on the wall. There were no specific instructions issued by Minto with respect to the master keys. There was no formal check-out or on-paper record of the master keys. There was no recommendation concerning lock security following the August incident nor were the tenants advised of the May incident or advised to install night latches. The plaintiff's lock was 11 or 12 years old. There was no system of inspection of tenant's locks and it is admitted that the tenants depend on Minto to some extent for security because of the night security patrol approximately every hour and because of the locks.

Mr. William McNeely's evidence, briefly put, was that he sold the ex. 9 type of lock to Minto and that in 1971-72 the one-half inch bolt was standard. It was good quality hardware at that time and his company still sells a lock comparable to ex. 9. Changes have taken place in the period 1972 to 1982 because of security

consciousness and the type of locks manufactured. He had called on Minto in upgrading campaigns concerning lock hardware and new construction. Minto Construction switched to one-inch deadbolt locks in the last six or seven years. The witness made no recommendation to Minto about their existing locks or bolts.

The last witness was Mr. Gilles Chenier, vice-president — accounts and administration of Minto. His evidence in many respects was similar to that of Mr. McIntyre. He did, however, confirm that Minto manages the rental units constructed by Minto Construction of which there are approximately 11,000 now and there were 8,500 to 9,000 in 1982. Tenants were permitted to install additional locks and chains. The ex. 9 type lock came out in 1969-70 and is still being installed by the Navaho project service office. Mr. Chenier admitted that Constable Marshall felt that "some locks were not quite adequate".

The company practice is still to use the ex. 11 form of application for employment and it does not inquire to see if an applicant has a criminal record. It did not know of Halliday's record.

A couple of days after the August incident, the police informed him of both incidents and asked him, since it was a police matter, to keep it quiet. He did not know of the May incident previously but, on being told, he walked into his owner's office and told him.

To the best of Mr. Chenier's knowledge, Minto has no programme or system to upgrade, inspect or maintain locks. The average tenant would not, on a reading of cl. 9A of the lease (ex. 1), think that he could install a lock, but Minto has never refused permission to install sliding bolts or night chains.

This concludes the evidentiary summary touching the liability issue.

The allegations of negligence against the defendants have been stated thus:

   (a) they failed to conduct a proper security check on their employees;

   (b) they made available master-pass keys which permitted access to the rented premises in the complex, including the Plaintiffs' and failed to adequately supervise, regulate or control access to or uses of these keys;

   (c) they failed to equip the Plaintiffs' leased apartment with proper locks and in particular with any inside locking device that would prevent others from gaining access by keys or by means of some other lock-slipping device from the outside and in fact prohibited the Plaintiff and other tenants from installing such locks thereby assuming a very high obligation to ensure that the Plaintiffs premises were secure;

   (d) they knew or should have known that a lady was assaulted in another of their rental units in Navaho Place sometime in May of 1982 in circumstances similar to those surrounding the assault of the Plaintiff and in circumstances

which would lead a reasonable person to believe or apprehend that this earlier assault was committed by a person having access to the rental units by use of keys from the outside, or by means of some other lock-slipping device, and yet the Defendants failed to take any adequate or cautionary measures to ensure the security of their tenants in Navaho Place from such invasions;

(e) They ignored the security recommendations of the Nepean Police Crime Prevention Unit;

(f) they gave no notice or warning to their tenants following the May incident;

(g) they inhibited their tenants from providing for their own security by reason of the provisions of clause 9A. of the lease.

I propose to deal with the liability issue under five headings:

1. Vicarious liability arising from the master-servant relationship.
2. Law of negligence.
3. Law concerning joint tortfeasors.
4. Law of contract.
5. Breach of the lease covenant for quiet enjoyment.

1. *Vicarious liability*

With respect to this aspect of the law, I am obliged to counsel for the defendants Minto and Greenberg. I can put it best by quoting from their memorandum of law on this aspect:

Although an employer is generally liable for the actions of his employee, this is only so if the employee who committed the act was acting within the scope of his employment.

"It is not sufficient to show that the relation of employer and employee existed between the actual tortfeasor and the person sought to be made liable, or even that the act in the doing of which the third person was injured was done on the employer's behalf. The act must be shown to have been performed while the employee was acting within the course of his employment, that is while the employee was engaged on his employer's business and was performing either duties falling within the scope of this authority which he was employed to perform or functions which were at least incidental to his employment. Unless this is established, any action against the employer will fail."

*Halsbury's Laws of England* Volume 16, p. 512

In my view, the defendant Halliday's wrongful act was an independent act, not within the scope of his employment and in these circumstances Minto cannot be held vicariously liable for Halliday's act of August 21, 1982. Halliday is, of course, liable in tort for the assault.

2. *Law of negligence*

There are two statutory provisions which must be considered with respect to this aspect of the law. They are s. 3(1) of the *Occupiers' Liability Act* and s. 96 of the *Landlord and Tenant Act*, which read as follows:

3(1) An occupier of premises owes a duty to take such care as in all the circumstances of the case is reasonable to see that persons entering on the premises and the property brought on the premises by those persons are reasonably safe while on the premises.

96(1) A landlord is responsible for providing and maintaining the rented premises in a good state of repair and fit for habitation during the tenancy and for complying with health and safety standards, including any housing standards required by law, and notwithstanding that any state of non-repair existed to the knowledge of the tenant before the tenancy agreement was entered into.

The submission by counsel for the plaintiff is that the obligation to provide and maintain safe and secure premises is an obligation under s. 96(1) and is also reiterated on the last page of the lease (ex. 1). The further submissions in law are that breach of s. 96 can be asserted in an action and that an obligation is created by s. 3(1) comparable to the common law duty of care. The authority for this first proposition is the decision of the Ontario Court of Appeal in *Fleischmann et al. v. Grossman Holdings Ltd. et al.* (1976), 16 O.R. (2d) 746 at p. 749, 79 D.L.R. (3d) 142 at p. 146. The authority for this second proposition is the decision of Smith J. in *Allison v. Rank City Wall Canada Ltd.* (1984), 45 O.R. (2d) 141, 6 D.L.R. (4th) 144, 29 C.C.L.T. 50, a decision involving a tenant plaintiff who was attacked and injured by a stranger in the parking garage of her apartment building. Smith J., at p. 145 O.R., p. 148 D.L.R., made this observation:

As far as the common law is concerned, it may be said to have been superseded by the Act, but only in the sense of the Act having abolished the distinction between invitees and licensees. The case-law had of itself gone a long way in that direction. The question which s. 3(1) directs the court to ask itself, "Did the defendant take reasonable care in *all the circumstances* to ensure that persons were reasonably safe while on the premises both in respect to their condition and regarding the activities carried on therein", is not at all different from the questions based upon *M'Alister (or Donoghue) v. Stevenson*, [1932] A.C. 562, and the cases following it. Who is my neighbour? Foreseeability and causation remain with us as well.

Counsel for the defendant Minto answers this by pleading that under s. 3(1) of the *Occupiers' Liability Act* the standard of care owed by the landlord to his tenant is one of "reasonableness". After citing a definition of a "reasonable person" propounded by Laidlaw J.A. in *Arland et al. v. Taylor*, [1955] O.R. 131 at p. 143,

[1955] 3 D.L.R. 358 at p. 367, this defendant's submission was that the landlord did exercise reasonable care with respect to its choice of locking devices on the door. It was said that there being no required statutory standard for deadbolt locks, the premises were equipped with locks which were considered acceptable in the community and which the plaintiff herself considered acceptable.

So far as the argument under s. 96(1) of the *Landlord and Tenant Act* was concerned, I am urged to find that what is a good state of repair is a matter of fact and degree in which regard must be had to the general conditions prevailing in the locality. It was submitted that the evidence showed that the locking devices and the system of master keys were both in general use in the community.

After reviewing the fairly lengthy evidence summaries which I have included in these reasons for judgment, I have concluded that the defendant Minto was negligent. It was the landlord in this case and I do not find negligence on the part of the defendants Greenberg. I would generally accept that the findings of negligence against Minto would include those set out in (b), (c), (d) and (e) referred to on pp. 589-90 above, with the exception of the latter part of (c). Minto did not prohibit the plaintiff and other tenants from installing locks.

The fact of the matter is that the lock on the plaintiff's door was not adequate or in a good state of repair. Locks which might have been acceptable in Ottawa generally would not, in my opinion, be acceptable in this community which I define as the Navaho project. I accept the evidence of the witnesses Limberger and Marshall.

I do not know what key opened the lock but it could have been a master key, a copied master key or, indeed, any other key if the lock was as worn as the witness Limberger indicated. The supervision of the keys generally by Minto was inadequate, particularly in the light of the known May incident. Minto did not accept the security recommendations which had been made but I do not consider that Minto could be faulted for not knowing Halliday's background or for not giving some general warning to all of the tenants following the May incident. The investigation was still under way and they were asked to keep things quiet. Halliday had provided references and had worked for the defendants for some years without problems. It is one thing to act in such a way as not to alarm tenants but it is quite another thing to take no additional security steps following the May incident and after being informed that the police considered that the culprit may have been an "insider".

With respect to foreseeability, I have decided that the action of the defendant Halliday was not too remote as to be reasonably foreseeable. Minto may not have foreseen that Halliday would have been the person to gain entry but the risk of some person entering in the circumstances was a foreseeable risk. If the landlord fails to provide proper locks, the likelihood of criminal activity increases.

The law with respect to intervening intentional and criminal conduct is well illustrated by two quotations from Linden, *Canadian Tort Law*, 3rd ed. (1982), p. 386:

Damage from intervening intentional and criminal conduct may have to be paid for by a negligent actor who creates an unreasonable risk of such a paid consequence. In *Stansbie v. Troman* [[1948] 2 K.B. 48], a decorator left in charge of a dwelling by the lady of the house departed for nearly two hours without locking the door. When some articles were stolen while the decorator was gone, he was made liable because he failed to take care to "guard against the very thing that happened". Similarly, In *Walker v. DeLuxe Cab Ltd.* [[1941] 3 D.L.R. 175], the defendant was held liable when the plaintiff's baggage was stolen along with the taxi cab which had been left at the curb with the ignition key in it. The same result followed when certain records were stolen out of an unattended and unlocked van. These cases may not be dealing with remoteness problems at all, but rather standard of care questions.

After referring to *Camphoto Ltd. et al. v. Aetna Roofing (1965) Ltd. et al.; Bastion-Blessing Co., et al., Third Parties*, [1971] 3 W.W.R. 116, on p. 387 this appears:

Wilson J., gave judgment for the plaintiff, rejecting the contention of the defendants that the meddling with the tanks constituted an intervening act which broke the chain of causation. Citing Greer L.J. in *Haynes v. Harwood* [[1935] 1 K.B. 146], he stated: "If what is relied upon as *novus actus interveniens* is the very kind of thing which is likely to happen if the want of care which is alleged takes place, the principle embodied in the maxim is no defence..." Referring to Lush J., in another case, Mr. Justice Wilson found that the intervention was not a "fresh, independent cause" of the damage and that "... the person guilty of the original negligence will still be the effective cause if he ought reasonably to have anticipated such interventions..."

### 3. *Law concerning joint tortfeasors*

I have held that the doctrine of vicarious liability does not apply in this case. Again, I am obliged to counsel for the defendant Minto for a quotation from their memorandum of law as follows:

For Brevity under this heading, *Salmond on Torts*, 12th Ed., makes the following observations:

"Where the same damage is caused to a person by two or more wrong-doers, those wrongdoers may be either joint or independent tortfeasors. Persons are deemed to be joint tortfeasors within the meaning of this rule whenever they are responsible for the same tort, that is to say,

whenever the law for any reason imputes the commission of the same wrongful act to two or more persons at once. This happens in at least three classes of cases — namely, agency, vicarious liability and common action, i.e., where a tort is committed in the course of a common action, a 'joint act done in pursuance of a concerted purpose' ... In order to be joint tortfeasors they must, in fact or in law, have attempted the same wrongful act. If a number of persons jointly participate in the commission of a tort, each is responsible, jointly with each and all of the others and also severally, for the whole amount of the damage caused by the tort, irrespective of the extent of its participation."

This is not a joint tortfeasor case. There was no common purpose between the defendants Halliday and Minto. They were, in my view, independent tortfeasors. Halliday's tort sounded in assault, and Minto's in negligence. They are, therefore, not jointly and severally liable to the plaintiff.

### 4. Law of contract

The plaintiff has alleged, *inter alia*, that the defendants prohibited the plaintiff and other tenants from installing additional locking devices on the inside of their doors.

The lease contracted between the plaintiff Q and the defendant did not prohibit the installation of any lock *per se*, but rather stated that the installation or changing of any locks could not be done without the consent of the landlord. This provision is precisely in keeping with the *Landlord and Tenant Act*, which states at s. 95:

95. A landlord or tenant shall not, during occupancy of the rented premises by the tenant, alter or cause to be altered the locking system on any door giving entry to the rented premises except by mutual consent.

As stated earlier, I hold that the plaintiff cannot succeed on this ground.

### 5. Breach of the lease covenant for quiet enjoyment

In the peculiar fact situation of this case, there was, in my opinion, no breach of the lease covenant and similarly, the plaintiff cannot succeed on this ground.

I turn now to the question of damages of the plaintiff and the infant plaintiff. The plaintiff alleges that she, as a result of the assault, has undergone pain, suffering, indignity and humiliation and has suffered emotional and psychological injury including fear, distress and anxiety and continues to do so. It is also alleged that the infant plaintiff, as a result of his mother's problems, has been deprived of guidance, care and companionship that he might reasonably have expected to receive from his mother if the assault had not occurred.

Dr. H. B. Danesh, a psychiatrist, saw the plaintiff on an emergency basis on November 25, 1982. Her symptoms were consistent with rape trauma and it was his opinion that individuals who have been subjected to this have two phases: an acute phase which was ending around November 25, 1982, and a chronic phase which continues for a long time. It is impossible, according to Dr. Danesh, to predict how long this chronic phase will last and most victims never really feel truly safe. The court proceedings tend to prolong the fright and abnormal or pathological grief can last for a long time. Dr. Danesh saw the plaintiff 11 times and the plaintiff with her son on four occasions. The son, who suffers from a learning disability, had behavioural and educational problems at school. Dr. Danesh's evidence is well stated in his report, dated October 24, 1983 (ex. 2), which reads in part as follows:

The circumstances of rape which included such conditions as having occurred in the middle of the night with her being awakened from her sleep, threatened with a gunlike object, and made to follow orders of an extraordinary and horrifying nature, all have caused her to develop a host of symptoms, which included considerable fear, inability to sleep, worry and anxiety about being raped again, and concerns about court appearance, all were noted. Initially it was felt that the crisis anxiety may subside without much subsequent symptoms and difficulties. The conclusion was primarily based on the healthy and the strong personality of Ms. Q.

However, subsequent interviews clearly showed that the extent of anxiety and phobia were greater than originally discerned and she was indeed suffering from a more prolonged and chronic phase usually observed in such traumatic conditions.

"Rape trauma syndrome", like most trauma induced conditions is usually combined with an acute and a chronic phase and in fact I began to see Ms. Q. at the tale end of the acute phase and the beginning of the chronic one. In the subsequent sessions between November, 1982 — September, 1983, Ms. Q. has been seen along with her son, age thirteen. The focus of therapy have been on anxieties and phobia's of Ms. Q. which were due to the rape incident and the stressful relationship between mother and son which were somewhat accentuated by the same incident.

The clinical history of this case clearly reveals that the rape incident has indeed caused her a long term emotional crisis which she has been able to overcome to some degree and has to continue to deal with for an undeterminable period of time, until she is fully recovered.

The conclusion of Dr. Danesh was that the plaintiff has not quite come to grips with reality but hopefully his expectation is that she will recover.

The plaintiff, in her evidence, testified that she experienced fear and that she did not discuss the incident with anyone for the first three weeks. At that point, she confided to a female friend and later spoke to members of her own family. She could not sleep and

lost considerable weight because she could not eat. She is tired and her pattern of life has changed with emphasis being placed on security since she now owns a large dog and has additional locks. The son was affected because of her problems, since, for example, she did not cook for him as she previously had and for a few months there was tension between them. The plaintiff went through the ordeal of the criminal trial and complains of "feeling dirty". The fortunate thing is that her son has improved and her present employer is satisfied with her performance. She is said to be considerably above average and superior in some respects. I assess the plaintiff's general damages at $40,000 and the infant plaintiff's damages under the *Family Law Reform Act*, at $1,000.

I am asked also, to award punitive damages as a sort of civil fine to protect the public in the future. It is said that the legal authorities do not require the inflicting of intentional harm and that it is enough if there is shown to be a reckless disregard for the position of the tenants or a callous indifference. I do not find any wanton disregard on the part of the defendant Minto and I am not prepared to award punitive damages against it.

Punitive damages cannot be assessed against the defendant Halliday who is at present in prison.

In the result, therefore, the plaintiff shall have judgment against the defendants Minto and Halliday in the amount of $40,000, and the infant plaintiff shall have judgment against the said two defendants in the amount of $1,000, which shall be paid into court to his credit to remain in court until he reaches his majority or until further order of the court. The action is dismissed against the other defendants.

Counsel suggested that submissions could be made on the question of costs or prejudgment interest after these reasons for judgment were released and I concur in that suggestion.

*Judgment for plaintiff against defendants Minto and Halliday; action against other defendants dismissed.*

---

## RE ADAIR

*Ontario Court of Appeal, Brooke, Lacourcière and Goodman JJ.A.*
*January 30, 1985.*

**Personal property security — Priorities — Bankruptcy — Collateral brought into jurisdiction — Extraprovincial security holder not filing within prescribed time — Debtor becoming bankrupt before expiry of period for filing — Trustee in bankruptcy has priority — Personal Property Security Act, R.S.O. 1980, c. 375, ss. 7, 22.**

A purchased an automobile and financed the purchase under a conditional sales agreement executed in Florida. The agreement was assigned to G Ltd. which perfected its interest in accordance with Florida law. On April 21st the automobile was brought into Ontario. On May 26th A made an assignment in bankruptcy. At that time at least two creditors had no knowledge of G Ltd.'s interest. On June 4th G Ltd. received notice that the automobile had been taken to Ontario. On June 28th G Ltd. filed a financing statement under the *Personal Property Security Act*, R.S.O. 1980, c. 375.

By s. 7(1) of the Act a security interest perfected in another jurisdiction before the collateral is brought into Ontario "continues perfected in Ontario for sixty days and also thereafter if within the sixty-day period it is perfected in Ontario", but by s-s. (2) where the secured party receives notice within the 60-day period that the collateral has been brought into Ontario his security interest ceases to be perfected in Ontario unless he registers a financing statement within 15 days of receiving notice. By s. 22(1)(*a*)(iii) an unperfected security interest is subordinate to the interests of the person who represents creditors, and by s. 22(2) the rights of such a person are referable to the date from which his status has effect. G Ltd. argued that its security interest continued perfected for 60 days from April 21st or, alternatively, for 15 days from June 4th, and so at the date when the trustee's status took effect (May 26th) G Ltd. had priority.

An application for an order to this effect succeeded at first instance. On appeal to the Ontario Court of Appeal, **held**, allowing the appeal, G Ltd.'s interest, not having been filed within the period stated in s. 7, was unperfected until June 28th. Consequently G Ltd.'s interest was subordinate to that of the trustee in bankruptcy.

*Bachand v. Trans Canada Credit Corp. Ltd. et al.* (1979), 1 P.P.S.A.C. 41; affd 30 O.R. (2d) 405, 117 D.L.R. (3d) 653, 1 P.P.S.A.C. 185, 12 B.L.R. 247, **apld**

**Other cases referred to**

*First National Bank of Bayshore v. Stamper* (1966), 3 U.C.C. Reporting Service 949, 225 A. 2d 162; *Churchill Motors Inc. v. A.C. Lohman Inc.* (1962), 16 A.D. 2d 560, 229 N.Y. 2d 570

**Statutes referred to**

*Personal Property Security Act*, R.S.O. 1980, c. 375, ss. 7, 22

**Rules and regulations referred to**

*Bankruptcy Rules*, C.R.C. 1978, c. 368

APPEAL from an order of Gray J., 48 C.B.R. (N.S.) 214, declaring a secured interest in an automobile.

*Melvyn L. Solmon*, for appellant.
*Michael McGowan*, for respondent.

The judgment of the court was delivered by

GOODMAN J.A.:—This is an appeal by Ward Mallette Inc., trustee in bankruptcy (the trustee) from an order pronounced on October 11, 1983, by the presiding judge in bankruptcy on an application by General Motors Acceptance Corporation (G.M.A.C.)

**ECF FILING ERROR - WILL BE AMENDED**

seeks. Nor do I think I can speculate whether there was here a casus omissus, and that the legislature merely forgot to make provision for traders in property. I have to consider the Act as it stands. I have to consider its scheme and its provisions in detail, and then see whether the payment received under it is indeed a trading receipt.

With all respect to the argument of counsel for the Crown, it seems to me that his broad proposition that whenever trading stock is turned into money it is a trading receipt is too wide. In each case, one must take account of the circumstances. The question to be answered is whether the particular receipt has to be brought into account in computing the profits or gains. There is no doubt that the value payment is in a sense a realisation, and the case no doubt bears a marked resemblance to *J. Gliksten & Son, Ltd.* v. *Green* (1) and *Newcastle Breweries, Ltd.* v. *Inland Revenue Comrs.* (2).

I have to consider the nature of the receipt having regard to the War Damage Act, 1943. We start, then, with this. There is nothing in the nature of a premium here. A capital payment has to be made in five instalments, and it is to be quite clear on the construction of s. 28, that, if and when a payment is received, no part of that payment, even if it be expended in restoring the property to its former state, can be brought into account when the property is sold and the net profit is realised as it otherwise admittedly would have been apart from the section. I think those two factors are indications that the legislature was not considering the trading aspect of the matter at all, but was imposing on an owner of land throughout the country the obligation to contribute, with the corresponding benefit, if disaster happened, of receiving a sum of money, a value payment. I think the legislature considered that that would be altogether outside the area of trading operations. It would be very remarkable, as Lord ATKIN pointed out in *Senham Harbour Dock Co.* v. *Crook* (3), if half of this money, which was plainly intended to be applied in rehabilitating the property —although it did not have to be so applied, that was the intention—should be instantly taken away in tax. I think that Parliament did not intend that result.

On the whole, although I think the case is a very difficult one, I have come to the conclusion that this is not a trading receipt. It was a contribution made and a payment received by the taxpayers, not as a part of their trading operations at all, but because they were compelled under the war damage scheme to make payments with the corresponding right of getting the benefit, in their capacity, not as traders, but as owners of the land. The scheme was brought into existence to enable owners of property to resort to a common purse to re-build war-damaged property for their benefit and the benefit of the country as a whole. I do not think it is proper to regard the receipt of this payment as a trading profit.

Accordingly, I must allow the appeals and the matter must be sent back to the commissioners to adjust the figure. The taxpayers must have the costs of the appeal, and of the cross-appeals. I allow the taxpayers' appeals, and I dismiss the Crown's appeals with costs.

*Taxpayers' appeals allowed. Crown's cross-appeals dismissed.*

Solicitors: *R. G. Bartlett & Co.* (for the taxpayers); *Solicitor of Inland Revenue.*
[*Reported by* F. A. AMIES, ESQ., *Barrister-at-Law*]

## SLATER v. CLAY CROSS CO. LTD.

[COURT OF APPEAL (Denning, Birkett and Parker, L.JJ.), May 16, 17, 1956.]

*Negligence—Negligence—Licensor's duty of care—Whether any distinction between duty to licensee and duty to invitee.*

*Negligence—Defence—Volenti non fit injuria—Knowledge of danger—Licensee walking on railway track—Injury owing to train driver's negligence.*

The defendants owned and operated a narrow gauge railway some 2¼ miles long which passed through a tunnel sixty-six yards in length. For many years local residents had habitually used the railway track as a pathway providing a short cut out to a village, and this practice had been acquiesced in by the defendants. While walking through the tunnel the plaintiff was struck by a train and injured and she claimed damages. The court found that the plaintiff was a licensee on the track and that the driver employed by the defendants was negligent, but that the plaintiff was guilty of contributory negligence. On appeal,

**Held:** the plaintiff was entitled to damages because—

(i) the defendants (whether they were invitors or licensors) were under a duty, in carrying out their operations, to take reasonable care not to injure anybody lawfully walking on the railway, and they had failed in that duty, and

(ii) the defence of *volenti non fit injuria* was not available since, although the plaintiff in walking through the tunnel voluntarily took the risk of danger from the running of the railway in the usual way, she did not take the risk of negligence by the driver; but her knowledge of the danger was a factor in considering the plaintiff's contributory negligence.

*Hankins* v. *Coulsdon & Purley Urban District Council* ([1954] 1 All E.R. 97) and *Dunster* v. *Abbott* ([1953] 2 All E.R. 1572) applied.
*Dann* v. *Hamilton* ([1939] 1 All E.R. 59) approved.

Appeal dismissed.

[Editorial Note. The third report of the Law Reform Committee, which was published as Cmd. 9305, made recommendations, to which DENNING, L.J., refers, concerning the abolition of the distinction between the duties owed by licensors and invitors respectively. The Occupiers' Liability Bill was introduced by the LORD CHANCELLOR on May 31, 1956, to give effect to recommendations of the Committee.

As to the duty of care owed to invitees and licensees, see 23 HALSBURY'S LAWS (2nd Edn.) 604, para. 853, and 610, para. 860; and for cases on the subject, see 36 DIGEST (Repl.) 54-56, 291-305, 65-68, 352-371.

As to the defence of *volenti non fit injuria*, see 23 HALSBURY'S LAWS (2nd Edn.) 715-718, paras. 1006, 1007; and for cases on the subject, see 36 DIGEST (Repl.) 160-162, 781-797.]

Cases referred to:
(1) *Hankins* v. *Coulsdon & Purley Urban District Council*, [1954] 1 All E.R. 97; [1954] 1 Q.B. 319; 118 J.P. 101; 3rd Digest Supp.
(2) *Dunster* v. *Abbott*, [1953] 2 All E.R. 1572; 3rd Digest Supp.
(3) *Slade* v. *Battersea & Putney Group Hospital Management Committee*, [1955] 1 All E.R. 429; 119 J.P. 212.
(4) *Dann* v. *Hamilton*, [1939] 1 All E.R. 59; [1939] 1 K.B. 509; 108 L.J.K.B. 255; 160 L.T. 433; Digest Supp.
(5) *London Graving Dock Co., Ltd.* v. *Horton*, [1951] 2 All E.R. 1; [1951] A.C. 737; 2nd Digest Supp.
(6) *Greene* v. *Chelsea Borough Council*, [1954] 2 All E.R. 318; [1954] 2 Q.B. 127; 118 J.P. 346; 3rd Digest Supp.
(7) *Cuthbert* v. *Manor*, (Jan. 19, 1956), unreported.

**Appeal.**

This was an appeal by the defendants, the Clay Cross Co., Ltd., from an order of ASHWORTH, J., at Nottingham dated Feb. 24, 1956. Responsibility for the plaintiff's injury suffered on the defendants' railway track was apportioned by the court as to sixty per cent. to the defendants by reason of their negligence and as to the remainder to the plaintiff in view of her contributory negligence and the plaintiff was awarded damages accordingly. The facts appear in the judgment of DENNING, L.J.

*Richard Elwes, Q.C., and Bernard Caulfield* for the defendants.
*H. G. Talbot* for the plaintiff.

DENNING, L.J.: In Derbyshire there has been for well over a hundred years a railway line owned by the defendants. We were told that George Stephenson himself made it. The defendants use it so as to carry limestone from their quarries at Crich down to Ambergate. It is a small gauge line, only three feet, three inches wide, and is 2¼ miles long. On that small line there are two tunnels. One of them, with which we are concerned, is only about eight feet or nine feet high, and it is just sixty-six yards long. On Feb. 12, 1953, the plaintiff was walking through the tunnel when she suddenly realised that a train was coming up behind her. She got down on to the ground to seek what safety she could, but unfortunately the train ran over one of her legs and cut it off. She now claims damages against the defendants saying that it was their fault.

If she were a trespasser on this railway, she would, of course, have no cause of action: but she says that the defendants had acquiesced for years in the villagers of Crich walking along this railway down to Ambergate and back. It was a short cut for them. The defendants had done nothing at all to show that they resented the villagers using it, and the villagers had in fact used it for years. The judge has found, and I think there can be no doubt, that she was what we call in law a licensee—not a trespasser who was unlawfully there, but a person who was permitted and allowed by the owners to be there—not for any matter in which they had an interest, but only for her own purposes.

It has been urged before us that, as she was a licensee and not an invitee, the duty of the defendants and their servants is greatly affected: and that it is much less on that account. The judge did not take that view; he held that it is much less on that account. The judge did not take that view; he held that there was a duty on the defendants' servants to take reasonable care in their operations, and he held that they had not taken that care. He found that instructions had been given to the drivers that on entering the tunnel they were to keep their heads down, they were to blow the whistle, and they were to slow down. On this particular occasion those instructions were not observed. It was in the winter. They had not been able to quarry fresh limestone up at Crich, they were using the existing stock; and, indeed, instead of having the train pulled by one little steam engine, they had a diesel engine on too. On coming up from Ambergate, the driver would have stopped before he entered the tunnel, and he would have whistled. On this occasion, the driver of the steam engine did not keep it pulling because he wanted to save up the steam for the gradient beyond but the diesel engine went on pushing behind. So the train did not stop at the entrance to the tunnel, the steam engine did not whistle at the entrance to the tunnel, and it did not slow down to a walking pace or stop. It went on at a pace which the judge put at eight miles an hour through the tunnel He found that in the circumstances it was going too fast, and that it failed to whistle; and that was negligence on the part of the driver for which the defendants were responsible. It seems to me that the judge's finding on that point cannot be disturbed.

Counsel for the defendants stressed the fact that the plaintiff was only a licensee and urged that this was of special significance. I do not think so. The

Law Reform Committee* has recently recommended that the distinction between invitee and licensee should be abolished, but this result has already been virtually attained by the decisions of the courts. The classic distinction was that the invitor was liable for unusual dangers of which he knew or ought to know, whereas the licensor was only liable for concealed dangers of which he actually knew. This distinction has now been reduced to vanishing point. The decision of this court in *Hawkins v. Coulsdon & Purley Urban District Council* (1) ([1954] 1 All E.R. 97) shows that a licensee too, as well as an invitee, is liable for unusual dangers of which he knew or ought to have known. The broken step in that case was not a concealed danger, but it was an unusual danger. The local authority did not know that it was a danger, but they ought to have known it, and they were held liable. The duty of the occupier is nowadays simply to take reasonable care to see that the premises are reasonably safe for people lawfully coming on to them: and it makes no difference whether they are invitees or licensees. At any rate, the distinction has no relevance to cases such as the present where current operations are being carried out on the land. If a landowner is driving his car down his private drive and meets some one lawfully walking on it, then he is under a duty to take reasonable care so as not to injure the walker; and his duty is the same no matter whether it is his gardener coming up with plants, a trades man delivering goods, a friend coming to tea, or a dog seller seeking a suitable gift. That is made clear by the decision of this court in *Dunster v. Abbott* (2) ([1953] 2 All E.R. 1572), which was applied by FINNEMORE, J., very recently in *Slade v. Battersea & Putney Group Hospital Management Committee* (3) ([1955] 1 All E.R. 429). So here it seems to me that the defendants, in carrying on their operations, were under a duty to take reasonable care not to injure anybody lawfully walking on the railway, and they failed in that duty. As the learned judge said:

'I, therefore, hold that the defendants' servants were guilty of negligence in exposing the plaintiff to a risk which the defendants, their servants and agents were well aware of, putting her in a position of great danger and failing to take the necessary reasonable precautions to prevent such danger arising.'

Counsel for the defendants next relied on the maxim *volenti non fit injuria*. He said that the plaintiff have known that it was dangerous to walk along this little tunnel and she must be taken voluntarily to have incurred the risk of danger from trains. He also said that that danger was an obvious one, and a licensee could not complain of dangers which were obvious or known to him or her. On this matter counsel very properly drew our attention to the decision of ASQUITH, L.J., in *Dann v. Hamilton* (4) ([1939] 1 All E.R. 59), where a passenger took a lift with the driver of a car who was obviously under the influence of drink. There was an accident due to the negligence of the driver, and it was said that the passenger had no cause of action against the driver because she had voluntarily incurred the risk. ASQUITH, J., held that the maxim *volenti non fit injuria* had no application to the case; and he gave judgment in favour of the injured passenger. I must say that I agree with him. I know that the decision has in some quarters been criticised, but I would point out that LORD ASQUITH himself wrote a note in the LAW QUARTERLY REVIEW for July, 1953, vol. 69, at p. 317, which explains what he decided. He wrote:

'The criticisms ... were to the effect that even if the volenti doctrine did not apply, there was here a cast iron defence on the ground of contributory negligence. I have since had the pleadings and my notes exhumed, and they very clearly confirm my recollection that contributory negligence was not pleaded. Not merely so, but my notes show that I encouraged counsel for the defence to ask for leave to amend this plea, but he would not

* See Editorial Note, p. 625, ante.

be drawn: why, I have no idea. As the case has been a good deal canvassed on the opposite assumption, I hope you will not grudge the space for this not unimportant corrigendum."

In so far as he decided that the doctrine of *volenti* did not apply, I think the decision was quite correct. In so far as he suggested that the plea of contributory negligence might have been available, I agree with him.

Applying that decision to this case, it seems to me that, when the plaintiff walked in the tunnel, although it may be said that she voluntarily took the risk of danger from the running of the railway in the ordinary and accustomed way, nevertheless she did not take the risk of negligence by the driver. Her knowledge of the danger is a factor in contributory negligence, but is not a bar to the action.

Even in cases which concern the condition of premises, like *London Graving Dock Co., Ltd. v. Horton* (5) ([1951] 2 All E.R. 1), which was mentioned to us, knowledge of the danger is only a bar where the party is free to act on it, so that his injury can be said to be due solely to his own fault. I tried to explain as much in *Greene v. Chelsea Borough Council* (6) ([1954] 2 All E.R. 318), and *Cuthbert v. Mason* (7) (Jan. 19, 1956, unreported). Where knowledge of the danger is not such as to render the accident solely the fault of the injured party, then it is not a bar to the action but only a ground for reducing the damages. So here the knowledge of the plaintiff of danger is not a complete bar. It is a factor in contributory negligence. The judge pointed out that, if she had been paying attention, she should have heard the train approaching, especially the diesel engine, which made a loud noise, and if she had looked back she ought to have seen or realised that the train was coming. He found that she was guilty of contributory negligence because anyone having due regard for his or her own safety on entering a tunnel would have paused and thought whether a train was coming.

So she was at fault; and the consequence of that is that, whereas in the old days she would have failed altogether, now it is a matter for reducing the damages to which she would otherwise be entitled. The judge put her responsibility at forty per cent. and the defendants' at sixty per cent. Counsel for the defendants has urged strongly before us that those proportions do not represent the right shares of responsibility; but we in this court always pay the greatest attention to the view of the judge who tried the case, heard the witnesses and had all the circumstances before him. On the whole, this is not, I think, one of those cases where we can interfere with the proportions.

In the result, I think the judge was right on all points in his decision, and I would dismiss the appeal.

**BIRKETT, L.J.:** I am entirely of the same opinion and have nothing to add.

**PARKER, L.J.:** I also agree and would only add a few words in deference to the argument of counsel for the defendants. The only point on which the learned judge has held the defendants liable in this case is that their driver, the driver of the train, was negligent in two respects, in that he did not whistle before entering the tunnel, and, in effect, that he was going too fast. On that issue it seems to me that the question of the relationship between the parties, licensor and licensee, is wholly immaterial except in this respect, to show that the plaintiff herself was lawfully on the land; and once the learned judge has found, as he did, that the driver well knew that people such as the plaintiff were used to going through this tunnel, it seems to me that he owed a duty to such a person to take reasonable precautions before entering the tunnel, and indeed his employers felt the same, because the instructions to the men were to blow a whistle and to slow down, and when one realises that the maximum speed of the train was ten miles an hour, slowing down there is clearly slowing down to walking pace.

In those circumstances counsel for the defendants is forced to attack the findings of the learned judge, and he points out, quite rightly, that in regard to the whistle there were only three persons who gave evidence. One was the plaintiff, who said she heard no whistle, and, as she did not even hear the train, not very much weight can be attached to that evidence. Then there was a man called Bradley, who was the driver of the diesel engine pushing the train. He was called by the plaintiff, and he said that he never heard a whistle. Counsel has quite rightly pointed out that he was far from satisfactory as a witness. The only other witness was Mr. Davenport, the driver of the steam train, who quite clearly was a very poor witness, to say the least, who alleged that he did sound the whistle. In those circumstances, the learned judge said that on the whole he accepted Mr. Bradley and not Mr. Davenport, and it seems to me that is clearly in accordance with the probabilities of the case, because on the return journey from Ambergate to Cred, the ordinary practice was for the train to stop and the whistle would only be sounded when the train went on again. On this occasion, although Mr. Davenport intended to stop, and so signalled to Mr. Bradley, Mr. Bradley from the rear of the train signalled him on and the train never stopped at all. It seems to me wholly in accordance with the probabilities that Mr. Davenport never sounded his whistle.

Finally, as regards the speed of the train, it is true that all the witnesses spoke of the train going slightly faster than a normal walking speed or walking pace, or, at the most, six miles an hour; but the learned judge, it seems to me, wholly refused to accept that evidence. Again, he looked to the probabilities of the case and found, as it seems to me, rightly, that at any rate the train was going faster than the plaintiff, because it caught her up in the tunnel itself. He took the view—and I see no reason to disagree with him—that the train throughout must have been going at a considerable speed, be it six or eight miles an hour—considerable, of course, in relation to the maximum speed of the train. I see no way in which those findings can be successfully challenged and I think the learned judge came to a right conclusion. On all other points I agree entirely with what my Lord has said.

*Appeal dismissed.*

Solicitors: *J. F. Coates & Co.* (for the defendants); *Sharpe, Pritchard & Co.,* agents for *Bertram Mather & Co.,* Chesterfield (for the plaintiff)

[*Reported by* F. A. AMIES, ESQ., *Barrister-at-Law.*]

Case 1:05-cv-10879-JLT    Document 76-19    Filed 03/26/2008    Page 1 of 3

## 1982—SCOTS LAW TIMES

Smith *v.* Downie

ments would be made for him to see it in private. This would seem to me to indicate that he knew full well the nature of the goods he was selling.

Counsel for the accused's third argument was to the effect that there was no shameless conduct inasmuch that no casual browser in his shop could see the content of the cassette. Certainly the cassette is in a wholly different position from an indecent and obscene magazine which is openly displayed on a shelf because there the casual browser can pick it up and see for himself the nature of its contents. Counsel for the accused also argued that it was in a different position from a film inasmuch that with a film one can pull out the film, hold it up to the light and see what is depicted in each frame, whereas with a cassette you can see nothing until you fit it into a video recorder and play it back through a television set. I agree that there is this difference between a film and a cassette and it was for this reason that the Crown ultimately requested that the word "films" be deleted and the words "video cassettes" substituted. This was agreed to by counsel for the accused who was no doubt anxious on behalf of the accused to obtain a decision. The distinction however is one without a difference inasmuch that one can scarcely imagine any shopkeeper selling films allowing members of the public to come in to their premises and pull out yards of cellulose until they found the frames which merited scrutiny. Yet there are many decisions upon this subject which include films amongst the indecent and obscene stock of the prosecuted retailer. In the case of *Tudhope* v. *Taylor*, 1980 S.L.T. (Notes) 54, there were findings-in-fact which indicated that the newsagent had taken considerable precautions to prevent the casual browser from perusing the contents of his "adult" stock and yet it was not found in that case that his conduct was less than shameless, although I accept entirely that the point which was argued in that case was whether the respondent had the necessary mens rea and that the findings-in-fact which revealed the steps he took to prevent magazines of a particular kind falling into the hands of children were prayed in aid of the Crown to show that he knew the calibre of his stock. In the recent case of *Robertson* v. *Smith*, 1979 S.L.T. (Notes) 51, it was held that a newsagent who kept stock in a drawer and showed the contents only on request was nonetheless guilty of shamelessly indecent conduct in respect of those items. It seems to me that standing the accused's admission that a person expressing an interest in purchasing the cassette would be allowed to view it, albeit privately, in the shop places the accused in a comparable position to a newsagent who keeps "adult stock" under the counter, as was the case in *Robertson*. In my opinion the accused not only had the cassette for sale in the sense that there was a physical object which he was prepared to hand over upon payment but also he exposed for sale its contents inasmuch that a prospective customer could view it in his shop. It might seem odd that a person who conducts a perfectly

legitimate business except for one item of stock should nonetheless find himself prosecuted for conducting himself in a shamelessly indecent manner but standing the trend of recent authorities on this branch of the law I am compelled to think that he did.

*Counsel for Accused. Taylor; Solicitors, Beltrami, Dunn & Co., Glasgow.*

[The accused appealed to the High Court but abandoned the appeal.]

# SHERIFF COURT OF LOTHIAN AND BORDERS AT EDINBURGH

*(Sheriff N. Macvicar, Q.C.)*

21 March 1978

## 10.   THOMAS GRAHAM & CO. LTD. v. THE CHURCH OF SCOTLAND GENERAL TRUSTEES

**Reparation — Negligence — Property — Operations on — Damage to neighbouring property — Vandalism — Whether duty of care to secure vacant property against vandalism which could damage neighbouring property.**

A company owning premises adjacent to a disused church raised an action of reparation against the Church's general trustees seeking damages for loss caused by a fire which had been started by unknown vandals in the church and which had spread to the company's premises. The pursuers contended that the defenders, knowing that the church was situated in an area subject to vandalism on a large scale and that it had been broken into on a number of occasions, had a duty of care to secure it against intruders.

*Held* that the possibility that intruders might maliciously or thoughtlessly set the defenders' premises on fire was something which should have been within the defenders' contemplation and that accordingly the pursuers' loss had been caused by the defenders' negligence; and decree *granted*. (*Evans* v. *Glasgow District Council*, 1978 S.L.T. 17 followed.)

Thomas Graham & Co. Ltd. raised an action for damages of £3,000 against the Church of Scotland General Trustees.

The sheriff made the following findings-in-fact:

(1) The pursuers are a limited company incorporated under the Companies Acts, carrying on business as plumbers' merchants and having a place of business at 23 Silvergrove Street, Glasgow; (2) the defenders are the Church of Scotland General Trustees, incorporated by the Church of Scotland (General Trustees) Order 1921, having their office at 121 George Street, Edinburgh; (3) the defenders are vested, as trustees aforesaid, in the

church building (with an adj... as Greenhead-Barrowfield Ch... London Road, Glasgow; (4) ... at 23 Silvergrove Street conn... slabbing shop, and are adjac... church; (5) in 1971 the said c... a place of worship, and th... various negotiations with the... buildings; (6) the document... process relate to the said ch... after the beginning of 1971 ... not occupied or used in an... remained under the direct c... and of the former ministe... Crombie; (9) the doors of the... and boarding was placed ove... ground level; (10) on a nu... 1971, 1972 and the early p... persons broke into the chur... various fixtures and fittings;... reported. when they occurred... who attempted to restore the... replacing the boarding on the... March 1973 onwards, access... gained by means of the doo... could no longer be locked;... interior of the church was... Mennie, a retired builder a... Glasgow Dean of Guild Court... the Glasgow Master of Works... Crombie and another repres... Scotland; (14) the said inspec... tion to the vandalism already... been lit in the interior; (15)... report dated 10 May 1973, e... the building was a serious fi... immediately demolished in th... (16) on the night of 15/16 M... persons unknown entered the ... fire, which caused extensive d... as a result of the conflagrat... timber fell on to the pursuers'... damage to the buildings and t... and damage sustained by th... £3,000; (19) the area of Gl... church is situated is subject ... scale.

On 21 March 1978 the sh...

*The Sheriff (N. Macvicar*... direct evidence as to the ... there can be very little do... by intruders, either as an a... or as a prank which g... remainder of my finding... evidence of the seven witn... namely, two of their direct... Mr McAllister; two official... of Works Department, ... Mackintosh; Mr Mennie... make the report for the De... Weir, of the Glasgow ... attended the premises at th... Police Inspector Barritt, wh... of the church as a local ser... 1971 and 1973. No sig... opinion, or dispute on ma... the course of their evidence... evidence.

## SHERIFF COURT REPORTS

church building (with an adjoining church hall) known as Greenhead-Barrowfield Church and situated at 570 London Road, Glasgow; (4) the pursuers' said premises at 23 Silvergrove Street consist of a yard, store and slabbing shop, and are adjacent to the rear of the said church; (5) in 1971 the said church ceased to be used as a place of worship, and the defenders entered into various negotiations with the object of disposing of the buildings; (6) the documents contained in no. 16 of process relate to the said church and negotiations; (7) after the beginning of 1971 the church buildings were not occupied or used in any way; (8) the buildings remained under the direct control of the Kirk Session and of the former minister, the Reverend William Crombie; (9) the doors of the church were kept locked and boarding was placed over windows accessible from ground level; (10) on a number of occasions during 1971, 1972 and the early part of 1973 unauthorised persons broke into the church and stole or damaged various fixtures and fittings; (11) these incidents were reported, when they occurred, to the church authorities, who attempted to restore the security of the building by replacing the boarding on the windows; (12) from about March 1973 onwards, access to the church could be gained by means of the door on the west side, which could no longer be locked; (13) on 10 May 1973 the interior of the church was inspected by Alexander Rennie, a retired builder acting as reporter to the Glasgow Dean of Guild Court, together with officials of the Glasgow Master of Works Department, the said Mr Crombie and another representative of the Church of Scotland; (14) the said inspection revealed that, in addition to the vandalism already referred to, small fires had been lit in the interior; (15) the said Mennie, in his report dated 10 May 1973, expressed the opinion that the building was a serious fire hazard and should be immediately demolished in the interest of public safety; (16) on the night of 15/16 May 1973, some person or persons unknown entered the said church and started a fire, which caused extensive damage to the building; (17) as a result of the conflagration masonry and burning timber fell on to the pursuers' said property and caused damage to the buildings and their contents; (18) the loss and damage sustained by the pursuers amounted to £000; (19) the area of Glasgow in which the said church is situated is subject to vandalism on a large scale.

On 21 March 1978 the sheriff *granted* decree.

*The Sheriff (N. Macvicar, Q.C.).*—There was no direct evidence as to the cause of the fire, but we can be very little doubt that it was started by intruders, either as an act of wilful fire-raising, or as a prank which got out of hand. The remainder of my findings are based on the evidence of the seven witnesses for the pursuers, namely, two of their directors, Mr Copeland and McAllister; two officials of the former Master of Works Department, Mr Gauld and Mr McIntosh; Mr Mennie, who was instructed to prepare the report for the Dean of Guild Court; Mr —, of the Glasgow Salvage Corps, who guided the premises at the time of the fire; and the Inspector Barritt, who had some knowledge of the church as a local sergeant of police between — and 1973. No significant difference of opinion, or dispute on matters of fact, arose in course of their evidence. The defenders led no evidence.

The proof allowed was before answer. I am satisfied, as an initial matter, that the pursuers have stated a relevant case. I see no reason why an owner or occupier of heritable property should not be liable to an adjoining proprietor for damage arising out of a fire started in his own premises by a malicious third party, provided that the risk of such an occurrence was so foreseeable that he ought to have taken steps to eliminate or reduce the risk. I respectfully agree with the opinion of Lord Wylie in the recent case of *Evans v. Glasgow District Council,* 1978 S.L.T. 17, at p. 19, where his Lordship says: "In the circumstances of the present case, on averment, there is the all-important factor that the defenders were well aware that both the premises occupied by the pursuer were located in areas where vandalism was likely to take place if premises were left improperly secured. In the case of Ballater Street . . . there is the further averment that the danger of this kind of intrusion had been specifically brought to their attention by the pursuer. In these circumstances, applying the time-honoured dictum of Lord Atkin in *Donoghue v. Stevenson,* 1932 S.L.T. 317; 1932 S.C. (H.L.) 31, it seems to me that it would be entirely in accordance with principle to hold that in such circumstances there was a general duty on owners or occupiers of property, particularly property of the tenement type, where they chose to leave it vacant for any material length of time, to take reasonable care to see that it was proof against the kind of vandalism which was calculated to affect adjoining property. It may be that the absence of precedent reflects a relatively recent development of this particular kind of social problem, but if the factual situation be as averred it seems to me impossible to accept that no such general duty of care exists." In *Evans* the damage to the pursuer's premises was caused by persons entering the premises above, and dropping lighted material through holes in the floor, but it does not seem to me that this factual difference affects the principle involved.

The defenders — through their agents, the minister and Kirk Session — must have been well aware that the church had been broken into on a number of occasions. The possibility that such intruders might maliciously or thoughtlessly set the premises on fire was something, in my opinion, which should have been within their contemplation. No owner of property who leaves it unoccupied for any material length of time can afford to ignore such a possibility, especially in an urban area of high vandalism, such as London Road in Glasgow is clearly proved to have been. The question is whether the defenders ought reasonably to have done more than they did to keep the premises secure. It was contended on their behalf that the risk of a fire was relatively so small that it would not have justified the trouble and expense — admittedly quite large — of making the premises totally, or at least virtually, secure against all comers, by bricking up the

Thomas
Graham
& Co. Ltd.
v. The
Church of
Scotland
General
Trustees

Case 1:05-cv-10970-JLT   Document 76-19   Filed 03/26/2008   Page 3 of 3

Thomas
Graham
& Co. Ltd.
v. The
Church of
Scotland
General
Trustees

windows and doing some equivalent operation to the doors.

There appear to me to be several weaknesses in this argument. In the first place, the limited risk of the building being set on fire and affecting nearby property must be weighed against the possibly catastrophic consequences of such an occurrence. Second, there is no evidence that the defenders, or anyone on their behalf, applied their minds to the question, and ample evidence to support the view that if they had, and had taken advice on the matter, they would have been told that the building was a serious fire risk. Further, the evidence is to the effect that, while the security of the building appears to have been maintained, at least to a deterrent standard, until early in 1973, the side door was not lockfast for about two months before the fire. If this is correct, it may well be that the small fires, evidence of which Mr Mennie saw on 10 May, had been lit during this last period, the insecure side door having constituted an invitation to children, tramps or similar intruders. In such a situation, it scarcely lies in the defenders' mouths to argue that even the most stringent security would not necessarily have prevented the fire. In my opinion, if the defenders had maintained the side door in the condition it was in before March 1973, there is a good likelihood that the fire would not have happened. Accordingly, I hold the defenders liable to pay damages to the pursuers in the agreed sum of £3,000.

*Solicitors for Pursuers, Murdoch Jackson, Glasgow.—Solicitors for Defenders, Brodies, W.S.*

## SHERIFF COURT OF LOTHIAN AND BORDERS AT EDINBURGH

(Sheriff R. D. Ireland, Q.C.)

2 *November* 1979

### 11.   TEAGUE v. WILLIAM BAXTER & SON LTD.

**Reparation — Negligence — Breach of statutory duty — Lifting operations — Lifting appliances to be of adequate strength — Crane and driver hired to main contractors injuring their employee — Whether crane owners "using" crane — Construction (Lifting Operations) Regulations 1961 (S.I. 1961 No. 1581), regs. 3 (1) and 10.**

Regulation 10 of the Construction (Lifting Operations) Regulations 1961 requires that every lifting appliance should be inter alia of adequate strength. Regulation 3 (1) defines the persons subject to the duty imposed by said regulation as:

"every contractor, and every employer of workmen, who . . . uses any plant or equipment to which . . . the provisions of [reg. 10 apply]." An action of damages for personal injuries caused by the collapse of a crane's jib was brought by an employee of the main contractors who had hired the crane and its driver against the owners of the crane. The defenders contended inter alia that they were not subject to this statutory duty since only the main contractors could be said to be "using" the crane within the meaning of the regulation. It was further argued by the defenders that there was no material difference between the position of the hirer of a crane and that of a seller in this regard, and since the latter could not be subject to the regulations' obligations, the former should not be either.

*Held,* that the crane-owners were subject to the duty imposed by the regulations in that, as it was their property, they alone had the right, failing provision in the contract of hire, to alter or adjust the crane so as to ensure that it complied with the regulations; and in that they were interested in the working of the crane since they were using it to earn money; and *proof before answer allowed.*

(Dicta of Lord President Cooper in *Gallagher v. Wimpey & Co. Ltd.,* 1951 S.L.T. 377; 1951 S.C. 515, *applied.*)

John Teague raised an action of reparation for personal injuries against William Baxter & Son Ltd., founding inter alia on the Construction (Lifting Operations) Regulations 1961.

The defenders tabled a plea to the relevancy.

On 2 November 1979 the sheriff *repelled* the defenders' preliminary plea and *allowed* a proof before answer.

*The Sheriff (R. D. Ireland, Q.C.).*—The pursuer was employed by a company called Mitchell Construction and was engaged in laying a sea wall at Seafield Road, Edinburgh. Mitchell Construction hired from the defenders a crane which was used to swing concrete slabs into position on the wall. The driver of the crane, Colin King, was employed by the defenders. On 24 February 1972, when the crane was getting a slab into position for lowering on to the wall, the jib collapsed and struck and injured the pursuer. On 11 February 1975, just before the expiry of the limitation period, the present action was raised in the sheriff court at Haddington. On 3 March 1975 the action was sisted and thereafter fell asleep. Three years later, on 14 March 1978, the cause was awakened and transferred to the sheriff court at Edinburgh, as being convenient for the parties and their solicitors. The record was closed on 20 September 1978, but was later amended, and after sundry procedure I heard counsel for the parties in debate on 17 October 1979, more than 7½ years after the accident.

The pursuer's case is based both on the common law and on the Construction (Lifting Operations) Regulations 1961. The defenders have preliminary pleas on both aspects of the case, but it was agreed at the debate that there should be a

proof before answer on the [...]
was contended however that t[...]
irrelevant and should not be a[...]

Regulation 10 of the C[...]
Operations) Regulations 196[...]
"(1) Every lifting appliance [...]
good mechanical constructi[...]
adequate strength and free f[...]
be properly maintained." [...]
counsel for the defenders t[...]
lifting appliance, nor tha[...]
sufficiently averred that it [...]
strength. He also conceded [...]
which the crane was being [...]
engineering construction, so [...]
reg. 2. The only issue betw[...]
whether the pursuer's averm[...]
defenders, who were not h[...]
owners of the crane who [...]
employers for the purpose [...]
work, were persons subject [...]
by the regulations. This [...]
determined by deciding wh[...]
the description, in the seco[...]
"every contractor, and ever[...]
men, who erects, instals, wo[...]
or equipment to which any [...]
Regulations 8 to 46, 48 and [...]

The word "contractor" i[...]
regulations or in the paren[...]
with the operations at Seafi[...]
describe Mitchell Construct[...]
taking the job as a whole. [...]
word, as it is used in the [...]
(1), seems to me to be cap[...]
to the defenders. The firs[...]
begins: "It shall be the du[...]
and every employer of wor[...]
*taking any of the operatio[...]
these Regulations apply."* [...]
reg. 3 (1), however, the qu[...]
have emphasised are omitte[...]
words: "who erects, instal[...]
plant or equipment". I infe[...]
language that the first part [...]
the undertaker of the who[...]
Mitchell Construction — bu[...]
may apply to anyone w[...]
described as a contracto[...]
provision of equipment. [...]
defenders are quite pr[...]
"contractors". This accor[...]
current use of the word as [...]
*Oxford English Dictionary:* [...]
furnish supplies, or to [...]
service at a certain pri[...]
undertakes work by cont[...]
wrong, however, the defen[...]
the description "employer [...]
crane driver was their empl[...]

The next question, to[...]
argument at the debate wa[...]
the defenders, either a[...]
employers of workmen, "u[...]
become subject to the seco[...]

## VEINOT v. KERR-ADDISON MINES LTD.

*Supreme Court of Canada, Laskin, C.J.C., Martland, Judson, Ritchie, Spence, Pigeon, Dickson, Beetz and de Grandpré, JJ.   October 1, 1974.*

Negligence — Occupier's liability — Snowmobile driver injured by barrier on private road — Whether licensee or trespasser — Duty of care.

Plaintiff suffered head injuries when he struck a two-inch pole that formed a gate across a private road on which he was travelling on his snowmobile at 15 to 20 m.p.h. at night. The gate was just west of a hydro right of way and the defendant was aware that a good deal of snowmobile traffic occurred on the private road to the east of the right of way and on the hydro right of way itself. One of the defendant's security officers had noticed occasional tracks to the west of the right of way as well. Plaintiff did not see the gate, although his lights were on. The private road extended from a public road, was ploughed, and had no markings to indicate that it was not a public road. The plaintiff did not realize that he was on private property. The jury found that the defendant was on defendant's land with the implied permission of the defendant, and that his injuries were caused by a concealed danger of which the defendant had knowledge, that the defendant had failed to take reasonable care to avoid injury to persons traversing the area and that plaintiff did not fail to take reasonable care for his own safety. The Court of Appeal reversed the judgment for the plaintiff based on this verdict on the ground that the evidence did not support a finding that plaintiff had an implied licence to be on that part of the property to the west of the hydro right of way.

On further appeal, *held*, Martland, Judson, Ritchie and de Grandpré, JJ., dissenting, the appeal should be allowed.

*Per* Dickson, J., Laskin, C.J.C., Spence, Pigeon and Beetz, JJ., concurring: There was evidence upon which the jury could reach the conclusions it did and the jury's verdict should not have been disturbed. Even if plaintiff were regarded as a trespasser, his presence could reasonably have been anticipated and the defendant therefore owed him a duty to treat him with ordinary humanity. The defendant should have recognized the pipe as a covert peril menacing the safety of anyone who came upon the road at night on a snowmobile.

*Per* Martland, J., Judson, Ritchie and de Grandpré, JJ., concurring, dissenting: A licence should not be implied unless the owner of property is aware of intrusions and permits them as opposed to merely tolerating them. There was no evidence of implied permission. The duty of an occupier to a trespasser can only arise if he knows of the presence of the trespasser or knows facts which show a substantial chance that trespassers may come on the land. There was no danger to trespassers for which the defendant could be held liable.

[*Robert Addie & Sons (Collieries), Ltd. v. Dumbreck*, [1929] A.C. 358; *Edwards et al. v. Railway Executive*, [1952] A.C. 737; *Com'r for Railways v. Quinlan*, [1964] A.C. 1054; *Com'r for Railways (N.S.W.) v. Cardy* (1960), 104 C.L.R. 274; *Videan et al. v. British Transport Com'n*, [1963] 2 Q.B. 650; *British Railways Board v. Herrington*, [1972] A.C. 877; *Southern Portland Cement Ltd. v. Cooper*, [1974] 1 All E.R. 87, refd to]

---

this did not occur. Hence, counsel for the applicant argued that s. 1.01 (b) (ix) had no application.

Counsel for the applicant contended that if the clause were not interpreted in this manner, any employee who was temporarily laid off who had seniority rights would be entitled to S.U.B. benefits and the words "pending an adjustment of work force in accordance with the collective agreement" would be meaningless. Or, to use his words, the chairman of the Board by his interpretation "bluepencilled" these words from s. 1.01(b) (ix). While this may be so, it should be noted that the agreement uses the word "pending", not "providing" or "if an adjustment of the work force is made".

On the other hand, counsel for the respondent contended that the chairman had given a reasonable interpretation to s. 1.01(b) (ix). He submitted that the words "pending an adjustment of work force in accordance with the terms of the collective agreement" were merely words of description, that is, they described the period or state of affairs that must exist before a person temporarily laid off out of the line of seniority could claim S.U.B. benefits.

In support of this interpretation, counsel for the respondent relied on the unjust and unfair result that would flow from adopting the submissions of counsel for the applicant. If the interpretation of counsel for the applicant of s. 1.01 (b) (ix) were correct, then a person who has been temporarily laid off would have no claim to S.U.B. benefits if he recalled in the second week, whereas a person not so recalled but who made use of the provisions of cl. 9.20(C) of the collective agreement to displace a junior employee would have a claim. As credits are built up in the S.U.B. Plan by length of service, counsel for the respondent argued that this would be most unfair to employees with seniority.

While there is considerable force in the argument advanced by counsel for the applicant, in my opinion the interpretation put on s. 1.01(b) (ix) by the chairman of the Board is one that it could reasonably bear. This being so, the Court cannot quash the decision of the Board. The application must, therefore, be dismissed. The respondents will be entitled to their costs from the applicant.

*Application dismissed.*

APPEAL from the judgment of the Ontario Court of Appeal, 31 D.L.R. (3d) 275, [1973] 1 O.R. 411, allowing an appeal from the judgment of Houlden, J., in favour of the plaintiff in an action for damages for personal injuries tried with a jury.

*R. B. Tuer*, Q.C., for appellant.
*C. F. McKeon*, Q.C., for respondent.

LASKIN, C.J.C., concurs with DICKSON, J.

MARTLAND, J. (dissenting):—This appeal is from a judgment of the Court of Appeal for Ontario, which allowed the appeal of the present respondent (hereinafter referred to as "the Company") from the judgment at trial, pronounced upon the answers to questions put to a jury, which awarded to the appellant, Peter Veinot (hereinafter referred to as "Veinot"), damages in the amount of $29,537 for personal injuries which he had suffered.

The Company operates a mine in the area of Virginiatown and in 1950 acquired the surface rights to a parcel known as Mining Claim L25195 for the purpose of storing its high explosives. It used the property for such purpose steadily until June of 1970, when the magazines were moved from the property into the mine complex itself as a result of a requirement that high explosives be guarded. In the year 1950, when the first magazine was built, a gate was erected consisting of a two-inch diameter pipe bar, placed some 45 in. from the ground, supported on two "U" bolts inserted in 8 x 8 posts on either side of the private road, which led west from the gate to the powder magazine, with a chain on the pipe so that it could be padlocked. The Company kept the gate locked at all times.

The Company had allowed only two people, other than Company employees, to have access to its property. One of these, Mr. Jim Youni, was given access for logging purposes at some time in the past. Mr. Youni had used the private road with permission and had been in possession of a key to the gate. A Mr. Campbell had been allowed to use the private road for prospecting purposes and he had been required by the Company to leave his truck inside the gate for the duration of this operation.

The only access for traffic to the powder magazine property was by the private road. This road came to a dead end at the powder magazines and from this point there were three old logging roads branching off, which were impassable or almost impassable. A short distance to the east of the site of

the powder magazines there was an old logging road extending to the north of the private road, which was passable by truck, with difficulty, for approximately a mile.

The Company caused a "Danger — Explosives in the Area" sign to be placed inside the gate on the north side of the private road and "Danger — Explosives, No Trespassing" signs at the powder magazines.

To the east of the gate the Company's private road runs to Virginiatown. Proceeding from Virginiatown to the gate, the road commences from 28th Ave., which is situated in the north-west portion of the townsite running east and west. The private road, which is owned and maintained by the Company, runs west from 28th Ave. for about 1,000 ft. and then swings slightly toward the north for about 200 ft. It then reaches a right of way of the Hydro-Electric Power Commission of Ontario, which runs north and south. The private road crosses the right of way, diagonally, toward the north-west, and then runs toward the west. From the westerly boundary of the Hydro right of way the road runs for some 1,100 ft. to the powder magazine area. The gate on the road is located where the private road leaves that boundary.

Some distance north of the private road there is another Hydro right of way, which intersects the north-south Hydro line. The old logging trail, which extends north from the private road near the powder magazine area, reaches to the east-west Hydro line.

On the night of March 17, 1970, Veinot was driving his snowmobile, accompanied by his wife, as a passenger. They were accompanied by a friend and his wife on their own snowmobile. Both machines had headlights. The journey commenced at Larder Lake, where Veinot has lived for some 32 years, and which is some 6 or 7 miles, as the crow flies, south-west of Virginiatown. They drove out onto the bay adjacent to Larder Lake, returned to the land and continued north-easterly for about 5¾ miles and then northerly for 7 or 8 miles. They then returned southerly and at Crosby Lake turned south-easterly, traversing Beaver Lake, crossing the Ontario Northland right of way and then turning more easterly, crossed Bear Lake and, at its eastern end, followed the east-west Hydro right of way until they came to the logging road.

Veinot was not sure where he was at that point, but travelled down this road until he came to the private roadway of the Company at the point somewhat easterly of the explosive storage locations. Veinot said that this road, i.e., the old

536    DOMINION LAW REPORTS    51 D.L.R. (3d)

logging road, had a lot of snowmobile tracks on it and was hard packed from previous use. He then continued easterly on the private road and, while driving at about 15 to 20 miles per hour, his head hit the pipe and he sustained serious injuries. His wife and the occupants of the other snowmobile were able to avoid injury.

The case was tried prior to the judgment of the House of Lords in *British Railways Board v. Herrington*, [1972] A.C. 877. It went to the jury on the basis that the Company's liability was dependent upon Veinot establishing that he was on the Company's land with the implied permission of the Company.

The questions put to the jury and their answers were as follows:

1. Was the plaintiff on the date of the accident on the land of the defendant with the implied permission of the defendant?

Answer: Yes.

2. If the answer to question 1 is "yes", were the plaintiff's injuries caused by a concealed or hidden danger or by a trap of which the defendant had knowledge?

Answer: Yes.

3. If your answer to question 2 is "yes", what was the concealed or hidden danger or trap? Please specify in detail.

Answer: It was a rusty pipe approximately 2" in diameter suspended across the travelled portion of the road at a height of approx. 45 inches from the road.

4. If your answers to questions 1 and 2 are "yes", then did the defendant fail to take reasonable care to avoid injury to such person traversing that area?

Answer: Yes.

If your answer is "yes", please specify in detail.

There were no distinguishing warnings of the location of the pipe across the roadway from either the east or west approach to the pipe or on the pipe itself.

5. If your answers to questions 1 and 2 are "yes", did the plaintiff fail to take reasonable care for his own safety?

Answer: No.

The Court of Appeal reached the conclusion that there was no evidence of implied licence which could support the finding of the jury on that point.

On this issue, the mine manager of the Company testified that he had no knowledge or information of snowmobiles coming down and going across any part of the powder magazine property. He was aware of the use for snowmobiles of the road from Virginiatown to the north-south Hydro right of way and thence, via the east-west Hydro right of way, to Bear Lake.

VEINOT v. KERR-ADDISON MINES LTD. (Martland, J.)    537

The chief security officer of the Company testified that he visited the powder magazine area on an average of once or twice a week. He would unlock the gate and proceed to the powder magazine. He had never seen anyone on the site other than mining personnel. In the winter of 1969-70 he had seen, on a very few occasions, snowmobile tracks just west of the gate. He had seen none near the powder magazine. He did not report the presence of these tracks to the mine manager. He did not do anything about them because, as he said, it would have been necessary to post a guard to prevent entry or to catch somebody who was there.

On the issue of implied licence, Arnup, J.A., who delivered the judgment of the Court, makes the following comments [31 D.L.R. (3d) 275 at p. 279 and 280, [1973] 1 O.R. 411]:

After careful consideration of the entire transcript it is my view that there was no evidence of implied licence to go to the jury. There was a good deal of evidence that snowmobilers had been using the defendant's private road to go westerly from the North Virginiatown townsite to the north-south Hydro right of way, and thence along that right of way in both directions. However, as noted earlier, the only evidence of knowledge on the part of servants of the defendant of any use of the roadway *west* of the Hydro right of way is that on "very few occasions" in that same winter, the security officer had seen snowmobile tracks a short distance west of the gate in question.

In my view, there was a physical separation, by the north-south Hydro line itself, of the two parts of the private roadway, even without regard to the gate across the roadway at the west limit of the Hydro right of way. I do not think that knowledge of user of the private roadway in that portion lying east of the Hydro right of way, however extensive, can be relied on so as to give rise to an implication that the occupier had good reason to expect similar trespassing on the portion *west* of the Hydro right of way.

In *Edwards et al. v. Railway Executive*, [1952] A.C. 737, the House of Lords had to consider the evidence requisite to create an implied licence. A nine-year-old boy, who had gone on to the defendant's railway line on top of a railway embankment, was struck by a train. The embankment was fenced, but there was evidence that other children had been accustomed to break through the fence and had made a slide down the embankment. The fence had been kept in repair, after damage, and was in proper condition on the day of the accident. The jury found that the boy had gone on to the embankment and on to the railway line with the tacit permission of the defendant's servants.

The House of Lords held that there was no evidence to jus-

tify these findings. At p. 747, Lord Goddard says: "Now, to find a licence there must be evidence either of express permission or that the landowner has so conducted himself that he cannot be heard to say that he did not give it." Lord Porter, at p. 744, says:

The onus is on the appellants to establish their licence, and in my opinion they do not do so merely by showing that, in spite of a fence now accepted as complying with the Act requiring the respondents to fence, children again and again broke their way through.

The implication of a tacit permission arising from other intrusions upon an owner's land could not be made, under the concept of an implied licence, unless it could be shown that the owner was aware of such intrusions, and, even if he was aware, it had to be shown that he permitted such intrusions on his land and not merely tolerated them.

Lord Porter, following the paragraph of his reasons which contains the statement above quoted, went on to say:

It will be observed that in expressing this opinion I have assumed that the servants of the Railway executive had knowledge that children were accustomed to go there. I am not convinced that they had this knowledge, but it may be that the fence must have known, although I am not prepared to accept the proposition that any inference can be drawn from the fact that trains passed up or down, or to hold that their drivers ought or must be taken to have seen the children. However that may be, and even assuming that the respondents had knowledge of the intrusion of children on to the embankment, the suggestion that that knowledge of itself constitutes the children licensees, in my opinion, carries the doctrine of implied licence much too far, though no doubt where the owner of the premises knows that the public or some portion of it is accustomed to trespass over his land he must take steps to show that he resents and will try to prevent the invasion.

As has already been noted, the Company had no knowledge that operators of snowmobiles had used its private road to drive their vehicles from the powder magazine area to the gate, or from the gate to that area. The only tracks seen by the persons security officer were just to the west of the gate. The persons whose vehicles created those tracks must have been aware of the presence of the gate, the very purpose of which was to indicate the resentment of the Company against trespass on its road, and to prevent such intrusion by vehicular traffic.

In my opinion, there was no evidence of implied permission having been given by the Company for the use of its private road by the drivers of snowmobiles.

This conclusion, in itself, does not necessarily involve the failure of this appeal. Counsel for Veinot contends that, even

if Veinot was not a licensee, none the less the Company owed a legal duty to him, even as a trespasser, which had, on the facts of this case, been breached. He relied chiefly upon the judgment of the House of Lords in *British Railways Board v. Herrington, supra.*

Before considering the reasons delivered in that case it is necessary to give attention to its facts. The plaintiff was a six-year-old boy. He had been playing with his two older brothers in a field which was National Trust property, which was freely open to the public. Adjoining this property was the defendant's electrified railway line. Beyond that was another National Trust property. Through the field in which the boy was playing ran a path which led to the railway line. Shortly before reaching the line the path came to a four-foot-high chain link fence, which bordered the track. The path turned to the right to a foot-bridge over the track. Where the path turned right there was a further short stretch of trodden path leading straight up to the fence. At the point where this path reached the fence, the fence had become detached from a supporting post and it had been pressed down to within 10 in. of the ground. The evidence showed that the fence had been in that condition for some time and that people had been using the gap to take a short-cut across the line. Employees of the defendant, some seven weeks before the accident, had reported the presence of children on the line, but no action had been taken. The plaintiff left the field where he had been playing, crossed the gap in the fence, and walked on to the line, where he came into contact with the electrified rail and was severely injured. No witnesses were called at the trial on behalf of the defendant.

The Railways Board contended that the boy had been a trespasser on its property and that, applying the principles enunciated in *Robert Addie & Sons (Collieries), Ltd. v. Dumbreck,* [1929] A.C. 358, there could be no legal claim for damages in respect of his injuries. The principle stated by Lord Hailsham, L.C., in that case, at p. 365, was as follows:

Towards the trespasser the occupier has no duty to take reasonable care for his protection or even to protect him from concealed danger. The trespasser comes on to the premises at his own risk. An occupier is in such a case liable only where the injury is due to some wilful act involving something more than the absence of reasonable care. There must be some act done with the deliberate intention of doing harm to the trespasser, or at least some act done with reckless disregard of the presence of the trespasser.

In his reasons in the *Herrington* case, at p. 931, Lord Diplock makes the following candid statement:

If the facts in the instant appeal are compared with those in *Addie's* case as stated by Lord Hailsham L.C., at pp. 359-360, I do not think it possible to say that, judged by current standards of behaviour, the conduct of those engaged in operating the appellants' railway in the instant case was any more blameworthy than the conduct of those engaged in running the colliery of the successful appellant in *Addie's* case. Yet all nine judges who have been concerned with the instant case in its various stages were convinced that the plaintiff's claim ought to succeed; and, if I may be permitted to be candid, are determined that it shall. The problem of judicial technique is how best to surmount or to circumvent the obstacle presented by the speeches of the Lord Chancellor and Viscount Dunedin in *Addie's* case, and the way in which those speeches were dealt with in the Privy Council in the comparatively recent Australian appeal of *Commissioner for Railways v. Quinlan* [1964] A.C. 1054.

The appeal of the Railways Board was dismissed unanimously by the five Law Lords constituting the Court, although Lord Wilberforce, at pp. 921-2 said: "I feel bound to say that I have less confidence than your Lordships or the trial judge that the proved facts make the case good."

Each of the five Law Lords wrote reasons and it is not easy to formulate any specific definition of the duty owed to a trespasser. As Professor Goodhart says, in his review of the case in 88 *L.Q.R.* 311 (1972):

Surprisingly the final result of all this work has been that a number of dicta stated in slightly different words concerning the duties of an occupier to a trespasser have been added to the existing collection, which Lord Pearson has summarised by saying: "Very broadly stated, it is a duty to treat the trespasser with ordinary humanity."

What does emerge from a consideration of the five judgments is that:

1. *Addie's* case should not be followed, because the duty owed by an occupier to a trespasser is broader than the duty as defined in that case.

2. The fiction of an implied licence should not be used as an aid in determining the rights of a trespasser as against an occupier.

3. The occupier does not owe to the trespasser as high a duty as that owed to persons lawfully on the land. (In England the duty owed to persons lawfully on the land was defined by statute in the *Occupiers' Liability Act, 1957*. The occupier must take such care as in all the circumstances of the case is reasonable to see that the visitor will be reasonably safe in using the premises for the purpose for which he is permitted by the occupier to be there.)

The House of Lords rejected the proposition that, in order

to incur any liability to a trespasser, the occupier must have actual knowledge of his presence on the land. Lord Reid (p. 899) refers to the occupier knowing before the accident that "there was a substantial probability that trespassers would come". Lord Morris of Borth-y-Gest (p. 908) said that if the Railways Board allowed their fence to be broken down at the place in question "there was a considerable risk that a small child would pass through it". Lord Wilberforce quotes the phrases "as good as knows" and "extremely likely" and appears to prefer the latter. Lord Pearson (p. 924) refers to the presence of the trespasser as being "known or reasonably to be anticipated". Lord Diplock, at p. 941, says:

My Lords, an occupier's expectation of a trespasser's presence, like his knowledge of a concealed danger, also involves two mental elements: actual knowledge of physical facts which indicate that trespassers are likely to come on to the land; and appreciation of the resulting likelihood. For reasons similar to those which I have indicated I think that, as the law has now developed, the test of appreciation of the likelihood of trespass is whether a reasonable man knowing only the physical facts which the occupier actually knew, would appreciate that a trespasser's presence at the point and time of danger was so likely that in all the circumstances it would be inhumane not to give to him effective warning of the danger or, in the case of a child too young to understand a warning, not to take steps to convey to his infant intelligence that he must keep away.

Towards a trespasser whose presence on the land is known, the duty or whose presence the occupier should have known, the duty imposed by the *Herrington* case is, apparently, not to take reasonable care for his safety, but to act in a humane manner.

The law in Canada as to the duty of an occupier toward a trespasser was considered in *Grand Trunk R. Co., of Canada v. Barnett* (1911), 12 C.R.C. 205, [1911] A.C. 361. The Privy Council said that the occupier is under a duty not to injure the trespasser wilfully nor to do a wilful act in reckless disregard of ordinary humanity. Otherwise, the general rule is that a man trespasses at his own risk.

The *Addie* case was cited with approval in *East Crest Oil Co. Ltd. v. The King*, [1945] 2 D.L.R. 353, [1945] S.C.R. 191, 83 C.C.C. 211.

The two most recent Privy Council decisions on the matter are *Com'r for Railways v. Quinlan*, [1964] A.C. 1054, and *Southern Portland Cement Ltd. v. Cooper*, [1974] 1 All E.R. 87, both being appeals from Australia.

The former case was concerned with a claim for personal injuries by the driver of a truck, which, while proceeding over a private level crossing across the defendant's railway line, was struck by a train. It was admitted by the driver of the

train that a whistle signal was given at a point too near the crossing to be of any use in averting a collision. The plaintiff was conceded to be a trespasser on the railway line. The jury were directed to the effect that, once they thought there was "a likelihood" of people using the crossing and the defendant was aware of such likelihood, the defendant owed a duty to the plaintiff, as a member of the public, to take reasonable precautions to secure his safety, and that that duty was not affected by the fact that he was a trespasser.

Viscount Radcliffe, who delivered the judgment, stated the duty toward a trespasser, at p. 1072, as follows:

The content and limits of the duty have been laid down in words that do not seem to admit of much qualification or to invite the skill of the amplifier. Hamilton L.J. stated the rule of the English common law with maximum brevity in *Latham v. R. Johnson & Nephew Ltd.*, [1913] 1 K.B. 398, 411; 29 T.L.R. 124, C.A.: "The owner of the property is under a duty not to injure the trespasser wilfully; 'not to do a wilful act in reckless disregard of ordinary humanity towards him'; but otherwise a man trespasses at his own risk."

He goes on to say that this statement of the law received the full approval of the House of Lords in the *Addie* case, where the Scottish rule of liability was held to be the same. He also says that the same principle was laid down as the law of Canada in *Grand Trunk R. Co. of Canada v. Barnett*, *supra*.

He goes on to say, at p. 1076:

It is true, however, that an occupier can be treated as having knowledge of a trespasser's presence, even though the latter is not visibly before his eyes at the time when the act that causes injury is done. He can be in a position in which he "as good as" knows that the other is there.

Dealing with the knowledge of the occupier, which is necessary to impose upon him a duty of care to a trespasser, he says, at p. 1077:

It must be stressed, however, that the knowledge that is here material is knowledge in the occupier sufficient to impose upon him the duty not to be wilful or reckless towards the man to whom otherwise he would owe no duty at all; and such knowledge is something a great deal more concrete than a mere warning of likelihood. The presence, if it is to be treated as anticipated, must be "extremely likely," to use Lord Buckmaster's words in the *Excelsior Wire Rope Co.'s* case, [1930] A.C. 404, 410. There was "great likelihood, not to say certainty of boys and others coming upon the site," *per* Dixon C.J. in *Commissioner of Railways (N.S.W.) v. Cardy*, 104 C.L.R. 274, 286: the trespasser must be one whose coming is "extremely likely" or foreseen." In the same case Windeyer J. says [at p. 320] that "the occupier's immunity from actions by trespassers may be qualified if he knows that they are or very probably may be present." This is the same thing as was said by Evatt J. in *Barton's* case, 49 C.L.R.

114, 135, "As a general rule the plaintiff must show that the occupier knew of the actual, or, at least, the very probable, presence of the trespasser on his land at the very time when some activity fraught with danger to the trespasser was being continued." In their Lordships' opinion, if an occupier is being charged with breach of duty towards a trespasser in not giving him warning of some dangerous activity that is conducted on the occupier's premises and by which the trespasser has been injured, the law requires that the occupier's knowledge of the other's presence at the material time should be established in some such terms as those quoted above.

Reference was made in the *Quinlan* case, as well as in the *Herrington* case, to the judgment of the High Court of Australia in *Com'r for Railways (N.S.W.) v. Cardy* (1960), 104 C.L.R. 274. In that case a 14-year-old boy, walking over the defendant's land, in an area used as a tip for the deposit of ashes, penetrated surface crust of the tip and his feet and ankles were severely burned by the hot ashes beneath. A pathway, open to pedestrians, ran alongside the tip. This path was freely used and people, particularly children, visited the tip. There had been casual and intermittent warnings to keep off the tip.

The plaintiff succeeded at trial, before a jury, and this decision was upheld on appeal to the Full Court of the Supreme Court of New South Wales and by the High Court of Australia. Dixon, C.J., with whom Fullagar, J., concurred, was of the opinion that liability arose, not because, on the evidence, it was proper to imply a licence to enter the land, but because, although the plaintiff was a trespasser, a duty of care rests upon a man to safeguard others from grave danger of serious harm where, knowingly, he has created a danger, or is responsible for its continued existence, and is aware of the likelihood of others coming into the proximity of the danger, and has the means of preventing it or bringing it to their knowledge.

The *Cooper* case, *supra*, involved an injury to a 13-year-old boy, who was playing on a mound of dumped waste material from the defendant's quarrying operations. This material had spread outwards, partially burying the poles which carried a high tension electric cable, which brought power to the defendant's operations. Orders to cease the dumping of material had been given when the gap between the mound and the cable had, at one point, been reduced to 12 ft. The orders were not obeyed and the gap became smaller. As a matter of urgency, arrangements were made on a Thursday for the removal of the cable on the following Monday. On the Sunday, while playing on the mound, the plaintiff's arm came into contact with the cable and he suffered severe injuries. School children



played at various points not far from the working area. Children had been warned off the defendant's land, and there was not much trespassing during working hours. There were, however, two places where children were accustomed to play, outside, but near the defendant's land, from which the growth of the new "sandhill" was plainly visible.

The defendant's appeal from a judgment in favour of the plaintiff was dismissed. Lord Reid, who delivered the judgment of the Privy Council, reviewed its decision in *Quinlan* at some length. He said, at p. 93, apparently with reference to the second passage previously cited from Viscount Radcliffe's reasons (at p. 1077):

What is said (see [1964] 1 All E.R. at 907, [1964] A.C. at 1077] shews that the Board were prepared to hold not merely that a duty would arise as soon as the occupier knew facts which made it extremely likely that a trespasser had already arrived, but also that a duty would arise before the arrival of the trespasser as soon as it became extremely likely that he would come in future. That puts a very much greater burden on the occupier.

He went on to reject the limitation, stated in *Quinlan*, that, before an occupier could be made liable in respect of a trespasser of whose presence he did not have knowledge, he must have known that his presence was "extremely likely". He stated that when an occupier himself creates a danger on his land, he is bound to give consideration to the possibility of protecting potential trespassers if he knows of facts which show a substantial chance that they might come that way and fail to see or realize the danger.

Lord Reid expressed agreement with the summary of the matter given by Barwick, C.J., in his judgment in the case in the High Court of Australia [at p. 99]:

"After verdict, bearing in mind the summing-up, it must be taken that the jury found that the respondent had created a situation of danger on its land. That situation was the proximity of the surface of the batter of the platform to the uninsulated high voltage transmission line. That situation of danger could only be regarded as highly dangerous to human life and safety. Then, the jury must be taken to have found that the respondent knew of the existence and dangerous quality of what they must have concluded as a concealed trap as far as children were concerned. Further, because the place of the danger was attractive to children seeking their amusement in the remote area where they lived, and having regard to the terms of the summing-up, the jury must have concluded that the respondent must have known that it was likely that children would be attracted to the place of danger. In my opinion, that finding in the circumstances of the case is the equivalent of a finding that the presence of the children in the area was to be expected by the respondent. On the possible view of the facts, which I have already

indicated, there was, in my opinion, sufficient evidence to support such findings. They are sufficient, in my opinion, to support a verdict against the respondent on the footing that, having created a situation highly dangerous to human life, the proximate presence of children was to be expected by it, with the consequence that the respondent owed the appellant a duty to take reasonable steps to prevent the appellant suffering injury by that highly dangerous situation. If there was any duty, there can be no question that the respondent failed to perform it. Therefore, because of the findings inherent in it, and on the basis I have indicated, I would not disturb the verdict of the jury."

I have reviewed these recent cases, at perhaps unnecessary length, because we find in the *Herrington* and *Cooper* cases an extension of the scope of the duty owed by an occupier toward a trespasser beyond the limits defined in the *Addie* case. This extension has permitted the elimination of the theory of implied licence, a device which has been used in the past, especially in cases involving children, to avoid the strict application of the *Addie* case. I am in agreement with, and would favour the adoption of this approach, which recognizes that, in certain circumstances, the conduct of an occupier of land may require him to take steps to enable a person who has entered on his land, without his actual consent, to avoid a danger of which the occupier is aware. The question is as to what is the extent of such a duty.

The submission that the duty could be based on the "neighbour" theory enunciated in *M'Alister (or Donoghue) v. Stevenson*, [1932] A.C. 562, was rejected in both of the above cases. Lord Pearson, in the *Herrington* case, at p. 924, says:

As the trespasser's presence and movements are unpredictable, he is not within the zone of reasonable contemplation (*Bourhill v. Young* [1943] A.C. 92) and he is not a "neighbour" (*Donoghue v. Stevenson*) to the occupier, and the occupier cannot reasonably be required to take precautions for his safety.

On the same page, he goes on to say:

Even when his presence is known or reasonably to be anticipated, so that he becomes a neighbour, the trespasser is rightly to be regarded as an under-privileged neighbour. The reason for this appears, I think, most clearly from a consideration of the analogous position of a lawful visitor who exceeds his authority, going outside the scope of his licence or permission. In *Hillen and Pettigrew v. I.C.I. (Alkali) Ltd.* [1936] A.C. 65, 69-70 Lord Atkin said:

"... this duty to an invitee only extends so long as and so far as the invitee is making what can reasonably be contemplated as an ordinary and reasonable use of the premises by the invitee for the purposes for which he has been invited. He is not invited to use any part of the premises for purposes which he knows are wrongfully dangerous and constitute an improper use. As Scrutton L.J. has pointedly said: 'When you invite a person into

your house to use the staircase you do not invite him to slide down the banisters.' (*The Calgarth* [1926] P. 93, 110.) So far as he sets foot on so much of the premises as lie outside the invitation or uses them for purposes which are alien to the invitation he is not an invitee but a trespasser, and his rights must be determined accordingly. In the present case the stevedores knew that they ought not to use the covered hatch in order to load cargo from it; for them for such a purpose it was out of bounds; they were trespassers. The defendants had no reason to contemplate such a use; they had no duty to take any care that the hatch when covered was safe for such a use; they had no duty to warn anyone that it was not fit for such use."

Lord Reid, in the *Cooper* case, accepted the submission that an occupier's duty to a trespasser could not be extended so as to make it exceed his duty to a licensee. He says (p. 97):

It was urged in argument that an occupier's duty to a trespasser cannot be extended so as to make it exceed his duty to a licensee. Their Lordships agree. The passage in the Board's judgment in *Quinlan's* case, [1964] 1 All E.R. at 911, [1964] A.C. at 1083, to which their Lordships have already referred appears to warrant affording to trespassing children, at least in some cases, rights substantially equivalent to those of a child licensee. It was there stated that the Board were at one with Dixon CJ in finding it unnecessary to resort to the categorisation of licensee in order to give to children the legal remedy that is felt to be their due.

Both of these cases were concerned with claims by infant trespassers who had suffered injury as a result of the existence, on the occupier's land, of something which, in itself, constituted a grave danger, in an area proximate to places where children were known to play. This is illustrated in the remarks of Lord Wilberforce in the *Herrington* case at p. 920:

Just as in the 19th century the introduction of turntables, attractive to children, accessible and dangerous, gave rise to a jurisprudence known by their name, so we must take account of the placing of electrical conductors above or on the ground all over our overcrowded island and see where this leads as regards foresight and care. The ingredients of such duty as may arise must stem from the inevitable proximity to places of access, including highways, from the continuous nature of the danger, from the lethal danger of contact and from the fact that to children the danger may not be apparent. There is no duty to make the place safe, but a duty does arise because of the existence, near to the public, of a dangerous situation. The greater the proximity, the greater the risk, and correspondingly the need of foresight and a duty of care.

The effect of these cases might be summarized as being that an occupier who knows of the existence of a danger upon his land which he has created, or for whose continued existence he is responsible, may owe a duty to persons coming on his land, of whose presence he is not aware, if he knows facts which

show a substantial chance that they might come there. This is, in essence, the duty stated by Dixon, C.J., in the *Cardy* case. Such duty, when it exists, is limited, in the case of adults, to a duty to warn. In the case of children something more may be required. The existence of a duty will depend on the special circumstances of each case.

I now turn to consider whether or not such a duty existed on the part of the Company towards Veinot.

The only danger which existed upon the Company's land, which is comparable to the live electrical rail in *Herrington*, the electrical cable in *Cooper*, and the beds of hot ash in *Cardy*, was the presence there of high explosives. Warning notices were posted at the powder magazines, and a warning notice was posted by the road inside the gate. The gate itself was put in place as a means of excluding unauthorized access to the private road to the powder magazines and was itself a notice by the Company that entry upon its premises was unauthorized. It had existed, to serve this function, for nearly 20 years prior to Veinot's accident.

It was contended on behalf of Veinot that the Company had created a danger by placing the pipe, unmarked, across its highway. This submission involves the proposition that the existence of something on the Company's land which had been there for some 20 years, during which it was not a danger, became a danger because of the special use made of the Company's land by Veinot in the operation of his snowmobile. In substance, it means that because he elected to make use of the Company's land, not for walking, but to operate a motor driven vehicle, at night, at a speed of some 15 to 20 miles an hour, the Company, because of that fact, permitted the existence of a danger on its land.

I have not overlooked the finding of the jury that the pipe constituted a concealed or hidden danger or trap, but that finding was, by the terms of the question to which it was an answer, predicated upon a finding of an implied permission for Veinot to operate his snowmobile on the Company's land and it has no force when taken out of that context.

I have already cited the passage from the judgment of Lord Atkin in the *Hillen* case, quoted by Lord Pearson in the *Herrington* case, which makes it clear that, even in respect of an invitee, the occupier's duty does not extend to a situation where the invitee makes use of the premises for a purpose not authorized by the invitation. We were not referred to any authority which would require an occupier to take steps to warn or protect a trespasser who drives a vehicle over the occupier's

land at a speed which makes some condition existing on the premises dangerous to him, because of the speed at which he is travelling, but which, to others, does not constitute a danger at all.

I have dealt with the question of there being a dangerous situation on the premises. Even if such a situation does exist, the duty of the occupier to a trespasser can only arise if he knew of the presence of the trespasser upon his land or, to quote Lord Reid in the *Cooper* case (p. 98), "when he knows facts which shew a substantial chance that they [*i.e.*, trespassers] may come there". I have already referred to the absence of any evidence to establish any knowledge by the Company that anyone had operated a snowmobile, as Veinot did, along the private road from the powder magazine area to the gate.

In conclusion, it is my opinion that there is no analogy between the circumstances of this case and those under consideration in *Herrington* and in *Cooper*. The former case involved injuries to a six-year-old boy; the latter involved injuries to a boy of 13. Veinot is an adult.

In *Herrington* the defendant maintained a live electric rail on its railway line running between two public areas where children played. In *Cooper* the defendant had created a situation highly dangerous to human life, *i.e.*, a high tension line in too close proximity to the ground, where the proximate presence of children was to be expected by it. In the present case the Company maintained a pipe, acting as a gate, to protect its premises, which would only prove to be a danger to a person travelling at night, at some speed, in a snowmobile, of whose potential presence there were no facts to warn the Company.

In my opinion, the appeal should be dismissed with costs.

JUDSON and RITCHIE, JJ., concur with MARTLAND, J.

SPENCE, J., concurs with DICKSON, J.

PIGEON, J.:—I agree with Dickson, J.'s conclusions on the basis that there was evidence to support the findings of the jury. I prefer to express no opinion on the other questions.

DICKSON, J.:—This is an occupier's liability case. That branch of the law of negligence having to do with the duty owed to a visitor or an intruder by an owner or occupier of land has long been in an unsettled state, due in part to the Procrustean and often vain attempt in an infinite variety of fact situations to fit a plaintiff neatly into the category of invitee, licensee or trespasser and then allow category to be the

conclusive determinant of landowner liability. It has not been found easy to reconcile the Victorian landowner's unbridled rights with the modern law of negligence. Nowhere are the uncertainties more apparent than when one comes to consider the position in law of a trespasser, one who enters the land of another without consent or privilege. Whether the entrant is a burglar or wandering child or irreproachable wayfarer, the general principles historically applied were those expressed in *Robert Addie & Sons (Collieries), Ltd. v. Dumbreck*, [1929] A.C. 358, by Lord Hailsham, L.C., at p. 365:

Towards the trespasser the occupier has no duty to take reasonable care for his protection or even to protect him from concealed danger. The trespasser comes on to the premises at his own risk. An occupier is in such a case liable only where the injury is due to some wilful act involving something more than the absence of reasonable care. There must be some act done with the deliberate intention of doing harm to the trespasser, or at least some act done with reckless disregard of the presence of the trespasser.

These rules, of course, perpetuated the traditional 19th century concern for the sanctity of landed property. The general principle was that a landowner could do as he wished with his land. He owed no duty to an intruder, however accidental or inadvertent the intrusion, other than to refrain from shooting him or otherwise recklessly and wantonly doing him harm. The rigour of the rule is exemplified in such cases as *Edwards et al. v. Railway Executive*, [1952] A.C. 737. As could be expected various inventions were employed from time to time to modify and ameliorate the harshness. In some of the cases the landowner's consent was implied or imputed, particularly in "children cases", the status of the intruder being elevated from that of trespasser, which he clearly was, to that of licensee, which he clearly was not. In other cases a generous meaning was given to the phrase "reckless disregard" or a tenuous distinction was drawn between land in a static condition and land upon which an operational activity was being conducted, productive of injury. In time, two distinct, not easy to reconcile, lines of jurisprudence emerged. One perpetuated the letter and spirit of *Addie's* case (*Com'r for Railways v. Quinlan*, [1964] A.C. 1054, is an example). The other gave effect to changing ideas of social responsibility and imposed upon the owner of land duties well beyond those in contemplation in *Addie's* case; *Com'r for Railways (N.S.W.) v. Cardy* (1960), 104 C.L.R. 274, and *Videan et al. v. British Transport Com'n*, [1963] 2 Q.B. 650, presaged the change which found expression in the leading case of *British Railways Board v. Herrington*, [1972] A.C. 877. That case was decided within the con-

text of the *Occupier's Liability Act, 1957* of England which imposed a "common duty of care" on occupiers towards all persons who might lawfully come on to their land, but left unaltered the existing law as to the trespassers. In *Herring-ton's* case their Lordships exhaustively considered the nature of the duty owed by occupiers to trespassers. Lord Reid applied a subjective test. He said (p. 899):

So it appears to me that an occupier's duty to trespassers must vary according to his knowledge, ability and resources. It has often been said that trespassers must take the land as they find it. I would rather say that they must take the occupier as they find him.

and later on the same page:

So the question whether an occupier is liable in respect of an accident to a trespasser on his land would depend on whether a con-scientious humane man with his knowledge, skill and resources could reasonably have been expected to have done or refrained from doing before the accident something which would have avoided it. If he knew before the accident that there was a substantial probability that trespassers would come I think that most people would regard as culpable failure to give any thought to their safety. He might often reasonably think, weighing the seriousness of the danger and the degree of likelihood of trespassers coming against the burden he would have to incur in preventing their entry or making his premises safe, or curtailing his own activities on his land, that he could not fairly be expected to do anything. But if he could at small trouble and expense take some effective action, again I think that most people would think it inhumane and culpable not to do that. If some such principle is adopted there will no longer be any need to strive to imply a fictitious licence.

The test of common humanity was also applied by Lord Morris of Borth-y-Gest (p. 909):

In my view, while it cannot be said that the railways board owed a common duty of care to the young boy in the present case they did owe to him at least the duty of acting with common humanity towards him.

The nature of the duty of care was described by Lord Wilber-force in these words (p. 920):

Again, it must be remembered that we are concerned with tres-passers, and a compromise must be reached between the demands of humanity and the necessity to avoid placing undue burdens on oc-cupiers. What is reasonable depends on the nature and degree of the danger. It also depends on the difficulty and expense of guarding against it. The law, in this context, takes account of the means and resources of the occupier or other person in control—what is reason-able for a railway company may be very unreasonable for a farmer, or (if this is relevant) a small contractor.

and by Lord Pearson in these words (p. 922):

It does not follow that the occupier never owes any duty to the trespasser. If the presence of the trespasser is known to or reasona-

bly to be anticipated by the occupier, then the occupier has a duty to the trespasser, but it is a lower and less onerous duty than the one which the occupier owes to a lawful visitor. Very broadly stated, it is a duty to treat the trespasser with ordinary humanity.

*Herrington's* case was considered by the Court of Appeal of England in *Pannett v. McGuinness & Co. Ltd.*, [1972] 3 W.L.R. 387. The following excerpt from Lord Denning's judg-ment aptly expresses, in my opinion, the more salient points a Judge should have in mind when considering intrusions upon land [at pp. 390-1]:

The long and short of it is that you have to take into account all the circumstances of the case and see then whether the occupier ought to have done more than he did. (1) You must apply your com-mon sense. You must take into account the gravity and likelihood of the probable injury. Ultra-hazardous activities require a man to be ultra-cautious in carrying them out. The more dangerous the activ-ity, the more he should take steps to see that no one is injured by it. (2) You must take into account also the character of the intrusion by the trespasser. A wandering child or a straying adult stands in a different position from a poacher or a burglar. You may expect a child when you may not expect a burglar. (3) You must also have regard to the nature of the place where the trespass occurs. An elec-trified railway line or a warehouse being demolished may require more precautions to be taken than a private house. (4) You must also take into account the knowledge which the defendant has, or ought to have, of the likelihood of trespassers being present. The more likely they are, the more precautions may have to be taken.

In the very recent case of *Southern Portland Cement Ltd. v. Cooper*, [1974] 1 All E.R. 87, the Privy Council considered the ar-gument that an occupier only comes under a duty to potential trespassers if he estimates or ought to estimate that the ar-rival of one or more trespassers on his land is "extremely likely". In the course of his speech Lord Reid said: "But in their Lordship's judgement it is now necessary to . . . abandon the limitation of extreme likelihood", and later [at p. 98]:

If the occupier creates the danger when he knows that there is a chance that trespassers will come that way and will not see or realise the danger he may have to do more. There may be difficult cases where the occupier will be hampered in the conduct of his own affairs if he has to take elaborate precautions. But in the present case it would have been easy to prevent the development of the dan-gerous situation which caused the plaintiff's injuries.

And so we come to the facts of the present case. There is no need to labour them. The plaintiff, 37 years of age, and his wife, on one snowmobile, accompanied by another married couple on another snowmobile, set out from their home for an evening of healthful recreation through woods and across

552          DOMINION LAW REPORTS          51 D.L.R. (3d)

lakes of northern Ontario. They went along well-travelled snowmobile trails, from Larder Lake to Crosby Lake, along a creek to Beaver Lake, to Bear Lake, to a hydro right of way along which were many ski-doo trails, down an old logging road "which was well ski-doo packed", to a wide, hard-packed, well-ploughed road on which they travelled until the plaintiff, Mr. Veinot, on the leading snowmobile, struck a rusty pipe, stretched across the road, at face-height, and sustained very serious injuries. The accident occurred on March 16, 1970. Mr. Veinot had owned snowmobiles since 1966. He had been for three years the president of the Larder Lake Snowmobile Club, one of the purposes of which was to maintain law and control snowmobiles in the Town of Larder Lake. The machine on which Mr. Veinot was riding, a Bombardier 640 Nordic, was not a racing machine. At the time of the accident, it was travelling at a moderate speed of 15 to 20 m.p.h. It was equipped with the ordinary snowmobile lights and also with spot fog lights to improve visibility. The jury found that Mr. Veinot did not fail to take reasonable care for his own safety.

The pipe which Mr. Veinot struck was two inches in diameter, supported by unpainted posts located off the road, and invisible at night due to the background of trees. The pipe had been erected some 20 years earlier to prevent the movement of unauthorized vehicular traffic to the defendant company's powder magazine not far from the community of Virginiatown. No point can be made of the fact that the pipe had been there for 20 years without accident for the type of accident which occurred in this case could only have occurred after the advent of snowmobiles.

From the evidence there seems no doubt that during the winter there was a great deal of travel on snowmobiles in and around Virginiatown. The two witnesses called on behalf of the defendant, the mine manager and the security officer, each had a machine. It also emerges that much of the snow-mobiling was done at night, after work. The road on which the accident happened was an extension of one of the streets of Virginiatown, which had formerly been a company town. The street and road led to and across a north-south hydro right of way and then continued west to the magazine. The defendant company permitted snowmobile traffic along the road as far as the iron pipe. Such traffic normally then turned to the right and continued north along the right of way until the intersecting east-west hydro right of way was reached which in turn led west to the lakes across which Mr. Veinot and his party had travelled. Generally, as I have indicated, the main ski-doo

VEINOT v. KERR-ADDISON MINES LTD. (Dickson, J.)          553

traffic was east of the iron pipe, but the defendant's security officer conceded that on a very few occasions he had seen ski-doo tracks in the winter of 1969-70 on the powder magazine side of the pipe. He did not report these discoveries to the mine manager and he did nothing about it.

The evidence is undisputed that there were "a lot of snow-mobile tracks" on the road leading south from the east-west hydro power line to the ploughed road on which the unfortunate accident occurred. The ploughed road "seemed to be well travelled"; looked like a public road; and had no markings to indicate that it was not a public road. Mr. Veinot had no idea he was on private property when he drove along the ploughed road and according to his evidence, which was not challenged, he would not have continued along it if he had known it was private property. Upon all of the evidence and following a charge by the trial Judge to which no objection has been, or could be, taken, the jury made certain findings: (1) That Mr. Veinot on the date of the accident was on defendant's land with the implied permission of the defendant; (2) That his injuries were caused by a concealed or hidden danger or a trap of which the defendant had knowledge, described by the jury in its answers as "a rusty pipe approximately 2" in diameter suspended across the travelled portion of the road at a height of approximately 45 inches from the road"; (3) The defendant failed to take reasonable care to avoid injury to persons traversing the area, there being no distinguishing warnings of the location of the pipe across the roadway from either the east or west approach to the pipe or on the pipe itself; (4) The finding to which I have already referred, that plaintiff did not fail to take reasonable care for his own safety. At the close of the evidence presented by the plaintiff a motion was made for a nonsuit. The motion was renewed after the evidence for the defendant had been heard and again after the answers of the jury were received. The trial Judge, Houlden, J., dismissed the motion. He held that the finding of the jury that there was implied permission for the plaintiff to be on the land of the defendant could be substantiated on the evidence. The Judge said:

The defendant knew that a number of old roads intersected its property. One of these roads was an old logging road coming from the north and this was the road which was followed by the plaintiff and his party on the night in question. There is no evidence that the defendant made any endeavour to close off this road. It knew of the existence of the road. It knew that it was possible for the road to be travelled by a truck for about a mile from the premises of the defendant, but nothing was done to close it off. According to the evi-

dence which has been given to the Court, this road was being used, and used frequently, by owners of snowmobiles. This old road led directly to the ploughed road of the defendant.

In my opinion, it was a most reasonable assumption for the plaintiff and the other members of his party, when they came to this ploughed road, to assume that it was an ordinary road available for travel by the public. The evidence is that the ploughed road was well travelled and, as I have said, I think that there was ample evidence for the jury to find that there was implied permission for the plaintiff to be on the defendant's land.

Whether or not there was an implied permission was a question of fact for the jury. The jury was properly instructed on the law and brought in its finding. I do not think that finding should be disturbed.

The Court of Appeal for Ontario, if it had been necessary to decide the point, would not have interfered with the jury finding that the pipe constituted a concealed danger. On the other point, that of whether or not there was an implied licence, Armup, J.A., for the Court, said [31 D.L.R. (3d) 275 at p. 280, [1973] 1 O.R. 411]:

Whether the test of the extent of knowledge on the part of the occupier which is required before an inference of implied licence can be drawn is that the presence of trespassers was "likely", "extremely likely", "a substantial probability", or "as good as knows", the evidence in this case falls far short of what is required.

With greatest respect, I think the issue of likelihood, and the weight of evidence on this issue, was plainly one for the jury, and having referred the question to the jury, the answer of that body should have been accepted and that would have been the end of the matter.

Even if Mr. Veinot is regarded as a trespasser his appeal to this Court should succeed. If he was a trespasser, the inquiry must be as to whether his presence on the ploughed road could reasonably have been anticipated for, if so, the company owed him a duty and that duty was to treat him with ordinary humanity.

Although as a general rule a person is not bound to anticipate the presence of intruders on private property or to guard them from injury, a duty may arise if the owner of land knew of, or from all the surrounding circumstances ought reasonably to have foreseen, the presence of a trespasser. It appears to me that a person of good sense in the position of the defendant company, possessing that knowledge which its responsible officers possessed about snowmobiles and the degree of snowmobile travel in the area, the proclivity for travel by night, the ease by which the ploughed road could be reached by the

several old roads leading on to it would have been alerted, on a moment's reflection, to the probability of someone reaching the ploughed road as Mr. Veinot did. Stress was laid during argument upon the fact that the plaintiff came in by way of the back door, as it were, and that such avenue of approach could not reasonably have been anticipated. I do not agree. Snowmobiles are ubiquitous. They have an unusual and well-known capacity for travel on and off the beaten path. In an uncharted Canadian wilderness area, of forest, rivers and lakes, one could reasonably expect them to go in almost any direction, at least until such time as they reached *indicia* of private property. If there was a likelihood that someone would come upon the ploughed road on a snowmobile at night, and the evidence in my view supports such a likelihood, then I do not think there can be doubt that the company failed in the duty it owed Mr. Veinot to treat him with common humanity. The ploughed road gave every appearance of being a public road. Mr. Veinot had good reason to believe that he might freely use it if he wished to do so. Acting on that belief he failed to see or appreciate the abeyant danger of the rusty pipe. The defendant company in my opinion erred in permitting the continuance of what should have been recognized by it as a covert peril, menacing the safety of anyone who came upon the road at night on a snowmobile. And it would have been so easy to have averted the accident, by painting the pipe white or by hanging a cloth or a sign from it.

I would allow the appeal, set aside the judgment of the Court of Appeal and restore the judgment of the trial Judge with costs throughout.

BEETZ, J., concurs with PIGEON, J.

DE GRANDPRÉ, J., concurs with MARTLAND, J.

*Appeal allowed;
judgment at trial restored.*

---

### CROSBY v. O'REILLY et al.

*Supreme Court of Canada, Laskin, C.J.C., Martland, Judson, Ritchie, Spence, Pigeon, Dickson, Beetz and de Grandpré, JJ.    June 28, 1974.*

Damages — Survival of actions — Conventional sum for shortened expectation of life — Whether award also possible for loss of amenities — Administration of Estates Act (Alta.), s. 51.

In an action under s. 82 of the *Trustee Act*, R.S.A. 1955, c. 346 (now s. 51 of the *Administration of Estates Act*, R.S.A. 1970, c. 1), the estate

THE COMMON LAW LIBRARY

# CLERK & LINDSELL

ON

# TORTS

NINETEENTH EDITION



LONDON
SWEET & MAXWELL
2006

AUSTRALIA
Law Book Co
Sydney

CANADA and USA
Carswell
Toronto

HONG KONG
Sweet & Maxwell Asia

NEW ZEALAND
Brookers
Wellington

SINGAPORE and MALAYSIA
Sweet & Maxwell Asia
Singapore and Kuala Lumpur

## CHAPTER 8—NEGLIGENCE

**8-01** which require lesser culpability. Any interest protected by such a tort is also likely to fall within the scope of negligence liability. Thus a negligent interference with enjoyment of land may give rise to both liability in negligence and liability under *Rylands v Fletcher*.[3] Negligent failure to maintain safety standards by an employer may give rise to both liability for negligence and for the tort breach of statutory duty.[4] Negligent harm to reputation may give rise to both liability for negligence where it occurs within a special relationship causing economic loss,[5] and for defamation which provides wide protection irrespective of fault but subject to a web of defences designed to protect freedom of speech.

**8-02** There is less overlap with the intentional torts which require greater culpability than negligence. It is true that whenever an interest is protected by the tort of negligence, it is likely that it will also be protected by an intentional tort. Thus, pecuniary damage caused by a careless false statement falls under negligence; but if caused by an intentional false statement liability is in deceit. But there are two reasons why the overlap is more limited. First, it may be inappropriate to classify intentional conduct as being careless. For example, it can hardly be said that an intentionally false statement has also been made carelessly. But this is not always the case: an intentional touching which constitutes a trespass might also be the result of a careless decision by the defendant and give rise to liability in both negligence and trespass.[6] Secondly, there are interests which do not merit protection by negligence and are protected only by the intentional torts. Thus, whilst there is liability for intentional interference with a person's trading relationships under the so-called economic torts, there is no liability for negligent interference with such interests. Negligence liability would impose too great a restriction on free competition. Malicious prosecution falls into the same category. There is no equivalent negligence liability for bringing a "careless" prosecution.

**8-03** It should be noted that negligence liability may also overlap with non-tortious grounds of liability under contractual, equitable or public law principles.[7] This potential overlap may give rise to difficulties where negligence principles point in a different direction from those of other grounds of liability. On occasion, the courts have found it necessary to limit the scope of negligence liability by

[2] *Goldman v Hargrave* [1967] A.C. 645. Commenting on *Goldman* in *Delaware Mansions Ltd v Westminster City Council* [2001] UKHL 52; [2002] 1 A.C. 321, at 333 Lord Cooke said: "The label nuisance or negligence is treated as of no significance. In this field . . . the concern of the common law lies in working out the fair and just content and incidents of a neighbour's duty rather than affixing a label and inferring the extent of the duty from it." See further para.1-61.

[3] See Ch.21.

[4] See Ch.9.

[5] *Spring v Guardian Assurance plc* [1995] 2 A.C. 296.

[6] This overlap has given rise to some problems. In *Letang v Cooper* [1965] 1 Q.B. 232 at 239, Lord Denning suggested that a careless application of force to another would be actionable only in negligence with trespass being confined to intentional conduct. The better view is that a claimant may still sue for negligent trespass but will not be able to claim any advantage from framing his case in trespass. See above para.1-46. But even if Lord Denning's view were to be accepted the procedure remain. Thus, a surgeon failing to inform a patient "in broad terms of the nature of the procedure intended" would be liable in both battery and negligence. See below paras 10-48 and 10-69.

[7] For full explanation of the overlap and distinctions, see above paras 1-03 to 1-08.

## 2. DUTY OF CARE

reference to the other non-tortious principles in order to maintain the coherence of the law.[8] Subject to these qualifications, negligence liability has the potential to apply in a wide range of situations to protect a wide range of interests. It is this potential which has led the courts to develop a complex series of requirements controlling the scope of liability.

**8-04** **Requirements of the tort of negligence** There are four requirements, namely:

(1) the existence in law of a duty of care situation, *i.e.* one in which the law attaches liability to carelessness. There has to be recognition by law that the careless infliction of the kind of damage in question on the class of person to whom the claimant belongs by the class of person to which the defendant belongs is actionable;

(2) breach of the duty of care by the defendant, *i.e.* that he failed to measure up to the standard set by law;

(3) a causal connection between the defendant's careless conduct and the damage;

(4) that the particular kind of damage to the particular claimant is not so unforeseeable as to be too remote.

When these four requirements are satisfied, the defendant is liable in negligence. Only then is it relevant to consider the assessment of damages, *i.e.* the compensation for the damage for which the defendant is responsible. There is no magic in the order as set out, nor should it be supposed that courts proceed from points (1) to (4) in sequence. In this text, causation and remoteness are considered in a separate chapter as the principles are relevant to other forms of tort liability. This chapter considers first, the duty requirement and secondly, the issue of breach.

## 2. DUTY OF CARE

### (a) The nature of the duty concept

**8-05** **Duty** The tort of negligence is committed when the damage is sustained. The period of limitation begins to run from the date of that damage.[9] The duty in negligence, therefore, is not simply a duty not to act carelessly; it is a duty not to inflict damage carelessly. Since damage is the gist of the action, what is meant by "duty of care situation" is that it has to be shown that the courts recognise as actionable the careless infliction of the kind of damage of which the claimant complains, on the type of person to which he belongs, and by the type of person to which the defendant belongs. It is a preliminary consideration whether liability

[8] See *Downsview Nominees Ltd v First City Corp Ltd* [1993] A.C. 295.

[9] Determining the date on which damage occurs may give rise to difficulty. See below para.33-10 and following.

[383]

**8-14**

## CHAPTER 8—NEGLIGENCE

require qualification in new circumstances. But I think that the time has come when we can and should say that it ought to apply unless there is some justification or valid explanation for its exclusion."[36]

**8-15** **Fairness and the three stage test** After a period during which the courts had debated both the relationship of foreseeability and proximity and that relevance of policy considerations,[37] the outcome was summarised by Lord Bridge in *Caparo Industries plc v Dickman*[38]:

"What emerges is that, in addition to the foreseeability of damage, necessary ingredients in any situation giving rise to a duty of care are that there should exist between the party owing the duty and the party to whom it is owed a relationship characterised by the law as one of 'proximity' or 'neighbourhood' and that the situation should be one in which the court considers it fair, just and reasonable that the law should impose a duty of a given scope on the one party for the benefit of the other."[39]

This passage has been cited in numerous subsequent decisions[40] and is now the accepted test for the existence of a notional duty. Commenting on the role of the three criteria in *Caparo*, Lord Oliver said:

"... it is difficult to resist the conclusion that what have been treated as three separate requirements are, at least in most cases, in fact merely facets of the same thing, for in some cases the degree of foreseeability is such that it is from that alone that the requisite proximity can be deduced, whilst in others the absence of the essential relationship can

---

[36] *Dorset Yacht Co Ltd v Home Office* [1970] A.C. 1004 at 1027. See also Lord Pearson at 1054 and Lord Morris at 1034. Lord Diplock was more cautious, saying at 1060:

"Used as a guide to the characteristics which will be found to exist in conduct and relationships which give rise to a legal duty of care this aphorism marks a milestone in the modern development of the law of negligence. But misused as a universal is manifestly false."

[37] The debate centred on the so-called "two-stage test" of Lord Wilberforce in *Anns v Merton London Borough Council* [1978] A.C. 728 at 751-2, a case concerning local authority liability for omission. He applied the following test to justify imposing a notional duty on the authority:

"First one has to ask whether, as between the alleged wrongdoer and the person who has suffered damage there is a sufficient relationship of proximity or neighbourhood such that, in the reasonable contemplation of the former, carelessness on his part may be likely to cause damage to the latter, in which case a prima facie duty of care arises. Secondly, if the first question is answered affirmatively, it is necessary to consider whether there are any considerations which ought to negative, or to reduce or limit the scope of the duty or the class of person to whom it is owed or the damages to which a breach of it may give rise."

The second stage introduced a policy element into the test. However, the first stage seemed to equate contemplation with foreseeability. The lack of a proximity requirement in the sense of a "close and direct relationship" led to criticism of the Wilberforce test and its eventual replacement by the three stage test in *Caparo*.

[38] [1990] 2 A.C. 605 at 617/8.

[39] Lord Oliver also referred to the three stage, foreseeability, proximity, justice and reasonableness test *ibid.* at 633 and Lord Jauncey at 658 cited Lord Griffiths' judgment in *Smith v Eric S Bush* [1990] 1 A.C. 831 at 865, as authority for "the three criteria ... foreseeability of damage, proximity of relationship and reasonableness."

[40] See for example in the House of Lords: *Spring v Guardian Assurance plc* [1995] 2 A.C. 296 at 333, per Lord Slynn; *Marc Rich & Co v Bishop Rock Marine* [1996] A.C. 211 at 235, per Lord Steyn.

---

## 2. DUTY OF CARE

**8-16**

most rationally be attributed simply to the court's view that it would not be fair and reasonable to hold the defendant responsible."[41]

Clearly, the criteria can be viewed as overlapping.[42] It has been said that "that the two headings (proximity and justice) are no more than two labels under which the court examines the pros and cons of imposing liability in negligence in a particular type of case."[43] To an extent, this is true of whatever formula is used to determine duty. As Sir Robin Cooke has observed:

"Ultimately the exercise can only be a balancing one and the important object is that all relevant factors be weighed. There is no escape from the truth that, whatever formula be used, the outcome in a grey area case has to be determined by judicial judgment. Formulae can help organise thinking but they cannot provide answers."[44]

The last point is significant. For although the factors which are relevant to one criterion may also be relevant to another, the criteria help organise thinking for they direct the court to the different questions with reference to which the balancing exercise is conducted.[45]

**Foreseeability and proximity** The criterion of reasonable foreseeability focuses on the knowledge that someone in the defendant's position would be expected to possess. The greater the awareness of the potential for harm, the more likely it is that this criterion will be satisfied. If the risk of harm is far-fetched, a duty will not arise. Proximity focuses on the broader relationship between the parties. In a much cited passage of his judgment in *Sutherland Shire Council v Heyman*,[46] Deane J. described the requirement as follows:

"It involves the notion of nearness or closeness and embraces physical proximity (in the sense of space and time) between the person or property of the claimant and the person or property of the defendant; circumstantial proximity such as an overriding relationship ... of professional man and client and what might (perhaps loosely) be referred to as causal proximity in the sense of the closeness or directness of the causal connection or relationship between the particular course of conduct and the loss or injury sustained;

"... they are but labels descriptive of the very different factual situations which can exist in particular cases and ... must be carefully examined ... before it can be pragmatically examined whether a duty of care exists ... "

---

[41] [1990] 2 A.C. 605 at 618.

[42] "These considerations inevitably shade into each other." *Elguzouli-Daf v Commission of Police of the Metropolis* [1995] Q.B. 335 at 349, per Steyn L.J.

[43] *White v Jones* [1995] 2 A.C. 207 at 221 per Nicholls V.C.; *Caparo Industries plc v Dickman* [1990] 2 A.C. 605 at 628, per Lord Roskill.

[44] *South Pacific Manufacturing Co Ltd v New Zealand Security Consultants & Investigations Ltd* [1992] 2 N.Z.L.R. 282 at 294. As Lord Pearce said in *Hedley Byrne & Co Ltd v Heller & Partners Ltd* [1964] A.C. 465 at 536, the answer "depends ultimately on the courts' assessment of the demands of society for protection from the carelessness of others".

[45] In *Perre v Apand Pty Ltd* (1999) 164 A.L.R. 606 at 684, Kirby J. noted the value of the labels in the threefold test in helping to "steer the mind through the task in hand" by providing the "headings to which considerations may be assigned". However, the majority of the High Court preferred to address the considerations directly, albeit without consensus as to which considerations were crucial.

[46] (1985) 60 A.L.R. 1 at 55-6.