UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10879-JLT

KIMBERLY GENEREUX,                    )
    Plaintiff                     )
                                  )    **AFFIDAVIT OF MARK F. ITZKOWITZ**
        v.                   )    **IN OPPOSITION TO DEFENDANTS'**
                                  )    **MOTION FOR SUMMARY JUDGMENT**
COLUMBIA SUSSEX CORPORATION,          )
STARWOOD HOTELS & RESORTS             )
WORLDWIDE, INC., and                  )
WESTIN HOTEL MANAGEMENT, L.P., )
    Defendants                    )

1.    My name is Mark F. Itzkowitz.  I am an attorney licensed to practice law in the Commonwealth of Massachusetts (BBO #248130) and in the State of New York.  I am the attorney for the plaintiff herein.

2.    I make this Affidavit freely based upon my personal knowledge.

3.    Hereto annexed are true and accurate photocopies of the following documents:

      Exhibit "A"          Transcript of the Deposition of Kimberly
                          Genereux (excerpts)

      Exhibit "B"          Map & Photo Key

      Exhibit "C"          Conference Centre at the Westin
                          Casuarina Resort Site Plan

      Exhibit "D"          Site Plan Excerpt-Identifications

      Exhibit "E"          Photographs

      Exhibit "F"          Affidavit of Kimberly Genereux

| | |
|---|---|
| Exhibit "G" | Royal Cayman Islands Police Service Letter to Westin Casuarina Attorney Michael Alberga, September 27, 2005 |
| Exhibit "H" | Reports of Eleanor K. Egan, LHMC (February 21, 2005 & September 16, 2007) |
| Exhibit "I" | Report of David S. Chapin, M.D. (February 29, 2007 [*sic*]) |
| Exhibit "J" | Report of Norman C. Hursh, ScD, CRC, CVE (February 10, 2008) |
| Exhibit "K" | Report of Allan M. Feldman, Ph.D. (February 27, 2008) |
| Exhibit "L" | System License Agreement |
| Exhibit "M" | Transcript of the Deposition of Theodore Mitchel (excerpts) |
| Exhibit "N" | Transcript of the Deposition of Theodore Mitchel (excerpts) in *Keppner v. Galleon Beach Resort, Ltd., et. als.,* Index No. 011724/2003 (N.Y. Sup. Ct., Erie County) |
| Exhibit "O" | Transcript of the Deposition of John McGovern (excerpts) |
| Exhibit "P" | American Hotel & Lodging Association, DIRECTORY OF HOTEL & LODGING COMPANIES (74th ed., 2005)(excerpts) |

Exhibit "Q"          American Hotel & Lodging Association,

                     DIRECTORY OF HOTEL & LODGING COMPANIES

                     (71st ed., 2002)(excerpts)

Exhibit "R"          Lashner Rush & Associates Audit

                     (September 24, 2000)

Exhibit "S"          Lashner Rush & Associates Audit (April

                     24, 2001)

Exhibit "T"          Westin Quality Assurance Program/QAP

                     2000

Exhibit "U"          Westin Hotels & Resorts Property

                     Maintenance Reference Guide

Exhibit "V"          Transcript of the Deposition of Theodore

                     Mitchel (excerpts) in *Reynolds v. Westin*

                     *Hotel Company, et. als.,* U.S.D.C. E.D.

                     Ky. Case No. 97-77 (March 16, 1998)

Exhibit "W"          Service Agreement

Exhibit "X"          Columbia Sussex website excerpt

Exhibit "Y"          *Westin Casuarina Opens Luxury Spa*

                     (Hospitality Job Resource, February 13,

                     2002)

Exhibit "Z"          Westin Corporate Identity Manual

Exhibit "AA"         Columbia Sussex' Manager's Manual

Exhibit "BB"         Lashner Rush & Associates Audit (August

                     30, 1999)

Exhibit "CC"          Transcript of the Deposition of Kellie
                      Ann Lowell (excerpts) in *Reynolds v.*
                      *Westin Hotel Company, et. als.,* U.S.D.C.
                      E.D. Ky. Case No. 97-77

Exhibit "DD"          Columbia Sussex Corporation Safety &
                      Loss Prevention Manual

Exhibit "EE"          Expert Witness Report of Robert J.
                      McCrie, Ph.D., CPP [filed but not
                      scanned because scanned by defense]

Exhibit "FF"          Cayman Islands Annual Report & Official
                      Handbook (1998)

Exhibit "GG"          Cayman Islands Annual Report & Official
                      Handbook (1999)

Exhibit "HH"          Cayman Islands Annual Report & Official
                      Handbook (2000)

Exhibit "II"          Cayman Islands Annual Report & Official
                      Handbook (2001)

Exhibit "JJ"          Cayman Islands Annual Report & Official
                      Handbook (2002)

Exhibit "KK"          Lashner Rush & Associates Audit
                      (November 5, 2002)

Exhibit "LL"          Starwood/Westin Design Review Memorandum

| | |
|---|---|
| Exhibit "MM" | Response of Defendant Columbia Sussex Corporation to Plaintiff's Request for Production of Documents |
| Exhibit "NN" | Correspondence of Mark F. Itzkowitz to Robert J. Brown and John B. Johnson (September 10, 2007) |
| Exhibit "OO" | Correspondence of Mark F. Itzkowitz to Robert J. Brown and John B. Johnson (September 19, 2007) |
| Exhibit "PP" | Correspondence of Robert J. Brown to Mark F. Itzkowitz (September 28, 2007) |
| Exhibit "QQ" | Correspondence of Robert J. Brown to Mark F. Itzkowitz (January 8, 2008) |
| Exhibit "RR" | Correspondence of Robert J. Brown to Mark F. Itzkowitz (January 25, 2008) |
| Exhibit "SS" | ASIS *Dynamics* (May/June 2000) |
| Exhibit "TT" | ASIS *Dynamics* (May/ June 2001) |
| Exhibit "UU" | ASIS *Dynamics* (May/June 2002) |
| Exhibit "VV" | ASIS *Dynamics* (May/June 2003). |

Signed under the pains and penalties of perjury, this 26th day of March, 2008.

_____

MARK F. ITZKOWITZ (BBO #248130)

## CERTIFICATE OF SERVICE

   I, Mark F. Itzkowitz, counsel for the plaintiff, hereby certify that on this date, I made service of the within document by serving it electronically to registered ECF participants and/or by mailing/faxing/hand-delivering a copy of same to non-registered ECF participants as indicated on the Notice of Electronic Filing ("NEF"), upon the following counsel of record:

John B. Johnson, Esquire             Robert J. Brown, Esquire
Corrigan, Johnson & Tutor, P.A.      Mendes & Mount, LLP
141 Tremont Street                   750 7th Avenue
Boston, MA 02111; and                New York, NY   10019-6829.


                                      s/ Mark F. Itzkowitz
                                     MARK F. ITZKOWITZ (BBO #248130)

Dated:  March 26, 2008

UNITED STATE DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action NO. 05-CV-10879-JLT

KIMBERLY GENEREUX,             )
                    Plaintiff, )
VS.                            )
COLUMBIA SUSSEX CORPORATION,   )
ET AL,                         )
                    Defendants.)

- - -

Deposition of THEODORE R. MITCHEL, a witness, was called on behalf of the Plaintiff as upon cross-examination, pursuant to the Rules of Civil Procedure, commencing at 9:30 a.m., on Friday, September 7, 2007, at the Sheraton Cincinnati, in the "A" Armstrong Room at 2826 Terminal Drive, Hebron, Kentucky, before Terence M. Holmes, professional court reporter, and notary public within and for the Commonwealth of Kentucky.

- - -

1          Q.    Are you referring to this particular

2    case, Ms. Genereux's case or to something different?

3          A.    No, to the Reynolds' case.

4          Q.    Okay.  And before we get started this

5    morning, we had received a copy of certain pleadings

6    from that case.  That's a case also involving the

7    Westin Casuarina, is that correct?

8          A.    Yes.

9          Q.    Okay.  So just to make sure that I'm

10   following this correctly.  You've been designated to

11   testify on behalf of Columbia Sussex in two cases in

12   which there were allegations of criminal -- of

13   somebody being hurt as a result of a criminal

14   incident, correct?

15         A.    Correct.

16         Q.    Okay.  Both of those cases involve the

17   Westin Casuarina?

18         A.    Yes.

19         Q.    Okay.  You had mentioned earlier that

20   you also had been designated to testify in civil

21   cases and you mentioned specifically slip and fall

22   cases.  How many civil cases approximately have you

23   been designated to testify in?

24         A.    I really can't recall, I mean it's

25   probably been somewhere around 10.

1    Genereux.  And as you know I'll be asking you a

2    series of questions this morning about the case and

3    the background and the corporate relationship and

4    such.  If at any time you don't understand my

5    questions or you don't hear them, by all means please

6    let me know that.  Okay.

7              A.   Okay.

8              Q.   And if you do that, I'll be happy to

9    repeat them, rephrase them or do whatever we need to

10   let you answer them.  Is there any reason, that

11   you're aware of, health related or anything else that

12   may interfere with your ability to answer questions

13   honestly today?

14             A.   None that I can think of.

15             Q.   Okay.  Terrific.  Then as along as you

16   provide answers, we're gonna assume that you've

17   understood the questions, correct, fair enough?

18             A.   Fair enough.

19             Q.   Great.  Can you tell us where you

20   live?

21             A.   I live in Cincinnati, Ohio.

22             Q.   Okay.  And where in Cincy, if you

23   don't mind?

24             A.   The address is 5157 Castlebrook Court.

25             Q.   And what do you do for a living?

1          A.    I'm employed by Columbia Sussex

2    Corporation as a secretary treasurer.

3          Q.    And where do you work out of for

4    Columbia Sussex Corporation?

5          A.    Their offices in Ft. Mitchell,

6    Kentucky.

7          Q.    Were you working for Columbia Sussex

8    back in May of 2002?

9          A.    Yes.

10          Q.    And were you working out of the same

11    location at that point?

12          A.    Yes.

13          Q.    Can you tell us how old you are,

14    please?

15          A.    How old am I?

16          Q.    Yes.

17          A.    I'm 54.

18          Q.    Okay.  And your date of birth?

19          A.    February 11th, 1953.

20          Q.    And where were you born?

21          A.    Sandusky, Ohio.

22                MR. ITZKOWITZ:  Off the record.

23                (Off the record by Mr. Itzkowitz.)

24          Q.    Are you married, sir?

25          A.    Yes.

1    then I also review the financial statements that

2    result from the entering of that activity to ensure

3    the accuracy of those, of those reports.

4            Q.    And the kind of reports that you're

5    referring to would be what?

6            A.    Payroll registers, accounts payable,

7    distribution reports, cash receipt journals, journal

8    entries that are made.

9            Q.    Okay.  You mentioned that one of the,

10   one of the departments that you have oversight

11   responsibilities for at the corporate office involved

12   risk management, is that correct?

13           A.    Yes.

14           Q.    What is risk management?

15           A.    Well, I guess I define it as to

16   include the procurement of insurance, and also the

17   oversight of those that review claims, whether it be

18   internal people or external, and then also assistance

19   with decisions about what risks are retained by the

20   company and what risks are passed down to insurance

21   companies.

22           Q.    When you say risks retained, do you

23   mean whether or not Columbia Sussex will self insure

24   with respect to particular risks?

25           A.    Yes.

1          Q.   Okay.  You mentioned that among your

2   responsibilities with respect to the Risk Management

3   Department of Columbia Sussex is the oversight of

4   those, the review claims, I think you had said?

5          A.   Yes.

6          Q.   Okay.  What do you mean by that?

7          A.   I would supervise the individuals that

8   handle the settlement of claims, whether it be

9   in-house personnel or outside TPA, or --

10         Q.   TPA -- I'm sorry.  TPA?

11         A.   It's a -- third party administrator.

12              MR. BROWN:  Third party administrator.

13         Q.   I'm sorry, I cut you off.

14         A.   And I would also review cases that are

15   handled by the insurance company directly.

16         Q.   On those cases that it handled by the

17   insurance company directly, do you have any authority

18   to direct the resolution of those cases by the

19   insurance company?

20         A.   Depends on how our contract is with

21   that insurance company.  If it's a self-insured

22   retention I have more authority.  If it's a

23   deductible, obviously the insurance company is

24   ultimately responsible under that situation.

25         Q.    In the case involving the insurance

1    that's covering this particular civil action, do you

2    have any authority to direct the resolution of that

3    claim?

4         A.   I don't remember what policy was in

5    place at the time of this incident, so I'm not sure

6    what type of insurance we had at that time.

7         Q.   Okay.  In terms of the supervision you

8    provide to the adjustors, both the internal adjustors

9    and the third-party administrators, what is the

10   nature of that supervision, what do you actually do

11   to supervise these folks?

12        A.   I ask about the status of the case,

13   you know, how it's proceeding, you know, help them

14   gather information if it's necessary for the

15   investigation of the case.

16        Q.   Do you provide any type of review to

17   determine trends of claims against, against Columbia

18   Sussex?

19        A.   At times I did.  We used to do some

20   analysis of claims, I don't do that currently.

21        Q.   During what time frame did you do that

22   type of analysis?

23        A.   I really don't remember.

24        Q.   Why did you stop?

25        A.   My responsibilities changed slightly

1    with regard to insurance.

2         Q.    Is there somebody else that performs

3    that type of analysis for Columbia Sussex at the

4    present time?

5         A.    Currently it's -- we have a risk

6    manager that is in the process of doing that kind of

7    a review, yes.

8         Q.    And who is that risk manager?

9         A.    His name is Frank Harrison.

10        Q.    And how long has he been performing

11   these types of reviews for Columbia Sussex?

12        A.    Since January of this year.

13        Q.    Had you been performing those types of

14   reviews up until January of 2007?

15        A.    No.

16        Q.    Had you been performing reviews of

17   claims back in 2002?

18        A.    I really don't remember.

19        Q.    In order to analyze claims to

20   determine what types of trends there are, what types

21   of materials would you typically analyze?

22        A.    Summaries of claims history, number of

23   incidences at each of the properties, areas where the

24   incidences occurred.

25        Q.    When you say "area where the incidents

1          I thought you were talking about the

2     Reynolds case.

3          A.    The Kepner case was a slip and fall.

4          Q.    Oh, okay.  All right.  And the

5     Reynolds case was an alleged sexual assault, you say?

6          A.    Yes.

7          Q.    Okay.  And of course the case that

8     brings us here today, the Genereux case, is an

9     alleged sexual assault, correct?

10         A.    Yes.

11         Q.    Were there any other claims that you

12    recall reviewing that involve alleged sexual

13    assaults?

14         A.    I don't remember any specifically, I'm

15    sure there was.  I mean I've been with the company

16    for 18 years, I'm sure during that period of time we

17    had another one somewhere.

18         Q.    Do you recall any other hotels where

19    there are alleged victim sexual assaults besides the

20    Westin Casuarina?

21         A.    I don't recall.

22         Q.    Okay.  Earlier you had mentioned that

23    one of the reasons for, for reviewing claims was to

24    determine if there were any areas that required

25    corrective action, is that correct?

1          Q.    Okay.  And did you continue monitoring

2     that particular parking lot because of its history to

3     take other steps as you felt the need arose?

4               MR. BROWN:  Is that directed to him

5               individually?

6               MR. ITZKOWITZ:  No, I'm sorry, the

7               corporation.

8          A.    Yes, we continued to monitor it.

9          Q.    Okay.  Had you performed any type of

10    analysis relating to the claims history of the Westin

11    Casuarina?

12         A.    I think I mentioned before that I

13    don't remember.  I'm -- my recollection is that it

14    would have been included in our analysis, but I don't

15    recall it specifically.

16         Q.    When you say "it would have been

17    included in our analysis," what do you mean?

18         A.    We reviewed claim activity for every

19    hotel that we either manage or have an Administrative

20    Services Agreement with.  So it would have been part

21    of the data base so-to-speak of properties that we

22    reviewed.

23         Q.    Was any distinction made in the way

24    you performed the review with respect to the Westin

25    Casuarina because of the nature of the relationship

Page 43

1    before Mr. Jacop?

2            A.    Rich Fitzpatrick, and he also had the

3    title CFO.

4            Q.    Have you been reporting to him since

5    the time of the Genereux incident back in May of 2002

6    or have there been other folks involved, as well?

7            A.    There's been other folks involved.

8            Q.    Who else have you reported to during

9    that time frame?

10            A.    I don't recall exactly.  There was --

11    When I first started the vice president of finance

12    was a person by the name of Joe Marquet, and then

13    somewhere in the early 2001 or 2002, I don't remember

14    exactly what year, Mr. Marquet left the company, and

15    a person by the name of Edward Rofes became vice

16    president of finance and I reported to him.

17            Q.    Okay.  And besides Mr. Marquet,

18    Mr. Rofes, Mr. Fitzpatrick and Mr. Jacop, have there

19    been other folks that you reported to?

20            A.    No.

21            Q.    In performing your responsibilities

22    with respect to risk management, do you have any

23    involvement with determining policies relating to

24    security or loss prevention for Columbia Sussex?

25            A.    That's an operational area, I

1   generally don't have any authority to change how we

2   operate a hotel.  I can make suggestions, but that's

3   up to the operations people.

4           Q.   Okay.  Within the operation -- I'm

5   sorry.  Is the Columbia Sussex Corporation set up so

6   that operations is a division or department or

7   whatever you want to call it of the corporation?

8           A.   I'm not sure what you mean by

9   "division or department."  There are individuals

10  that, you know, the General Manager of the hotels and

11  they're -- they have district managers or Vice

12  President of Operations that they report to.  And

13  they report to our Executive Vice President of

14  Operations.  I wouldn't call those a separate

15  department.  There's a separate line of reporting I

16  think, is probably a better way to describe it.

17          Q.   Okay.  And just --

18               MR. BROWN:  And, again, that's --

19               you're giving a response in general.

20               MR. ITZKOWITZ:  In general.

21          A.   In general as it relates to Columbia

22  Sussex.

23          Q.   Right.  Okay.  And just to make sure I

24  got that hierarchy right.  Who is it that reports to

25  the Executive Vice President of Operations, is it the

Page 45

1    District Manager?

2              A.    District Manager, yes.

3              Q.    And who do they oversee?

4              A.    Who does the District Manager oversee?

5              Q.    Right.

6              A.    Generally we geographically group

7    hotels so that they have an area that they oversee

8    that's relatively close geographically so they can

9    get to the properties easier.

10             Q.    Okay.  And then so at that -- within

11   the geographic area would be the hotel manager,

12   General Manager?

13             A.    There would be a General Manager that

14   actually is on site at the property, you know, day in

15   and day out.  That person has the ultimate

16   responsibility for how the hotel is operated.

17             Q.    Okay.  With respect to security and

18   loss prevention, is there a separate group of

19   individuals that handles that particular function, or

20   does it go also from the, through the General Manager

21   to the District Manager?

22             A.    It goes through the General Manager to

23   the District Manager of Operation.  There's no

24   separate security department.

25             MR. BROWN:  And again you're speaking

1    Casuarina?

2              A.    Yes.

3              Q.    Was there a district manager or some

4    other type of -- No -- Was the district manager

5    responsible for the Cayman Island hotels, for

6    Columbia Sussex?

7              A.    I'm not sure how to answer that.

8    There's no district manager since that I have, that

9    we had, that I've explained previously with regard to

10   the U.S. based operation Columbia Sussex.

11             The manager at the Westin Casuarina,

12   prior to the sale of the Courtyard, oversaw that

13   operation.  So he oversaw the General Manager of the

14   Courtyard Grand Cayman.  So was he considered to be a

15   district manager, maybe, I don't know, we didn't give

16   him that title.

17             Q.    Did the manager of the Westin

18   Casuarina also oversee the General Manager of the

19   Marriott Grand Cayman?

20             A.    I'm not sure if he was there during

21   that time period.  I believe at least for a portion

22   of the time he did.

23             Q.    And what was the name of the manager

24   that you're referring to from the Westin Casuarina?

25             A.    His name is Dan Szydiowski.

1        Q.    Is he the manager at the present time?

2        A.    Yes.

3        Q.    Do you know how long he's been the

4    manager?

5        A.    I don't know the exact time period.

6        Q.    Was he the manager at the time of the

7    incident involving Ms. Genereux?

8        A.    I think he was, but I don't -- I'm not

9    positive.

10        Q.    Was there somebody that Mr. Szydiowski

11    reported to at Columbia Sussex in terms of monitoring

12    what was going on on the properties in the Cayman

13    Islands?

14        A.    I'll have to be very careful that not

15    at Columbia Sussex.  Mr. Yung as President of Galleon

16    Beach Resort Limited, which owns the Westin

17    Casuarina, Mr. Szydiowski would have reported to

18    Mr. Yung in that capacity.

19        Q.    Was there anybody who served an

20    intermediate level of management position between

21    Mr. Yung and Mr. Szydiowski with respect to the

22    Cayman properties?

23        A.    No.

24        Q.    At the present time, how many Westin

25    hotels as opposed to other brands of hotels does

1   Columbia Sussex has a relationship to of some type?

2           A.   I think there is -- I think there's

3   five currently.

4           Q.   Okay.  Does that -- Are you including

5   the Casuarina in that group?

6           A.   Yes.

7           Q.   Have there been more Westins at

8   different points in time than there are presently?

9           A.   Yes.

10          Q.   And do you know what the maximum

11  number of Columbia Sussex had a relationship with at

12  any point in time?

13          A.   I think now is the maximum.

14          Q.   Okay.  And in terms of the Westin as

15  opposed to different brands of hotels, what type of

16  relationship does Columbia Sussex have with Westins?

17          A.   I'm not sure I understand your

18  question.

19          Q.   Well you had mentioned earlier that

20  there was an Administrative Services Agreement that

21  applied to the Westin Casuarina, correct?

22          A.   That's correct.

23          Q.   Okay.  With respect to the other four

24  or so Westins that Columbia Sussex has a relationship

25  with, what's the nature of that, with those

1          A.   Both.

2          Q.   Okay.  And since we're limiting these

3    questions just to the Westin hotels that Columbia

4    Sussex has a management agreement with, in terms of

5    the procedures and policies for those Westin hotels,

6    does Columbia Sussex have to follow the policies and

7    procedures of the Westin licensing company or Westin

8    hotel company, whatever they call themselves?

9          A.   The different brands, Westin being

10   one, has a set operating policy that we have to

11   comply with, but there's areas that that doesn't

12   address or maybe we want to go beyond that in terms

13   of our control.  So it would be differences between

14   or other areas that aren't covered by that Westin

15   management or Westin operating manual.

16         Q.   Okay.  All right.  Just to make sure

17   that I understand.  In other words, to the extent

18   that there is a policy existing in the Westin

19   manuals, Columbia Sussex is obliged by its

20   relationship with Westin to carry out those policies

21   as minimal levels of service.  If Columbia Sussex

22   chooses to provide additional service over and above

23   what Westin requires, Columbia Sussex can do that?

24         A.   Yes, or it isn't just services, it's,

25   you know, control procedures.  You know, we, you know

1    the Westin manual is just as an example, probably

2    doesn't go into any detail about how the hotel makes,

3    you know, controls cash.  We would put in policies

4    and procedures how cash is to be deposited and

5    controlled, or how bills for services rendered to the

6    hotel are approved. The Westin manual wouldn't even

7    address that.

8            The Westin manual is specifically

9    address guest service and how the hotel appears, its

10   appearance of the hotel.  And our, the Columbia

11   Sussex's policies and procedures would address all

12   the other myriad of areas that affect how you run a

13   business.

14           Q.    Okay.  With respect to the Westin

15   hotels that Columbia Sussex has a relationship to

16   pursuant to these Hotel Management Agreements, did

17   those agreements make Columbia Sussex the owner of

18   the hotel?

19           A.    No.

20           Q.    Okay.  Do those agreements make

21   Columbia Sussex the operator of the hotel, manager of

22   the hotel, as it were?

23           A.    Yes.

24           Q.    One of the documents that had been

25   produced in discovery in the case, I believe by the

Page 54

1    Westin Starwood defense, was a document called a

2    System License Agreement between Westin Starwoods and

3    the Westin Casuarina.  Did Columbia Sussex sign on to

4    System License Agreements for the other hotels that

5    it managed for Westin or was there a different type

6    of a contract?

7                  MR. BROWN:  I object to the form of

8             the question.  I think you made a

9             representation that there was an agreement

10            between Westin Casuarina --

11                 MR. ITZKOWITZ:  Yeah.

12                 MR. BROWN:  -- and Westin license, and

13            then you've asked whether Columbia Sussex

14            signed on to others, which would implicit

15            in your question is that they signed on to

16            what you said they haven't signed on to.

17                 MR. ITZKOWITZ:  Oh, thank you for

18            pointing that out to me.  Let me phrase

19            that.

20            Q.    Had Columbia Sussex signed any System

21    License Agreements with the Westin company in terms

22    of the operation of any of the other Westin hotels

23    not Columbia, not the Westin Casuarina?

24            A.    I believe the license agreement was

25    signed by an officer of the entity that owns the

1   hotel, not by Columbia Sussex.

2              Q.   Okay.  So just to make sure I

3   understand then, as far as you're aware, Columbia

4   Sussex Corporation was not a signatory to any systems

5   license agreement with the Westin Licensing Company

6   or its --

7              A.   Yes, to my understanding.

8              Q.   Okay.  Did Columbia Sussex Corporation

9   execute any types of documents with the Westin

10  Licensing Company or any of the various corporate

11  names that it, that are affiliated with it in terms

12  of operating any of the Westin hotels that Columbia

13  Sussex operates?

14             A.   I don't believe there is any agreement

15  that Columbia Sussex as a separate corporation

16  signed.

17             Q.   Okay.  So the management agreements

18  between -- the management agreements that Columbia

19  Sussex would have signed onto would have been with

20  the owner of the hotel, but not with the Westin

21  company?

22             A.   That's correct.

23             Q.   Okay.  But if I understood your

24  earlier testimony, I just want to make sure I'm

25  right, by executing those agreements between Columbia

1    Sussex and the owner of the hotel, Columbia Sussex

2    agreed to enforce the Westin policies as minimal

3    operating policies for the hotel?

4            A.   That would have been one of the

5    provisions in the Hotel Management Agreement to

6    ensure compliance with the franchise agreement, which

7    was that licensing agreement.

8            Q.   And if I understand you correctly, the

9    Hotel Management Agreements between Columbia Sussex

10   and the owners of the different Westin hotels that

11   Columbia Sussex would be managing, would include the

12   terms of the Westin manual that would apply, for

13   example, to security or to loss prevention, correct?

14           MR. BROWN:  Can I have that read back?

15           (The pending question was read back.)

16           MR. ITZKOWITZ:  Let me phrase it, let

17           me save you the aggravation on that one.

18           Q.   Under the Hotel Management Agreements

19   that Columbia Sussex signed with the owners of the

20   different Westin hotels, would Columbia Sussex be

21   responsible for seeing that the hotel complied with

22   those provisions of the Westin manual relating to

23   security?

24           A.   It wouldn't mention specifically, bit

25   it -- it says that they're responsible for compliance

1    with Westin standards, and if that included security,

2    then, yes.

3            Q.    Okay.  Great.  Now you had mentioned

4    that the agreements with the hotels in the Cayman

5    Islands included particularly Westin Casuarina and

6    Administrative Services Agreements as opposed to

7    Hotel Management Agreements?

8            A.    Yes.

9            Q.    What was the distinction and the

10   service provided by Columbia Sussex between the

11   service managing -- the Administrative Services

12   Agreement, excuse me, and the Hotel Management

13   Agreement?

14           A.    Well the Administrative Services

15   Agreement, in my mind, is more, you know, ministerial

16   or I'm not sure that's the right word.  It involves,

17   you know, keeping track of records, paying bills,

18   preparing financial statements, doing administrative

19   things as opposed to Hotel Management Agreement,

20   which addresses hiring and firing, compliance with

21   its manual of the franchisor, operation, direct

22   oversight of operations.  So they're, they're really

23   pretty dramatically different in terms of level of

24   services provided.

25           Q.    Okay.  In terms of paying the bills,

1    Casuarina from all the other different funds that

2    Columbia Sussex has access to?

3              A.    Yes, they are kept separate.

4              Q.    Are the funds from the accounts pulled

5    for any purpose?

6              MR. BROWN:  Objection to the form.

7              A.    The --

8              MR. BROWN:  What accounts?

9              MR. ITZKOWITZ:  Oh, okay.

10             Q.    Are the Galleon Beach funds pulled

11   with funds from hotels that Columbia Sussex has a

12   relationship to for any purpose?

13             A.    No.

14             Q.    Okay.  Am I correct in understanding

15   that pursuant to the Administrative Services

16   Agreement Columbia Sussex procures insurance on

17   behalf of the Westin Casuarina?

18             A.    Yes.

19             Q.    Okay.  Focusing just on the

20   procurement of insurance, just by way of example.

21   Are the insurance policies that are purchased for the

22   Western Casuarina purchased as -- along with policies

23   purchased for other hotels that Columbia Sussex has a

24   relationship to in order to maximize the discounts,

25   for example, or to lower the cost of purchasing the

Page 64

1    insurance?

2            A.    Yes, they are.  Exposure is included

3    with all the other exposures.

4            Q.    And can you explain what you mean by

5    that?

6            A.    When we negotiate with an insurance

7    company to provide property insurance, for example,

8    the data that's provided to the insurance company

9    includes data on the Westin Casuarina.  And as apart

10   of that insuring agreement Galleon Beach Resort

11   Limited will be listed as an additional insured on

12   that policy.

13           Q.    Okay.  And if I understood correctly,

14   the part of the reason for making that kind of

15   arrangement is to maximize purchasing power in terms

16   of what you purchase for insurance coverage, am I

17   right?

18           A.    I'm not sure what you mean by

19   "maximize purchasing power," but, yes, it's done to

20   try to provide a greater pool of risk that is then --

21   When you negotiate with the insurance company you

22   have more buying power, so-to-speak.

23           Q.    Okay.  Great.  Is there any other area

24   in which any services that are provided for the

25   Westin Casuarina by Columbia Sussex are combined with

1    performs for the Westin Casuarina under the

2    Administrative Services Contract?

3              A.    Yes.  We will maintain copies of

4    contracts for that property and monitor, you know,

5    termination dates and renewal dates.

6              Q.    And what types of contracts are you

7    referring to?

8              A.    Maintenance contracts, be one example,

9    utility contracts, lease agreements for copiers and

10   things like that.

11             Q.    Okay.  Are there any contracts

12   relating to the provision of security services at the

13   Westin Casuarina that Columbia Sussex performs a

14   record keeping function with respect to?

15             A.    There might be, I don't recall

16   specifically if there's a contract with an outside

17   security service.

18             Q.    Does Columbia Sussex provide any

19   record keeping function with respect to Westin

20   Casuarina employees?

21             A.    Yes.  We maintain personnel files for

22   Westin employees.

23             Q.    And where are those files maintained?

24             A.    They're maintained in our offices in

25   Ft. Mitchell.

Page 67

1              Q.   Oh.  Are there duplicative copies down

2    in the Cayman Islands?

3              A.   There might be some that are

4    maintained down there, I don't know though, you know,

5    what, to what extent they keep duplicate copies.

6              Q.   Okay.  In addition to physically

7    hanging onto the files here in Kentucky, does

8    Columbia Sussex provide any type, any other type of

9    service with respect to the personnel files?

10             A.   Again, I'm not sure exactly what you

11   mean by that.  I mean we monitor, you know, vacation

12   taken, so, you know, so we know how much more

13   vacation somebody has to take.  We monitor sick days,

14   and then -- the kind of things that need to be

15   monitored in connection with a personnel function.

16             Q.   Okay.  And that's sort of what I was

17   wondering.  For example, if there was a problem with

18   an employee as perceived by the management by there

19   at the hotel in the Cayman Islands, would you keep

20   tabs of the documentation that were maintained in the

21   files with respect to that employee?

22             A.   I believe discipline -- that's what

23   you're asking for, discipline records are maintained

24   at the property locally.  Home office here does not

25   maintain records of discipline.

Page 68

1          Q.    Does the home office get copies of the

2    disciplinary files?

3          A.    I don't believe so.

4          Q.    Okay.  And perhaps as sort of the

5    inverse side of discipline, are files monitored up

6    here with respect to promotions or commendations for

7    Westin Casuarina employees?

8          A.    To the extent there's a pay rate

9    change, that document is kept up here.

10         Q.    Okay.  Would pay rate change documents

11   also cover, for example, if a person was promoted to

12   a -- from one level of employment up to a higher

13   level within the same department or to a management

14   function or something like that?

15         A.    Yes.

16         Q.    Are the payroll checks for the

17   employees in the Caymans issued from here in

18   Kentucky?

19         A.    Yes.

20         Q.    Does Columbia Sussex use some type of

21   payroll service to pay employees of the various

22   hotels, or does it do that in-house?

23         A.    It does it in-house.

24         Q.    As far as you're aware, just from your

25   knowledge of the personnel files and the payroll

Page 69

1    information up here, are there employees at the

2    Westin Casuarina whose function is to provide

3    security services on the property?

4                MR. BROWN:  Can I have that read back?

5            (The pending question was read back.)

6            A.   I don't recall seeing anybody that is

7    in that category, but that doesn't mean that there

8    isn't somebody, but I don't recall.

9            Q.   Okay.  And earlier in the different

10   context we had talked about coding bills and things

11   like that.  Are there also codes from personnel files

12   that would indicate what department an employee

13   worked in in the hotel?

14           A.   Yes.  Every employee is given a

15   specific job code.

16           Q.   Okay.  Are the job codes for the

17   Westin Casuarina the same job codes used for other

18   hotels that Columbia Sussex manages?

19           A.   For the most part, there might be some

20   special ones that they need, but I think for the most

21   part they're the same.

22           Q.   Okay.  So that stuff that would apply

23   to all the hotels like housekeeping that would be the

24   same codes?

25           A.   Yes.

1          Q.   Okay.  I had asked you a little while

2     ago whether you were aware of there being employees

3     at the Westin Casuarina who has security functions.

4     Are there employees who are designated as loss

5     prevention or risk management employees at the Westin

6     Casuarina, as far as you know?

7          A.   No, I don't believe so.

8          Q.   I'm gonna take you a step back from

9     this whole series of things we've been talking about

10    with the, under the Administrative Services

11    Agreement.

12               From what you've been describing so

13    far, obviously there are different type of agreements

14    that Columbia Sussex has with different hotels.  What

15    determines what type of an agreement Columbia Sussex

16    will enter with a hotel?

17         A.   If there is a direct or indirect

18    ownership interest by Columbia Sussex and the

19    property, generally there's a Hotel Management

20    Agreement.  If there's no ownership interest between

21    the property and Columbia Sussex, generally it's an

22    Administrative Services Agreement.

23         Q.   And is there a person at Columbia

24    Sussex who makes the final determination with respect

25    to what type of agreement will be entered into for

Page 74

1    conditions on the property?

2              A.   I don't recall if we had a form or

3    not, I just don't recall.

4              Q.   Okay.  But if there was something that

5    caught their eye they would make recommendations for

6    the -- to make changes to the property, is that

7    correct?

8              A.   Yes, they would point out if there

9    need to be a change to the property or a condition

10   that needed to be corrected.

11             Q.   Okay.  And during the course of these

12   walk throughs, would they be examined for issues

13   relating to hotel security?

14             A.   They might notice whether, you know,

15   the door to a maintenance area should be locked so a

16   guest doesn't go in there.  That's kind of security

17   related.

18             Q.   Um-hum.

19             A.   Or they might, you know, notice

20   whether there's, any lights are out in the parking

21   lot, which might be security related.  So there's --

22   there's probably things that could be considered

23   security related that they look for.

24             Q.   Okay.  You had mentioned earlier when

25   we were talking about the New York property about one

1    of the changes made was to put a fence around the

2    property and put gates into control access in and out

3    of the parking lot, correct?

4            A.    Yes.

5            Q.    Would that type of parameter security,

6    for lack of a better word, be one of the types of

7    things they would look for in these walk throughs?

8            A.    Not in that particular case, not

9    unless there was an indication from a review of the

10   incidences.  We wouldn't normally put a fence around

11   the property.  That is unusual to do that.

12           Q.    Okay.  I understand that.  But what

13   I'm asking is: Would they examine whether they felt

14   there was a need, for example, for a fence, not that

15   they necessarily determined there was?

16           A.    That wouldn't be done from the on-site

17   visit, that would be done from a review of Incident

18   Reports.

19           (Short break was taken.)

20           Q.    During these walk throughs would the

21   Columbia Sussex risk management employee also examine

22   the staffing levels for security purposes at the

23   hotel?

24           A.    Generally not.

25           Q.    Was there anybody else that would

Page 76

1    conduct that type of an interview?

2                    MR. BROWN:  You're saying at Columbia

3              Sussex?

4                    MR. ITZKOWITZ:  At Columbia Sussex,

5              yeah.

6              A.    The District Manager might review that

7    with the General Manager, what their staff -- They

8    review staffing levels, in all positions, so they

9    would -- You know, security is apart of that staff,

10   they would review that one.

11                   MR. BROWN:  And again that was a

12             general question.

13                   MR. ITZKOWITZ:  That was a general

14             question, yes.

15             Q.    Okay.  I just want to make sure that I

16   understood you correctly and I apologize.  There is

17   not a separate security department within Columbia

18   Sussex that handle security related issues?

19             A.    No, there's no separate security

20   department, no.

21             Q.    Okay.  Would there be somebody within

22   the corporate hierarchy at Columbia Sussex, and again

23   general question.  Would there be somebody in the

24   corporate hierarchy at Columbia Sussex that would

25   review the security needs of the individual hotels

Page 77

1    that Columbia Sussex had a relationship with?

2            A.   Again, not any specific individual, it

3    would go through the General Manager reporting to the

4    District Manager.  That would be the only people that

5    would, you know, that have any input on that.

6            Q.   And then from the District Manager it

7    would go up to the Vice President of Operations?

8            A.   Yeah.

9            Q.   Okay.  So is it correct then that in

10   terms of determining the security needs of the

11   individual hotel that determination would be made by

12   the General Manager?

13           A.   Yes, in consultation with our District

14   Manager.

15           MR. BROWN:  And, again, although it --

16           may not be repeated, this is a general

17           question --

18           MR. ITZKOWITZ:  Yes.

19           MR. BROWN:  -- a general answer.

20           MR. ITZKOWITZ:  Yes.

21           Q.   Okay.  And so in terms of insuring

22   that the security needs of a hotel were being

23   satisfied, within the corporation folks that would do

24   that would be the District Manager and above him the

25   Executive Vice President of Operations?

Page 78

1          A.    Yes.

2                MR. BROWN:  I guess I feel compelled

3          to just put in that these general questions

4          not being specified to the property in the

5          Cayman Islands at the Galleon Beach Resort

6          do not necessarily apply to that property.

7                MR. ITZKOWITZ:  Understood,

8          understood.

9          Q.    Okay.  Given the nature of the

10   relationship between the Westin Casuarina and

11   Columbia Sussex that you've been describing for us,

12   is there anybody at Columbia Sussex who reviews the

13   security provisions at the Westin Casuarina?

14               MR. BROWN:  Objection to the form.

15        Q.    Let me simplify that.  Is there

16   anybody at the Columbia Sussex Corporation who

17   reviews the security needs of the Westin Casuarina?

18        A.    Mr. Yung in his capacity as president,

19   would review that with the General Manager.

20               MR. BROWN:  In his capacity as

21          President of Galleon Beach.

22        A.    In his capacity as President of

23   Galleon Beach, yes.

24        Q.    Okay.  Do you know what if any type of

25   training Mr. Yung has in security matters, hotel

Page 80

1   been talking about, were they located in

2   Ft. Mitchell, Kentucky?

3           A.   Yes.

4           Q.   Okay.  So when they would visit the

5   hotels, wherever the hotel happened to be located,

6   would it be Columbia Sussex that would pay their way

7   as a business expense?

8           A.   Yes.

9           Q.   Okay.  And so that would include all

10  the airfare and hotel room and whatever else?

11          A.   Yes.

12          Q.   You had mentioned earlier in the

13  deposition that in addition to being an officer at

14  Columbia Sussex you're also an officer of Galleon

15  Beach, is that correct?

16          A.   That's correct.

17          Q.   And what office do you hold at Galleon

18  Beach?

19          A.   Secretary treasurer.

20          Q.   Is it the same office you hold for

21  Columbia Sussex?

22          A.   Yes.

23          Q.   Are there any other folks who hold --

24  Well, Mr. Yung, I take it, also holds positions, the

25  same position both at Galleon Beach and at Columbia

Page 81

1   Sussex, correct?

2         A.   That's correct.

3         MR. BROWN:  Objection to the form,

4        just to clarify it.  He's president of

5        Galleon Beach Resort Limited and he's

6        president of Columbia Sussex.  I just

7        didn't want there to be any clutter in the

8        record as to calling it the same position.

9         MR. ITZKOWITZ:  Fair enough.  Do you

10       need me to rephrase it to clarify it or are

11       you content with that?

12         MR. BROWN:  No, he said fair enough,

13       so we -- just an understanding.

14        Q.   Okay.  Are there any other employees

15  of Columbia Sussex Corporation who were also, also

16  hold a position of Galleon Beach Resort Limited?

17        A.   Yes.

18        Q.   Who else?

19         MR. BROWN:  Are we talking currently

20       or are you putting back in time or is there

21       any time on it?

22         MR. ITZKOWITZ:  Why don't we do both.

23        A.   Currently I believe John Jacop, the

24  CFO of Columbia Sussex is also CFO of Galleon Beach

25  Resort Limited.

1          Q.    Okay.   Are there any others besides

2    Mr. Jacop, you and Mr. Yung who hold positions?

3          A.    Currently?

4          Q.    Currently.

5          A.    Not that I can recall.

6          Q.    Okay.   And what about in the past,

7    have there been other employees who hold positions in

8    both?

9          A.    They -- Mr. Jacop's predecessors as

10   CFO would have held both positions.   Ed Rofes and Joe

11   Marquet had positions at both.

12         Q.    Would the title that they held at

13   Galleon Beach Resort Limited be the same title that

14   they had held at Columbia Sussex Corporation?

15         A.    I believe they're essentially the

16   same, there might be some small difference.

17         Q.    Okay.   And would their functions that

18   the various individuals perform for Galleon Beach?

19   Let me stop at that.

20              MR. BROWN:   I'm sorry, was there a

21              question.

22              MR. ITZKOWITZ:   No, let me rephrase.

23              I apologize.

24         Q.    You know, why don't we limit it for

25   the moment.   Do you perform any particular functions

1    for Galleon Beach?

2              A.    In my capacity as secretary treasurer

3    I review, you know, monthly financial statements, and

4    I will approve a contract or a bill in certain

5    situations.  You know, in regard to insurance I'll

6    determine what level of self insurance or retention

7    that we have.  I might also set, you know,

8    administrative policies, in terms of how information

9    is reported or what level approval is needed.

10             Q.    When you say "what level approval is

11   needed," what do you mean by that?

12             A.    Whether a bill can be approved by just

13   a general manager or whether it requires an

14   additional approval of an officer.  Mr. Yung has to

15   approve it or I should approve it or John Jacop would

16   approve it.

17             Q.    Okay.  Any -- Are there any other

18   functions that you perform for Galleon Beach?

19             A.    Not that I can think of off the top of

20   my head.

21             Q.    Okay.  With respect to approving

22   contracts, are there any contracts that you have

23   approved with respect to security at the Westin

24   Casuarina?

25             A.    I don't recall signing any security

1    agreements for Westin Casuarina.

2           Q.    Okay.  As far as you know, are there

3    any outside vendors that provide security services at

4    the Westin Casuarina?

5           A.    I'm not aware of any presently, I know

6    there have been outside security services used.

7           Q.    Do you know what security services

8    have been used?

9           A.    No, I don't know what the name of the

10   firm is.

11          Q.    Do you know whether any outside

12   security services have been used as of the time of

13   the incident with Ms. Genereux on May of 2002?

14          A.    I really don't have any knowledge,

15   recollection on that.

16          Q.    Do you know why the outside security

17   services were discontinued?

18          A.    Again, I don't know the circumstances

19   for that.

20          Q.    Do you know when they were, when they

21   ended?

22          A.    No, I don't.  To clarify, I don't know

23   if they've ended either.

24          Q.    Thank you.  Have you personally been

25   down to the Westin Casuarina?

Page 96

1    any other recommendations or instructions you've made

2    to the General Manager of the Westin Casuarina with

3    respect to any work you had done pursuant to the

4    service agreement?

5            A.    I'm sure there has been over the

6    years.  I don't recall specifically what those might

7    have been.

8            Q.    Okay.  Do you recall any occasions

9    when having a made recommendation to the General

10   Manager pursuant to the service agreement, the

11   General Manager refused to comply with your

12   recommendations?

13           A.    Maybe we need to step back.  My

14   directions to the General Manager would have been

15   done in my capacity as secretary treasurer of Galleon

16   Beach Resort Limited, not necessarily in connection

17   with my providing services under the Administrative

18   Services Agreement.

19           Q.    Okay.  Would all of the

20   recommendations to the General Manager have come

21   either from you or from Mr. Yung?

22           A.    It would have come from either of us

23   or someone that one of us designated to give

24   direction.

25           Q.    Okay.  And in terms of the folks that

UNITED STATE DISTRICT COURT
DISTRICT OF MASSACHUSETTS
Civil Action NO. 05-CV-10879-JLT

| | |
|---|---|
| KIMBERLY GENEREUX, | ) |
|            Plaintiff, | ) |
| VS. | ) |
| COLUMBIA SUSSEX CORPORATION, | ) |
| ET AL, | ) |
|            Defendants. | ) |

- - -

Deposition of THEODORE R. MITCHEL, a witness, was called on behalf of the Plaintiff as upon cross-examination, pursuant to the Rules of Civil Procedure, commencing at 9:30 a.m., on Friday, September 7, 2007, at the Sheraton Cincinnati, in the "A" Armstrong Room at 2826 Terminal Drive, Hebron, Kentucky, before Terence M. Holmes, professional court reporter, and notary public within and for the Commonwealth of Kentucky.

- - -

Page 97

1    you would have designated, would those have been

2    Columbia Sussex employees or would they have been

3    Galleon Beach employees or both?

4              A.    They could have been both.

5              Q.    Were there employees besides the group

6    of officers that you had named earlier, were there

7    folks who were both employees of Galleon Beach and

8    Columbia Sussex at the same time?

9              A.    No.

10             Q.    Okay.  All right.  And so just to get

11   back to the question I asked a moment ago and sort of

12   clean it up a little perhaps.  Were there any

13   employees of Columbia Sussex who were only employees

14   of Columbia Sussex who had made recommendations to

15   the General Manager of the Westin Casuarina pursuant

16   to the service agreement?

17             A.    I'll give you an example that maybe

18   clarifies it.  Individuals that work for me, I would

19   have given them direction to contact the property,

20   either the General Manager or some other position

21   down there about a particular procedure that I wanted

22   followed as it relates to my position as treasurer of

23   Columbia Sussex.

24                   Under our Administrative Services

25   Agreement we don't provide direction to the property

1    management employees direction to tell the employees

2    of the Westin Casuarina to do specific things, I

3    don't recall that.

4         Q.   Okay.  And in terms of some of the

5    other information that you were talking about earlier

6    when you said you would tell your employees at

7    Columbia Sussex to pass on information to the Westin

8    Casuarina, what types of issues would you have and

9    discuss with the Westin Casuarina?

10        A.   Possibly timely submission of deposits

11   to the bank, completeness of reports, you know,

12   approvals of invoices.  I can't think of any other

13   specific things.

14        Q.   Okay.  Well even within that procedure

15   sort of -- what you would be instructing will be

16   procedures as to how to go about doing these

17   different things, when and how to report to the bank,

18   when and how to make deposits, when and how to --

19        A.   Yes.

20        Q.   -- prepare reports?  On any of those

21   occasions when you had instructed your subordinates

22   at Columbia Sussex to pass on those recommendations

23   to the manager of the Westin Casuarina, had the

24   Westin Casuarina refused to carry out those

25   instructions?

1          A.    No to my recollection.

2          Q.    The agreement makes reference in

3    Paragraph 7 to the relationship between the two

4    corporations, Galleon Beach and Columbia Sussex.  And

5    there's a sentence -- I guess it's the second

6    sentence that begins in that paragraph.  "This

7    agreement in no way affects any other agreements on

8    other matters between CSC and GBR that do not relate

9    to accounting and/or business management services..."

10    Do you see that, first off?

11          A.    Yes.

12          Q.    Okay.  Are you aware of any other

13    agreements between the two corporations?

14          A.    No, I'm not.

15          Q.    As part of the business management

16    services that Columbia Sussex would provide under

17    this agreement, would Columbia Sussex monitor to see

18    whether the Westin Casuarina was complying with the

19    requirements of the Westin operating manuals?

20          A.    I would say no.

21          Q.    Okay.  Are you familiar with the

22    System License Agreement between the Westin Casuarina

23    and the Westin licensing company?

24          A.    I'm aware that it exist, I don't

25    remember specific provisions in the agreement.

Page 106

1    Casuarina?

2            A.    No, I have not.

3            Q.    To your knowledge, does Columbia

4    Sussex Corporation identify any relationship between

5    it and Galleon Beach or it between it and the Westin

6    Casuarina in terms of Columbia Sussex's own public

7    relations or advertising?

8            A.    I'm not sure I follow your question.

9    That you're asking under the Administrative Service

10   Agreement does Columbia Sussex arrange for

11   advertising for the Westin Casuarina, the answer is,

12   "yes."

13           Q.    Okay.  Let me back you up again, I

14   apologize.  But I thought I had asked you earlier

15   what types of services Columbia Sussex provided and I

16   don't recall that one having been mentioned.  So in

17   addition to arranging advertising, are there any

18   other services that Westin -- that Columbia Sussex

19   does provide for the Westin Casuarina pursuant to the

20   services agreement besides administering records,

21   paying the bills that we had talked about, procuring

22   the insurance and arranging the advertising?

23           A.    Again, not that I can recall.

24           Q.    Okay.  In terms of the advertising,

25   what type of advertising does Columbia Sussex handle

1  for Westin Casuarina?

2          A.    I believe it's the placements of

3  advertisements in travel magazines or in airline

4  magazines that are provided to people that fly the

5  different airlines, or possibly the newspaper such as

6  USA Today.

7          Q.    Is that a service that Columbia Sussex

8  provides separate from any advertisements handled by

9  the Westin company?

10          A.    Yes, this would be in addition to what

11  would be handled by Westin.

12          Q.    Okay.  And so just to make sure I'm

13  following you correctly.  Galleon Beach is actually

14  getting benefit of advertising from both

15  corporations, from the Westin group and from Columbia

16  Sussex?

17          A.    No.  Columbia Sussex is only arranging

18  for the advertising to be placed.  Galleon Beach pays

19  for it.

20          Q.    Okay.

21          A.    So it's not benefitting from Columbia

22  Sussex placing the advertisements.

23          Q.    Well benefitting in the sense that it

24  doesn't have to do itself?

25          A.    Just for administration of placing the

Page 108

1    ad.

2              Q.    Okay.  Who makes the determination as

3    to whether or not ads will be placed?

4              A.    I believe it's Mr. Yung in

5    consultation with the General Manager.

6              Q.    Do any of these ads, as far as you

7    know, identify the relationship between the Westin

8    Casuarina and Columbia Sussex?

9              A.    I believe they're silent with regard

10   to that.

11             Q.    I'm assuming from the way you've been

12   answering the questions that Mr. Szydiowski as

13   General Manager of the Westin Casuarina is aware of

14   the relationship between the Westin Casuarina and

15   Columbia Sussex?

16             A.    Yes, he is.

17             Q.    Okay.  Do you know whether other

18   employees of the Westin Casuarina are informed of the

19   nature of that relationship?

20             A.    I believe it would be done on a

21   need-to-know basis.

22             Q.    Have you ever heard of any employees

23   of the Westin Casuarina telling anyone that the

24   Westin Casuarina is owned and operated by Columbia

25   Sussex Corporation?

Page 109

1          A.    I have no knowledge of that ever

2    happening.

3          Q.    And I take it from your earlier

4    answers, if they had made that representations that

5    would not be correct?

6          A.    That's correct.

7          Q.    Do you know whether the Columbia

8    Sussex website identifies the Westin Casuarina as a

9    Columbia Sussex property?

10          A.    I believe that property is listed on

11    our, on the website for Columbia Sussex.  I'm not

12    aware of how it refers to it.

13          Q.    When Columbia Sussex enters into a

14    relationship with a new hotel, do they typically

15    issue press releases about the new endeavor?

16          A.    Usually not.  It doesn't mean it

17    hasn't happened, but we generally don't issue press

18    releases.

19          Q.    Okay.  Do you know of any that were

20    issued in connection, for example, with the property

21    out in Las Vegas when Columbia Sussex took over that

22    one?

23          A.    Which property are we referring to?

24          Q.    Caesar's Tahoe?

25          A.    Ceaser's Tahoe is not in Las Vegas,

Page 110

1    it's in Tahoe, Lake Tahoe, Nevada.

2            Q.   I don't have knowledge of Nevada, I

3    apologize.

4            A.   I don't recall seeing a press release,

5    but that doesn't mean there wasn't one.

6            (Columbia Sussex Hotel Properties, marked
             for identification as Mitchel Exhibit 3.)
7            Q.   Mr. Mitchel, I've handed you an

8    excerpt of a page from the Columbia Sussex

9    Corporation website that lists some of the -- what

10   are captioned Columbia Sussex Hotel Properties; do

11   you see that?

12           A.   Yes.

13           Q.   Okay.  This isn't the full website,

14   let me represent, but on the second page of Exhibit 3

15   it does list the properties that are identified as

16   Westin properties; do you see that?

17           A.   Yes.

18           Q.   And that does include the Westin

19   Casuarina, correct?

20           A.   Yes, it does.

21           Q.   Okay.  There is no indication on there

22   of the fact that Columbia Sussex according to your

23   testimony or actually doesn't own the Westin

24   Casuarina, correct?

25           A.   That's correct.

Page 111

1      Q.    And it doesn't indicate that it does

2  not manage or operate the hotel, correct?

3      A.    It does not indicate what capacity

4  Columbia Sussex has to do with that property, you're

5  correct.

6      Q.    Okay.  Do you know why it listed it

7  without indicating it neither owns or operates it?

8      A.    No, I don't.

9      Q.    This indicates, as well, that there

10  are about eight hotels, Westin hotels that Columbia

11  Sussex has a relationship with, is that correct?

12      A.    That's correct.

13      Q.    Okay.  And earlier you had mentioned

14  that you thought that there were five?

15      A.    Yes.

16      Q.    Okay.  Would it be correct to say that

17  there more likely eight than five?

18      A.    Yes.

19      Q.    I've just handed you a document we

20  have marked as Exhibit 4, I believe.

21      A.    Yes.

22          (Web page, marked for identification
            as Mitchel Exhibit 4.)
23      Q.    Okay.  Let me represent to you this is

24  the page that comes up if you would click on the

25  reference to Grand Cayman -- I'm sorry, to Westin

Page 115

1          Q.    Okay.  And other than that, are you
2    aware of anything else that would so indicate?
3                MR. BROWN:  Objection.  I don't
4                understand anything else in the universe or
5                in the world.
6                MR. ITZKOWITZ:  A very good point.
7                I'll withdraw for a minute.
8                (Short break was taken)
9          Q.    Mr. Mitchel, if I can just call your
10   attention again to the service agreement.  I think we
11   marked it as Exhibit 1.
12         A.    Okay.
13         Q.    The fella who signed off on it in
14   addition to you was Joseph Marquet?
15         A.    Yes.
16         Q.    Am I correct he's an officer of both
17   the corporations, is that correct?
18         A.    At that time, yes, he was.
19         Q.    So on the second page of Exhibit 1
20   Mr. Marquet had signed it as vice president of
21   Finance for Columbia Sussex Corporation.  On the
22   third page Amendment No. 1 without identifying his
23   title on behalf of Galleon Beach Resort Limited.  Do
24   you see that?
25         A.    Yes.

Page 116

1          Q.    Okay.  That's not a typo, he signed in

2     the correct capacity in both places?

3          A.    Yes.

4          Q.    The System License Agreement that we

5     marked earlier, I think it may have been Exhibit 3.

6          A.    Yes.

7          Q.    Again, I apologize.  Have you reviewed

8     that document on behalf of Galleon Beach before it

9     was signed?

10         A.    Well, I don't recall if I signed it, I

11    probably reviewed it, although it looks like

12    Mr. Marquet signed it, so I might not have reviewed

13    it.

14         Q.    Okay.  And as you're sitting here now,

15    do you have any recollection of having reviewed it?

16         A.    Not really.

17         Q.    Earlier you mentioned that there was

18    advertising that Columbia Sussex administered on

19    behalf of the Westin Casuarina that was in addition

20    to the advertising that was done by Westin licensing

21    company of the Westin hotels?

22         A.    Yes.

23         Q.    The advertising that's done that would

24    include the Westin Casuarina in the brochures and

25    websites and things produced by Westin, is that

Page 137

1    that?

2              A.    Yes.

3              Q.    Okay.  The job categories start off

4    with Corporate Manager and Risk Manager, then the

5    third one is the Hotel General Manager?

6              A.    Yes.

7              Q.    In the case of the Westin Casuarina,

8    was there anybody who would fill in those first two

9    categories, the Corporate Manager and the Risk

10   Manager?

11             A.    Well I would have filled in the, I

12   would have filled in Corporate Management

13   responsibility, and either myself or people at my

14   direction would have filled in the Risk Manager

15   responsibility.

16             Q.    Okay.  So in terms of the items listed

17   in this Section 2, were you the one then that

18   established the intent and direction of the safety

19   policy that would be indicated in the first bullet?

20             A.    Yes.

21             Q.    And how did you do that?

22             A.    By providing this manual.

23             Q.    Was there anything else that you did

24   besides providing the manual?

25             A.    No.

Page 138

1      Q.   Okay.  The second one, the risk

2   manager researches, writes and updates and the loss,

3   the Safety & Loss Prevention Manual.  Were you

4   involved in any way in reviewing or updating this

5   particular document?

6      A.   Yes.

7      Q.   How so?

8      A.   I reviewed it.

9      Q.   Okay.  Was that at the time that you

10  told the General Manager to comply with it?

11     A.   Would have been before it was issued.

12     Q.   Okay.  When you reviewed the manual,

13  did you do that on behalf of Columbia Sussex or was

14  that something you did for Galleon Beach Resort with

15  respect to the Westin Casuarina?

16     A.   Again, we're splitting hairs, I mean

17  with -- I have two roles, one is treasurer of

18  Columbia Sussex, one is treasurer Galleon Beach.

19  Some of the things I do I do once, but it's on behalf

20  of both companies.  So the fact that I reviewed and

21  updated a safety manual for Columbia Sussex and then

22  directed people to communicate that update to the

23  people in, at Galleon Beach, I've done it in my

24  capacity as an officer of Galleon Beach.

25     Q.   Okay.  All right.  But you actually

Page 139

1    did review this in your capacity as an officer of

2    Columbia Sussex, as well?

3              A.    Yes.

4              Q.    Okay.  Who wrote the manual?

5              A.    The actual writing of the manual would

6    have been done by individuals within my risk, our

7    risk management Columbia Sussex Risk Management

8    Department.

9              Q.    Okay.  Was there anybody from the

10   operations division that was involved in contributing

11   to the manual?

12             A.    We might have consulted with some

13   operations people, but I don't believe that anybody

14   from operations was involved in the writing of the

15   manual.

16             Q.    Okay.  And I apologize, I am -- I

17   apologize, I just want to make sure that I've got

18   this right.  Putting aside anything having to do with

19   the Westin Casuarina, the manual itself is written

20   under your direction by employees who answered to you

21   in the Risk Management Department?

22             A.    Yes.

23             Q.    And you reviewed the manual for the

24   entire Columbia Sussex corporation?

25             A.    Yes.

Page 140

1      Q.   And did you make some, for example,

2  the updates that appear in the document at different

3  places?

4      A.   Yes.  Somebody under my direction

5  would have done those updates, yes.

6      Q.   Okay.  And you reviewed what they

7  prepared and then approved it?

8      A.   Yes.

9      Q.   Okay.  And that was all done in the

10  capacity of your responsibilities for Columbia Sussex

11  Corporation, correct?

12     A.   Correct.

13     Q.   Okay.  And having already done it, you

14  then instructed the Westin Casuarina to comply with

15  it?

16     A.   Yes.

17     Q.   Thank you.  Okay.  The third item on

18  this section relates to the responsibilities of the

19  hotel General Manager?

20     A.   Yes.

21     Q.   And the first of those is to read and

22  assimilate the loss prevention, the Safety & Loss

23  Prevention Manual.  Had anybody in the Risk

24  Prevention Department or you personally done anything

25  to insure that the General Manager of the Westin

Page 141

1   Casuarina had read and assimilated this manual?

2           A.    No, I had not.

3           Q.    The second item there says the hotel

4   General Manager is to "educate the staff on the need

5   to follow the safety guidelines, conduct accident

6   investigation, and prompt reporting of accidents and

7   incidents, and follow-up."  Had you done anything to

8   ensure that the General Manager had provided that

9   educational function?

10          A.    Other than the fact that Incident

11  Reports are prepared and prepared completely, but

12  beyond that, no.

13          Q.    Okay.  And as I understand in the case

14  of Ms. Genereux, they actually hadn't prepared

15  Incident Reports, correct?

16          A.    That's my understanding that an

17  Incident Report was not prepared at the time of the

18  incident.

19          Q.    Okay.  The third item under General

20  Manager as he appoints key personnel for duty such as

21  training property inspection and accident incident

22  investigation and reporting.  Had you done anything

23  to ensure that the General Manager of the Westin

24  Casuarina had performed those functions?

25          A.    Nothing specific other than again to

Page 142

1    review documents that would have been generated by

2    these particular categories.

3            Q.    Okay.  Would the General Manager or

4    the folks designated in these categories typically

5    send reports up to you to review?

6            A.    They would have sent reports to the

7    Columbia Sussex Risk Management Department, then send

8    reports to me.

9            Q.    Right.  And had you received reports

10   from folks within the Columbia Sussex Risk Management

11   Department relating to how the Westin Casuarina was

12   carrying out this, appointing key personnel?

13           A.    I don't recall seeing anything, no.

14           Q.    The last item in that section says

15   that the hotel General Manager is to ensure that the

16   safety and loss prevention efforts are documented.

17   Again, is there anything that you did personally to

18   ensure that the hotel General Manager was carrying

19   out that responsibility?

20           A.    No, other than directing him to comply

21   with this and to report the incidents and do his

22   inspections as they are called for in the manual.

23           Q.    Okay.  And do you recall reviewing any

24   documents indicating that he had in fact performed

25   that documentation?

1    A.   I don't recall looking at anything,

2    no.

3    Q.   Would there be any place at the

4    corporate offices in Ft. Mitchell that might have

5    documents of that type that had been prepared by the

6    Westin Casuarina manager?

7    A.   There might be files of the inspection

8    reports, and I know there is files of Incident

9    Reports that have been prepared.

10    Q.   Okay.  We've been provided a certain

11    limited number of documents in this case related to

12    the Westin Casuarina.  Were you involved in reviewing

13    documents that were compiled for production in this

14    case?

15    A.   I don't recall reviewing those, but

16    this case has been going on for a number of years, so

17    I can't recall what I did, you know, a year or two

18    ago.

19    Q.   Are you aware of any documents that do

20    exist, either Incident Reports or any of the

21    inspection reports of any type that do exist at

22    Columbia Sussex office in Ft. Mitchel that have not

23    been produced?

24    A.   I'm not aware of any.

25    Q.   Couple of pages beyond where we are

Page 145

1   time the Westin Casuarina performed an analysis of

2   the incident involving Ms. Genereux?

3          A.   I think I've already commented that it

4   was my understanding that certain reports were

5   prepared at the point of the filing of the litigation

6   that documented different employees' recollection of

7   the events at the time of the incident.

8          Q.   Okay.

9          A.   Can I take a quick break?

10         Q.   Yeah, of course.

11              MR. BROWN:   Yeah.

12         (A short break was taken.)

13         Q.   Mr. Mitchel, I understand there was a

14   question you wanted to clarify an answer to?

15         A.   Yes.  My role involving risk

16   management at Columbia Sussex and Galleon Beach

17   Resort Limited changed in, and I can't remember the

18   exact time period, but 2002 or 2003, I was no longer

19   involved in overseeing risk management.  And then

20   just recently within the last month I took on that

21   role again.  So there's a gap in my involvement with

22   risk management from around, somewhere in Year 2002

23   or 2003 through recently.  So I wanted to clarify

24   that there was a gap in my responsibility for risk

25   management.

Page 146

1          Q.    Okay.  When you say "recently" you

2    were referring to 2007?

3          A.    Yes.

4          Q.    And do you know whether you were

5    overseeing the risk management function at the time

6    of Ms. Genereux's incident in May of 2002?

7          A.    I believe I was.

8          (Email, May 3, 2005, marked for
            identification as Mitchel Exhibit 8.)
9          Q.    Okay.  Mr. Mitchel, we've just handed

10   you what was marked as Exhibit 8 at the deposition.

11   This is a document with a typed signature of a fella

12   named Denzil Luke dated May 3rd, of 2005; do you see

13   that?

14         A.    Yes.

15         Q.    Okay.  Is this the report that you

16   were talking about that reported the recollection of

17   employees relating to the incident involving

18   Ms. Genereux?

19         A.    Yes.

20         Q.    Were there any other reports like this

21   that you had seen?

22         A.    I can't recall specifically, I thought

23   -- I thought Dan Szydiowski had done one, but it's

24   possible he just did that verbally with me.

25         Q.    Okay.  And Mr. Luke in his report

Page 149

```
 1          A.    Yes.

 2          Q.    Do you know where at any point in time

 3   the Westin Casuarina prepared an analysis of the

 4   incident involved with Ms. Genereux?

 5          A.    I believe I mentioned before where

 6   there wasn't, to my knowledge, an Incident Report

 7   prepared at the time, so there wouldn't have been any

 8   analysis of the accident if there wasn't any Incident

 9   Report.

10          Q.    Okay.  What I'm -- and I apologize,

11   what I'm asking is slightly different.  After it was

12   called to the attention of the General Manager of the

13   Westin Casuarina that an Incident Report had not been

14   prepared, do you know whether the hotel itself as

15   opposed to anything done by the attorneys, whether

16   the hotel itself had prepared any type of analysis?

17          A.    Not to my knowledge.

18          Q.    Okay.  Earlier today you had mentioned

19   that there was another allegation of a sexual assault

20   at the Westin Casuarina involving a minor female

21   named Reynolds.  Do you know whether any type of

22   analysis was prepared involving her incident?

23          A.    There was an Incident Report prepared.

24          Q.    Okay.  And addition to the Incident

25   Report was there an analysis of how the Reynolds'
```

Page 150

1    incident had occurred?

2              A.    There wouldn't have been any

3    additional report beyond that Incident Report.

4              Q.    On the -- Okay.  The page that you're

5    looking at right now, the one captioned Accident

6    Investigation & Analysis talks about an analysis, is

7    it your understanding that the analysis is actually

8    incorporated into the Incident Report form?

9              A.    Yes.

10             Q.    Okay.  And so in connection with the

11   Reynolds' incident, would there have been an analysis

12   undertaken and reported on the form?

13             A.    Yes.

14             Q.    One of the items mentioned as part of

15   this investigation analysis is a requirement to "come

16   to a conclusion.  Make necessary recommendations for

17   change."  Do you see that?

18             A.    Yes.

19             Q.    Do you know whether the hotel prepared

20   any conclusions with respect to Ms. Genereux's

21   incident, not on the form itself, because you've

22   indicated it doesn't exit, but do you know whether

23   they undertook any type of separate review that lead

24   them to come to a conclusion of the type referenced

25   here?

Page 151

1    A.    It's my recollection that there wasn't

2    any additional or change that was required to be made

3    in connection with that incident.  So I think the

4    answer to your question is, no, we did not do

5    anything to change policy or procedure because of

6    that incident.

7    Q.    Were there any policies or procedures

8    changed as a result of the Reynolds' incident?

9    A.    I don't recall.  I don't recall, you

10   know, there might have been but I don't recall.

11   Q.    The page after the one you're looking

12   at right now is captioned Quarterly Safety Meetings

13   and Documentation?

14   A.    Yes.

15   Q.    Okay.  I think you had mentioned

16   something to that a little bit earlier in the

17   deposition.  Do you know whether or not the Westin

18   Casuarina did undertake quarterly safety meetings?

19   A.    I don't have any specific knowledge to

20   that effect.

21   Q.    Had you ever seen any reports of

22   quarterly safety meetings?

23   A.    No, I have not.

24   Q.    Had you been told by anybody at the

25   Risk Management Department at Columbia Sussex if they

Page 152

1    had reviewed reports of quarterly safety meetings?

2              A.   No.

3              Q.   We had talked earlier this morning

4    about analyses that you had performed of loss trends

5    based on insurance records.  This document, the

6    quarterly safety meeting and documentation page talks

7    about analyses of loss trends to be performed by the

8    General Manager and the hotel staff.  Do you know

9    whether any loss-trend analyses had been undertaken

10   by the Westin Casuarina staff?

11             A.   I've no specific knowledge of that.

12             Q.   Okay.  And I take it you didn't see

13   any such trends analyzed in writing?

14             A.   No, not to my recollection.

15             Q.   Okay.  And I take it you didn't hear

16   of any such trends analyzed by the hotel that had

17   been reported to other members of the Columbia Sussex

18   Risk Prevention Department, Risk Management

19   Department?

20             A.   Not to my knowledge.

21             Q.   There's a reference in the second

22   paragraph to a quarterly cost allocation report from

23   the home office/risk management; do you see that?

24             A.   Yes.

25             Q.   What document is that referring to?

1         A.    That's the report that I alluded to

2    earlier where it monitors timely compliance with

3    reporting of incidents.

4         Q.    Would that particular document, copies

5    of that document be sent to the various hotels that

6    Columbia Sussex had a relationship with?

7         A.    Yes, there would have been a copy

8    sent.

9         Q.    The next page after the one you have

10   in front of you right now is captioned at the top

11   Reports and Forms - An Overview.  Do you see that?

12        A.    Yes.

13        Q.    One heading up from the bottom of that

14   there's a heading that starts Safety

15   Checklist-Quarterly Procedures; do you see that?

16        A.    Yes.

17        Q.    And it requires quarterly inspection

18   of the hotel property by select members of management

19   and/or engineering, and describes that as "...vital

20   for the safety of our guests and employees."  Do you

21   see that?

22        A.    Yes.

23        Q.    Do you know whether quarterly

24   inspections had been performed at the Westin

25   Casuarina?

Page 154

1          A.   I've no specific knowledge of that.  I

2    know it's one of our required procedures, but I don't

3    have any specific knowledge.

4          Q.   Okay.  And I take it from that, you

5    haven't seen quarterly reports?

6          A.   I've seen them, but I don't recall

7    specifically seeing one for this property.

8          Q.   Had you heard from any of your

9    subordinates in the Risk Management Department that

10   they had been receiving quarterly inspection reports

11   from the Westin Casuarina?

12         A.   I don't recall whether they reported

13   to me that they weren't getting reports from this

14   property.

15         Q.   I'm sorry.  That they were not?

16         A.   They were not getting the reports.

17         Q.   Had they in fact been receiving

18   quarterly reports from the Westin Casuarina, would

19   those be maintained on file at Columbia Sussex?

20         A.   They would be for a period of time.

21         Q.   Do you know what period of time would

22   be?

23         A.   I believe generally we keep those kind

24   of things for three years.

25         Q.   Okay.  And do you know whether there

Page 155

1  are any quarterly reports on file related to -- well,

2  dated from the time you became aware of this lawsuit?

3          A.   I don't have any specific knowledge of

4  that.

5          Q.   In addition to the Incident Reports

6  that were to be prepared for particular incidents,

7  was there a requirement that the hotel maintain a log

8  of all the Incident Reports that were being been

9  completed?

10          A.   Yes, they're required to maintain a

11  log.

12          Q.   And do you know whether the Westin

13  Casuarina had maintained a log?

14          A.   I don't know if they did or not.  I

15  know I didn't receive any indication that they

16  weren't.

17          Q.   Did you receive any indication that

18  they were maintaining a log?

19          A.   No.  I generally only hear about

20  things if they don't comply.

21          Q.   Since this lawsuit was filed on behalf

22  of Ms. Genereux, have you had occasion to see any

23  logs of Incident Reports, of incidents at the Westin

24  Casuarina?

25          A.   I don't recall seeing any, no.

Page 158

1              Q.    Okay.  Do you know whether or not the

2    Westin Casuarina had enacted a safety training

3    schedule?

4              A.    Again, I didn't receive any reports

5    that they weren't and that's generally how I'm only

6    made aware of things when they don't comply, so I

7    would have assumed that they did.

8              Q.    Okay.  On the flip side though you had

9    not seen any reports that they in fact had complied?

10             A.    No.

11             Q.    And I take it you hadn't received any

12   information from other folks in the Risk Management

13   Department of Columbia Sussex that they had received

14   reports that the Westin Casuarina was carrying out a

15   safety training schedule?

16             A.    The people in the Risk Management

17   Department would have received those reports, so I --

18   but I didn't get any report from them that they

19   weren't complying.

20             Q.    Okay.  Did you get any report from

21   them that the Westin Casuarina was complying?

22             A.    I wouldn't have expected one though.

23   I did not, but I wouldn't have expected one.

24             Q.    Did you ever do anything personally to

25   find out whether or not the Westin Casuarina was

1    providing the training referenced in Section 7?

2              A.   No, I did not.

3              Q.   On page 7-2, 7-2, toward the very

4    bottom there is a section that says Documentation of

5    Training; do you see that?

6              A.   Yes.

7              Q.   And it requires that the employees who

8    attend the training sign an attendance roster?

9              A.   Yes.

10             Q.   Do you know whether there is an

11   attendance roster in existence for the Westin

12   Casuarina for employee training?

13             A.   Again, if they -- if the property

14   complied with the training they would have submitted

15   documentation of the attendance log for that specific

16   training.  And since I didn't receive any notice that

17   they weren't complying, I assume that they did.

18             Q.   Okay.  This mentions that the records

19   would be on file for three years, right?

20             A.   Yes.

21             Q.   Actually for at least three years it

22   says.  Would Columbia Sussex have a copy of those

23   records going back at least three years then?

24             A.   I would expected that we would, yes.

25             Q.   Okay.  The last sentence in bold on

1           Q.   Okay.  There is a reference in there

2    to closed circuit television cameras being used to

3    monitor the garages?

4           A.   Yes.

5           Q.   Do you know whether there are any

6    closed circuit television systems that are in use at

7    the Westin Casuarina for any purpose?

8           A.   I'm not aware of any.

9           Q.   Do you know whether there have been

10   any at the Westin Casuarina?

11          A.   No, I don't.

12          Q.   A little further down the same

13   document there's a reference to security patrols,

14   specifically to unschedule rounds and irregular

15   patrols.  Do you know whether there have been any

16   security patrols used at the Westin Casuarina?

17          A.   I don't have any specific knowledge of

18   that.

19          Q.   In the document dealing with garages

20   about the middle of it there's a reference to

21   controlling stairwells and elevators.  Do you know

22   whether there were any, whether there was any access

23   control at the Westin Casuarina for different areas

24   of the property?

25          A.   I'm not sure what you mean by "access

1        A.    I'm not aware of any.  I know at some

2   of our hotels after a certain hour they lock the

3   outside doors.  I don't know specifically if that is

4   done at the Westin Casuarina or at what time that is

5   done, if it is done.

6        Q.    All right.  Are you familiar with the

7   spa building that's located at the Westin Casuarina?

8        A.    Very superficially.

9        Q.    Okay.  You understand that it exist as

10  a separate building on property grounds?

11        A.    Yes.

12        Q.    Good.  Do you know whether there are

13  any restrictions placed on access to that particular

14  building after the spa is closed?

15        A.    I have no specific knowledge of that,

16  although I would expect that certain areas of that

17  building, if not all that building, are locked at a

18  certain point in the evening, but I don't know that

19  for a fact.

20        Q.    And why would you suspect that?

21        A.    Within the spa area itself there is

22  inventory and supplies and things that we would, you

23  know, take some action to restrict access if there

24  was no one there to monitor it.

25        Q.    Okay.  In the immediate area of the

Page 170

1    spa building, are you familiar, as well, with the

2    governor's ballroom facility?

3            A.   Yes, I know there is a ballroom in the

4    back part of that building, yes.

5            Q.   Okay.  And is it your understanding,

6    as well, that during hours when the ballroom is not

7    in use, that portion of the property is also locked?

8            A.   I don't have any knowledge of that,

9    whether it's locked or not.

10           Q.   Is that something you would expect to

11   happen?

12           A.   I would expect that, you know, after

13   use or late at night that that building would, that

14   part of the building would be secured.

15           Q.   Okay.  When you say "late at night"

16   what are you referring to?

17           A.   I think it all depends on, you know,

18   the local properties -- use of the property.  If

19   there -- you know -- it all depends on the

20   circumstances.  If they've got events going on that

21   are -- or if there's activity on the island or in the

22   area that would make, you know, make it practical to

23   leave access open, I would think they would do that,

24   and if -- And again I don't know what -- what local

25   policy the General Manager would have put into place

1                   (Columbia Sussex Manager's Manual, marked
                   for identification as Mitchel Exhibit 9.)

2           Q.   Okay.  And let me represent to you so

3  that the record is accurate.  John Johnson, one of

4  the local attorneys in Boston, had made the manual

5  accessible to me in his office and we had only copied

6  portions of it.  So the document that you have is not

7  the complete manual, it's just excepts from --

8           A.   Six -- doesn't appear to be fat

9  enough.  Okay.

10          Q.   Am I correct in understanding that

11  that, this is actually prepared by Columbia Sussex to

12  serve as sort of a detailed guide for the managers as

13  to how they should carry out certain practices at the

14  hotel?

15          A.   Yes.

16          Q.   And I gathered from just sort of a

17  review of it that it's primarily related to financial

18  matters?

19          A.   Primarily, it's paperwork basically

20  what it addresses.

21          Q.   Okay.  There's a reference in there to

22  something called a D-Sheet?

23          A.   Yes.

24          Q.   Can you tell just in a general sense

25  what that is?

Page 196

```
 1   night?

 2              A.   I don't recall.

 3              Q.   In the course of discussing this

 4   incident with Mr. Szydiowski or any of the employees,

 5   either at Columbia Sussex or at Galleon Beach, and

 6   again putting aside conversations with counsel, had

 7   you come to learn anything about other criminal

 8   incidents at the Westin Casuarina?

 9              A.   No.

10              Q.   Had you come to learn anything about

11   complaints on the island about the level of crime in

12   the Caymans at the time of this incident?

13              A.   The only information I get is that the

14   Cayman Islands is one of the safest islands in the

15   Caribbean.

16              Q.   Did you learn that specifically in

17   connection with this incident or is that just sort of

18   a --

19              A.   That's a general claim by the Cayman

20   Islands, tourism department.

21              Q.   Do you know if anything had been done

22   by, by the Westin Casuarina to obtain information

23   relating to crime on the Caymans at any point in

24   time?

25              A.   No.
```

1          Q.   Earlier when we were talking about

2     analyzing claims for various hotels that were

3     operated or managed by the -- or owned by Columbia

4     Sussex, we talked about some of the information that

5     we gathered in the course of preparing analysis,

6     would that information include information relating

7     to crime levels in the area of the hotel?

8          A.   No, that would only -- that report is

9     only -- would have been an analysis of the Incident

10    Report.

11         Q.   Okay.  And other than putting that

12    particular analysis aside, do you know of any other

13    folks at Columbia Sussex that analyze crime levels in

14    the vicinities of Columbia Sussex or the managed

15    hotels for any purpose?

16         A.   No.

17         Q.   After the incident with Ms. Genereux,

18    did you come to learn of any, any other incident

19    involving alleged criminal acts at the Westin

20    Casuarina?

21         A.   Other than the one I had already

22    mentioned, the Reynolds case, which happened years

23    before that.  Wasn't aware of anything else.

24         Q.   Okay.  And we talked earlier about the

25    two, two other cases at the Casuarina that gave rise

Page 204

1    manual, there's a provision that states that all

2    interior and exterior areas, grounds and parking

3    facilities must be kept safe and secure.  And would

4    you agree that that provision would apply to the

5    Westin Casuarina?

6              A.    If it's in the Westin manual it was

7    provided to the Galleon Beach Resort Limited, then,

8    yeah.

9              Q.    Okay.  There's another provision in it

10   that says, "Adequate safety and security precaution

11   shall be taken in all areas of the hotel."  Would

12   that also applied to the Westin --

13             A.    Yes, to the extent it's in the manual

14   it's been provided to them, yes.

15             Q.    And the last one that I want to read

16   to you, there's a provision relating to the public

17   restrooms on a heading that says "safety and

18   security."  It says adequate safety/security

19   precautions must be taken in all public restrooms.

20   All emergency lights must be in good working

21   conditions at all times.  Access to these areas and

22   all unauthorized persons must be restricted.  Would

23   you agree that that would apply to the Westin

24   Casuarina?

25             A.    Yes.