UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10879-JLT

KIMBERLY GENEREUX,               )
    Plaintiff                  )
                               )   **APPENDIX OF**
       v.                     )   **FOREIGN AUTHORITIES**
                               )
COLUMBIA SUSSEX CORPORATION,     )
STARWOOD HOTELS & RESORTS        )
WORLDWIDE, INC., and             )
WESTIN HOTEL MANAGEMENT, L.P.,   )
    Defendants                 )

**CAYMAN ISLANDS LEGISLATION**

A    The Consolidated Index of Laws and Subsidiary Legislation as at 1st January 2005

B    The Interpretation Law (1995 Revision)

C    The Tourism Law (1995 Revision)

D    The Tourism Regulations (1999 Revision)

E    The Tourism Regulations (2002 Revision)

**CAYMAN ISLANDS CASES**

F    *Carter v. Scott's Industries Limited,* 2001 CILR 355

G    *R. v. Seymour*, 2003 CILR 53 (Gr. Ct.)

**BRITISH COMMONWEALTH LEGISLATION**

H    Occupiers' Liability Act of 1957

I    Occupiers' Liability Act of 1984

**BRITISH COMMONWEALTH CASES**

J    *Allison v. Rank City Wall Canada Ltd.*, 6 D.L.R. 4th 144
     (Ont. 1984)

K    *Gould v. McAuliffe,* [1941] 2 All E.R. 527 (C.A.)

L    *Jeffrey v. Commodore Cabaret Ltd.,* 13 B.C.L.R. 3d 149 (B.C.
     Sup. Ct. 1995)

M    *Marshall v. Rubypoint Ltd.,* [1997] EWCA 898 (Eng. & Wales
     C.A.)

N    *Public Transport Commission of New South Wales v. Perry*,
     [1975-1976] 137 C.L.R. 107

O    *Q v. Minto Management Ltd.,* 15 D.L.R. 4th 581 (Ont. 1985)

P    *Reeves v. Commissioner of Police of the Metropolis,* [1999] 3
     W.L.R. 363

Q    *Slater v. Clay Cross Co., Ltd.,* [1956] 2 Q.B. 264, [1956] 2
     All E.R. 625

R    *Thomas Graham & Co. Ltd. v. The Church of Scotland General
     Trustees,* [1982] S.L.T. 26 (Scot. Sheriff Ct.)

S    *Veinot v. Kerr-Addison Mines Ltd.,* 51 D.L.R. 3d 533 (Can.
     1974)


**TREATISES**

T    CLERK & LINDSELL ON TORTS (Anthony M. Dugdale, et. als.
     eds., 19th Edition 2006), §8-04, §8-15

                              The Plaintiff,
                              By her Attorney,


                         _____
                         MARK F. ITZKOWITZ (BBO #248130)
                         85 Devonshire Street
                         Suite 1000
                         Boston, MA  02109-3504
                         (617) 227-1848
                         March 26, 2008

## CERTIFICATE OF SERVICE

    I, Mark F. Itzkowitz, counsel for the plaintiff, hereby certify that on this date, I made service of the within document by serving it electronically to registered ECF participants and/or by mailing/faxing/hand-delivering a copy of same to non-registered ECF participants as indicated on the Notice of Electronic Filing ("NEF"), upon the following counsel of record:

| | |
|---|---|
| John B. Johnson, Esquire | Robert J. Brown, Esquire |
| Corrigan, Johnson & Tutor, P.A. | Mendes & Mount, LLP |
| 141 Tremont Street | 750 7th Avenue |
| Boston, MA 02111; and | New York, NY   10019-6829. |

    s/ Mark F. Itzkowitz
    MARK F. ITZKOWITZ (BBO #248130)

Dated:  March 26, 2008

106

H. C. of A.
1975-1976.
~~~
THE QUEEN
v.
HEAGNEY;
Ex parte
A.C.T.
EMPLOYERS
FEDERATION.

Murphy J.

*Professional Engineers of Australia; Ex parte Victoria* (21) Dixon C.J., McTiernan, Williams, Webb and Taylor JJ. said:

"No doubt demands which are not intelligible or convey nothing clearly to the mind of the person to whom they are addressed may fail in giving rise to an industrial dispute. The doctrine by which this Court has allowed paper demands to form evidence, sufficient evidence, of a real dispute has not hitherto been qualified by any principle which requires paper demands to be in any specific form or to be incapable of misreading or misconstruction. It surely must be sufficient that the party to whom they are addressed ought fairly to understand what he is requested to do in the specific matters which form the subject of the alleged grievance."

The precision relating to the concepts of offer and acceptance in the law of contract should not be applied to the formation of an industrial dispute arising because of a refusal or failure to accept a log of claims. For example, as the prosecutor conceded, claim for "wage indexation" would be sufficient to found an industrial dispute. Such a simply expressed claim is ambiguous, indefinite and uncertain, but it is intelligible.

The order nisi should be discharged, but without costs (see s. 197A of the *Conciliation and Arbitration Act* 1904-1973).

*Order nisi discharged.*

Solicitors for the applicants, *Moule Hamilton & Derham.*
Solicitors for the respondent Union, *Holding, Ryan & Redlich.*

R.C.M.

(21) (1957) 100 C.L.R. 155, at p. 162.

---

[HIGH COURT OF AUSTRALIA.]

PUBLIC TRANSPORT COMMISSION OF NEW
SOUTH WALES
DEFENDANT,
APPELLANT;

AND

PERRY . . . . . . . .
PLAINTIFF,
RESPONDENT.

ON APPEAL FROM THE SUPREME COURT OF
NEW SOUTH WALES.

H. C. of A.
1976-1977.
~~~
SYDNEY,
1976,
Aug. 24, 25.
~~~
1977,
June 22.
~~~
Barwick C.J.,
Gibbs,
Stephen,
Mason and
Jacobs JJ.

*Negligence—Dangerous premises—Injury to entrant—Liability of occupier—Duty of care—Trespasser—Invitee—Passenger awaiting arrival of train—Involuntary fall on to line—Struck by train—Liability of railway operator.*

While awaiting the arrival of a train at a suburban station an intending passenger suffered an epileptic attack and fell unconscious on to the rails where she was struck by a train. In an action against the operator of the railway which was tried before a jury a verdict was found for her on the ground that the train driver had failed to keep a proper lookout and to take all reasonable care in driving the train.

*Held:* (1) By Gibbs, Stephen, Mason and Jacobs JJ., Barwick C.J. dissenting, that a carrier by rail owes a duty to take reasonable care for the safety of a passenger, whether the passenger is in the course of being carried or is standing on a platform waiting for a train.

(2) By Gibbs, Stephen, Mason and Jacobs JJ., that the plaintiff's involuntary fall to the rails from the platform, where she was entitled to be, did not make her a trespasser and absolve the defendant from its duty to take reasonable care for her safety.

(3) By Gibbs, Stephen, Mason and Jacobs JJ., that there was evidence from which the jury could have concluded that the defendant was in breach of its duty of care.

*Hillen and Pettigrew v. I.C.I. (Alkali) Ltd.,* [1936] A.C. 65; *Braithwaite v. South Durham Steel Co. Ltd.,* [1958] 1 W.L.R. 986; [1958] 3 All E.R. 161; *Commissioner for Railways v. Quinlan,* [1964] A.C. 1054; *Commissioner for Railways v. McDermott,* [1967] 1 A.C. 169; *Herrington v. British Railways Board,* [1972] A.C. 877; and *Southern Portland Cement Ltd. v. Cooper* (1973), 129 C.L.R. 295; [1974] A.C. 623, considered.

Decision of the Supreme Court of New South Wales (Court of Appeal) affirmed.

H. C. OF A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

HIGH COURT [1976-1977.

APPEAL from the Supreme Court of New South Wales.

While waiting for the arrival of her train at a suburban station in Sydney Deidre Ngareta June Perry suffered an epileptic attack which caused her to fall unconscious on to the railway line where she was struck and injured by the train for which she had been waiting. She sued the Public Transport Commission of New South Wales in the Supreme Court of New South Wales alleging that the driver of the train was required and failed to keep a proper lookout and to take all reasonable steps to avoid injuring her. In a trial before a jury a verdict for the plaintiff was returned. An appeal by the Commission to the Court of Appeal Division (Hutley, Samuels and Glass JJ.A.) was dismissed. The Commission then appealed to the High Court. Further facts are set out in the judgments hereunder.

P. J. Kenny Q.C. (with him P. N. D. Jenkyn), for the appellant. The plaintiff became a trespasser when she fell on to the line. She had no permission to go there. It is immaterial that because of the involuntary nature of her conduct she is not liable to an action for trespass. She was on the line without the defendant's permission. Its invitation or permission to come on to the platform or into the train did not extend to the line. Once she exceeded the bounds of the invitation or permission she became a trespasser: Hillen and Pettigrew v. I.C.I. (Alkali) Ltd. (1). It is immaterial whether the excess is caused by the voluntary or the involuntary act of the propositus. Once the driver saw and identified the plaintiff on the rails he came under a duty to take reasonable steps to avoid injury to her. An occupier owes no duty to a trespasser until he knows he is present on the land. Nothing the driver could have done here would have saved the plaintiff. He became aware of her presence too late. The case is governed by Commissioner for Railways v. Quinlan (2). If the case is not to be dealt with on occupier-entrant lines, the plaintiff still cannot succeed. There is no duty. Foreseeability is restricted by reason of the fact that no person is expected to be on the line. The duty is no more than to do what is reasonable after the plaintiff's presence on the line is known. [He also referred to Southern Portland Cement Ltd. v. Cooper (3); Herrington v. British Railways Board (4); and Munnings v. Hydro-Electric Commission (5).]

(1) [1936] A.C. 65, at p. 69.
(2) [1964] A.C. 1054.
(3) [1974] A.C. 623, at pp. 636-638.
(4) [1972] A.C. 877.
(5) (1971) 125 C.L.R. 1.

H. C. OF A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

[7 C.L.R.] OF AUSTRALIA.

A. D. Collins Q.C. (with him A. R. Ashburner), for the respondent. The respondent was not a trespasser. No conscious act brought her on to the line. She entered the premises as an invitee and nothing she did wilfully or negligently took her outside that category. The events that occurred could have been foreseen by the driver. Commissioner for Railways v. Quinlan was decided on occupier-entrant lines, and on the ground that the Commissioner's system was at fault. Here there is another relationship between the parties that is relevant. The action is based on the driver's negligence for which the appellant is vicariously liable. [He referred to Voli v. Inglewood Shire Council (6).] The fact that the incident occurred on the appellant's land does not enable it to have the benefit of the restrictive occupier-entrant rules.

P. J. Kenny Q.C., in reply.

Cur. adv. vult.

1977, June 22.

The following written judgments were delivered:—

BARWICK C.J. The basic facts relevant to the resolution of this appeal are that an electric train in the service of the appellant was being driven upon the appellant's property between two stations on the northern suburbs line of the appellant's electric railway system in the Sydney metropolitan area. It had left Killara, the more northerly station, and was proceeding towards the city, the next station being Lindfield station at which it was scheduled to stop. On a platform of that station there were passengers waiting to be uplifted for carriage to Sydney. Amongst them was the respondent. Whilst awaiting the arrival of the train, she was subject to some form of epileptic attack which rendered her unconscious. She was then standing at a point proximate to the edge of the platform from which, in that state, she fell on to the railway track, straddling the lines or at least one of them. This happened when the train had left Killara station and was on its way to Lindfield station which was at a lower altitude than the former. Throughout, the train was being driven at the speed at which such trains usually travel between those stations. When the train reached the point appropriate to such a course, the driver duly applied the service brake which would have brought the train into Lindfield station at a speed appropriate for stopping there. The direct evidence of

(6) (1963) 110 C.L.R. 74.

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

the driver was that he looked forward down the line towards the next station. When he closely approached the "accept signal" for Lindfield station, though there was a slight bend in the line his view forward allowed him to see the place where the respondent lay on the railway track. Whilst thus looking, he said that he saw what appeared to him to be some paper on the line in the area of the station. The presence of the paper on the line created no hazard and in itself, in my opinion, could not reasonably be held to call for any further action on the part of the driver, beyond the application of the service brake which, in fact, was already in operation. A very—indeed an extremely—short time thereafter, according to the evidence, the driver realized, as he had a closer view, that the object on the line was a human being. He said that he then immediately applied his brakes to their full extent by operating the emergency braking mechanism. There was clearly nothing else he could then have done to avoid injury to the person on the line. However, the application of the brakes did not bring the train to a halt before it reached the point where the respondent lay. It almost did so, but when it reached her it continued for a short distance in the course of which it caused her serious injury. According to her own evidence, the respondent remained unconscious at least until she was struck by the train.

In an action tried in the Supreme Court of New South Wales with a jury, an application for a verdict for the defendant, by direction was refused and a verdict for the plaintiff for $90,000 was returned by the jury. An appeal to the Court of Appeal Division of the Supreme Court was dismissed.

In this appeal, the appellant does not seek a new trial of the action but presses for the allowance of the appeal and the entry of a verdict in its favour on the footing that, in the circumstances most favourable to the respondent which the jury could find, there was no liability in the appellant for the respondent's injuries.

Notwithstanding this attitude of the appellant, I have fully examined the summing up of the learned trial judge to ascertain precisely the basis upon which the matter was left to the jury. I have also examined the whole of the evidence which was placed before the jury in relation to the occurrence.

Although, as will appear, I am of opinion that negligence in the driving of the train would not attract to the appellant liability for the respondent's injuries, it is proper, in my opinion, to set out some parts of the evidence of the driver, being the only direct evidence relating to the manner in which the train was driven and controlled.

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

The driver is reported in the evidence as having said that:

"Approaching the other signal, at least the Killara end of Lindfield platform, approximately 60 feet from the signal my view of the platform is partially obstructed by this signal, and just as I am approaching the signal I see an object in the line in the distance towards the end of the platform. I have already made my application of the brakes to stop on the platform. Under normal circumstances and when I realize this is something else other than what I thought it was on the line I made the full emergency application of the brakes, and as I made the full emergency application of the brakes as much as possible under the circumstances and the train kept proceeding down I immediately, knowing that I couldn't do much better than I did, I gave the guard the signal to come forward, you know, as quickly as possible to render any assistance."

"Q. You said in your evidence that you saw something on the line?
A. Yes.
Q. You had some thoughts about this?
A. When I first saw this object on the line I thought it was a piece of paper.
Q. Any colour?
A. Yes, I thought it was a piece of brown paper. We frequently see paper on the line—quite a lot of it.
Q. When was it—can you say?
A. When I first saw this object?
Q. Can you say with any certainty where it was that you changed your mind about it being a piece of paper?
His Honour: Would you find out where he first thought it was a piece of brown paper?
Mr. Jenkins: Q. Where was your train when you first thought it was a piece of paper?
A. As soon as I got a clear view of that signal and the platform I got this object in my vision on the line.
Q. You say as soon as you got a clear view of the platform?
His Honour has suggested we might clear this up. Was your attention drawn to the object before the signal, at the signal, or where would you say?
A. Approaching on the signal area."

"Q. Where was the train when you decided or felt or came to the conclusion this was not a piece of paper but it was a body?
A. I would be about 200 yards from the platform.
Q. What did you do then?
A. I immediately applied the brakes to the fullest emergency position."

In cross-examination he said:

"Q. You can get children and animals straying on to the line?"

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

A. Very few animals, apart from dogs. Not in the metropolitan areas.

Q. Children stray on to the line occasionally?

A. I have never seen any myself.

Q. You know it does happen?

A. Yes.

Q. They are the sorts of things you are warned to be on the alert against?

A. Yes.

Q. And people fall on to lines, don't they?

A. Yes—quite a lot.

Q. And that is something you are warned constantly to be on the alert against, isn't it?

A. Yes.

Q. Indeed there is provision, is there not, at some stations for the station staff to walk across the lines?

A. They do, but they are not supposed to.

Q. But you know that they do?

A. Yes.

Q. And you have to be on the alert for it?

A. You have to be on the alert for everything.

Q. From the moment you leave Killara Station it is dead straight, isn't it, all the way to Lindfield?

A. No, it is not.

Q. You can see all the way?

A. No, you can't.

Q. You can see Lindfield Station from the moment you have left Killara Station?

A. Yes—just before.

Q. You can see the middle platform from Killara.

A. You can see the left-hand one?

A. Not from where I am.

Q. That is a considered answer?

A. Not until you are about clear of the signal.

Q. Clear of the signal?

A. Coming into the signal area before you get a full view of the platform.

Q. You could see the line?

A. You can see portion of it.

Q. You can see all of the line running along the platform from about halfway from Killara Station, can't you?

A. No, I would say 60 to 80 yards on the Killara side of the signal I can see the full view of the platform.

Q. That is somewhere between 250 and 300 yards from the commencement of the platform you can see the full line ahead?

A. Once you get into that area.

Q. From about 300 yards before you get to the platform you would be in a position to see the line as it goes alongside the platform?

A. Just starting to get a view of it.

Q. And about 300 yards before the platform?

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

A. At a rough estimate it would be that, I suppose.

Q. So that at that point you saw something on the line which should not have been there?

A. That is correct.

Q. That something could have been anything, couldn't it?

A. To me it look like a large piece of paper. We see a lot of paper on the lines blowing about.

Q. That was the moment, was it not, according to your training and experience when you should have anticipated an emergency, wasn't it?

A. That is when I acted—when I saw it.

Q. But you did not act straight away, did you? You kept on going?

A. Only momentarily. At that distance I could not realise what it was. I thought it was paper. When I saw it was not paper I applied the emergency brake.

Q. It does not matter what it was. It was something that gave you notice of an emergency?

A. We don't always stop trains when we see something on the line which we think is paper. We would never get to our destination. At that distance, as soon as I realised it was a woman on the line I immediately applied the emergency brake.

Q. As you approached this woman before the impact you could see her quite clearly?

A. Yes—just before.

Q. You could see, could you not, that far from being a piece of brown paper it was a woman dressed in a bright white and purple dress?

A. I didn't take much notice of the colour at all. All I was concerned about was trying to stop that train."

The driver remained unshaken throughout a long cross-examination of which I have reproduced only a very small part. There was, in my opinion, no basis whatever on which the driver could be disbelieved: nor was there, in my opinion, any material upon which it could have been concluded that he saw the respondent on the line at an earlier point of time than that of which he gave evidence or, if it be material, that he ought to have seen the respondent as a human being before the time at which he said he did so. Further, there was no evidence to contradict his evidence as to the view he had from his position in the driver's cabin of a fast moving train: this I say, notwithstanding the various photographs put in evidence. They do not represent what was or would necessarily be seen by the driver of a moving train at any particular and relevant moment of time. If it had been possible to find that the driver knew of the respondent's presence on the line at the time he saw what he

114    HIGH COURT    [1976-1977]

H. C. OF A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

concluded was paper on the line, the jury might properly have concluded that an emergency application of the brakes at that point of time would have brought the train to a halt before it reached the point where the respondent was. However, because of the views I have formed as to the fate of this appeal, I do not pause to examine closely the evidence in this respect so as to resolve whether the evidence would have supported that view.

In support of a view that the driver was negligent in not applying his emergency brakes so soon as he saw what he thought was paper on the line, reliance was placed on the concessions of the driver that it was necessary to be on the lookout for persons as well as things upon the line: and, in particular, his statement that people fall "quite a lot" on the lines. It is worth remarking that the statement was not that people quite often fall off stations on to the railway track. It was a general statement that included the falling of persons from moving trains or between platforms and moving trains. But whatever the full impact of these concessions, they can have, in my opinion, no bearing upon the present case. In the first place, a railway system, perhaps particularly such a system in a densely populated metropolitan area, cannot be conducted on the footing that the trains must travel at a speed and under such restraint that if at any time a person should fall upon a line, whether from a moving train or from a station platform, the train can be halted without injury to the fallen person. Nor could it be concluded that, because of the frequency with which people fall on to the railway track, any object seen on the rails must be treated as a human being: or even suspected to be one: and action thereupon taken as if, in fact, the object were a human being. Nor do these concessions warrant the conclusion that this driver was not keeping a proper lookout. They do not furnish any material, in my opinion, on which it could properly be said that the driver in this case was reckless in what he did or did not do, nor even, in my opinion, that he was lacking in reasonable care in his management of the train. There is, in my opinion, no evidence from which it could be inferred that the railway was not keeping a proper lookout.

I might mention here that, according to some calculations based on various pieces of evidence as to distances between described points on or adjacent to the railway line, and on an assumed speed of the train at or about these points, it was said it have been possible to conclude that the train could have been brought to a halt at a point northward of the position where the respondent lay on the line and thus have avoided injury to her.

137 C.L.R.]    OF AUSTRALIA.    115

H. C. OF A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

had the emergency brake been fully applied at the time the driver said he realized that a human being was on the railway track. But, in my opinion, the appearance of exactitude which these calculations give is quite spurious. They do not, in my opinion, warrant the conclusion sought to be said to result from them. They lack reality in relation to such a mobile situation constituted by this moving and loaded train on a down gradient in charge of its driver, particularly bearing in mind that the effectiveness of the braking system depended on the contact of metal wheels with metal rails. These calculations would be, in my opinion, an inappropriate basis on which to allow a jury to disbelieve the evidence of the driver and to infer negligence in him, let alone reckless behaviour. Further, even if the driver's evidence were not accepted, these calculations would not, in my opinion, present evidence on which a jury could reasonably hold that the driver did not take the earliest opportunity to apply the emergency brakes of the train.

However, though I could not accept the conclusion sought to be drawn from these calculations as warranting any relevant conclusion, I am content to decide the appeal on the footing that, had the driver become aware that the respondent was on the railway track at the time he saw what he thought was a piece of paper, the accident could have been avoided by the application at that point of time of the emergency braking system of the train. The case has been dealt with throughout on the footing that the driver was under a general duty of care to the respondent: that, in the language of Donoghue v. Stevenson (7), she was in this respect, without qualification, his "neighbour". The particular duty of care was said to be to keep a proper lookout. It was this duty which was said to have been breached. This approach, in my opinion, was fundamentally erroneous.

The most important and indeed basic fact in this case is that the respondent was on the appellant's land when the occurrence occurred. The only relevant duty on the part of the appellant's driver towards the respondent derived from, and could only derive from, the occupancy by the appellant of the land on which the railway was conducted and the respondent's presence there. Both the trial judge and the members of the Court of Appeal rejected the view that the respondent was a trespasser on the land. But it was not said by that Court, as in my opinion it could not be said, that the respondent was either a licensee or an invitee of the appellant at the place on the railway track where

(7) [1932] A.C. 562.

116 HIGH COURT [1976-1977]

H. C. of A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.
Barwick C.J.

she lay. I shall say more on this question a little later. In the view of the Court of Appeal, the respondent did not fall within any of the established categories of relationship to the occupier of the land and *therefore* a general duty to keep a proper lookout devolved upon the appellant's driver.

Hutley J.A., having earlier decided in his reasons for disallowing the appellant's appeal that the respondent was not a trespasser on the railway track, said:

"The real difficulty is how to fit a person who is neither a trespasser, licensee nor invitee into the structure of occupier's duties as fixed by the judgment of Willes J. in *Indermaur v. Dames* (8). The categories cannot in my opinion be used to control the existence of liability in the sense that every person who happens to be on land occupied by another has to be either a trespasser, licensee or invitee. The difficulty of fitting every case into one of the three categories was discussed by the High Court in *Aiken v. Kinghorough Corporation* (8a) per Latham C.J. and Dixon J.

The situation of the plaintiff (respondent) being outside the established categories, what is then the duty, if any, owed by the defendant (appellant) to her?"

and later:

"It is, however, foreseeable that there will be obstacles on the track for which the driver has to be on the look out in the interests of the safety of the train. He has to maintain a continuous watch to ensure that such obstacles do not endanger his train and passengers. Where an obstacle on the track is not a trespasser, and is human, why should not that person be entitled to be the beneficiary of that duty? In other words, why should not such a person be entitled to the benefit of the driver's attention for obstacles, and if he fails to give proper attention have a right of action. No reason was given to the court except the submission that the plaintiff was a trespasser, a view which I consider unsound. Common humanity, to which even a trespasser is entitled, would appear to require this right."

Glass J.A., having also decided that the respondent was not a trespasser, said:

"It was open to the jury to find, basing itself upon evidence specifically directed to the subject and upon its own common knowledge, that passengers may come from the platform or to the lines as a result of falling, slipping, tripping or being pushed. On most occasions such movements would be involuntary and on some occasions the result of inadvertent folly. It was also proved that employees of the defendant might be voluntarily on the railway lines for completely

(8) (1866) L.R. 1 C.P. 274, at p. 288.
(8a) (1939) 62 C.L.R. 179, at pp. 190-191, 205.

37 C.L.R.] OF AUSTRALIA. 117

H. C. of A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.
Barwick C.J.

lawful reasons. That persons might find themselves on the railway track adjoining the platform for a variety of proper reasons was well within the scope of the reasonable foresight of a driver of a suburban train. It followed that the plaintiff was a member of a class of persons which was foreseeably exposed to the risk of injury if the train driver failed to avoid careless acts and omissions in the driving of the train. By virtue of this circumstance the driver owed a duty of care to the plaintiff for breach of which the defendant was vicariously responsible."

Samuels J.A., having said that he did not see any foundation for a finding that the respondent was a trespasser, said:

"Since she was not a trespasser, the duty owed to her was to take reasonable care to avoid injuring her as she lay on the track: *Commissioner for Railways v. McDermott* (9).

These views, as did the attitude of the trial judge, spring from what, in my respectful opinion, is a failure to appreciate the deep significance for this case of the decision of the Privy Council in *Southern Portland Cement Ltd. v. Cooper* (*Cooper's Case*) (10). In that litigation, this Court, bound by the unqualified view of the Privy Council in *Commissioner for Railways v. Quinlan* (*Quinlan's Case*) (11), based largely on the decision of the House of Lords in *Robert Addie & Sons (Collieries) Ltd. v. Dumbreck* (12), but building on some remarks made in their Lordships' reasons in *Quinlan's Case*, felt itself able to found liability in the defendant upon a relationship springing out of the nature of the situation created by the defendant involving the proximity of electricity at a lethal voltage to children of whose possible presence the defendant must have been taken to be aware. This conclusion was drawn notwithstanding the fact that the defendant was the occupier of the land and that the children had no legal right to be present on or at the particular place.

Upon appeal to the Privy Council from the decision of this Court, their Lordships, to an extent qualifying the views expressed in *Robert Addie & Sons (Collieries) Ltd. v. Dumbreck* (12) and in their decision in *Quinlan's Case* (11), held that a particular duty in the circumstances of the case, substantially the same as that found by this Court, was laid on the defendant as occupier towards the plaintiff who was accepted as a trespasser. But this Court's reasons for its conclusion were not sustained or indorsed by their Lordships. The Board, having the ability thus to qualify earlier decisions, was content to sustain the result at which this Court had arrived without resort to any

(9) [1967] 1 A.C. 169, at pp. 186-187.
(10) [1973] 129 C.L.R. 295, [1974] A.C. 623.
(11) [1964] A.C. 1054.
(12) [1929] A.C. 358.

H. C. of A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.
Barwick C.J.

relationship other than that of occupier and trespasser: and, indeed, as I think, in denial of the possibility of any other relevant relationship.

The transcendent importance of their Lordships' decision for the resolution of the instant case is that their Lordships affirmed that if injury occurs to a person present on the property in the occupation of the defendant, any duty of the defendant towards that person must spring out of one of the established relationships which may exist between that person and the defendant as occupier even when mechanical operations are conducted on that property by the occupier. Their Lordships appear to have accepted the view of the House of Lords in *Herrington v. British Railways Board* (13) denying validity to the endeavour of the Court of Appeal in *Videan v. British Transport Commission* (14) to create a general duty of care where the occupier maintains or operates on the land machinery or other sources of potential injury to humans.

Their Lordships' qualification of earlier decisions, by somewhat enlarging the duty of the occupier towards a trespasser in certain respects, has no relevance to the present case. We are not here dealing with a situation comparable to that with which their Lordships were dealing in *Cooper's Case* (15). The qualification of their Lordships of the formerly held view of the extent of the duty of an occupier to a trespasser may no doubt in future be of considerable consequence, if not indeed definitive, in circumstances akin to those which obtained in *Thompson v. Bankstown Corporation* (16) and *Munnings v. Hydro-Electric Commission* (17). Here, we are dealing with a railway line and railway service upon the appellant's land and an intending passenger coming upon a railway platform to board a train. The conditions of the appellant's premises exhibit no features unknown to the passenger and no features of inherent danger to her in her use of the appellant's premises for their intended purposes.

Before going further in stating the consequences of their Lordships' decision in *Cooper's Case* (18), I should say something as to the reasons for decision in *Commissioner for Railways v. McDermott* (19). The injured person in that case was lawfully upon the railway crossing. Her position was contrasted with that of a trespasser (20). The crossing was inadequately

(13) [1972] A.C. 877.
(14) [1963] 2 Q.B. 650.
(15) [1973] 129 C.L.R. 295; [1974] A.C. 623.
(16) [1953] 87 C.L.R. 619.
(17) [1971] 125 C.L.R. 1.
(18) [1973] 129 C.L.R. 295; [1974] A.C.
(19) [1967] 1 A.C. 169.
(20) [1967] 1 A.C. at p. 190.

H. C. of A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.
Barwick C.J.

maintained. Its condition was conducive to the falling of persons upon it in the path of oncoming trains, which would approach round a curve in the line and into the crossing. The plaintiff being, as was held, at least a licensee on the crossing, the defendant was thus in breach of its duty as an occupier to her. That duty in relation to the crossing, upon which the injured person lawfully was, was stated to be one of "taking all reasonable precautions" to reduce to a minimum the danger of injury to the person "lawfully using the crossing" (21).

This was the decision in the case. But some statements were made which might be thought to lend encouragement to the view that concurrently with the duty of an occupier there could be a general duty of care. The precise extent of these statements is, with due respect to their Lordships, anything but clear. Indeed, one may suspect that the reasons for judgment exhibit a tendency to regard the crossing as a public thoroughfare attracting duties appropriate to such a place (21). It seems to me that par. (3) of the headnote in the report of the case takes too much from what was said at pp. 187-189, and any reference to a general duty of care was unnecessary to the decision of the case. Their Lordships were content to distinguish *Quinlan's Case* (22) on the footing that it dealt with a trespasser. But no examination of that case is reflected in the judgment. The impossibility of finding concurrent duties, that of occupier and that of the general duty of care applicable in a public place is apparent from their Lordships' reasons in *Quinlan's Case*. Equally, a caveat against imputing to an occupier a general duty of care in respect of his occupation of property can be perceived in those reasons. There was clearly no intention on the part of those participating in *Commissioner for Railways v. McDermott* (23) of overruling *Quinlan's Case* (22) in any respect. Consequently, that case must be explained so as to make its reasoning consistent with *Quinlan's Case*. This is even more necessary since their Lordships, having taken in hand in *Cooper's Case* (24) an examination of *Quinlan's Case*, have affirmed its insistence upon the singularity of the duties of an occupier and its denial of the possibility of a concurrent general duty of care. The felicitous phrase of their Lordships in *Commissioner of Railways v. McDermott*, "occupation of premises is a ground of liability and is not a ground of exemption from liability" (25), in my opinion adds nothing to the jurisprudence of the liability of an occupier to

(21) [1967] 1 A.C. at p. 189.
(22) [1964] A.C. 1054.
(23) [1967] 1 A.C. 169.
(24) [1973] 129 C.L.R. 295; [1974] A.C. 623.
(25) [1967] 1 A.C. at p. 186.

120

H. C. OF A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

HIGH COURT    [1976-1977.

those who come upon the property. As the event of which complaint is made has happened on the occupier's property, it goes without saying that the source of any liability in the occupier is the occupation and therefore the control of the property. It is indisputable that the liability which is thus derived is not the same as the liability of an occupier to which persons resort as of common right. It is also beyond question that the liability of the occupier is dependent upon the relationship to the injured person and that that liability is a restricted liability however much room there may be for argument in particular cases as to its precise extent. The words I have quoted cannot be read as denying any of these propositions or as meaning that the occupier has or might have a general duty of care unrestricted as in *Donoghue v. Stevenson* (26) and concurrent with the duty as an occupier. In reality, the phrase, as I have said, adds little and indeed does not illumine the subject.

In *Quinlan's Case* (27), their Lordships examined a number of authorities, including *Thompson v. Bankstown Corporation* (28). In that case, there appeared in the reasons for judgment of Kitto J. the following passage (29):

"The respondent's contention appears to assume that the rule of law which defines the limits of the duty owed by the occupier to a trespasser goes so far as to provide the occupier with an effective answer to any assertion by the trespasser that during the period of the trespass the occupier owed him a duty of care. The assumption is unwarranted, for the rule is concerned only with the incidents which the law attaches to the specific relation of occupier and trespasser. It demands, as Lord Uthwatt said in *Read v. J. Lyons & Co. Ltd.* (30), a standard of conduct which a reasonably-minded occupier, with due regard to his own interests might well agree to be fair and a trespasser might in a civilized community reasonably expect. It would be a misconception of the rule to regard it as precluding the application of the general principle of *M'Alister (or Donoghue) v. Stevenson* (31), to a case where an occupier, in addition to being an occupier, stands in some other relation to a trespasser so that the latter is not only a trespasser but is also the occupier's neighbour in Lord Atkin's sense of the word: see *Transport Commissioners (N.S.W.) v. Barton* (32)."

Their Lordships appear to have read this passage as suggesting that a general duty of care could co-exist with the limited duty

(25) [1932] A.C. 562.
(26) [1932] A.C. 562.
(27) [1964] A.C. 1054.
(28) (1953) 87 C.L.R. 619.
(29) (1953) 87 C.L.R. at pp. 642-643.

(30) [1947] A.C. 156, at p. 185.
(31) [1932] A.C. 562.
(32) (1933) 49 C.L.R. 114, at pp. 127 et seq.

[37 C.L.R.]    OF AUSTRALIA.    121

H. C. OF A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

an occupier. So reading Kitto J.'s reasons, their Lordships said (33):

"... their Lordships cannot find any line of reasoning by which the limited duty that an occupier owes a trespasser can co-exist with the wider general duty of care appropriate to the *Donoghue v. Stevenson* (31) formula: and, if the relation of occupier and trespasser is to be displaced by some other relation, as may happen, the grounds upon which that displacement can be held to occur must admit of reasonably precise definition, otherwise the task of charging juries as to what a law requires or allows will become virtually incapable of formulation."

In *Mannings v. Hydro-Electric Commission* (34) I expressed the view that in the light of these reasons in *Quinlan's Case* (35), their Lordships accepted the view that in *Thompson v. Bankstown Corporation* (36) the relevant relationship was not that of occupier and trespasser. This Court in *Mannings v. Hydro-Electric Commission* (37) took the view that the relevant relationship between plaintiff and defendant was not that of occupier and trespasser. Neither the decision nor any statement in *Commissioner for Railways v. McDermott* (38) affords any warrant for the view that a general duty of care can co-exist with the duty of an occupier. As I have indicated, the rejection in *Herrington v. British Railways Board* (39) of the view of the Court of Appeal in *Videan v. British Transport Commission* (40) as to a general duty of care underlines the unacceptability of any such concept.

To make the reasons in *Commissioner for Railways v. McDermott* (38) conformable to the reasoning in *Quinlan's Case* (35) and in *Cooper's Case* (41), the basis of the case must be confined, as I have earlier expressed it, in those reasons. Any reported decisions which might appear to support the possibility of concurrent duties upon the occupier, one as under the categories as set out in *Indermaur v. Dames* (42), and the other the general duty of care as in *Donoghue v. Stevenson* (43), cannot stand, in my opinion, against the authoritative pronouncements to the contrary in *Quinlan's Case* and in *Cooper's Case*. Cases in which an employer has been held liable to his employees do not, in my opinion, bear on the question arising in this case. If the reported decisions are in any sense supportable, it must be

(33) [1964] A.C. at p. 1081.
(34) (1971) 125 C.L.R. at p. 11.
(35) [1964] A.C. 1054.
(36) (1953) 87 C.L.R. 619.
(37) (1971) 125 C.L.R. 1.
(38) [1967] 1 A.C. 169.

(39) [1972] A.C. 877.
(40) [1963] 2 Q.B. 650.
(41) (1973) 129 C.L.R. 295, [1974] A.C. 623.
(42) (1866) L.R. 1 C.P. 274.
(43) [1932] A.C. 562.

H. C. of A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

under some particular circumstances not present or paralleled in this case.

Reference has been made to the decision of the House of Lords in *Dublin, Wicklow and Wexford Railway Co. v. Slattery* (44). The only question in that case before their Lordships was whether, because of the limited nature of the appeal to the Court of Exchequer Chamber, a verdict for the defendants ought to have been directed when a rule nisi to set aside a verdict for the plaintiff was discharged. Lord Cairns L.C. said (45):

"Thereupon the appellants appealed to the Court of Exchequer Chamber. The appeal could not, according to the practice, raise again the question whether the verdict was against evidence or the weight of evidence: it only raised the question whether the verdict should be entered for the defendants. On this point the Judges in the Exchequer Chamber in Ireland were equally divided, and the verdict for the plaintiff was therefore directed to stand.

It is this question, and this only, namely, whether the verdict should be entered for the appellants, the defendants in the action, which comes before your Lordships by way of appeal."

No questions relevant to the matters in issue in this case were raised in debate. But, in any case, it would appear that the plaintiff in that case was an invitee in crossing the railtrack, that being a necessary path to the ticket office where the intention was to purchase a rail ticket.

Also, in *Thatcher v. Great Western Railway Co.* (46) and in *Caterson v. Commissioner for Railways* (47), the plaintiff was an invitee on the station platform, or in the railway carriage, attending as he was persons thereon or therein as travellers on the defendant's train.

Here, it cannot be contended, in my opinion, that it was in any other capacity than that of an occupier that any duty towards the respondent devolved upon the appellant. No such circumstances are present in this case as existed in *Thompson v. Bankstown Corporation* (48); *Munnings v. Hydro-Electric Commission* (49) or, as this Court saw the case, in *Cooper v. Southern Portland Cement Ltd.* (50). No ground whatever exists, in my opinion, for finding or constructing any other relevant relationship. In particular, the presence of the respondent's body on the railway track did not, in my opinion, raise any "displacing relationship", the duty of the appellant remained that of an occupier towards a person present on the occupied property.

(44) (1878) 3 App. Cas. 1155.
(45) (1878) 3 App. Cas., at p. 1162.
(46) (1893) 10 T.L.R. 13.
(47) (1973) 128 C.L.R. 99.

(48) (1953) 87 C.L.R. 619.
(49) (1971) 125 C.L.R. 1.
(50) (1972) 128 C.L.R. 427.

H. C. of A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

There is thus, in my opinion, no escape from a decision as to the legal relationship of the respondent when upon the railway line or the appellant as occupier of the line. Upon the resolution of that question, the nature and extent of the appellant's duty will depend. So to approach the matter is in no sense to seek to treat the appellant's occupation of the line as a ground of exemption from liability. It is to give effect to the obligations which properly fall upon the appellant and to the responsibility which it assumes by reason of its occupation of the railway line.

So far as presently relevant, therefore, the result of their Lordships' decision in *Cooper's Case* (51) is that where injury befalls a person on land occupied by another, any duty owed by the owner or occupier to the injured person in respect of his injuries must be found, and exclusively found, in the legal relationship of the injured person to the occupier. Their Lordships in *Cooper's Case* adverted to the reason for confining the duties of the occupier within the traditional categories. They said (52):

"The rights and interests of the occupier must have full consideration. No unreasonable burden must be put on him. With regard to dangers which have arisen on his land without his knowledge he can have no obligation to make inquiries or inspection. With regard to dangers of which he has knowledge but which he did not create he cannot be required to incur what for him would be large expense."

The lines between contractual right, invitation and licence are no doubt at times difficult to draw and become blurred in application to unusual situations. But, in totality, these categories of relationship serve to distinguish between those persons towards whom the occupier by his acts, or by the pursuit of his interests, accepts a degree of responsibility and those persons who do not come upon the relevant part of the property by his persuasion, or by permission, in either case expressly or impliedly extended or given. In this case, we are not really concerned with deciding whether the presence of the respondent on the railway track was "courted" by the appellant by its acts or its pursuit of its interests or whether, on the other hand, that presence of the respondent was, so far as the appellant concerned, forced upon it without its encouragement or persuasion.

I now return to the consequences of *Cooper's Case* (51). That decision, following *Quinlan's Case* (53) in this respect, leaves no

(51) (1973) 129 C.L.R. 295; [1974] A.C. 623.
(52) (1973) 129 C.L.R., at p. 308; [1974] A.C., at p. 644.
(53) [1964] A.C. 1054.

H. C. of A.
1976-1977.

Public
Transport
Commission
(N.S.W.)
v.
Perry.

Barwick C.J.

room in the case of an occupier for any general duty of care as is owed to a neighbour in a public place, even though machinery brought upon or used upon the property or other activity of the occupier there is the cause of the injury sustained. Here, no contractual right is or, in my opinion, could be asserted. I shall later say something on the question whether the respondent could be held to be an invitee or licensee at the relevant place and time. The nature of the duty owed respectively to an invitee and a licensee is well settled.

In relation to a trespasser, their Lordships said (54):

"The fundamental difference between the relationship of occupier and trespasser and other relationships which give rise to a duty of care is that the occupier's relationship with a trespasser is forced on him against his will, whereas other relationships are generally undertaken voluntarily. So it cannot be said in this case that a man ought not to enter into a relationship with others unless he has the ability and resources necessary for the proper performance of the duties which that relationship entails."

and (55):

"But in applying that passage" [scil., of Lord Atkin's speech in *Donoghue v. Stevenson* (56)] "to trespassers it must be remembered that the neighbourhood relationship has been forced on the occupier by the trespasser and it would therefore be unjust to subject him to the full obligation resulting from it in the ordinary way."

Their Lordships' decision means, in my opinion, in this case that unless the respondent could establish the appellant's licence or invitation to be upon the railway track, the only duty which was owed by the appellant to the respondent was that which would be appropriate in the circumstances to a trespasser. So the relationship to the occupier which it, the occupier has created expressly or by implication, which imports the duty towards licensee or an invitee. The invitation or licence makes the presence on the land lawful so far as the occupier is concerned. The occupier's duty to the person who does not fall within either of those categories is the duty spoken of in relationship to a trespasser, a person without legal right (including in that description, for present purposes, an invitation or mere licence) deriving from the occupier to be where he or she was when injury befell.

No substantial attempt was made in the argument of this case to establish that the respondent was an invitee or even a licensee.

(54) (1973) 129 C.L.R. at p. 307; [1974] A.C., at p. 642.

(55) (1973) 129 C.L.R., at p. 308; [1974] A.C., at pp. 643-644.

(56) [1932] A.C., at p. 580.

the railway track. No doubt the failure to establish the child as a licensee in *Videan v. British Transport Commission* (57) was a considerable discouragement to such an attempt. Clearly, the respondent was an invitee upon the platform for the purpose of boarding a train. The invitation to the respondent to be upon the appellant's property extended no further relevantly, in my opinion, than the confines of the railway platform: and, of course, to the train when entered and to the platform of the traveller's destination. The invitation was not express. It cannot, in my opinion, be enlarged beyond the purposes for which it was impliedly extended to the respondent: in my opinion, it did not extend to the area of the railway track. The respondent cannot properly be regarded, in my opinion, as invited generally into the appellant's property. It could not properly be said, in my opinion, that the respondent had the appellant's invitation or licence to walk upon the track. A school boy on the platform whose school case dropped from his hand without fault on his part to the railway line would have no invitation or licence derived from the appellant to descend to the track to recover it. The invitation to him as an intending passenger would not include an invitation or licence in such circumstances to be on the railway track. I cannot think that the invitation to the would-be passenger included by implication a statement "should you faint and fall upon the line, you are invited, or you have my permission to be, and whilst unconscious to remain, there". The implication of such an invitation or licence is neither reasonable nor in accordance with reality. Nor can I think that, because the respondent was properly upon the platform and able to stand near the edge of it, she had the appellant's invitation or permission, if she should over-balance, to be on the railway track. Further, an attempt to imply such an invitation or licence in order to create a duty in the appellant towards the respondent whilst on the railway line is not consonant, in my opinion, with the emphasis which has been placed upon the situation of the occupier. It would represent, in my opinion, a failure to give proper weight to the circumstance that, in truth, the respondent's presence on the railway track was, in the language of their Lordships, "forced" upon the appellant and not in any sense courted by it by its invitation or licence.

The trial judge and the Court of Appeal Division were of opinion that the respondent was not a trespasser at the relevant time. They founded this opinion upon the undoubted circumstance that the respondent could not have been sued in

(57) [1963] 2 Q.B. 650.

H. C. of A.
1976-1977.

Public
Transport
Commission
(N.S.W.)
v.
Perry.

Barwick C.J.

H. C. of A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

trespass by the appellant for having fallen or having remained unconscious upon the railway track. But that circumstance, no foundation, in my opinion, for the conclusion that the appellant in the circumstances owed the respondent any duty other than that owed to a trespasser. Perhaps the designation "trespasser" has tended to obscure the real question in the case. As I have said, the source and extent of any duty to a person on the land of another is the occupancy of the land, the legal relationship of the injured person to the occupier. If the occupier has not created expressly, or by necessary implication a right based on contract, invitation or licence to be at the particular place upon the land, the injured person is without any standing upon which to found any duty higher than that owed a trespasser. Such a person is without legal right or occasion to be at the particular place on the invitation or permission of the occupier and is properly styled a trespasser, whether or not a cause of action in trespass is available to the occupier. His trespass to be on the land of another without legal right invitation or permission. It may not be actionable trespass because of attendant circumstances. The defendant may have a defence in the involuntary nature of the action which is said to be the trespass. All that the cases, to which reference is made in the reasons for judgment of the members of the Court of Appeal Division, decide is that actionable trespass requires volition on the part of the trespasser. I have already pointed out that in Commissioner of Railways v. McDermott (58), the respondent was lawfully on the crossing. None of the cases have decided that the "involuntary trespasser" has a legal right, invitation or licence to do that which is said to be a trespass. The important thing for present purposes is the absence of legal right, invitation or licence stemming from the appellant. Thus, if the respondent were neither licensee nor invitee on the railway track, she lacked any relevant legal right to be there. It is nothing to the point, in my opinion, that she came there involuntarily. Had she been pushed from the platform, she would not have thereby obtained a right to be on the rails derived from the appellant. The person who pushed her could not confer upon her any relevant right against the appellant by invitation or licence. Equally, she could not attract to herself any such right to be upon the railway track from the circumstance that she was unconscious when she fell from the platform. Thus, however the respondent is described, the appellant, in my opinion, came under no greater

(58) [1967] 1 A.C. 169.

H. C. of A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

duty to her than the duty owed to a person having no legal right derived from contract, invitation or licence to be upon the land at the particular place where injury was suffered.

There then remains the question of the nature of that duty. Several paragraphs from Cooper's Case (59) might here be cited in relation to the duty owed to the person present on the occupier's land without legal right, invitation or licence. Their Lordships said (60):

"Their Lordships are breaking no new ground in holding that the nature and extent of an occupier's duty to a trespasser must be based on considerations of humanity. As long ago as 1820 in Ilott v. Wilkes (61), a case dealing with injury to a trespasser by a spring gun, Best J. said (62): 'the law of England will not sanction what is inconsistent with humanity.' In Grand Trunk Railway Co. of Canada v. Barnett (63), the judgment of the Board refers to 'wilful or reckless disregard of ordinary humanity rather than mere absence of reasonable care.'"

Their Lordships indorsed (64) Lord Pearson's view in Herrington v. British Railways Board when he said (65):

"I think the word 'reckless' in the context does not mean grossly negligent but means that there must be a conscious disregard of the consequences—in effect deciding not to bother about the consequences. Thus a subjective, mental element, a sort of mens rea, is required as a condition of liability."

and adopted (66) the words of Lord Uthwatt in Read v. J. Lyons & Co. Ltd. (67):

"There is demanded of him a standard of conduct no higher than what a reasonably minded occupier of land, with due regard to his own interests, might well agree to be fair and no lower than a trespasser, ... might in a civilised community reasonably expect."

As the respondent was, in my opinion, neither invitee nor licensee at the place on the railway track where she lay, the duty appropriate to the instant circumstance was, in my opinion, a duty not to be reckless to the point of inhumanity towards the person known to be at the particular place upon the land or, to put what seems to me might in some circumstances be a grey and indefinite area not presently relevant, a trespasser whose presence at

(59) (1973) 129 C.L.R. 295; [1964] A.C. 623.
(60) (1973) 129 C.L.R., at p. 307; [1974] A.C., at p. 642-643.
(61) (1820) 3 B. & Ald. 304 [106 E.R. 674].
(62) (1820) 3 B. & Ald., at p. 219 [106 E.R., at p. 680].
(63) [1911] A.C. 361, at p. 370.
(64) (1973) 129 C.L.R., at p. 306; [1974] A.C., at p. 642.
(65) [1972] A.C., at p. 928.
(66) (1973) 129 C.L.R., at p. 309; [1974] A.C., at pp. 644-645.
(67) [1947] A.C. 156, at p. 185.

H. C. OF A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

the particular place is "as good as known". Here, it could be properly be said, in my opinion, that the driver relevantly knew or even as good as knew, of the respondent's presence on the line before the time at which he says he recognized that what he has seen was a human being. But, even if it could be said that knew, or as good as knew, of her presence at any earlier time, having regard to what I am about to say, that earlier knowledge would make no difference, in my opinion, to the result of this case. It could not properly be said that, in not applying the emergency brakes at that earlier point of time, he was reckless to the point of inhumanity, however negligent it might have been not to have done so.

Earlier I discussed some aspects of the evidence in this case from the point of view of negligence though, as I think, there was no general duty of care operating in the case. It is quite plain from that discussion that, in my opinion, it could not be concluded that the driver of the train was reckless or lacking in humanity or accorded the respondent less than a trespasser might fairly and reasonably expect in a civilized community. No doubt the respondent could not be said to be at fault in being overcome by the epileptic attack: that, however, is no basis for implying any right by invitation or licence to her to be upon the railway track. But equally the driver, presented with her presence on the railway track, could not be said to be in breach of the occupier's duty to the respondent.

Being of this view I have no need to discuss whether, even if the respondent could be said to be an invitee or licensee on the railway track, the appellant was in breach of duty toward her. But I should remark, firstly, that the respondent did not sue as invitee or licensee. The action was based on a breach of a general duty of care. Secondly, whether invitee or licensee, the general duty of care was not owed to the respondent by the plaintiff. The nature of these duties to invitee or licensee is well settled. It is enough to say that I would see considerable difficulty in saying in this case, on the view I have taken of the permissible findings of fact, that the driver was in breach of any such duty.

In my opinion, the trial judge ought to have taken the case from the jury on the footing that the only duty owed by the appellant to the respondent was the duty which an occupier of property has towards a person who has no legal right or licence to be at the particular place on the property where the injury occurred: and that there was no material on which the jury could find that the appellant was in breach of that duty.

I find no need to examine in any detail the reasons for judgment of the Court of Appeal Division of the Supreme Court. It sufficiently appears from what I have written that the quotations from these reasons which I have made are, in my opinion, insupportable upon a proper understanding and application of the decision in *Cooper's Case* (68) and of the nature of the trespasser as one who has no legal right, invitation or licence vis-à-vis the occupier to be upon the relevant part of the property, whether or not the trespass is actionable.

The appeal, in my opinion, should be allowed and orders made which would cause judgment to be entered in the action for the defendant.

GIBBS J. On the morning of the 14th February 1972, at about 8.15, Mrs. Perry, the respondent, went to the railway station at Lindfield, a northern suburb of Sydney with the intention of catching a southbound train to Chatswood. She held a weekly ticket entitling her to travel by train. She was standing on the platform, waiting for a train to arrive, when suddenly, and without warning, she collapsed and fell unconscious on to the railway line. She had suffered an epileptic, or epileptiform, attack. There was evidence from which it might have been concluded that she was about 125 ft from the northern end of the platform when she fell, although the distance could have been less. A train was approaching from the north. There were some other people on the platform. One of them, Mr. O'Donnell, saw the respondent on the line, and the approaching train, and ran along the edge of the platform for a distance of sixty to eighty yards waving his hand and his briefcase, hoping to attract the attention of the driver of the train. The train did slow down, but not soon enough. It struck the respondent and caused her serious injuries.

When the train was about 300 yards to the north of the platform, the driver saw that something was on the line. From that point he had an uninterrupted view of the platform. He had already started to apply his brakes, for the purpose of making a normal stop at the Lindfield station, but the train was still travelling at about forty m.p.h. He thought that the object on the line was a large piece of brown paper. In fact the respondent was wearing a white dress with purple stripes. He did not see Mr. O'Donnell running down the platform. He knew that people did fall on to railway lines—quite a lot, he said—and he had been warned to be on the alert against such a possibility. However

(68) (1973) 129 C.L.R. 295; [1974] A.C. 623.

H. C. OF A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Barwick C.J.

H. C. of A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.
Gibbs J.

when he first saw the object on the line he made no further application of his brakes. He travelled for some distance, which he estimated to be about a hundred yards, before he realized that what he could see on the line was a person. He then applied the emergency brakes. He said that after the train hit the respondent it went for about a car length before it stopped. A car length is about sixty-three ft. However other witnesses said that the train stopped within a few feet after striking the respondent.

There was evidence that if the train were travelling on that line at forty m.p.h., and the emergency brakes were applied, the train, if laden, would stop within a distance of 870 feet, and, if empty, would stop in about 660 feet. It was peak hour, so the train might have been expected to be fairly full.

The respondent brought an action against the appellant, the Public Transport Commission of New South Wales, for damages for the personal injuries which she sustained in the accident. She pleaded that she had been injured by the negligence of the appellant, its servants and agents. The learned trial judge directed the jury that the appellant, through the driver of the train, was required to keep a proper lookout and to take reasonable steps to bring the train to a stop upon the happening of any emergency which a proper lookout would reveal. The jury returned a verdict for the respondent for $90,000. An appeal to the Court of Appeal of the Supreme Court of New South Wales was dismissed.

The appellant now contends that it did not owe to the respondent a duty to take reasonable care for her safety. The respondent was, so the appellant submits, a trespasser on its railway line, and the appellant's only duty to her was that an occupier of land owes to a person who has trespassed on that land. It is further submitted that in the circumstances the appellant was under no duty to the respondent until the driver of the train had actual knowledge that she was on the railway line, i.e., until he had identified the object on the line as a person. As soon as the driver became aware that what he had seen on the line was a person and not a piece of paper, he did all he could to stop the train. Therefore, the submission concludes, the appellant was not in breach of its duty to the respondent.

The special rules which the common law has evolved to govern the liability of an occupier of premises to a person who sustains injury while on those premises do not in every case state exhaustively the nature of the occupier's duty to the person who has come on to his premises. The relationship between the parties may be such as to give rise to a duty upon the occupier to

H. C. of A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.
Gibbs J.

take reasonable care for the safety of the other person. If the relationship between the parties imposes upon the occupier this general duty of care, which may be higher than that which he owes in his capacity as occupier, the fact that he is an occupier does not relieve him of the higher duty. The two duties exist concurrently. The statement made in *Commissioner for Railways* v. *McDermott* (69), and repeated in *Herrington* v. *British Railways Board* (70), that "occupation of premises is a ground of liability and is not a ground of exemption from liability" is incontestably correct, at least so far as persons lawfully on the premises are concerned. The books are full of cases in which workmen have successfully sued their employers for damages for injuries sustained on the employer's premises, and in which the liability of the employer has been based, not on the fact that he was in occupation and control of the premises, but upon a breach of the general duty of care. Similarly there are many cases in which a company or authority operating a railway has been held liable for damages for injuries caused by its negligence, although the injured person was on railway property when the injuries were sustained. I need not refer in detail to the cases in which the occupier of railway premises has been held liable when passengers have tripped or slipped on railway platforms; in some of those cases the liability of the defendant was based on a breach of the duty owed by an occupier, but in others it was based on a breach of the general duty of care. By way of example, perhaps unnecessary, of the point I am making I would refer to three cases which concerned persons who were not passengers. In *Dublin Wicklow, and Wexford Railway Co.* v. *Slattery* (71) the man in respect of whose death the action was brought was run down while crossing a railway line for the purpose of buying a ticket for his cousin who intended to travel on the railway. None of the distinguished law lords who debated the issues in that important case thought it necessary to inquire whether the deceased was an invitee or a licensee of the railway company; liability was based on negligence. Much more recently, in *Caterson* v. *Commissioner for Railways* (72) this Court upheld a verdict given in favour of a plaintiff who had carried his friend's luggage into a railway carriage and who had jumped off the train when, without warning, it had begun to move. It was not regarded as material to consider whether or not the plaintiff had bought a platform ticket, for again it was the general duty of care that was held to have been broken. In

(69) [1967] 1 A.C. 169, at p. 186.
(70) [1972] A.C. 877, at pp. 913, 929.
(71) (1878) 3 App. Cas. 1155.
(72) (1973) 128 C.L.R. 99.

H. C. of A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Gibbs J.

HIGH COURT                              [1976-1977.

*Thatcher v. Great Western Railway Co.*"(73) where a person standing on a platform after seeing off his friends was struck by an open door on the train, it was argued that the duty of the railway company was only that which is owed by an occupier to a licensee. However the Court of Appeal rejected this contention and held that the railway company owed the plaintiff a duty to take reasonable care for his safety.

It may be taken as settled that in appropriate circumstances a person who has lawfully come on to premises occupied by the defendant can recover damages for injuries sustained by reason of the negligence of the defendant, i.e., for breach of the duty defined in *Donoghue v. Stevenson* (74). In other words the occupier may owe to a person lawfully on his land a general duty of care in addition to the special duty which is owed by an occupier to an invitee or a licensee. I need not consider whether an occupier may similarly owe concurrent duties to a trespasser. The decision in *Commissioner for Railways v. Quinlan* (75) and dicta in the judgment of their Lordships in *Southern Portland Cement Ltd. v. Cooper* (76) may be thought to favour the view that an occupier owes a trespasser only that duty of ordinary humanity which was expounded and explained in *Herrington v. British Railways Board* (77). Earlier decisions of this Court support the conclusion that two parallel duties may exist. However, this question need not be decided in the present case. In my opinion, for reasons I am about to give, the respondent was not a trespasser.

On behalf of the appellant it is said that the respondent had neither right nor permission to be on the railway line and that she was therefore a trespasser upon it. With all respect I regard this as too narrow and artificial a view. At the outset it may be remarked that the presence of the respondent upon the appellant's railway line was not a legal wrong committed by the respondent against the appellant. Since the respondent had got on to the line involuntarily her presence there gave the appellant no right of action. It has been established for centuries that a defendant does not commit an actionable trespass by going on to the plaintiff's land involuntarily: *Smith v. Stone* (78). If a trespasser, within the meaning of the rules as to the liability of an occupier, is a person whose presence on the land is a legal wrong (as some remarks of Lord Diplock in *Herrington v. British*

(73) (1893) 10 T.L.R. 13.
(74) [1932] A.C. 562.
(75) [1964] A.C. 1054.
(76) (1973) 129 C.L.R. at p. 309; [1974]
(77) [1972] A.C. 877.
(78) (1647) Style 65 [82 E.R. 533].

137 C.L.R.]                    OF AUSTRALIA.

133

H. C. of A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Gibbs J.

*Railways Board* (79) would suggest) the respondent was clearly not a trespasser. However I doubt whether it is right to say that a person can never be regarded as a trespasser, for the purpose of the rules governing an occupier's liability, if his presence on the premises came about involuntarily. It would seem to me that it would be unfairly burdensome to an occupier to hold that persons who have come on to his premises without his permission, and in circumstances in which he could not be expected reasonably to foresee their presence, are entitled to expect that care for their safety which is owed to invitees or licensees, if they have come on to the premises involuntarily, for example, by falling from an adjoining tree, or by landing in a crashed aircraft, or by being thrown there by hoodlums. But that question does not arise in the present case, where the respondent came on to the premises of the appellant quite lawfully, with the permission of the appellant. She could then become a trespasser only if she went outside the scope of her permission. The relevant principle was stated by Lord Atkin in *Hillen and Pettigrew v. I.C.I. (Alkali) Ltd.* as follows (80):

"In my opinion this duty to an invitee only extends so long as and so far as the invitee is making what can reasonably be contemplated as an ordinary and reasonable use of the premises by the invitee for the purposes for which he has been invited. He is not invited to use any part of the premises for purposes which he knows are wrongfully dangerous and constitute an improper use. As Scrutton L.J. has pointedly said: 'When you invite a person into your house to use the staircase you do not invite him to slide down the banisters' (*The Carlgarth* (81). So far as he sets foot on so much of the premises as lie outside the invitation he is not an invitee but a trespasser, and his rights must be determined accordingly.'"

In my opinion a person who is lawfully upon premises, and is using them lawfully, becomes a trespasser only if he goes voluntarily on to a part of the premises to which the invitation does not extend: if he falls, or is pushed, on to a forbidden area he does not thereby become a trespasser. This view is strongly supported by *Commissioner for Railways v. McDermott* (82). In that case it was submitted that the plaintiff was a trespasser, being on the railway track and away from the level crossing. Their Lordships rejected this contention, because there was evidence from which the jury could

(79) [1972] A.C., at p. 943.
(80) [1936] A.C. 65, at p. 69.

(81) [1927] P. 93, 110.
(82) [1967] 1 A.C. 169.

HIGH COURT [1976-1977.

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.
Gibbs J.

have inferred that the plaintiff stumbled and fell onto the track, and that she was not deliberately or negligently trespassing there (83). Further support for the conclusion which I have reached is to be found in *Braithwaite v. South Durham Steel Co. Ltd.* (84). In that case the plaintiff, in accordance with the proper and settled practice, was walking along a narrow walkway adjacent to a railway track in the occupation of the British Transport Commission. Part of the walkway was also occupied by the Commission, but the plaintiff had an implied licence to use it. A train was travelling silently along the line, and the driver shouted to warn the plaintiff of the danger. The plaintiff turned to ascertain the reason for the shout and in so doing inadvertent-ly put his foot or body a few inches on or over the sleepers to which the Commission's implied licence did not extend and he was struck by the approaching train and injured. It was held that the guard had failed to keep a proper look-out, that the Commission was negligent, and that the plaintiff's involuntary encroachment outside the licensed area, caused by the negligence of the Commission, did not constitute him a trespasser. Edmund Davies J. said (85):

"It affronts common sense that licensors, having by their negligence caused a licensee to take a startled and un-premeditated step of a few inches outside the licensed area, should thereafter be entitled to say that if any portion of the plaintiff's anatomy was outside the licensed area he must be regarded as a trespasser to whom no duty was owed other than that of refraining from harming deliberately or recklessly. None of the cases cited to me warrant what in my judgment would be a wholly artificial approach to the facts of this case ..."

That case is distinguishable from the present, because there the involuntary encroachment was caused by the defendant's negligence, but the decision supports the view that the fact that the plaintiff has no permission to be on the part of the premises where he in fact is found does not necessarily make him a trespasser if he got there involuntarily.

In the present case the respondent was making a reasonable and proper use of part of the railway premises where she was entitled to be—she was standing upon the platform waiting for the train to arrive. Her involuntary fall on to another part of the premises in the occupation of the appellant did not make her a trespasser. It did not exempt the appellant from its duty to take reasonable care for her safety.

(83) [1967] 1 A.C., at p. 184.
(84) [1958] 1 W.L.R. 986; [1958] 3 All E.R. 161.
(85) [1958] 1 W.L.R., at p. 991; [1958] 3 All E.R., at p. 165.

197 C.L.R.] OF AUSTRALIA.

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.
Gibbs J.

The matter may be summed up as follows. A carrier by rail owes a duty to take reasonable care for the safety of a passenger, whether the passenger is in the course of being carried or is standing on a platform waiting for an approaching train. The carrier is not absolved from that duty because the passenger becomes ill and collapses, whether she falls upon the platform or falls off on to the railway line where she would otherwise have no right to be. In the present case the learned trial judge was quite right in directing the jury that the appellant was under a duty to take reasonable care for the safety of the respondent.

The final question is whether there was evidence on which it was open to the jury to find that the appellant was negligent. The case was very much on the borderline and a jury could well have decided it either way. Nevertheless there was in my opinion evidence to sustain the verdict. I need hardly repeat that the obligation that lay upon the appellant was no more than to take reasonable care. The appellant was not obliged to bring its trains to a halt before they reached every station for fear that a passenger might fall in their path. But the appellant's drivers were bound to keep a proper look-out and to take reasonable steps to stop the train if they in fact saw someone on the line. It was open to the jury to conclude that the driver had not kept a proper look-out. The fact that he mistook the respondent, in her white dress with purple stripes, for a piece of brown paper and that he did not see Mr. O'Donnell running and waving his briefcase, could have been given weight in reaching that conclusion. It was further open to the jury, on the facts that I have outlined, including the estimates of the speed and position of the train and of the distance within which it could have been stopped, to conclude that if the driver had kept a proper look-out, he would have seen and recognized the danger in time to bring the train to a halt before it reached the respondent.

The decision of the Court of Appeal was in my opinion correct and the appeal should be dismissed.

STEPHEN J. On the morning of 14th February 1972 Mrs. Perry was standing on the platform at Lindfield railway station on Sydney's north shore line waiting for a south-bound train to take her to work at Chatswood. She suddenly collapsed and fell unconscious on to the rails. Soon afterwards, and before any of the other passengers waiting on the platform were able to go to her assistance, the train she had been waiting for arrived and, despite emergency braking, struck her as she lay on the line.

She was seriously injured and sued in negligence; the case was heard in the Supreme Court and, after extensive evidence

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Stephen J.

from a number of witnesses including the train driver and quite a number of eye-witnesses and two expert witnesses, the jury, by statutory majority, found for Mrs. Perry and awarded her substantial damages.

At the close of evidence counsel for the defendant, the Public Transport Commission, had sought a direction that judgment be entered for the defendant upon the grounds that there was no evidence of negligence on its part and that the only duty owed to Mrs. Perry was that owed to a trespasser. The learned trial judge, in rejecting this application, said that he did not regard Mrs. Perry's involuntary presence upon the track as that of a trespasser; she was owed the same duty of care when lying unconscious on the track as when waiting on the platform, the defendant must take reasonable measures to prevent risk of foreseeable and preventable injury. The issue for the jury, said his Honour, was whether the train driver was keeping a proper lookout for emergency situations such as that precipitated by Mrs. Perry's fall from the platform.

His Honour then charged the jury that the Commission's duty, through its driver, was to keep a proper lookout and to take all reasonable steps to stop the train in the event of an emergency; if any breach of that duty was a cause of Mrs. Perry's injuries she was entitled to damages. There then followed most careful examination of the evidence, to which no exception was taken, and the jury thereafter returned its majority verdict for Mrs. Perry.

The Commission's appeal to the New South Wales Court of Appeal was unsuccessful and it now appeals to this Court. On neither occasion has the Commission sought a new trial, instead it has contended that judgment should be entered in its favour, there being no evidence capable of supporting the jury's finding of fault; Mrs. Perry, once she fell from the platform, was, so it was said, in the position of a mere trespasser so far as concerned the Commission.

Were the doctrine enunciated in *Robert Addie & Sons (Collieries) Ltd. v. Dumbreck* (86) still operating in its full vigour to categorize Mrs. Perry as a trespasser might well have sufficed to acquit the Commission of liability as occupier of railway property. The evidence disclosed neither malice nor such recklessness as would be "tantamount to malicious acting" (per Viscount Dunedin (87)) and in their absence that doctrine would allow no trespasser to recover. But this is no longer so. In

(86) [1929] A.C. 358.
(87) [1929] A.C., at p. 377.

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Stephen J.

*Commissioner for Railways v. Quinlan* (88). *Herrington v. British Railways Board* (89) and *Southern Portland Cement Ltd. v. Cooper* (90) the duty of occupiers to trespassers has been subjected to intensive re-examination and whatever uncertainties remain in it is at least clear that malice and recklessness no longer mark out the boundaries of that duty. Instead "the nature and extent of an occupier's duty to a trespasser must be based on considerations of humanity" (*Cooper's Case* (91)) and an "all-embracing" consideration of the facts is required to identify those trespassers to whom that duty may be owed; factors such as the degree of likelihood of the coming of trespassers and the extent of the risks they will then run from hidden or unexpected dangers are to be weighed against detriments to the occupier involved in taking steps to safeguard them (*Cooper's Case* (92)).

However, in the present case, both trial judge and jury and the Court of Appeal have alike treated Mrs. Perry as no trespasser. Whether they are right in doing so must form the first subject of inquiry. I may say that argument and discussion in this case has concentrated upon the status of trespasser and that of invitee; any contractual right of entry has been ignored and for the purposes of this judgment I conform to this approach.

Mrs. Perry entered Lindfield railway station at the Commission's invitation and as she stood on the platform awaiting the arrival of her train she was owed by the Commission no lower duty than it owed to any invitee. But that duty was not confined to perils of the premises. If the Commission, in the person of one of its porters, had knocked her down while carelessly conveying luggage along the platform in a trolley it would have been liable to her in negligence without need for any inquiry as to the state or condition of the platform. As was said by the distinguished members of the Court of Queens Bench in *Tebbutt v. Bristol and Exeter Railway Co.* (93) in upholding the plaintiff's appeal:

"It was contended that, assuming this to have been an act of negligence on the part of the porter, for which the defendants would have been responsible to a passenger by their own line, yet that the company were not responsible to the plaintiff, inasmuch as he was neither a passenger of theirs, nor a person who was on their premises on any business in which they were interested, but was a mere licensee using the platform for his own convenience.

(88) [1964] A.C. 1054.
(89) [1972] A.C. 877.
(90) [1973] 129 C.L.R. 295; [1974] A.C. 623.
(91) [1972] 129 C.L.R., at p. 307; [1974] A.C., at pp. 642-643.
(92) [1973] 129 C.L.R., at pp. 308-309; [1974] A.C., at p. 644.
(93) [1870] L.R. 6 Q.B. 73, at p. 75.

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Stephen J.

It is unnecessary to consider what would have been the rights of the parties if the plaintiff's complaint had reference merely to the state and condition of the platform upon which he was allowed to enter. What he complains of is an act of misfeasance done by a servant of the defendants in the doing carelessly what the course of his employment—the doing carelessly what the servant was employed to do, and which caused damage to the plaintiff".

In *Quinlan's Case* it was said (94), citing *Gallagher v. Humphrey* (95), that, had the plaintiff been a licensee and not a trespasser, while he would have had to take the level crossing there in question as he found it, he would nevertheless "presumably" have been "entitled to complain of any positive act of negligence on the part of the railway staff". In *Commissioner for Railways v. McDermott* (96), that passage was seen as a recognition "that the duty arising from the relationship of occupier and licensee did not exclude any duty which might arise from other features of the situation". It was to such a duty that Cockburn C.J. gave effect when, in *Gallagher v. Humphrey* (97) he spoke of negligence "superadded" to any particular state of the premises, a licensee being obliged, without complaint, to take the premises as he finds it but having a cause of action in negligence for superadded negligence unconnected with the state of the premises. Almost one hundred years later the Board, speaking through Lord Somervell of Harrow, said, of the postulated case of an occupier negligently driving a motor-car into a licensee, "the principle that the licensee must take the land as he finds it would clearly have no application" (*Perkowski v. Wellington Corporation* (98)).

An invitee or licensee who enters upon the property of another does not thereby forfeit the benefit of having owed to him, by those who are in a state of proximity to him and should foresee the consequences which their conduct may have upon him, the neighbourly duty to take reasonable care for his safety. He remains entitled once on the premises, as he was off them, to have this duty performed by those with whom he is in the necessary relationship of proximity. To a lawful entrant the occupier will normally owe such a duty, the entry involving the requisite degree of proximity.

Overlaid upon this situation will be the more specific right-duty relationship, dependent upon the status of occupier of premises and of lawful entrant upon them and concerned in particular

(94) [1964] A.C., at pp. 1082-1083.
(95) [1862] 6 L.T. (N.S.) 684.
(96) [1967] 1 A.C. 169, at p. 190.
(97) (1862) 6 L.T. (N.S.), at p. 685.
(98) [1959] A.C. 53, at p. 67.

with structural hazards which the state of the premises may represent. This duty, arising from the presence of a sufficient degree of control by the occupier over his premises (*Wheat v. E. Lacon & Co. Ltd.*, per Lord Denning (99)) is no exception from but is rather a special and limited manifestation of the general duty of care which proximity imposes (*McDermott's Case* (1); the result is that there are, in the case of a lawful entrant upon the premises, "two duties of care existing concurrently, neither displacing the other" (2).

So it is that it has repeatedly been said that the occupation of premises provides no exemption from liability but is, rather, a ground for liability (*Quinlan's Case* (3); *Videan v. British Transport Commission*, per Pearson L.J. (4); *McDermott's Case* (5)). In *Herrington's Case* Lord Morris described the contrary view as "heresy" (6) and Lord Wilberforce remarked that it "has been refuted more than once" (7). His Lordship there described "the correct conception" as that stated by Viscount Radcliffe in *Quinlan's Case* (8) that the *Addie* (9) rules were expressive of certain consequences as regards proximity and foreseeability" flowing from the relationship of occupier and invitee or licensee, the law then being able to "take into account other relevant factors, if they exist, which bear upon these matters of foresight and prudence".

The lawful entrant upon the property of another thus suffers no loss of the right to have reasonable care taken for his safety. Those upon whom that duty is imposed and against whom that right is enforceable comprise a class the membership of which depends upon proximity and foreseeability, factors which in the case of an occupier will also impose upon him the special duty of care which usually accompanies control of premises. The interests of the entrant will then usually be adequately served by observance of the *Addie* rules, but if there intrudes superadded negligence on the occupier's part which, had it occurred off the premises, would have attracted liability to him it will do so none the less because occurring on the premises.

The case of the unlawful entrant is a distinct one. If his entry be by stealth and unanticipated, entry alone will not cast any duty of care whatever upon the occupier. His arrival on the premises not being authorized, known or anticipated no duty in respect of the state of the premises will arise upon entry and he

(99) [1966] A.C. 552, at p. 577.
(1) [1967] 1 A.C., at pp. 186-187.
(2) [1966] A.C., at p. 586.
(3) [1964] A.C., at p. 907.
(4) [1963] 2 Q.B. 650, at p. 677.
(5) [1967] 1 A.C., at pp. 186-187.
(6) [1972] A.C., at p. 907.
(7) [1972] A.C., at p. 913.
(8) [1964] A.C., at p. 1072.
(9) [1929] A.C. 358.

H. C. of A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Stephen J.

will in no sense be any "neighbour" of the occupier. Once his presence is known the position changes and a duty, which has been described as one of common humanity, is cast upon the occupier. In the view which I take of this case the precise ambit of that duty need not concern me. In *Cooper's Case* (10) their Lordships have sought to re-examine and restate its basis and its content. I add only this, that the really difficult area in the case of unlawful entrants arises not in relation to the acts or omissions of occupiers who know of their presence but in relation to what, if anything, should be done by an occupier, in advance of that knowledge, so as to prevent or reduce the risk of harm to any such entrant who may in the future appear on the premises. It is in the realm of precautions against the as-yet-unidentified entrant that difficult questions of degrees of reasonable anticipation arise, coupled as they necessarily are with fears of unduly burdening occupiers for the benefit of future trespassers.

I have said that I do not regard myself as concerned in this case with any question of the duties owed by an occupier to a trespasser. Mrs. Perry's precise status as she lay unconscious on the line I view as irrelevant; that involuntary physical movement from platform to railway line which was the consequence of Mrs. Perry's fall was not antecedent to, and did not affect the setting in which there arose, the duty for breach of which she sues. That movement was no more than a circumstance to which that pre-existing duty applied. The duty was a duty by the Commission to intending passengers to take reasonable care for their safety, not merely in relation to the premises but in relation also to the operation of the Commission's trains.

It follows that I regard as correct the learned trial judge's charge to the jury, directing their attention to the questions of the keeping of a proper lookout and of the prompt taking of steps to bring the train to a stop should the maintenance of such a lookout reveal the existence of an emergency on the line ahead.

Mrs. Perry was a person lawfully upon the Commission's premises; within those premises the Commission was conducting an activity, the running of trains at speed along tracks which was capable of causing injury or death to any who might come into physical contact with the moving trains; add to that the fact, attested to in evidence, that people fall onto tracks "quite a lot", that being something that train drivers are warned constantly to be on the alert against; add also the fact that it is

H. C. of A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Stephen J.

precisely alongside station platforms that the Commission's tracks are necessarily situated in close proximity to people congregated above those tracks, tracks which lie at their feet and from which they cannot be fenced off. These circumstances, viewed in the context of a general duty of care for Mrs. Perry's safety, were in my view ample to entitle the jury to conclude that if there was any failure on the part of the train driver to keep a proper lookout that would constitute a breach of the Commission's general duty of care owed to her which, if it were a cause of Mrs. Perry's injuries, would render it liable in damages.

This view of the facts accords well enough with common community experience. Rail transportation has been a feature of our society for more than one hundred and twenty years and the fall from the platform, like the level crossing accident, is one of the classic hazards which every child is warned of and of which no railway authority can be unaware.

In *McDermott's Case* (11) the duty found to have been breached was not that arising out of the Commission's occupation of the railway line. It depended rather upon "the inherently dangerous activity of running express trains through a level crossing which was lawfully and necessarily used" by a variety of persons (12). Lord Gardiner L.C. there said that such an activity was likely to cause serious accidents unless carried out with all reasonable care and that therefore there was a duty to use all reasonable care. The like duty arises in the present case although what will satisfy that duty will, of course, differ.

The steps which the Commission should take in observance of its duty of care must, no doubt, be judged in the light of relative infrequency of occurrence of a particular emergency and of relative gravity of harm which is likely to ensue. The ease with which precautions may be taken must also be significant and may well be conclusive when the precaution, for want of which the emergency proves fatal, is one which, quite apart from the particular emergency, ought to have been observed in any event. Such is very much the case when the keeping of a proper lookout is in question.

What the Commission must do to satisfy its duty will depend upon what may reasonably be expected of it in all the circumstances. It would, for example, be unreasonable to require it to run its trains at such a low speed as to enable them to stop immediately should persons suddenly fall directly in front of a train. But it is quite another thing to require only that those who drive trains should keep a proper lookout on the track ahead,

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Stephen J.

something which is no doubt in any event essential for the safety of the train and its passengers. I regard the Commission as owing to Mrs. Perry that duty of keeping a proper lookout, owed to her as much as it is to passengers actually in transit on trains.

In the view I take it is nothing to the point that the invitation extended by the Commission to Mrs. Perry to enter the station premises was one suitably limited in terms of area and which did not extend to the tracks alongside the railway platform. It may readily enough be conceded that Mrs. Perry was not invited to lie upon the tracks any more than an intending passenger awaiting a Sydney ferry is invited to plunge into the waters of Circular Quay. But nothing follows from this lack of invitation. The special duty of care owed by an occupier of premises in relation to hazardous structures is well suited to the application of this notion of a sharply defined and limited area of invitation or of licence. Not so, however, the underlying and more general duty of care, whose existence and scope at any particular time and place will depend upon proximity and foreseeability. Such a duty neither owes its origin to the existence of particular premises nor is its content to be measured by the extent of any invitation to enter premises; with premises it has no necessary connexion whatever. It will continue to be owed by the Commission so long as the person entitled to its protection continues within a neighbourly relationship to the Commission. Mrs. Perry's fall onto the tracks did not sever that relationship and led to no termination of the Commission's duty towards her but was, rather, the first step in the creation of a situation of emergency and of peril, the harmful effects of which the Commission was obliged to take reasonable steps to avert.

An examination of the evidence, much of it conflicting, leaves me in no doubt but that it was open to the jury, so directed, to bring in a verdict for Mrs. Perry. The jury had to consider whether or not the driver had kept a proper lookout and, if he had, whether he had acted with all reasonable care for the safety of Mrs. Perry once he had perceived, as a result of that lookout, the emergency created by her position on the track. There was evidence which the jury might accept and which would lead it to answer each of these questions adversely to the Commission, just as there was a body of evidence to the contrary, also open for acceptance by the jury if it saw fit.

I do not propose to enter upon an examination of the evidence. This has been undertaken in considerable detail in the course of the several judgments in the Court of Appeal and with those analyses I agree. I do, however, make one obser-

vation. This is that exceptional case which, although concerned with questions of speed and distance of a moving vehicle, may, on a view of the evidence open to the jury, readily be resolved without the aid of calculations based upon possibly erroneous assumptions. It was open to the jury to conclude that the train had almost come to a halt when it struck Mrs. Perry, that she was carried forward only a matter of a few feet before the train stopped. It must follow that had the train's full braking capacity been applied very slightly earlier than it was Mrs. Perry would have escaped injury. This conclusion being open to the jury and there also being evidence, referred to in the learned trial judge's charge, from which the jury might have concluded either that a better lookout ought to have been maintained or that more prompt emergency braking ought to have been applied, or that there were failures in both these respects, it follows that the jury's verdict was well capable of being supported upon a view of the evidence properly open to it.

I would accordingly dismiss this appeal.

MASON AND JACOBS JJ. On the morning of 14th February 1972 the respondent, having purchased a weekly train ticket, was standing on the railway station at Lindfield, a suburb on the Sydney north shore, waiting for a train to take her to Chatswood. She took up a position that is to say, south towards the city. She had about 125 ft from the northern end of the platform. She had some form of fit or seizure which caused her to become unconscious and she fell on to the railway line with her legs over one of the rails. Thereafter the front wheels of an electric train travelling towards the city from Killara, the next station to the north, either passed over her body or pushed her along the line. She suffered very serious injuries. She brought an action in the Supreme Court of New South Wales against the appellant claiming damages for negligence and the jury returned a verdict in her favour for $90,000. An appeal to the New South Wales Court of Appeal was dismissed.

The driver of the train had brought the train out of Killara station and travelled at about forty to forty-five m.p.h. in the direction of Lindfield station, intending that the train should stop there with the foremost carriage at the southern end of the station platform. He had already applied his service brake for the purpose of stopping the train at Lindfield station when about 300 yards from the station he observed something on the line adjacent to the Lindfield platform. By that time his speed had been reduced by about five m.p.h. At first he thought that what

H. C. OF A.
1976-1977.
PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Stephen J.

## 144     HIGH COURT     [1976–1977.

H. C. of A.
1976–1977.

PUBLIC TRANSPORT COMMISSION (N.S.W.)
v.
PERRY.

Mason J.
Jacobs J.

he saw was a piece of brown paper, but when he was about 200 yards from the Lindfield platform he recognized that the object was a human body. He gave evidence that he then immediately applied the brakes to the full emergency position but the evidence of Mr. Rooney who was on Lindfield station at the time would have entitled the jury to conclude that the full emergency application of the brakes took place much closer to the respondent than two hundred yards. The train was no doubt substantially laden with passengers, it being Monday morning in a peak hour, though it had commenced the service only two stations further up the line. The minimum stopping time for a fully laden train travelling in that place at forty-five m.p.h. was 1,090 ft. and at forty m.p.h. 870 ft. Unladen the distances were 830 ft and 660 ft respectively.

The train in fact stopped at a point between one foot and a carriage length, i.e. 62½ ft, beyond the position where the respondent lay. Witnesses varied on this point, but the evidence would justify the jury in determining that if the driver had applied the brakes harder or in emergency position at a time before he positively identified the object on the line as a human body, the train could have been stopped before reaching the plaintiff; but that by the time the driver identified the object on the line it was just too late to stop the train before the front carriage of the train came in contact with the respondent's body.

The braking system was fully described in evidence by Mr. Grimshaw. Braking was ordinarily actuated by movement of air in the brake handle to a service position causing release of air pressure in the system with degree of braking controlled by the driver by return of the braking handle to the lap position from the service position between releases of air. Thus after one braking service position could be further brakings short of full emergency braking could be achieved by moving the brake handle again from the lap position to the service position. Emergency braking was achieved by release of air in the system at the maximum possible rate.

Upon these facts the appellant claims that there was no evidence of a breach of any duty of care owed towards the respondent at any relevant time whereby she suffered her injury. It is submitted that no duty of care was owed to a person in the position of the plaintiff until the driver positively identified the plaintiff as a human being, that at the time when the duty of care arose, that is to say, upon such identification, the driver of the train did all that he could to avert injury to the respondent, and that her injuries were not caused by any act or omission of

## [37 C.L.R.]     OF AUSTRALIA.     145

H. C. of A.
1976–1977.

PUBLIC TRANSPORT COMMISSION (N.S.W.)
v.
PERRY.

Mason J.
Jacobs J.

the driver at a time when a duty of care was owed. This submission is based upon the contention that the only duty owed by the appellant to the respondent at a time causally related to the injury was the duty which may arise in certain circumstances between an occupier of land and a trespasser on the land. The appellant was the occupier of the railway line which it used for the running of its trains. The respondent, it is said, was a trespasser, even though an involuntary one. The duty, it is submitted, of an occupier to a trespasser is not deliberately to do such a person harm or not to act with lack of care for the safety of the person when that person is known or "as good as" known (see *Southern Portland Cement Ltd. v. Cooper* (13) to be present on the occupier's land. In this connexion, it is said and rightly, there is no essential difference in the duty of care which is owed between the case where an injury is caused by the condition of the occupier's premises and that where the injury is caused by the carrying on on such premises of some activity, in this case the driving of the train. It is, however, hardly possible since *Southern Portland Cement Ltd. v. Cooper* to limit the enunciation of duty in the way suggested. We shall return to this aspect later.

The basis of the submission presently being considered is that the respondent was properly to be categorized as a trespasser on the lines, even though an involuntary one and that the involuntariness of the trespass is of no legal significance. There is, however, an important piece of evidence which was given by the driver of the train. He was asked:

"Q. And people fall on to lines, don't they?
A. Yes—quite a lot.
Q. And that is something you are warned constantly to be on the alert against, isn't it?
A. Yes."

The respondent was thus invited, to use the conventional language, to be upon the railway platform beside the railway lines, and the jury could have inferred that people quite often fell on to lines from railway platforms as well as from other places. Once the latter fact was accepted by the jury, the legal question whether, and if so what, duty of care existed fell to be determined in the light of that circumstance. If the fact was disputed, then it fell to be determined by the jury and the question of law whether and, if so, what duty of care arose required determination by the Court in the light of that determination of fact. For the purposes of this appeal, in which no new trial, but only a

(13) (1973) 129 C.L.R. 295; [1974] A.C. 623.

H. C. OF A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Mason J.
Jacobs J.

verdict for the appellant is sought, it must be assumed that this circumstance was established in the respondent's favour and that no question arises on the adequacy of the summing up upon this aspect.

Bearing in mind the circumstance that people quite often fell on the lines, what was the duty of care owed by the Commissioner and his servants to a person who was invited on to the station platform but fell on the lines inadvertently? Was it, as the appellant argues, only a duty to take care for the safety of such a person when it was known that he or she was on the lines? Or was it a duty to take reasonable care for the safety of a person who, having been invited to be in a position close to the lines, inadvertently fell on to the lines? We have no doubt that it was the latter. To speak of such a person as an invitee or a licensee who by exceeding his or her invitation or licence became simply a trespasser on the lines with consequent rigid definition of the duty owed is impermissibly to formalize the categories of duty. So to say is not to question the exhaustiveness of the categories as affirmed in *Commissioner for Railways v. Quinlan* (14) and *Southern Portland Cement Ltd. v. Cooper* (15). It is simply to clothe them with the reality of particular circumstances as they newly come before the courts. There is no occasion to apply to the appellant a so-called "general" duty of care arising from the circumstance that it was reasonably foreseeable that some person or another might be in the path of the train at some time or another. Within the concept of the appellant as occupier of the land and the respondent as invitee on to one part of the land who was involuntarily upon another part of the land the duty of care can be enunciated which is applicable to the circumstances. See *Southern Portland Cement Ltd. v. Cooper* (16). The significant circumstances are that the respondent was invited to be close to the lines, that her fall on to the lines was inadvertent and that people did fall on to the lines "quite a lot". In these circumstances there was a duty to take reasonable care not to cause injury to a person in the position of the appellant. It was for the jury to determine (a) whether there was a failure to keep a look-out for such a person and to take the step, when an unusual but yet unidentified object was seen on the lines, of slowing down in case it should be such a person, and (b) whether the failure was a breach of the duty of care.

Further, even if the respondent be categorized merely as a trespasser, it does not follow that a duty of care arose only when

(14) [1964] A.C. 1054.
(15) [1973] 129 C.L.R. 295; [1974] A.C. 623.
(16) [1973] 129 C.L.R. at p. 300; [1974] A.C. at p. 637.

H. C. OF A.
1976-1977.

PUBLIC
TRANSPORT
COMMISSION
(N.S.W.)
v.
PERRY.

Mason J.
Jacobs J.

the driver actually knew that she, a human being, was on the railway line in the path of his train. The duty of an occupier to a trespasser is higher than that in the circumstances which the jury could have found to have existed in this case. Cases such as *Commissioner for Railways v. Quinlan* (17) deal with the duty of care owed to persons whom the occupier may suspect will come upon the land "at some time or another" (see *Southern Portland Cement Ltd. v. Cooper* (18). The question with which we now deal is different, namely, the duty which arises when something is brought to the notice of an occupier or his servant which would lead an ordinary man to suspect that a person, albeit a trespasser, may actually be upon the land and in a position where a continuation of the occupier's activity is likely to cause death or a very serious injury if the suspicion turns out to be a reality.

We have no doubt that there then arises a duty of care on the part of the occupier towards the person whom an ordinary man would suspect to be actually upon the land and in a situation where the activities of the occupier or his servant, if pursued, will probably kill or seriously injure that person. If a man is out shooting on his land and something comes to his notice which would ordinarily lead to a suspicion that a human being may well be actually in the line of fire, he cannot escape liability by saying "Perhaps I had reason to suspect that something which could well be a human being was actually in the line of fire but I did not know positively that what I had observed was a human being. Therefore it was not incumbent on me to alter my shooting pattern in any way nor to take any step to negative the possibility that it might be a human being in my line of fire". If there comes to the notice of the occupier or, in this case its servant, something which would ordinarily lead to a suspicion that there may well be a person actually on the land who would be likely to suffer death or serious injury as a result of the course of conduct of the occupier or his servant if pursued, the duty arises in the occupier to take reasonable care to ascertain whether the suspicion has any foundation before he continues to pursue unaltered his course of intended conduct. The considerations of humanity referred to by their Lordships in *Southern Portland Cement Ltd. v. Cooper* (19) lead directly to this conclusion.

Provided that there was evidence to support the determination, it was for the jury to determine whether the circumstances in fact existed which gave rise to the legal duty and, if so, whether the duty was breached. That is to say, that it was for the jury to

(17) [1964] A.C. at p. 1070.
(18) [1973] 129 C.L.R. at p. 303; [1974] A.C. at p. 639.
(19) [1973] 129 C.L.R. 295; [1974] A.C. 623.

H. C. OF A.
1976-1977.
PUBLIC TRANSPORT COMMISSION (N.S.W.)
v.
PERRY.
Mason J.
Jacobs J.

determine whether the circumstances would have led an ordinary man to suspect that a human being might well be upon the line in a position of danger and, if so, whether the driver acted reasonably and, if not, whether his failure so to do was a cause of the respondent's injuries.

There was in our opinion evidence upon which the jury could on each of these inquiries reach a conclusion favourable to the respondent. The driver of the train gave evidence that he was on the look-out all the time, ready for any emergency. He agreed that an emergency was more likely to occur at a station than on the open line. He knew that quite often people fell on to lines. The driver observed something on the line when he was 300 yards from the platform of Lindfield station. He thought it looked like a large sheet of brown paper, but it was something which ought not to have been there, and it indicated to his mind the possibility of an emergency. It was something which potentially created an emergency, a hazard. It was open to the jury to conclude that in these circumstances a man in the position of the driver, knowing that people quite often fell on to the lines, would ordinarily have suspected that the object might well be a human body. The jury could then proceed to consider whether the driver of the train thereafter acted reasonably. The driver had already commenced the application of the service brake, an application sufficient to stop the train at Lindfield station. He made no stronger application of the brake until he positively identified the object as a human being. Only then did he apply the full emergency brake. This may have been at a distance of two hundred yards from the platform but the jury may have concluded that it was much closer. It appears to us that the omission of the driver which the jury could regard as showing a lack of reasonable care was his failure to do anything until he positively identified the object as a human body. Here was an object on the lines beside a railway platform at a busy time in the morning. All that the driver needed to do in order to ensure that, if it was a person who had fallen from the platform, then that person would not be injured was to apply his brake to the next stage by a further service application, so that the train would have been capable of being stopped at the northern end of or partly along the platform. As it was, the train stopped, on a finding of fact which was open to the jury, as little as one foot after hitting the body. Thus on a view of the facts which was open to the jury, a duty of care arose in law and it was for the jury to determine whether the driver ought to have taken some action at the earlier time, and whether, if action had been taken, it would have averted the injury to the respondent.

H. C. OF A.
1976-1977.
PUBLIC TRANSPORT COMMISSION (N.S.W.)
v.
PERRY.

Thus, even on an assumption that the respondent was in law to be categorized as one to whom no higher duty was owed than a duty owed by an occupier towards a trespasser, the appellant does not succeed in the submission that there was no evidence of breach of that duty.

We would dismiss the appeal.

*Appeal dismissed with costs.*

Solicitor for the appellant, A. R. Coleman.
Solicitors for the respondent, Axtens & Co.

R.A.S.

362

**Murray v. Foyle Meats Ltd. (H.L.(N.I.))** [1999]

**Lord Clyde**

The industrial tribunal in the present case correctly approached the matter in a straightforward way, treating it as a factual inquiry, without any artificial subtlety. They considered the material before them and simply asked themselves the question posed by the Act. They stated that they "were of the opinion that the business needed fewer employees to do the work in the slaughter hall and that led to the dismissal of the applicants." The issue before the tribunal was whether there had been a diminution of some work of a particular kind which led to the dismissal and the tribunal were satisfied that this applied in this case. It seems to me that the tribunal made no error in their understanding of the law and were entitled to come to the conclusion which they reached on the basis of the evidence before them. I agree that the appeal should be dismissed.

*Appeal dismissed.*
*Respondents' costs in House of Lords*
*to be paid out of legal aid fund.*
*Order suspended for four weeks to allow*
*objection by Legal Aid Board.*

Solicitors: *Canavan & Co. Londonderry; Elliot Duffy Garrett, Belfast.*

M. G.

---

363

**[HOUSE OF LORDS]**

REEVES . . . . . . . RESPONDENT

AND

COMMISSIONER OF POLICE OF THE METROPOLIS . APPELLANT

1999 March 10, 11;     Lord Hoffmann, Lord Mackay of Clashfern,
July 15               Lord Jauncey of Tullichettle, Lord Hope of
                      Craighead and Lord Hobhouse of Woodborough

*Negligence—Duty of care to whom?—Police—Failure to take reasonable steps to prevent suicide of prisoner in police custody—Claim on behalf of deceased's estate—Whether defences of volenti non fit injuria, novus actus interveniens or ex turpi causa available—Whether contributory negligence of deceased—Law Reform (Contributory Negligence) Act 1945 (c. 28), ss. 1(1), 4*

The deceased was held in a police cell in the custody of the defendant's officers, who had been alerted to the risk that he might commit suicide, although a doctor who examined him soon after his arrival at the police station stated that he showed no evidence of any psychiatric disorder or clinical depression. Taking advantage of the officers' inadvertence in leaving the flap of the cell door open, the deceased tied his shirt through the spy hole on the outside of the door and hanged himself. In an action for negligence begun by the plaintiff as administratrix of his estate, the defendant raised the defences of, inter alia, novus actus interveniens and contributory negligence under the Law Reform (Contributory Negligence) Act 1945. The judge found that the defendant's officers were in breach of a duty of care to take reasonable steps to prevent the deceased's suicide but held that since he was of sound mind his deliberate act entitled the defendant to rely on the suicide as a novus actus interveniens, and accordingly dismissed the action. On the issue of contributory negligence the judge assessed the deceased's responsibility at 100 per cent. The Court of Appeal, by a majority, allowed the plaintiff's appeal on the grounds that the duty of care to the deceased existed irrespective of his state of mind and that his suicide, being the very act against which the defendant had been required to guard, did not constitute a novus actus interveniens, and that in all the circumstances it was appropriate to reduce the award of damages to reflect the deceased's responsibility for his loss.

On the defendant's appeal:—

*Held,* (1) (Lord Hobhouse of Woodborough dissenting) that a deliberate and informed act intended to exploit a situation created by a defendant did not negative causation where the defendant was in breach of a specific duty imposed by law to guard against that very act; that those entrusted with the custody of prisoners had a duty to take reasonable care for their safety while in custody whether they were of sound or unsound mind; and that, accordingly, since the defendant was admittedly in breach of duty, the deceased's act in taking his own life did not entitle the defendant to rely on the defences of novus actus interveniens or volenti non fit injuria (post, pp. 367G–H, 368C, F–H, 372E–F, 374A–D, 375A–C, 378H, 379G–H, 380A–D).

*Kirkham v. Chief Constable of the Greater Manchester Police* [1990] 2 Q.B. 283, C.A. considered.

[1] Law Reform (Contributory Negligence) Act 1945, s. 1(1): see post, p. 369F.–D. S. 4: see post, p. 369.

Reeves v. Comr. of Police (H.L.(E.))    [1999]

But (2) allowing the appeal, that "fault" within the meaning of section 4 of the Act of 1945 could include intentional acts as well as negligence; that the deceased had responsibility for his own life and since his intentional act while he was of sound mind was a substantial cause of his death, the defence of contributory negligence succeeded; and that, having regard to all the circumstances, responsibility for the suicide should be apportioned equally between the deceased and the defendant and the damages reduced accordingly (post, pp. 369H–370A, D–F, 371C–H, 372D–F, 376G–377B, 382A–C, 383E–384B, C–D).

Decision of the Court of Appeal [1999] Q.B. 169; [1998] 2 W.L.R. 401; [1998] 2 All E.R. 381 reversed in part.

The following cases are referred to in their Lordships' opinions:

Airedale N.H.S. Trust v. Bland [1993] A.C. 789; [1993] 2 W.L.R. 316; [1993] 1 All E.R. 821, H.L.(E.)

Alcan v. City of Brownsville (1993) 865 S.W.2d 148

Beresford v. Royal Insurance Co. Ltd. [1938] A.C. 586; [1938] 2 All E.R. 602, H.L.(E.)

British Columbia Electric Railway Co. Ltd. v. Leach [1916] 1 A.C. 719, P.C.

Caparo Industries Plc. v. Dickman [1990] 2 A.C. 605; [1990] 2 W.L.R. 358, H.L.(E.)

Champagne v. United States of America (1994) 513 N.W.2d 75

Cleaver v. Mutual Reserve Fund Life Association [1892] 1 Q.B. 147, C.A.

Cole v. Multnomah County (1979) 592 P.2d 221

Cutler v. United Dairies (London) Ltd. [1933] 2 K.B. 297, C.A.

Dunn v. Hamilton, The [1957] A.C. 386; [1956] 3 W.L.R. 598; [1956] 3 All E.R. 144, H.L.(E.)

Empire Jamaica, The [1939] 1 K.B. 509; [1939] 1 All E.R. 59

Environment Agency (formerly National Rivers Authority) v. Empress Car Co. (Abertillery) Ltd. [1998] 2 W.L.R. 350; [1998] 1 All E.R. 481, H.L.(E.)

Forsikringsaktieselskapet Vesta v. Butcher [1989] A.C. 852; [1989] 2 W.L.R. 290; [1989] 1 All E.R. 402, H.L.(E.)

Freeman v. Home Office (No. 2) [1984] Q.B. 524; [1984] 2 W.L.R. 802; [1984] 1 All E.R. 1036, C.A.

Funk v. Clapp (1986) 68 D.L.R. (4th) 229

Haynes v. Harwood [1935] 1 K.B. 146, C.A.

Hickey v. Zezulka (1992) 487 N.W.2d 106

Hugh v. National Coal Board, 1972 S.C. 252

Hughes v. Lord Advocate [1963] A.C. 837; [1963] 2 W.L.R. 779; [1963] 1 All E.R. 705, H.L.(Sc.)

Hutchinson v. London and North Eastern Railway Co. [1942] 1 K.B. 481; [1942] 1 All E.R. 330, C.A.

Hyde v. Tameside Area Health Authority, The Times, 16 April 1981; Court of Appeal (Civil Division) Transcript No. 130 of 1981, C.A.

Imperial Chemical Industries Ltd. v. Shatwell [1965] A.C. 656; [1964] 3 W.L.R. 329; [1964] 2 All E.R. 999, H.L.(E.)

Kirkham v. Chief Constable of the Greater Manchester Police [1989] 3 All E.R. 882; [1990] 2 Q.B. 283; [1990] 2 W.L.R. 987; [1990] 3 All E.R. 246, C.A.

McLaughlin v. Sullivan (1983) 461 A.2d 123

Malton v. City of Cleveland (1988) 839 F.2d 240

Monat v. Clark Boyce [1992] 2 N.Z.L.R. 559

Myers v. County of Lake Indiana (1994) 30 F.3d 847

Nettleship v. Weston [1971] 2 Q.B. 691; [1971] 3 W.L.R. 370; [1971] 3 All E.R. 581, C.A.

Overseas Tankship (U.K.) Ltd. v. Morts Dock & Engineering Co. Ltd. (The Wagon Mound) [1961] A.C. 388; [1961] 2 W.L.R. 126; [1961] 1 All E.R. 404, P.C.

Pallister v. Waikato Hospital Board [1975] 2 N.Z.L.R. 725

Pigney v. Pointer's Transport Services Ltd. [1957] 1 W.L.R. 1121; [1957] 2 All E.R. 807

Pretty on Top v. City of Hardin (1979) 597 P.2d 58

Reg. v. Deputy Governor of Parkhurst Prison, Ex parte Hague [1992] 1 A.C. 58; [1991] 3 W.L.R. 340; [1991] 3 All E.R. 733, H.L.(E.)

Rowe v. Turner Hopkins & Partners [1980] 2 N.Z.L.R. 550

St. George's Healthcare N.H.S. Trust v. S. [1999] Fam. 26; [1998] 3 W.L.R. 936; [1998] 2 All E.R. 673, C.A.

Scott v. Shepherd (1773) 3 Wils. 403

Stansbie v. Troman [1948] 2 K.B. 48; [1948] 1 All E.R. 599, C.A.

Stapley v. Gypsum Mines Ltd. [1953] A.C. 663; [1953] 3 W.L.R. 279; [1953] 2 All E.R. 478, H.L.(E.)

Staveley Iron & Chemical Co. Ltd. v. Jones [1956] A.C. 627; [1956] 2 W.L.R. 479; [1956] 1 All E.R. 403, H.L.(E.)

Sudderth v. White (1981) 621 S.W.2d 33

Watters v. T.S.R. Inc. (1990) 904 F.2d 378

Williams v. Birmingham Battery and Metal Co. [1899] 2 Q.B. 338, C.A.

Yachuk v. Oliver Blais Co. Ltd. [1949] A.C. 386; [1949] 2 All E.R. 150, P.C.

The following additional cases were cited in argument:

Froom v. Butcher [1976] Q.B. 286; [1975] 3 W.L.R. 379; [1975] 3 All E.R. 520, C.A.

Jayes v. I.M.I. (Kynoch) Ltd. [1985] I.C.R. 155, C.A.

McFarland v. Stewart (1900) 19 N.Z.L.R. 22

Mitchell v. W.S. Westin Ltd. [1965] 1 W.L.R. 297; [1965] 1 All E.R. 657, C.A.

Appeal from the Court of Appeal.

This was an appeal by leave of the Court of Appeal, by the defendant, the Commissioner of Police of the Metropolis, from a decision dated 10 November 1997 of that court (Lord Bingham of Cornhill C.J. and Buxton L.J., Morritt L.J. dissenting) allowing an appeal by the plaintiff, Sheila Reeves, as joint administratrix of the estate of Martin Lynch deceased, from a decision of Judge White sitting at the Central London County Court on 19 June 1996 dismissing her claim against the defendant for damages on behalf of the deceased's dependants under the Fatal Accidents Act 1976.

The facts are stated in their Lordships' opinions.

David Pannick Q.C., Simon Freeland, Mark Shaw and Jeremy Johnson for the defendant.

Nicholas Blake Q.C. and Tim Owen for the plaintiff.

Their Lordships took time for consideration.

15 July. LORD HOFFMANN. My Lords, on 23 March 1990 Martin Lynch hanged himself in his cell in Kentish Town police station. He had been remanded in custody on charges of credit fraud and was also under investigation for handling stolen vehicles. He had made two previous attempts at suicide. One had been in a cell at Clerkenwell Magistrates' Court three months earlier. The second was in a cell at Brent Magistrates' Court that very morning. On each occasion he had tried to strangle himself with his belt. After the first incident, the police noted on his record that he was a suicide risk. When he was brought back to Kentish Town Police Station after the second incident, he was seen by a doctor. She found no other evidence of mental disturbance but gave instructions that, as a suicide risk, he should be frequently observed. An hour later, at

1.57 p.m., a policeman looked through the open wicket hatch in his cell door and saw that he was lying on his bed. A few minutes later he used his shirt as a ligature to hang himself by pushing it through the wicket hatch and securing it to the door. He was found by another policeman at 2.05 pm. Despite attempts at resuscitation, he died a week later.

The police and prison service have long been aware that prisoners are more than usually likely to attempt suicide or self-injury. In 1994 the Director of Prisons issued an Instruction to Governors (IG 1/1994) which said: "The care of prisoners who are at risk of suicide and self-harm is particularly high among prisoners on remand facing a new environment and an uncertain future. Between 1972 and 1982, 45 per cent. of suicides in prisons were remand prisoners, although they made up only 10–15 per cent. of the prison population: Report by Helen Grindrod Q.C. and Gabriel Black, "Suicides at Leeds Prison: An inquiry into the deaths of five teenagers during 1988/89" (1989), p. 5. As long ago as 1968 the Home Office sent a circular to Chief Constables drawing attention to the need to ensure that fittings in cells should not provide an opportunity for the prisoner to do himself injury. Paragraph 4 said:

"where cell doors are fitted with a drop-down service hatch, the hatch should not be left open when the cell is occupied by a prisoner. With the hatch open it would be possible for a person inside the cell to secure a ligature on the handle of the hatch."

Mr. Lynch did not use the handle. He fastened his shirt through the spyhole above the hatch. But he was able to do so because the hatch had been left open.

The plaintiff in this action is Mrs. Sheila Reeves, who had lived with Mr. Lynch for some years and had a child by him. She sues the Commissioner of Police of the Metropolis under the Fatal Accidents Act 1976 for negligently causing Mr. Lynch's death. The trial judge (Judge White) found that having regard to the fact that the police knew that Mr. Lynch was a suicide risk, they owed him a duty to take reasonable care to prevent him from committing suicide while being held in custody. He also found that the police had been negligent and in breach of this duty by failing to shut the wicket hatch after he had been put in the cell. There has been no appeal against these two findings.

The judge found, however, that the breach of duty by the police did not cause Mr. Lynch's death. He was of sound mind and his judgment was not impaired. The sole cause of his death was therefore his deliberate act in killing himself. The judge thought that this result could be expressed in Latin either by the maxim volenti non fit injuria (Mr. Lynch had consented to the injury he received) or by saying that his suicide was a novus actus interveniens. He also gave the commissioner leave to amend the defence to raise an alternative plea of contributory negligence. On the assumption that the death had been caused partly by the fault of the commissioner and partly by the fault of Mr. Lynch, he assessed the responsibility of Mr. Lynch in accordance with section 1(1) of the Law Reform (Contributory Negligence) Act 1945 at 100 per cent. The judge was also inclined, without deciding the point, to think that the plaintiff's claim should fail on grounds of public policy in accordance with the maxim ex turpi causa non oritur actio. He held that if the action had succeeded, he would have assessed the damages at £8,690.

Mrs. Reeves appealed to the Court of Appeal [1999] Q.B. 169. By a majority, the appeal was allowed. Lord Bingham of Cornhill C.J. and Buxton L.J. said that, as the police did not deny that they owed Mr. Lynch a duty to take reasonable care to prevent him from committing suicide or that their breach of duty had enabled him to commit suicide, they could not say that their breach of duty was not a cause of his death. "So to hold," said Lord Bingham C.J., at p. 196, "would be to deprive the duty of meaningful content." Morritt L.J. dissented, saying that a deliberate act of suicide by a person of sound mind must negative the causal connection between acts which merely created the opportunity and the subsequent death.

On contributory negligence, there was no clear majority view. Buxton L.J., for reasons to which I shall return, thought that the concept really had no application. Lord Bingham of Cornhill C.J. said it did, and would have held the commissioner and Mr. Lynch responsible in equal shares. Morritt L.J. agreed in principle that contributory negligence could apply but said that the judge was right to assess Mr. Lynch's responsibility at 100 per cent. In order to have some majority judgment on the point, Lord Bingham of Cornhill C.J., while adhering to the view that Mr. Lynch's fault contributed to his death, agreed to assess his share of responsibility at 0 per cent. So the plaintiff recovered the damages in the full amount of £8,690 assessed by the judge.

The commissioner appeals to your Lordships' House. Mr. Pannick argued two points on his behalf. The first was the question of causation: was the breach of duty by the police a cause of Mr. Lynch's death? The way to put the answer was to say that the deliberate act of suicide, while of sound mind, was a novus actus interveniens which negatived the causal connection between the breach of duty and the death. He said at first that he was going to argue the application of the maxim volenti non fit injuria as a separate point. But when it came down to it, he accepted that if the breach of duty was a cause of the death, he could not succeed on volenti non fit injuria. I think that is right. In the present case, volenti non fit injuria can only mean that Mr. Lynch voluntarily caused his own death to the exclusion of any causal effect on the part of what was done by the police. So I think it all comes to the same thing: was the breach of duty by the police a cause of the death?

The other point argued by Mr. Pannick was contributory negligence. The question of public policy or ex turpi causa non oritur actio, which had not found favour with any member of the Court of Appeal, was not pursued.

On the first question, Mr. Pannick relied upon the general principle stated in Hart and Honoré, Causation in the Law, 2nd ed. (1985), p. 136: "the free, deliberate and informed act or omission of a human being, intended to exploit the situation created by a defendant, negatives causal connection." However, as Hart and Honoré also point out, at pp. 194–204, there is an exception to this undoubted rule in the case in which the law imposes a duty to guard against loss caused by the free, deliberate and informed act of a human being. It would make nonsense of the existence of such a duty if the law were to hold that the occurrence of the very act which ought to have been prevented negatived causal connection between the breach of duty and the loss. This principle has been recently considered by your Lordships' House in Environment Agency (formerly National Rivers Authority) v. Empress Car Co. (Abertillery) Ltd. [1998] 2 W.L.R. 350. In that case, examples are given of cases in which liability has been imposed

for causing events which were the immediate consequence of the deliberate acts of third parties but which the defendant had a duty to prevent or take reasonable care to prevent.

Mr. Pannick accepted this principle when the deliberate act was that of a third party. But he said that it was different when it was the act of the plaintiff himself. Deliberately inflicting damage on oneself had to be an act which negatived causal connection with anything which had gone before.

This argument is based upon the sound intuition that there is a difference between protecting people against harm caused to them by third parties and protecting them against harm which they inflict upon themselves. It reflects the individualist philosophy of the common law. People of full age and sound understanding must look after themselves and take responsibility for their actions. This philosophy expresses itself in the fact that duties to safeguard from harm deliberately caused by others are unusual and a duty to protect a person of full understanding from causing harm to himself is very rare indeed. But, once it is admitted that this is the rare case in which such a duty is owed, it seems to me self-contradictory to say that the breach could not have been a cause of the harm because the victim caused it to himself.

Morritt L.J. drew a distinction between a prisoner who was of sound mind and one who was not. He said, at p. 190, that when a prisoner was of sound mind, "I find it hard to see how there is any material increase in the risk in any causative sense." In *Kirkham v. Chief Constable of the Greater Manchester Police* [1990] 2 Q.B. 283, 289–290 Lloyd L.J. said much the same. It seems to me, however, they were really saying that the police should not owe a person of sound mind a duty to take reasonable care to prevent him from committing suicide. If he wants to take his life, that is his business. He is a responsible human being and should accept the intended consequences of his acts without blaming anyone else. Volenti non fit injuria. The police might owe a general moral duty not to provide any prisoner with the means of committing suicide, whether he is sound mind or not. Such a duty might even be enforceable by disciplinary measures. But the police did not owe Mr. Lynch, a person of sound mind, a duty of care so as to enable him or his widow to bring an action in in damages for its breach.

My Lords, I can understand this argument, although I do not agree with it. It is not, however, the position taken by the commissioner. He accepts that he owed a duty of care to Mr. Lynch to take reasonable care to prevent him from committing suicide. Mr. Lynch could not rely on a duty owed to some other hypothetical prisoner who was of unsound mind. The commissioner does not seek to withdraw this concession on the ground that Mr. Lynch has been found to have been of sound mind. For my part, I think that the commissioner is right not to make this distinction. The difference between being of sound and unsound mind, while appealing to lawyers who like clear-cut rules, seems to me inadequate to deal with the complexities of human psychology in the context of the stresses caused by imprisonment. The duty, as I have said, is a very unusual one, arising from the complete control which the police or prison authorities have over the prisoner, combined with the special danger of people in prison taking their own lives.

Mr. Pannick also suggested that the principle of human autonomy might be infringed by holding the commissioner liable. Autonomy means that every individual is sovereign over himself and cannot be denied the right to certain kinds of behaviour, even if intended to cause his own

death. On this principle, if Mr. Lynch had decided to go on hunger strike, the police would not have been entitled to administer forcible feeding. But autonomy does not mean that he would have been entitled to demand to be given poison, or that the police would not have been entitled to control his environment in non-invasive ways calculated to make suicide more difficult. If this would not infringe the principle of autonomy, it cannot be infringed by the police being under a duty to take such steps. In any case, this argument really goes to the existence of the duty which the commissioner admits rather than to the question of causation.

The decision of the majority of the Court of Appeal is supported by the Commonwealth and United States authority to which we were referred: see in particular, *Pallister v. Waikato Hospital Board* [1975] 2 N.Z.L.R. 725 (Court of Appeal of New Zealand), *Funk v. Clapp* (1986) 68 D.L.R. (4th) 229 (British Columbia Court of Appeal) and *Hickey v. Zezulka* (1992) 487 N.W.2d 106 (Supreme Court of Michigan).

This brings me to the question of contributory negligence. Section 1(1) of the Act of 1945 provides:

"Where any person suffers damage as the result partly of his own fault and partly of the fault of any other person or persons, a claim in respect of that damage shall not be defeated by reason of the fault of the person suffering the damage, but the damages recoverable in respect thereof shall be reduced to such extent as the court thinks just and equitable having regard to the claimant's share in the responsibility for the damage . . ."

Section 4 defined "fault" as:

"negligence, breach of statutory duty or other act or omission which gives rise to a liability in tort or would, apart from this Act, give rise to a defence of contributory negligence."

Plainly Mr. Lynch's act in committing suicide would not have given rise to liability in tort. That part of the definition is concerned with fault on the part of the defendant. The question is whether, apart from the Act, it would have given rise to a defence of contributory negligence. I recognise, of course, that it is odd to describe Mr. Lynch as having been negligent. He acted intentionally and intention is a different state of mind from negligence. On the other hand, the "defence of contributory negligence" at common law was based upon the view that a plaintiff whose failure to take care for his own safety was a cause of his injury could not sue. One would therefore have thought that the defence applied a fortiori to a plaintiff who intended to injure himself. The late Professor Glanville Williams, in his book *Joint Torts and Contributory Negligence* (1951), p. 199 expressed the view that "contributory intention should be a defence." It is not surprising that there is little authority on the point, because the plaintiff's act in deliberately causing injury to himself is almost invariably regarded as negativing causal connection between any prior breach of duty by the defendant and the damage suffered by the plaintiff. The question can arise only in the rare case, such as the present, in which someone owes a duty to prevent, or take reasonable care to prevent, the plaintiff from deliberately causing injury to himself. Logically, it seems to me that Professor Glanville Williams is right.

Buxton L.J. took a different view and I must examine the reasons which he gave. First, he said, at p. 182, that there was no authority that the intentional act of the plaintiff could be "fault" within the meaning of

section 4 of the Act of 1945. This, as I have said, is true but, logically, I think it can be.

Secondly, he said that the conclusion that Mr. Lynch's act did not prevent the negligence of the police from being a cause of his death meant that his death could not have been partly as a result of his own fault and partly as a result of the fault of the police. The way he put it was, at p. 182:

"on the assumption that Mr. Lynch's alleged 'fault' is to have killed himself, did Mr. Lynch suffer death partly as a result of his killing himself and partly as a result of the defendants giving him an opportunity to kill himself, to adapt the terms of section 1 of the Act of 1945 to this case? The commonsense answer to a question posed in those terms is that given by the judge: that Mr. Lynch suffered death entirely as a result of his killing himself. That conclusion would however entail, and be the same as saying, that Mr. Lynch's act of self-destruction was in law a novus actus: which, as I have sought to demonstrate, is not the case."

This reasoning seems to me fallacious. It is saying that because Mr. Lynch's own act did not negative the causal connection between the negligence of the police and his death, it would be inconsistent to say that he caused his own death at all. Neither logic nor common sense requires such a conclusion. Mr. Lynch's suicide did not prevent the breach of duty by the police from being a cause of his death but that does not mean that his suicide was not also a cause of his death. As I said in *Environment Agency (formerly National Rivers Authority) v. Empress Car Co. (Abertillery) Ltd.* [1998] 2 W.L.R. 350, 358: "one cannot give a common sense answer to a question of causation for the purposes of attributing responsibility under some rule without knowing the purpose and scope of the rule." Because the police were under a duty to take reasonable care not to give Mr. Lynch the opportunity to kill himself, the common sense answer to the question whether their carelessness caused his death is "Yes." Because Mr. Lynch also had responsibility for his own life, the common sense answer to the question whether he caused his own death is "Yes." Therefore both causes contributed to his death and the Act of 1945 provides the means of reflecting this division of responsibility in the award of damages: see the majority judgment of Riley J. in *Hickey v. Zezulka*, 487 N.W.2d 106, 123 and the view of Richmond J. in *Pallister v. Waikato Hospital Board* [1975] 2 N.Z.L.R. 725, 736.

Thirdly, Buxton L.J. referred to cases under the Factories Acts, in which appellate judges have warned against allowing the legislative policy in imposing an absolute duty on the employer to be undermined by too readily allowing a defence of contributory negligence. He quoted Goddard L.J.'s remarks in *Hutchinson v. London and North Eastern Railway Co.* [1942] 1 K.B. 481, 488:

"It is only too common to find in cases where the plaintiff alleges that a defendant employer has been guilty of a breach of a statutory duty, that a plea of contributory negligence has been set up. In such a case I always directed myself to be exceedingly chary of finding contributory negligence where the contributory negligence alleged was the very thing which the statutory duty of the employer was designed to prevent."

It is important to notice that these remarks were made before the Act of 1945 was passed. It is not surprising that judges, faced with all or

nothing decision between the policy of the Factories Acts and the common law rule which made contributory negligence a complete defence, should have given priority to the legislative policy even if in practice it often meant overriding the common law rule. But Goddard L.J. did not say that contributory negligence could not in principle be a defence and it has always been recognised as such. Buxton L.J., at p. 182, also quoted an observation of Lord Tucker in *Staveley Iron & Chemical Co. Ltd. v. Jones* [1956] A.C. 627, 648 after the Act of 1945 had come into effect:

"in Factory Act cases the purpose of imposing the absolute obligation is to protect the workmen against those very acts of inattention which are sometimes relied upon as constituting contributory negligence so that too strict a standard would defeat the object of the statute."

This citation performs the valuable function of reminding us that what section 1 requires the court to apportion is not merely degrees of carelessness, but "responsibility," and that an assessment of responsibility must take into account the policy of the rule, such as the Factories Acts, by which liability is imposed. A person may be responsible although he has not been careless at all, as in the case of breach of an absolute statutory duty. And he may have been careless without being responsible, as in the case of "acts of inattention" by workmen. I shall return to this point when I consider the proper apportionment of responsibility in this case. But the two citations do not support the view that contributory negligence can in principle have no application when the plaintiff's carelessness is something which the defendant had a duty to guard against. It is commonly the case that people are held liable in negligence for not taking precautions against the possibility that someone may do something careless and hurt themselves, like diving into a shallow swimming pool, but I do not think it has been suggested that in such cases damages can never be reduced on account of the plaintiff's contributory negligence.

Fourthly, Buxton L.J. referred, at p. 183, to cases in which a defence of contributory negligence failed against child plaintiffs who had injured themselves by taking opportunities to play with dangerous things which the defendant had carelessly given them or left unguarded. He treated these as cases in which the defence failed because the child had done the very thing which it was the defendant's duty to take reasonable care to prevent. In my opinion, however, they have a different explanation. It is because the plaintiffs were children, without full understanding of the dangers they were running, that it would not have been just and equitable to attribute responsibility to them. This may be equally true in the case of a prisoner of unsound mind who commits suicide. In *Kirkham v. Chief Constable of the Greater Manchester Police* [1989] 3 All E.R. 882, where a prisoner suffering from clinical depression committed suicide in his cell, Tudor Evans J. decided that no share of responsibility for his death should be attributed to him under the Act of 1945. There appears to have been no appeal against this finding: see [1990] 2 Q.B. 283. But it does not follow that no prisoner committing suicide in consequence of a breach of duty by the police or prison officers can ever be treated as sharing the responsibility for his own death.

In my view I would therefore have been right to apportion responsibility between the commissioner and Mr. Lynch in accordance with the Act of 1945. The judge and Morritt L.J. would have apportioned 100 per cent. to Mr. Lynch. But I think that this conclusion was heavily influenced by their view, expressed in connection with the question of causation, that

Lord Hoffmann    Reeves v. Comr. of Police (H.L.(E.))    [1999]

Mr. Lynch. as a person of sound mind. bore full responsibility for taking his own life. This is of course a tenable moral view, which was powerfully advocated by Lord Denning M.R. in 1981 in *Hyde v. Tameside Area Health Authority*, The Times, 16 April 1981; Court of Appeal (Civil Division) Transcript No. 130 of 1981, reported in 1986 (1981) 2 P.N. 26. But whatever views one may have about suicide in general, a 100 per cent. apportionment of responsibility to Mr. Lynch gives no weight at all to the policy of the law in imposing a duty of care upon the police. It is another different way of saying that the police should not have owed Mr. Lynch a duty of care. The law of torts is not just a matter of simple morality but contains many strands of policy, not all of them consistent with each other, which reflect the complexity of life. An apportionment of responsibility "as the court thinks just and equitable" will sometimes require a balancing of different goals. It is at this point that I think that Buxton L.J.'s reference to the cases on the Factories Acts is very pertinent. The apportionment must recognise that a purpose of the duty accepted by the commissioner in this case is to demonstrate publicly that the police do have a responsibility for taking reasonable care to prevent prisoners from committing suicide. On the other hand, respect must be paid to the finding of fact that Mr. Lynch was "of sound mind." I confess to my unease about this finding, based on a seven-minute interview with a doctor of unstated qualifications, but there was no other evidence and the judge was entitled to come to the conclusion which he did. I therefore think it would be wrong to attribute no responsibility to Mr. Lynch and compensate the plaintiff as if the police had simply killed him. In these circumstances, I think that the right answer is that which was favoured by Lord Bingham of Cornhill C.J., namely to apportion responsibility equally. I would therefore allow the appeal and substitute a judgment for the plaintiff in the sum of £4,345 with interest.

LORD MACKAY OF CLASHFERN. My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Hope of Craighead and Lord Hoffmann. For the reasons they have given I, too, would allow the appeal and make the same order as that which has been proposed.

LORD JAUNCEY OF TULLICHETTLE. My Lords, this appeal arises out of the death by suicide of Martin Lynch while in police custody. The deceased was brought to the police station shortly after midday on 23 March 1990 having already tried to kill himself in a cell at the magistrates' court earlier in the day. Police officers at the station were made aware of this attempt and as a result the deceased was examined by a doctor at about 1.40 p.m. who found no evidence of schizophrenia. clinical depression or other mental disturbance but considered him to be a suicide risk and left instructions that he should be frequently observed. He was thereafter taken back to a cell whose door contained a flap which opened outwards and a spy hole which should have contained but was in fact devoid of glass. At 1.57 p.m. he was observed through the open flap to be sitting awake on his bed but at eight minutes later at 2.05 p.m. he was discovered with his shirt tied around his neck beside the door. He had tied his shirt through the open flap and spy hole and thereby hanged himself. Attempts to resuscitate him failed and he did on 1 April 1990. His administratrix raised the present action of damages against the commissioner on the ground of negligence. The trial judge accepted the plaintiff's contention

Reeves v. Comr. of Police (H.L.(E.))    Lord Jauncey of Tullichettle

that it was negligent not to shut the flap after the deceased had been placed in the cell but concluded that the defence of volenti non fit injuria had been made out and the claim therefore failed. In the Court of Appeal [1999] Q.B. 169 Buxton L.J. concluded that none of the three defences advanced by the commissioner. namely novus actus interveniens, volenti non fit injuria and contributory negligence. were made out and that the appeal should be allowed. Morritt L.J. considered that both the defences of novus actus interveniens and volenti non fit injuria were made out and that the appeal should be dismissed. He went on to express the view that if contributory negligence fell to be considered he would uphold the judge's apportionment of 100 per cent. blame to the deceased. Lord Bingham of Cornhill C.J. rejected the defences of novus actus interveniens and volenti non fit injuria but expressed the view that had he been sitting alone he would have concluded that the deceased was 50 per cent. to blame for the fatal outcome. In the event, however, because of the divergent view of the three judges he thought it right to allow the appeal and award the plaintiff full damages.

In opening the commissioner's appeal to this House Mr. Pannick accepted (1) that because they were aware that he was a suicide risk there was a duty on the part of the officers at the station to take reasonable care to prevent the deceased from committing suicide; and (2) that they were in breach of this duty by failing to close the flap. There were, he submitted, three issues for your Lordships' consideration namely. (i) novus actus interveniens. (ii) volenti non fit injuria. and (iii) contributory negligence. I shall deal with these issues in that order.

*Novus actus interveniens*

Mr. Pannick submitted that the deceased's death was caused not by the negligence of the police officers but by the voluntary act of the deceased while of sound mind. This act broke the chain of causation between the commissioner's breach of duty and the death. He referred to *Kirkham v. Chief Constable of the Greater Manchester Police* [1990] 2 Q.B. 283 and in particular to the following observations of Lloyd L.J. at p. 290:

"So I would be inclined to hold that where a man of sound mind commits suicide. his estate would be unable to maintain an action against hospital or prison authorities, as the case might be. Volenti non fit injuria would provide them with a complete defence"

Lloyd L.J. then pointed out that the plaintiff was not of sound mind. Mr. Pannick went on to develop his argument by referring to the fundamental principle of the autonomy of each individual and his or her right of self-determination as expounded in *St. George's Healthcare N.H.S. Trust v. S.* [1999] Fam. 26. 44B. If it is unlawful forcibly to administer food or medicine to a patient against his will because of his right of self-determination it must follow that an adult of sound mind who chooses to take his own life must bear the whole responsibility for his act.

My Lords, I consider that this argument is flawed. In *Clerk & Lindsell on Torts*, 17th ed. (1995), para. 2-24 it states:

"if a particular consequence of the defendant's wrongdoing is attributable to some independent act or event which supersedes the effect of the tortuous conduct. the defendant's responsibilities may not extend to the consequences of the supervening act or event."

Reeves v. Comr. of Police (H.L.(E.))    [1999]

It goes on to state that the novus actus interveniens "must constitute an event of such impact that it rightly obliterates the wrongdoing of the defendant." The reference to an independent act superseding the effect of the tortious conduct must, in my view, relate to an act which was outwith the contemplated scope of events to which the duty of care was directed. Where such a duty is specifically directed at the prevention of the occurrence of a certain event I cannot see how it can be said that the occurrence of that event amounts to an independent act breaking the chain of causation from the breach of duty, even although it may be unusual for one person to come under a duty to prevent another person deliberately inflicting harm on himself. It is the very thing at which the duty was directed: see *Stansbie v. Troman* [1948] 2 K.B. 48; Tucker L.J. at pp. 51–52. In *Kirkham v. Chief Constable of the Greater Manchester Police* [1990] 2 Q.B. 283, 295c Farquharson L.J. rejected the defence of volenti non fit injuria as "inappropriate where the act of the deceased relied on is the very act which the duty cast upon the defendant required him to prevent." These observations are equally apposite to the defence of novus actus interveniens in the present case. In *Pallister v. Waikato Hospital Board* [1975] 2 N.Z.L.R. 725 Woodhouse J. in a dissenting judgment, at p. 742, put the matter most succinctly: "The concept of a novus actus interveniens does not embrace foreseeable acts in respect of which the duty of care has specifically arisen." It follows that the observations of Lloyd L.J. in *Kirkham v. Chief Constable of the Greater Manchester Police*, at p. 290B, cannot apply to a case in which there exists a duty of care on a custodian to prevent a man with known suicidal tendencies from committing suicide.

The individual's right of self-determination is irrelevant here for two reasons. In the first place it is not a defence to a breach of duty but rather an argument against the existence of a duty at all. If an individual can do to his own body what he wills, whether by positive act or neglect then there can be no duty on anyone else to prevent his so doing. In this case, however, it is accepted that the commissioner owed a duty of care to the deceased. In the second place the cases in which the principle has been recognised and to which your Lordships have been referred were cases in which prevention of injury to health or death would have involved an unlawful physical invasion of the individual's rights. In this case performance of the duty of care by closing the flap would have involved no invasion of any rights of the deceased.

Mr. Pannick, with his customary fairness, drew the attention of your Lordships to a number of authorities from other common law jurisdictions which he accepted did not support his contention. In the U.S.A. the position appears to be that although as a general rule the act of suicide is viewed as an intentional intervening act which relieves the tortfeasor of liability, where a person with known suicidal tendencies is placed in the care of a jailer or other custodian the failure of such person to take reasonable care to prevent the suicide may be a direct and proximate cause of the death: *Sudderth v. White* (1981) 621 S.W.2d 33 (Court of Appeals of Kentucky); *McLaughlin v. Sullivan* (1983) 461 A.2d 123 (Supreme Court of New Hampshire) and *Watters v. T.S.R. Inc.* (1990) 904 F.2d 378 (U.S. Court of Appeals, Sixth Circuit).

In New Zealand, Richmond J. in *Pallister v. Waikato Hospital Board* [1975] 2 N.Z.L.R. 725, 736 expressed the view that had there been a failure by the hospital board to use reasonable care to guard the deceased against his known suicidal tendencies that failure would have been an effective or substantial cause of his death.

Reeves v. Comr. of Police (H.L.(E.))

It appears from the decision of the British Columbia Court of Appeal in *Funk v. Clapp*, 68 D.L.R. (4th) 229 that in Canada the doctrine of novus actus interveniens does not necessarily break the chain of causation between a jailer's failure in duty of care and the suicide of a prisoner in his charge.

My Lords, I have no doubt that given the admitted breach of duty of care the defence of novus actus interveniens cannot assist the commissioner. The deceased's suicide was the precise event to which the duty was directed and as an actus it was accordingly neither novus nor interveniens.

*Volenti non fit injuria*

Mr. Pannick conceded that if his argument on novus actus interveniens failed so must his argument on volenti non fit injuria. I consider that this concession was rightly made. If the defence were available in circumstances such as the present where a deceased was known to have suicidal tendencies it would effectively negative the effect of any duty of care in respect of such suicide as Farquharson L.J. pointed out in *Kirkham v. Chief Constable of the Greater Manchester Police* [1990] 2 Q.B. 283, 295c in the passage to which I have already referred.

*Contributory negligence*

Mr. Blake for the plaintiff submitted that the act of suicide could not amount to contributory negligence on the part of the deceased inasmuch as it did not amount to fault by him within the meaning of section 4 of the Law Reform (Contributory Negligence) Act 1945. Section 1(1) of that Act provides that where A suffers damage "as the result partly of his own fault and partly of the fault" of B, the damages recoverable may be reduced "having regard to the claimant's share in the responsibility for the damage." Fault is defined in section 4 as meaning "negligence, breach of statutory duty or other act or omission which gives rise to a liability in tort or would, apart from this Act, give rise to the defence of contributory negligence." Mr. Blake contended that since an act which was intentional not only as to its performance but also as to its consequences would not have amounted to contributory negligence at common law it followed that the deceased's act of suicide was not "fault" within the meaning of section 4. He referred to a number of English cases which did not appear to me to bear upon the issue or to advance his argument. In *Pallister v. Waikato Hospital Board* [1975] 2 N.Z.L.R. 725, 736. Richmond J. referred to the possibility of the act of the deceased in jumping from the window amounting to "fault" within the meaning of the Contributory Negligence Act 1947. Mr. Blake also referred to three United States cases, two from state Court of Appeals and one from a federal Court of Appeals which ruled that a plaintiff's suicide did not amount to contributory negligence. In *Cole v. Multnomah County* (1979) 592 P.2d 221 the Court of Appeals of Oregon ruled that acts which a plaintiff's mental illness caused him to commit were the same acts which the defendants had a duty to prevent and therefore could not constitute contributory negligence. In *Alvarado v. City of Brownsville* (1993) 865 S.W.2d 148 the State Court of Appeals ruled that the Texas Civil Practices and Remedies Code prohibited the use of a plaintiff's suicide as a defence if the suicide was caused in whole or in part by a defendant's breach of duty. In *Myers v. County of Lake Indiana* (1994) 30 F.3d 847 the United States Court of Appeals, Seventh Circuit opined that Indiana law would probably not recognise intentional efforts to

commit suicide as defences to the tort of negligently failing to prevent suicide attempts. However, this opinion was expressed in the context of a defence which appeared to equiparate contributory negligence to novus actus interveniens and volenti non fit injuria as a complete defence rather than one resulting in reduced quantum of damages. I do not therefore consider that it advances Mr. Blake's argument.

On the other hand Mr. Pannick referred to three United States cases one from a Federal Court of Appeals and two from state Supreme Courts in which suicide had been treated as amounting to contributory negligence. In *Hickey v. Zezulka*, 487 N.W.2d 106 the majority of the Supreme Court of Michigan held that the contributory negligence of a prisoner who committed suicide could be taken into account in assessing damages for the jailer's breach of duty. In *Molton v. City of Cleveland* (1988) 839 F.2d 240 the United States Court of Appeals, Sixth Circuit, refused to disturb the decision of a jury as to the degree of contributory negligence found on the part of a prisoner who committed suicide. In *Champagne v. United States of America* (1994) 513 N.W.2d 75 the Supreme Court of North Dakota rejected an argument that the contributory negligence of the victim is never to be considered where suicide is a foreseeable result of a medical provider's failure to take reasonable steps to prevent it and held that where the patient was responsible for his own care allocation of fault was in order. Although I have referred to the circumstances of each of the six United States cases cited by counsel in relation to contributory negligence the only significant conclusion which I draw from them is that in the United States a deliberate act of suicide by someone in command of his senses does not necessarily bar a plea of contributory negligence in reduction of damages.

My Lords, no United Kingdom authority has been cited in support of Mr. Blake's contention so far as the period before 1945 is concerned. This is perhaps not altogether surprising in view of the fact that the effect of contributory negligence at that time was identical to that of the defence of volenti non fit injuria. The authorities from New Zealand and the United States do not suggest that an act intentional as to performance and consequences can never amount to contributory negligence. If the law is to retain the respect of the public it should where possible walk hand in hand with common sense. There are, of course, occasions where legislation both domestic and European appear to make this impossible but where there is no such legislative inhibition the law should be interpreted and applied so far as possible to produce a result which accords with common sense. To take as an example A working beside a tank of boiling liquid which is inadequately guarded negligently allows his hand to come in contact with the liquid and suffers damage; B for a dare plunges his hand into the same liquid to see how he can stand the heat. It would be bordering on the absurd if A's entitlement to damages were reduced but B could recover in full for his own folly. B's responsibility for the damage which he suffered is undeniable. I see no reason to construe section 4 of the Act of 1945 to produce such a result and I agree with Lord Bingham of Cornhill C.J. that the word "fault" in that section is wide enough to cover acts deliberate as to both performance and consequences. An individual of sound mind is no less responsible for such acts than he is for negligent acts and it is his share of responsibility for the damage which reduces the damages recoverable.

In this case the open flap was not a danger to an occupant of the cell acting normally with reasonable regard for his own safety. It only became

a danger when it was deliberately used by the deceased as part of the mechanism whereby he strangled himself. The act of the deceased was accordingly a substantial cause of his own demise and any damages recoverable by the plaintiff should be reduced to reflect this.

Were I sitting alone I would have apportioned the blame as to one third to the commissioner and as to two thirds to the deceased. However, I understand that the majority of your Lordships favour a 50/50 division of responsibility and I do not feel inclined to dissent from that view.

In all the circumstances I would allow the appeal and make the same order as that proposed by my noble and learned friend, Lord Hoffmann.

LORD HOPE OF CRAIGHEAD. My Lords, the problem with which this case is concerned is, sadly, all too familiar both to the police and to the prison authorities. It is well known that people are more likely to commit suicide when they are in prison or in a police cell than when they are at liberty. Research has shown that some prisoners are more at risk than others would be when detained in custody. Those who are mentally disordered, young persons on remand and those who are serving very long sentences are thought to be particularly vulnerable. In some cases the prison regime may be a contributory factor in a prisoner's decision to end his own life. In others there may be no such contributory factor. The act of suicide may be both unforeseen and unforeseeable. But in the present case the act was foreseeable, and it would not have occurred if reasonable care had been taken to prevent it.

The deceased, who was then aged 29, died on 1 April 1990 as a result of having hanged himself on 23 March 1990 while he was in custody in Kentish Town police station. The judge said that, on the evidence, he was unable to conclude other than that the deceased was of sound mind at the time. He was not suffering from any marked medical or psychiatric condition. A doctor who had seen him earlier that day said that she had found no evidence of any psychiatric disorder or clinical depression and that he was calm and rational. There is no suggestion that there was anything in the conditions in which he was being held which might have prompted a rational person to wish to take his own life. On the other hand he had tried about three months previously to throttle himself with a belt when he was in a cell at Clerkenwell Magistrates' Court, having just been remanded in custody. In the light of this incident, which occurred on 29 December 1989, the court jailer completed a form which notified the prison authorities that he presented a special risk because he might have suicidal tendencies.

After about 10 days he was released from custody without further incident. But on 21 March 1990 he was arrested again following further police investigations into his activities. He was kept overnight at West Hampstead Police Station and transferred the next day to Willesden Police station, where he was charged and kept overnight to appear at Brent Magistrates' Court on 23 March 1990. By the time when he arrived at the magistrates' court he had been identified as a suicide risk. He was placed in a cell on his own under close observation. Within five minutes he was seen to be on the floor attempting once again to throttle himself with a belt. As he was uninjured, he duly appeared before the magistrates who remanded him in custody. He was then transferred to Kentish Town Police Station, where all the responsible officers were alerted to the fact that he was a suicide risk as he had made an attempt at suicide that morning.

He was examined by the doctor soon after his arrival at the police station. At 1.50 p.m. he was returned to his cell. Seven minutes later, at 1.57p.m., he was checked by a police officer who saw him on his bed. Minutes later, no later than 2.05 p.m., when his cell was again checked he was found in a semi-crouched position by the door with his shirt tail round his neck, having strangled himself. He was cut down and artificial respiration was applied. but he died from his injuries a week later in hospital.

The fact that the deceased, who was clearly determined to put an end to his own life, was able to achieve his aim so quickly despite being kept under observation by the custody officer was due to defects in the door of his cell. The wicket gate, or drop-down service hatch, on the cell door had been left open and the glass was missing from the spy hole above the wicket gate. The deceased had taken the opportunity of tying his shirt through the spy hole in order to form a ligature, with which he was then able to strangle himself. A Home Office circular of 10 April 1968 had warned police authorities and police officers of the need to ensure that fittings in cells should not provide for a prisoner to do himself injury. It had stated that, where cell doors were fitted with a drop-down service hatch, the hatch should not be left open when the cell was occupied by a prisoner, as with the hatch open it would be possible for a person inside the cell to secure a ligature on the handle of the hatch. In the present case the deceased did not need to use the handle, as the open spy hole provided him with an even more effective means of securing his ligature.

The commissioner accepts that he owed a duty of care to the deceased while he was in police custody. He also accepts that he was in breach of that duty, as the wicket gate was left open when the deceased was in the cell. But he submits that, as the deceased was of sound mind, his suicide in these circumstances did not give rise to a liability to his estate in damages. He seeks to distinguish this case from *Kirkham v. Chief Constable of the Greater Manchester Police* [1990] 2 Q.B. 283, where the deceased who committed suicide was held to have been suffering from clinical depression when he took his own life while in police custody. His arguments on liability have been maintained in your Lordships' House on three grounds: *volenti non fit injuria, novus actus interveniens* and contributory negligence.

In my opinion it is necessary at the outset to identify the duty which was owed to the deceased by the commissioner. There is no doubt that the commissioner was right to concede that he owed a duty of care to the deceased while he remained in police custody. The deceased had been identified as a suicide risk, having on two previous occasions attempted to strangle himself with a belt after being placed in a cell. It was the commissioner's duty to take reasonable care not to provide him with the opportunity of committing suicide by making use of defects in his cell door. The risk was not that he would injure himself accidentally if given that opportunity, but that he would do so deliberately. That is the nature of an act of suicide by a person who is of sound mind. It is a deliberate act of self-destruction by a person who intends to end his own life. So I think that the commissioner's duty can most accurately be described as a duty to take reasonable care to prevent the deceased, while in police custody, from taking his own life deliberately.

It is unusual for a person to be under a duty to take reasonable care to prevent another person doing something to his loss, injury or damage deliberately. On the whole people are entitled to act as they please, even if

this will inevitably lead to their own death or injury. As a general rule the common law duty of care is directed towards the prevention of accidents or of injury caused by negligence. The person to whom the duty is owed is, of course, under a corresponding duty to take reasonable care for his own safety. If he is in breach of that duty, his damages may be reduced on the ground of his contributory negligence. But if he injures himself by intentionally doing deliberately the very thing which the defendant is under a duty to prevent him from doing negligently, he may find that he is unable to recover any damages. He may be found to have assumed the risk of injury, on the principle of *volenti non fit injuria.* Or it may be held that the chain of causation was broken by his deliberate act, in which case his claim will be defeated on the principle of *novus actus interveniens.* Or it may simply be that his loss, injury and damage will be held to have been caused wholly by his own fault, with the result that there will be no room even for a reduced award on the ground of contributory negligence.

But the duty of care may sometimes extend to preventing people injuring themselves deliberately. The person to whom the duty is owed may be unaware of the risks to which he will expose himself by his deliberate act. Or he may be too young to appreciate them, as in *Yachuk v. Oliver Blais Co. Ltd* [1949] A.C. 386, where petrol was sold to a child aged nine who was unaware of its dangerous properties, or *Hughes v. Lord Advocate* [1963] A.C. 837, where the inquisitive children meddled with objects in the unattended shelter in the roadway without thought as to the consequences. Or he may be of unsound mind, with the result that he is at risk of doing something to himself which he would inevitably lead to injury. Or the he would appreciate that to do this would inevitably lead to injury. Or the risk that the person may commit an act of deliberate self-harm may be the result of something which the defendant has done or is doing to him.

That is the situation which may arise where a person who is of sound mind is deprived of his liberty and put in prison or detained in custody by the police. The duty of those who are entrusted with his custody is to take reasonable care for his safety while he remains in their hands. If it is known that he may engage in self-mutilation or suicide while he is in their custody, their duty is to take reasonable care to prevent him from engaging in these acts so that he remain free from harm until he is set at liberty. This duty is owed to the prisoner if there is that risk, irrespective of whether he is mentally disordered or of sound mind. It arises simply from the fact that he is being detained by them in custody and is known to be at risk of engaging in self-mutilation or of committing suicide. If the prisoner, while of sound mind, destroys himself despite all reasonable precautions to prevent him doing so, there is no liability: see *Pallister v. Waikato Hospital Board* [1975] 2 N.Z.L.R. 725, where the board was held not to have been negligent: *Pretty on Top v. City of Hardin* (1979) 597 P.2d 58, where there was no evidence that the cause of the prisoner's suicide was anything other than his own intentional act: *Sudderth v. White,* 621 S.W.2d 33. But it is hard to see why liability should not follow if the prisoner was a known suicide risk and precautions which could have been taken to prevent a deliberate act of suicide were not taken by the police.

This brings me to the first of the three arguments which the commissioner has advanced in his defence, which is *volenti non fit injuria.* I do not see how that principle can be applied to a case where the loss, injury or damage was caused by the deliberate act of self-harm which the defendant was under a duty to take reasonable care to prevent. The situation would be different if a defendant who was under a duty to

prevent the plaintiff from sustaining injury by accident or negligently was faced with a claim for damages arising from an injury which the plaintiff, in full knowledge of the risks, had done to himself deliberately. It might then be said that he had voluntarily assumed the risk of injury. But that is not this case. The deceased did to himself the very thing that the commissioner was under a duty to take reasonable care to prevent while he remained in his custody. It is true that he deliberately exploited the situation which had been created by the commissioner's negligence. But that was the thing which the commissioner was under a duty to prevent, as it was the foreseeable consequence of his acting negligently.

Similarly, I do not see how what occurred in this case could be said to amount to a novus actus interveniens. There was no "new" act here at all. The act by which the deceased killed himself was the very act which the commissioner was under a duty to prevent by not leaving the wicket gate open when the deceased was in his cell and thus providing him with the means of hanging himself. The chain of causation was not broken. There was no "third factor," as explained by Hart and Honoré, Causation in the Law, 2nd ed., p. 134, which might have negatived a causal connection between the wrongful act and the harm to the deceased. Here the wrongful act was the cause of the harm because it created the opportunity for the deliberate act of self-harm. The suicide was a foreseeable consequence of the failure in duty which occurred when the deceased, who was a known suicide risk, was placed in a cell which provided him with the opportunity to carry out that act.

Support for this view can be found in cases from New Zealand, the United States, and Canada. In Pallister v. Waikato Hospital Board [1975] 2 N.Z.L.R. 725, 742 Woodhouse J., who dissented on the question whether there was evidence that the board were negligent, rejected the argument that the voluntary act of the deceased in throwing himself from the window of the hospital was a new and independent cause of his death. He said that in his opinion it was not, because it had been made possible by the removal of the precautions. The fall was the product of the board's negligence, not independent of it. In Molton v. City of Cleveland, 839 F.2d 240 (6th Cir. 1988), it was held that, as the deceased's suicide was well within the scope of the risk and was foreseeable, it was not an independent intervening cause resulting in no liability. In Funk v. Clapp, 68 D.L.R. (4th) 229 Seaton J.A. said that the doctrine of novus actus interveniens could not aid the defendants in that case, where the deceased had committed suicide in his cell by hanging himself from the top of his cell door with his own belt two hours after he had been arrested, on the ground that the act of negligence consisted in the failure to take reasonable care to guard against the very thing that happened. Stansbie v. Troman [1948] 2 K.B. 48, 51–52, per Tucker L.J. There was evidence that the police were in breach of their duty, as they should have removed his belt before he was placed in the cell and checked at intervals to see if he was all right.

There remains the question whether the damages should be reduced on the ground of contributory negligence and, if so, what should be the extent of the reduction. The first question raises an issue of statutory construction as well as an issue of principle. Section 1(1) of the Law Reform (Contributory Negligence) Act 1945 provides:

"Where any person suffers damage as the result partly of his own fault and partly of the fault of any other person or persons, a claim in respect of that damage shall not be defeated by reason of the fault

of the person suffering the damage, but the damages recoverable in respect thereof shall be reduced to such extent as the court thinks just and equitable having regard to the claimant's share in the responsibility for the damage . . ."

The word "fault" is defined by section 4 of the Act in these terms:

"negligence, breach of statutory duty or other act or omission which gives rise to a liability in tort or would, apart from this Act, give rise to the defence of contributory negligence."

The question is whether this definition extends to a deliberate act such as that which the deceased performed when he strangled himself with the ligature.

It has been said that the meaning of "fault" comprises two limbs: Rowe v. Turner Hopkins & Partners [1980] 2 N.Z.L.R. 550, 555, per Prichard J., in a passage which was approved by O'Connor L.J. in Forsikringsaktieselskapet Vesta v. Butcher [1989] A.C. 852, 866b–c. The first limb, which is referable to the defendant's conduct, comprises various acts or omissions which give rise to a liability in tort. The second limb, which is referable to the plaintiff's conduct, deals with acts or omissions which would, but for the Act, have given rise to the defence of contributory negligence. The first is directed to the basis of the defendant's liability, while the second is concerned with his defence on the ground that the damage was the result partly of the plaintiff's own negligence. In Mouat v. Clark Boyce [1992] 2 N.Z.L.R. 559, 564–565 Sir Robin Cooke P. departed to some extent from Prichard J.'s views as to the proper interpretation of the words used in the first limb. But he did not disagree with the underlying analysis, which makes it clear that the question whether the deceased was at fault in this case must be considered with reference to the words used to describe the second limb.

Mr. Blake said that the deceased's deliberate act fell outside the scope of the common law concept of contributory negligence. It would not have provided the commissioner with a defence to the claim of damages, as it was his duty to prevent that very same act of intentional self-harm. He submitted that the defence of contributory negligence excluded the idea of deliberation, as the defence was based on the plaintiff's failure to take reasonable care: Salmond on the Law of Torts, 10th ed. (1945), p. 451. It would be inconsistent with a rejection of the defence of novus actus interveniens, on the ground that there was no intervening act to break the chain of causation, to hold that the deceased's own act had nevertheless contributed to the harm which resulted from it.

This argument is not without substance, for the reasons which were explained by Buxton L.J. in his discussion of this question in the Court of Appeal [1999] Q.B. 169, 181–183. But I am unable to agree with it. In the first place, it seems to me that the consequences of this approach are unacceptable on policy grounds. It would mean that a plaintiff's award of damages could be reduced if it was held that he had contributed to his injury even to a small degree by his own negligence, but that it could not be reduced irrespective of the degree of the defendant's negligence if it was held that he had caused his own injury deliberately. This problem did not emerge until after the reform which was introduced by the Act of 1945. Until that Act introduced a new approach to the question of contributory negligence, the fact that the plaintiff's own act contributed to the damage was always a complete defence to the claim. It made no difference to the

Lord Hope
of Craighead

**Reeves v. Comr. of Police (H.L.(E.))**    [1999]

result whether his act was a negligent or a deliberate one. There was no need for the question to be explored, because there was no opportunity in either case for an apportionment of the liability in damages. But at least it can be said that no authority was cited from the law as it existed before the Act of 1945 which would make it impossible for us to say that a person was negligent, in the sense of failing to take reasonable care for his own safety, where he acted deliberately by inflicting harm on himself. That would lead to what I would regard as the proper result, which is that he should accept a share of the responsibility for the consequences.

Next there is the analysis of the definition in section 4 into two limbs, I do not disagree with this analysis. But I think that it ought not to lead us to ignore its context, which is that of an apportionment of liability according to each party's share in the responsibility for the damage: see section 1(1) of the Act. It seems to me that the definition of "fault" in section 4 is wide enough, when examined as a whole and in its context, to extend to a plaintiff's deliberate acts as well as to his negligent acts. This reading of the word would enable the court, in an appropriate case, to reduce the amount of damages to reflect the contribution which the plaintiff's own deliberate act of self-harm made to the loss.

The point that one should not be unduly inhibited by the use of the word "negligence" in the expression "contributory negligence" has been well made by Prosser and Keeton on Torts, 5th ed. (1984), p. 453, section 65, in a passage which appears as a footnote in Hickey v. Zezulka, 487 N.W.2d 106, to which I refer later, at p. 123:

"It is perhaps unfortunate that contributory negligence is called negligence at all. 'Contributory fault' would be a more descriptive term. Negligence as it is commonly understood is conduct which creates an undue risk of harm to others. Contributory negligence is conduct which involves an undue risk of harm to the actor himself. Negligence requires a duty, an obligation of conduct to another person. Contributory negligence involves no duty, unless we are to be so ingenious as to say that the plaintiff is under an obligation to protect the defendant against liability for the consequences of the plaintiff's own negligence."

Then there is Buxton L.J.'s reference [1999] Q.B. 169, 182: to the warnings which have been issued on policy grounds against permitting an employer's absolute duty under the Factories Acts to be undermined by an appeal to contributory negligence, especially where the contributory negligence alleged was the very thing which the statutory duty of the employer was designed to prevent: e.g. Hutchinson v. London and North Eastern Railway Co. [1942] 1 K.B. 481, 488, per Goddard L.J. I do not think that much, if anything, can be made of this point. The need for such extreme caution is less obvious now that the complete defence which was afforded by a finding of contributory negligence has been replaced by the provisions which the Act of 1945 made for reducing the amount of damages. Cases such as Hugh v. National Coal Board, 1972 S.C. 252 show that judges have no difficulty in practice in making a finding of contributory negligence where a plaintiff has deliberately disobeyed instructions which his employer, in pursuance of an absolute statutory duty, has issued to his employees.

Further support for the view that a finding of "contributory negligence" may be made where the plaintiff has injured himself deliberately can be found in decisions in other jurisdictions in cases where damages have been claimed following an act of suicide. In Pallister v. Waikato Hospital Board

3 W.L.R.    **Reeves v. Comr. of Police (H.L.(E.))**    Lord Hope
of Craighead

[1975] N.Z.L.R. 725, 736 Richmond J. doubted whether, if it had been established that the board failed to use reasonable care to guard against his own suicidal tendencies, that could be called the sole cause of his death as the act of the deceased in jumping from a window would possibly amount to "fault" as defined by section 2 of the Contributory Negligence Act 1947. It was unnecessary to decide the point, as it was not argued in that case. But the question has been decided, as an issue about comparative fault, in several cases in the United States.

In Molton v. City of Cleveland, 839 F.2d 240 the city's liability for the death of a detainee who committed suicide in a cell after being beaten by police officers was reduced by 20 per cent on the ground of the detainee's comparative fault. In Hickey v. Zezulka, 487 N.W.2d 106 it was held that the campus police officer who had been accused of negligence after a person whom he had arrested hanged himself in a cell was entitled to an instruction at the trial on comparative fault. The judges in the Michigan Supreme Court were not unanimous as to the need for such an instruction. But the majority view was that, while the plaintiff should not lose his cause of action because the act of suicide had been committed deliberately, the court should not go to the other extreme of holding that the defendant must assume all responsibility and liability for injuries that the plaintiff intentionally commits upon himself. The majority were also of the opinion that jurors were capable of reaching a rational and sensible balance between the deceased's deliberate fault and the jailer's negligence. As Riley J. put it, at p. 124, the goal of establishing a fair system of apportionment of damages is not served, rather it is thwarted, when a slightly negligent defendant is held liable for 100 per cent of the damages caused principally by the plaintiff's wrongful intentional conduct. In Champagne v. United States, 513 N.W.2d 75, after examining a number of cases about comparative fault in cases of suicide including the Hickey case, the Supreme Court of North Dakota rejected the argument that, when a patient's act of suicide is a foreseeable result of a medical provider's failure to treat reasonably to prevent the suicide, it is never appropriate to compare the victim's act of suicide with the medical provider's fault. If the patient was capable of being responsible for his own care, allocation of fault was in order. But a mentally ill patient could only be held to the degree of care permitted by his diminished capacity. The worse the suicidal patient's diminished capacity, the greater the medical provider's responsibility.

I would apply that approach to the present case. The judge found that the deceased was of sound mind. One may question whether that is an appropriate description of a person who for no obvious reason decides to end his own life. But the judge felt that he was bound to proceed on the evidence and we also must accept that evidence. So there are no grounds for minimising the deceased's share of the responsibility on the basis of diminished mental capacity. Moreover the contribution which he made to the fatal outcome was clearly a substantial one. It was not only a deliberate act. The fact that it was done so quickly, within minutes of the last check of the cell, also indicates a determination on his part immediately to seize the opportunity before the time came for the next check. On the other hand the contribution which was made by the commissioner's fault indicates that he too must bear a substantial share of the responsibility. The defects in the cell door fell clearly within the warning in the Home Office circular. Anyone taking reasonable care to prevent the deceased from committing suicide should have appreciated that these defects would

Reeves v. Comr. of Police (H.L.(E.))

[1999]

The Weekly Law Reports 30 July 1999

provide him with the opportunity of taking that step as soon as he was left unobserved in the cell. In all the circumstances I agree with the view expressed by Lord Bingham of Cornhill C.J. in the Court of Appeal [1999] Q.B. 169, 180D–E, that responsibility for the suicide should be shared equally in this case between the deceased and to the commissioner, so that the damages recoverable by the plaintiff should be reduced by 50 per cent.

I would therefore allow the appeal and make the same order as that which has been proposed by my noble and learned friend, Lord Hoffmann.

LORD HOBHOUSE OF WOODBOROUGH. My Lords, this appeal raises two questions. The first is whether the death of Mr. Lynch was caused by the negligence of the defendant. The second is whether, assuming that it was, the defendant has a defence under the Law Reform (Contributory Negligence) Act 1945. Your Lordships would answer both questions in the affirmative. It was a forensic paradox (as confirmed by the judgment of Buxton L.J. in the present case) that the argument of each side on the second question was persuasive to undermine its argument on the first question. If however the first question is, contrary to my view, to be answered in favour of the plaintiff, then I see no difficulty in answering the second question in favour of the defendant nor, on that hypothesis, would I differ from your Lordships' opinion, in agreement with the preferred view of Lord Bingham of Cornhill C.J., that the reduction in the plaintiff's recoverable damages should be 50 per cent. In this speech I will therefore confine myself to the first question, the question of causation.

The plaintiff's cause of action arises out of the death of her former husband, Mr. Lynch. She is to be taken as having sued under both the Fatal Accidents Act 1976 and the Law Reform (Miscellaneous Provisions) Act 1934. Under sections 1(1) of each of these Acts, the plaintiff is not entitled to assert any cause of action which the deceased could not have asserted if he had survived and the defendant can rely upon the defences he would have had against the deceased. (See also section 5 of the Act of 1976.) This needs to be stressed at the outset since there are indications in the judgments of both Buxton L.J. and Lord Bingham C.J. in the Court of Appeal in the present case that they were influenced by the fact that the action was being brought for the benefit, not of the deceased, but of his relatives. But it is fundamental that it is the deceased's cause of action (if any) which is being sued on. For the purposes of any discussion of causation it is both convenient and right to treat the deceased as the plaintiff. The principles of law to be applied are those which relate to the assessment of the conduct of a plaintiff as the cause of his own loss.

The starting point in the present case is the acceptance that the defendant owed Mr. Lynch a duty of care. As Lord Bingham of Cornhill C.J. put it [1999] Q.B. 169, 196: "the defendant by his officers at Kentish Town police station owed the deceased a duty to take reasonable care to ensure that he was not afforded an opportunity to take his own life." (This duty is an application of the more general duty to take reasonable care of a person in one's custody: Reg. v. Deputy Governor of Parkhurst Prison, Ex parte Hague [1992] 1 A.C. 58.) Lord Bingham of Cornhill C.J. emphasised that the duty was a duty to take reasonable care and not to guarantee that a fatality did not occur. He then went on to say in two similar passages, at pp. 196–197:

"Since an act of self-destruction by the deceased was the very risk against which the defendant was bound in law to take reasonable

3 W.L.R.

Reeves v. Comr. of Police (H.L.(E.))

precautions, I cannot see how that act can be regarded as a novus actus. So to hold would be to deprive the duty of meaningful content. This was, after all, the very thing against which the defendant was duty-bound to take precautions. It can make no difference that the deceased was mentally 'normal' (assuming he was), since it is not suggested that the defendant's duty was owed only to the abnormal. The suicide of the deceased cannot in my view be regarded as breaking the chain of causation . . . If the defendant owed the deceased a duty of care despite the fact that the deceased was of sound mind, then it again seems to me to empty that duty of meaningful content if any claim based on breach of the duty is inevitably defeated by a defence of volenti."

I would draw attention to three features of these two passages. The first is that Lord Bingham C.J. apparently does not accept that any conduct of the suicide would be capable of constituting the sole legal cause of his death. The second is the peculiarity of the present case that the deceased was held by the trial judge to have been of sound mind in contrast with the finding which had been made in Kirkham v. Chief Constable of the Greater Manchester Police [1990] 2 Q.B. 283, and had formed the basis of the Court of Appeal's decision in that case. The third is the use of metaphors and Latin tags which I will suggest have outlived their usefulness and now only serve to cause confusion (a view expressed by Lord Sumner as long ago as 1915: British Columbia Electric Railway Co. Ltd. v. Loach [1916] 1 A.C. 719, 727–728).

My Lords, in relation to the first feature, let me take two hypothetical situations, neither unduly fanciful. Suppose that the detainee is a political agitator whose primary motivation is to further a political cause. Such persons are liable to see self-destruction, in circumstances which they hope will attract as much publicity and media attention as possible, as an appropriate means of advancing their political cause. Can such a person, having taken advantage of a careless oversight by the police and carried out his purpose, vicariously bring an action against the police and recover damages from them? Or suppose a detainee who and whose family are in serious financial difficulties and who, knowing what the Court of Appeal decided in the present case, says to himself "the best way for me to help those I love is to commit suicide" and then carries out that purpose by taking advantage of the careless oversight. As Mr. Pannick said in argument, he might even leave a suicide note for his wife telling her this. In cases such as these it would be surprising if the courts were to say that, notwithstanding the determinative, rational and deliberate choice of the deceased, that choice had not become the only legally relevant cause of the death. It would also in my judgment be contrary to principle. It certainly would be contrary to principle to resort to the fiction of saying that he was guilty of 100 per cent. contributory negligence: if the responsibility for his death was his alone, the principled answer is to say that the sole legal cause was his own voluntary choice. Yet, if such a case were hereafter to come before a court, that court, on the basis of the majority decision of the Court of Appeal, would be bound to award the plaintiff damages.

I give these examples to illustrate the need to identify a dividing line unless one is to say that even in such cases the deliberate voluntary choice of the deceased, the quasi-plaintiff, can never break the chain of causation. The view accepted by the majority of the Court of Appeal reduces all such

386

Lord Hobhouse
of Woodborough

Reeves v. Comr. of Police (H.L.(E.))

[1999]

The Weekly Law Reports 30 July 1999

questions to an examination of the scope of the duty of care or remoteness (which in the context of the law of negligence is effectively the same thing, but, as it was, he rightly considered that he should follow the reasoning of the Court of Appeal in that case and dismiss the claim. Lord Bingham of Overseas Tankship) U.K.) Ltd. v. Morts Dock & Engineering Co. Ltd. (The Wagon Mound) [1961] A.C. 388). The reason why this is contrary to principle is that it is a basic rule of English law that a plaintiff cannot complain of the consequences of his own fully voluntary conduct—his own "free, deliberate and informed" act: see Hart and Honoré, Causation in the Law, p. 136. This principle, overlooked by the plaintiff, is to be found in a variety of guises in most branches of the law. In the law of tort it overlaps with other principles and invites recourse to expressions (usually Latin maxims) not all of which have a consistent usage.

One such guise is that a party cannot rely upon his own unlawful or criminal conduct: the so-called ex turpi causa non oritur actio maxim. Until the passing of the Suicide Act 1961, suicide was a crime and accordingly a person who committed that crime could acquire no rights thereby. But it was always open to the interested party to say that the suicide was not criminally responsible because of insanity, usually temporary insanity. The insanity negatived both the criminal character of the conduct and its immorality. This principle is no longer relevant to the present type of case and has not been relied upon by the defendant before us. I agree with the unanimous rejection by the Court of Appeal of this defence. But it is necessary to mention it since the terminology of insanity has properly been used in cases in the past and has, since then, still tended confusingly to colour some of the judicial language. The contrast now is not between sane and insane behaviour but between conduct of the plaintiff which can and cannot be properly described as voluntary.

Suicide is within the range of conduct lawfully open to a person: personal autonomy includes the right to choose conduct which will cause that person's death and this includes to refuse to allow others to obstruct that choice: Airedale N.H.S. Trust v. Bland [1993] A.C. 789; St. George's Healthcare N.H.S. Trust v. S. [1999] Fam. 26. Imprisonment does not deprive the prisoner of that autonomy: Freeman v. Home Office (No. 2) [1984] Q.B. 524. It would also be wrong to treat the principle of illegality or public policy as the answer to the illustrative hypothetical examples which I have given. Our culture has always regarded the willingness to sacrifice one's life for a cause or for the benefit of others as laudable not reprehensible.

In the context of suicide, these points are illustrated by the classic decision of your Lordships' House, Beresford v. Royal Insurance Co. Ltd. [1938] A.C. 586. There the assured who was sane decided, in circumstances not dissimilar to those postulated by Mr. Pannick in argument, that copious life insurance followed by deliberate suicide was the answer to the grave financial problems with which he and his family were faced. The assured's heir was unable to recover under the policies for two primary reasons. "No system of jurisprudence can with reason include amongst the rights which it enforces rights directly resulting to the person asserting them from the crime of that person:" at p. 596, quoting Fry L.J. in Cleaver v. Mutual Reserve Fund Life Association [1892] 1 Q.B. 147, 156. The other was: "On ordinary principles of insurance law an assured cannot by his own deliberate act cause the event upon which the insurance money is payable:" p. 595. The causation question is independent of the crime/public policy question and remains notwithstanding the removal of the other.

The legal problem in the present case arises because of the particular findings of fact which the trial judge made about the state of mind of

Mr. Lynch. Were it not for those findings, the case would have been indistinguishable from the decision in Kirkham's case [1990] 2 Q.B. 283; Cornhill C.J. was clearly surprised by the findings which the trial judge had made. I can understand his reaction. It might be thought that any person locked up in a cell was almost certainly being subjected to abnormal stresses which would be liable to cause him to act in an irrational fashion and do things which he would not normally contemplate; he may be all other suffer impulses which he would not normally suffer. He may be in all other respects a normal person. He may not be mentally ill or otherwise suffering from any disturbance of the mind. It is the general experience of those concerned with prison administration and the custody of persons in police stations that the risk of suicide or self-harm exists among those confined whether they be suffering from some frank mental condition or appear to be relatively undisturbed. Your Lordships have been referred to reports and statistics which support this and the risk is clearly recognised in the instructions and recommendations issued by the police authorities and the Home Department. The risk of suicide is a concern of those responsible for holding persons in custody and within their contemplation. But it was the trial judge who heard the evidence, including expert evidence, and made the findings, being fully aware of their significance, and his findings have not been challenged.

*The facts*

Mr. Lynch committed suicide whilst left in a police cell unobserved for a period of about 8 minutes between 1.57 p.m. and 2.05 p.m. He had been identified as a suicide risk. He had however been put in a cell with a defective door. The glass spy-hole was broken and the glass missing. In fact flap on the door was also defective and could not be shut properly. In fact it was left open. This created what was a known opportunity for a prisoner to rig a ligature and strangle himself. It was this opportunity which Mr. Lynch took.

He was treated as a suicide risk because he had earlier that day whilst in a cell at the magistrates' court attempted to throttle himself. At the police station he had been seen by a doctor between 1.40 p.m. and 1.50 p.m. who was able to observe marks upon his neck consistent with that p.m. was able to observe marks upon his neck consistent with that having occurred. He claimed to be bored. The doctor's assessment was that he appeared calm and rational with no evidence of mental disturbance. Judge White found:

"In this case the deceased at the time he took his own life was not suffering from any marked medical or psychiatric condition. On the evidence, I am unable to conclude other than that he was, when he took the decision to end his life, of sound mind . . . The risk of suicide covers not only that which can be attributed to the irrational decision of persons of adequately sound mind. As the doctor pointed out, some people kill themselves when they are not depressed. The deceased here was of sound mind in that his judgment, in the difficult circumstances in which he found himself and had now to face, was not impaired."

(The "difficult circumstances" referred to were that Mr. Lynch was facing a trial on serious criminal charges.)

388

Lord Hobhouse
of Woodborough

Reeves v. Comr. of Police (H.L.(E.))

The Weekly Law Reports 30 July 1999

[1999]

The character of the act in question has been well described by my noble and learned friend, Lord Hope of Craighead: "the nature of an act of suicide by a person who is of sound mind ... is a deliberate act of self-destruction by a person who intends to end his own life." Mr. Lynch's act was deliberate and voluntary and no question of its being uninformed arises. Indeed it was because he knew of the defendant's oversight that he was in a position to take advantage of it.

### Kirkham v. Chief Constable of the Greater Manchester Police

In this case the Court of Appeal held [1990] 2 Q.B. 283 that a prisoner's wife was entitled to recover damages in the tort of negligence for the suicide of her husband whilst in custody. But that case was specifically decided on the basis that Mr. Kirkham had at the material time been suffering from clinical depression. Lloyd L.J. said, at p. 290:

"So I would be inclined to hold that where a man of sound mind commits suicide, his estate would be unable to maintain an action against the hospital or prison authorities, as the case might be. Volenti non fit injuria would provide them with a complete defence ... But in the present case Mr. Kirkham was not of sound mind. True, he was sane in the legal sense. His suicide was a deliberate and conscious act. But Dr. Sayed, whose evidence the judge accepted, said that Mr. Kirkham was suffering from clinical depression. His judgment was impaired ... he was not truly volens."

This decision was binding upon Judge White in the present case. He followed what Lloyd L.J. said and concluded that volenti non fit injuria provided the defendant with a defence. (He was prepared to hold that the claim failed on other grounds as well.)

### In the Court of Appeal

There was no appeal against Judge White's findings of fact. Only points of law were raised on appeal to the Court of Appeal (causation, volenti non fit injuria, novus actus interveniens, public policy/ex turpi causa, and contributory negligence). The Court of Appeal decided the appeal (as they were bound to) on the basis of the judge's findings of fact. The suicide was the deliberate act of a man of sound mind. The majority allowed the appeal because they held that as a matter of law, regardless of Mr. Lynch's state of mind, the defences of lack of causation and volenti were not apt.

I have already quoted from the judgment of Lord Bingham C.J. The reasoning of Buxton L.J. was similar but went rather further. He gave a number of grounds for rejecting the causation/volens argument. He held that the defence was inconsistent with the duty which contemplated and was directed to the very act of suicide; he adopted the alternative ground of Farquharson L.J. in Kirkham's case, p. 295: "the defence is inappropriate where the act of the deceased relied on is the very act which the duty cast upon the defendant required him to prevent." This is a mistaken analysis. The act of the deceased relied upon as providing the defence is not the act of suicide: it is the voluntary choice which precedes the act of suicide. His second ground involves a similar error; he suggests that the claim could never succeed and the duty is owed to those who are of sound mind as well as to those who are not. The defence does not affect or negative the duty of care. It presupposes the existence of such a duty and that it has been broken in a factually relevant way. Where, as in Kirkham's case and

the New Zealand case Pallister v. Waikato Hospital Board [1975] 2 N.Z.L.R. 725, the deceased was not of sound mind at the relevant time, the defence will fail. As one accepts, the cases where the defence will succeed will be exceptional. But this is not a reason for denying the defence when exceptionally such a case occurs. Buxton L.J. and Lord Bingham of Cornhill C.J. argued that evidentially it was impractical to apply a rule which involved examining the deceased's state of mind and considering whether or not he had acted voluntarily. The difficulties are for the defendant. The burden of proof, either legal or evidential, is upon him: Williams v. Birmingham Battery and Metal Co. [1899] 2 Q.B. 338. In the exceptional case where the defendant can satisfy the judge of fact, the finding should be acted upon. Similarly Buxton L.J. argued that the situation did not meet the technical features of the defence of volenti since it did not involve the element of acceptance of risk. There are two answers to these arguments. First, the deceased did voluntarily accept the consequence of the defendant's negligence; observing what had occurred, he voluntarily chose to take advantage of it. Secondly, even were the strict criteria of volenti not satisfied, there still remains the question of legal causation and the principle that a plaintiff cannot complain of the consequences of his own free and deliberate choice.

The proposition of law facing the defendant on this appeal is that the scope of the duty of care which he owed to the deceased (and which he broke) precludes any scope for relying on the causation and volenti defences—that as a matter of law they are not apt and therefore cannot be entertained.

### Causation

My Lords, causation as discussed in the authorities has been complicated both by conflicting statements about whether causation is a question of fact or of law or, even, "common sense" and by the use of metaphor and Latin terminology, e.g., causa sine qua non, causa causans, novus actus and volenti, which in themselves provide little enlightenment and are not consistently used.

At one level causation is purely a question of fact. It is a question of fact whether event A was a cause of event X. To simplify, it is a factual question whether event X would still have occurred if event A had not. However facts are not that simple. Virtually every event will have a number of antecedent facts which satisfy such a factual test. The ordinary use of language then distinguishes between them, choosing some and discarding others. The presence of oxygen is a necessary cause of combustion yet it is not normally treated as being a cause. This is because it is part of the normal environment and therefore is disregarded when identifying the cause of some abnormal event. (In certain circumstances, oxygen is not or should not be part of the normal environment, e.g. in tanks used for the sea carriage of petroleum, in which case its presence would be identified as a cause.) The ordinary use of language makes a distinction, independent of any legal concept, between the normal and the abnormal in describing something as a cause.

This use of language is most easily observed in relation to physical events but is also applied to human conduct. Reasonable human responses to situations are not treated as causative: they are a normal consequence of the antecedent event and it is that event which is described as the cause. Thus the reasonable response of a rescuer to an accident caused by the

negligence of another would not without more be described as a cause of an injury suffered by the rescuer. Similarly, to act reasonably on the faith of some misinformation is normally described as a consequence not as a cause. Human conduct, which is not entirely reasonable, for example, where it is itself careless, but is within the range of human conduct that is foreseeable and normally contemplated as not unlikely, may add a further cause of the relevant subsequent event but would not normally mean that an earlier relevant event ceased also to be *a* cause of that later event. Careless conduct may ordinarily be regarded as being within the range of normal human conduct when reckless conduct ordinarily would not.

Any disputed question of causation (factual or legal) will involve a number of factual events or conditions which satisfy the "but for" test. A process of evaluation and selection has then to take place. It may, for example, be necessary to distinguish between what factually are necessary and sufficient causes. It may be necessary to distinguish between those conditions or events which merely provide the occasion or opportunity for a given consequence and those which in the ordinary use of language would (independently of any imposed legal criterion) be said to have caused the relevant consequence. Thus certain causes will be discarded as insignificant and one cause may be selected as *the* cause. It is at this stage that legal concepts may enter in, either in a way that is analogous to the factual assessment—as for "proximate" cause in insurance law (bearing in mind that responsibility may not be exclusive). In the law of tort it is the attribution of responsibility to humans that is the relevant legal consideration.

The attribution of human responsibility is often a complex exercise since it involves an examination of the legally relevant features of the consequence in question and the legally relevant features of the conduct complained of (e.g. *The Empire Jamaica* [1957] A.C. 386) in conjunction with or in contrast to other human conduct which may also be factually relevant. Legal criteria (maybe fact-sensitive) have to be applied. At this level causation is a question of law. Now is not the time to enter upon an exhaustive examination of the relevant legal criteria. For present purposes two categories are directly relevant.

Before examining these two categories, however, I would stress three points. First, a distinction is drawn between natural and human phenomena. Save in theologically inspired language now long discarded, responsibility is not attached to natural events. The only consideration to which they give rise is remoteness. Secondly, human conduct in contrast can have a double relevance, both to remoteness and to attracting legal and moral responsibility. But, for most purposes in the law, and in particular in the law of tort, all a plaintiff need prove is that the defendant's tort was a cause of the loss in respect of which the plaintiff claims. If two or more tortfeasors have each contributed to causing the plaintiff's loss, each of them is severally liable for that loss. Remoteness is, again, the only relevant consideration. Unless the conduct of one tortfeasor has been such as to take the consequence out of the scope of another's tortious duty and render it too remote, the liability of one does not preclude the claim of the plaintiff against each.

Thirdly and most importantly in the present context, there is a radical distinction between the conduct of the plaintiff and the conduct of third parties. To overlook this distinction will inevitably lead to error. At one level where it merely involves some lack of care or breach of duty it

reduces but does not negative the plaintiff's right of recovery: this is the position (now) where there is contributory negligence. Failure to mitigate can be similarly analysed (though it can also be analysed pro tanto in terms of remoteness or causation). Where deliberate voluntary conduct of the plaintiff is involved in the knowledge of what the defendant has done, the plaintiff cannot disclaim responsibility for the consequence: he has caused his own loss. His conduct has a different impact to that of a third party.

*Remoteness*

The first category is the concept of remoteness. In the law of tort, the question is whether the consequence complained of, although factually caused by the defendant's act or omission, was legally too remote. This in turn, in relation to negligence, involves an inquiry into what was reasonably foreseeable by the defendant at the relevant time and what matters came within the scope of the duty of care which the defendant owed to the plaintiff: *The Wagon Mound* [1961] A.C. 388; *Caparo Industries Plc. v. Dickman* [1990] 2 A.C. 605. Where other factually causative human conduct is concerned, the application of these tests provides the legal answer. Foreseeable human conduct which falls within the scope of the duty of care is not too remote, even if dishonest or criminal. A clear illustration of this is the well known case of *Stansbie v. Troman* [1948] 2 K.B. 48. A decorator was left in charge of the plaintiff's house. He went out to buy some more rolls of wall paper leaving the front door unlocked. As a result a burglar was able to enter and steal the plaintiff's diamond bracelet. The decorator was liable notwithstanding the intervening criminal act of the burglar. The burglar's act was both foreseeable and within the scope of the duty owed by the defendant to the plaintiff. (Of course this does not mean that the burglar was not also legally responsible.) The conclusion can be expressed in a number of ways: the defendant's negligence caused the plaintiff's loss; the plaintiff's loss was not too remote; the burglar's act was not a novus actus interveniens. As discussed in *Environment Agency (formerly National Rivers Authority) v. Empress Car Co. (Abertillery) Ltd.* [1998] 2 W.L.R. 350, it is necessary to evaluate the subsequent human intervention in conjunction with the essential character of the fault of the defendant.

This principle also extends to conduct of the plaintiff. Was the conduct of the plaintiff foreseeable? Was it within the scope of the duty of care owed by the defendant to the plaintiff? Where the plaintiff is a child, the predictable conduct of the child will not make the child's injury too remote; indeed it is usually the foundation of the defendant's liability to the child: *Yachuk v. Oliver Blais Co. Ltd.* [1949] A.C. 386. Where the defendant's conduct has created a dangerous situation either for the plaintiff or another, the conduct of the plaintiff in response to that danger will not be too remote: *Scott v. Shepherd* (1773) 3 Wils. 403; *Haynes v. Harwood* [1935] 1 K.B. 146. Where the defendant has set out to deceive the plaintiff, the success of that deception even though others might not have been deceived does not render the plaintiff's loss too remote: intended consequences are not too remote. Many other examples could be given. Where the conduct of the plaintiff has also been blameworthy, justice is achieved by applying the provisions of the Law Reform (Contributory Negligence) Act 1945. On the other hand, conduct, whether of the plaintiff or any other person, which is of such a character as to remove the relevant

factual consequence from the scope of the relevant duty owed by the defendant to the plaintiff or take it outside the range of what was reasonably foreseeable, will by the same criteria make the consequence too remote for it to be said that it was caused by the relevant act or omission of the defendant.

Thus far, my Lords, these legal principles present no obstacle to the plaintiff in the present case. The suicide of Mr. Lynch was foreseeable; it was within the scope of the duty of care owed by the defendant to Mr. Lynch. If the plaintiff or some other person had an independent cause of action of their own against the defendant, say for nervous shock, in connection with what occurred that day in Kentish Town Police Station, the conduct of Mr. Lynch would not make the loss suffered by such a person too remote. The Court of Appeal and your Lordships have been right to reject the defence of novus actus. But where, in my judgment, the majority of the Court of Appeal went wrong was to stop there. They rejected wholly any relevance of the second category of legal principle. It would be wrong to be too critical since, as was illustrated by the argument in your Lordships' House, counsel, too, tended to make the same error.

*The responsibility of the plaintiff*

The second category of legal principle to which I must refer is that which relates to the responsibility of the plaintiff for that of which he complains. A number of principles are involved. First there is the fundamental principle of human autonomy. Where a natural person is not under any disability, that person has a right to choose his own fate. He is constrained in so far as his choice may affect others, society or the body politic. But, so far as he is himself alone is concerned, he is entitled to choose. The choice to commit suicide is such a choice. A corollary of this principle is, subject to the important qualification to which I will refer, the principle that a person may not complain of the consequences of his own choices. This both reflects coherent legal principle and conforms to the accepted use of the word "cause;" the person's choice becomes, so far as he is concerned, the cause. The autonomy of the individual human confers the right and the responsibility.

To qualify as an autonomous choice, the choice made must be free and unconstrained—i.e. voluntary, deliberate and informed. If the plaintiff is under a disability, either through lack of mental capacity or lack or excess of age, the plaintiff will lack autonomy and will not have made a free and unconstrained choice. Child plaintiffs come into this category. Both as a matter of causation and the attribution of responsibility, their conduct does not (without more) remove the responsibility of the defendant or transfer the responsibility to the child plaintiff: *Yachuk v. Oliver Blais Co. Ltd.* [1949] A.C. 386. Similarly, plaintiffs suffering from a temporary or a more serious loss of mental capacity (*Kirkham v. Chief Constable of the Greater Manchester Police* [1990] 2 Q.B. 283; *Pallister v. Waikato Hospital* [1975] 2 N.Z.L.R. 725; *Pigney v. Pointer's Transport Services Ltd.* [1957] 1 W.L.R. 1121), will not have made the requisite free and unconstrained choice. Where the plaintiff's lack of mental capacity has been caused by the defendant's breach of duty, the entitlement to recover is all the stronger. On the same basis choices made under constraint of circumstances, such as those made by rescuers or persons placed in immediate danger, will not carry with them the consequence that the choice was the sole cause of the subsequent injury to the plaintiff nor will it result in his bearing the sole

responsibility for his injury: *Haynes v. Harwood* [1935] 1 K.B. 146: cf. *Cutler v. United Dairies (London) Ltd.* [1933] 2 K.B. 297. The same applies if the plaintiff's choice was vitiated by misinformation or lack of information. In the context of employment, the question of the reality of the employee's assent and his acceptance of risk has been the subject of many decisions; perhaps the most illuminating discussion for present purposes is to be found in *Imperial Chemical Industries Ltd. v. Shatwell* [1965] A.C. 656, particularly *per* Lord Hodson, at pp. 680–681, where he stresses that the plaintiff's conduct cannot be described as voluntary unless he truly had a free choice. (The case also, like *Stapley v. Gypsum Mines Ltd.* [1953] A.C. 663, illustrates the distinction between lack of care for one's own safety and the true acceptance of risk.) These qualifications are fundamental and are the basis of the decisions where a plaintiff has been held entitled still to sue notwithstanding his having made a choice which led to the event of which he complains.

The simplest way in which to express the relevant principles, both the basic principle of autonomy and the qualification, is in terms of causation. Both as a matter of the ordinary use of language and as a matter of law it is correct to say that the plaintiff's voluntary choice was *the* cause of his loss. Another partial expression of this principle is the maxim *volenti non fit injuria*. This maxim, originating from a rather different Roman law context, is a notorious source of confusion: *Dann v. Hamilton* [1939] 1 K.B. 509. In intentional torts it means consent by the plaintiff to the act which would otherwise be the tort. In the law of negligence it means the acceptance variously of the risk created by the defendant's negligence or of the risk of the defendant's negligence. In such cases it is probably best confined to cases where it can be said that the plaintiff has expressly or impliedly agreed to exempt the defendant from the duty of care which he would otherwise have owed (*Nettleship v. Weston* [1971] 2 Q.B. 691), a formulation which, it will be appreciated, immediately brings the maxim into potential conflict with section 2 of the Unfair Contract Terms Act 1977. It will also be appreciated that so interpreted the maxim would only have an artificial application to the facts of the present case. The suggestion that Mr. Lynch was agreeing to exempt the police authority from anything is both objectionable and wholly unrealistic. (It may be that this consideration understandably coloured counsel's presentation of the defendant's case.)

But, my Lords, if the question raised by Mr. Lynch's conduct is seen as a question of causation, these artificialities fall away. If Mr. Lynch, knowing that the police officers had put him in a cell with a defective door and had failed to close the hatch, then voluntarily and deliberately, in full possession of his faculties, made the rational choice to commit suicide, the intervention of his subsequent death. He was not, on the judge's findings, acting under any disability or compulsion. He made a free choice: he is responsible for the consequence of that choice.

*Conclusion*

I would allow the appeal and direct judgment to be entered for the defendant. The argument of the plaintiff and the decision of the majority of the Court of Appeal disclose errors of law. They fail to have adequate regard to the fact that the action is to be decided as if Mr. Lynch was the plaintiff. They treat remoteness as the sole criterion of recovery. They do

not recognise the principle that a plaintiff who by his own *voluntary* choice deliberately chooses to cause the loss which he seeks to recover from the defendant cannot thereafter say that his choice was not the sole cause of his loss. The decision of the Court of Appeal is also worrying since it fails to provide any dividing line between cases where the plaintiff can recover and those where he cannot and, in view of the findings of fact that were made in the present case, leaves it open for any suicide to recover once some negligence on the part of the prison or police authorities has been shown. I do not consider that this is the law.

*Appeal allowed.*
*Damages reduced by 50 per cent.*

Solicitors: *Metropolitan Police Solicitor; Christian Fisher & Co.*

[Reported by SHIRANIKHA HERBERT, *Barrister*]

[CHANCERY DIVISION]

**In re CAMERON, DECD.**

[1996 Ch. C. No. 1199]

1999 Jan. 25, 26, 27, 28, 29;    Lindsay J.
March 24

*Will—Ademption—Double portion—Mother bequeathing estate to sons in equal shares—Mother's attorneys subsequently making provision for education of grandchild—Whether gift by mother amounting to portion—Whether inter vivos gift to grandchild capable of adeeming son's legacy*

In 1974 the deceased executed a will by which the whole of her net estate was divided equally between her sons, the four defendants. Having been diagnosed as suffering from a condition that caused the progressive deterioration of her mental capacity, the deceased executed an enduring power of attorney in 1989 under which the second, third and fourth defendants were appointed her attorneys with authority to act on her behalf in relation to all her property and affairs. In 1991 the attorneys established an educational trust for the benefit of the second defendant's children and, without consulting the first defendant, made provision towards the education of his son, intending that such provision would be taken into account against the first and second defendants' shares in the deceased's estate. On the deceased's death in 1992 one of her executors applied for a determination as to whether the first defendant's share in the deceased's estate was adeemed by the gift towards the education of his son. The first defendant counterclaimed that the inter vivos

---

since a gift by a mother ordinarily did not constitute a portion and therefore could not adeem a legacy.
On the application:—

*Held*, that for a gift to be a portion it sufficed that either the father or the mother of the donee made it to establish the child in life or make substantial provision for him; that whether a gift was a portion and, where there were two portions, whether there was ademption depended upon the intention of the donor; that there was a rebuttable presumption that a donor would not intend to give two portions to the same donee and that where he made two gifts, both having the characteristics of a portion, the latter, in the absence of a contrary indication in admissible evidence, was wholly or in part in substitution for, and thus ademed, the former; that the donee's knowledge of the terms of either the will or the inter vivos gift was not a necessary condition for a ademption of one portion by another; that an inter vivos gift to a son's child which could fairly be seen as intended for the substantial benefit of the son could adeem the son's legacy; and that, accordingly, since there was nothing to rebut the presumption, the first defendant's share in the deceased's estate was pro tanto ademed by the inter vivos provision for his son (post, pp. 408B–F, 409E–F, 411C–D, F–412A, 413G, 418D–G, 419B–C, 420A–C, 424H).

*In re Pollock; Pollock v. Worrall* (1885) 28 Ch.D. 552, C.A.; *In re Eardley's Will; Simeon v. Freemantle* [1920] 1 Ch. 397 and *In re Vaux; Nicholson v. Vaux* [1939] Ch. 465, C.A. applied.

*Lord Chichester v. Coventry* (1867) L.R. 2 H.L. 71, H.L.(E.) considered.

The following cases are referred to in the judgment:

*Ashton, In re; Ingram v. Papillon* [1897] 2 Ch. 574; [1898] 1 Ch. 142, C.A.
*C. (A Patient), In re* [1991] 3 All E.R. 866
*Chapman v. Salt* (1709) 2 Vern. 646
*Chichester (Lord) v. Coventry* (1867) L.R. 2 H.L. 71, H.L.(E.)
*Cooper v. Macdonald* (1873) L.R. 16 Eq. 258
*D. (J.), In re* [1982] Ch. 237; [1982] 2 W.L.R. 373; [1982] 2 All E.R. 37
*Durham v. Wharton* (1832) 5 Sim. 297; (1836) 3 Cl. & F. 146, H.L.(E.)
*Eardley's Will, In re; Simeon v. Freemantle* [1920] 1 Ch. 397
*Furness, In re; Furness v. Stalkartt* [1901] 2 Ch. 346
*George's Will Trusts, In re; Barclay's Bank Ltd. v. George* [1949] Ch. 154; [1948] 2 All E.R. 1004
*Hoskins v. Hoskins* (1706) Prec.Ch. 263
*Kershaw's Trusts, In re* (1868) L.R. 6 Eq. 322
*Kirk v. Eddowes* (1844) 3 Hare 509
*Lacon, In re; Lacon v. Lacon* [1891] 2 Ch. 482, C.A.
*Lowther v. Bentinck* (1874) L.R. 19 Eq. 166
*M'Clure v. Evans* (1861) 29 Beav. 422
*Montefiore v. Guedalla* (1859) 1 De G.F. & J. 93
*Pankhurst v. Howell* (1870) L.R. 6 Ch.App. 136
*Pilkington's Will Trusts, In re* [1961] Ch. 466; [1961] 2 W.L.R. 776; [1961] 2 All E.R. 330, C.A.; [1964] A.C. 612; [1962] 3 W.L.R. 1051; [1962] 3 All E.R. 622, H.L.(E.)
*Pollock, In re; Pollock v. Worrall* (1885) 28 Ch.D. 552, C.A.
*Powys v. Mansfield* (1836) 3 My. & Cr. 359
*Pye, Ex parte; Ex parte Dubost* (1811) 18 Ves. 140
*Pym v. Lockyer* (1840) 5 My. & Cr. 29
*R. (Enduring Power of Attorney), In re* [1990] 2 W.L.R. 1219; [1990] 2 All E.R. 893