UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

KIMBERLY GENEREUX,

                Plaintiff,

v.

COLUMBIA SUSSEX CORPORATION
STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., WESTIN HOTEL
MANAGEMENT L.P.

                Defendants.

C.A. NO. 05-CV-10879-JLT

**MEMORANDUM IN OPPOSITION TO MOTION TO STRIKE AFFIDAVIT OF JOHN MCGOVERN**

---

Defendants Columbia Sussex Corporation ("Columbia Sussex"), Starwood Hotels and Resorts Worldwide, Inc. ("Starwood") and Westin Hotel Management, L.P. ("Westin") respectfully submit the following Memorandum in opposition to Plaintiff's Motion to Strike Portions of the Affidavit of John McGovern, which was submitted in support of Defendants' Motion for Summary Judgment. Plaintiff moves to strike portions of McGovern's Affidavit based upon the alleged use of non-expert opinion testimony in violation of Federal Rule of Evidence 701 and the use of testimony allegedly contradictory to McGovern's deposition testimony. Both contentions are false and will be addressed in turn.

Defendants also note that Plaintiff's suggestion that McGovern may have contradicted himself may be Plaintiff's attempt to assert that a trial is necessary to test McGovern's credibility. Not only is there no support for Plaintiff's suggestion of contradictory testimony, but also there was nothing proffered by Plaintiff to refute McGovern's testimony. There is no need for a trial.

### A. Alleged Non-Expert Opinion Testimony

First, Plaintiff moves the Court to strike portions of McGovern's Affidavit, namely paragraph 21, because McGovern allegedly "proffered non-expert opinion testimony concerning the foreseeability of the attack upon Ms. Genereux ... in violation of Fed. R. Evid. 701." The specific language of the Affidavit to which Plaintiff is referring provides as follows: "Starwood and Westin had no reason to anticipate that any criminal sexual activity, trespass or rape would occur at The Westin Casuarina in 2002 or prior such as the plaintiff claims happened on May 3, 2002." Contrary to Plaintiff's assertion, this testimony represents a statement of fact based on the personal knowledge acquired by McGovern in his position at that time as Vice President of Franchise Operations in 2001 and 2002. (McGovern Aff. at ¶ 2). Therefore, based on his position at Starwood, McGovern has acquired the requisite personal knowledge to testify that he had no reason to anticipate the criminal activity that allegedly occurred.

Even if the Court were to find that McGovern proffered opinion testimony in his Affidavit, such testimony certainly did not rise to the level of argument and, in any event, merely represented lay opinion based upon his personal knowledge, all of which is appropriate and permissible within the confines of Federal Rule of Evidence 701.

An affidavit complies with Federal Rule of Civil Procedure 56(e) if it presents evidence which would be admissible at trial. As a general rule, this requires that the affiant have personal knowledge of the information contained in the affidavit. For an explanation, see the Seventh Circuit opinion in <u>Visser v. Packard Engineering Associates, Inc.</u>, 924 F.2d 655 (7th Cir. 1991) which provides as follows:

> The proper ground for excluding the affidavits is that witnesses who are not expert witnesses ... are permitted to testify only from their personal knowledge. Testimony about matters outside their personal knowledge is not admissible, and if not admissible at trial neither is it

> admissible in an affidavit used to support or resist the grant of summary judgment. In fact Rule 56(e) incorporates [Fed. R. Evid. 602] in words as well as by reference, by stating that "supporting and opposing affidavits shall be made on personal knowledge." It is true that "personal knowledge" includes inferences -- all knowledge is inferential -- and therefore opinions. But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.

Id. at 659 (internal citations omitted). In Smith v. F.W. Morse & Co., 76 F.3d 413 (1st Cir. 1996) and United States v. Doe, 960 F.2d 221 (1st Cir. 1992) the First Circuit cited to the language provided by the court in Visser to explain the admissibility of evidence grounded on personal knowledge and personal inferences. Therefore, as the court explained in Visser, any inference or opinion based upon the personal knowledge of McGovern is also admissible into evidence and should not be stricken from the record.

**B. Alleged Contradictory Statements**

Second, Plaintiff moves to strike paragraph 20 of McGovern's Affidavit, contending that the testimony therein is allegedly contradictory to McGovern's deposition testimony at pages 225-226 and 231-232. McGovern testified in paragraph 20 of his Affidavit as follows: "I was also asked in my deposition whether public area doors require high grade locks as is suggested in the [Quality Assurance Program of 2001 (hereafter "QAP")]. I have since re-examined the QAP, and I do not believe that the QAP recommends such high grade locks on public restroom doors. The decision whether to install locks on public restroom doors would be left to the operator of the hotel. The focus of the QAP as to safety in the bathrooms has to do with slips and falls, not criminal activity. To prevent the occurrence of slip and falls, the QAP suggest that the hotel operator post warning signs when employees are mopping the restroom floors."

McGovern's statement in paragraph 20 of his Affidavit clarifies his deposition testimony. At his deposition, McGovern testified that a standard of the QAP provided that "public area doors have locks that are high grade and difficult to force." He further agreed that a "public area door" could be defined to include "public restroom doors." However, as McGovern clearly noted in his Affidavit, he has re-examined the QAP. The QAP does not recommend high grade locks on public restroom doors. Rather, the focus of the QAP as to safety in the bathrooms has to do with slip and falls. This is supported by McGovern's deposition testimony on the very same page cited by Plaintiff for his allegedly inconsistent statement, page 226. After discussing the interpretation of "public area doors," McGovern confirmed the fact that the QAP addresses "safety signs to be used in conjunction with mopping" as the only standard set forth on restroom safety. (McGovern Dep. at pp. 226 – 229 annexed hereto as Exhibit "A". All other relevant portions of deposition testimony have been submitted to the Court pursuant to the affidavit of Plaintiff's counsel, Mark Itzkowitz). Accordingly, McGovern included in paragraph 20 of his Affidavit that to "prevent the occurrence of slip and falls, the QAP suggest that the hotel operator post warning signs when employees are mopping the restroom floors." There is nothing inconsistent about Mr. McGovern's testimony.

## CONCLUSION

**FOR ALL OF THESE REASONS**, Defendants respectfully request that Plaintiff's Motion to Strike Portions of the Affidavit of John McGovern be denied in its entirety.

Error! Unknown document property name.

*Dated*: March 31, 2008

*Yours respectfully,*

CORRIGAN JOHNSON & TUTOR
141 Tremont Street
Boston, MA 02111
(617) 338-0075

*By*: _____
John B. Johnson, #252580

-and-

MENDES & MOUNT, LLP
750 Seventh Avenue
New York, New York 10019
(212) 261-8000

Attorneys for Defendants
Columbia Sussex Corporation
Starwood Hotels & Resorts
    Worldwide, Inc.
Westin Hotel Management, L.P.

**Error! Unknown document property name.**    5

Page 1

VOLUME I
PAGES 1-263
EXHIBITS 1-12

COMMONWEALTH OF MASSACHUSETTS
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO.:  05-CV-10879-JLT

KIMBERLY GENEREUX,                )
                                  )
               Plaintiff,         )
                                  )
vs.                               )
                                  )
                                  )
COLUMBIA SUSSEX CORPORATION,      )
ET AL,                            )
                                  )
               Defendant.         )

DEPOSITION OF JOHN B. MCGOVERN, a witness called on behalf of the Plaintiff in the above-entitled cause, taken before Dawn Mack-Boaden, Notary Public in and for Commonwealth of Massachusetts, pursuant to the Massachusetts Rules of Civil Procedure, at the Law Offices of Mark F. Itzkowitz, 85 Devonshire Street, Boston, Massachusetts, on Monday, September 17, 2007, commencing at 10:05 a.m.

EYAL COURT REPORTING, INC., BOSTON, MA
(800) 322-3925

Page 2

APPEARANCES

Mark F. Itzkowitz, Esquire
LAW OFFICE OF MARK F. ITZKOWITZ
85 Devonshire Street, Suite 1000
Boston, Massachusetts 02109
(617) 227-1848
Counsel on behalf of the Plaintiff

John B. Johnson, Esquire
Corrigan, Johnson & Tutor
141 Tremont Street
Boston, Massachusetts 02111
(617) 338-0075
Counsel on behalf of the Defendants

Page 3

INDEX

EXAMINATION:    DIRECT   CROSS   REDIRECT   RECROSS

By Mr. Itzkowitz    4

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | System License Agreement | 101 |
| 2 | Printout from Web Site of Columbia Sussex | 107 |
| 3 | Page from Web Site of Columbia Sussex | 108 |
| 4 | Westin Corporate Identify Manual | 112 |
| 5 | Page in Columbia Sussex Manager's Manual | 123 |
| 6 | Westin Marketing & Sales Manual Dated 1995 | 126 |
| 7 | Property Maintenance Reference Guide | 188 |
| 8 | Westin Quality Assurance Program QAP-2000 | 215 |
| 9 | Westin Quality Assurance Program QAP-2001 | 227 |
| 10 | Document Listing Standards for Westin, January, 2001, Fitness Centers & Pools | 231 |
| 11 | Westin Quality Assurance Program QAP-2001 Guest Room, bathroom, & Corridor Checklist | 232 |
| 12 | Design Review Memo | 250 |

*** Exhibits were retained by Attorney Itzkowitz.

Page 4

P-R-O-C-E-E-D-I-N-G-S

JOHN B. MCGOVERN, a witness first having been satisfactorily identified by the production of his driver's license, was sworn and testified as follows:

MR. ITZKOWITZ: What do you want to do on stipulations?

MR. JOHNSON: All objections, except as to the form of the question, are reserved until the time of trial. Motions to strike are reserved until the time of trial.

Mr. McGovern would like to read and sign the transcript after it's been prepared, and we'll get it back to you within 30 days.

MR. ITZKOWITZ: Sounds great. Okay.

DIRECT EXAMINATION
BY MR. ITZKOWITZ:
Q. Can you tell us your full name, sir.
A. John Bernard McGovern.
Q. And could you spell McGovern for us, please.

Page 5

A. M-C-G-O-V-E-R-N.
Q. Mr. McGovern, you've been designated to testify in response to a -- you've been designated to testify on behalf of the Westin Corporations; is that correct?
A. Yes.
Q. Okay. Are you also designated to testify on behalf of Starwood?
A. Yeah.
Q. Okay. Great. Do you know how it was that you were chosen to be the person to testify on behalf of those corporations?
A. Yes.
Q. How is that?
A. I believe the first person, Mary Hynes, she wasn't available; so they called me.
Q. Okay. And what was Mary Hynes' title?
A. What is it or what was it?
Q. I'm sorry, what is it?
A. Mary is the director of franchise operations and services, I believe. Vice president. Did I say that?
Q. No.
A. VP.

Page 222

1   A.  Yes.
2   Q.  Do you know what safety, security, and loss
3   control procedures and policies is referred to in
4   that item?
5   A.  No, I don't.
6   Q.  Would there have been a standard somewhere
7   that would have set out safety, security, and loss
8   control procedures and policies for garage
9   associates to follow?
10  A.  It appears that there is, yes.
11  Q.  Do you know whether that's contained in
12  this document or if it's somewhere else?
13  A.  It would have to be somewhere else.  This
14  is just clearly the standards --
15  Q.  Okay.
16  A.  What that loss -- security and loss control
17  policy -- procedure and policy looks like, I don't
18  know.
19  Q.  Okay.  In the section headed Accident and
20  Loss Prevention, there's a provision that says:  A
21  member of the management staff is involved in guest
22  communication regarding incidents of loss or injury.
23     Do you see that?
24  A.  Yes.

Page 223

1       MR. JOHNSON:  Where are you reading
2   from, Mark?
3       MR. ITZKOWITZ:  That was the second item
4   under the accident and loss investigation on
5   page 73.
6       MR. JOHNSON:  Yes.  Thank you.
7   BY MR. ITZKOWITZ:
8   Q.  Okay.  Again, that would -- that would have
9   been a standard of the Westin in January of 2000?
10  A.  Yes.
11  Q.  When it says guest communication, do you
12  know what that is referring to?
13  A.  I would assume that anything that involves
14  a guest, someone from management would be in
15  communication with them.
16     An example would be if you checked into a
17  hotel room and your watch was missing.  So you'd
18  call down and say I think my watch has been stolen.
19     They'd respond.  Perhaps the local police
20  would be called in.  Someone from management would
21  say, Mark, we understand your watch has been stolen.
22  We're looking in to it.  We'll keep you apprised.
23  Q.  Okay.  So as you understand it, the
24  reference is as to communication between the guest

Page 224

1   and the hotel as opposed to between the hotel and
2   Starwood or Westin brand?
3   A.  No; I see it between the hotel operator and
4   the guest that had the incident.
5   Q.  Okay.  And the next item, again, it says:
6   All activities are completed while displaying or
7   carrying a concerned attitude toward the guest of
8   patron.
9       That would have been a standard --
10  A.  Yes.
11  Q.  -- back in January of 2000?
12  A.  Yes.
13  Q.  On page 120 on the same document, there's a
14  bold heading that talks about exterior lighting.
15  It's about the middle of the page.  Do you see that?
16  A.  Yes.
17  Q.  There's an item that starts, Hotel entrance
18  and exterior areas are well illuminated.  Adequate
19  timing/sensing, quote, on/off, closed quote, device
20  is installed and working.  Do you see that?
21  A.  Yes.
22  Q.  This was, again, a standard of Westin?
23  A.  Yes.
24  Q.  Did Westin require its hotels to have

Page 225

1   timing devices on -- on exterior lights?
2   A.  Not to my knowledge.  I think if you did
3   have an area that -- if you had a huge parking lot
4   and the back part of it was never used and you want
5   to put a sensor on it to save some electricity, that
6   was an option you could use.
7       But I don't know that we ever had a
8   standard saying you had to use timers or sensors to
9   turn your lights on and off.
10  Q.  Okay.  I had asked you earlier today if
11  there were any more specific standards dealing with
12  security measures, and there is something that
13  appears on page 126.
14     I just want to make sure that this was a
15  standard of Westin back in January of 2000.  On
16  public area doors, the second item -- and it's
17  towards the top of the page.
18  A.  Okay.  Yes.
19  Q.  It says:  Public area doors have locks that
20  are high grade and difficult to force.
21     Do you see that?
22  A.  Yes.
23  Q.  Okay.  That would have been a standard?
24  A.  Yes.

Page 226

1    Q.  Does that mean, since it was a standard,
2  that all Westin Hotels, whether franchised or owned
3  and operated, had to have high grade locks that are
4  difficult to force on public area doors?
5    A.  Yes.
6    Q.  Okay.  And would public area doors have
7  included such things as public restroom doors?
8    A.  Yes.
9    Q.  Okay.  On page 129 of the same document
10 there's a section about the middle -- maybe just
11 under the middle of the page.  It talks about
12 restroom safety.  Do you see that?
13   A.  Yes.
14   Q.  And there's one item in the section that
15 says:  Appropriate safety signs are used in
16 conjunction with mopping.
17      Do you see that?
18   A.  Yes.  Appropriate safety signs are used in
19 conjunction with mopping, yes.
20   Q.  Okay.  That would have been the standard
21 back in January of 2000; right?
22   A.  Yes.
23   Q.  That appears to be the only item listed
24 under the category of restroom safety.

Page 227

1      Do you -- is that the only standard, as far
2  as you know, that was set forth on restroom safety
3  for Westin Hotels?
4    A.  That's the only one that I know of.
5
6      (Whereupon, a break was taken in the
7      proceedings.)
8
9      MR. ITZKOWITZ:  Why don't we mark this
10     as the next one.
11
12     (Exhibit Number 9 was marked for
13     identification.)
14
15 BY MR. ITZKOWITZ:
16   Q.  Okay.  I've just handed you what we've
17 marked as Exhibit 9, which is, again, a Westin
18 Quality Assurance Program QAP-2001.
19     This one appears to be specific for the
20 front office, exterior, and public area checklist.
21 Do you see that?
22   A.  Yes, I do.
23   Q.  Have you ever seen this type of document
24 before?

Page 228

1    A.  You know, not that I can remember; but it
2  sure looks like a Westin standards manual for front
3  office and exterior and public area checklist.
4    Q.  Okay.  And, again, just flipping through it
5  randomly, do these appear to be the standards that
6  apply for the front office, the exterior, and the
7  public areas?
8    A.  I guess.  I mean, the brochure racks went
9  out when we turned on computers.  I mean, some of
10 these things are dated; but, yes.
11   Q.  Okay.  Let me call your attention to page
12 32 of this document.
13     The very last item, again, is one that's
14 captioned Restroom Safety.  Do you see that?
15   A.  Yes.
16   Q.  And, again, the only item mentioned in
17 there is that appropriate safety signs are used in
18 conjunction with mopping.  Do you see that?
19   A.  Yes.
20   Q.  Again, am I correct in understanding that,
21 to your knowledge, that's the only Westin safety
22 standard that applied to public restrooms?
23     MR. JOHNSON:  Objection.  It's a brand
24     standard; right?

Page 229

1      THE WITNESS:  Right; the brand standard.
2  Now, there were -- I'm sure they had smoke
3  detectors and sprinklers and, you know,
4  required in these areas.
5      But as far as, you know, in this manual,
6  it's identifying, you know, if the floor is
7  going to be wet and you're mopping, you want
8  to put the sign out so nobody comes in and
9  slips on the tile and falls down.
10 BY MR. ITZKOWITZ:
11   Q.  Okay.  I'll tell you what, let me back you
12 up.
13     The last two pages -- pages 31 and 32 --
14 have a category heading that says Public Restrooms,
15 and then the safety thing that I had you look at is
16 actually sort of a subcategory of that.
17   A.  Okay.
18   Q.  Let me just ask you to read these standards
19 to yourself.  Tell us when you're done.
20     MR. JOHNSON:  You're just talking about
21     under public restrooms?
22     MR. ITZKOWITZ:  Yes.
23     THE WITNESS:  Okay.
24 BY MR. ITZKOWITZ: