UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-10879-JLT

| | | |
|---|---|---|
| KIMBERLY GENEREUX, | ) | |
| Plaintiff | ) | |
| | ) | **PLAINTIFF'S PRE-TRIAL** |
| v. | ) | **MEMORANDUM** |
| | ) | |
| COLUMBIA SUSSEX CORPORATION, | ) | |
| STARWOOD HOTELS & RESORTS | ) | |
| WORLDWIDE, INC., and | ) | |
| WESTIN HOTEL MANAGEMENT, L.P., | ) | |
| Defendants | ) | |

## PLAINTIFF'S SUMMARY OF THE EVIDENCE

Ms. Genereux expects the evidence to prove the following. Sources of the evidence have been detailed in the Plaintiff's Memorandum in Opposition to the Defendants' Motion for Summary Judgment and are not referenced here.

## THE RAPE

On Friday, May 3, 2002, 48 year old Kimberly Genereux was raped in the women's restroom of the Hibiscus Spa building of the Westin Casuarina Hotel and Resort on Seven Mile Beach, Grand Cayman, Cayman Islands. She was visiting the Islands during a leave of absence from her work as an architect, related to the illness and untimely death of her sister. Ms. Genereux had visited the Caymans five or six times before 2002. She was a frequent visitor to the Westin Casuarina, having eaten in its restaurants, shopped at its gift shop, had a drink in its bar, visited its spa, and attended two public conferences at the Governor's Ballroom which is located adjacent to the spa

building, although she had not rented a room at the hotel.  She watched the Twin Towers fall on September 11, 2001 on a Westin Casuarina lobby television.  She was well acquainted with the restroom since it was made available to attendees of Governor's Ballroom conferences, and she had been directed to it as "the public restroom" by spa employees on the afternoon of the rape.

The evening of the rape, Ms. Genereux went for a walk along the beach, visited friends, shopped at Fosters in The Strand, and started walking back to her vacation condominium along West Bay Road, a well-lit main road in the Cayman Islands, carrying two plastic bags.  She was wearing a black skirt, top and shoes.  At approximately 10:45 p.m., a man stopped his van and offered Ms. Genereux a ride.  She declined.  As she continued walking, he slowed, stopped and again offered her a ride.  Again, she declined.  A little further up the road, in the vicinity of the Westin Casuarina, Ms. Genereux believed she saw the van approach from the opposite direction.  The driver did not make contact with her a third time.  She did not know whether he was a cab driver but she started to get nervous.  Knowing that she was approaching a dark, unpaved area along the road, she decided that she would be safer walking along the well-lit beach.

Ms. Genereux approached the beach access path located on the Westin Casuarina property, which was identified by a sign.  She found the path unlit, very dark and overgrown, and partially

2

blocked by a piece of machinery.  She considered it "scary" and felt that she would be safer walking along the hotel walkway through the hotel to the beach.

Ms. Genereux approached the spa building as she walked along the hotel walkway.  Having been unnerved by the van driver, and not having used a restroom in several hours, Ms. Genereux felt an urgent need to use the facility.  She went to the same women's restroom to which she had been directed earlier that day.

The women's restroom was located at a recessed end of a long corridor, adjacent to a mens room and near a storage or equipment room.  Photographs will show the approach to the spa building, restroom and stall.  It was open and well lit.  None of the photographs shows a "no trespass" sign.  No key was needed to enter.  No one was in the restroom.  Everything seemed normal. Ms. Genereux entered the second stall, locked the stall door, and sat on the commode.

Shortly afterward, Ms. Genereux heard the restroom door open and someone enter.  Through the louvered wooden stall door, she saw the lower torso and forearm of a man.  She yelled out that he was in the wrong room.  The man apologized, walked away, and left the restroom.  She took out her cell phone.

Very quickly, the door opened again, the lights were extinguished, plunging Ms. Genereux into total darkness, and a man entered.  Ms. Genereux could not see the man, could not

3

identify him as the man who had just entered and left, and could not identify him as the man who had driven the van or as another man she had seen along West Bay Road.  The Royal Cayman Islands Police ("RCIP") never have identified the rapist although they claim to have investigated several leads, conducted DNA tests, and spoke with the man Ms. Genereux saw along the road.  The RCIP noted that the restroom is so dark when the lights are extinguished that officers could not see the palms of their hands in front of their faces.  There is no evidence that anyone "stalked" her, "pursued" her or followed her from the road into the restroom, as the defendants contend.

Ms. Genereux yelled that she had a phone and was calling the police.  Her efforts to intimidate her assailant failed, as did her efforts to call the RCIP.  Wood from the louvered stall door flew at her face as her assailant smashed it.  The rapist pressed a knife hard against her throat, threatened to kill her and threatened "to cut [her] face up".  He pulled her skirt up around her waist and cutting upwards against her right hip, cut her underwear with the knife.  He raped her orally and vaginally.  He then ordered her to count to one hundred before she left the restroom.  He left.

Ms. Genereux waited, left the restroom and walked directly to the Westin Casuarina lobby.  No one was at the front desk.  A hotel guest directed her to a female bartender at a bar adjacent

4

to the lobby.  Ms. Genereux told the bartender that she had just been raped in the spa restroom and asked the bartender to call the police and hotel security guards.  The bartender told her that there were no security guards, and that "she couldn't call the police.  She had to call the manager".  The bartender offered no assistance while Ms. Genereux waited for the manager.  When a hotel employee arrived, he again refused Ms. Genereux' requests that he call the police.  Instead, he insisted that Ms. Genereux return to the restroom to show him what had occurred.  After questioning her about the broken wooden louver, the hotel employee had Ms. Genereux follow him back to the hotel and left her standing in a room alone for quite some time, without so much as a chair or a glass of water.  Hotel employees entered and left the room to conduct their business, but none would speak with her or respond to her requests for assistance.  One woman finally gave her a glass of water.

RCIP officers finally responded, had Ms. Genereux return to the scene of the rape again, and finally took her for hospital treatment.

The rape has had a devastating impact upon Ms. Genereux. Unable to function emotionally, she was terminated by Flansburgh Associates, Inc., her employer of eighteen years, notwithstanding her professional accomplishments and the high regard in which her employer had held her before the rape.  She has been in in-

5

patient and out-patient psychotherapy since the rape.  She has been diagnosed as suffering debilitating post-traumatic stress disorder, major depressive disorder, and dissociative disorder. She suffered physical injuries from the rape which have hindered her ability to defecate and which will require surgical repair. She is receiving social security disability.  She no longer has been able to perform even the function of a shop clerk in a small tourist town.  Her vocational abilities have been curtailed severely.  Her lost earning capacity nears one million dollars.

**STARWOOD/WESTIN CONTROL OF SECURITY AT THE WESTIN CASUARINA**

The Westin Casuarina Resort, Grand Cayman is a "first-class resort facility" operated pursuant to a 20 year System License Agreement ("SLA") executed in March 1995 by Westin License Company, *inter alia*.  It services a wealthier clientele than most other Columbia Sussex hotels.  Room rates of $350 per night during high season are common.  Few other Columbia Sussex hotels command that high a rate.  Guests are permitted to incur charges of $3,000 before they are requested to pay down the charges. Columbia Sussex Secretary Treasurer, Theodore Mitchel, testified that the Westin Casuarina "has always been special".  "[I]t's one of the nicest properties we have and he's [Columbia Sussex president, William Yung] always taken a special interest in it."

The SLA defines a "Westin hotel" as "any hotel or resort operated under the Westin name".  Defendant, Westin Hotel

6

Management, L.P., is the successor in interest to the Westin
License Company and the Westin Hotel Company.  Defendant Starwood
Hotels & Resorts Worldwide, Inc. ("Starwood") owns Westin and
operates it as a "brand" of hotel, having taken control of Westin
in approximately 1997 or 1998.  Starwood owns several hotel
brands/chains.  Starwood owns and operates some Westin hotels and
licenses others.  It is the only corporation with the ability to
license or franchise Westin hotels.  For the purposes of this
action, and as testified by John McGovern, Vice President of
Aloft and Element Operations for Starwood, who was designated to
testify on behalf of both Starwood and Westin, Starwood and
Westin are "one company".  Starwood assumed control of Westin
franchise agreements when it took control of Westin.  Starwood is
one of the ten largest hotel companies and was at the time Ms.
Genereux was raped.

> The SLA, p. 2, paragraph (i), recites that:
>
> Westin Hotel Company ("WHC") has been in the business
> of owning and managing first-class, high quality,
> hotels for many years and has performed management
> services and related functions throughout the world.
> Based upon its experience, WHC has developed a system
> for hotel marketing and operations under the Westin
> name that includes access to certain of WHC's
> marketing, reservations and front-office systems,
> operations manuals and guidelines, training with
> respect to the foregoing, and certain pre-opening
> activities (collectively, the "Westin System").

In paragraph iv, the licensee

> acknowledges that the Westin System includes detailed
> specifications and standards for operating first-class

7

> hotels using the Westin name, understands the
> importance of maintaining first-class hotel standards,
> and desires to operate and maintain the hotel or resort
> facility in conformity with the specifications and
> standards for first-class hotels promulgated by Westin.

"Westin Hotel Standards" are defined as "the minimum standards,
specifications, and requirements for the Hotel to operate a
first-class, high quality hotel or resort under the Westin
System. ... The Westin Hotel Standards are contained in Westin
Operations Manuals and in periodic directives".  SLA, p. 4.
"Westin Operations Manuals" are defined, in part, as "manuals and
guidelines prepared and revised from time to time by Westin for
use by licensees in operating the hotels and resorts in
accordance with the Westin System", and are identified in SLA
Exhibit 1 to include the Westin Quality Assurance Program Manual
for Franchised Hotels, the Facilities Standards Manual, and the
Property Maintenance Reference Guide,.

   The licensee's use of the Westin Operations Manuals is
described as both a "right and obligation".  SLA, p. 5, ¶1.3.
The Licensee agrees that it

> shall operate the Hotel as a first-class facility and
> in a clean, orderly, and respectable manner in
> compliance with this Agreement and the Westin Hotel
> Standards. ... Licensee shall at all times implement
> all portions of the Westin System in its operation of
> the Hotel.  In operating the Hotel, Licensee shall use
> only ... services that conform to the Westin Hotel
> Standards.

SLA, p. 10, ¶4.1.  Licensees commit to maintaining the Westin
Standards.  Westin/Starwood retain the "right ... to inspect the

8

Hotel for compliance with the terms of the Agreement and the Westin Hotel Standards". SLA, p. 13, ¶4.8. Licensees agree to submit to inspection to determine conformity with the Westin Standards. Material non-compliance with the Agreement or with the Westin Hotel Standards gives Westin/Starwood the right to suspend the licensee's access to the Westin Reservations System, to send a quality assurance inspector to work with the Hotel at licensee's cost, to retrain licensee's employees at licensee's costs, to credit or rebate guests at licensee's cost, and, where the licensee fails to cure deficient compliance with the Westin Hotel Standards timely, to terminate the SLA. *Id.*, p. 13-14, ¶5.3. Columbia Sussex acknowledged that it was obliged to comply with Westin operating and brand standards and policies.

Westin/Starwood's rights to enforce the Westin Hotel Standards are not theoretical. Starwood has been committed to eliminating poor representation of the brand. Starwood de-franchised many hotels that didn't comply with brand standards. When he was Starwood's Vice President of Franchised Operations, Mr. McGovern was responsible for ensuring compliance with brand standards. Starwood regional directors of operations would examine franchised hotels to enforce compliance with brand standards. Lashner Rush & Associates ("LRA"), a third party auditing firm, would audit franchise compliance with brand standards. Action plans were prepared to bring offending hotels

9

into compliance.  Meetings, telephone calls, and related follow up were designed to enforce compliance.  Hotels that remained out of compliance faced a legal process outlined in the license that could lead to termination.  Standards were set by the brand. Standards were mandatory.  The fact that hotel employees who offended against mandatory Westin standards were not Westin or Starwood employees but franchise employees made no difference to the licensee's duty to comply with brand standards or to the imposition of penalties for failing to comply.  The Westin Casuarina was cited in LRA audits for the failure of its employees to repeat its guest's name the required number of times in conversation and to say "thank you" often enough.

Westin brand standards included a number of standards related to hotel security.  The Westin Quality Assurance Program/ QAP 2000, a comprehensive list of Westin brand standards in effect shortly before Ms. Genereux' rape, required the provision of security escorts to guest rooms and automobiles by a designated hotel employee.  A standard mandated the type of response franchise employees were to display to guests who had suffered loss or injury.  Standards governed the types of locks required for guest room entry doors, balcony doors, and connecting doors to adjoining rooms.  Most significantly, the Westin standard required locks that are "high grade and difficult to force" for "public area doors".  Public area doors include

public restroom doors.  As a standard, "all Westin Hotels,
whether franchised or owned and operated, had to have high grade
locks that are difficult to force on public area doors".  The
same standard applied in 2001 and 2002.  The same review and
audit procedures used to enforce other aspects of the Westin
Hotel Standards are used to enforce compliance with those
standards which govern hotel security.

Columbia Sussex acknowledged Westin Casuarina's obligation
to comply with Westin security standards.  Columbia Sussex
acknowledged that it was obliged to enforce Westin provisions
relating to security which appeared in the Westin manuals even if
Westin did not term such provisions "standards".  Thus, the
Westin Casuarina was obliged to enforce the requirements of
keeping all interior and exterior areas and grounds safe and
secure, of taking adequate safety and security precautions in all
areas of the hotel, and of taking adequate safety/security
precautions in all public restrooms, and restricting access by
unauthorized persons to the restrooms.

**COLUMBIA SUSSEX CONTROL OF SECURITY AT THE WESTIN CASUARINA**

Galleon Beach Resort, Ltd. ("Galleon Beach"), a Cayman
Islands corporation, formally is the other signatory to the SLA.
Defendant Columbia Sussex, a Kentucky corporation, is in the
business of owning and operating hotels and resorts.  Galleon
Beach and Columbia Sussex are "affiliated companies", sharing a

11

"common ownership string".  Officers of Columbia Sussex hold
identical offices in Galleon Beach.

Although Columbia Sussex has a relationship with eight
Westin hotels, it has not executed System License Agreements or
any other type of agreement with Westin for any of the hotels.
Instead, Columbia Sussex has other entities execute the SLAs and
then executes a separate agreement between Columbia Sussex and
the company which executes the SLA.  Columbia Sussex executed a
"Service Agreement" with Galleon Beach, which ostensibly had
Columbia Sussex provide only limited services for Galleon Beach,
including maintaining records, paying bills and preparing
financial statements.  The Service Agreement was executed by
Theodore Mitchel as Secretary/Treasurer of Galleon Beach and by
Joseph Marquet as Vice President of Finance for Columbia Sussex.
The 1999 amendment to the Service Agreement was executed by the
same men holding the same offices for the opposite corporations:
Marquet for Galleon Beach and Mitchel for Columbia Sussex.  The
role reversal was not a typographical error.

The defendants argue that the Service Agreement insulates
Columbia Sussex from liability on the grounds that it assumes no
responsibility for operating the Westin Casuarina.  The evidence
demonstrates that the Service Agreement is a convenience that
Columbia Sussex asserts when it seeks to deny legal liability but
ignores when it deals generally with the Westin Casuarina.

12

Columbia Sussex identifies the Westin Casuarina as one of its hotel properties on the Columbia Sussex website.  Industry publications list Columbia Sussex as owner of the Westin Casuarina and do not identify the resort as a franchise.  Galleon Beach does not appear in the 2002 or 2005 American Hotel and Lodging Association "Hotel Directory".  Advertising placed by Columbia Sussex for the Westin Casuarina does not identify a limited relationship between Columbia Sussex and the resort.  To the contrary, a press release originating at Columbia Sussex' office in Ft. Mitchell, Kentucky, announcing the opening of the Hibiscus Spa, stated:  "The Westin Casuarina Resort and Spa is owned and operated by Columbia Sussex Corporation".

Starwood/Westin understood Columbia Sussex to be the operator of the Westin Casuarina.  Columbia Sussex employees told Starwood Vice President McGovern that Columbia Sussex "had a hotel in the Cayman Islands and it was the Westin Casuarina".  McGovern testified that the Columbia Sussex website accorded with his understanding that Columbia Sussex owned or operated the Westin Casuarina.

In violation of Westin Corporate Identity Manual standards, Columbia Sussex did not identify either itself or Galleon Beach as the Westin Casuarina franchisee on printed hotel documents which Westin required contain such identification.  Franchisee identification is mandated by Starwood/Westin in order to

13

distinguish franchisees from Westin itself, in part so that guests will not hold any franchise deficiencies against the Westin brand.  LRA Audits cited the Westin Casuarina for violating corporate identity brand standards.

Even Columbia Sussex employees are told of the so-called "limited" relationship only "on a need-to-know basis". Accordingly, Westin Casuarina Service Express Supervisor Kellie Ann Lowell, who had held that position since the opening of the Westin Casuarina, testified that Columbia Sussex controlled the Westin Casuarina by "doing business as Galleon Beach".

The project manager for the construction of the Westin Casuarina was a Columbia Sussex employee.  Architectural diagrams for the construction of the Hibiscus Spa building, including the restroom where Ms. Genereux was raped, identify "[t]he Westin Casuarina Resort Grand Cayman Island [as] [a]nother successful property of Columbia Sussex Corporation".

The Westin Casuarina is referenced repeatedly in the Columbia Sussex Manager's Manual, a detailed guide prepared by Columbia Sussex to instruct Columbia Sussex managers how they should carry out certain practices at their hotels.  The Westin Casuarina is included among other Columbia Sussex insurance exposures when Columbia Sussex purchases insurance in order to increase Columbia Sussex' insurance buying power.  The Casuarina is part of Columbia Sussex' insurance claim history data base.

14

Columbia Sussex' risk management director Mitchel reviewed insurance claims to determine trends and included the Westin Casuarina as part of the Columbia Sussex analysis.

Most importantly for the case at bar, Mitchel ordered the Westin Casuarina to comply with the Columbia Sussex Corporation Safety & Loss Prevention Manual.  That Manual had been written by Columbia Sussex employees who answered to Mr. Mitchel as the person in charge of Columbia Sussex' Risk Management Department. Mitchel reviewed the Manual for Columbia Sussex Corporation before it was issued.  Columbia Sussex employees under Mitchel's direction updated the Manual and Mitchel reviewed and approved the updates as part of his responsibilities for Columbia Sussex. The Manual is a proprietary document so secret that it was produced to plaintiff's counsel in this action only after a confidentiality agreement had been signed.  Moreover, the defendants sought and received an Order from this Court that excerpts of the Manual not be filed in Court notwithstanding that the confidentiality agreement allowed their use with respect to motions in this action.  Nevertheless, Mitchel sent a copy of the Manual to a corporation other than Columbia Sussex (Galleon Beach) and instructed the Westin Casuarina to follow the Manual even though it applied to Columbia Sussex and not to Galleon Beach, and even though Mitchel testified that he lacked authority to change hotel operations.

15

Similarly, Mitchel used Columbia Sussex employees, who were not employees or officers of Galleon Beach, to convey his instructions to the Westin Casuarina.  Mitchel could not recall any occasion when the Westin Casuarina refused to carry out instructions conveyed by Columbia Sussex employees who were not Galleon Beach employees or officers.

Mitchel testified that he held the "Corporate Management" and "Risk Manager" roles and performed the responsibilities designated in Section 2 of the Safety and Loss Prevention Manual at and before Ms. Genereux' rape.  Yet, he failed to carry out the responsibilities of those positions in any meaningful way.

**THE NEED FOR PROPER SECURITY AT THE WESTIN CASUARINA**

The plaintiff's security expert witness, Robert D. McCrie, Ph.D., CPP, will testify that hotel industry practice requires hotel security directors to set policies, train subordinates, monitor progress and evaluate technology, among their responsibilities.  The starting point of any analysis is a review of crime and crime trends in the area of the hotel.  Dr. McCrie's review concluded that serious crime increased substantially during 1998-2002, and that the trend was sufficiently clear that business owners and operators should have recognized it.

The Cayman Islands' two main industries are offshore banking and tourism.  Both industries benefit from an elevated level of secrecy, especially with respect to crime information.  Thus, the

parties in this case have been unable to obtain RCIP reports of the rape of Ms. Genereux or even her hospital emergency room records.  Detailed RCIP crime reports are no more forthcoming. Official government reports obfuscate crime information and since 2002 have all but omitted it.  The Cayman Islands does not provide crime information to Interpol.

However, the limited information available was sufficient for Dr. McCrie to identify the following evidence of a serious crime problem.  Grand Cayman criminal court records, which are reported and which do not include Cayman Brac or Little Cayman islands, increased exponentially between 1999 and 2002:  109% during the entire period, 32% from 2000 to 2001, and 47% from 2001 to 2002.  Sexual offenses more than doubled from 2000 to 2001 and were not reported in 2002.  Criminal clearance rates for sexual offenses were dramatically below clearance rates for other offenses, particularly reported drug offenses.  The RCIP increased the size of its force by 11.7% between 2001 and 2002 alone and by 23.7% between 1998 and 2002.  By contrast, the population of the Cayman Islands grew by 18% between 1995 and 2006.  In 2003, the U.S. State Department issued an advisory warning American travelers of the danger of sexual assaults in the Caymans.  By 2004, the Cayman Islands government instituted a crime crackdown, increasing criminal penalties, modifying evidentiary standards, and adding DNA testing facilities.  Cayman

17

citizens reported their concerns to Caymanian media.

While the crime statistics are insufficiently detailed to
refer directly to the Westin Casuarina or its immediate vicinity,
the defendants were aware of crime on their own premises.  Of the
approximately 80 hotels owned and/or operated by Columbia Sussex,
Secretary/Treasurer Mitchel could only recall two incidents of
alleged sexual assaults.  Both incidents occurred at the Westin
Casuarina.  One involved two teen age girls.  He was not
designated to testify on behalf of Columbia Sussex in any case
involving damages arising from criminal incidents other than
those which arose at the Westin Casuarina.

## NEGLIGENT SECURITY PRACTICES AT THE WESTIN CASUARINA

Ms. Genereux alleges that the three defendants were liable
directly for their negligent security practices in addition to
being liable vicariously for the negligent security practices of
the Westin Casuarina.  Dr. Robert McCrie's report outlines the
defendants' negligence.

Security practices at Starwood/Westin were prepared by the
Westin brand team; the same individuals who determined standards
for bedding, shampoo varieties and location, and similar matters.
No one within the Westin brand of Starwood is responsible for
designing security standards, policies or practices.  There is no
standard broadly governing security at Westin hotels.  There is
no standard governing the use of security devices at Westin

hotels, such as security guards/personnel, alarms, panic buttons, or closed circuit television systems.

Neither Starwood nor Westin review security policies established by individual Westin hotels. Neither Starwood nor Westin make any body of consultants or experts available to Westin hotels to handle security functions. Neither Starwood nor Westin ever have conducted an analysis of crime levels in the area of a franchised Westin hotel. Neither Starwood nor Westin provide any security training to the operators of individual Westin hotels to ensure that they are properly knowledgeable regarding hotel security. No one at Starwood or Westin even is responsible for ensuring that franchised hotels are developing any security polices at all. Starwood vice presidents of franchised operations do not analyze or review analyses prepared of crime levels in the areas of franchised hotels within their jurisdiction. Although brand recognition is so important to Starwood and Westin that standards govern the type of shampoo to be placed in bathtubs, Starwood/Westin insist that they set no standards to insure that Starwood/Westin hotels are safe and secure inside and out.

No person, division or department at Starwood is responsible for overseeing security at Starwood owned and licensed hotels. Starwood vice presidents of franchise operations do not review or design security policies. They do not even have security

consultants assigned to them to help them review and enforce security standards at Starwood hotels. Starwood does not use outside consultants to devise or review security standards.

However, Starwood and Westin do acknowledge an obligation to provide reasonable security for all persons lawfully on their property. Starwood/Westin expect that Westin hotels will be kept safe and secure and will take adequate safety and security precautions in all areas of the hotel, including public restrooms. They draw no distinction between owned/operated and franchised hotels. They draw no distinction between registered guests and persons lawfully on their premises who are not registered guests. There is no evidence that unregistered guests are required to notify Westin hotels when they enter Westin property. There is no evidence that Ms. Genereux ever was required to notify the Westin Casuarina of her presence when she frequented its spa, gift shop, ballroom, restaurants, or lobby. Photographs of the property do not show "no trespass" signs.

Yet, Starwood/Westin's designated deponent was unaware of any situation where Starwood or Westin required a franchised hotel to change its security practices. None of the many Starwood hotels defranchised for failing to comply with Starwood brand standards were defranchised due to security considerations. LRA audit reports repeatedly cited the Westin Casuarina for failing to adhere to Westin brand standards relating to security.

The 1999 audit which LRA summarized as "somewhat disappointing", cited failures to comply with Westin standards relating to the use of secondary locking devices on guestroom patio doors, the provision of security information, the absence of door locking instructions on guest room entry doors, employees publicly revealing guest room numbers during the check-in process, the absence of working locking mechanisms on public restroom stall doors, and the use of a recording to answer an emergency telephone.  The 2000 Audit similarly reports breaches of various Westin security standards:  the absence of locks on connecting room doors, inconsistent use of secondary locking devices on patio doors, the absence of a deadbolt on the door to the safety deposit box room, and connecting a caller directly to a guest room without confirming the caller's knowledge of the guest's identity.  The 2001 Audit showed some improvement in limiting guest room access but cited hotel employee failure to explain guest room security features.  Security breaches continue to be reported in the 2002 Audit:  the absence of patio door locks, the absence of security notices, and revealing room numbers during the check-in process.  A Starwood/Westin Design Review Memorandum concerning the Hibiscus Spa facility prepared three months after Ms. Genereux' rape cites more than 20 deficiencies in "public spaces" but fails to cite the absence of a lock on the women's public restroom door despite the Westin standard requiring one.

Dr. McCrie concluded that Starwood/Westin violated the hospitality industry standard of care. Failing to maintain a security department was a violation of the standard. At least, seven of the ten largest hotel chains, and all of the upscale chains, had a senior corporate security officer. Only Starwood did not. Not only was the absence of a corporate security officer a violation of the industry standard, Starwood countered the industry trend because Starwood had such a position in the 1990's and eliminated it as a cost saving measure.

Nor did Columbia Sussex have a distinct security department. Security arrangements generally are handled by Columbia Sussex' district manager of operations. However, no Columbia Sussex employee analyzes crime levels in the vicinity of Columbia Sussex hotels. Columbia Sussex has no district manager of operations for the Cayman Islands. The Westin Casuarina manager answered directly to Columbia Sussex' owner/president, William Yung, including with respect to the Westin Casuarina's security needs. Mitchel, Columbia Sussex' risk prevention director, did not know if anything ever had been done by the Westin Casuarina to collect information relating to crime in the Cayman Islands.

Although Columbia Sussex paid Westin Casuarina employees and maintained their personnel files and payroll records, Columbia Sussex produced no record during discovery of any Westin Casuarina employee whose function was to provide security, loss

prevention or risk management services. Nor does it have any record of an outside security company providing services at the Westin Casuarina, although such services had been used before Ms. Genereux had been raped. Neither of the Westin Casuarina employees who have submitted affidavits for the defense have testified that any security was called or even existed. Although Westin Casuarina's former Food and Beverage Director has proffered an affidavit claiming to be the Casuarina's security director at the time of Ms. Genereux' rape, his testimony is suspect in light of Columbia Sussex' and Mr. Mitchel's lack of knowledge about his existence. Moreover, membership directories of the American Society for Industrial Security do not list him as a member in 2000, 2001 or 2002, although he attested that he was. He is not identified as the Westin Casuarina security director until after Ms. Genereux' rape. Photographs of the hotel disprove his averments about "no trespassing" signs.

There were no cameras, security lights, security mirrors, security officers, or other equipment or personnel to safeguard the safety and security of guests and other persons lawfully using the women's public restroom in the spa building when Ms. Genereux was raped. The Westin Casuarina did not employ closed circuit television. There were no locks on the outer door of the women's public restroom in the spa building at the time of Ms. Genereux' rape. Photographs of the restroom taken since her rape

23

show locks on the restroom doors, demonstrating feasability.  Mr.
Mitchel was unaware whether the Westin Casuarina locked doors on
the spa building or elsewhere on the premises, although he
"expect[ed]" that certain areas would be locked in the evening to
limit access.

Dr. McCrie reports defects in the security procedures in
place at the Westin Casuarina at the time of Ms. Genereux' rape
which are attributable to Columbia Sussex.  The failure to have a
working lock and to lock the restroom door on the isolated spa
building was the simplest and most obviously correctable defect.
However, the design of the building, constructed only the year
before Ms. Genereux' rape, violated principles of Crime
Prevention Through Environmental Design ("CPTED") and created an
attractive nuisance for criminals by isolating and obscuring the
spa restroom, by blocking lines of sight to the restroom, by
omitting crime deterrent construction and security devices, and
by placing unlockable male and female restroom doors so close as
to facilitate "accident[al]" entry of males into female
restrooms.  The defendants' violation of CPTED principles invited
criminal activity and enabled it to succeed.  Security treatises
prepared more than a decade before the Hibiscus Spa was completed
noted that "[a]ccess to ... toilet facilities and so on are the
principal attractions and the essence of the security man's job
is to prevent all non-residents from gaining access".

24

Finally, both Dr. McCrie and Starwood/Westin's designated deponent, Mr. McGovern, agreed that the Westin Casuarina's response to Ms. Genereux' rape violated both industry and Westin standards.

## **FACTS ESTABLISHED BY PLEADINGS/STIPULATIONS/ADMISSIONS**

The following facts are derived from the admissions made by the defendants in their Answer to the plaintiff's Complaint. The paragraphs are numbered to correspond to the numbering of the paragraphs in the Complaint and Answer.

1. The plaintiff, Kimberly Genereux, is an individual residing in and a citizen of the Commonwealth of Massachusetts.

2. The defendant, Columbia Sussex Corporation, is a corporation, duly organized under the laws of the Commonwealth of Kentucky, having a principal place of business at 740 Centre View Boulevard, Crestview Hills, Commonwealth of Kentucky.

3. The defendant, Starwood Hotels & Resorts Worldwide, Inc., is a corporation, duly organized under the laws of the State of Maryland, having a principal place of business at 1111 Westchester Avenue, White Plains, State of New York.

4. The defendant, Westin Hotel Management, L.P., is a limited partnership of which defendant, Starwood Hotels & Resorts Worldwide, Inc. is the general partner; is duly organized under the laws of the State of Delaware, having a principal place of business at 1111 Westchester Avenue, White Plains, State of New

York; and on January 12, 2006, acquired and assumed the assets of former defendants, Westin License Company and Westin Management Company East, subject to any present or future liabilities.

7.    At all times material, defendants Columbia and Starwood owned certain hotels throughout the United States, and defendant, Westin holds licensing rights for certain hotels throughout the United States and in certain foreign countries.

8.    At all times material, defendant Westin had license agreements with certain hotels within the Commonwealth of Massachusetts.

10.    At all times material, defendant Westin, through its predecessor, had a franchise agreement with the Westin Casuarina Hotel (hereafter "the Premises"), which was located in George Town, Grand Cayman, Cayman Islands, British West Indies; which territory is an overseas dependency of the United Kingdom of Great Britain and Northern Ireland.

## CONTESTED ISSUES OF FACT

The defendants contest their control over security at the Westin Casuarina and their liability to Ms. Genereux.

## JURISDICTIONAL QUESTIONS

There are no pending jurisdictional questions.

## PENDING MOTIONS

There are no motions pending other than motions *in limine*. The plaintiff's motions *in limine* are identified later in this

Memorandum.

## ISSUES OF LAW

The parties contest the defendants' duty of care to Ms. Genereux, as addressed in the Defendants' Motion for Summary Judgment and the Plaintiff's Opposition.  The parties are unaware of any other contested issues of law other than those addressed in the motions *in limine*.

## REQUESTED AMENDMENTS TO THE PLEADINGS

The parties do not request any amendments to the pleadings.

## ADDITIONAL MATTERS TO AID IN DISPOSITION

The Cayman Islands laws of negligence and premises (occupiers') liability were argued in the Defendants' Motion for Summary Judgment and the Plaintiff's Opposition.  The parties have provided copies of relevant authorities to the Court in connection therewith.

## ESTIMATED LENGTH OF TRIAL

Six to seven days.

## PLAINTIFF'S WITNESSES & ESTIMATED LENGTH OF TESTIMONY

The plaintiff anticipates calling the following witnesses to testify on direct examination:

1.    Kimberly Genereux, the plaintiff (approximately 3-4 hours)

2.    Robert J. McCrie, Ph.D., CPP, New York, NY (approximately 3-4 hours)

3.    Eleanor K. Egan, LHMC, Watertown, MA (approximately 3 hours)

27

4.   Martha Praught, M.D., Brookline, MA (approximately 1-2 hours)

5.   David S. Chapin, M.D., Boston, MA (approximately 1 hour)

6.   Norman C. Hursh, ScD, CRC, CVE, Boston, MA (approximately 1-2 hours)

7.   Allan M. Feldman, Ph.D., Providence, RI (approximately 1-2 hours)

8.   Theodore Mitchel, Crestview Hills, KY (approximately 3-4 hours)

9.   John McGovern, Boston, MA (approximately 3-4 hours)

10.  Timothy Maxwell, Jamaica Plain, Massachusetts (approximately 30-45 minutes)

11.  Paula Stuart, Rockport, Massachusetts (approximately 30-45 minutes)

12.  Rose Fiore, Boston, MA (approximately 1 hour)

13.  David Soleau, Boston, MA (approximately 1 hour)

14.  Record keepers as necessary to authenticate records (approximately 5-10 minutes each).

The plaintiff does not anticipate calling the following witnesses to testify on direct examination unless the need to do so arises due to the unavailability of one or more of the foregoing witnesses or developments at trial:

1.   Erik Thorkildsen, Cambridge, Massachusetts (approximately
     30-45 minutes)

2.   Steven Morse, Cambridge, Massachusetts (approximately 30-45
     minutes)

3.   Kate Isselbacher, M.D., Newton, MA (approximately 1 hour)

4.   Robert Lawton, MSW, LICSW, McLean Hospital, Belmont, MA
     (approximately 1-2 hours)

5.   Steven B. Royster, U.S. State Department, Washington, DC
     (approximately 1 hour)

6.   Kellie Ann Lowell (approximately 30 minutes)

7.   Carolyn Parker, Grand Cayman, Cayman Islands (approximately
     1 hour)

8.   Kafara Augustin, Grand Cayman, Cayman Islands (approximately
     1 hour)

9.   Michael Lyons, New Jersey (approximately 1 hour)

10.  Fred Buro, New Jersey (approximately 1 hour).

11.  Record keepers as necessary to authenticate records
     (approximately 5-10 minutes each).


     The plaintiff does not anticipate calling the following
witnesses to testify on direct examination but reserves the right
to call them as rebuttal witnesses depending upon developments at
trial:

1.  Charles E. Reynolds, Esquire, Cincinnati, OH (approximately 1 hour)

2.  Leslie Reynolds, Cincinnati, OH (approximately 1 hour)

3.  Louise H. Reynolds, Cincinnati, OH (approximately 1 hour)

4.  Ted Graney, Esquire, Buffalo, NY (approximately 1 hour).

5.  Record keepers as necessary to authenticate records (approximately 5-10 minutes each).

### PLAINTIFF'S PROPOSED EXHIBITS

The plaintiff anticipates introducing the following exhibits at trial:

1.  Map & Photo Key

2.  Conference Centre at the Westin Casuarina Resort Site Plan

3.  All architectural drawings, diagrams and plans produced by the defendants

4.  Site Plan Excerpt-Identifications

5.  Photographs of Westin Casuarina and surrounding area

6.  Photographs of Medications

7.  Royal Cayman Islands Police Service Letter to Westin Casuarina Attorney Michael Alberga (September 27, 2005)

8.  Royal Cayman Islands Police Service (Det. Sergeant Eustace Joseph, Criminal Investigation Department) Letter to Gail Duquesney (May 7, 2002)

9.  Reports of Eleanor K. Egan, LHMC (February 21, 2005 & September 16, 2007)

10. Medical Records - Eleanor K. Egan, LHMC

11. Medical Records - The Trauma Center

12. Medical Records - McLean Hospital

13. Medical Records - George Town Hospital (prescription labels)

14. Medical Records - Rosaline F. Barron, M.D., Mt. Auburn
    Hospital

15. Medical Records - Martha Praught, M.D.

16. Medical Records - Karen T. Isselbacher, M.D.

17. Medical/Employment Records - The Wellness Corporation

18. Medical Bills - Eleanor K. Egan, LHMC

19. Medical Bills - The Trauma Center

20. Medical Bills - McLean Hospital

21. Medical Bills - Rosaline F. Barron, M.D., Mt. Auburn
    Hospital

22. Medical Bills - Martha Praught, M.D.

23. Medical Bills - Karen T. Isselbacher, M.D.

24. Report of David S. Chapin, M.D. (February 29, 2008)

25. Medical Records - David S. Chapin, M.D.

26. Medical Bills - David S. Chapin, M.D.

27. Report of Norman C. Hursh, ScD, CRC, CVE (February 10, 2008)

28. Report of Allan M. Feldman, Ph.D. (February 27, 2008)

29. System License Agreement

30. American Hotel & Lodging Association, DIRECTORY OF HOTEL &
    LODGING COMPANIES (74th ed., 2005)(excerpts)

31. American Hotel & Lodging Association, DIRECTORY OF HOTEL & LODGING COMPANIES (71st ed., 2002)(excerpts)

32. Lashner Rush & Associates Audit (August 30, 1999)

33. Lashner Rush & Associates Audit (September 24, 2000)

34. Lashner Rush & Associates Audit (April 24, 2001)

35. Lashner Rush & Associates Audit (November 5, 2002)

36. Westin Quality Assurance Program/QAP 2000

37. Westin Quality Assurance Program/QAP 2001

38. Westin Hotels & Resorts Property Maintenance Reference Guide

39. Westin Garage Reference Guide

40. Westin Marketing & Sales Manual, Vol. 2

41. Westin Corporate Identity Manual

42. Westin Fitness Center/Pool Checklist, QAP 2001

43. Westin Front Office/Exterior & Public Areas Checklist, QAP 2001

44. Westin Guest Room, Bathrooms & Corridors Checklist, QAP 2001

45. Westin Franchise Requirements Checklist, QAP 2001

46. Westin Associate Orientation Manual for Franchised Hotels, Vol. 30, Sections II & III

47. Westin Risk Management Film Library Catalog

48. Westin Front Office Reference Guide

49. Westin Banquets & Meeting Facilities Checklist, QAP 2001

50. Westin Purchasing Technical Guide

51. Westin Food & Beverage Outlets Checklist, QAP 2001

52.  Westin Food & Beverage Technical Guide

53.  Westin Telephone Courtesy Manual

54.  Westin Telephone Department Reference Guide

55.  Westin Service Express Reference Guide

56.  Service Agreement

57.  Starwood/Westin Design Review Memorandum

58.  Columbia Sussex website excerpts, including pages showing
     "Columbia Sussex Hotel Properties", "Columbia Sussex
     Property Detail; Westin Casuarina", "Employment
     Opportunities" at Westin Casuarina

59.  Westin Corporate Identity Manual

60.  Columbia Sussex' Manager's Manual (excerpts)

61.  Columbia Sussex Corporation Safety & Loss Prevention Manual

62.  Cayman Islands Annual Report & Official Handbook (1998)

63.  Cayman Islands Annual Report & Official Handbook (1999)

64.  Cayman Islands Annual Report & Official Handbook (2000)

65.  Cayman Islands Annual Report & Official Handbook (2001)

66.  Cayman Islands Annual Report & Official Handbook (2002)

67.  *Westin Casuarina Opens Luxury Spa* (Hospitality Job Resource,
     February 13, 2002)

68.  Expert Witness Report of Robert D. McCrie, Ph.D., CPP

69.  Curriculum Vitae - Robert D. McCrie

70.  Stingray City Video (May 2, 2002)

71.  Prescription containers

72.  Cell Phone

73.  Beach towel purchased at Westin Casuarina by plaintiff

74.  Employment records – Flansburgh Associates, Inc.

75.  Flansburgh Associates Brochures

76.  Articles released by Flansburgh Associates about Plaintiff

77.  Plaintiff's Curriculum Vitae

78.  Social Security Disability Notice of Award

79.  Social Security Administration Certification of Extract from Records

80.  Life Tables

81.  Starwood/Westin website excerpts, including pages announcing "Starwood Returns to Las Vegas; Westin Hotel Makes its Debut in Sin City This Fall (March 17, 2003)

82.  Cayman Islands Department of Tourism website excerpts, including page announcing "Department of Tourism and Local Industry Collaborate For New American Airlines NY-GCM Direct Service (May 24, 2002)

83.  Hibiscus Spa Brochure

84.  Cayman Islands Annual Tourism Conference Brochure

85.  Certificate of Liability Insurance (Columbia Sussex Corporation for Westin Casuarina)

86.  Curriculum Vitae – Eleanor Egan, M.D.

87.  Curriculum Vitae – Martha Praught, M.D.

88.  Curriculum Vitae – Norman Hursh, ScD, CRC, CVE

89.   Curriculum Vitae - Alan Feldman, Ph.D.

90.   Curriculum Vitae - David S. Chapin, M.D.


        The plaintiff does not anticipate introducing the following exhibits at trial but reserves the right to do so if necessary for impeachment or to address an issue relating to the proper identification of the Westin defendants, which the plaintiff does not presently anticipate will be at issue:

1.    Response of Defendant Columbia Sussex Corporation to Plaintiff's Request for Production of Documents

2.    Response of Defendant Starwood Hotels & Resorts Worldwide, Inc. to Plaintiff's Request for Production of Documents

3.    Response of Defendant Westin License Company to Plaintiff's Request for Production of Documents

4.    Correspondence of Mark F. Itzkowitz to Robert J. Brown and John B. Johnson (September 10, 2007)

5.    Correspondence of Mark F. Itzkowitz to Robert J. Brown and John B. Johnson (September 19, 2007)

6.    Correspondence of Robert J. Brown to Mark F. Itzkowitz (September 28, 2007)

7.    Correspondence of Robert J. Brown to Mark F. Itzkowitz (January 8, 2008)

8.    Correspondence of Robert J. Brown to Mark F. Itzkowitz (January 25, 2008)

9.   ASIS *Dynamics* (May/June 2000)

10.  ASIS *Dynamics* (May/June 2001)

11.  ASIS *Dynamics* (May/June 2002)

12.  ASIS *Dynamics* (May/June 2003)

13.  ASIS membership information

14.  Westin Food & Beverage Technical Guide Vols. I & II

15.  Westin Food & Beverage Resource Guide

16.  Purchase and Sale Agreement between Westin License Company
     and Westin Hotel Management, L.P.

17.  Bill of Sale, Assignment and Assumption Agreement between
     Westin License Company and Westin Hotel Management, L.P.

18.  Purchase and Sale Agreement between Westin Management
     Company North and Westin Hotel Management, L.P.

19.  Bill of Sale, Assignment and Assumption Agreement between
     Westin Management Company North and Westin Hotel Management,
     L.P.

20.  Purchase and Sale Agreement between Westin Management
     Company East and Westin Hotel Management, L.P.

21.  Bill of Sale, Assignment and Assumption Agreement between
     Westin Management Company East and Westin Hotel Management,
     L.P.

22.  Purchase and Sale Agreement between Westin North American
     Management Company and Westin Hotel Management, L.P.

23. Bill of Sale, Assignment and Assumption Agreement between Westin North America Management Company and Westin Hotel Management, L.P.

24. Agreement of Limited Partnership of Westin Hotel Management, L.P.

25. Stock Purchase Agreement

26. Limited Liability Company Operating Agreement of Westin International Services, LLC

27. Purchase and Sale Agreement

28. Transcript of the Deposition of Theodore Mitchel (excerpts)

29. Transcript of the Deposition of Theodore Mitchel (excerpts) in *Keppner v. Galleon Beach Resort, Ltd., et. als.,* Index No. 011724/2003 (N.Y. Sup. Ct., Erie County)

30. Transcript of the Deposition of John McGovern (excerpts)

31. Transcript of the Deposition of Theodore Mitchel (excerpts) in *Reynolds v. Westin Hotel Company, et. als.,* U.S.D.C. E.D. Ky. Case No. 97-77 (March 16, 1998)

32. Transcript of the Deposition of Kellie Ann Lowell (excerpts) in *Reynolds v. Westin Hotel Company, et. als.,* U.S.D.C. E.D. Ky. Case No. 97-77

## PLAINTIFF'S MOTIONS *IN LIMINE*

1. Plaintiff's Motion *in Limine* for Leave to Call Plaintiff's Medical Expert Witness, David S. Chapin, M.D., out of Order (Assented To) (Allowed, April 8, 2008)

37

2.    Plaintiff's Motion *in Limine* to Preclude Testimony by and Evidence That the Westin Casuarina Employed Security Officers/Guards, Directors or Vendors at the Time of the Plaintiff's Rape

3.    Plaintiff's Motion *in Limine* to Allow Counsel to Refer to Chalks and Exhibits in Opening Statement

4.    Plaintiff's Motion *in Limine* to Exclude Evidence of the Cause of the Plaintiff's Sister's Death

5.    Plaintiff's Motion *in Limine* to Redact Medical Records and Bills

6.    Plaintiff's Motion *in Limine* to Permit Jurors to Take Notes

7.    Plaintiff's Motion *in Limine* to Redact Conversations Relating to Litigation from Psychotherapy Records

                                The Plaintiff,
                                By her Attorney,


                                _____
                                MARK F. ITZKOWITZ (BBO #248130)
                                85 Devonshire Street
                                Suite 1000
                                Boston, MA  02109-3504
                                (617) 227-1848
                                April 8, 2008

<u>**CERTIFICATE OF SERVICE**</u>

I, Mark F. Itzkowitz, counsel for the plaintiff, hereby certify that on this date, I made service of the within document by serving it electronically to registered ECF participants and/or by mailing/faxing/hand-delivering a copy of same to non-registered ECF participants as indicated on the Notice of Electronic Filing ("NEF"), upon the following counsel of record:

John B. Johnson, Esquire          Robert J. Brown, Esquire
Corrigan, Johnson & Tutor, P.A.   Mendes & Mount, LLP
141 Tremont Street                750 7th Avenue
Boston, MA 02111; and             New York, NY   10019-6829.


                                   s/ Mark F. Itzkowitz
                                  MARK F. ITZKOWITZ (BBO #248130)

Dated:  April 8, 2008