UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------------

KIMBERLY GENEREUX,

Plaintiff,

v.

COLUMBIA SUSSEX CORPORATION          C.A. NO. 05-CV-10879-JLT
STARWOOD HOTELS & RESORTS
WORLDWIDE, INC., WESTIN HOTEL
MANAGEMENT L.P.

Defendants.

------------------------------------------------------

## MOTION IN LIMINE
## TO PRECLUDE THE EXPERT TESTIMONY OF
## ROBERT McCRIE

Defendants Columbia Sussex Corporation (hereafter "Columbia Sussex"), Starwood

Hotels & Resorts Worldwide, Inc. (hereafter "Starwood"), and Westin Hotel Management, L.P.

(hereafter "Westin") respectfully move this Court to strike Plaintiff's designation of Dr. Robert

McCrie as an expert witness and to preclude Dr. McCrie from testifying at trial.  Dr. McCrie is

not qualified to give the opinions rendered, his opinions are unsupported by any reliable facts or

relevant evidence, and admission of his testimony will not assist the Court and trier of fact but

would only serve to confuse the jury and unduly prejudice Defendants.

Plaintiff has designated Dr. Robert McCrie as a "security expert" and he has produced a

report "Concerning the Security Practices and Procedures at The Westin Casuarina  Resort,

Grand Cayman, the Cayman Islands, on or about May 3, 2002." (See expert witness report of

Robert McCrie at title page, annexed hereto as "Exhibit A").  Dr. McCrie never visited the

Cayman Islands, nor did he interview anyone at The Westin Casuarina Hotel.  He misreads

Cayman Island statistics, cites to anonymous sources on Internet blogs, quotes irrelevant U.S.

authorities, relies upon articles, data and photographs that postdate the incident, and offers nothing to this Court and the trier of fact more than his own unsupportable and unreliable personal speculation.

## A.    Legal Standard

Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) govern the admissibility of expert witness testimony.    Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  An expert must have the appropriate qualifications upon which to adequately opine on the material issues. *See*, <u>Levin v. Dalva Bros.</u>, 459 F.3d 68, 78 (1st Cir. 2006).

The district court must also ensure that the expert opinion is both relevant and reliable. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993); <u>Kumho Tire Co., Ltd. v. Carmichael</u>, 526 U.S. 137, 141 (1999) (applying <u>Daubert</u> to expert testimony generally, not just scientific testimony); Fed. R. Evid. 702; Fed. R. Evid. 703.  Under <u>Daubert</u>, the district court acts as a "gatekeeper" excluding opinion evidence that does not meet the standards of relevance and reliability. *See*, <u>Beaudette v. Louisville Ladder, Inc.</u>, 462 F.3d 22, 26 (1st Cir. 2006) ("[I]t is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis.") (citing to <u>Daubert</u>, 509 U.S. at 597).  Finally, the proponent of the testimony bears the burden of admissibility. <u>Bourjaily v. U.S.</u>, 483 U.S. 171, 175-76 (1987); Fed. R. Evid. 702, Committee Note to 2000 Amendment.

**B.    Dr. McCrie is Not Qualified**

The trial court must first determine whether the proffered expert is appropriately qualified by "knowledge, skill, experience, training, or education" as is necessary pursuant to Federal Rule of Evidence 702. Levin v. Dalva Bros., 459 F.3d 68, 78 (1st Cir. 2006); *See also*, Diefenback v. Sheridan Transp., 229 F.3d 27, 30 (1st Cir. 2000).  Under this rule, a testifying expert "should have achieved a meaningful threshold of expertise" in the given area.  Levin, 459 F.3d at 78; Pravado Alvarez v. R.J. Reynolds Tobacco Co., Inc., 405 F.3d 36, 40 (1st Cir. 2005).  That "a witness qualifies as an expert with respect to certain matters or areas of knowledge, [does not mean] that he or she is qualified to express expert opinions as to other fields." Levin, 459 F.3d at 78 (quoting Nimely v. City of New York, 414 F.3d 381, 399 n. 13 (2d Cir. 2005)).

While Dr. McCrie might be trained and experienced in security, he has no knowledge, skill, experience, training, or education in law to render an expert opinion on Defendants' alleged negligence.  On page 22 of his report, Dr. McCrie specifically admits to the fact that he is not an attorney, but all of his opinions nonetheless address Defendants' negligence.  The "findings," summarized on page 26 of his report, provide, in part, that Defendants are negligent in providing inadequate security procedures (Exhibit A at 26 – 31), improperly designing the Hotel's restrooms (Id., at 32), and by not foreseeing a sexual assault by a third-party stranger (Id., at 33). Incredibly, he also renders a opinion on Defendants' franchise liability due to Defendants' "extensive power" over the operators of The Westin Casuarina. (Id., at 23).

Dr. McCrie admits that he is not an attorney, that he has never studied the law, and that he has no experience in providing legal analysis.  He earned one graduate degree in biology and two degrees in history.  These degrees did not, and could not, prepare him to properly perform an analysis of Defendants' alleged negligence or franchisor liability.  Dr. McCrie's sole experience

in law has been through courses he has taught on Criminal Justice and American Legal History. While these courses may tend to support his knowledge and experience in the field of history, they fail to support that he is qualified to render opinions on legal liability.

Dr. McCrie has no qualification to opine on franchise liability or franchise operations. His resume is devoid of any expertise or experience in law or franchise organizations. Nevertheless, Dr. McCrie finds that "the ultimate responsibility for quality control and operations is that for the franchisor and licensor." (Id. at 23). Nothing in the record supports this statement, and Dr. McCrie is not qualified to make it.

## C.    Dr. McCrie's Opinions Lack a Sufficient Foundation

In all cases where expert testimony is offered, the trial judge must find the testimony "properly grounded, well reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702, Committee Note to 2000 Amendment.   This means the opinion must be the product of reliable principles and methods that are reliably applied to the facts of the case.  Id.  Expert opinions based on speculative assumptions or unsupported by the record are excludable. Daubert, 509 U.S. at 590 (noting that an expert's opinion must be supported by "more than subjective belief and unsupported speculation" and should be supported by "good grounds," based on what is known).

"The inquiry envisioned by Rule 702… is a flexible one."  Daubert, 509 U.S. at 594. Thus, although Daubert set forth a list of possible relevant factors, the list is non-exhaustive and discretionary.  Id. at 593 ("Many factors will bear on the inquiry, and we do not presume to set out a definitive checklist or test"); see also, Kumho Tire, 526 U.S. at 149-50.  A trial court has broad latitude in determining whether an expert's testimony is reliable.  Id. at 152 ("The trial court must have … latitude in deciding how to test an expert's reliability, and to decide whether

or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides *whether* that expert's relevant testimony is reliable." (emphasis in original))[1]

### 1. Dr. McCrie Bases His Opinions on Irrelevant Evidence

Dr. McCrie relied on irrelevant evidence to support almost every conclusion identified in his report. The list set forth below details some of the irrelevant evidence relied upon by Dr. McCrie and the erroneous "expert opinions" he renders based upon that "evidence." The Court will note that much of the "evidence" upon which Dr. McCrie relies postdates Plaintiff's assault and is therefore irrelevant as a matter of law because it proves nothing of the criminal environment in the Cayman Islands when Plaintiff was assaulted. This evidence is insufficient to form a basis of an expert opinion.

- Dr. McCrie references articles posted on an Internet website, www.CayPolitics.com, one of which, dated February 2003, postdates Plaintiff's assault by a full year. (Exhibit A at 6). This 2003 article is irrelevant as it proves nothing of the criminal atmosphere of the Cayman Islands in 2002. Moreover, the URL domain name has expired and the website no longer exists. As such, it is impossible to verify what is written in these articles and whether Dr. McCrie is referencing them appropriately.

- Dr. McCrie states in his report that a United States National Crime Victimization Survey reveals that in 2003 (one year following Plaintiff's assault) only 38.5% of rape and sexual assault were reported to police. (Id., at 17). However, this survey reveals only statistics of the United States, and does not tend to prove anything with regard to Cayman Island crime. Dr. McCrie cites to no report that reveals a similar phenomenon in the Cayman Islands.

---

[1] The non-exclusive list of factors set forth in Daubert is as follows: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. Daubert, 509 U.S. at 593. Other factors include: (1) whether the witness proposes to testify based on matters growing naturally out of research he conducted independently of the litigation, or whether he developed his opinion solely and expressly for the purpose of testifying (See, e.g., Lauzon v. Senco Prods., Inc., 270 F.3d 681, 687 (8th Cir. 2001)); (2) whether the proposed witness's conclusion represents an unfounded extrapolation from the underlying data (See, e.g., Hollander v. Sandoz Pharms. Corp., Inc., 289 F.3d 1193, 1208 (10th Cir. 2002)); whether the witness has adequately accounted for alternative explanations for the effect whose cause is at issue (See, e.g., Domingo v. T.K., M.D., 289 F.3d 600, 606-607 (9th Cir. 2002)).

- Dr. McCrie claims, without citing specific examples, that the British Crime Survey of England and Wales also suggests that rape crimes are not reported to law enforcement. (Id., at 17). However, contrary to Dr. McCrie's suggestion that the Cayman Islands is a "country within Great Britain." (Id.), the Cayman Islands are a British Dependant Territory of the United Kingdom, with its own self government. It is clearly a matter of Judicial notice that the criminal statistics of a highly-populated and diverse country such as England provide no relevance to the criminal atmosphere of a small community and tourism-based island such as Grand Cayman Island.

- Dr. McCrie cites to Internet news articles from Cayman Net News that postdate Plaintiff's assault by two years. (Id., at 20). These articles prove nothing with respect to the criminal atmosphere of the Cayman Islands in 2002.

- Dr. McCrie cites to an Internet blog from the same source from which he claims to have obtained the Internet news articles, referred to above, www.caymannetnews.com, which is dated March 26, 2004. (Id., at 19). The blog is irrelevant, as it proves nothing of the criminal atmosphere in the Cayman Islands during May 2002. Moreover, the blog was submitted anonymously and represents nothing more than mere hearsay.

- Dr. McCrie quotes from a 2003 advisory warning of the United States Department of State that postdates Plaintiff's assault by a year. (Id., at 21). This advisory warning is irrelevant because it fails to prove anything about criminal activity on Grand Cayman Island at the time the Plaintiff was assaulted in May 2002. Moreover, the advisory warning fails to support Dr. McCrie's opinion. The advisory clearly states that "violent crime" was "rare" in the Cayman Islands. (Id.)

- Dr. McCrie references a Lashner Rush Associates audit report to note that The Westin Casuarina received "two negative citations weighted to a value deficit of 20" for "Life Safety." His reliance on his this "evidence" is particularly troublesome. First, he fails to define the term "Life Safety." Further, he fails to identify the date of the particular audit. (Id., at 26). Dr. McCrie, in fact, is referencing an audit conducted by Lashner Rush Associates on November 5, 2002, *six months after Plaintiff's assault*. A copy of the pages of this audit to which Dr. McCrie refers is attached hereto at Exhibit "B". Finally, the "two negative citations" to which he cites were for (1) failing to place double locks on guestroom patio doors above the second floor and (2) failing to place stickers on the patio doors advising guests to use the double locks. These citations have nothing to do with security of the Resort's restrooms, where the Plaintiff was assaulted, and are thus utterly irrelevant to this case.

- Dr. McCrie opines that the Spa building of The Westin Casuarina violates "principles of Crime Prevention Through Environmental Design" because

employees stationed at the Spa reception area cannot easily see people enter and exit the Spa restrooms. (Id. at 30)  However, Dr. McCrie fails to state how "natural surveillance" of the restroom entrance might prevent sexual assault in the interior areas of the women's restroom.  Defendants' purported "violation" is therefore irrelevant.   Moreover, Dr. McCrie falsely and incorrectly assumes that Defendants designed the Spa and restrooms.  In fact, they did not.

- Dr. McCrie states that "industry practices require" the use of closed circuit televisions to monitor people entering and leaving the premises. (Id., at 31). However, Dr. McCrie does not describe how such a practice would have prevented Plaintiff's assault.  Instead, Dr. McCrie admits that closed circuit televisions would be "beneficial to law enforcement in conducting an investigation" after a crime has been committed.  Without further evidence, the practice of installing closed circuit televisions is irrelevant to the *prevention* of Plaintiff's alleged sexual assault.  Further, Dr. McCrie fails to cite to or provide proof of "industry practices" in hotels on the Cayman Islands.

- Beginning on page 32 of his report, Dr. McCrie claims that Defendants are negligent in "failing to provide reasonable response to the victim after she was attacked."  However, evidence of what occurred *after* the sexual assault is irrelevant, as it proves nothing of Defendants' alleged negligence in preventing an attack.  This "evidence" is clearly an improper attempt by Dr. McCrie to suggest negligent security based upon Plaintiff's account of how she claims to have been treated after the incident. (Additionally, there is no support for the supposition that any of the Defendants' employees were in the Cayman Islands, much less at the Hotel.)

## 2.   <u>Dr. McCrie Bases His Opinion on Unreliable Evidence</u>

The evidence upon which an expert bases his opinion must not only be relevant, but also *reliable.*  Daubert, 509 U.S. at 589.  In <u>Damon v. Sun Co., Inc.</u>, 87 F.3d 1467, 1474 (1st Cir. 1996), the First Circuit explained that "[i]t is fundamental that expert testimony must be predicated on facts legally sufficient to provide a basis for [an] expert's opinion.  Thus, an expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation."  (Internal citations and quotations omitted).  "[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion

evidence that is connected to existing data only by the *ipse dixit* of the expert." <u>Kumho Tire</u>, 526 U.S. at 157.

Prior to writing his report, Dr. McCrie never visited The Westin Casuarina or even the Cayman Islands (Exhibit A at 7). Moreover, he never consulted or interviewed any employee at the resort. Despite the fact that he conducted absolutely no on-site investigation of The Westin Casuarina to identify the security policies and procedures that it employs, Dr. McCrie blindly states that The Westin Casuarina had no significant security policies in place, no private resort signs, no on-going liaison with local law enforcement, etc. (Exhibit A at p. 36). Had he performed an on-site investigation, he would have learned that his assumptions on the procedures and operations of The Westin Casuarina were, in fact, completely wrong. (See the Affidavit of Niels Olsen, Director of Security for The Westin Casuarina in 2002, sworn to March 8, 2008, which was submitted in Support of Defendants' Motion for Summary Judgment, at ¶¶ 10-12, 14-16, and 19.) There is nothing to support Dr. McCrie's opinion on these matters except his own say-so and he is without personal knowledge, and clearly unqualified to state these facts.

In addition, Dr. McCrie unilaterally discredits legitimate statistics and statements that actually support the proposition that the Cayman Islands are safe with nothing more than his own unsupported assumptions.[2] For example, Dr. McCrie unilaterally discredits the data or statements. Specifically, Dr. McCrie discredits the "positivist outlook" of official statistics and reports that support a conclusion that the Cayman Islands are safe, such as those found in the 1998 and 2002 Annual Report & Official Handbook of the Cayman Islands, by *assuming* Cayman Island officials underreported and misrepresented statistics. (Ex. A at 14-15). He even claims, in an absurd statement that goes only to illustrate his unsupported speculation and the

---

[2] One source quoted by Dr. McCrie calls the Cayman Islands "one of the safest places to live in the world." (Exhibit A at 4).

careless nature with which he has addressed this serious case, that anyone believing the officially-reported statistics must be "on cannabis." (Exhibit A at 15). Dr. McCrie would instead have this Court adopt his own unreliable beliefs which are based upon bare crime statistics,[3] an anonymous blogger, and unsupported speculation. In a surprising display of candor, Dr. McCrie even admits to having consulted Wikipedia and Google Maps to help form the basis of his opinions. (Exhibit A at. 6-7).

In perhaps the most egregious mischaracterization in his "expert" report, Dr. McCrie's inability to locate Cayman Island crime statistics for the years 2001 and 2002 leads him to the "reasonable conclusion" that the situation "had turned severely worse in the Cayman Islands..." (Exhibit A at 18). However, Dr. McCrie's "support" for this conclusion is utterly incorrect.

Dr. McCrie attempts to support his "conclusion" by identifying the 109% jump in criminal cases heard by the Cayman Islands courts from 2000 to 2002, and by assuming that "such criminal matters are likely to reflect cases of a grave nature." (Id.). However, Dr. McCrie does not identify the types of cases (e.g., petty crime, theft, sexual, etc.) that purportedly increased. Further, he fails to point out that Cayman Islands statistics do provide assistance in breaking down this 109% figure. The Chief Justice of the Cayman Islands stated in an Address printed in the 2002 Annual Report:

> There were some 10,389 cases filed in Summary Court, **with more than 8,000 of these relating to traffic offences or breaches**.

The Judicial Administration, Cayman Islands, Annual Report 2002, at 26, annexed hereto as Exhibit "C" (available at www.CaymanJudicial-legalinfo.KY) (emphasis added). Dr. McCrie either ignored or disregarded these facts. Further, Dr. McCrie does not point out that these cases

---

[3] Bare crime statistics are insufficient to establish a defendant's reasonable foreseeability, because a court cannot determine the specific nature of the crimes reported. Grisham, et al. v. Wal-Mart Stores, Inc., 929 F.Supp. 1054, 1058 (E.D. KY 1995). Bare statistics lack the necessary detail to establish the similarity of those crimes to the plaintiff's situation. Id.

were filed in Summary Court, the Cayman Islands most subordinate court, and that the overwhelming majority were minor offenses, hardly cases "of a grave nature." Indeed, in Grand Court, where the more serious crime cases are heard, only 61 indictments were filed in 2002, down from a total of 70 indictments the year prior. (Id.) The 2002 Annual Report provides pie charts and graphs to illustrate these reported statistics (Id., at 61-69). As Figure 1 on page 62 indicates, 84% of the 13,028 charges filed (which amounted to a total of 10,389 cases) in Summary Court were neither "serious drug charges" nor "serious non-drug charges", but instead merely "other charges e.g., minor traffic offences." Id. at 62. Moreover, these statistics included the island of Cayman Brac, and not just Grand Cayman. Dr. McCrie failed to include any of these facts in his report, which underlies his opinion. The correct facts clearly reduce his self-proclaimed "reasonable deduction" that by 2002 crime had reached the highest level in the Cayman Islands to unsupportable nonsense. (Exhibit A at 18). Additionally, Dr. McCrie's chart on page 16 is incorrect as it labels the 10,300 (his figure) cases as "Criminal Court Grand Cayman." The correct category is Summary Court, Criminal, Cayman Islands (which is the Cayman Islands most subordinate court).[4]

The following further examples of the unreliable evidence and speculative statements upon which Dr. McCrie based his so-called "expert" opinions provide sufficient proof that he offers no expertise at all to this Court on the subjects addressed and instead would have the Court accept his unreliable and irrelevant views as facts.

- Beginning on the first page of his report, Dr. McCrie makes inaccurate assumptions and speculations. He identifies Columbia Sussex as "Operator" of

---

[4] A copy of the Cayman Islands Judiciary Annual Report 1999/2000 is annexed hereto as Exhibit "D". "All criminal cases start in the Summary Court, with more serious cases being committed to the Grand Court for trial on indictment . . . Customarily there are three Summary Court sittings daily, one of which is usually a traffic court, where cases heard comprise mainly traffic matters." Id. at 6. (emphasis added). A copy of the chart from which Dr. McCrie apparently created his version is found at page 74 of the Cayman Islands 2002 Annual Report & Official Handbook. (Ex. "E").

The Westin Casuarina.  There is no support in the record for this assumption. Moreover, Plaintiff has expressly admitted to the undisputed material fact set forth in Defendants' LR 56.1 Statement of Material Facts on Motion for Summary Judgment that (1) Columbia Sussex does not own, <u>operate</u>, or manage The Westin Casuarina, (2) The Westin Casuarina is a franchise operation owned and <u>operated by Galleon Beach</u>, and (3) Galleon Beach, owner and <u>operator</u> of The Westin Casuarina, is not a party to this civil action.  (emphasis added).

- Dr. McCrie assumes that the area in and around the ballroom and spa of The Westin Casuarina (which happens to be adjacent to the Hotel) would only be the center of "considerable activity" when the spa is open and the ballroom is being used.  (<u>Id</u>., at 9-10).  However, having never visited The Westin Casuarina or interviewed any employee of the resort, he has no personal knowledge of the activity and foot-traffic of this area during "off-hours."  He merely asserts this blind assumption and moves forwards with his unsupported opinions.

- Without visiting The Westin Casuarina and merely reviewing pictures provided by Plaintiff's counsel in 2004 (and taken by the Plaintiff in 2004 and other times well after the incident that is the subject of this litigation), Dr. McCrie opines that the Hotel restroom in which Plaintiff was assaulted invites the use of the general public. (<u>Id</u>., at 12).  His opinion is completely unfounded and unsupportable.  The Plaintiff's photographs fail to show the "Private Report" and "All Facilities for use of Registered Guests" signage that, in fact, existed at the Resort in 2002, (Olsen Affidavit at ¶¶ 11-12), nor do they show the location of the restrooms in relation to the street.  Had Dr. McCrie visited The Westin Casuarina and interviewed anyone at the Hotel, he would have learned and seen that these signs did exist at the time of the incident (<u>Id.</u>), and that the restroom was far removed from the street and not visible to the public.

- On page 13 of his report, Dr. McCrie states that the Plaintiff's photographs reveal a "lockset" on two restroom doors which could have easily been locked by Hotel management to prevent the incident that is the subject of this case.  Had Dr. McCrie interviewed anyone from The Westin Casuarina, (or interviewed the Plaintiff) he would have learned that this lockset did not exist in May 2002, when the plaintiff alleges to have used the bathroom. (Olsen Affidavit at ¶16).

- On page 15 of his report, Dr. McCrie states that a Director of Security should have conducted a risk assessment concerning the levels of crime in the areas surrounding the Resort.  However, Dr. McCrie failed to interview anyone from The Westin Casuarina to identify any risk assessments that may have been conducted, nor does he even know that The Westin Casuarina had its own Director of Security in 2002.

- On page 18, Dr. McCrie states that "nobody knows what the crime pattern was for 2001-02," but he nonetheless the following speculation:  "A reasonable conclusion is that the situation had turned severely worse in the Cayman Islands

and the less said about it, the better considering the importance tourism has for the economic vitality of the islands." (Id.)  Dr. McCrie offers absolutely no support for this statement. (Id.).

- On page 19, Dr. McCrie claims that an increase in police personnel supports his conclusion that the Cayman Islands have experienced an increase in crime.  On the other hand, he also notes that a police presence might normally increase due simply to an increase in population. (Id.).  Indeed, earlier in his report, Dr. McCrie notes that between 1995 and 2006 the population of the Cayman Islands grew from 38,000 to 45,000 on the island (an increase of more than 18%).  Thus, Dr. McCrie himself provides alternate theories to explain the increase in police personnel on the Cayman Islands but nonetheless concludes with no support or explanation that crime was the reason for the increased police presence.

- Beginning on page 19 and carrying over to page 20, Dr. McCrie cites to anonymous Internet blogs to support his wild speculation that officials underreport their crime statistics of the Cayman Islands.

- On page 32 of his report, Dr. McCrie states that the multi-stall restroom at The Westin Casuarina where the incident that is the subject of this action occurred should have had a user's lock inside the door at its main entrance.  He supports this conclusion by claiming it to be "industry practice."  (Id.)  However, Dr. McCrie does not provide any evidence that all, or even some, hotel multi-stall restrooms have such locks.  In fact, Dr. McCrie provides no evidence of industry practice specific to the Cayman Islands.

Dr. McCrie acknowledges that police records regarding the Genereux incident are sparse and that there are no records whatsoever of Royal Cayman Island Police calls for police service at The Westin Casuarina regarding any other incident. (Exhibit A at 33).  However, Dr. McCrie nonetheless opines that, "the attack on Kimberly Genereux should have been foreseeable due to an earlier incident." (Id.)  This "incident" that occurred in 1997, five (5) years prior to the incident that is the subject of this action, involved under-aged drinking by three teenaged guests at the hotel and allegations of sexual impropriety in one of the guest's hotel room.  (See Olsen Affidavit at ¶ 8).  Not only have the Defendants distinguished that incident, the Reynolds case, as wholly different from Ms. Genereux's claims (Id.), but Dr. McCrie's own statements about the incident are so conditional and speculative as to render it wholly worthless:

> No conclusion can be drawn about how security <u>might</u> have changed following the Reynolds' incident.  It is <u>suggestive</u>, however, that some similarities between the two cases <u>might have existed</u> to the extent that security measures <u>could have improved</u>, but no evidence exists that any significant alterations in protective procedures were implemented.

(Exhibit A at 34)(emphasis added).[5]  Dr. McCrie could not be more speculative.  There is not a single reliable source or fact to support his opinion that the Genereux incident was foreseeable, much less "reasonably foreseeable."

Dr. McCrie's Report, and therefore his opinions, utterly fail to acknowledge the actual facts in this case.  The Report fails to note the Plaintiff's sworn deposition testimony that she was walking on public streets during the evening hours and was approached by a strange man in a van twice and propositioned for a ride each time; nor that she feared the van approaching a third time and elected to leave the public road and pass through the private resort property of The Westin Casuarina to evade the strange man.  This testimony by Plaintiff is set forth nowhere in Dr. McCrie's Report, nor is there any indication anywhere in the Report that he has even considered these undisputed facts.  Nonetheless, Dr. McCrie expresses an "opinion" upon Defendants' liability and alleged negligent security as well as the foreseeability of the crime.  Clearly, Dr. McCrie's opinions are not based upon relevant and reliable information and his testimony as a so-called expert should be precluded.

**More Prejudicial than Probative**

Federal Rule of Evidence 403 clearly provides that a court may exclude otherwise admissible evidence if there is a danger that the evidence would be unfairly prejudicial, confuse the issues, or mislead the jury.  <u>Id</u>.   When an opinion is offered by an expert, a court should be more cognizant of the danger of prejudice.  <u>Daubert</u>, 509 U.S. at 595 ("Expert evidence can be

---

[5] Of course, had Dr. McCrie interviewed anyone at The Westin Casuarina he may have learned that following the <u>Reynolds</u> incident, Galleon Beach implemented a strict alcohol service policy.  (Olsen Aff. at ¶18).  Nonetheless, that incident and the procedure implemented afterwards are entirely inapposite to the <u>Genereux</u> case.

both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.")

Dr. McCrie's testimony should be excluded based on the standard identified in Federal Rule of Evidence 403. (Id.) The probative value of Dr. McCrie's proffered testimony is substantially outweighed by the danger of its unfair prejudice to Defendants. The unreliable sources, irrelevant statistics, inadmissible hearsay, and baseless allegations upon which Dr. McCrie forms his opinion would only serve to confuse the issues, mislead the jury, and ultimately prejudice Defendants. (Id.)

Moreover, the report submitted by Dr. McCrie is deficient as it does not conform to the federal rules. Federal Rule of Civil Procedure 26(a)(2)(B) provides that every expert report must contain the following information:

> (i)    a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii)   the data or other information considered by the witness in forming them;
>
> (iii)  any exhibits that will be used to summarize or support them;
>
> (iv)   the witness's qualifications, including a list of all publications authored in the previous ten years;
>
> (v)    *a list of all other cases in which, during the previous four years, the witness testified as an expert at trial or by deposition; and*
>
> (vi)   *a statement of the compensation to be paid for the study and testimony in the case.*

Id. (emphasis added)

Here, items (v) and (vi) of Rule 26(a)(2)(B) are not included in Dr. McCrie's report. He has failed to list the cases in which he testified as an expert, and he has failed to submit a statement of the compensation he will receive for his study and testimony in this case. Both

elements of an expert report are vital to the proper cross examination of any expert witness. Without this information, neither the Court nor the jury can determine Dr. McCrie's credibility. Therefore, allowing Dr. McCrie to testify at trial will only serve to further prejudice Defendants.

**CONCLUSION**

**FOR ALL OF THESE REASONS**, Defendants Columbia Sussex Corporation, Starwood Hotels & Resorts Worldwide, Inc. and Westin Hotel Management, L.P. respectfully request that this Court strike Plaintiff's designation of Robert McCrie as an expert witness and to preclude Dr. McCrie from testifying at trial.

Dated: April 8, 2008

*Yours respectfully,*

CORRIGAN JOHNSON & TUTOR
141 Tremont Street
Boston, MA 02111

By:    John Johnson

-and-

Robert J. Brown (RB7619)
MENDES & MOUNT, LLP
750 Seventh Avenue
New York, New York 10019
(212) 261-8000

Attorneys for Defendants
Columbia Sussex Corporation
Starwood Hotels & Resorts Worldwide, Inc.
Westin Hotel Management, L.P.

Expert Witness Report

In the Case of


*Kimberly Genereux v. Columbia Sussex Corporation, et als.*

*US District Court (D. Mass.)  No. 05-CV-10879-JLT*


**Concerning Security Practices and Procedures at the Westin Casuarina Resort, Grand Cayman, the Cayman Islands, on or about May 3, 2002**


Robert D. McCrie, PhD, CPP
rmccrie@verizon.net

February 29, 2008

# Table of Contents

**Introduction**                                                    **1**

**Materials Evaluated**                                             **2**

**Visit to the Westin Casuarina Hotel**                             **7**

**Are the Cayman Island Hot Spots for Crimes?**                     **14**

**Settled Matters and Findings**                                    **22**

**Discussion**                                                      **35**

**References**                                                      **37**

**Curriculum Vitae of Robert D. McCrie**

# Introduction

On May 3, 2002, at approximately 11 p.m., Kimberly Genereux, a Cambridge, Massachusetts resident, was returning to her vacation residence in Grand Cayman, the Cayman Islands. She had visited the Cayman Islands "more than six times since the year 2000." (Second Amended Complaint, p. 4; Genereux, p. 30) Nearing the Westin Casuarina Hotel on Seven Mile Beach Road, she stopped to use the restroom in the spa building, which was located in a separate facility just off the main hotel building.

She approached the spa building and entered the women's restroom. The light was on. She entered a toilet stall and locked the door. A few moments later a male entered which she was able to determine through the slats of the locked door. She told him that he was in the wrong lavatory area. He apologized and left. But moments later the man--presumably the same person--returned, switched off the lights, forcibly broke the slated wooden door to the toilet stall, and brutally sexually attacked Ms. Genereux. After waiting for a few moments as instructed by her departing assailant, Ms. Genereux left the spa building and entered the main hotel building where she eventually received assistance.

The plaintiff seeks civil damages from the operators of the hotel and from the franchisor/licensor of the property. The issue I shall seek to analyze is: Did Starwood Hotels & Resorts Worldwide, Inc. and Westin Hotel Management, LLP (Starwood/Westin), licensor, and Columbia Sussex Corporation, operator of the Westin Casuarina Hotel on Grand Cayman, have a duty to provide reasonable security measures for Ms. Genereux that were breached on this day and time resulting in grievous injury?

Materials Evaluated

*Kimberly Genereux v. Columbia Sussex Corporation, et als.*

## Court Filings

First Amended Complaint and Jury Trial Demand, August 23, 2005

Answer and Jury Claim of Defendant Columbia Sussex Corporation, October 14, 2005

Answer to Complaint by Starwood Hotels & Resorts Worldwide et als.,

> November 23, 2005

Answer of Defendant Starwood Hotels & Resorts Worldwide, Inc., to Plaintiff's First Set

> of Interrogatories, October 31, 2006

Answer of Defendant Columbia Sussex Corporation to Plaintiff's First Set of

> Interrogatories, November 6, 2006

Responses of Defendant Westin License Company to Plaintiff's First Set of

> Interrogatories, January 4, 2007

Answers of Defendant Starwood Hotels & Resorts Worldwide, Inc., to Interrogatories

> Posed by Plaintiff Kimberly Genereux, February 5, 2007

Answers of Defendant Westin License Company to Interrogatories Posed by Plaintiff

> Kimberly Genereux, February 6, 2007

Answer of Defendant Columbia Sussex Corporation to Interrogatories Posed by Plaintiff

> Kimberly Genereux, July 27, 2007

Second Amended Complaint & Jury Trial Demand, February 13, 2008

-2-

**Depositions**

Kimberly Genereux, December 21, 2006

Theodore R. Mitchel, September 7, 2007

John B. McGovern, September 17, 2007


**Legal**

The Tourism Law (10 of 1974) (1995 Revision) Supplement No. 8 published with

      Gazette No. 11 of May 29, 1995

The Tourism Law (1995 Revision) (1999 Revision) Supplement No. 6 published with

      Gazette No. 6 of March 15, 1995

The Tourism Law (1995 Revision) (2002 Revision) Supplement No. 12 published with

      Gazette No. 13 of July 2, 2002


**Police Reports**

Memo from Sgt. Eustace Joseph to Gail Duquesney RCIP, Criminal Investigations

      Department, May 7, 2002

Letter from Royal Cayman Islands Police (RCIP) to Michael L. Berga,

      September 27, 2005

Letter from Michael William Needham, RCIP, Joint Intelligence Unit, to Bruce Kraft, n.d.


**Westin Hotels & Resorts & Columbia Sussex Documents**

Westin Property Maintenance Reference Guide, Vol. 20, May 1994

Westin Garage Reference Guide, Vol. 15, revised May, 1994

Westin License Company, System License Agreement Between Westin and Galleon

Beach Resort, December 16, 1995 (redacted)

Westin Marketing & Sales Manual, Vol. 2, revised May, 1995

Service Agreement between Columbia Sussex Corporation and Galleon Beach Resort,

January 1, 1996

Deed between the Governor of the Cayman Islands and Galleon Beach Resort and

Nomura Asset Capital, October 3, 1997

Westin Corporate Identity Manual revised December 1997

Westin Comprehensive Checklist for Quality Assurance Program, QAP 2000, revised

January, 2000; Also QAP 2001

Westin Fitness Center/Pool Checklist, QAP 2001, revised January 2001

Starwood Design Review Memorandum, June 10, 2002

Lashner Rush Associates audit of 2002 of the Westin Casuarina, November 5, 2002

Certificate of Liability Insurance from Property Risk Services for the Insured, Columbia

Sussex Corporation, dated November 20, 2005

Associate Orientation Manual for Franchised Hotels, Vol. 30, Sections II & III received

January 30, 2008


**<u>Columbia Sussex Documents</u>**

Columbia Sussex Manager's Manual, revised December, 1997

Columbia Sussex and Affiliates Safety & Loss Prevention Manual, September 10, 2003

-4-

**Correspondence from Related Parties**

Letter from Mendes & Mount (M&M) to Mark F. Itzkowitz (MFI) on January 25, 2008

Letter from John B. Johnson at Corrigan, Johnson & Tutor to MFI on January 25, 2008

- Audit of the Westin Casuarina Resort by Westin Hotels & Resorts of August 30, 1999
- Audit of the Westin Casuarina Resort of September 24, 2000
- Hotel audit summary of Westin Casuarina Resort dated April 24, 2001

**Statements**

Denzil Luke, May 3, 2002

**Photographs & CD**

Color Photographs (14) of Westin Casuarina Resort Showing Entrance to the Restroom and Corridor

Photos from Kim Genereux to Mark Itzkowitz, May 11, 2004; Also Site Plan for the Westin Casaurina Conference Centre; Enlarged Portion of the Site Plan with Locations Illustrated and Marked by Ms. Genereux, May 11, 2004.

CD of Westin Showing Photos & Plan, March 6, 2005

**Miscellaneous Items**

Cayman Islands 1998 Annual Report and Official Handbook, George Town, Grand Cayman, British West Indies: August 1999, pp. 81-85, 173, 254-255, 280-289;

Also Cayman Island Annual Report & Official Handbooks for 1999-2001

"Police Report: Rape Allegation," Caymanian Compass, May 7, 2002

Sheena Carlen, "Police Appeal: Hunt for Rapist," Caymanian Compass, May 10, 2002,

> p. 2

"Some Government Officials Have Expressed Dismay that this Medium Carried News of

> the Recent Increase in Reported Crimes." www.caymannetnews.com  accessed

> February 4, 2000

"Help Police Find Pervert," September 13, 2001, archived January 23, 2004; "RCIP 2000

> Report Reveals a 13 Percent Increase in Crime," January 15, 2002, archived

> January 23, 2004; "House Hears Report on Youth Violence in Cayman," January

> 14, 2002, archived, January 23, 2004; "Crime Rate 'Unacceptable,'" February 17,

> 2003, archived January 23, 2004.  All found in www.CayPolitics.com

"Cayman Islands" from Wikipedia, obtained October 15, 2007

*Leslie B. Reynolds et al. v. Westin Hotel Company , et al.* United States District Court,

> Eastern District of Kentucky, summons, case no. 97-77.


**Plus references at the end of the report**

## Visit to the Westin Casuarina Hotel

Normally, it is my procedure to visit locations where I evaluate circumstances. However, I have not visited so far the Westin Casuarina Hotel. But, 40 colored photographs of the location from all angles were available. Additionally, a CD of digital pictures was examined. Further, Google maps and the hotel's own website were used for orientation. Finally, maps showing properties along the Seven Mile Beach Road were examined.

The Cayman Islands are a British overseas territory located in the Western Caribbean Sea. They comprise the islands of Grand Cayman, Cayman Brac, and Little Cayman. They are a major global off-shore financial services center. The population of the Cayman Islands has grown rapidly from 38,000 in 1995 to 45,000 as of July 2006. About 60% of the population is mixed race, mostly mixed African European. The Caymanians enjoy the highest standard of living in the Caribbean. According to the *CIA World Factbook*, the GDP per capita is the eighth highest in the world. The Cayman Islands dollar is pegged to the US dollar at a fixed rate.

Tourism represents 70% to 75% of the annual GDP. The vast majority arrive at the capital, George Town on Grand Cayman. The great attraction there is Seven Mile Beach regarded as one of the best beaches in the world and a take-off point for countless SCUBA dives.

The Westin Casuarina Resort is located on a prominent stretch of the beach. Just to the south is the site of the Ritz-Carlton Resort. Just to the north is Government House

-7-

and beyond that a resort complex, The Pinnacle. Other prominent resorts, residential

structures and government buildings are located along a western stretch of the beach.

(See Figure 1.)

## Figure 1



To their east is West Bay Road beyond which commercial, retailing, and residential

businesses are located.

    The Westin Casuarina is composed of two structures. The first is the hotel itself

which includes rooms, restaurants, bars, and a large swimming pool. Immediately to the

north, just before Government House, the property was expanded in 2001 to create a spa

with a ballroom capable of handling multiple functions. (See Figures 2 & 3.) In the

daytime and evening the ballroom and spa could be the center of considerable activity.

But if the ballroom is not in use and the spa has closed for the day, the activity would be

**Figure 2**

**Figure 3**



considerably diminished.

The plaintiff, Ms. Genereux, was attacked in the middle stall of the ladies lavatory. The entrance is accessible from a terrace open to the outside. (See Figure 4.) Access to the lavatory facilities is not encumbered in any way. On the pictures provided no indication of signage occurs to deter the public from using a facility on this private

-10-

Figure 4



property.  No gate is seen that would have allowed, quite easily, the securing of the

lavatory area when it would not be needed by guests of the hotel or the spa.  In a sense,

the hotel property was inviting the guests, staff, and public in general to use the facility.

Therefore, entrance to the toilets was located off a totally open foyer.  As one enters the

foyer, doors to the men's and women's restrooms are readily visible. (See Figures 5 & 6.)

### Figures 5 (upper) & 6 lower)



-12-

Figure 5 shows the entrance to the two restrooms from an outer perspective of the foyer. The doors contain a lockset by which management could have locked the doors if they had chosen to do so. To the left in Figure 5 is the door to an electrical room which one would assume would be locked. Figure 6 approaches the doors more closely. The two doors for the restrooms are near each other, separated by little more than one foot. The area appears to be well lighted and clear of any obstacles. No emergency phone or alarm was noted in these pictures or in any of the other photographic materials made available for inspection.

The Westin Casuarina Resort is described as a "first-class resort facility" including 350 deluxe guest rooms, 2,600 square feet of meeting place, two restaurants and a snack bar, a pool, and other amenities (Hotel's website).

## Are the Cayman Islands Hot Spots of Crime?

The 1998 *Annual Report & Official Handbook* of the Cayman Islands, entitled "Preparing for the New Millennium," states: "The Cayman Islands remains one of the safest places to live in the world. The year 1998, saw reduction of 10.6 percent on the previous year, bringing the total recorded crime down to 3,173. The detection rate is the envy of the civilised world" (p. 83). The 2002 *Annual Report* continued the same positivist outlook: "The Cayman Islands remains one of the most crime-free countries in the world. Crime in the Islands fell 4% during 2002, and the actual numbers remain very low. However, Cayman is a transshipment point for drug trafficking and large quantities of cocaine and cannabis (known locally as ganja) are recovered annually."

Indeed, the *CIA World Factbook* tersely states for the Caymans: "Offshore financial center; vulnerable to drug transshipment to the US and Europe."

The significance of such a query into the level of crime in an area relates to the controls managers in public and private institutions must install as conditions change. If crime is steady, the organization might seek to improve quality and, perhaps, experiment with systems improvement. If crime is increasing, however, the usual response is to increase security personnel and budgets, and search for new means to reverse a worsening trend. This usually means that significant commercial entities work closely with local law enforcement.

In this situation, serious crime increased substantially during the study period, 1998-2002. The trend was sufficiently clear that business owners and operators in this

-14-

action would have or should have apprized themselves of the changing risk pattern. They should then have called in an outside expert to conduct a comprehensive risk assessment. Alternatively, their own Chief Security Officer (CSO) or Director of Security should have conducted the risk assessment survey meeting with other concerned resort hotel operations and local law enforcement. The conclusions and recommendations would be considered by local, regional, and national management, and decisions would be made about the appropriate next steps in risk mitigation.

But all of this is predicated upon the reality that crime was changing, in this case new circumstances that would dictate that security needed to be tighter. What are the signs that a manager would see that should lead to the conclusion that Grand Cayman Island was (is) more dangerous than official rhetoric? Here is some evidence:

- <u>The government reports a high clearance rate, but data are suspicious</u>. For the years 1998-2000, the clearance rate was an impressive 75.3%, 73.0%, and 78% respectively. (See Table 1.) But these stunning figures are buttressed by marijuana and cocaine arrests which are high in the 90 percentile range. In other words 90-plus percent of all the cases involving these two drugs are solved. To believe that this is a credible reflection of success at fighting crime, one would have to be on cannabis at the time.  That is, the number of drug offenses which occur but which do not reach the attention of police is vastly underreported. Note, too, that the clearance rate considers only those incidents which are reported to police.  The true number of incidents could be 3- to 3.5-times higher.

According to Park Elliott Dietz, a professor of law and behavioral medicine and psychiatry at the University of Virginia: "The true rate of

-15-

Case 1:05-cv-10879-JLT    Document 108-2    Filed 04/08/2008    Page 18 of 22

occurrence is not known for any statutory category of sex offense. Only rape has been the subject of multiple and sophisticated efforts to measure true incidents…The best available data on rape incidents comes from victimization survey (most notably the national crime panel

## Table 1

### Crime and Vital Data Comparison for the Cayman Islands, 1998-2002 (Preliminary)

| Crime Category | 1998 Reported | 1998 Detected | 1999 Reported | 1999 Detected | 2000 Reported | 2001 Reported | 2002 Reported |
|---|---|---|---|---|---|---|---|
| Offences of sexual impropriety | 64 | | 43 | 50 | 30 | 61 | |
| Offences against the person | 316 | 251 | 282 | 207 | 342 | | |
| Offences against property | 998 | 481 | 963 | 446 | 948 | | |
| Marijuana (ganja) offences | 558 | 554 | 509 | 494 | 628 | | |
| Offenses involving cocaine | 490 | 465 | 355 | 338 | 363 | | |
| All reported crime | 2,957 | 2,228 | 2,877 | 2,101 | 3,254 | | |
| RCIP/Officers & Support | 250/50 | | 270/40 | | 295/40 | 332 total | 322/49 |
| Clearance Rate | 75.3% | | 73.0% | | 78% | | |
| Criminal Court Grand Cayman | 4,923 | | 4,929 | | 5,297 | 6,996 | 10,300 |

Source: *Cayman Island Annual Report and Official Handbook, Cayman Islands Government 1998-2002.*

-16-

surveys conducted by the United States Bureau of the Census), not
from law enforcement data sources. (p. 1491)

Dietz doesn't indicate what the victimization surveys in the United States

reveal. However, the National Crime Victimization Survey (NCVS), to which he

refers, reveals that in 2003 only 38.5% of rape and sexual assault were

reported to police. (NCVS, p. 10)

But the incident in this action occurred in a country within Great

Britain. Could crime data be more reliably reported there? In England and Wales,

the equivalent to the NCVS is the British Crime Survey. This research

concentrates on property crime and confirms that, similar to the US, this type of

crime usually is not reported to law enforcement. (Ditton and Farrall)

- <u>More serious crimes against the person have a lower clearance rate</u>. For two years

  of comparison, the rates were: 20.6% for 1998, and 26.6% for 1999. The rate for

  this type of crime in 2000 is not known as the RCIP aggregated the reported data

  and reported a rate of 78% without explaining what the percentages were for the

  various constituent parts.

- <u>The most relevant crime in this action—offenses of sexual impropriety—shows a</u>

  <u>weaker clearance rate</u>. In 1998, for this category of offense, the clearance rate was

  67.2% and the next year it had dropped to 60%. (As mentioned above, nobody

  knows what the clearance rate was in 2000, and the subsequent years or and on,

  because the data were no longer reported.) Sexual offense is the category of crime

  which concerns this action. Yet, a perusal of *Annual Reports* over these years

  does not reflect any innovations about dealing with sexual crimes. One would

-17-

expect for 2003 to see evidence of police program innovation to deal with sexual incidents and other criminal offenses. The number of women employed as sworn police officers is not recorded anywhere in the documentation for these years.

- Nobody knows what the crime pattern was for 2001-02. That's because the government stopped reporting detailed crime data as it had for so many years in the past. Why? This was a time when police departments in the United States were increasingly sharing crime data with the public. No explanation was provided by government. A reasonable conclusion is that the situation had turned severely worse in the Cayman Islands and the less said about it, the better considering the importance tourism has for the economic vitality of the islands.

- Criminal cases heard in court soared from 1998-2002. While the RCIP stopped providing specific crime data to the public with 1999, the courts continued to report on cases heard—criminal and civil. This provides some reflection on matters reaching the court's attention. Such criminal matters are likely to reflect cases of a grave nature. Criminal court cases heard in 1998 and 1999 were about the same. But then double digit increases occurred over the next three years. By 2002—the year of the incident involved in this case—the total cases had soared to 10,300, an astonishing increase of 109.0% in just three years. It is a reasonable deduction that by 2002 crime had reached the highest level ever in the Cayman Islands based on fragmented statistics published by the government.

- The RCIP responded by rapidly increasing police personnel. As mentioned above, when crime increases, the usual response is to throw personnel at the

-18-

problem. From 1998 to 2002, the number of police officers plus staff personnel grew from 300 to 371, up 23.7%. (Normally, police might increase with the growth in population.) The growth is especially strong between 2001 and 2002, when the number of police personnel jumped 11.7 in one year. The RCIP provides no explanation why from 1999 on the quantity of police and support personnel grew to such an extent.

- The Cayman Islands government has decided to keep their actual crime statistics secret. As observed above, crime data from 2000 on have been reduced in detail and clarity while other information less important gushes forth. For example, full Fire Services statistics are provided including the number of brush fires (217 in 2001). Interpol, the International Criminal Police Organization, includes 186 countries as members, but not the Cayman Islands. If they were a member, they would be expected to publish crime data for the world to see. The Cayman Islands *are* included as a sub-unit member of Interpol under the United Kingdom. But in this category they are not obliged to provide crime data.

- Bloggers report that crime in the Islands is worse that the positive p.r.  On a blog managed by www.caymannetnews.com a picture emerges from experiences that indicate problems residents and visitors have had about crime.  Here are two postings (March 26, 2004), though not contemporaneous with the attack on the plaintiff, as they occurred just about two years after the attack on Ms. Genereux:

> *Since crime statistics have not been submitted to Interpol for years, how can anyone be sure that the government is not altering crime statistics in Cayman? For example, the US State Department website states that rape and sexual assaults are likely "underreported," etc. in Cayman. Also,*

-19-

*there is much more crime in Cayman than most US municipalities of
40,000 residents—that is a fact.  Calling Cayman safe perpetuates a myth
in my opinion*—Anonymous.

*As a former resident of Cayman...As I remember most of the crime
committed in Cayman was aquisical, it fed a drug dependency or was
gang related, the prison was full most of the time. Cayman needs to
educate their young, having a zero tolerance on juvenile crime, setup a
DTO (Detention Training Order), ASBO (Anti-Social Behaviour Orders)
and insure the offender learns from the experience*—John Newby.

While these two reports post-date the attack in 2002, they reflect post-incident

skepticism about the accuracy of Cayman crime data, in one case, and

disillusionment generally with the criminal justice system there, in the other.

- Cayman government officials themselves instituted a crime crackdown.  By 2004,

    the government had become concerned "as a result of the recent spate of violent

    crimes," reported Brian Buckley in Cayman Net News, Sept. 2, 2004.  No

    statistics were provided on the extent of criminal activity.  But the attorney

    general introduced a new Evidence Law to protect witnesses, the amendment of

    the Penal Code providing a "two strikes and you are out" provision, and funds to

    establish a DNA lab at the George Town Hospital. [This would be helpful in rape

    investigations.] The announcement came at a major press conference attended by

    the governor, the attorney general, and the acting chief secretary.  Earlier that

    year in a period of a couple of month, violent crimes occurred in the Caymans

    involving two murders, and armed robbery of a tourist, and stabbings during a

    home invasion. (Cayman Net News, March 26, 2004)

- Sexual attack risks in the Caymans are noted in travelers' advisories.  The US

    Department of State warn visitors to the Cayman Islands in 2003 that sexual

-20-

assault was one of the risks:

> *Violent crime is rare in the Cayman Islands, but petty thefts occur. There have been incidents of sexual assault, some reportedly involving the youths of so-called "date rape" drugs, such as ruhyonol. To avoid being victims of crime, Americans should exercise common sense and take basic precautions, including being aware of one's surroundings, not walking alone after dark or in remote areas, and using reasonable caution when offered food or beverages by persons unknown to them.*

### How Dangerous a Paradise?

By May 2, 2002, the chances of risks to members of the public in Grand Cayman, were growing substantially from the levels of earlier years. This was apparent from government reports even when government stopped to be so forthcoming with this information. The Caymans were attracting and developing a criminal class who sought easy spoils from the wealth created by tourism, the liberal banking and incorporation laws of the country, and the high economic standing relative to similar islands or the nearby mainland. The growing drug culture undoubtedly contributed to the loss of controls. The Caymans had become a paradise for offenders, which was recognized by the government with its exceptional proposal that occurred two years following the attack on Ms. Genereux. Business operators would have or should have noted the shifting risks to employees, customers, and the general public and make appropriate adjustments to their security endeavors.

## Settled Matters and Findings

The findings in this case flow from certain working assumptions made in the course of the fact-finding and the review of documents in the action. Some of these assumptions are to my mind settled matters. I offered them not with a legal opinion, because I am not a lawyer, but from an expert's perspective having consulted with businesses on security and managerial issues since 1970.

**<u>Here are the settled matters</u>**:

- <u>Kimberly Genereux was grievously injured</u> on or about May 3, 2002, by an unknown male, while she was in the women's restroom of the Westin Casuarina Hotel on Seven Mile Beach, Grand Cayman, the Cayman Islands.

- <u>Genereux was legally present on the site at the time of the attack</u>. She had visited the islands "more than six times since the year 2000." (Second Amended Complaint, p. 4; Genereux p. 30) She previously "had visited the Premises on several occasions...for the purposes, *inter alia*, of shopping, touring, lounging, bathing, dining, and using the lavatory facilities of the Premises." No signage indicated that the use of the facility was prohibited to someone such as the plaintiff. No gate, guard, alarm system, or physical barriers prevented a person from using the restroom facilities at any time they were open. Ms. Genereux had, in fact, been on the premises earlier in the day and was told by an employee of the Hibiscus Spa to use the restroom where she was attacked later the same day. (Genereux, pp. 58-60)

- <u>The daily care and control of the premises</u> is the responsibility of the operator

-22-

Columbia Sussex Corporation.  This was (and is) a substantial business in the

hospitality industry owning, operating, or managing approximately 58 properties

in 2002.  Operators hire, supervise, fire employees, care for the guests and

property, and attend to the myriad details in operating such a facility.  For all

effective purposes Columbia Sussex Corporation and Galleon Beach Resorts are

interchangeable. (McGovern, p. 101, 104-05; Mitchel, p. 82-83, 97-98)

- <u>The ultimate responsibility for quality control and operations</u> is that of the
franchisor and licensor, Starwood Hotels & Resorts Worldwide, Inc., and Westin

  Hotel Management.  The reason for this opinion is because of the extensive

  power held by the licensor.  Starwood/Westin exercises, if it choose to, almost

  minute control over any licensee.  This includes, but it is not limited to: exterior

  and interior design including colors used, landscaping maintenance, pool lounge

  furniture, signage, elevator cab decoration, and countless other issues.  On a

  design review memorandum dated October 6, 2002, Starwood manager Steve

  Sherman provided approximately 23 "changes for compliance" that the Westin

  Casuarina Resort would be expected to implement.  Despite the fact that the

  Governor's Ballroom had just been renovated, the memo called for replacing the

  carpet, lighting, and wall covering.  Starwood/Westin monitored complaints and

  comments from patrons and its own visiting checkers.  Additionally, an outside

  audit firm, Lashner Rush Associates (LRA), provided a trained, disinterested site

  audit to assure that standards were maintained according to the Starwood/Westin

  expectations.  The LRA report for 2002 of the Westin Casuarina in Grand

-23-

Cayman, covers 27 pages of detail.  Additionally, as mentioned, the chain itself

would send its own personnel to check the location and counsel local management

on what needed to be done differently.  If Columbia Sussex failed to meet criteria

established by Starwood/Westin, the licensor had all the cards.  Physical design,

daily operations strategy, reservations, sales promotions, personnel decorum and

performance, and the TV channels guests were able to access were specified from

the Starwood/Westin system.  Starwood/Westin even dictates how many sheets

(three) should be on the bed of an up-scale room and that "all rooms contain a 4-

cup coffee brewer and service, auto shut-off per Brand OS&E. Standards."  It is

common sense that the much larger and more experienced hospitality entity,

Starwood/Westin, would have the first word and the last word when it comes to

security.  It's the licensor that holds the big stick with almost four pages of single-

spaced terms for termination. They call it "de-franchising." Liquidated damages

also must be paid in circumstances where the licensee uses the Westin name or

services upon termination or expiration of the agreement.

The System License Agreement between Westin License Company and

Galleon Beach Resort (licensee) states:

> (i) *Westin Hotel Company (WHC) has been in the business of owning*
> *and managing first-class, high quality, hotels for many years...throughout*
> *the world.  Based upon its experience, WHC has developed a system...of*
> *WHC's marketing, reservation and front-office systems, operations*
> *manual and guidelines, training with respect to the foregoing, and certain*
> *pre-opening activities (collectively, the "Westin System").*

Further...

> (iv) *Licensee acknowledges that the Westin System includes detailed*

-24-

> *specifications and standards for operating first-class hotels using the
> Westin name, understands the importance of maintaining first-class
> hotel standards…in conformity with the specifications and standards
> for first-class hotel promulgated by Westin.* (System License Agreement,
> p. 2)

Still later in the agreement:

> 1.11 *Westin Not Liable for Licensee's Obligations. Westin shall not be
> responsible for any of Licensee's costs, expenses or obligations associated
> with the Hotel or its operations. Licensee may not perform any activity or
> incur any obligation or indebtedness in a manner that could result in
> making Westin liable for same.*

Westin has a particular interest in any legal actions:

> 4.7 *Notice of Court Action and Material Incident. Licensee shall notify
> Westin as soon as practical but in any event within: (a) 24 hours of any
> incident, and (b) three days of commencement of any action, suit or
> proceeding, or of the issuance of any order, writ, injunction, award or
> decree of the court, agency or government instrumentality; that may
> materially affect the operation of financial condition of the Hotel, Westin,
> its affiliates, or Licensee.*

Security and life safety issues are not mentioned here in detail. McGovern

confirms that Starwood/Westin maintains a kind of security check of its licensees:

> Q. With respect to the security standards of the type you mentioned
> before, like double locks and the evacuation card on the back of the
> door, is there somebody from Starwood or from the Westin brand
> within Starwood that actually goes out to make sure that the individual
> hotels are in compliance with those particular standards?
>
> A. Yes.
>
> Q. And do they do that through the type of audit procedures that
> you were telling us about earlier?
>
> A. Yes. (McGovern, p. 74)

In this incident the license agreement began March 20, 1995, for a period of 20

years. The licensee has an option of terminating the agreement if the licensee is in

agreement with the provisions but the licensor "substantially breaches any material provision of this Agreement" that is not remedied within 90-day period of being notified in writing.

### Here are the findings:

**1. Supervision of security by Starwood/Westin was negligent.** It's expected for a facility operator like Columbia Sussex Corporation to turn to its licensor for guidance on security and life safety matters. However, though Starwood/Westin had good ideas about the thread count of sheets, they didn't provide much leadership about security and life safety. The LRA audit clearly indicates that security-related issues were (and are) part of the Brand Assurance Program. Under the heading Core Essential Standards, the location was required to meet:

**Life Safety (includes door locks, room access, etc.)**

While it is obvious that door locks for rooms are expected, there is no indication that the supervision might extend to public areas where security is required, like public restrooms. (In fact, the Westin Casuarina Resort received a high grade from the contemporaneous survey *except for* Life Safety where it received two negative citations weighted to a value deficit of 20 in the audit's survey.)

Why didn't Columbia Sussex Corporation get a more thorough critique on security and safety measures from its own professional traveling managers? The reason why is that Starwood/Westin has no in-house security director and had none in May 3, 2002. John Bernard McGovern, vice president of operations of a Starwood entity

-26-

currently and vice president of operations/franchise operations for the northeast region of

Starwood on May, 2002, testified:

> Q. Okay. In terms of Starwood's corporate structure, as it
> were, is there a – is there some division of some department
> within Starwood that handles security functions or loss
> prevention functions?
>
> A. No.
>
> Q. Who handles security functions within Starwood?
>      MR. JOHNSON: If anyone.
> BY MR. ITZKOWITZ:
> Q. Right; if anyone.
>
> A. I don't know. (pp. 60-61)

The matter was continued later in testimony.

> Q. Okay. Just as an example, there are different sorts of industry
> groups for the hotel and motel industry that address security
> functions, like Resort Security International or Hospitality Risk
> Controls.
>      Do you know whether Starwood or Westin brand within
> Starwood have people who are members of these organizations?
>
> A. I don't know.
>
> Q. Okay. Do you know if there's anybody that Starwood requires
> to be a member of these organizations as part of their job function?
>
> A. No.
>
> Q. No, they don't, or, no, you don't know?
>
> A. I don't know.
>
> Q. Is there anybody at Starwood or anybody within the Westin brand
> that reviews the security policies that individual Westin Hotels design for
> themselves?
>
> A. No.

> Q. Is there anybody within Starwood or within the Westin brand of
> Starwood that is responsible for providing training to the people who
> actually operate Westin Hotels to make sure they have proper
> security training?
>
> A. No. (McGovern, pp. 73-74)

In this circumstance, contrary to the industry trend, such a premium chain as

Starwood/Westin cynically cut its chief security officer (CSO) position in the mid-90's as

a cost savings measure. Starwood/Westin CSO's membership was dropped from ASIS

International by 2001, and this point was confirmed telephonically with Richard Hudak,

previously a security director with Sheraton, and a person who knew most of his security

colleagues in the hospitality industry. (ASIS *Dynamics*)

Using a list of largest hotel chains from *Hotels Magazine*, I checked the largest

organizations (excluding casinos) which are primarily hotel/motel chains to see which

have senior security managers at corporate headquarters. The senior security position

was determined by comparing membership with either or both of three organizations: the

International Security Management Association (ISMA), ASIS International, or the

British Security Industry Association. Here is the status of that inquiry:

| Hotel Chain | Senior Security Officer at Hqtrs. |
|---|---|
| InterContinental Hotels Group, Windsor, UK | Yes |
| Wyndham Hotel Group, Parsippany, NJ | Yes |
| Marriott International, Washington, DC | Yes |
| Hilton Hotels, Beverly Hills, CA | Yes |
| Accor, Paris, France | Yes |
| Choice Hotels International, Silver Spring, MD | ? |
| Best Western International Phoenix, AZ | Yes |
| Starwood Hotels & Resorts, White Plains, NY | No |
| Carlson Hospitality, Minneapolis, MN | ? |
| Global Hyatt, Chicago, IL | Yes |

Even many smaller domestic hotel chains have security directors at headquarters: Omni Hotels, Loews, Hospitality International, Ritz-Carlton, Manhattan East Suites, and many others. Of course simply having a competent security director with adequate support in a headquarters office does not translate into a national or global program that will mitigate security-related risks. That person must make a difference and all employees need to be part of the security program.

It is an industry practice that corporate security directors, including for hotel chains, set policies, conduct site visits, train subordinates and associates, advise the Board on progress, and evaluate technology. (McCrie, pp. 3-28)

Starwood/Westin does have security directors for a few of their properties but not the Westin Casuarina Resort, Grand Cayman. The corporation no longer has a CSO with support staff to assure that the latest procedures, legal advisories, and technologies are made available to the properties under their control. Starwood/Westin has not advised that local security services be in place.

Starwood/Westin particularly should be expected to have higher security consciousness because it charges higher rates for its properties. Their properties are above average in cost per room per night. Theodore R. Mitchel, Columbia Sussex Corporation secretary treasurer, testified that guests have an in-house high balance limit of $3,000 at the Westin Casuarina Resort, Grand Cayman. (p. 181) Places that charge more have higher expectation of investing more in all ways, including guest safety and security. In 2005, Starwood owned and operated a variety of properties: Sheraton®, Four Points® of Sheraton, W Hotels, aloft^sm, The Luxury Collection®, Le Méridien®, Element,

-29-

Westin®, and St. Regis®. According to *Hotels Magazine* in 2005, Starwood owned or

controlled 257,889 rooms with 845 properties. Such an organization is large enough to

support a security program based at headquarters.

**2. Starwood/Westin puts attention disproportionately on guest comfort**

**issues at the expense of guest safety.** Extensive annual in-house audits of the Westin

Casuarina Resort were inspected for 1999, 2000, and 2001. (The LRA Audit was a

separate document.) These audits are in many ways laudable, designed to provide the

guest with a comfortable stay. However, security is egregiously overlooked. Doors and

door locks must meet Westin Quality Assurance Program requirements. Guests' in-house

room safes are required on a complimentary basis. "A sticker with door locking

instructions is placed just above the guest room/lanai/patio door lock. The notice advises

the guests to lock the door when not in use." Copious details like this occur throughout

the audit. However, major issues like locking facilities in public areas rate nary a word.

The design of the Hibiscus Spa building, constructed only in 2001, violates

principles of Crime Prevention Through Environmental Design (CPTED). Timothy

Crowe, a security consultant, cites nine major CPTED strategy that may be used in any

number of combinations. All of them have relevance—or should have had—in the

construction of the spa facility. One point that is most relevant in this situation:

> *Redesign or revamp space to increase the perception of natural*
> *surveillance.* In this situation the entrance to the waiting room is
> obscured by a pillared portico and a mechanical shed. Someone
> turning down the narrow corridor leading to doors for the restroom
> facilities cannot easily be seen by someone even a few feet away.
> Natural surveillance from the reception of the spa is impossible.
> The design facilitated the criminal occurrence. One doesn't need
> to be formally trained in CPTED to conclude that the design is
> illogical, unnecessary, and dangerous.

Other relevant CPTED principles:

*Provide clear border definition of control space*

*Provide clearly marked transitional zones*

*Redesign the use of space to provide natural barriers*

*Overcome distance and isolation.* In this situation the entrance to the restroom area is far from a spot where employees or guests might discourage or deter improper activity.

**3. Security procedures were negligent at the Westin Casuarina on May 3, 2002.** The attack to Ms. Genereux could not and would not have occurred if the facility had merely locked restroom doors after a given hour. The property had no obligation to keep the restrooms unlocked as they did, even in a "safe" island like Grand Cayman. If a customer like Ms. Genereux arrived at the restroom door and found it locked, she could have entered the main building just a few feet away and used a restroom facility there off the lobby.

Once accepting that the facility was unlocked, even though no customers were using the spa or ballrooms, Starwood/Westin had an obligation to provide reasonable security in or near the restrooms. While not a mandated legal consensual standard, industry practices require facilities built and fitted to contemporary circumstances typically have closed circuit television (CCTV) installed and operating to capture the images of persons entering or leaving the premises at all entrances and exits. Such a system is certainly beneficial to law enforcement in conducting an investigation. But CCTV is equally useful in deterring attackers because they know their images are being captured and stored in a secure location off-site. As Figure 3-6 indicate, CCTV was not

-31-

installed in or near the ballroom and spa building where the attack occurred.

**4. Security design was negligent at the Westin/Casuarina on May 3, 2002.**

Lighting appears to be adequate for the foyer leading to the restrooms. However, as shown by Figure 4, no line-of-sights occur from a distant area to the lavatory doors. Hence, no natural supervision was possible concerning people who would enter the restrooms.

Further, the doors to the restrooms as shown in Figures 5 & 6 are too close to each other, facilitating the entry of a male into a facility for females "by accident" is eased by this design flaw.

The lavatory should have had a user's lock inside the door of the restroom. This is an industry practice. It would have been a reasonable public safety measure in view of the accessibility of the restroom facility.

**5. The Westin Casuarina Resort failed to provide reasonable response to the victim after she was attacked.** The purpose of security practices and policies is to protect people first. Everything else is subordinate. This hospitality property which was so sensitive to any guest slight, whim, need, or desire, cold-shouldered someone who was quite obviously injured recently and in severe emotional and physical distress.

The victim testified that after she was injured when she asked the bartender to call police, she informed her that she couldn't:

> Q. What did she tell you?
>
> A. She told me that she couldn't call the police. She had to call the manager. Genereux, p. 76)

A trained security employee—or personnel trained in security—would have

-32-

initially comforted the victim, placed her in a private area, provided a female attendant, then immediately called police and emergency services, and then would have returned to cared for the victim in a sensitive way until authorities had arrived. Starwood/Westin and Columbia Sussex required no such measures from its employees and no security employees were on site, despite a function taking place that evening. (Genereux, 28-29) Instead, employees in a bar provided no aid. The manager on duty arrived much later, apologized, but then provided no assistance until he had required the victim to leave the hotel building, return to the restroom in the spa building, and see for himself that the restroom was in disorder with the louvered doors broken. Gratuitously, even then, the manager asked if she was "sure" that she had been raped. When police arrived, the ordeal was continued. By not calling police immediately—waiting until the manager was personally satisfied that a crime probably had been committed—the chances of arresting the attacker was diminished with a faster police response.

   **6. The attack on Kimberly Genereux should have been foreseeable due to an earlier incident.** Criminal records produced by the RCIP in this incident are sparse. No longitudinal study of individual calls for police service at The Westin Casuarina Resort were possible because police either do not have or did not produce the records. However, in a deposition by Theodore R. Mitchel the following exchange occurred:

> Q. Okay. Earlier today you have mentioned that there was another allegation of a sexual assault at the Westin Casuarina involving a minor female named Reynolds. Do you know whether any type of analysis was prepared involving her incident?
>
> A. There was an incident report prepared.

Q. Okay. And addition to the incident report was there an analysis
of how the Reynolds' incident had occurred?

A. There wouldn't have been any additional report beyond
that incident report. (pp. 149-50.)

In the Reynolds case two teenage girls were illegally served alcoholic beverages
without the knowledge of the adults responsible for their care and then sexually assaulted
by a hotel guest aided and abetted by a room service employee and other hotel employees.
The incident occurred on the evening of March 22, 1997 and the following morning.
(Reynolds, pp, 4-5)

No conclusion can be drawn about how security might have changed following
the Reynolds' incident. It is suggestive, however, that some similarities between the two
cases might have existed to the extent that security measures could have improved, but no
evidence exists that any significant alterations in protective procedures were implemented.
Columbia Sussex and Starwood/Westin didn't seemed to learn anything from this
incident. Mitchel further testified:

A. It's my recollection that there wasn't any additional or change that
was required to be made in connection with [the Genereux] incident.
So I think the answer to your question is, no, we did not do anything
to change policy or procedures because of the incident. (p. 151)

Mitchel testified that he was unaware if the Westin Casuarina did undertake
quarterly safety meetings as required by internal policy. (p. 151-52)

-34-

## Discussion

The *Handbook on Security* notes: "Of all the specialized security functions, perhaps the most difficult to carry out is that of hotel security. The complex organization of a modern hotel, together with the necessarily ever changing population mix means that ensuring the safety of the guests, staff and the protection of the contents and fabric of the building is one of the most demanding jobs in security." (p. 5.24-01)  The publication further notes: "The fact that a hotel is open 24 hours a day lends it a unique position and those establishments...will suffer more from undesirables than other. Access to...toilet facilities and so on are the principal attractions and the essence of the security man's job is to prevent all non-residents from gaining access...." (p. 5.24-02)

Harry Smith, earlier director of security at Loews Hotels and a member of the National Committees on Security and Safety, American Hotel & Motel Association, notes the dangers when hotel managements fail to put priority on security. He writes:

> There has always been an implied understanding that the traveler stops at the inn not only for the comfort of a bed, a roof overhead, and a meal on the table, but also for the safe haven provided by the lodging. Guests automatically assume that security is high on a hotel's list of priorities, but unfortunately the opposite is often true. (p. vii)

The Westin Casuarina gave short-shrift to security at the expense of the plaintiff, for sure, and others before her. Security does entail a cost, but in a location like a Caribbean island, physical security is a reasonable expectation. Harvey Burstein writes that hotel security is considered a positive by guests:

> The overwhelming majority of guests are aware of the existence of lodging industry security problems of one sort or another. As a result they

-35-

welcome the idea that management is sufficiently concerned with their
protection to have a security program. This does not mean that they welcome
a security effort that projects the image of an iron camp or a police or
military installation. Whether traveling on business or for pleasure, people
prefer a relaxed, comfortable, but proper atmosphere, and this mandates
that security programs be low-keyed and that a security staff's presence
be known but unobtrusive. (p. 83)

The Westin Casuarina had no security program of significance: no proprietary

security worker, no contract security service, no CCTV near the spa building, no alarms

there, no records of security and safety training of hotel employees (Mitchel, p. 200), no

incident report produced, no evidence of on-going liaison with local law enforcement, no

reasonable and caring procedures for soothing someone who has been brutally attacked

nearby.

So does a facility and its licensor/franchiser have a duty to those who might be

injured through negligence?  Norman D. Bates, a lawyer and professor at Northeastern

University, wrote:

> An innkeeper has the duty to exercise reasonable care for guests.  If
> A hotel is experiencing an increase in crime or if the surrounding neighborhood
> is having problems with crime in a way that could affect the hotel's guests,
> and the innkeeper fails to respond to that threat by improving or increasing
> security measures, the innkeeper may be liable for any injuries suffered by
> guests at the hands of a third party criminal. Even if the offender is not
> caught, providing that the injury occurred in or immediately adjacent to
> the hotel's property, the hotel may pay.

> Liability in these cases is predicted on the theory of negligence,
> in that it was reasonably foreseeable that the injury would occur if
> corrective action were not taken.  If the innkeeper knew or should have
> known of the threat, the *reasonable care* rule will apply, establishing
> that the innkeeper has a duty to protect a guest, failed to do so and as a
> result a guest was harmed. (p. 526)

# References

ASIS *Dynamics*. May/June, 2001.  (This membership directory shows no CSO at headquarters for Starwood/Westin.  An assistant security director of Sheraton, Edward P. Johnson, Jr., appears in this volume but not subsequent editions.)

Bates, Norman D.  "Hotel Security" in *Handbook of Loss Prevention and Crime Prevention*, 2nd ed. Lawrence J. Fennelly, ed.  Boston: Butterworth Publishers, 1989.

Burstein, Harvey. *Management of Hotel and Motel Security*.  New York: Marcel Dekker, 1980.

Crowe, Timothy. "Crime Prevention Through Environmental Design Strategies and Applications. In *Effective Physical Security*, 2nd ed. Boston: Butterworth-Heinemann, 1997,

Dietz, Park Elliott. "Sex Offenses" in *Encyclopedia of Crime and Justice*. New York: The Free Press, 1983, vol. 3.

Ditton, Jason and Stephen Farrall. "The British Crime Survey and the Fear of Crime." In *Surveying Crime in the 21st Century.  Crime Prevention Studies*, vol. 22, p. 223.

Hamilton, Peter (ed.). *Handbook of Security*.  London: Kluwer Publishing, 1988.

McCrie, Robert. *Security Operations Management*, 2nd ed. Boston: Butterworth-Heinemann, 2007.

National Crime Victimization Survey. "Criminal Victimization, 2003," Washington, DC: Bureau of Justice Statistics, September, 2004.

Smith, Harry. *Hotel Security*.  Springville, IL: Charles C Thomas, 1993.

# Robert D. McCrie

### Professor of Security Management

### Department of Law, Police Science & Criminal Justice Administration
### John Jay College of Criminal Justice
### The City University of New York (CUNY)
### 899 Tenth Avenue
### New York, NY 10019

*Telephone:*   212-237-8386 (Office)
212-237-8032 (Assistant)
212-348-1553 (Home Office)
212-289-0093 (Mobile)

*Faxes:*  212-237-8383 (JJC)
212-534-2957 (Home)
E-mail: rmccrie@verizon.net

## EDUCATION

Ph.D.   Major: Urban History.  Minor: Criminal Justice History.
CUNY Graduate School & University Center, 1995. Dissertation:
"Crime in a City: Urban Disorder and Its Consequences in
New York, 1890-1990."

M.Phil. CUNY Graduate School & University Center, 1993.

M.A.   History. Hunter College, 1992.  Essay: "Peter Ramus as an Innovator of
Curricular Change in the Sixteenth-Century."

M.S.   Biology.  University of Toledo, 1964. Dissertation: "Physiological
Changes in *Oryzias latipes*."

Certificat D'Études Françaises, Université de Poitiers, Institute D'Études
Françaises de Touraine, 1964.

B.A.   Biology.  Ohio Wesleyan University, 1960.

## ACADEMIC WORK HISTORY

Assistant to full Professor, John Jay                    1986-present

Department Chair                                          1997-2003

| | |
|---|---|
| Adjunct Lecturer, John Jay | 1985-86 |
| Exchange Professor, National Centre for Police Excellence, National Crime and Operations Faculty, Centrex, Bramshill, UK | Sept.-Dec., 2004 |
| Visiting Professor, Chinese People's Public Security University | Oct., 2003 |
| Professeur Invité, DESS, Institut d'Etudes Politiques de Toulouse | 2000, -02,-04, -07 |
| Visiting Professor, Ministry of Public Security, Beijing, China Five College Lecture Series across China | December '00- January '01 |
| Guest Lecturer, Fashion Institute of Technology, Graduate School, Dean's Lecture Series. | 1993-1995 |
| Guest Lecturer, Central Connecticut State University | 1981-1983 |
| Guest Lecturer, Jersey City State University | 1978-1981 |
| Graduate Teaching Fellow.  Biology.  University of Toledo | 1960-1962 |

# TEACHING

*Courses taught since 1985*

Introduction to Criminal Justice (CRJ 101); American Legal History (HIS 277); Introduction to Security (SEC 101); Security Management (SEC 211); Security of Computers and Their Data (SEC 270); Emergency Planning (SEC 310); Internship supervision (CRJ 398); Independent Study (SEC/PSC/LAW 410); Radical Penology (COR 495); Protection Management Systems (PMT 701); Seminar in Protection Management Systems (PMT 753); Contemporary Issues in Security Management (PMT 754).

Developed and offered an undergraduate courses on Security Management, Emergency Planning, and Radical Penology; also developed and taught two graduate courses (PMT 701 and 754).  Taught numerous classes and brief courses and led workshops for the Criminal Justice Institute and the Security Management Institute.

At Institut d'Etudes Politiques de Toulouse, Centre d'Etudes et de Recherches sur la Police, "Radical Penology: The Prison as Society's Most Failed Institution."

*Other Academic Responsibilities*

Served on Ph.D. dissertation, Master's thesis, and Internship committees.  Supervised independent study for students in undergraduate and graduate programs.  Coordinator of the Security Management undergraduate A.S. and B.S. major programs, 1986-97.  Coordinator

of the MS in Protection Management degree program, 1995-98. Chair the Victor Herbert Memorial Scholarship and Richard and Madeleine Rockwell scholarship award panels. Involved in accrediting review committees of Middle States Association of Colleges and Secondary Schools; presidential performance review committee. Search committee for dean of graduate studies. External evaluator of the criminal justice programs for Tiffin University and Eastern Kentucky University. Serve on doctoral committees, Rutgers University and the University of Paris.

## RESEARCH AND PUBLICATIONS

### Books

In process **Of Crimes and of Punishments**

2007    **Security Operations Management**. Boston: Butterworth-Heinemann, 2nd ed.

> Reviewed: ☆☆☆☆☆ " The updated edition is well-suited for the experienced professional yet fundamentally enough for the novice or student. The result is an improvement of an already excellent work that will be a reliable resource in the classroom and possibly the corporate boardroom as well." Bob Sena, in *Security Management*, Sept. 2007, p. 208.

2002    **Readings in Security Management: Principles and Practices.** Alexandria, VA: ASIS International

> Reviewed: "It is a delight to finally see the kind of research available to the security industry that the law enforcement community has had access to for years. With its excellent presentation and content, this book is well suited for security practitioners with data-driven programs, for anyone wishing to know more about such programs, and for those participating in undergraduate and graduate security programs." Glen Kitteringham in *Security Management*, May, 2003, p. 128.

2001    **Security Operations Management.** Boston: Butterworth-Heinemann.

> Reviewed: "(M)anagers and management students would do well to analyze successful security departments to learn lessons for other business functions....McCrie masterfully discusses how to interweave security throughout an organizations...Exhaustively researched and well written, this book is an ideal addition to the library of any security management professional." Richard P. Wilson in *Security Management*, July, 2002, p. 152.

> Reviewed: "This book demonstrates the depth of insight that comes from true concentration on the engine of professional security operations—a management team and how it conducts its business....I recommend this book to all security management instructors and to all operational security managers." Jim Calder, in *Security Journal*, vol. 15 (4) p. 75.

### Edited Publications

1989-98    **Security Journal,** vetted research quarterly published by Elsevier Science, now published by Palgrave Macmillan

1970-present    **Security Letter**, semi-monthly newsletter published by Security Letter

1993    **Security Letter Source Book**, 5th edition. Boston: Butterworth-Heinemann

*Refereed Journal Articles and Book Chapters*

2006    "A History of Security." In Martin Gill (ed.) **Handbook of Security**, London: Palgrave Macmillan

2005    "Serving Security: A History of Security Management Education at John Jay College of Criminal Justice." **J. Security Education**, 1 (1), 83-93.

2005    "ASIS International." In Larry E. Sullivan (ed.). **Encyclopedia of Law Enforcement**, vol. 2. Thousand Oaks, CA: Sage Publications, pp. 547-49.

2004    "The History of Expertise in Security Management Practice and Litigation." **Security J.**, 17 (3), 11-19.

1999    "The First Murders in New Amsterdam/New York: Origins and Consequences." In Andrew Karman (ed.). **Crime and Justice in New York City.** New York: McGraw-Hill, pp. 13-22.

1998    "Some Notions about the Differences between Homicide in the United States and Turkey." **Polis Bilimleri Dergisi** 1(1): 35-40.

1997    "A Brief History of the Security Industry in the United States." In Marcus Felson and Ronald V. Clarke (eds.). **Business and Crime Prevention.** Monsey, NY: Criminal Justice Press, pp. 197-218.

1993    "Private Correction: The Delicate Balance." In Gary W. Bowman, Simon Hakim, and Paul Seidenstat (eds.) **Privatizing Correctional Institutions.** New Brunswick, NJ: Transaction Publishers, pp. 19-32.

1992    "Three Centuries of Criminal Justice Privatization in the United States." In Gary W. Bowman, Simon Hakim, and Paul Seidenstat (eds.). **Privatizing the United States Justice System.** Jefferson, NC: McFarland & Company, pp. 12-26.

1990    "Planning to Make Police Departments More Secure." **Security Journal** 1(2):95-100.

1988    "The Development of the US Security Industry." **Annals of the American Academy of Political and Social Sciences.** July, 498-23.

1983    Three chapters in Charles Schnabolk's **Physical Security: Practices + Technology.** Boston: Butterworth.


**Bibliographic Compilation**

1993    "Bibliographic Entries on Urban Crime and Policing: New York, London and Paris." Lloyd George Sealy Library.

*Conference Presentations (partial)*

2007   "Mutations Securitaires et Appareils Policiers: Certaines Aspects de la Criminalité et de la Sécurité aux Etats Unis." Colloque International du Groupe Europeen de Recherche sur les Normalités (GERN), Institut d'Etudes Politiques de Toulouse, January 26.

2005   "Early Impressions: Positive Results from Response to Hurricane Katrina," Part of a workshop, Review of TOPOFF III and Other Maritime Security Exercises, 4th Annual Expo and Conference, New York, September 21.

2005   Panel member: "Homeland Security and the Academic World: An Evolving Partnership," 51st Annual Seminar and Exhibits, ASIS Intl., Orlando, September 14.

2003   The 'New York Miracle': The Decline in Crime in New York City and How Cooperation between Police and Public Security Helped," 40th Anniversary Convocation of the Police Administration program, Dongguk University, Seoul, South Korea, October 24.

2002   "The Law of Terrorism in the USA: Perspectives since 9/11," Faculty of Law, University of Padova, Italy, November 29.

2002   "Port Personnel Security Screening Requirements: Public and Private Sector Issues," US Maritime Security Conference, New York City, Sept. 18.

2002   "The English and Crime in the City of New York, 1609-1790," International Perspectives on Crime and Justice, London, England, June 18.

2002   "Tourism and Terrorism," conference at the MS in international travel management degree program, University of Toulouse, DESS, January 22.

2001   "Creating Materials to Improve the Teaching of Security Management in Business Schools." ASIS Educational Symposium. University of Maryland. August 2.

2000   "Italians and Crime Involvement in New York City: 1900-1980." International Perspectives on Crime, Justice and Public Order. Bologna, Italy. June 5-9.

2000   "What is the Body of Knowledge in Security Education?" ASIS Educational Symposium. University of Oklahoma. May 25.

1999   "New York and Singapore: What Matters in Policing." Senior Staff Convocation. Singapore Police Academy. January 19.

1998   "Prospects for Security Management Education at Undergraduate and Graduate Business Schools." Pinkerton lecture. ASIS Educational Symposium. John Jay College. October 4.

1998    "Hungarians and Crime in New York City: 1848 to World War I." International
Perspective on Crime, Justice and Public Order.  Budapest, Hungary.  June 22.

1998    "The Prospects for Master's Degree Programs in Security Management within
Criminal Justice Graduate Education."  Academy of Criminal Justice Sciences.
Albuquerque, March 13.

1997    "The Irish and Crime in New York City: How 'We' Stopped Being Criminals."
AIHS-CUNY Lecture Series.  American Irish Historical Society.  April 9.

1996    "Analyzing Crime Data Real-Time to Improve Performance."  Plenary speaker.
Convocation.  National Police College.  Ankara, Turkey.  October 16.

1996    "Looking Back through History in Criminal Justice: Yesterday's Faces, Today's
Problems." Also "Academic Perspectives on Security Management: Japan, Europe,
and the US." 2nd Annual Conference on Criminal Justice Education, John Jay
College.  October 5.

1996    "The Irish and Crime in New York City, 1850-1990." International
Perspectives on Crime, Justice and Public Order.  Dublin Castle, Dublin, Ireland.
June 17.

1996    "Crime City?"  Public program series. New-York Historical Society.  March 23.

1994    "The Historian in Non-Academic Roles."  Tribute to Richard C. Wade at the
Graduate School and University Center Conference at CUNY, October 27.

1992    "Evaluating Advanced Security Systems in a Post-Recessionary Economy."
SecurTech Conference, Crystal City, VA, April 7.

1991    "Academic Security Programmes in the United States." The Security Profession in
1991: An International Conference. Loughborough University of Technology,
England, May 10.

1991    "Technological Advances in Identification and Its Management."  The International
Security Systems Symposium and Exhibition, Crystal City, VA.  October 29.

1990    "Three Centuries of Criminal Justice Privatization in the United States."
29th Annual Meeting. Western Regional Science Assn.  Molokai, Hawaii, Feb. 23.

1990    "Issues on Campus Security: Historical Origins and the Use of Security Personnel."
At Campus Safety: A Colloquium on Policies, Practices, and Research, sponsored
by the Research Foundation of CUNY, December 18.

1990    "The Privatization of Corrections: Making Profits from Prisons." 7th Annual
Conference on Criminal Justice Statistics, American Statistical Assn., Dec. 7.

1989    "Integrity Testing—A Management Tool in Transition." Conference on Paper and
        Pencil Integrity Testing, Security Management Institute, February 10.


## *Articles*

2007    "Security Expertise."  In *Encyclopedia of Security Management*, 2nd ed., John J. Fay,
        ed. Boston: Butterworth-Heinemann, pp. 495-98..

2002    "Where Do We Go from Here? Top Corporate Security Chiefs Reflect on Today's
        Risks and Countermeasures," **Forbes**, September 30.


1995    "Law and Order: Should Nassau Cops Work 12-hour Shifts?"  **Newsday**, Op-ed page.
        January 29, p. A49.

1994    "The New Age in Security Communications." **International Security Review**,
        Spring. Pp. 44-46.

1993    "Every Generation: Corruption Hits the Fan." **New York Newsday**, Op-ed page.
        October 6, pp. 90-91.

1993    "Minimum standards for Security Products and Services. **World Security**, pp. 35-37.

1990    "The Vetting Game." **International Security Review**.  May/June, pp. 36-39.

1990    "America—A Market Profile." **Security Industry**, August, pp. 57-59.

1989    "Electronic Guard of Guards." **International Security Review**, March/April,
        pp.84-87.

1988    "Emergency Medical Services in the USA." **Ambulance Mgmt. International**,
        January, p. 21.

1988    With Gerald W. Lynch: "A Gunrunner's Right to Arms." **Newsday**, Op-ed page,
        January 29.

1986    "Terrorism Today and the Manager's Response. "**Mosler Today & Tomorrow**.
        Summer.

1982    "Vetting—Techniques in Britain, the USA, and Germany." **International Security
        Review**, September-October.

*Professional Development (partial)*

2005    Chair, panelist.  Security Day, Jacob Javits Center, May 25.

2002    Chair, panelist, and discussant.  ASIS Educational Symposium, University
of  Cincinnati, May 29-31.

1999    Discussant "Corruption in Early America." Conference: Corruption—Public and
Private.  John Jay College. September 8.

2000    Chair, panelist, and discussant.  ASIS Educational Symposium.  University of
Oklahoma, Norman. May 21-23.

2000    "The New York Miracle." Convocation. Escola de Policia de Cataluña, Barcelona

1999    Chair, panelist, and discussant. ASIS Educational Symposium. University of Nevada,
Reno. May 21-23.

1999    Speaker, panelist. Annual Seminar and Exhibits. ASIS, Las Vegas. (And at most
previous annual meetings since 1980.)

1993    Alumni Career Conference, John Jay College. Opportunities in Private Security and
Public Safety Employment. November 5. Chair and speaker.

1992    "The Business Justification for Electronic Photoimaging Identification (EPI), in
Modern Security Systems." CardTech/SecurTech Conference, April 7. Hyatt Chrystal
City.

1992    Loss Prevention Colloquium II, Ft. Lauderdale. Prospects for Integrated Electronic
Systems Controls.

1992    Technical Management Conference, Madison Square Garden. Fraud and Counter-
measures in Telecommunications Systems, October 9.

1991    Keynote speaker. Intl. Assn. For Healthcare Security & Safety. Atlantic City. Oct. 14.

1990    Loss Prevention Colloquium Im Boca Raton. Shoplifting in Victorian Times and
Today.

1990    "What's Good About Hallcrest II? And Bad?"  International Security Conference,
Javits Center, August 28.

1990    "Art Security: The Good, the Bad, and the Indifferent." Museum, Library, and
Archive Security group of New York, June 12.

1988   An Analysis of Recent Security Guard Training Requirements in Major Urban States. Committee on National Security Companies. Boston, October 5.

### Legislative Testimony

2007   Risks from Non-performing Security Services Businesses, Legislative Group, Chicago Center, October 6.

2007   Procurement of Private Security Services for Chicago Area Airports, City of Chicago Council, Committees on Aviation and Finance, July 17.

2006   Concerning the need for higher security guard standards in the State.  New York State Assembly Committee on Codes, October 12.

2005   Concerning the Enhanced Professional Security Act of 2005. Judiciary Committee of the City Council of the District of Columbia, June 30.

2005   Crisis in Private Security: Public Safety at Risk, Workshop at the 34th Annual Legislative Conference, New York State Association of Black and Puerto Rican Legislators, Assemblyman Clarence Norman, Jr., chair. February 19.

2003   Testimony re: Intro. No. 105 concerning revision of Section 14-109 of the Administrative Code (involving age of entry to the NYCPD) before the Committee on Civil Service and Labor of the Council of the City of New York. June 9. Also December 16, 2002, same committee.

1991   Legislation on Limit Length of Car Alarm Disturbances in New York City. Convened by Sen. Roy Goodman. June 17.

1990   Hearings on Violence and Security Measures in the Daily News Strike.  Convened by Assemblyman Frank J. Barbaro. November 26.

1989   Hearings of the New York Senate Crime and Correction Committee relative to legislation on security guard regulation in the State.  Convened by Sen. Christopher Mega.  February 23. (S. 266 & A. 427)

# PROFESSIONAL (ACADEMIC) SERVICE

### Journal Reviewer/Consulting Editor

2003-   Advisory Board. **Journal of Security Education.**  Haworth Press, Binghamton

1999-   Editor Emeritus; Editorial Board. **Security Journal.** Palgrave Macmillan

1996-   Advisory Board. **Polis Bilimleri Dergisi**. Ministry of Police, Ankara

1990-   International Board of Referees. **Computers & Security**. Elsevier Advanced
Technology, Oxford.

1990-   Vet chapters and book submissions for various publishers including: Butterworth-
Heinemann, McGraw-Hill, Prentice Hall, and West/Wadsworth.

1990-   Editorial Advisory Board, **The Journal of Asset Protection and Financial Crime,**
Centre for Police and Criminal Justice Studies, University of Exeter.

### *Professional Organizations*

2007    American Criminal Justice Association. Section on corrections.

1995-   Academy of Criminal Justice Sciences. Members: Security/Crime Prevention Section.

1990-2001 ASIS International. Standing Committee on Crime/Loss Prevention.

1990-2001 American Society for Testing and Materials.  Committee F-12 Security Products
and Standards.

1990-2002, present   American Correctional Association.

1990-2004  American Historical Association.

1990-  Urban History Association.  Life member.

1987-  American Association of University Professors.

## COLLEGE SERVICE (1990-)

2007-   Faculty and Student Judicial Committee

2003-   US Department of State, Overseas Security Advisory Council

1997-2002  Marshal at Commencement

1997-2003  College Personnel and Budget Committee.  Subcommittees: Budget and
Re-appointment

1995-98   Master of Science in Protection Management.  Program Coordinator

1994-2000   Martial Arts Society, Faculty Co-advisor

1992-  Faculty Senate Adopt-a-Precinct Program

1990- 1995   Middle States Association/Commission on Higher Education (MSA/CHE)
            Self-study Coordinating Committee

1990-  Faculty Senate and College Council.  Elected (1990-93; 95-96)
       Conducted College-wide evaluation of administrative and staff services by faculty.
       Executive Committee of the College Council, 1995-1996 (elected).

1990-  Student Advisement Program.  Semi-annual

1990-  College Security Committee, intermittent

1988-90   Committee on Student Standards and Retention.  Sub-committee on Retention and
          Academic Standards

1987-2001  Professional Staff Conference.  Alternative delegate to state convention.
           (Elected and re-elected over period)

1986-  Security Management Society.  Founder and Faculty Advisor of student club

1986-97  Security Management Major (A.S. and B.S.).  Coordinator


# DEPARTMENTAL SERVICE

1997-2003     Chair, Department of Law, Police Science and Criminal Justice
              Administration, Re-elected, May 2000.

1994-95       Personnel & Budget Committee

1990-95       Curriculum Committee.  Secretary 1989-90; chair 1990-92


# AWARDS & RECOGNITIONS

*Institutional*

2001   Medal.  Ministry of Public Security, People's Republic of China

2000   Harvey J. Watson Award, National Association of Security Companies

1996    Security Service Accolade, the International Association of Professional Security Consultants

1992    The Breslin Award, International Security Management Association

1992    The John J. Duffy Award, National Council of Investigation and Security Services

1990    President's Award of Merit, ASIS International

### *Collegiate*

2003    Honorary Professor. Zeijang Police College (Hangzhou) China.

1998-99    For "Your Vision and Drive for Perfection." John Jay Student Council

1998 et al.    Certificate of Appreciation in "Recognition of Your Many Significant Contributions as Faculty Advisor to the Security and Safety Society"

## MISCELLANEOUS

2006    "25 Most Influential Security Executives." *Security*, December, p. 39.

## HONORARIES

1960-    Pi Delta Epsilon, *journalism*

1960-    Delta Sigma Rho, *rhetoric*

## CERTIFICATION

1986-    **Certified Protection Professional**. Professional Certification Board of ASIS International. Re-certified each three years. Current expiration: December 31, 2007.

## OTHER

1978-    **Who's Who in America**

1987-    **Who's Who in Finance and Industry**

1987    **Who's Who in US Writers, Editors, and Poets**

1989    **Who's Who in Security**

November 7, 2007

# Westin Hotels & Resorts
# Brand Assurance Program - Summary Report

North America Division

**The Westin Casuarina Resort**
Grand Cayman

WESTIN
HOTELS & RESORTS

## Summary Standards Compliance

|  |  |  | CURRENT SCORE |  |  |  |
| --- | --- | --- | --- | --- | --- | --- |
| Standard Category | Default Level Ratings | Standard Line Items Missed | Weighted Value Defects | Total Possible Defects | Sigma Rating | Percentage (for reference only) |
| Encounters | 85% | 39 | 121 | 804 | 2.6 | 84.95% |
| Facility | 90% | 45 | 97 | 1391 | 3 | 93.03% |
| Brand Identity | 90% | 301 | 1417 | 4910 | 2.1 | 71.14% |
| Cleanliness | 90% | 18 | 32 | 1052 | 3.4 | 96.96% |
| Conditions | 90% | 9 | 14 | 1050 | 3.8 | 98.67% |
| Overall Rating | 90% | 412 | 1681 | 9207 | 2.5 | 81.74% |

## Essential Standards Compliance

|  |  |  | CURRENT SCORE |  |  |  |
| --- | --- | --- | --- | --- | --- | --- |
| | Default Level Ratings | Standard Line Items Missed (10 points each) | Weighted Value Defects | Total Possible Defects | Sigma Rating | Percentage (for reference only) |
| Essential Standards Rating | 100% | 72 | 720 | 3570 | 2.4 | 79.83% |

Standard Line Items Missed = Number of individual standards missed
Weighted Value Defects = Non-compliant standards with a weighted value appli
Sigma Rating = Based on defects per 1,000,000.

The most critical of all Standards are identified as Essential Standards. Core Essential which are common to all Starwood Brands in the North America Division. There are also Brand Essential Standards wh unique to the Brand (see breakdown of compliance on following pages).

Special Hotel Type:   N/A
Ownership:   Franchise
General Manager:   Mr. Dan Szydlowski
Property #   01095

Evaluated by: Merritt Zucca
Evaluated on: 1/5/2002

Westin Hotels & Resorts
**Brand Assurance Program – Summary Report**
North America Division
The Westin Casuarina Resort
Grand Cayman

WESTIN
HOTELS & RESORTS

|  | Standard Line Items Missed (10 points each) | Core Essential Standards Compliance | | | |
|---|---|---|---|---|---|
|  |  | CURRENT SCORE | | | |
|  |  | Weighted Value Defects | Total Possible Defects | Sigma Rating | Percentage (for reference only) |
| **Core Essential Standards** |  |  |  |  |  |
| SPG Participation | 1 | 10 | 40 | 2.2 | 75.00% |
| Business Services (PC, printer, fax, copier) | 0 | 0 | 80 | 6 | 100.00% |
| Three–Meal Restaurant Service | 0 | 0 | 20 | 6 | 100.00% |
| In-Room Dining | 0 | 0 | 10 | 6 | 100.00% |
| Fitness Facility on site or nearby | 0 | 0 | 50 | 6 | 100.00% |
| Two Telephones Per Brand OS&E Standards and Voice-Mail | 0 | 0 | 100 | 6 | 100.00% |
| Laundry/Dry Cleaning Services | 0 | 0 | 10 | 6 | 100.00% |
| Uniform Program Participation (with nametag) | 0 | 0 | 140 | 6 | 100.00% |
| Life Safety (includes door locks, room access, etc.) | 2 | 20 | 660 | 3.4 | 96.97% |
| Ownership Disclosure Signage (Franchise Only) | 0 | 0 | 40 | 6 | 100.00% |
| Photography | 0 | 0 | 10 | 6 | 100.00% |
| **Core Essential Standards Rating** | **3** | **30** | **1160** | **3.5** | **97.41%** |

Westin Hotels & Resorts
Brand Assurance Program – Detail Report
North America Division
The Westin Casuarina Resort
Grand Cayman



WESTIN®
HOTELS & RESORTS

| | | C - Capital |
| | | F - Failure Standard |
| | | PIP - Property Improvement Plan |
| | | SV - Standards Variation |
| | | TO - Tracking Only |
| | | LAW - Legally Prohibited Standard |
| | | CON - Contingency Affected Standard |

Special Hotel Type:  N/A
General Manager:  Mr. Dan Szydlowski
Property #  01095

Evaluated by: Merritt Zucca
Evaluated on: 11/5/2002

| | Status | Weighted Value Defects | Total Possible Defects |
|---|---|---|---|
| **G. GUESTROOM** | | | |
| **Doors & Windows** | | | |
| **Facility Standards** | | | |
| G.01.01.01  ESSENTIAL STANDARD: 2 patio sliding door locking devices; any combination is acceptable as long as they operate independently of each other. | | 10 | 10 |
| *Secondary locks were only in place on the first and second floor room patio doors.* | | | |
| G.01.01.01  ESSENTIAL STANDARD: Notice on patio doors advising guests to double lock doors when not in use. | | 10 | 10 |
| **Bedding** | | | |
| **Brand Identity Standards** | | | |
| **Heavenly Bed** | | | |
| G.02.01.01W  ESSENTIAL STANDARD: The hotel has fully implemented the Heavenly Bed in all rooms. All items meet detail Westin specifications for the Heavenly Bed. | | 100 | 100 |
| *The property's custom gold accessories were approved, however, the sheets and blankets did not meet specifications. Points were deducted in rooms 196, 292, 350, 321, 208, 221, 254, 258, 160 and 154.* | | | |
| G.02.01.01W  ESSENTIAL STANDARD: The Heavenly Bed has Three (3) sheets per bed - bottom sheet is extra wide, fitted sheets are preferred where operationally feasible; T-180 (Top and bottom), middle sheet is T-250. | | 100 | 100 |
| *The property was not using the Heavenly Bed sheets. Points were deducted in rooms 196, 292, 350, 321, 208, 221, 254, 258, 160 and 154.* | | | |
| G.02.01.03  ESSENTIAL STANDARD: Mattress and pad are per Brand OS&E Standard | F | 0 | 20 |
| G.02.01.01W  ESSENTIAL STANDARD: The Heavenly Bed has a Down blanket located between the middle and top sheet. | | 100 | 100 |
| *A wool style blanket was used in all rooms evaluated. Points were deducted in rooms 196, 292, 350, 321, 208, 221, 254, 258, 160 and 154.* | | | |
| G.02.01.01W  ESSENTIAL STANDARD: The Heavenly Bed has Four (4) sleeping pillows per bed; two feather and two synthetic. | | 10 | 100 |
| *The double bedded rooms had only two pillows per bed. Points were deducted in room 208.* | | | |

# CAYMAN ISLANDS
# 2002
## ANNUAL REPORT &
## OFFICIAL HANDBOOK



Published by the Government of the Cayman Islands
September 2003

George Town, Grand Cayman
Cayman Islands

*Law Enforcement and Public Safety*

| Performance Measures | Estimated | Actual |
|---|---|---|
| Civil Cases | 900 | 1467 |
| Civil Appeals | 25 | 22 |
| Divorce and Estate | 400 | 301 |
| Criminal cases Summary Court | 7,000 | 10 389 |
| Criminal Indictments in Grand Court | 80 | 61 |
| Cases filed prepared for Coroner's Court | 34 | 33 |
| Civil Legal Aid applications | 75 | 148 |
| *Approved Civil Legal Aid | | 79 |
| Criminal Legal Aid applications | 240 | 176 |
| *Approved Criminal Legal Aid | | 162 |
| Services to support tickets issued by RCIP | 5,000 | 7303 |
| Collection of Outstanding Fines | $1.3m. | $1.154m |
| Legal Aid | $830 000 | $1.203 660 25 |

Collection of outstanding fines faltered in 2002, largely because of the number of outstanding warrants and their non-delivery, especially in the outlying districts. In addition, recent changes in the Traffic Law meant fines being prorated to reflect charges only on speeds that exceeded posted limits by at least 10 mph. Previously an offender could incur a fine at any point over the stated limit. Fines collected by the Courts Office continue to be remitted to the Treasury daily. They do not form a part of the Judicial Administration's budget.

or that there were fewer more serious offences coming before the Court, or that the Grand Court achieved speedier disposal. (But the disposal rate still averaged 18 months per indictment—the benchmark identified in the judiciary's report in 2000).

## COURT STATISTICS, 1996 to 2002

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|---|---|
| Appeals to Court of Appeal | | | | | | | |
| Criminal | 51 | 52 | 76 | 49 | 54 | 49 | 34 |
| Civil | 19 | 41 | 73 | 35 | 23 | 23 | 22 |
| | | | | | | | |
| Grand Court | | | | | | | |
| Indictments | 64 | 64 | 67 | 61 | 79 | 70 | 61 |
| Civil cases (incl. Admiralty) | 619 | 782 | 719 | 750 | 864 | 710 | 936 |
| Estates | 183 | 145 | 105 | 135 | 164 | 143 | 108 |
| Divorces | 144 | 151 | 168 | 156 | 161 | 170 | 193 |
| Adoptions | 5 | 3 | 6 | 1 | 0 | 1 | 0 |
| | | | | | | | |
| Appeals to Grand Court | 51 | 87 | 56 | 110 | 60 | 73 | 63 |
| | | | | | | | |
| Summary Court | | | | | | | |
| Criminal (Grand Cayman) | 4,905 | 5,117 | 4,923 | 4,929 | 5,297 | 6,996 | 10300 |
| Criminal (Cayman Brac) | * | 104 | 60 | 91 | 94 | 158 | 89 |
| Civil cases | 762 | 1,380 | 1,604 | 1,403 | 1,241 | 350 | 399 |
| Maintenance and Affiliation | 77 | 72 | 64 | 102 | 125 | 128 | 132 |
| Deaths reported to Coroner | 29 | 37 | 34 | 29 | 21 | 23 | 33 |
| Youth Court | 145 | 197 | 213 | 176 | 225 | 331 | 132 |
| Juvenile Court | 34 | 31 | 30 | 32 | 35 | 37 | 38 |

*1996 Criminal cases include Cayman Brac. Separate figures given for subsequent years





The Cayman Islands Judiciary

Annual Report 1999/2000



*The Cayman Islands Judiciary*

*Annual Report 1999/2000*



*The Court House, Central George Town*

# CONTENTS

FOREWORD BY THE HONOURABLE CHIEF JUSTICE

**THE COURTS OF JUSTICE**
SUBORDINATE COURTS
SUPERIOR COURTS
JUDICIAL COMMITTEE OF THE PRIVY COUNCIL
PREVIOUS PRESIDENTS & CHIEF JUSTICES
PRESENT JUDICIARY   (JUSTICES OF COURT OF APPEAL/CHIEF JUSTICE/PUISNE JUDGES/MAGISTRATES)

**HISTORY OF THE JUDICIAL SYSTEM**
HISTORY OF THE COURTS
ROLE OF THE COURTS

**INTERNATIONAL OUTLOOK**
THE ROLE OF THE COURTS IN INTERNATIONAL LITIGATION AND LEGAL ASSISTANCE

**REFORMS**
NEW RULES OF COURT
NEW FEES
PRACTICE DIRECTIONS
LEAFLETS

**SENTENCING ADVISORY COMMITTEE**

**CI LAW REPORTS**

**LIBRARY**

**INFORMATION TECHNOLOGY**
JUDICIAL ENFORCEMENT MANAGEMENT SYSTEM
SECURITY

**PROPOSALS FOR FUTURE**
IMPROVED ACCOMMODATION
CHILDREN LAW
SMALL CLAIMS
COST RULES
CASE MANAGEMENT

**FACTUAL REPORTS**
PERFORMANCE TARGETS
GRAND COURT (CIVIL & CRIMINAL)
SUMMARY COURT
STATISTICS

**ADMINISTRATION**
JUDICIAL CONFERENCES AND SEMINARS
STAFF TRAINING
STAFF CHART
CHANGES (APPOINTMENTS/RETIREMENT/RESIGNATION)

**APPENDIX**
1. JUSTICES OF THE PEACE
2. MEMBERS OF RULES COMMITTEE
3. MEMBERS OF SENTENCING ADVISORY COMMITTEE
4. ROLL OF ATTORNEYS

*Three*

# Foreword by
## The Honourable Chief Justice

The Judicial Department has issued this, its first annual report, at the start of the Year 2000, regarded by many as the start of the new millennium. The launch of this report coincides with the introduction of a number of initiatives to meet new and increasingly complex challenges facing the Courts and, indeed, the Cayman Islands.

As I noted at the opening of the Grand Court in January 2000, change is certainly in the air. Psychologically and emotionally we have entered a new era.

As Chief Justice, I view the task of rising to this call for change as most serious. The personal challenge and that of the judges, magistrates, lay justices, the professional and administrative staff and of my colleagues throughout the legal and judicial systems of the Cayman Islands is to ever aspire to the maxim: "Excellence results from dedication to daily progress...making something a little better every day." [1] The abiding confidence of the public we serve in the administration of justice cannot be assured by the mere institutionalisation of systems. There must be real access to justice, and in every place and time the axiom "justice delayed is justice denied" holds true.



> The abiding confidence of the public we serve in the administration of justice cannot be assured by the mere institutionalisation of systems. There must be real access to justice, and in every place and time the axiom "justice delayed is justice denied" holds true.

Our ultimate objective must be the just, timely, efficient and cost effective resolution of the problems and difficulties confronting the persons who come before our courts.

This first annual report outlines some of the initiatives designed to achieve that goal. A priority for this year will be the implementation of the new Children Law which will modernise our approach to the issues of custody, care and control of the young.

Another of our key proposals is aimed at expanding the sentencing options available to judges, magistrates and lay justices. We are very keenly aware of the dual obligation that ensures our sentences not only punish the crime but also rehabilitate the offender.

Innovative sentencing options with just those objectives in mind have been identified, and we anticipate that enabling legislation will be prepared during the course of 2000. Much thought and discussion have also been focused on harnessing goodwill in the private sector and the wider community. We have secured the commitment of many willing to lend significant resources to support the efforts of those who may have strayed from the path of rectitude as they strive towards meeting their new goal of redemption in the eyes of their family, friends and the wider society.

The pursuit of excellence in the administration of justice cannot, of course, be limited in scope, important though the treatment of children and the treatment of offenders may be. The focus of our efforts must also be on achieving an efficient rate of disposal of the many

---

[1] Peters, *Thriving on Chaos* (Knopf, 1987)

*First*

types of cases presented, varied and difficult though they often are. Towards this goal, as outlined in this report, several innovative and successful measures have resulted in significantly reducing the time between the filing of actions and trial dates; and this result has been achieved on both the criminal and civil sides.

In keeping with this incremental pursuit of excellence, the new millennium finds us at the Courts making suitable changes for an age of increasingly sophisticated technology. Charting our course, we see on the horizon kiosks where first-time traffic offenders can enter guilty pleas, paying fines by debiting their bank accounts; video-links for bail applications from persons in custody as well as for overseas witnesses; electronic transfer and filing of documents.

The nature of our jurisdiction also demands that the Courts maintain and observe a positive international outlook. So often cases that come before our courts involve issues that affect persons and have repercussions far beyond our borders. These are issues that behove our judges and practitioners alike to keep abreast of legal and other changes at home and abroad.

This constantly unfolding landscape of change from within the Courts system, aimed always at efficiency and fairness, fortunately mirrors the efforts of attorneys of both the private and public bars. There is evidence of a keener awareness and observance of deadlines; of the rules for disposal of complex cases; and of the need for clear and early instruction for the proper disposal of criminal cases.



*The Honourable Chief Justice*
*ANTHONY SMELLIE QC, JP*

As Chief Justice I am most encouraged. We have inherited a highly respected judicial system, but we must constantly renew our efforts as we meet new challenges and respond to the continuing task of ensuring justice for all. This is an opportunity for renewing our dedication to the cause in a fresh start – in a new beginning – in which a solid foundation and sound direction are essential factors if excellent standards are to be achieved. "For when the ancients said that a work begun was half done, they meant that we ought to take the utmost pains in every undertaking to make a good beginning." [1] In the words of John Ruskin, 19th century English art critic and historian, "Quality is never an accident; it is always the result of intelligent effort." [2]

The Cayman Islands judicial system has set its goal as nothing less than this. With such high aspirations, we can be assured that we will, with determination and dedication, continue to succeed at making much in the Cayman Islands a great deal better. Nothing less will do; in the administration of justice excellence must indeed always be a work in progress.

*Anthony Smellie QC, JP*
*Chief Justice*

[1] Plutarch, c45c - 120, *The Parallel Lives: Pericles*
[2] John Ruskin, 1819-1900, *The Two Paths*

## The Courts of Justice

# THE ROLE OF THE JUDICIARY IN THE CONSTITUTIONAL SYSTEM OF THE CAYMAN ISLANDS

The Cayman Islands has enjoyed for more than 40 years a form of fully democratic Government based upon the British Westminster model: expressed and enshrined in Constitutional Order in Council made by her Majesty the Queen in Council in the exercise of powers delegated by the British Parliament through imperial legislation.

This section gives a brief overview of the structure, history and role of the judiciary and Courts as an integral part of that system of Government.

The Judiciary is one of three separate Arms of State. It administers the law independently of the Executive and the Legislative branches, an independence that is safeguarded in the Constitution of the Cayman Islands.

The Hon. Chief Justice is head of the Judiciary.

Because of its historical and constitutional ties to England, the judicial system of the Cayman Islands bears many similarities to, and connections with, the English judicature.

These similarities are perhaps nowhere more evident that in the hierarchy of the courts, with the traditional appellate jurisdiction in the higher courts determining appeals from the lower courts. In addition, the final appellate body of much of the Commonwealth — the Judicial Committee of Her Majesty's Privy Council — hears final appeals from courts in the Cayman Islands.

In ascending order of jurisdiction, the structure of the courts may be represented as follows:

## SUBORDINATE COURTS
### The Summary Court, Juvenile and Youth Courts and Coroners Court

These courts are each creatures of statute[1] and are presided over chiefly by a legally qualified magistrate or three lay justices appointed under the Summary Jurisdiction Law.

### Summary Court

The Summary Court exercises jurisdiction over a wide variety of civil and criminal matters. Civil jurisdiction in monetary claims is limited by the amount of the claim, which at present cannot exceed $2,000, but there is a proposal to raise this threshold.

The Summary Court also hears affiliation, maintenance and domestic violence applications.

All criminal cases start in the Summary Court, with more serious cases being committed to the Grand Court for trial on indictment. The Summary Court is empowered to impose sentences of up to four years' imprisonment, and in certain types of drug cases this power is extended to 20 years or, on second or subsequent convictions, 30 years. Customarily, there are three summary court sittings daily, one of which is usually a traffic court, where cases heard comprise mainly traffic matters.

### Juvenile and Youth Courts

The Juvenile and Youth courts sit on Fridays to hear cases involving young persons under the age of 17 years who are in need of care and protection or who are alleged to have committed criminal offences. Serious charges may be sent to the Grand Court to be heard. In cases where the offence is alleged to have taken place with an adult, the case will be heard in the Summary Court or the Grand Court, depending on the seriousness of the indictment.

A modern law to address childcare issues, the Children Law, is expected to be promulgated in 2000. Under it, jurisdiction will be exercised variously by the Justices of the Peace, Magistrates and Grand Court Judges.

### Coroners Court

Any unnatural or unusual death is referred to a magistrate acting as Coroner. Where it is necessary to hold an inquest, a jury, directed on the legal issues by the Coroner, determines the cause of death.

---

[1] By the Coroner's Law, 1975, the Juveniles Law (since 1995 re-designated the Youth Justice Law) and the Summary Jurisdiction Law (1995 Revision), respectively.

# SUPERIOR COURTS

## The Grand Court

Apart from when it sits as an appellate court from the lower courts or other tribunals (usually statutory, quasi-judicial), this court is a Superior Court of Record of First Instance, having unlimited jurisdiction in both criminal and civil matters. As such it exercises within the Cayman Islands similar jurisdiction as is vested in or capable of being exercised in England by Her Majesty's High Court of Justice and its divisional courts.



The Grand Court was first created as a court of special limited jurisdiction by statute in 1877[1].

In its present modern form, the Grand Court was established by the Grand Court Law of 1975, and enshrined as a Constitutional Court in 1984[2].

The Chief Justice has responsibility for "all matters arising in judicature."[3] By this means and by the other statutory and constitutional processes which establish and separate the Courts from the Legislative and Executive arms of Government, the separation of powers **and independence of the Judiciary is ensured.**

*The Rt. Hon. Justice Edward Zacca, JA, OJ, President of the Court of Appeal*

In addition to purely judicial functions, the Chief Justice, or a designated judge acting in an administrative capacity, is also the Central Authority for the purposes of the Mutual Legal Assistance Treaty (MLAT). The treaty was entered into between the United States and the United Kingdom on behalf of the Cayman Islands in 1986.

The Cayman Islands' status as a leading international offshore banking and financial centre often generates actions involving complex issues and substantial assets.

The Grand Court also tries indictable criminal cases including murder, rape and serious assault. For criminal trials, Grand Court judges either sit alone or with a jury of seven (12 for murder trials). When hearing civil matters, judges usually sit alone. The Grand Court hears both civil and criminal appeals from the Summary Court.

Although the Grand Court is in session throughout the year, its formal ceremonial opening takes place on the first Wednesday in January, subsequent sessions being marked by a less formal opening on the first Wednesday of each alternate month.

Jurors are summonsed to serve for a complete session of two months.

## The Court of Appeal

Appeals from the Grand Court go to the Court of Appeal. Like the Grand Court, the Court of Appeal is a Superior Court of Record. Unlike the Grand Court, however, the Court of Appeal does not exercise inherent jurisdiction but is a creature of statute[4] and of the Constitution[5].

This Court is comprised of judges who have held high judicial office for many years in the Cayman Islands and elsewhere in the Commonwealth. Three judges sitting together comprise the Court. There is at present a roster of four or more appellate judges. The current president is the Hon. Edward Zacca, JA, OJ, a former Chief Justice of Jamaica and one of two members of the Cayman Islands Court of Appeal who are members of the Judicial Committee of Her Majesty's Privy Council.

The Cayman Islands Court of Appeal was established in 1984. In preceding years, appeals were heard by the Court of Appeal of Jamaica exercising jurisdiction for the Cayman Islands. Sittings were held either in Grand Cayman or Jamaica.



The Court of Appeal is the final appellate court in the Cayman Islands and comprises the President and two Justices of Appeal. The Court of Appeal hears appeals from the Grand Court in both civil and criminal matters. The Court of Appeal sits three or four times yearly, for sessions of three to four weeks' duration.

---

[1] By the Cayman Islands Grand Court Law of 1877, Law 31 of 1877 of the Jamaica Legislature.
[2] By amendment to the 1972 Constitutional Order in Council.
[3] See the Grand Court Law 1975, section 6.
[4] The Court of Appeal Law, 1975
[5] By amendment to the 1972 Constitutional Order in Council in 1984 (prior to this the Court of Appeal of Jamaica served as the Court of Appeal of the Cayman Islands)

### THE JUDICIAL COMMITTEE OF THE PRIVY COUNCIL

This appellate body, often referred to as the Privy Council, was established by the Judicial Committee Act of 1833, an Imperial Act of the British Parliament. As appeals from colonial courts were historically ultimately referred to the Sovereign as the fountain of justice, such appeals were referred to Her Majesty, who considered them upon the advice of Her Privy Council. The Privy Council became formalised as a Judicial Committee in 1833. Since then that final appellate court has comprised members of the Judicial Committee of the House of Lords (the final Appellate Court for the United Kingdom itself) and other eminent jurists appointed from other courts of the Commonwealth.

## Chief Justices, Presidents, Judges and Magistrates

### CHIEF JUSTICES OF THE GRAND COURT

There have been seven Chief Justices of the Cayman Islands since the post was instituted to head the local judiciary in 1968. Prior to that time, visiting judges and magistrates of the Jamaican judiciary served in the Cayman Islands courts.

### ROLL OF CHIEF JUSTICES

The Honourable Mr. Justice Geoffrey Horsfall, CBE, 1968-1973
The Honourable Mr. Justice Locksley Moody, CBE, QC, 1973-1977
The Honourable Mr. Justice Sir John Summerfield, CBE, QC, 1977-1987



The Honourable Mr. Justice Gerald Collett, CBE, QC, 1987-1989
The Honourable Mr. Justice Sir Denis Malone, 1990-1993
The Honourable Mr. Justice George Harre, 1993-1998
The Honourable Mr. Justice Anthony Smellie, QC, 1998-

### JUSTICES OF THE COURT OF
### APPEAL (SINCE ITS ESTABLISHMENT IN 1984)

The Right Honourable Mr. Justice Edward Zacca, JA, OJ, President
The Right Honourable Mr. Justice Telford Georges
The Honourable Mr. Justice Gerald Collett, QC
The Honourable Mr. Justice Ira Rowe, QC
The Honourable Mr. Justice Kenneth Henry (Retired 1995)
The Honourable Mr. Justice James Kerr, QC (Retired 1999)



*The Grand Court hears appeals from the Summary Court and exercises jurisdiction equivalent to that of the High Court of England or Wales.*



*Chief Justice, Judges, and Magistrates*

JUDGES OF THE GRAND COURT (SINCE 1968)

The Honourable Mr. Justice Anthony Smellie, QC, Chief Justice

The Honourable Mr. Justice Henry Graham

The Honourable Mr. Justice Dale Sanderson, QC

The Honourable Mr. Justice Kipling Douglas (Acting)

The Honourable Mr. Justice Geoffrey Horsfall, CBE (retired 1973)

The Honourable Mr. Justice Locksley Moody QC (Retired 1977)

The Honourable Mr. Justice David Hull (Retired 1988)

The Honourable Mr. Justice Derek Schofield (Retired 1996)

The Honourable Mr. Justice David Murphy (Resigned 1999)


MAGISTRATES

Her Honour Mrs. Grace Donalds

Her Honour Mrs. Margaret Ramsay-Hale

Her Honour Ms. Nova Hall

His Honour Mr. Rafael Rattray (1957-1958)

His Honour Mr. James Atwood (1958-1959)

His Honour Mr. Everard Robinson (1959-1961)

His Honour Mr. Robert Laming (1961-1963)

His Honour Mr. Derwent Thacker (1964-1965)

His Honour Mr. Geoffrey Horsfall (1965-1968)

His Honour Mr. Locksley Moody, QC (1971-1973)

His Honour Mr. Frank Field (1974-1975)

His Honour Mr. James Shaw (1975-1977)

His Honour Mr. Charles Graham-Perkins (1977)

His Honour Mr. Wilton Hercules (1977-1983)

His Honour Mr. Kipling Douglas (Senior Magistrate 1983 - 1993)

His Honour Mr. Jeffrey Ramsay (Magistrate 1987 – 1993)

His Honour Mr. Peter Jackson (Magistrate 1993 – 1998)



## History of the Judicial System

### HISTORY OF THE COURTS

The doctrine of Separation of Powers, constituting the Judiciary as one of the three distinct pillars of state, is emphatically enshrined in the Constitution of modern Cayman.

From at least 1798, however, Justices of the Peace, appointed on behalf of the British Crown by the Governor of Jamaica, administered public affairs. In carrying out their duties, these forerunners of today's judiciary functioned under the direction of one of their number who was styled Chief Magistrate or Custos.

The post of Clerk of the Court is one of the oldest in the Islands, being known to have existed since 1811, although carrying today distinctly different responsibilities.

Courts in existence in 1849 were:

- Courts of Summary Jurisdiction (presided over by a Justice of the Peace and trying small debts up to £1)
- Courts of Reconciliation (disputes over land and presided over by a Justice of the Peace with a jury)
- Petty Courts (small debts up to £10 and assault and battery. Presided over by two Justices of the Peace and sitting in each district)
- Grand Court (sat twice yearly with three Justices of the Peace and heard more serious cases, including appeals from the other courts)

In 1898 the powers of the Custos were vested in a Commissioner who combined administrative duties with those of a Judge of the Grand Court. He appointed Justices of the Peace and could try all cases except capital felonies. At that time all the main administrative and judicial powers were vested in one man – the Commissioner.

A Stipendiary Magistrate was appointed in 1957 to perform all judicial and legal functions. He could sit as a Judge of the Grand Court in all but capital offences and could try all cases in the Court of Petty Session.

Further changes took place in 1975 with the appointments of a Judge of the Grand Court (upon the constituting of the Court in its modern form) and a Magistrate. Assigned dual roles, the Magistrate was also appointed Coroner. At the same time, the Grand Court was upgraded to supreme court status, summary courts replaced the petty sessions courts and a Juvenile Court was established. A Chief Justice was appointed the following year under the Grand Court Law of 1975.

The final major change in the constitution of the local courts took place in 1984, with the establishment of the Cayman Islands Court of Appeal to exercise the appellate jurisdiction formerly held by the Jamaican Court. This meant that all judicial proceedings could be heard within the Cayman Islands, subject to a possible final appeal to the Privy Council in London.



*The visit of HRH the Duke of York, CVO, ADC, to the Courts in March 2000 underscores historical and constitutional ties with Britain. H.E. the Governor Peter Smith, CBE (right), accompanied HRH.*

Changes leading up to the separation of powers and responsibilities are depicted in the chart shown below.

## CONSTITUTIONAL STRUCTURE

*1888-1898*
Legislature
Custos is President:

Executive Branch
Custos is head

Judiciary
Custos is Chief Judge

*1898-1957*
Legislature
Commissioner is President

Executive Branch.
Commissioner is head

Judiciary
Commissioner is Chief Judge

*1957-1967*
Legislature
Commissioner is President

Executive Branch
Administrator is head

Judiciary
Stipendiary Magistrate is Chief Judge
(also sits in Legislative Assembly and
as a member of Executive Council)

*1967*
Attorney General replaces Stipendiary Magistrate in the Legislative Assembly and on the Executive Council.

*Present Day (from 1972)*
Legislature                Executive Council                Judiciary
The Chief Justice is responsible for all matters in judicature and functions independently of the Legislative Assembly and of the Executive Council.



"Commissioner" became "Administrator" with introduction of first written Constitution on 4th July 1959.
Present Constitution was issued in 1972, assigning a higher level of responsibility for local Government to members of Executive Council.

## International Outlook

THE ROLE OF THE COURTS IN INTERNATIONAL LITIGATION AND LEGAL ASSISTANCE

The increasing volume and growing complexity of criminal matters handled by the courts of the Cayman Islands are generally widely recognised. What is not so well known, perhaps, is the mounting importance of the Grand Court as an arbiter of large, multifaceted, and often international civil disputes.

Concomitant to that role, the court plays a significant part in assuring the competitiveness of the Cayman Islands as a successful financial centre.

There are many reasons for this increased demand for the court's intervention in the area of international finance. The first, of course, is domicile. The many locally registered companies, banks and trusts, insurance and mutual funds entities and numerous other institutions all benefit from the convenience of having their cases heard in their respective jurisdiction. Weighing in also on the side of the local jurisdiction is the fact that assets are often present which is also reason to make amenable to being restrained, pending resolution of cases. The common law limit on payable matters is another important factor, while a further key consideration is that local law exclusively governs a busy sector of commercial litigation business — trusts.

In the same vein, it is generally of importance to the international client that the Cayman Islands legal system is similar to that of the United Kingdom.

As a result of this jurisdictional primacy, the Grand Court has in recent years become a busy hub, resolving disputes among international parties, sometimes with billions and often with hundreds of millions of dollars in assets at stake.

As a result of this jurisdictional primacy, the Grand Court has in recent years become a busy hub, resolving disputes among international parties, sometimes with billions and often with hundreds of millions of dollars in assets at stake. On a more routine basis, but contributing equally to the work of the court, trustees often turn to the Grand Court for guidance in exerting such powers.

The Grand Court also often tries international cases in a variety of matters involving the reconstruction, amalgamation or dissolution of Cayman Islands companies. A paradigm of the role was the series of transnational insolvency proceedings arising from the collapse of the now-defunct Bank of Credit and Commerce International (BCCI).

In the context of this world-wide liquidation, one aspect in particular of the court's global work — judicial assistance — was greatly strengthened by the work done by the Grand Court in conjunction with other courts abroad. Another significant development was the demonstrated utility of the MLAT in providing evidence for investigation and prosecution of those who perpetrated the fraud that destroyed the bank. The Chief Justice or a judge designated by him serves as the Central Authority for the MLAT.

That bilateral treaty with the U.S., operating since 1990, provides for assistance in the investigation and prosecution of crime, and where appropriate, for the confiscation of proceeds of crime and for asset sharing between the jurisdictions. The treaty covers any crime that carries more than 12 months imprisonment in the Cayman Islands and the United States, as well as certain specified offences peculiar to American law.

Equipped with that international compass to guide the path to co-operation, the Grand Court had the distinction of supervising in BCCI the largest restitution to its sundry victims in history, as confirmed by Jonathan Michael Paling in



a special report dated 10 February 2000. So remarkable was that happy ending in comparison to the originally anticipated legal and financial disaster, that the liquidator noted that the role played by the legal system of the Cayman Islands was one of the most dramatic liquidation stories of our times. It was also, he said, "a watershed in the relationship between the legal systems of the Cayman Islands and the United States."

That landmark was achieved, Mr. Pilling added, through "extraordinary co-operation," during which the Cayman Islands demonstrated that its legal

*The Chief Justice presides in chambers over an international civil dispute.*

system is based on "the firm principle of according discretion and privacy to those who conduct their business affairs honestly...." In so doing, he said, Cayman showed itself to be "a strong and co-operative partner in international law enforcement efforts to eliminate the scourges of money laundering, narcotics trafficking and fraud."

But the outlook at the start of the liquidation process was anything but promising. Riddled with fraud, the bank's 1991 collapse was then the largest in history. With an estimated deficit exceeding $10 billion, it initially appeared that creditors would receive no more than 10 cents in the dollar.

As the liquidators attempted to make sense of the chaos, it appeared from an initial global perspective that "the United States would be part of the problem, and not part of the solution."

The liquidator explained: "Although the United States agencies were solvent and all creditors of those agencies would be fully paid, the United States authorities initially took Draconian measures against the now-defunct BCCI." These included a $200 million penalty on indictment in New York, and a Federal indictment with the prospect of forfeiture of all US assets of BCCI, an amount then estimated to be in excess of one billion dollars.

"Despite the fact that the wrongdoers had fled and the companies were in the hands of the courts for the benefit of creditors, doctrines of corporate criminal liability created the unfortunate prospect of severe penalties in the US against a foreign insolvent organisation," the liquidator said.

"Yet from this rather uncompromising start, a very effective working relationship between the United States and Cayman Islands authorities developed. This has resulted in the largest restitution to insolvency victims in history and a return to creditors that will soon pass 60 percent — and is likely to go even higher," the liquidator also noted.

Tracking the wide international co-ordinating effort that was necessary to achieving such a fortuitous resolution, the liquidators' report detailed:

*"In November and December 1991, under the supervision of the Grand Court of the Cayman Islands, the District Court of Luxembourg and the High Court in England, the BCCI liquidators negotiated an historic plea and co-operation agreement with the United States. The agreement was presented to the Grand Court of the Cayman Islands and approved in December 1991.*

*"In accepting this agreement, Judge Joyce Hens Green of the United States District Court for the District of Columbia stated:*

*[T]he Plea Agreement now before the Court reflects on a truly global measure extraordinary efforts and amazing co-operation of a multitude of signatories representing myriad jurisdictions, to fully settle actions against the corporate defendants, which had operated in 69 countries around the globe, and through that plea restitution, to locate and protect all realizable assets of BCCI for the ultimate benefit of the depositors, creditors, United States financial institutions and other victims of BCCI. The promise of the Plea Agreement is that those extraordinary efforts, that amazing co-operation, should continue.*

While the BCCI case is important because it demonstrates success particular to that case, it is exemplary because it demonstrates the capabilities of the Cayman Islands' judicial system to respond to the demands of international disputes, however complex and difficult.

*"Seven and a half years later, as she closed the case, Judge Green found that the promise of the Plea Agreement for unprecedented international co-operation had been realised. She called the agreement a 'partnership between the Department of Justice and the Court Appointed Fiduciaries' and praised the foresight of the official liquidators acting pursuant to the direction of the Cayman Court, stating that 'their efforts on behalf of the victims in this case and beyond have been truly inspirational.' (United States v BCCI Holdings (Luxembourg) SA, 1999 WL 499134, at 27.) In assessing the results of the Plea Agreement, Judge Green called it a 'significant triumph'*

*"The hallmarks of the Plea Agreement are principles which should serve to guide the relationship between the two countries in dealing co-operatively with international frauds in the future. These principles are: restitution to victims, co-operation in sharing investigative materials and respect and comity for their respective legal systems.*

*"At the centre of the agreement was the concept of restitution to victims. While the US government had authority under existing statutes to seize all US assets of BCCI, the agreement established a World wide Victims Fund under the aegis of the Court Appointed Fiduciaries, to which the US Government undertook to remit half of the funds recovered by contractual agreement and to remit additional amounts at the discretion of the US Attorney General*

*"In our view, the US Attorney General has shown true global vision in making the interest of innocent creditors paramount. More than $1.2 billion has been remitted to the liquidation estates through the agreement process. In addition the United States has furthered the interest of innocent creditors in a number of important agreements it negotiated with third parties that resulted in hundreds of millions more being remitted to the liquidation estates.*

*"In addition to restitution, BCCI stands for unprecedented co-operation in the sharing of investigative information. Both the United States and the Cayman Islands wanted to get to the bottom of BCCI and learn its lessons for the future. The agreement provided for co-operation in investigations 'to the fullest extent allowed under applicable United States and foreign law.' That phrase captures well the spirit of aggressive international law enforcement as well as the recognition that international co-operation must always be carried out within the framework of local law. The United States authorities and the Court Appointed Fiduciaries worked together to find solutions that would make information available in a manner that was consistent with Cayman Islands law. Numerous applications pursuant to the MLAT were presented to and approved by the Cayman Authority, which permitted large quantities of information to be shared expeditiously but consistent with Cayman Islands law. That spirit of co-operative inquiry coupled with respect for legal structures yielded excellent results in BCCI, while simultaneously providing a blueprint for future co-operation"*

While the BCCI case is important because it demonstrates success particular to that case, it is exemplary because it demonstrates the capabilities of the Cayman Islands judicial system to respond to the demands of international disputes, however complex and difficult.

The Courts' calendars have already shown rising numbers of such cases over the years. The prospects for the future are that this trend will certainly continue, presenting a challenge that the judicial services recognise and are determined to meet.

*Fourteen*

# Reforms

As it grappled with the growing complexity of issues, the judicial system instituted a range of reform measures during the 1999-2000 period. While demonstrating its commitment to doing its part to meet urgent societal needs however, the Courts entered the debate with a clear appeal for everyone in the society to seek more fundamental solutions.

This was articulated by the Chief Justice in his remarks at the 2000 formal opening of the legal year during which he stressed that overall efforts should focus on prevention.

"...The criminal justice and penal systems should not be expected to provide the real answers to the problems of crime. The lasting solution is not to punish, but to prevent crime," the Chief Justice said, calling for an examination of the wider social causes.

He said that rapid change could lead to disaffection, and that to insulate itself against further erosion of its social fabric Cayman needed to come to terms with how it perceived and defined itself. "A lack of definition has serious consequences it gives rise to a sense of separation and division.

The Chief Justice urged Cayman to recapture its sense of community saying that "...there is a tremendous amount of goodwill to be harnessed in tackling the problems of crime and of youth," in the private sector.

While articulating this call to action by all, the Chief Justice described a range of reforms taking place at the Courts. These included ongoing recommendations to criminal law and procedural reform, with submissions to the Attorney General for legislative change, the drafting and implementing of new rules of court, the work of the Sentencing Advisory Committee, and an effort to create greater public awareness of the activities at, and role of, the Courts.

A synopsis of some legal and procedural reform initiatives at the Courts follows.

## NEW RULES OF COURT

The Court of Appeal (Amendment Rules) 1999 set out procedural changes governing the way in which appeals are presented in that court.

Included in the Grand Court (Amendment) Rules 1999 was authority for a number of procedures to be dealt with administratively. Procedures that previously required judicial action were:

- Uncontested applications to restore a company to the register
- Application for leave to issue summons to examine a judgement debtor
- Judgement by default
- Signing of consent orders.

These rules also permitted affidavits to be sworn before a notary employed in the same firm as an attorney acting for the person swearing the affidavit.

The interest rates on judgement debts are regularly reviewed and were last amended in January 1998.



## NEW FEES

The Court Fees Rules 1999 combined the Grand Court and Court of Appeal Fees Rules and set out revised fees. The Matrimonial Fees Rules were amended in keeping with the revised Grand Court Fees; the Bailiff's Fees were also updated.

## PRACTICE DIRECTIONS

A number of Practice Directions has recently been issued, including:

- Directions regarding document filing. This is to reduce the amount of paperwork on the court file.
- Clarification regarding the procedure for drawing up orders
- Improvement regarding the listing of short summonses
- Directions regarding the presentation of signed indictments by the Attorney General
- Revision of the form of affidavit of means for legal aid applications
- Creation of a new listing form

## INFORMATION LEAFLETS

Production continued on a series of leaflets designed to provide the public with easy to grasp information relating to court practices and procedures. The first three leaflets, touching on the following subjects, were published in 1999.

- *Jurors and Jury Service*
- *Domestic Violence*
- *The Judicial Department*

When summoned for jury service, all new jurors receive leaflets providing concise information on selection procedures and stating what is required of them. The leaflet is supplemented on their first day by a video presentation.



Data in the domestic violence leaflet explains what can be done for victims through the courts. This information has been supplied to the Women's Resource Centre and other interested organisations and individuals.

The Judicial Department leaflet provides a straightforward explanation of the aims and objectives of the department.

Additional publications planned for 2000 will include topics such as affiliation and maintenance and legal aid

*Mrs. Jennie Pacheco, maintenance officer, consults with a client.*

## Sentencing Advisory Committee

Recognising the need for additional sentencing options, the Chief Justice in 1999 set up a sentencing advisory committee. The diverse membership includes persons representing all the disciplines and agencies involved in the administration of criminal justice, as well as the private sector and the clergy. The committee's first recommendation concerned the provision of a structure for Community Service Orders. Prepared with the assistance of the Social Services Department, the suggested structure has been submitted to Government for action. Judges and magistrates will be able to make such orders with the assurance that a system for supervision is in place. This is expected to be an important additional sentencing option, of invaluable assistance to the community as an alternative to prison.

A range of other options, which has already been researched and identified, is slated to become the subject of future reports. It is expected that they will be followed by recommendations for enabling legislative change.

## Cayman Islands Law Reports

Reports on the decisions of the Cayman Islands Courts have become indispensable to members of the legal profession and to professionals of the financial sectors, locally and abroad. The Cayman Islands Law Reports ensure the ready availability of a source of information on court decisions.

Under contract with the Cayman Judiciary, Law Reports International of Oxford, England, publishes these decisions in paperback (semi-annually) and in annual hard-bound volumes. Publication of these reports confirms that the Cayman Islands has the necessary legal structure and expertise to support and regulate the offshore banking and financial industries. Decisions of the Cayman Islands Courts have been quoted in a variety of jurisdictions, including in England's House of Lords and in Australia.

## Library

The Courts' Law Library, which provides a reference service to the profession, continues to expand and has now outgrown available space. The availabililty of new technology is enabling the court to cope with these restrictions. Several CD-ROM versions of textbooks and reports have been purchased. At present, use of this resource is restricted to members of the judiciary. However there are plans to install compatible computers in the library, thereby expanding access to this material to the profession and others who may wish to have reference to them.

With the imminent appointment within the Courts' staff of a law librarian responsible for the three law libraries (including the Law Schools and the Government Legal Department's) a central database of all holdings will be created.

There is an ongoing programme for updating and replacing standard subscriptions and for acquiring pertinent new material.



*The Courts' Law Library outgrows available space*

# Information Technology and Security

Resources were primarily directed towards updating computer equipment and software in 1999. While Y2K preparations caused a number of other plans to be deferred, Y2K transitions were failure-free.

## CASE MANAGEMENT SYSTEM

At the beginning of the year, a case management system (Judicial Enforcement Management System) was purchased. In use in America and the Caribbean, this system tracks cases from initial receipt to final disposal and produces orders and management information. It went live during November 1999 with criminal cases in addition to certain traffic matters. Case details are found either by keying in a case number or a name, and information is networked within the courts office and judicial chambers. The civil side will also shortly be on line.

## COURT REPORTERS

A new software package was purchased for court reporters, ensuring competent handling of the latest developments in the recording and transcribing of court proceedings. The present complement of reporters work under severe pressure, and there are plans to further streamline the service and to increase the number of reporters. Two new posts have been approved for Year 2000.

## SECURITY

With the activation of an electronic system, security was reinforced during 1999. This new system utilize card or punch-code operated controls to secure certain specified areas of the building, and, on the advice of the Royal Cayman Islands Police, other security systems have been installed. These include a metal detector at the main entrance and security cameras both inside and outside the building.



*Marshalls and bailiffs serving the Courts*

*Proposals for the Future*

## ACCOMMODATION

The most pressing need is for improved and expanded accommodation to house courts and administrative staff. The present Courthouse was constructed in 1973 when there was only one judge and one magistrate. Subsequent years have seen adaptations, but facilities are now clearly inadequate for present needs, forcing the lease of additional buildings to obtain relief. In 1999, the Public Works Department worked with the Court Administrator to consider options and draw up plans for a new building.

Capital development costs are such that it is unlikely construction will start for another three years. A sinking fund has been agreed with the Government and the Finance Committee of the Legislative Assembly to ensure the availability of the funds at that time.

Present indications suggest the need to split the siting of the Grand Court away from the subordinate courts'.

In the interim, a working party under the direction of the Chief Justice has been formed to complete the planning process and to consult with interested organisations.

> *"There is an urgent need to provide improved and extended accommodations for the judges, magistrates and court staff."[1]*
>
> *Charles Quin*
> *President Cayman Islands*
> *Law Society*

## THE CHILDREN LAW

Passed in 1995 and intended to protect the welfare of children, particularly those in need, the Children Law is yet to be implemented. While it is hoped to bring the law into force in 2000, further amendments are planned. In particular it is felt that the Summary, rather than the Grand Court, should be the designated court of first instance for these matters.

## SMALL CLAIMS

A draft bill describing a small claims court was considered last year. It contained innovative provisions, including the reference of small claims disputes to arbitration, but was deemed too complex in other respects. Alternative proposals are being developed with a view to introducing a draft bill later in 2000. An important understanding already reached confirms that the Summary Court jurisdiction should be raised above the current level of $2,000 to $25,000.

## COST RULES

The Rules Committee has prepared a draft of new cost rules for final comment by the profession. These rules will apply to both the Court of Appeal and the Grand Court. Disputes as to costs will be the primary responsibility of the Civil Registry, with the Senior Deputy Clerk of the Court designated as the Taxing Officer.

A judge of the Grand Court will hear appeals from the Taxing Officer's decisions.

## CASE MANAGEMENT

Lord Woolf, the Master of the Rolls in England and Wales, introduced the concept of case management, with close reference to the report, *Access to Justice*. The Grand Court Rules Committee has considered the resulting reforms. While it is thought not yet appropriate to introduce the Woolf reforms wholesale, it is clear that modern rules for judicial case management are now required. The Rules Committee will consider draft proposals already prepared for implementation in early 2000.

Opening of the Grand Court, 5 January 2000.

## FACTUAL REPORTS

Timely case disposal remains a primary means of measuring the efficiency of the legal process, and a key aim during the past two years has been to reduce delay.

Specific performance targets are:

- Disposal of criminal indictments to within an average of six months of receipt in Grand Court
- Maintenance of the level of outstanding indictments to no more than one half the number received in a given year
- Ensurance of early hearing dates for Grand Court Civil hearings
- Disposal of all outstanding criminal cases before the Grand and Summary courts (i.e., those over two years old)
- Reduction of the number of part-heard cases in the Summary Court.

> *Results to date have been encouraging. All key targets have been met.*
>
> *Terry Beckett*
> *Court Administrator*

Results to date are encouraging and, at 31 December 1999, were:

## GRAND COURT — CRIME

|  | 1997 | 1998 | 1999 | Change 1997/1999 |
|---|---|---|---|---|
| Indictments outstanding | 63 | 35 | 18 | 71% |
| Average number of days from receipt in Grand Court to disposal | 338 | 356 | 167 | 51% |
| Age of oldest indictment outstanding | 45 months | 23 months | 18 months | 59% |

All key targets in Grand Court crime were met. The continuing thrust will be to reduce the average length of case disposal. While most cases are now being dealt with quickly, there still remains a small number that takes longer to be disposed of than is desirable.

## GRAND COURT — CIVIL

Already a more proactive judicial attitude has reduced the time for disposal of civil cases. However, until improved case management rules are introduced, the speed of civil proceedings remains largely in the hands of the parties and their attorneys.

Notwithstanding these realities, the measure of the court's efficiency often depends on the availability of overseas counsel. Complex, interlocutory hearings can be heard within weeks of request, urgent applications even sooner.

## SUMMARY COURT — CRIME

|  | 1997 | 1998 | 1999 | Change |
|---|---|---|---|---|
| Cases outstanding over 2 years | * | 84 | 6 | 93% |
| Part Heard Trials | * | 56 | 7 | 87% |
| Age of oldest case | * | 50 months | 22 months | 56% |
| * Statistics not kept prior to 1998 | | | | |

The number of part-heard cases has been substantially reduced and cases over two years old are well on course to being disposed of. This is particularly evident in the availability of trial dates. In 1998 the standard waiting time from the point when cases were ready for trial until trial date was some six to eight months. In contrast, by January 2000 a number of trial dates were available within the month.

## Statistics

The number of criminal cases has remained at about the same level for the last four years. Civil cases have, however, increased, largely due to small debt-recovery plaints filed by Government for fees of various kinds.

Growth is depicted in the following charts:







*Twenty-one*







Nature of Work (1999)
Summary Court

- Criminal Cases - Coroner's Inquests - Civil Cases - Youth Court - Maintenance & Affiliation



Nature of Work (1999)
Grand Court

- Civil Cases
- Estates
- Divorces
- Summary Court Appeals to Grand Court
- Indictments
- Adoptions

*Twenty-three*

## Administration

### JUDICIAL CONFERENCES AND SEMINARS

The dictates and demands of this modern judiciary require that judges and magistrates regularly participate in continuing education programmes.

One such programme in which the Cayman judiciary participated in 1998/'99 was sponsored by the UNDCP and the University of the West Indies and focused on money-laundering issues.

At these and other symposia, the Chief Justice presented papers at the invitation of the organisers. He also presented a paper on human rights issues to the regional meeting of the Commonwealth Magistrates and Judges Association, in St. Lucia, in July 1999.

### STAFF TRAINING

Encouraging staff to take advantage of training opportunities remains a high priority.

In preparation for the new computerized case management system, many staff participated in computer training courses organized by the Cayman Islands Community College. One staff member now provides instruction in functions such as Mail Merge. Additional internal training is planned.



Members of staff undertook the professional practices course and LLB (Hons.) degree studies at the Cayman Islands Law School. With the objective of gaining experience with large bills of costs, arrangements were made for the Senior Deputy Clerk of Courts to visit the Supreme Court Taxing Office in London. Also during 1999, staff were enrolled in courses provided by Government's Personnel Training Unit. These included the office skills development programme and the office attendant course.

*Administrative staff at work.*

### RETIREMENTS AND APPOINTMENTS 1999

#### RETIREMENTS AND RESIGNATIONS
* The Honourable Mr. Justice James Kerr of the Court of Appeal retired on 2 January 1999
* The Honourable Mr. Justice Murphy resigned as a judge of the Grand Court on 31 December 1999
* Mr. Peter Jackson retired as magistrate on 1 January 1999

#### APPOINTMENTS
* The Honourable Mr. Justice Ira Rowe was appointed a Justice of the Court of Appeal as of 1 January 1999
* Her Honour Ms Nova Hall was appointed magistrate on 3 May 1999



*Staffing and Organizational Chart*

*(at 1 January 2000)*

**Staffing and Organizational Chart (at 1 January 2000)**

## Court Staff



*Court Staff*



*Front: Court Administrator, Clerk of the Court, Rear: Registrar of
Court of Appeal and Deputy Clerk of Court*



*Court Reporters and Listing Officer*



*Civil Registry Staff*



*Systems Analyst, Secretaries, and Affiliation Officer*



*Criminal Registry Staff*



*Accounts Officers, Cashiers and Receptionist*

## Appendix

# JUSTICES OF THE PEACE
## (at January 2000)

| | | | |
|---|---|---|---|
| ADAMS, Colin Charles | East End | JACKSON, Peter Brierly | George Town |
| ARCH, Robert James | George Town | JACKSON, Sybil | Cayman Brac |
| ARCH, Richard, MBE | George Town | JACKSON, Vernon, OBE | West Bay |
| BASDEO, Joy V., MBE | George Town | JEFFERSON, Hon Thomas C., OBE | George Town |
| BANKS, Guy A., MBE | Cayman Brac | JOHNSON, Kt, CBE, Sir Vassel | George Town |
| BODDEN, Hubert Lawrence | Bodden Town | KIRCHMAN, Ann | East End |
| BODDEN, E. Ashton | Cayman Brac | KIRKCONNELL, Capt. Eldon, OBE | George Town |
| BODDEN, James A., MBE | George Town | KIRKCONNELL, Capt. Mabry S., MBE | Cayman Brac |
| BODDEN, Norman, OBE | George Town | LAWRENCE, Mary | Bodden Town |
| BODDEN, S. Thomas | George Town | McCARTHY, Hon. George, OBE | George Town |
| BODDEN, Hon. Truman M., OBE | George Town | McCOY, Harwell, OBE, BEM | Bodden Town |
| BOTHWELL, Andrea, Cert. Hon. | George Town | McCOY, Virginia Lee | North Side |
| BOTHWELL, John | West Bay | McLAUGHLIN, Sybil L., MBE | East End |
| BOXALL, Ian | George Town | McLEAN, Hon. John B., Snr., OBE | East End |
| BRYAN, Andrea | Savannah | McTAGGART, William, Snr. | George Town |
| BUSH, W. McKeeva, OBE | West Bay | MANDERSON, Jenny, MBE | West Bay |
| BUSH, Floyd M. | West Bay | MERREN, Dr. Edlin, OBE | George Town |
| CHISHOLM, Harry | George Town | MILLER, Eunley E. | North Side |
| CONNOLLY, Walsham W. | George Town | MILLER, Olive, MBE, Cert. Hon. | George Town |
| CONNOLLY, Anthony W. | Pedro | MOYLE, Edna | North Side |
| CONNOLLY, Capt. Coolidge | North Side | MYRIE, Georgette | George Town |
| CONNOLLY, Warren, OBE | East End | NIXON, Kirkland, QFSM, MBE | Spotts |
| CRIGHTON, Rex | George Town | NIXON, Melba | George Town |
| DACOSTA, Hartmann M. | George Town | O'CONNOR-CONNOLLY, | |
| DILBERT, Leonard | West Bay | Hon. Juliana | George Town |
| EBANKS, Benson, OBE | West Bay | OWENS-ELLIOTT, Darlene | West Bay |
| EBANKS, Carson | West Bay | PANTON, Gurney | Newlands |
| EBANKS, Craddock, OBE | North Side | PARSONS, Arden | West Bay |
| EBANKS, Hildred, Cert. Hon. | Bodden Town | POWERY, W. Garfield | George Town |
| EBANKS, Louis Marsden | George Town | PIERSON, Linford | George Town |
| EBANKS, Leonard K. | West Bay | RANKINE, Evangelyn | East End |
| EDEN, Hon Anthony S. | Bodden Town | RITCH, David | George Town |
| ELDEMIRE, Irvin B. | Little Cayman | RYAN, Bennen | Cayman Brac |
| FOSTER, Dennis H., CVO, CBE | George Town | RYAN, Hon. James M., MBE | George Town |
| FOSTER, Nolan Brown | Cayman Brac | RYAN, James W. A. | Cayman Brac |
| GORDON, Cecil H. | George Town | SCOTT, Audley E. | Cayman Brac |
| GOMEZ, Kearney, MBE | George Town | SCOTT, Carl Esmond | Cayman Brac |
| HEW, Leonard | West Bay | SCOTT, Ivalee Elme | George Town |
| HUNTER, Karen A. | Bodden Town | SCOTT, Jewell E. E. | Cayman Brac |
| HURLSTON, Lemuel John, MBE | George Town | SMITH, Ardyth E. | West Bay |
| HURLSTON, Thomas, MBE | George Town | STEPHENSON, Hope | George Town |
| JACKSON, C. A. (Sammy), MBE | George Town | TATUM, Aaron Samuel | Cayman Brac |
| JACKSON, Emily | West Bay | TATUM, Wanda | Cayman Brac |
| JACKSON, Percival V. | East End | THOMPSON, A. Lawrence | George Town |

| | | | |
|---|---|---|---|
| TIBBETTS, Kurt | Bodden Town | WATLER, Vernica | East End |
| TIBBETTS, Nathaniel | Cayman Brac | WALTON, A. Joel | George Town |
| WATLER, Charles | Bodden Town | WALTON, Linell Shirdan | Cayman Brac |
| WATLER, Harding O. | Bodden Town | WOOD, William J. | Bodden Town |

## EX OFFICIO JUSTICES OF THE PEACE

THE HOLDERS OF THE OFFICES OF:

Chief Justice
Judge of the Grand Court
Magistrate
Court Administrator
Clerk of the Court
Deputy Clerk of the Court
Listing Officer
Registrar of Lands
Registrar of Companies
District Commissioner
Deputy District Commissioner
Deputy Financial Secretary



*From left, Council Member, President, Vice President and Secretary of the Justices of the Peace Association, Cayman Islands*

# MEMBERS OF THE GRAND COURT
# RULES COMMITTEE

The Honourable Chief Justice
The Honourable Attorney General
Mr. Andrew Jones, Attorney-at-law, Secretary
Mr. Alden McLaughlin, Jnr., Attorney-at-law

# MEMBERS OF THE SENTENCING
# ADVISORY COMMITTEE

Chairmen:
The Hon. Chief Justice Smellie, QC
The Honourable Mr. Justice Graham

Members:

| | |
|---|---|
| Mrs. Grace Donalds | Magistrate of the Summary Court |
| Mrs. Margaret Ramsay-Hale | Magistrate of the Summary Court |
| Ms Nova Hall | Magistrate of the Summary Court |
| Mrs. Deanna Lookloy | Director of Social Services |
| Ms Jen Dixon | Deputy Director of Social Services |
| Mr. Dudley Roach | Project Officer Cayman Islands Youth Facility |
| Mrs. Mary Lawrence | President of the Justices of the Peace Association |
| Mr. Mitchell Ebanks | Drug Counsellor – Caribbean Haven Outpatient Services |
| Mr. Roy Melody | Drug Counsellor – Caribbean Haven Outpatient Services |
| Pastor Alson Ebanks | Pastor and member of Prison Fellowship Cayman Islands |
| Mr. Dale Banks | Director of Labour |
| Commissioner David Thursfield | Commissioner of the Royal Cayman Islands Police Force |
| Chief Inspector Dennis Brady | Royal Cayman Islands Police Force |
| Mrs. Tessa Bodden | Chairman of the National Drug Council |





| | |
|---|---|
| Dr. Kit Thaied | Consultant, Government Psychiatris. |
| Mr. Wil Pineau | Manager of the Chamber of Commerce |
| Mrs. Christine Wright | Administrative Officer of the Chief Secretary's office |
| | Secretary of the Parole Board |
| Mr. Horario Thomas | Acting Director of Northward Prison |
| Mr. John Furniss | Attorney at law Representing the Central Criminal Bar |
| Hon. Sybil McLaughlin | |
| Mr. Andy McGaw | |
| Mr. Lemuel Hurlston | |
| Mr. Samuel Bulgin | Solicitor General |
| Mr. Adam Roberts | Senior Crown Counsel |
| Mr. Arek Joseph | Parole Commissioner's Board |
| Mr. John Retson | Probation Officer |

# ROLL OF ATTORNEYS-AT-LAW

## GOVERNMENT

### Portfolio of Legal Affairs

| | |
|---|---|
| Mr. David Ballantyne | Attorney General |
| Mr. Samuel Bulgin | Solicitor General |
| Mr. Stephen Hall-Jones | Senior Crown Counsel |
| Mrs. Lorna Hampson | Senior Crown Counsel |
| Mr. Adam Roberts | Senior Crown Counsel |
| Mr. Anthony Akiwumi | Crown Counsel |
| Ms Jane Rowley | Crown Counsel |
| Ms Cheryll Richards | Crown Counsel |
| Ms Audrey Clarke | Crown Counsel |
| Mrs. Sheena Frederick-Westerborg | Crown Counsel |
| Ms Jacqueline Wilson | Crown Counsel |
| Mr. Arden Warner | Crown Counsel |
| Mr. Duncan Nicole | Crown Counsel |

### Deputy Clerk of Court
Mr. Valdis Foklaus

## PRIVATE SECTOR

| Name | Firm |
|---|---|
| ADAMS, G. Charles, JP | Charles Adams, Ritchie & Duckworth |
| ALBERGA, Michael | Myers & Alberga |
| ALBERGA, Ramon, QC. | |
| ALLEN, Clyde Henry | Brooks & Brooks |
| ANDREW, Seamus Ronald | Walkers |
| APPLEYARD, Justin W | Maples & Calder |
| ASHENHEIM, Bryan Lewis | Myers & Alberga |
| ASHMAN, Ian G. | Walkers |
| BAGNALL, W. James T. | Boxalls |
| BANKS, James Frank | Walkers |

DACOSTA-BANKS, Julene D.
BARRIE, Steven Johnstone            C. S. Gill & Co
BERGSTROM, Eric James               Boxalls
BERRY, Gina Marie                   C.S. Gill & Co.
BESTWICK, Heather                   Walkers
BIRD, David G.
BODDEN, Joannah                     Maples & Calder
BODDEN, Sherri
BODDEN, Truman Murray               Truman Bodden & Co.
BOLTON, Andrew James                Hunter & Hunter
BOLTON, Sarah Elizabeth Anne        Boxalls
BONI, Phillip Simon                 Truman Bodden & Co.
BOXALL, Ian Llewelyn, J.P.          Boxalls
BRIDGES-GIGLIOLI, Cherry Jane       Ritch & Conolly
BROADBENT, John Vincent             Bruce Campbell & Co.
BROADHURST, Peter Allan             Broadhurst DaCosta
BROOKS, Sheridan A.                 Brooks & Brooks
CALDER, Douglas Watler George       Calder & Co. (Overseas)
CARRINGTON, Caroline Teresa         Quin & Hampson
CHARLTON, Angus                     Ritch & Conolly
CHAPMAN, James C. B.                Boxalls
CLIFFORD, Nigel Robert Leslie       Hunter & Hunter
COCKHILL, Laura M.                  Boxalls
COCKHILL, Peter                     Boxalls
COLES, Richard H.                   Coles
COLLINS, Keith Christian            Keith Collins & Co
COLLINS, Sara Jane                  Walkers
O'CONNOR-CONNOLLY, Julianna Y.
CONOLLY-SMELLIE, Jacqueline P.      Ritch & Conolly
CRAIG, Alan Stewart                 Walkers
CROWLEY, Dale                       Maples & Calder
DACOSTA, Gene A.                    Walkers
DACOSTA, Waide L.                   Broadhurst DaCosta
DACOSTA, Linda D.                   Myers & Alberga
DENTON, Shaun                       Maples & Calder
DIAMOND, Stuart N.                  Truman Bodden & Co.
DILBERT, Sophia A.                  Maples & Calder
DOBBYN, Sarah                       Hunter & Hunter
DUCKWORTH, Anthony G. D.            Charles Adams, Ritchie & Duckworth
EBANKS, Wanda L.                    Maples & Calder
EMBURY, Magda Zoe                   Solomon Harris
ESCALANTE, Twila                    Hunter & Hunter
FARROW, Kenneth John                Quin & Hampson
FEAR, Richard David                 Charles Adams, Ritchie & Duckworth
FINLAY, Richard Lyle                Charles Adams, Ritchie & Duckworth



*Thirty-three*



*The Cayman Islands Law Reports have become an indispensable tool.*

| | |
|---|---|
| FIRTH, Simon | Maples & Calder |
| FOSTER, Angus J. Elliott | Walkers |
| FOWLER, Jon | Maples & Calder |
| FOWLER, Pamela J. | Maples & Calder |
| FURNISS, John Howard | Keith Collins & Co. |
| GARCIA, Morris | Morris Garcia |
| GATTI, Elisa | Walkers |
| GIGLIOLI, George | Giglioli & Co. |
| GILL, Charnjit Singh | C. S. Gill & Co. |
| GRIFFITHS, Gareth Wynn | Maples & Calder |
| GROOM, Siobain L. | Bruce Campbell & Co. |
| HAMPSON, Graham William | Quin & Hampson |
| HARFORD, Henry Scandrett | Maples & Calder |
| HARPER, Susan Morag | Walkers |
| HARRIS, Daniel A. | Quin & Hampson |
| HARRIS, Sophia-Ann Carolyn | Solomon Harris |
| HELFRECHT, William J. | Boxalls |
| HENDRICKEN, Crystal Teresa | Coutts & Co. |
| HERNANDEZ, Angelyn Ruth M. | Quin & Hampson |
| HERSANT, Eric Andrew | Walkers |
| HEW, Sabrina Bridget | Walkers |
| HILL, Norman Washington, QC | c/o Samson Murray Jackson |
| HORSPOOL, Anthony B.G. | Walkers |
| HOLMES, Nicole M. | Truman Bodden & Co |
| HOUGHTON, Kirsten Annette | Walkers |
| HOWORTH, Gordon | Solomon Harris |
| HUNTER, Bryan | Hunter & Hunter |
| HUNTER, Jennifer | Hunter & Hunter |
| ISSA, Christopher R. J. | Quin & Hampson |
| JACKSON, James Samuel | Samson Murray Jackson |
| JAFFA-BODDEN, Minakshi | Hunter & Hunter |
| JENNINGS, Charles Stuart | Maples & Calder |
| JONES, Andrew John | Maples & Calder |
| JONES, David G. | Maples & Calder |
| JONES, Melanie C. | Maples & Calder |
| JONES, Robert Henry | Ritch & Conolly |
| JOSEPH, Nicholas | Hunter & Hunter |
| KANDIAH, Peter | |
| MYERS-KHOURI, Melanie M. | Myers & Alberga |
| KLEIN, Norman Joseph | Orren Merren & Co. |
| LAMBERT, Ian Thomas Gordon | Maples & Calder |
| LAMONTANGE, Pierre, QC | |
| LAWLESS, John | Quin & Hampson |
| LAWRENCE, Joanna Marie | Maples & Calder |
| LAWSON, Peter Damien | Walkers |

| | |
|---|---|
| LEVY, Neville W. | Neville Levy & Assoc. |
| LEWIS, Mark P. | Walkers |
| LEWIS, Theresa | Maples & Calder |
| LOCKINGTON, Graham Charles | Maples & Calder |
| LOCKE, Guy Anthony | Walkers |
| LOUGHRAN, Kieran | Quin & Hampson |
| LUMSDEN, Danaree L. | Quin & Hampson |
| LUMSDEN, Paul Edward V. | Maples & Calder |
| MACKAY, Colin James | Ritch & Conolly |
| McCAHILL, Dominic T. J. | Walkers |
| McCANN, Shaun Thomas | Bruce Campbell & Co. |
| McDONOUGH, John Ross | Bruce Campbell & Co. |
| McFIELD, Alan Steve | A. Steve McField & Assoc. |
| McGRATH, David Thomas | Quin & Hampson |
| McKIE, Colin D. | Maples & Calder |
| McLAUGHLIN, Alden McNee, Jr. | Charles Adams, Ritchie & Duckworth |
| McMILLAN, Robin | Hunter & Hunter |
| MAGNER, Del Ashley | Ritch & Conolly |
| MARTIN, Linda Alexandra | Maples & Calder |
| MEGHOO, John Godfrey | Samson, Murray, Jackson |
| MELIA, Nicola G. | Maples & Calder |
| MERREN III, Henry Orren | Orren Merren & Co. |
| MERREN, Zena Mae | Hunter & Hunter |
| MOON, Andrew Simon | Maples & Calder |
| MOSES, Huw St. John | Hunter & Hunter |
| MURRAY, Diarmad MacFarlane | Walkers |
| MURRAY, H. Delroy | Samson Murray Jackson |
| MURRAY, John A | Truman Bodden & Co |
| MYERS, Darryl W. B. | Myers & Alberga |
| WHITTAKER-MYLES, Rosie C. | Charles Adams, Ritchie & Duckworth |
| YARBOROUGH, Christopher John | Truman Bodden & Co. |
| NELSON, Roger Lawrence | Nelson & Co. |
| NERVIK, Glenis Eileen | Nervik & Co. |
| NOLAN, Allison B. | Hunter & Hunter |
| O'LOUGHLIN, Hugh | Walkers |
| PAGET-BROWN, Ian | Paget-Brown & Co. |
| PALMER, Simon J. | Maples & Calder |
| PANTON, Anthony Dwight | O. L. Panton & Co. |
| PANTON, Gurney Wayne | Walkers |
| PASCOE, Simon M. B | Quin & Hampson |
| PEARSON, Carol Juanita | Bruce Campbell & Co. |
| PECCARINO, Anna L. | Maples & Calder |
| PIERSON, Sharon Patricia | Maples & Calder |
| PITCAIRN, Maureen Theresa | Maples & Calder |
| PRIESTLEY, Daniel Richard Mark | Boxalls |





| | |
|---|---|
| POLACK, Peter | Polack & Co. |
| POLANCEC, Marta Beatriz | Maples & Calder |
| POPE, Adrian Keith | Maples & Calder |
| PORTER, Stephen W. | C. S. Gill & Co. |
| PUTTERILL, Bruce Spencer Dent | Hunter & Hunter |
| QUIN, Charles George | Quin & Hampson |
| REDDYHOUGH, Juilian Nicholas | Maples & Calder |
| REID, William Andrew Stewart | Maples & Calder |
| RIDLEY, Timothy C.L. OBE | Maples & Calder |
| RITCH, David E., JP | Ritch & Conolly |
| RITCHIE, Graham Fraser | Charles Adams, Ritchie & Duckworth |
| ROBERTS, Amanda Jane | Charles Adams, Ritchie & Duckworth |
| ROY, Steven Ashley | C.S. Gill & Co. |
| ROULSTONE, Sharon A. | Walkers |
| RUTKOWSKI, Patricia M. | Bruce Campbell & Co. |
| RYAN, James A. JP | Cayman Brac |
| SAMSON, Lloyd Austin | Samson Murray Jackson |
| SCRIVENER, Paul H | Solomon Harris |
| SCHMID, Patrick | Maples & Calder |
| SCHOFIELD, Douglas Stuart | Brooks & Brooks |
| SHAW, Colin G. | Charles Adams, Ritchie & Duckworth |
| SIMON, Paul Stephen Leslie | Orren Merren & Company |
| SIMPSON, Eliot Denning | Boxalls |
| SMITH, John Barry | Truman Bodden & Co. |
| SMITH, Henry Selwyn N. | Maples & Calder |
| STAFFORD, Peter S.G. Vanbatenburg | Hunter & Hunter |
| STRAVIS, Sonia Jane | Walkers |
| STEIN, Grant J. R. | Walkers |
| STELLER, Rebecca | Maples & Calder |
| STEPHENS, Simon Harrington D. | Bruce Campbell & Co. |
| SYKES, Margaret L. | Truman Bodden & Co. |
| SYKES, Ward A. | Broadhurst DaCosta |
| TERRY, Woodward L. | Woodward Terry & Co. |
| THORP, Richard Joylon | Maples & Calder |
| THOMSON, Jennifer Anne | Walkers |
| MARTINEZ-THOMPSON, Karin | Karin Thompson & Co. |
| TIMMS, Neil Richard F. C | Maples & Calder |
| TODD, Lawrence Rory | Hunter & Hunter |
| TOMKINS-MARCH, Simone A | CITCO & Trust Co. |
| TONGE, Jonathan Paul | Walkers |
| TRAVERS, Antony, OBE | Maples & Calder |
| TURNER, Alan | Walkers |
| UZZELL, Julien M. B. | Couns & Co |
| WALKER, David E. S | |
| WALKER, William S. OBE | Caledonian Bank & Trust |

| | |
|---|---|
| WALTERS, Alistair J. | Bruce Campbell & Co. |
| WALTON, Jeremy P. | Hunter & Hunter |
| WATLER, Olivaire R | Maples & Calder |
| EDUN-WATLER, Sandra Camille | Charles, Adams, Ritchie & Duckworth |
| WATTON, Karen Louise | Walkers |
| WAUCHOPE, James Jonathan | Bruce Campbell & Co. |
| WEAVER, Andrew J. | Hunter & Hunter |
| WEAVER, Sarah L. | Hunter & Hunter |
| WEBB, Adriannie E. | Adriannie E. Webb |
| WEBSTER, Anthony | Maples & Calder |
| WEBSTER, James A. E. | Maples & Calder |
| WHITTOME, David J | Walkers |
| WILLIAMS, Andrea R. | Truman Bodden & Co. |
| WILLIAMS, Caroline Susan | Walkers |
| WILLIAMS, Oliver H. | Maples & Calder |
| WILLIAMS, Richard D. | Maples & Calder |
| WOLF, John P. | Bruce Campbell & Co |

Edited and designed by
Government Information Services
April 2000.



*Thirty-seven*



Group photograph following opening of Grand Court in January 2002.





# THE JUDICIAL ADMINISTRATION

# CAYMAN ISLANDS



## ANNUAL REPORT 2002

Front Cover:
**The Chief Justice Inspects the Guard of Honour
at the Grand Court's Annual Ceremonial Opening
in January 2003.** Photo: Carol Winker, Cayman Free Press.

2



# OPENING OF THE GRAND COURT 2003



**The Bugler: Police Constable, I. Levine, sounds the General Salute to the Judiciary as Chief Justice, Hon. Anthony Smellie Q.C., commences the inspection of the Guard of Honour at the Grand Court Opening 2003.** Photo: Justin Uzzell

3





**The Hon. Chief Justice Anthony Smellie Q.C. with Mr. Justice Dale Sanderson Q.C., and Madame Justice Priya Levers; Mr. Valdis Foldats, Clerk of Courts; Mr. David Thursfield, Commissioner of Police and Mr. Winston Bodden, Chief Marshall before the inspection of the Guard of Honour at the Grand Court Opening, January 2003.** Photo: Carol Winker, Cayman Free Press.



# <u>INDEX</u>

1.  INTRODUCTION    AND    OVERVIEW:    THE    COURT
    ADMINISTRATOR.


2.  TEXT OF THE CHIEF JUSTICE'S REMARKS ON THE OCCASION
    OF THE OPENING OF THE GRAND COURT,
    8TH JANUARY 2003.


3.  OTHER SPEECHES.


4.  STATISTICS FOR THE YEAR 2002.


5.  APPENDICES:

    •  THE    JUDICIAL    ADMINISTRATION'S    BUDGETARY
       ALLOCATION FOR YEAR 2002.

    •  ACTUAL BUDGET FOR 2002

    •  STAFFING AND ORGANISATIONAL CHART.



## *INTRODUCTION AND OVERVIEW*

*The Ceremonial Opening of the Grand Court usually takes place on the first Wednesday in January. It marks the start of new business for the Judiciary and the Judicial Administration in the administration of justice.*

*The ceremony is attended by members of the Judiciary and the Bar. It begins with the inspection of the Guard of Honour by the Honourable Chief Justice accompanied by the Commissioner of Police and the Clerk of Courts. In attendance also are the two other Puisne Judges. The Guard of Honour is provided for by the Royal Cayman Islands Constabulary and is a symbolic gesture of support to the Judiciary and to the administration of justice.*

*The other members of the Judiciary and the legal profession in attendance as well as members of the public gather to observe the parade.*

*At the end of the ceremonial inspection, which takes place on the front steps of the main Courthouse, attendees convene in Court Room No. 1 where the second half of the official opening of the Grand Court continues.*

*It is customary that after prayers are offered, the Attorney General is invited to move a motion for the opening of the Grand Court. The Honourable Acting Attorney General, Mr. Samuel Bulgin, moved the opening of the Grand Court this year. His remarks, in part, addressed proposals for Legislative reform, the*

*identification of property to construct a new Courts building to house the Summary Courts, the creation of a new Drug Court and new sentencing options.*

*The President of the Caymanian Bar Association, Mr. Bryan Hunter seconded the motion. His comprehensive speech covered the new rules of professional conduct for attorneys, the amendment to the Monetary Authority Law to provide for that institution's operational independence; the decision of the Foreign and Commonwealth Office to forward a draft constitution to the public of the Cayman Islands in late January 2003 for further input and the effect of the new legal practitioners' fees on the smaller, mostly Caymanian, Law firms. He also spoke briefly about the European Union Savings and Tax Directive, the proposed revamping of the Professional Practice course provided by the Law School and of the joint Caymanian Bar Association/Cayman Islands Law Society Law Revision Advisory Group.*

*Mr. Charles Jennings, President of the Cayman Islands Law Society also seconded the motion of the Honourable Acting Attorney General. His comments, amongst other things, dealt with the Government's attempts to raise revenue and commented that these attempts to raise revenue retrospectively from the profession for 2002 would be opposed. He also opined that the payment bands were inequitable. He suggested that Government needed to consider ways of cutting expenditure. To that end the profession would be making a number of proposals aimed at updating the Islands' Financial Legislation to bring it in line with the rest of the world.*

*Mr. Jennings also reported that a draft Code of Conduct for the profession had been prepared. On the administration of justice, he commented on the impressive facilities in Kirk House on the one hand and lack of facilities in the main courthouse itself, on the other. He hoped that this situation would soon be rectified.*

*Mr. Ramon Alberga Q.C. was the penultimate speaker. He spoke very highly of the work being done by the Judiciary in terms of the quality and number of full written judgments produced. Some 83 full written judgments and reasons were delivered by the Judges of the Grand Court not including those in the EuroBank Trial. He recognised the many late hours and week-ends of work which this required. He was particularly pleased to note that as at year end there were no judgments outstanding. At this point he paused to congratulate the Honourable Chief Justice on his recent accomplishment of being named an Honourary*

*Bencher of Grays Inn, London, the first Chief Justice of this jurisdiction to be so recognised and honoured.*

*Mr. Alberga also spoke about the demands of this jurisdiction and the need to attract the highest calibre of Judges and the need for continuity and certainty which could only be assured by the retention of four permanent Judges.*

*In according to the motion for the opening of the Grand Court, the Honourable Chief Justice, as is usual, responded to the proposals and gave an overview of the accomplishments of the past year together with accompanying statistics. These statistics have been interpreted in graphic form in the attached schedule in order to give the reader a visual picture of the work of the Judicial Administration.*

*In response to the Acting Attorney-General's motion, the Chief Justice noted the proposals for Legislative reform and the new sentencing measures but urged consultation with the Judiciary before the reforms are made. In his reply to Mr. Hunter, the Chief Justice commented on the Constitutional modernisation process and the proposals which seek to address the independence of the Judiciary. He was to return to this theme in his main speech when he spoke of the functions and responsibilities of the staff of the Judicial Administration. Not only, he said, must the Judiciary be independent but since the work of the Judicial Administration is inextricably linked to the work of the Judiciary, their work cannot be measured on a "performance" type basis with accountability to the Executive. To do so would be to compromise the independence of the work of the Judiciary itself. The Honourable Chief Justice urged that this "unworkable conundrum" which had found its way into the new Public Management and Finance Law be rectified forthwith. As the Law now provides that it shall not operate so as to impede the independence of the Judiciary, the Judicial Administration will comply with all it requires but in a manner consistent with that objective until it is clarified.*

*In response to Mr. Hunter and Mr. Jennings, the Honourable Chief Justice noted the wide range and relevance of the issues touched upon in their respective addresses; encouraged them to regard this as an appropriate occasion for the attorneys as officers of the Court to air such matters and expressed the hope that their comments would be taken in the constructive light in which they were made. He particularly welcomed the proposed new Code of Conduct for the legal profession which would replace the "rather archaic*

8

regime" which now operates under section 7 of the Legal Practitioners' Law (2002 Revision).

The Honourable Chief Justice also expressed his gratitude to Mr. Alberga Q.C. for his unreserved support for the Judiciary and the administration of justice and congratulated him on this his 50th year of practice.

Other matters of importance addressed were the terms and conditions of service of the Magistracy, the need for new Court facilities and the necessity for a dedicated computerisation system for the Judicial Administration to be separate from the Government's system because of the confidential and often sensitive nature of the work undertaken. The Judicial Administration will be inviting tenders for the design and provision of the system once the feasibility study which has been commissioned is available. The necessary funding will then be known and raised.

The Chief Justice concluded with particular thanks to the Royal Cayman Islands Police for their support in the administration of Justice.

### PERFORMANCE MEASURES REALISED FOR 2002

The actual outputs over estimated outputs were exceeded in the excerpt below. This is to be considered by reference to the estimated budget compared to the actual budget for the provision of the outputs.

| Performance Measures | Estimated | Actual |
|---|---|---|
| Civil Cases | 900 | 1467 |
| Civil Appeals | 25 | 22 |
| Divorce and Estate | 400 | 301 |
| Criminal cases in Summary Court | 7,000 | 10,389 |
| Criminal Indictments in Grand Court | 80 | 61 |
| Case files prepared for Coroner's Court | 34 | 33 |
| Civil Legal Aid applications | 175 | 148 |
| *Approved Civil Legal Aid | | 79 |
| Criminal Legal Aid applications | 240 | 176 |
| *Approved Criminal Legal Aid | | 162 |
| Services to support tickets issued by RCIP | 5,000 | 7303 |
| Collection of Outstanding Fines | $1.3m. | $1.154m |
| Legal Aid | $830,000 | $1,203,660.25 |

9

*The estimated number of criminal indictments in the Grand Court was 80. However, the actual was 60. This reduction in the number of indictments could be a reflection of the fact that more individuals were electing to have their cases tried in the Summary Court for Category B offences, or there were slightly fewer of the more serious offences coming before the Court or because of speedier disposal in the Grand Court. The disposal rate is still an average of 18 months per indictment which was the benchmark identified in the Year 2000 Report.*

*There has been a relapse in the collection of outstanding fines, largely attributable to the number of outstanding warrants and the non-execution of those especially in the outlying Districts. Additionally, the recent change in the Traffic Law means that fines have been prorated to reflect a fine on speeding for every 10 miles over the limit. For example, in a 20 mile per hour zone, up to a speed of 29 miles per hour will incur no fine. Prior to this change, the offender would have incurred a $100.00 fine, that is, a tariff of $100.00 was imposed within each band of 10 M.P.H. over the speed limit.*

*The Judicial Administration realises that the timeliness standard for payment of unpaid tickets within a 3 day period, may have been optimistic and will be revised.*

*Fines collected by the Courts office are remitted to the Treasury on a daily basis. Fines do not form a part of the Judicial Administration's budget and it would be inappropriate to make output projections based on the level of fines projected.*

*Legal Aid*
*An estimated CI$1.3m was allocated for the 2002 year based on a performance measure of a total of civil and criminal legal aid applications totalling 415. The actual spent compared to previous years was an increase of 70%. This was attributable to the EuroBank trial and continues to have a knock-on effect on the 2003 budget.*

*Law Reports*
*This service continues to be provided at a very high standard and within budget*

10

*with an increasing rate of subscription, locally and abroad. The total amount earned in 2002 from the sale of the Cayman Islands Law Reports was CI$19,585.00. The subsidy will therefore continue to be requested. This is however a small price to pay for the prestige of having the Islands own Law Reports.*

*Conclusion*

*The Judicial Administration is pleased to provide this Annual Report as the first of its reports in keeping with the Public Management and Finance Law (2002 Revision) as that Law applies to the Judicial Administration.*

*Mrs. Delene Cacho*
*Court Administrator*
*January 2003.*



## <u>LIST OF SPEECHES DELIVERED ON THE OCCASION OF THE OPENING OF THE GRAND COURT 8TH JANUARY 2003.</u>

1.   **THE HONOURABLE CHIEF JUSTICE ANTHONY SMELLIE Q.C., CHIEF JUSTICE OF THE CAYMAN ISLANDS.**

2.   **MR. SAMUEL BULGIN, ACTING ATTORNEY GENERAL.**

3.   **MR. BRYAN HUNTER, PRESIDENT OF THE CAYMANIAN BAR ASSOCIATION.**

4.   **MR. CHARLES JENNINGS, PRESIDENT, CAYMAN ISLANDS' LAW SOCIETY.**

5.   **MR. RAMON ALBERGA, O.B.E., Q.C. – MOST SENIOR MEMBER OF THE CAYMAN ISLANDS BAR.**