

# THE JUDICIAL ADMINISTRATION

# CAYMAN ISLANDS



## ANNUAL REPORT 2002

Front Cover:
**The Chief Justice Inspects the Guard of Honour
at the Grand Court's Annual Ceremonial Opening
in January 2003.** Photo: Carol Winker, Cayman Free Press.



# OPENING OF THE GRAND COURT 2003



**The Bugler: Police Constable, I. Levine, sounds the General Salute to the Judiciary as Chief Justice, Hon. Anthony Smellie Q.C., commences the inspection of the Guard of Honour at the Grand Court Opening 2003.** Photo: Justin Uzzell





**The Hon. Chief Justice Anthony Smellie Q.C. with Mr. Justice Dale Sanderson Q.C., and Madame Justice Priya Levers; Mr. Valdis Foldats, Clerk of Courts; Mr. David Thursfield, Commissioner of Police and Mr.Winston Bodden, Chief Marshall before the inspection of the Guard of Honour at the Grand Court Opening, January 2003.** Photo: Carol Winker, Cayman Free Press.



# **INDEX**

1.    INTRODUCTION    AND    OVERVIEW:    THE    COURT
      ADMINISTRATOR.


2.    TEXT OF THE CHIEF JUSTICE'S REMARKS ON THE OCCASION
      OF THE OPENING OF THE GRAND COURT,
      8TH JANUARY 2003.


3.    OTHER SPEECHES.


4.    STATISTICS FOR THE YEAR 2002.


5.    APPENDICES:

      • THE    JUDICIAL    ADMINISTRATION'S    BUDGETARY
        ALLOCATION FOR YEAR 2002.

      • ACTUAL BUDGET FOR 2002

      • STAFFING AND ORGANISATIONAL CHART.



## *INTRODUCTION AND OVERVIEW*

*The Ceremonial Opening of the Grand Court usually takes place on the first Wednesday in January. It marks the start of new business for the Judiciary and the Judicial Administration in the administration of justice.*

*The ceremony is attended by members of the Judiciary and the Bar. It begins with the inspection of the Guard of Honour by the Honourable Chief Justice accompanied by the Commissioner of Police and the Clerk of Courts. In attendance also are the two other Puisne Judges. The Guard of Honour is provided for by the Royal Cayman Islands Constabulary and is a symbolic gesture of support to the Judiciary and to the administration of justice.*

*The other members of the Judiciary and the legal profession in attendance as well as members of the public gather to observe the parade.*

*At the end of the ceremonial inspection, which takes place on the front steps of the main Courthouse, attendees convene in Court Room No. 1 where the second half of the official opening of the Grand Court continues.*

*It is customary that after prayers are offered, the Attorney General is invited to move a motion for the opening of the Grand Court. The Honourable Acting Attorney General, Mr. Samuel Bulgin, moved the opening of the Grand Court this year. His remarks, in part, addressed proposals for Legislative reform, the*

*identification of property to construct a new Courts building to house the Summary Courts, the creation of a new Drug Court and new sentencing options.*

*The President of the Caymanian Bar Association, Mr. Bryan Hunter seconded the motion. His comprehensive speech covered the new rules of professional conduct for attorneys, the amendment to the Monetary Authority Law to provide for that institution's operational independence; the decision of the Foreign and Commonwealth Office to forward a draft constitution to the public of the Cayman Islands in late January 2003 for further input and the effect of the new legal practitioners' fees on the smaller, mostly Caymanian, Law firms. He also spoke briefly about the European Union Savings and Tax Directive, the proposed revamping of the Professional Practice course provided by the Law School and of the joint Caymanian Bar Association/Cayman Islands Law Society Law Revision Advisory Group.*

*Mr. Charles Jennings, President of the Cayman Islands Law Society also seconded the motion of the Honourable Acting Attorney General. His comments, amongst other things, dealt with the Government's attempts to raise revenue and commented that these attempts to raise revenue retrospectively from the profession for 2002 would be opposed. He also opined that the payment bands were inequitable. He suggested that Government needed to consider ways of cutting expenditure. To that end the profession would be making a number of proposals aimed at updating the Islands' Financial Legislation to bring it in line with the rest of the world.*

*Mr. Jennings also reported that a draft Code of Conduct for the profession had been prepared. On the administration of justice, he commented on the impressive facilities in Kirk House on the one hand and lack of facilities in the main courthouse itself, on the other. He hoped that this situation would soon be rectified.*

*Mr. Ramon Alberga Q.C. was the penultimate speaker. He spoke very highly of the work being done by the Judiciary in terms of the quality and number of full written judgments produced. Some 83 full written judgments and reasons were delivered by the Judges of the Grand Court not including those in the EuroBank Trial. He recognised the many late hours and week-ends of work which this required. He was particularly pleased to note that as at year end there were no judgments outstanding. At this point he paused to congratulate the Honourable Chief Justice on his recent accomplishment of being named an Honourary*

*Bencher of Grays Inn, London, the first Chief Justice of this jurisdiction to be so recognised and honoured.*

*Mr. Alberga also spoke about the demands of this jurisdiction and the need to attract the highest calibre of Judges and the need for continuity and certainty which could only be assured by the retention of four permanent Judges.*

*In according to the motion for the opening of the Grand Court, the Honourable Chief Justice, as is usual, responded to the proposals and gave an overview of the accomplishments of the past year together with accompanying statistics. These statistics have been interpreted in graphic form in the attached schedule in order to give the reader a visual picture of the work of the Judicial Administration.*

*In response to the Acting Attorney-General's motion, the Chief Justice noted the proposals for Legislative reform and the new sentencing measures but urged consultation with the Judiciary before the reforms are made. In his reply to Mr. Hunter, the Chief Justice commented on the Constitutional modernisation process and the proposals which seek to address the independence of the Judiciary. He was to return to this theme in his main speech when he spoke of the functions and responsibilities of the staff of the Judicial Administration. Not only, he said, must the Judiciary be independent but since the work of the Judicial Administration is inextricably linked to the work of the Judiciary, their work cannot be measured on a "performance" type basis with accountability to the Executive. To do so would be to compromise the independence of the work of the Judiciary itself. The Honourable Chief Justice urged that this "unworkable conundrum" which had found its way into the new Public Management and Finance Law be rectified forthwith. As the Law now provides that it shall not operate so as to impede the independence of the Judiciary, the Judicial Administration will comply with all it requires but in a manner consistent with that objective until it is clarified.*

*In response to Mr. Hunter and Mr. Jennings, the Honourable Chief Justice noted the wide range and relevance of the issues touched upon in their respective addresses; encouraged them to regard this as an appropriate occasion for the attorneys as officers of the Court to air such matters and expressed the hope that their comments would be taken in the constructive light in which they were made. He particularly welcomed the proposed new Code of Conduct for the legal profession which would replace the "rather archaic*

*regime" which now operates under section 7 of the Legal Practitioners' Law (2002 Revision).*

*The Honourable Chief Justice also expressed his gratitude to Mr. Alberga Q.C. for his unreserved support for the Judiciary and the administration of justice and congratulated him on this his 50th year of practice.*

*Other matters of importance addressed were the terms and conditions of service of the Magistracy, the need for new Court facilities and the necessity for a dedicated computerisation system for the Judicial Administration to be separate from the Government's system because of the confidential and often sensitive nature of the work undertaken. The Judicial Administration will be inviting tenders for the design and provision of the system once the feasibility study which has been commissioned is available. The necessary funding will then be known and raised.*

*The Chief Justice concluded with particular thanks to the Royal Cayman Islands Police for their support in the administration of Justice.*

## PERFORMANCE MEASURES REALISED FOR 2002

*The actual outputs over estimated outputs were exceeded in the excerpt below. This is to be considered by reference to the estimated budget compared to the actual budget for the provision of the outputs.*

| Performance Measures | Estimated | Actual |
|---|---|---|
| Civil Cases | 900 | 1467 |
| Civil Appeals | 25 | 22 |
| Divorce and Estate | 400 | 301 |
| Criminal cases in Summary Court | 7,000 | 10,389 |
| Criminal Indictments in Grand Court | 80 | 61 |
| Case files prepared for Coroner's Court | 34 | 33 |
| Civil Legal Aid applications | 175 | 148 |
| *Approved Civil Legal Aid | | 79 |
| Criminal Legal Aid applications | 240 | 176 |
| *Approved Criminal Legal Aid | | 162 |
| Services to support tickets issued by RCIP | 5,000 | 7303 |
| Collection of Outstanding Fines | $1.3m. | $1.154m |
| Legal Aid | $830,000 | $1,203,660.25 |

*The estimated number of criminal indictments in the Grand Court was 80. However, the actual was 60. This reduction in the number of indictments could be a reflection of the fact that more individuals were electing to have their cases tried in the Summary Court for Category B offences, or there were slightly fewer of the more serious offences coming before the Court or because of speedier disposal in the Grand Court. The disposal rate is still an average of 18 months per indictment which was the benchmark identified in the Year 2000 Report.*

*There has been a relapse in the collection of outstanding fines, largely attributable to the number of outstanding warrants and the non-execution of those especially in the outlying Districts. Additionally, the recent change in the Traffic Law means that fines have been prorated to reflect a fine on speeding for every 10 miles over the limit. For example, in a 20 mile per hour zone, up to a speed of 29 miles per hour will incur no fine. Prior to this change, the offender would have incurred a $100.00 fine, that is, a tariff of $100.00 was imposed within each band of 10 M.P.H. over the speed limit.*

*The Judicial Administration realises that the timeliness standard for payment of unpaid tickets within a 3 day period, may have been optimistic and will be revised.*

*Fines collected by the Courts office are remitted to the Treasury on a daily basis. Fines do not form a part of the Judicial Administration's budget and it would be inappropriate to make output projections based on the level of fines projected.*

*Legal Aid*
*An estimated CI$1.3m was allocated for the 2002 year based on a performance measure of a total of civil and criminal legal aid applications totalling 415. The actual spent compared to previous years was an increase of 70%. This was attributable to the EuroBank trial and continues to have a knock-on effect on the 2003 budget.*

*Law Reports*
*This service continues to be provided at a very high standard and within budget*

*with an increasing rate of subscription, locally and abroad. The total amount earned in 2002 from the sale of the Cayman Islands Law Reports was CI$19,585.00. The subsidy will therefore continue to be requested. This is however a small price to pay for the prestige of having the Islands own Law Reports.*

*Conclusion*

*The Judicial Administration is pleased to provide this Annual Report as the first of its reports in keeping with the Public Management and Finance Law (2002 Revision) as that Law applies to the Judicial Administration.*

*Mrs. Delene Cacho*
*Court Administrator*
*January 2003.*



## LIST OF SPEECHES DELIVERED ON THE OCCASION OF THE OPENING OF THE GRAND COURT 8TH JANUARY 2003.

1.     THE HONOURABLE CHIEF JUSTICE ANTHONY SMELLIE Q.C., CHIEF JUSTICE OF THE CAYMAN ISLANDS.

2.     MR. SAMUEL BULGIN, ACTING ATTORNEY GENERAL.

3.     MR. BRYAN HUNTER, PRESIDENT OF THE CAYMANIAN BAR ASSOCIATION.

4.     MR. CHARLES JENNINGS, PRESIDENT, CAYMAN ISLANDS' LAW SOCIETY.

5.     MR. RAMON ALBERGA, O.B.E., Q.C. – MOST SENIOR MEMBER OF THE CAYMAN ISLANDS BAR.

## CHIEF JUSTICE'S REMARKS
## OPENING OF THE COURT
## YEAR 2003

**INTRODUCTORY REMARKS:**

Welcome to the commencement of the business of the Court for the Year 2003.

I begin with the customary thanks to our visiting pastor, Pastor Rev. Noble Bloomfield, for having led us in prayer.

Before I call upon the Hon. Acting Attorney General to move the motion, I must also say a special word of welcome to Madam Justice Levers who is present at this her first of what we hope will be many openings of this Court. Justice levers will be taking up her permanent appointment at the end of March subject to the terms and conditions of service such as pension and tenure of office being confirmed with the Governor's Office. These are matters which the Judiciary considers to be settled but about which the Governor has expressed the need to take advice.

Justice Levers is of course no stranger to this jurisdiction, having appeared many times before as defence counsel and having acted as a Judge of this Court last year. I am confident that we will benefit greatly from her tenure and that she will enjoy a mutually beneficial relationship with the public and the profession alike.

Justice Sanderson's sitting with us today will not have been so obviously observed as his first such occasion as well, but it is. He was sure to return from

Vancouver where he spent his holidays with his family to be here for this opening. For him this was not an occasion to miss because, I regret to report, he will shortly be demitting office as a permanent Judge of this Court. This Court will be the poorer for having lost his services but will be the richer for having had him as a Judge for three years.

I have come to regard Justice Sanderson as a colleague for whom I have the fondest regard and deepest respect. I consider it a matter of great regret that he should have been presented with circumstances which breach his contract and which quite understandably caused him to reconsider his and his family's position.

I am pleased to tell you however, that Justice Sanderson has assured me of his willingness to assist this Court in the future in anyway he can.

Now that I have made those necessary introductory remarks I invite you Mr. Acting Attorney, to move the motion for the opening of the Court for 2003.

## [MOTION FOR THE OPENING OF THE GRAND COURT IS MOVED AND SECONDED]

# THE CHIEF JUSTICE REPONDS TO THE FOLLOWING SPEAKERS:

## TO THE ACTING ATTORNEY GENERAL

First of all thank you for all the sentiments of support which you have expressed and for moving the motion for the opening of the Court, to which I of course, in the usual manner, accede.

I am of course unable to respond to each of the interesting issues and ideas arising from the submissions of all the speakers this morning.

Indeed the variety of points raised reflect the view that this occasion presents a welcome venue for the airing generally of matters of concern to the profession.

I wish to reassure you that my own view is that as officers of this Court, the attorneys should be able to regard this as an occasion for expressing their professional views on matters of common interest to the profession and the public.

I regard all the views expressed in the submissions this morning as timely, useful and I hope will be taken in the constructive light in which they are presented.

Mr. Attorney I have noted in particular your concerns about recruiting and keeping suitably qualified staff and express the hope that your office will be

provided with the resources needed to maintain the high standards of professionalism which have come to be expected from the Legal Department. I also urge the profession to respond to your plea for placements for those in need of Articles.

I welcome your statements about the introduction of the Drug Court and the alternative sentencing measures, all of which are regarded as long overdue and should be given high priority on the legislative agenda.

The other proposals for legal reform are also noted. We urge the Legal Portfolio to ensure that there is proper consultation including the Judiciary before the reforms are made. It must not be forgotten that the Courts will have to implement them.

## TO MR. BRYAN HUNTER – PRESIDENT OF THE CAYMANIAN BAR ASSOCIATION

While I have noted all you have said Mr. Hunter and commend the Bar Association for the keen interest it has taken in the development of legal policies and initiatives, for reasons already explained, I cannot respond to all the points you have made. I will respond to two matters in particular.

The first is as to the constitutional modernisation process. I invite the professional associations also to consider the proposals which have emanated from the Judiciary which seek to enhance the independence of the Judiciary.

While I was invited to make submissions to the Constitution Review Commissioners, the Judiciary has been given no response to those submissions

and were not invited to participate in the talks which have taken place since then. I think it would be helpful to have the views of the professional associations in the matter.

Secondly, I am pleased to note from yours and Mr. Jennings' submissions, the proposal for a new code of conduct for the profession. The proposal I think will contain modern and reasonable measures for self-regulation by the profession while allowing for the more serious disciplinary matters to be brought before the Chief Justice. It should result in an improvement over the now outdated regime set out in section 7 of the Legal Practitioners Law, which requires that <u>all</u> matters of discipline, however mundane or amenable to resolution, are brought to the Judge.

In relation to the recent amendments to the Legal Practitioners Law, I will say only in passing now that as these new measures are to fall to the Courts for enforcement I anticipate some difficulties of construction. I invite the Hon. Financial Secretary and the Attorney General to meet to discuss the solutions to these problems.

## <u>TO MR. CHARLES JENNINGS – PRESIDENT OF THE LAW SOCIETY</u>

I also thank Mr. Jennings for his comments, and indeed the Attorney for his, in relation to the need for new court facilities. I will have a bit more to say on this later on, but am pleased to be able to moderate what I would say because of what has been said today.

I note what Mr. Jennings has said about the proposed changes to be made to the environs of this building for the sake of this year's Quincentennial celebrations. I share the concerns of the profession and have already expressed similar concerns to the Quincentennial Committee. I intend to take the matter up again with them.

## TO MR. RAMON ALBERGA Q.C.

Congratulations on your 50th year of practice. We appreciate the support which you have always given to the Judiciary and to the administration of justice in this jurisdiction.

We look forward to many more years of your leadership of the Bar.

## THE CHIEF JUSTICE'S MAIN REMARKS

So far as personnel is concerned last year was a year of transition. It observed the unexpected departure of Justice Graham for whose 5 years of service we take this occasion to once more express our thanks.

We also saw in September, the well-deserved appointments within the senior ranks of the administration: Mrs. Delene Cacho as Court Administrator, Mr. Valdis Foldats as Clerk of Courts, Mrs. Audrey Bodden as Registrar/Snr. Deputy Clerk of Courts and Mrs. Cecile Collins as Deputy Clerk of Courts (Administrative). These highly regarded and dedicated public officers need no further introduction.

Mrs. Yasmin Ebanks is the new Listing Officer designate. She will be working closely with Mrs. Collins over the next couple of months to ensure the smooth transition of those important responsibilities. This office is the distribution center for the work of the courts. It is therefore of importance that the rules for the listing of cases be conscientiously observed. The habit of some practitioners of direct approach to a Judge or Magistrate to have matters listed is wrong and must cease.

While the Judiciary are keen to provide a timely hearing particularly where the liberty of the person is at risk, such direct approaches cause disruption, will tend to the advantage of the few who always see themselves as having urgent matters and worse, could give the unintended impression of "forum shopping".

I therefore take this opportunity to remind everyone that all listings not done in open court must be done through the Listing Officer. The circular letter issued early last year sets out the procedure.

I am pleased publicly to observe those well deserved promotions and advancements within the administration. Those senior officers and the able and dedicated team of officers who support them, are the indispensable foundation upon which the Courts must depend in its quest to provide justice for the people of these Islands and for the untold numbers abroad who must have their rights recognised or enforced in this jurisdiction.

I urge the profession as a whole to continue to give your cooperation and support to the court staff, as they continue to fulfill their important duties as officers who serve the administration of justice.

This reflection upon the functions and responsibilities of the staff of the Judicial Administration is necessary and timely for another, I regret to say, less welcoming reason.

It is important that I preface my following remarks by a brief consideration of the importance of the autonomy of the Judicial Administration. By this I mean in particular, their autonomy as an institution of persons who support the Judiciary in the dispensation of justice. It is beyond argument, not only that the Judiciary must be independent from the rest of Government, but also that it manifestly appears to be so.

An indispensable aspect of the Judiciary's independence is the ability to fulfill its sworn responsibility to do justice in a timely and efficient manner to everyone who comes before the Courts. This often includes Government itself as a litigant. When the Government is a party, the opposite parties must be assured that they will be successful if they deserve to be.

None of this can be assured if the Judicial Administration is to be held accountable to the Executive for the amount of work that it produces or for the manner or timeliness of that work. The work of the Judicial Administration is inextricably linked to the work of the Judiciary. It is simply not possible or practicable to measure or in the language of the Legislation that which I am about to discuss – for the Executive to "purchase" the outputs of the court staff without involving the work of the Judiciary. Yet this is theoretically what is proposed by the new Public Management and Finance Law.

While that Law purports to exclude the Judiciary from its requirements of accountability to the Executive, it would nonetheless require that the rest of the Judicial Administration enter into a performance agreement with the Executive such that the Executive will purchase their outputs. This would be the basis for the allocation or retention of annual budgetary resources. This performance agreement would be assessed by means of quarterly reports to the Executive. Failure to meet the agreed outputs could result in budgetary reductions reflecting for instance, it might be assumed, the Executive's view of whether there should be reduction in the numbers of personnel.

One would think that just the expression of that idea would be sufficient to reveal the inherent dangers and fallacies. Nonetheless, the persistence in the

policy which has now found a form of expression in legislation is real. It is presented despite the Judiciary's concerns being expressed before the Law was passed. Indeed as originally passed in 2001, the Law was found to be unacceptable for that and other reasons and amendment was deemed necessary.

Unfortunately, the amendments late last year to the Law, still offend against the constitutional safeguards of independence and separation of powers in the way I have described. This amendment was an attempt to avoid those concerns while still making the Judicial Administration accountable to the Executive. The upshot is what the Attorney General has described as a "latent ambiguity" and which I would describe as an unworkable conundrum.

Unfortunately, the draft form of amendment which I had agreed with the Attorney General and which I was made to believe would have been presented to the House, appears not to have been carried through the legislative process.

My discussion of this matter now is unavoidable because of the publication of the Law in its present form and the obvious concerns which the public would have over its implications.

I trust that I shall shortly be able to resolve these concerns. This can only be done by the acceptance that the Judicial Administration like the Judiciary itself, might not be expected to enter into performance agreements with the Executive.

Such a thing is unheard of anywhere else in the democratic world and was eschewed in New Zealand from whence I understand, this Legislation was borrowed. If that is not what is intended as I hope it is not, then the "latent

ambiguity" needs to be removed from the Legislation. In the meantime, I trust there will be no difficulties encountered over this Administration's attempt to comply in an acceptable manner with the budgetary process.

While it is customary in the month of January to be at once both retrospective and prospective - looking backwards and forwards, like the Roman god for whom the month is named, often it seems that life within the Judicial Administration occurs within a circular realm. When change occurs it often does so at an almost imperceptible pace.

This is by no means always the wish of the Judicial Administration. The reality is that all significant change requires resources and the Administration does not occupy a primary seat at the table at which resources are allocated. The result is that this year, as in the past four years, I find myself having to report to you and to the public that important changes seem no closer to being realised.

As in the case of the last four years, I have to report that the long over -due building to house the Magistrates' Court is no closer to being realised. While I welcome the assurance voiced on behalf of government by the Acting Attorney I am obliged once more to explain the need.

In 1972, thirty years ago, this building was designed to accommodate two courtrooms and a total staff of fifteen people. Then there were on average only a small fraction of the thousands of criminal or quasi-criminal cases and hundreds of civil cases which are now dealt with each year. Today there are often seven courts being run at once supported by a staff of nearly fifty people.

The Judicial Administration dealt with more than 10,000 new criminal and more than 1,000 new civil cases last year. Apart from the rented space at Kirk House, the Courts are operating from within the same space as in 1972. The fact that the rest of Government and its need for space has grown exponentially since 1972 must surely itself make a compelling argument for the need for another court building.

I am encouraged by the direct interest which the current Minister of Works and his Permanent Secretary have recently expressed to making the project a reality and expect that finally this year after more than ten years under discussion, some progress will be made.

A similar lack of progress I regret to note, has attended the improvement in terms and conditions for the Magistracy.  The need for this improvement was established in a report by Mr. Michael Bradley CMG, Q.C., commissioned by then Governor Smith more than three years ago. Before he demitted office, there appeared to have been agreement over the acceptance of those recommendations with Governor Smith, only for my office to be told on the eve of his departure that there was not. I can only report that I shall be persistent in this matter. The Magistrates and the public whom they serve are entitled to the assurance that they enjoy reasonable security of tenure and conditions of service. The Bradley Report was recognised as suggesting nothing more or less than that.

Another matter about which we seem to occupy the same position year after year is computerisation and the use of information technology within the Courts. The innovative application of information technology in the EuroBank trial proved to

be indispensable. It served to confirm the urgent need for the wider and more general application throughout the court system.

The courts must have their own dedicated and purpose built system. The main reason for lack of progress has been the attempt to get the case management software to be compatible with the software used by the rest of government. While the government network is important for certain functions such as accounts management and the intranet between departments, those matters might not be allowed to stand in the way of modernisation of the courts' system. An overriding concern will be to ensure the confidentiality of certain types of pleadings and orders which will be placed on the system. The Judicial Administration's system must therefore be a discrete system.

The single note of progress to report in this area is that a feasibility study for a Judicial website and I. T. system has been commissioned. Among other things, that study will consider the costs implications and revenue earning potential of the website to house the Law Reports for online access, to allow online searches of the Register of Writ Actions and other types of searches within the Registry; to allow the electronic filing of pleadings and, ultimately, the electronic payment of fees, fines and other monetary payments into court. The system must also allow for the internal management of cases including the creation of an electronic database of court files and for the future central management of the split sites of the Registries of the Court of Appeal, the Grand and Summary Courts from a single dedicated location in this building.

It is already apparent that these innovations will generate their own internal economies of scale in terms of savings of personnel time and other efficiencies.

We do not anticipate that the implementation will require a relatively large investment of capital. I hope that next year I will be able to report on some real progress in this regard.

In closing I will give the usual statistical overview of case disposals for the past year.

There were some 10,389 cases filed in the Summary Court, with more than 8,000 of these relating to traffic offences or breaches. This compares with the total number of filed in 2001 of 6,996.

The breakdown of charges filed for 2002 revealed 1,702 serious non-drug charges and 360 trafficking related or serious drug charges.

There were 531 civil cases filed in the Summary Court compared to 478 in 2001.

In the Court of Appeal there was a notable decrease in the number of criminal appeals down to 34 from 49 in the Year 2001 and 54 in 2000. Civil appeals remained steady at 22, as compared with 23 in 2001 and 23 in 2000.

There were no part heard cases at the end of 2002; a remarkable benchmarked in itself being maintained from Year 2001.

In the Grand Court 61 indictments were filed last year compared with 70 in 2001. At end of year, 36 were outstanding compared with 39 at end of Year 2001. Despite the impact of five particularly involved cases, most notably the EuroBank trial, the cases awaiting trial are approximately one half the number of

those taken in for the year. This translates into an average disposal time of 18 months per indictment which is the benchmark identified in the Year 2000 report. Nonetheless, an average disposal time of 12 months from date of filing of indictments in the Grand Court still remains the attainable objective.

On the civil side, there were 936 actions filed excluding divorce cases which numbered 193. The comparative numbers for 2001 were 710 and 170 respectively.

I am advised by our Listing Office that even the more involved interlocutory applications can now be listed after 5 weeks of the filing of an action and the trial list can accommodate trial dates after only 3 months. This exceeds the benchmarks set in 2000.

I take this opportunity to express our thanks to the visiting Judges from overseas without whose assistance the results which I just reported for the Grand Court would not have been possible. Indeed the now established perennial need for such assistance is clear justification for the full time appointment of the fourth Judge. This has been agreed with the Governor's Office but postponed until Year 2004.

## POLICE

Thanks to the Commissioner of Police and the dedicated officers of the RCIP for their resplendent turnout and for the important symbolic demonstration of support which their parade represents.

I wish on behalf of the entire Judicial Administration to express our appreciation for the fine service of the Royal Cayman Islands Police Force given to this jurisdiction.

We will now adjourn with the usual invitation to join us for refreshments before returning to the rest of the day's business.

*THE HONOURABLE JUSTICE ANTHONY SMELLIE Q.C.*
*CHIEF JUSTICE OF THE CAYMAN ISLANDS*
*8TH JANUARY 2003.*

## MOTION BY THE ACTING ATTORNEY GENERAL

My Lord Chief Justice, Judges of the Grand Court and I pause here to give special recognition and welcome to Mrs. Justice Levers, Learned Magistrates, senior Members and other colleagues at the bar, members of the RCIP, other special members of the audience, ladies and gentlemen.

The Hon. Attorney General has asked me to convey his apologies for his unavoidable absence today.

My Lord it is not unusual, indeed it is customary for us to use this occasion to review the previous year and at the same time to give a preview of the year ahead.

From the perspective of the Legal Portfolio, I have to observe that as has become customary we experienced our fair share of staff turnover last year. This was due to several factors including the fact that those who joined us on the understanding that there was a 15% Contracted Officers Supplement, found the current remuneration package less attractive when that aspect of the package was replaced by a Pension Scheme. Others have moved on simply because such a move is more in keeping with their ultimate career objectives. Naturally we have to replace those who have moved on, and, so we are currently in the process of recruiting additional members of staff.

We are also hoping to augment our Legislative Drafting department with the addition of a fourth Legislative Counsel.

My Lord may I also be permitted to observe at this point that for the first time in approximately ten years, the Government Legal Department has been inundated with requests from persons, mostly young Caymanians seeking to be articled with us. Regrettably we were only able to accommodate one articled clerk for this year, while the others are wait-listed for next year, or more appropriately, when the next budget exercise is undertaken at which stage we are hoping to increase the amount of posts for articled clerks.

I am aware that there are some firms that are doing extremely well in offering Articles to young graduates. Indeed the Court has also been playing its part, I would like however to use this occasion to also appeal to other firms to try to assist in providing placements to these youngsters, especially this coming year when there will be a slight change in the Law School's academic programme which will see the Articles being undertaken prior to Professional Practice courses.

My Lords, I am aware of the long outstanding issue of the need for accommodation for the Courts. I am happy to announce that the Government is currently in the process of identifying property within Central George Town to construct a building to house the Courts. It is hoped that when this is completed, justice can be dispensed in a more comfortable and spacious setting.

My Lords, on the issue of Legislative reform, we with the usual co-operation of Honourable members of the Legislative Assembly, have been able to make meaningful amendments to a number of legislation, all aimed at amongst other things, enhancing our already first rate justice system.

In the coming year we will be seeking to continue this endeavour with planned amendments to the Penal Code, for e.g., to create a distinction between Causing Grievous Bodily Harm and Inflicting Grievous Bodily Harm, to the Court of Appeal Law, to make provision for the Crown to appeal in a limited way some orders of the Grand Court sitting in its original jurisdiction.

Similarly we will be seeking to make amendments to the Evidence Law and the Police Law among others.  In brief, it is proposed that the Evidence Law be amended, firstly:

- To empower the Court in criminal proceedings to admit written statements into evidence in the absence of the consent of the opposing party, where the justice of the case justifies such admission; secondly

- To remove the obligation of the Court to give the Jury a warning about convicting the accused on the uncorroborated evidence of an accomplice, where the charge is of a sexual offence and in cases where the evidence is from a child witness; and thirdly

- To allow the Court to draw certain inferences from the silence of an accused person both at the stage of interview by the Police and at trial, i.e. failure to testify, and also from the failure of an accused to account for certain objects, substances or marks.  We have moved slowly in formulating the various drafts in this regard as we are seeking to ensure that there are appropriate safeguards in place to protect the rights of the accused.

All of these changes in respect of the law of evidence are already in effect in the United Kingdom.

Given the improvements and advances in technology and forensic investigation techniques as well as the level of sophistication now being employed by criminals in committing crimes, it is proposed that the Police Law be amended to enhance the capabilities of the Police by providing them with wider powers to collect samples, intimate and non-intimate, during investigations.

This year priority will also be given to legislation to create a Drug Court and it is hoped that the long awaited Children's Law will finally be implemented. My Lords it would be misleading, if not remiss of me not to mention that both the Children's Law and the Drug Court legislation are in fact part of a "work in progress" exercise involving several interested parties including the enormous efforts of My Lord Chief Justice, and members of the Magistracy. Additionally, the recommendations on alternative sentencing methods were tabled in the Legislative Assembly in July 2002, and drafting will commence shortly to enact legislation to give effect to them. Among the sentencing options, which the Court will have, once these methods are in place, is the power to impose:

1. Conditional and intermittent sentences;
2. Suspended sentences with supervision orders;
3. House arrests;
4. Orders to provide for education for domestic violence offenders;
5. Orders for juvenile offenders cautioning programmes; and also
6. Electronic tagging, surveillance and curfew.

Finally in the light of recent world events, and our general global perspective, we are at a very advanced stage with our draft terrorism legislation with a view to combat and suppress the financing of terrorism.   This piece of legislation will complement the Terrorism (United Nations Measures) (Overseas Territories) Order 2001, which was extended to the Overseas Territories including the Cayman Islands in October 2001.

My Lord it was [Ormord] J way back in 1970 who made it quite clear that he was equally unimpressed by a man who wanted to be that most unlikely thing – that is, the master of his own house.  He described such men as being engaged in a meaningless fight for mystic superiority, which invariably ended in physical violence of a childish nature.

My Lords his observation is as relevant today as it was in 1970.  It is with this in mind that like the other relevant agencies of the State, and NGOs, the Legal Department is pursuing a zero tolerance approach to domestic abuse, however and from whomever.

We have moved very swiftly to amend the Evidence Law, to make a spouse not just competent but <u>now</u> "<u>compellable</u>" to give evidence in such proceedings.  It follows that the reluctant wife or husband, as the case may be, can now be compelled to give evidence when assaulted.

Finally, I wish to associate myself with the call for consideration to be given to provide training, in advance, to those of us who will be called upon to deal with

the many Human Rights issues that will arise when the Bill of Rights is finally in place.

It will be of the utmost importance that Public authorities seek legal advice prior to making decisions that will affect a person's liberty, property or general welfare.

There will be many constitutional challenges, which this Court will be called upon to rule on. For us at the bar some will be instructed to institute and present these challenges and some of us will be tasked with the duty of defending the claims.

It can and no doubt will be a very fertile area of litigation and it behoves us therefore to be forearmed to deal with it.

My Lords with those brief remarks I now respectfully move the motion for the opening of the Grand Court for the year 2003.


*Samuel Bulgin*
*Acting Attorney General*
*8th January 2003.*

# ADDRESS BY MR. BRYAN HUNTER
# PRESIDENT, CAYMANIAN BAR ASSOCIATION

## 1.    Introduction

My Lords, I rise, on behalf of the Caymanian Bar Association, to second the motion of the Hon. Attorney General.  In so doing, I take this opportunity to wish all members of the judiciary, the magistrates and the court staff and the members of the Bar best wishes for a happy and prosperous New Year.

My Lords, it is well known that the legal profession, and the financial industry as a whole, has had to deal with numerous issues over the course of the last several years including those arising from the FATF and OECD initiatives, the constitutional review process and the immigration law review process.  2002 was yet another busy year for the legal profession in dealing with new laws, proposed bills and other issues affecting the profession.

My Lords, with your indulgence, I will now highlight some of the issues that the profession has had to face over the course of the last year and can expect to face early this year.  I will also describe some of the issues of concern to the Caymanian Bar Association.

## 2. Rules of Professional Conduct and new system of self-regulation

An initiative that was recently established and is still ongoing is the development of Rules of Professional Conduct for the profession and the development of a new system for the self-regulation of the profession. The Law Society is spearheading this initiative with input from the Bar Association and I am sure that my colleague Mr. Charles Jennings will have more to say on this matter during his submissions. To avoid stealing his thunder, so to speak, I will leave it to Mr. Jennings to give a more comprehensive account of this issue. What I will say is that the main concerns of the Caymanian Bar Association in relation to this matter are as follows:

(a) that the Rules of Professional Conduct meet international standards but reflect the current practice of law in the Cayman Islands;

(b) that the Caymanian Bar Association has equal representation to that of the Law Society in setting the Rules of Professional Conduct;

(c) that the Caymanian Bar Association plays an equal role to that played by the Law Society in whatever disciplinary scheme is ultimately adopted; and

(d) that there is no requirement that all attorneys be members of the Law Society under the new disciplinary scheme.

3.    **Judgments of the Planning Appeals Tribunal and Labour Appeals Tribunal**

My Lords, I am pleased to report that during the course of last year the Ministry of Planning adopted the policy of circulating the judgments of the Planning Appeals Tribunal to the attorneys who practice planning law and the Minister of Human Resources has informed me that his Ministry will adopt a similar policy with respect to the judgments of the Labour Appeals Tribunal. Having access to such judgments is very useful to the attorneys who practice in these areas and the Government is to be commended for agreeing to make the planning and labour systems more transparent in this manner.

4.    **Monetary Authority (Amendment) Law**

My Lords I will now turn to the initiative to make the Monetary Authority operationally independent. For some time the Cayman Islands has been under pressure from various international organisations to make the Monetary Authority operationally independent so that the Monetary Authority, rather than Executive Council, would have the power to make licensing and regulatory decisions in particular cases and would be free of outside influences (actual or perceived) in relation to such matters. In July, 2002 we became aware that the Government had drafted the Monetary Authority (Amendment) Bill whereby the Monetary Authority would be made operationally independent and intended to bring the bill to the then current session of the LA with a view to it being passed during that session. At that time the private sector had not yet seen a draft of the bill. Accordingly, we, in conjunction with the Law Society, asked the

Government to give the private sector a reasonable opportunity to review and comment on the bill before its passage through the LA.  Pursuant to our request the Government withdrew the bill from the then current sitting of the LA and submitted the bill to the Private Sector Consultative Committee for its consideration and comments.  On reviewing the bill the Private Sector Consultative Committee expressed several concerns about the initial draft of the bill.  Although the private sector agreed that the Monetary Authority should be made operationally independent, it was the view of the private sector, including the Bar Association, that the elected Government should retain overall responsibility for the financial industry, and in particular should:

(a)   make the laws and rules that are to be observed by the financial sector;

(b)   make the policy decisions that will be observed by the Monetary Authority, and have the means of ensuring that the Monetary Authority observes such policy decisions;

(c)   have sufficient access to information on the Monetary Authority's activities; and

(d)   have sufficient control over the composition of the Monetary Authority's Board.

A sub-committee of the Private Sector Consultative Committee was formed to deal with this matter and deliberated over the bill for several months.  The Government then brought a revised draft of the Bill to the LA in the final session of 2002 and it is my understanding that the bill that

was passed by the Legislative Assembly accepted most of the substantive comments made by the private sector in relation to this matter. Again, we commend the Government for agreeing to consult with the private sector on this very important issue and for accepting most of the substantive feedback from the private sector on this matter.

**5.**    **The Constitutional Review Process**

My Lords, I will now discuss briefly the constitutional review process. Clearly, the adoption of a new constitution will have a significant impact on the practice of law in the Cayman Islands and thus the Bar Association has played a very active role in this process. The Bar Association's primary concern in relation to this matter is that the new constitution contain provisions that:

(a)    protect the rights of the individual in accordance with international standards, whilst at the same time allowing for the protection of the culture of the Cayman Islands and the interests of Caymanians in the work place and in local businesses;

(b)    provide for sufficient checks and balances on the power of the elected Government under the Westminster model of Government; and

(c)    provide a transparent system for choosing the elected Government.

The constitutional review process commenced in June, 2001 when the Governor appointed the constitutional review commissioners and following a period of public consultation the constitutional commissioners submitted their report to the Governor in March, 2002, which report included a draft constitution.  During the period of public consultation the Bar Association made comprehensive submissions to the Constitutional Commissioners, including a proposed draft constitution.  Following the submission of the report by the Constitutional Commissioners the CBA announced that it was in favour of a referendum being held to determine the views of the electorate on certain key constitutional issues.  The progress of the constitutional review process since the submission by the Commissioners of their report has been widely publicised and I do not propose to describe such process in detail.  However, we are pleased that both political parties have recently agreed on several issues on which they previously disagreed and the agreed positions on those issues are in accordance with the submissions made by the Bar Association.  We understand that, at a meeting that took place in London in early December between the FCO, representatives of both political parties and representatives of two NGOs, the FCO indicated that it intends to prepare a draft constitution based on the Constitutional Commissioners' report, the submissions by the two political parties and the submissions by various NGOs and to forward said draft constitution to the public in the Cayman Islands in late January for further public input.  We look forward to receiving a copy of the draft prepared by the FCO and intend to make further submissions in relation to same.

6.    **Legal Aid**

Another area of concern to the Bar is the legal aid system. We have some concerns about the policies and procedures currently in place for the granting of legal aid and we have formed a committee to look into this matter. We intend to make submissions to the Chief Justice in relation to this matter in the near future.

7.    **Professional Practice Course**

As the Chief Justice will be aware, during the course of 2002 the Legal Advisory Council recommended to Executive Council that certain changes be made to the Professional Practice Course ("**PPC**") conducted by the Cayman Islands Law School. One of the most significant proposed changes is to suspend the PPC for the 2003/4 academic year to enable the course to be re-designed to bring it into line with other internationally recognised professional practice courses, such as England's Legal Practice Course and Bar Vocational Course. The re-design of the course will involve, among other things, the preparation of dedicated course manuals in each of the relevant modules. Currently, there are no textbooks available for students of the PPC and students have to rely almost entirely on their lecture notes when studying for examinations. Furthermore, the teachers of the course have to rely on their skeleton notes for their lectures. This means that whenever a teacher leaves the PPC his replacement does not have a convenient source of material to become familiar with subjects to be taught in the PPC. It is envisaged that the current lecturers of the PPC will use the one-year suspension of the PPC to prepare comprehensive textbooks for the course. Not only will these be

41