useful to the students and teachers of the PPC but will be useful to practitioners who are new to the jurisdiction. It was felt by all concerned that it would be impracticable to make all the necessary changes to the PPC while conducting it at the same time. In order to minimise the inconvenience of the suspension of the PPC to the current students of the Law School the LAC resolved to recommend to Executive Council that the Legal Practitioners (Students) Regulations be amended to allow the students who graduate from the Law School in 2003 to carry out up to one year of articles prior to their enrolment in the PPC.

8. **EU Savings Directive**

Another issue that had great prominence and significance to the Bar during the course of 2002, and that will continue to be an issue this year, is the EU Savings Directive. The UK has made it clear that it would like its Overseas Territories other than Bermuda to agree to adopt the Directive. We believe that the adoption of the Directive would be seriously detrimental to the financial industry in the Cayman Islands. The Leader of Government Business has repeatedly stated that his Government will not adopt the Directive and we wholeheartedly support the stance that he has taken in relation to this matter.

9. **New fees for law firms**

My Lords, I would now like to address the new fees that Government has recently imposed on law firms. The Government recently passed the Legal Practitioners (Amendment) Law, which imposed a new operational licence fee on law firms. The operational licence fee varies according to

the number of attorneys that a firm has and varies in brackets, with there being no fee for firms of 5 attorneys or less, a fee of CI$15,000 for firms of 6-10 attorneys, a fee of CI$30,000 for firms of 11-15 attorneys, a fee of CI$45,000 for firms of 16-20 attorneys, a fee of CI$160,000 for firms of 21-25 attorneys, and a fee of CI$300,000 for firms of 26 or more attorneys. Although we do not object to Government raising from law firms the aggregate amount that it intends to raise with the new fee, which is approximately CI$1,000,000 per year, we object strenuously to the structure of the fee. We believe that the new fee provides a disincentive for small and medium sized firms to grow and provides an unfair advantage to the larger firms in comparison to the medium sized firms. The fee is a disincentive for small to medium sized firms to grow for the following reason. If a firm is at the upper threshold of a particular fee bracket then it would cost that firm a substantial amount to grow by one additional attorney. The fee provides an unfair advantage to the larger firms in comparison to the medium sized firms for the following reason. As I have mentioned before, the new fee for firms that have more than 25 attorneys is capped at CI$300,000. Accordingly, the fee per attorney for a firm that has, for example, 75 attorneys would be one third of that for a firm that has only 26 attorneys.

Government first indicated that it intended to impose a new fee on law firms in December, 2001. At that time Government indicated that it intended to impose the new fee by way of a traders licence fee under the Trade & Business Licensing Law. We wrote to both the FS and the LGB expressing our concerns about the new fee and suggested that a fairer and simpler way for Government to raise the fees that it intended to raise from

law firms was to simply increase the work permit fees for attorneys and to exempt the first 4 non-Caymanian attorneys in each firm from the increases in order to protect the smaller firms, which are owned primarily by Caymanians. We received no response from Government at the time and Government proceeded to pass the amendment to the Trade & Business Licensing Law as they initially proposed it. Shortly after the passage of the amendment to the Trade & Business Licensing Law it was pointed out to Government that law firms are not subject to the Trade & Business Licensing Law but instead are subject to the Legal Practitioners Law. Accordingly, no attempt was made by Government to collect from law firms the new traders licence fee under the Trade & Business Licensing Law. It was not until 17 December 2002 that Government indicated that it intended to impose the aforementioned operational licence fee under the Legal Practitioners Law and the profession was given only two days in which to consider the amendment legislation before it was dealt with in the House on 19 December. Thus, Government waited almost an entire year to deal with a problem that was pointed out to them in early 2002. On reviewing the amendment bill to the Legal Practitioners Law it became clear that the operational licence fee was based on the same unfair fee structure that the traders licence fee was based on. Accordingly, on 19 December we again wrote to Government to express our concerns about the legislation and to suggest a fairer alternative, which would protect the interests of the smaller Caymanian firms. Our proposal was that the new fee be based on a flat fee for each attorney, excluding the first six attorneys in each firm. Again Government ignored our submissions and passed the bill as initially proposed.

In light of the fact that our objection is not to the aggregate amount to be raised from law firms, but simply to the manner in which it is to be raised, we do not understand Government's reluctance to accept our submissions in relation to this matter. Our organisation is comprised of Caymanian attorneys only and thus it is our view that we are best placed to determine what is in the best interests of Caymanian attorneys. We have asked Government to adopt a scheme that we believe would be in the best interests of Caymanian attorneys but they have repeatedly ignored our suggestions. We would hope that Government would reconsider its position on this matter.

10.  **Joint CBA/CILS Law Revision Advisory Group**

My Lords, on a more positive note, I am pleased to report that we and the Law Society have jointly formed a Law Revision Advisory Group whose function is to review the existing laws relating to the financial industry and proactively make suggestions to Government as to the amendments that should be made to such laws in order to make the jurisdiction more competitive. Such Advisory Group is currently reviewing the Companies Law and intends to submit to Government in the near future suggested amendments to such law.

11.  **Conclusion**

My Lords, as I have outlined above, we as a profession have had to weather many storms over the course of the last few years. Notwithstanding the numerous issues that the profession and the jurisdiction have faced during this time, we are still cautiously optimistic

about the future of the financial industry.     The Caymanian Bar Association will continue to do what it can to protect the integrity and interests of the legal profession generally and Caymanian attorneys in particular.

Thank you My Lords.

*Mr. Brian Hunter*

*President, Caymanian Bar Association*

*8th January 2003.*

## ADDRESS BY MR. CHARLES JENNINGS
## PRESIDENT OF THE CAYMAN ISLANDS LAW SOCIETY

May it please Your Lordship, Honourable Justice Sanderson and Honourable Justice Levers. As President of the Law Society of the Cayman Islands it gives me great pleasure to second the motion of the Honourable Acting Attorney General to open the Grand Court for the year 2003. This is a singular honour for me personally because it is the first time I have appeared as advocate in any court in the Cayman Islands.

As I predicted in my speech for the 2002 Grand Court opening, the workload of the Law Society has continued to increase dramatically, to the point where being its President is fast becoming a full-time job. That job spans an extraordinary range of activities, including having the pleasure of attending the Legal Advisory Council with Your Lordship, the Director of Legal Studies and the President of the Caymanian Bar Association; addressing and commenting on proposed legislation, sometimes at lengthy meetings with Government or its representatives; corresponding and speaking on a daily, sometimes hourly, basis with my Council members; representing the legal profession on the Council of the Chamber of Commerce; acting as the Society's representative on the International Bar Association; receiving and replying to numerous communications from overseas lawyers on all aspects of Cayman Islands law; and generally representing the Cayman Islands legal profession to Government and legal business organisations both on the island and elsewhere in the world.

The Legal Profession

Your Lordship, the Cayman Islands legal profession continues to grow. Last year I commented that it did so despite the economic difficulties of the previous year; now I think it is doing so because of them. In a world economic downturn such as the one we are presently experiencing, litigation and insolvency work increases. My members' firms' litigation departments have increased accordingly and are, I am told, very busy.

On the commercial side, the picture is rather more patchy. While investment vehicles, particularly hedge funds and to a lesser extent private equity funds, continue to flourish, real estate and local commercial work are only just starting to recover from a significant slump over the past 12 months and private client work continues to decline. Financial recovery is impeded, particularly in the case of smaller law firms, by the enormous due diligence exercise we are undertaking in relation not only to new clients but to existing clients as well, which must be completed by June this year. Furthermore, recent international initiatives by the International Monetary Fund and the European Union, in the latter case through its Tax Savings Directive (to which, if I may say so, the Cayman Islands Government is reacting with commendable zeal), provides us with a difficult business background in which to operate, let alone flourish; and the situation is exacerbated by moves to increase the cost of doing business still further by introducing new and expensive employment legislation at what, in economic terms, could not be a more unfortunate time.

On a more positive note, I hope that my colleague Bryan Hunter, President of the Caymanian Bar Association, will agree that never before have the two

professional associations, the Law Society and the Bar Association, worked so closely together. While the Bar Association represents Caymanian lawyers only, the Law Society represents the profession as a whole, whether Caymanian or expatriate. Our interests frequently are the same, and I would like, if I may, to pay tribute to Mr. Hunter for the cooperation and support he has given me over the past year. I hope he feels I have given the same to him.

## Legislation

Draft legislation continues to be produced by Government in great volume, and the Law Society has been instrumental in commenting on it in what we hope has been a constructive manner. Certainly over the past year lines of communication between Government and the legal profession have improved dramatically, to such an extent that I really cannot criticize Government's accessibility and its willingness, indeed desire, to listen to our views on legislation dealing with legal issues. By way of example, I would cite the negotiations over the Cayman Islands Monetary Authority Bill already mentioned by Mr. Hunter, the Securities Investment Business Law, the employment proposals mentioned above and various guidance notes prepared by the Monetary Authority.

Sadly, though, as with the Bar Association those comments do not extend to revenue-raising measures. The Law Society, and indeed the Caymanian Bar Association, oppose any attempt to impose retrospective effect on the latest amendments to the Legal Practitioners Law so as somehow to raise revenue from the profession for the year 2002, and moreover consider the basis on which law firms are banded for payment (as described by Mr. Hunter) as inequitable.

49

Further, we have seen enormous increases, in percentage terms, in fees payable to the Registrar of Companies, the Monetary Authority and other Government bodies in repeated efforts to raise more revenue from the financial industry. While the Law Society appreciates, of course, that significant revenue is needed by Government, these increases and the huge cost of meeting the regulatory burden have combined to make us uncompetitive in the offshore financial market and there is no doubt but that any further increases in the fiscal and regulatory burden in the present market will drive investors away to other jurisdictions.

As I stressed last year and wish to do so again now, the interests of the private and public sectors here are the same, namely the social and economic well-being of these Islands. The direct tax bill suffered by many law firms here has at least trebled over the past two years. At the risk of using a corny old saying, we do urge Government not to harm one of the geese that lay the golden eggs. With the present slump in the tourist industry, the offshore financial industry, including the legal profession which supports it, is one of the few continuing economic success stories here and continues to be a major employer. The Law Society will shortly be making a number of proposals, in conjunction with the Bar Association and other relevant professional bodies, to update our financial legislation to bring it in line with current world trends. It would be appreciated if, when Government receives that draft legislation, having reviewed it and if necessary received our explanation of it, it could pass it as soon as possible to give our jurisdiction the preeminence against its competitors that it has so often had in the past.

Much is said about level playing fields: I think I am speaking on behalf of the Law Society when I say that I have no objection to an <u>unlevel</u> playing field, provided it slopes to the advantage of the Cayman Islands.

## Code of Conduct

As promised in my last speech, I have prepared a draft Code of Conduct and circulated it to interested parties. I have received a large number of comments on it and will be circulating a further draft within the next month. Further, proposed further amendments to the Legal Practitioners Law are in the pipeline to modernise the regulation of Cayman Islands lawyers, all of which should, I hope, be ready for final circulation by the end of March 2003.

I should add that I have no objection in principle to any of the Caymanian Bar Association's comments on the draft Code of Conduct as recited in Mr. Hunter's earlier submissions.

## Administration of Justice

My Lords, the new court space provided in Kirk House for the Euro Bank trial is most impressive. The court room is spacious and well laid out and the sophisticated IT facilities are particularly welcome. Taken together with the Judges' chambers, conference rooms and ancillary accommodation, they are just what is needed. We trust that they will continue to be available after the Euro Bank trial: there are certainly other major cases pending which would benefit from court accommodation of this kind.

However, this also raises what has been a recurrent theme over the past several years now, namely concern about inadequate facilities in the main court house itself. It has long since ceased to be adequate for the vast increase in the work-load since it was built. The point has been made repeatedly that there are practical difficulties in accommodating the work of the Summary Court and the Grand Court under one roof. There is also the problem of the lack of suitable facilities for dealing with juvenile offenders. The legal profession have an urgent need of proper conference rooms. The public areas too need improvement. It is very much hoped that real progress can be made in addressing these issues in the near future and we welcome the Acting Attorney General's comments that the Government is seeking alternative accommodation with George Town.

It is noted with pleasure that the Hon. Justice Levers has been appointed a Judge of the Grand Court, following various spells as an Acting Judge. We welcome her and wish her every success in fulfilling the important office which she holds in this busy and diverse jurisdiction.

On a personal note, I was delighted that the Governor saw fit to elevate my friend and partner Andrew Jones to the position of Queen's Counsel last year. He is, I believe, the first attorney-at-law from private practice here to be given that honour, and I hope that in due course it will be extended to other deserving candidates within what is, if I may say so, a very talented local Bar.

As always we are grateful to all those who are responsible for the administration of the Court system. Our particular thanks go to the Clerk and Deputy Clerks of

the Court, the Listing Officer and the Registrar of the Court of Appeal and all those who work with them.

It is traditional on this occasion also to acknowledge the valuable work undertaken by Dr. Alan Milner and those who work with him in producing our Law reports. Most important among them is the Consulting Editor, our own Ramon Alberga. He is also to be particularly congratulated on having passed the milestone of the 50th anniversary of his call to the Bar.

One final word about the courts building. The Cayman Islands Law Society, as much as the judiciary and the court staff, fully supports all measures taken to maintain the dignity and appropriateness of the building housing this Honourable Court, and similarly oppose anything that undermines them. We leave it in Your Lordship's discretion to determine what is and is not appropriate in terms of the construction, decoration and general atmosphere of your Court House and its surrounding area and assure Your Lordship that your views will receive our support. The administration of justice and the manner in which it is seen to be administered are of paramount importance for a jurisdiction like ours. Although perhaps too small nowadays for the enormous amount of business undertaken here, this building has a dignity and gravity about it commensurate with its importance in the community. That must be protected at all costs.

It remains only for me now formally to second the Honourable Attorney General's motion to open the Grand Court for the year 2003. And on behalf of the Cayman Islands Law Society I take this opportunity to wish Your Lordship, judges, court staff and fellow members of the legal profession a very Happy New Year.

*Charles Jennings*

*President, Cayman Islands Law Society.*

*8th January 2003.*

## ADDRESS BY MR. RAMON D. ALBERGA O.B.E., Q.C.

1.  My Lord Chief Justice, The Hon. Mr. Justice Sanderson, The Hon. Madam Justice Levers and the Hon. Magistrates of the Summary Court.

    I regard it as an honour to be given the privilege to associate myself with the motion to open the Grand Court for the year 2003 moved by the Solicitor-General and seconded jointly and ably by the Presidents of the Law Society and the Bar Association and to add a few words of my own in respect of matters not referred to by my learned friends but about which I have special knowledge.

2.  I begin by extending my own personal best wishes to your Lordships, to our Magistrates, to the Clerk of the Courts and all the staff in the Courts offices who are always as helpful, for a very happy and successful 2003. It is my hope that all your hopes and expectations for this New Year will materialise.

3.  These opening sessions afford an opportunity of reflection and renewal. If we reflect on 2002 I can affirm that it has been a busy year in which the Judges of the Grand Court and the Magistrates have undertaken and completed a great volume of work.

4.  82 written decisions and rulings have been handed down by our Courts during 2002 on a variety of matters and this large number does not include

the many detailed rulings given in the absence of the jury during the Eurobank criminal trial which have not yet been made available for publication.

5.   I would wish on an occasion such as this to record the profession's appreciation to the judiciary for the manner in which they have handled this large volume of sophisticated and difficult work which has come before the Courts during the course of last year and for the comparatively short time that elapses between the conclusion of a complicated trial and the handing down of a written decision containing full reasons for such a decision and in which all the points covered during the hearing are addressed and dealt with.

6.   The Public perhaps may not fully appreciate how much extra and out of Court time (often late into the night), which is given by our judiciary in the preparation of the full written judgments which they never fail to produce.  This noteworthy feature of our administration is one that generates confidence and attracts the most favourable comments from the many overseas and experienced Counsel from other jurisdictions who frequently appear in our Courts and is something about which we can be justly proud.  I do not believe that 2002 concluded with any reserved judgments still to be completed.  We pay tribute to the judiciary this morning for this achievement.

7.   As to Law Reports, Dr. Alan Milner, the Editor and Publisher of these Reports continues to maintain his efficient and dedicated approach to their editing and production.  Part 1 of the 2002 Reports has already been

published. The single volume for 2002 when completed by the addition of Parts 2, 3 and 4 will be the 15th volume produced since their introduction and will probably be our largest ever volume. The Cumulative Index and Tables for 1952-2001 inclusive is now in electronic form and it is my hope that I shall be around to see a disc containing all our Reports from 1952 and giving easy and immediate access to any local case that is mentioned or cited in a judgment that is being reviewed. Dr. Milner has just completed such a service for Jersey who now have their own website on which all their law reports can be reviewed. We should consider following Jersey's lead and good example in this respect.

We of course record today our thanks to Dr. Milner for his work and for his progressive suggestions for improvement and for his never failing interest. I should like also to express my appreciation to Mr. Colin McKee of Maples and Calder who now gives invaluable help in reviewing with me all the judgments and making helpful suggestions in relation to their reporting. He will be an excellent future Consulting Editor when I am put out to pasture.

I bring greetings to your Lordships and to the profession from Dr. Milner and his regrets at not being present today.

8.    My Lords, the ceremony making the official opening of our Grand Court on the first or second Wednesday in January which we all look forward to attending and enjoy so much, first took place in 1992. Today is therefore the 12th of these ceremonies.

9.    It is also the 5th opening over which His Lordship the Chief Justice will be presiding.  In the years since your appointment in 1999 you have Sir, made an invaluable and significant contribution to the administration of justice in this country and it is my hope and also the hope of the entire legal profession that we will see you presiding at these ceremonies and continuing to generate the fine leadership and example for dedication and hard work you have shown as our Chief Justice for many many more years.

We eagerly anticipate hearing today the forthright, penetrating and challenging observations that we have come to expect from you on this occasion.

It is appropriate for me to call attention today to your Lordship's recent appointment as an Honourary Bencher of Grays Inn, one of the oldest and most prestigious Inns of Court in London.  This is a great compliment not only to your Lordship but to the Cayman Islands.  Such an honour is only conferred on persons such as yourself who have been recognised as persons of great legal learning and knowledge and possessing high judicial acumen. We rejoice with you on Grays Inn's recognition of your great contribution which is manifested in your many and illuminating judgments in so many fields of law.

It is the first time that a Judge of the Grand Court has received an honour of this nature and I am very pleased to be able to call attention this morning to this well deserved accolade that has been given to your Lordship.

58

10.   The year 2003 does not appear that it will be any less exacting than was 2002.   The list of matters awaiting trials and hearings are already substantial and growing and the Listing Officer complains that there is a shortage of Judges before whom all the requests for hearings can be listed. Justices Douglas, Henderson, Kellock, Hibbert, Levers and Panton have kindly assisted us at various times during last year and we are grateful to all of them for their assistance but continuity and certainty is required.  I hope that it will soon be recognised and accepted that it is essential for the judiciary of this country to be manned by at least four permanent Judges of the highest calibre and experience.  This is essential if confidence is to be generated in those resorting to our Courts.  It is also my hope that it will be appreciated that we will only be able to attract Judges of experience, learning and independence if we are able to offer attractive terms of service including a realistic pension when retirement age is reached to these who apply when vacancies on the Bench have to be filled.  Without this we will never attract the best and it is only the best that we should aim at getting.

11.   And so as we embark on the task of meeting any new challenges and difficulties that may arise, I can re-affirm without reservation our confidence in our judiciary's ability so ably led by My Lord the Chief Justice to meet such challenges and to continue displaying the great independence and unquestionable integrity for which it has become known.  We promise our fullest co-operation, support and assistance at all times.

And my Lords, I thank you for allowing me once again to exercise my prescriptive right to add a few words on this very happy occasion.

I wish you well.

*Ramon D. Alberga O.B.E.,Q.C.*
*8th January 2003.*



# STATISTICS FOR THE YEAR 2002

The following bar and pie charts track the work of the Judicial Administration between 1999 and 2002.

Figure 1 shows the breakdown of charges filed in 2002. The total number of charges filed was 13,028 involving 10,389 cases.

It is evident that while Grand Court Civil cases have increased, Summary Court Civil are just slightly more than what it was in 2001 but much less than in 1999. The reason for the large increase in 1999 and 2000 was due to the many small debt-recovery plaints filed by Government.

Criminal Summary Court cases, shown in Figure 4, and which include those on Cayman Brac, have steadily increased.

The number of requests dealt with by the Honourable Chief Justice as Mutual Legal Assistance Authority under the Mutual Legal Assistance Treaty (MLAT) with the United States remained constant at approximately 20 MLAT requests each year. The number of such requests since implementation in 1990 is now 212.

Figures 5, 6, 7, 8, and 9 are self explanatory.

**Breakdown of Criminal Charges Filed in 2002**



Figure 1



Figure 2



Figure 3



Figure 4



Figure 5



Figure 6



**Court of Appeal Cases**

Figure 7

**Nature of Cases 2002 - Summary Court in Divisions**



Figure 8

**Nature of Cases 2002 - Grand Court in Divisions**



**Divisions**

☐ Civil ☒ Estates ☐ Divorces ☐ Adoptions ☒ Indictments ☒ Summary Court Appeals to Grand Court

Figure 9

69



# <u>APPENDICES</u>

**The Judicial Administration's Budgetary Allocation for Year 2002**

**Actual Expenditure for 2002**

**Staffing and Organisational Chart**



## THE JUDICIAL ADMINISTRATION'S BUDGETARY ALLOCATION FOR YEAR 2002

HEAD 0200: JUDICIAL

## ANNUAL BUDGET STATEMENT FOR 2002

1.    **SCOPE OF BUSINESS AND STRATEGIC OBJECTIVES**

- The Judiciary of the Cayman Islands administers in the Cayman Islands and provides additional related services.

- The Judicial Department is committed to fairly dispensing justice in the Cayman Islands and disposing of cases as quickly and efficiently as in consistent with the interests of justice and to providing a Central Authority under the Mutual Legal Assistance Treaty with the United States of America.

1.    To raise the jurisdiction of the Summary Court from $2,000 to $25,000 with procedures for simple disposal of small claims up to $5,000.

2.    To complete the implementation of a criminal case management system.

3.    To interface the courts computer system with other law enforcement agencies.

4.    To implement a civil case management system that will incorporate electronic filing and on-line display of information.

5.    To establish a specialized Drug Court jurisdiction.

6.    To continue to enhance the sinking fund for the new Summary Courts building.

7.    To increase revenue by identifying areas of fees and charges to increase.

8.    To create a web site for access to case law and other judicial services.

72