

The Court House, Central George Tauro

# CONTENTS

FOREWORD BY THE HONOURABLE CHIEF JUSTICE

THE COURTS OF JUSTICE
SUBORDINATE COURTS
SUPERIOR COURTS
JUDICIAL COMMITTEE OF THE PRIVY COUNCIL
PREVIOUS PRESIDENTS & CHIEF JUSTICES
PRESENT JUDICIARY  (JUSTICES OF COURT OF APPEAL/CHIEF JUSTICE/PUISNE JUDGES/MAGISTRATES)

HISTORY OF THE JUDICIAL SYSTEM
HISTORY OF THE COURTS
ROLE OF THE COURTS

INTERNATIONAL OUTLOOK
THE ROLE OF THE COURTS IN INTERNATIONAL LITIGATION AND LEGAL ASSISTANCE

REFORMS
NEW RULES OF COURT
NEW FEES
PRACTICE DIRECTIONS
LEAFLETS

SENTENCING ADVISORY COMMITTEE

CI LAW REPORTS

LIBRARY

INFORMATION TECHNOLOGY
JUDICIAL ENFORCEMENT MANAGEMENT SYSTEM
SECURITY

PROPOSALS FOR FUTURE
IMPROVED ACCOMMODATION
CHILDREN LAW
SMALL CLAIMS
COST RULES
CASE MANAGEMENT

FACTUAL REPORTS
PERFORMANCE TARGETS
GRAND COURT (CIVIL & CRIMINAL)
SUMMARY COURT
STATISTICS

ADMINISTRATION
JUDICIAL CONFERENCES AND SEMINARS
STAFF TRAINING
STAFF CHART
CHANGES (APPOINTMENTS/RETIREMENT/RESIGNATION)

APPENDIX
1. JUSTICES OF THE PEACE
2. MEMBERS OF RULES COMMITTEE
3. MEMBERS OF SENTENCING ADVISORY COMMITTEE
4. ROLL OF ATTORNEYS

# Foreword by
# The Honourable Chief Justice

The Judicial Department has issued this, its first annual report, at the start of the Year 2000, regarded by many as the start of the new millennium. The launch of this report coincides with the introduction of a number of initiatives to meet new and increasingly complex challenges facing the Courts and, indeed, the Cayman Islands.

As I noted at the opening of the Grand Court in January 2000, change is certainly in the air. Psychologically and emotionally we have entered a new era.

As Chief Justice, I view the task of rising to this call for change as most serious. The personal challenge and that of the judges, magistrates, lay justices, the professional and administrative staff and of my colleagues throughout the legal and judicial systems of the Cayman Islands is to ever aspire to the maxim: "Excellence results from dedication to daily progress...making something a little better every day."[1] The abiding confidence of the public we serve in the administration of justice cannot be assured by the mere institutionalisation of systems. There must be real access to justice, and in every place and time the axiom "justice delayed is justice denied" holds true.

> *The abiding confidence of the public we serve in the administration of justice cannot be assured by the mere institutionalisation of systems. There must be real access to justice, and in every place and time the axiom "justice delayed is justice denied" holds true.*

Our ultimate objective must be the just, timely, efficient and cost effective resolution of the problems and difficulties confronting the persons who come before our courts.

This first annual report outlines some of the initiatives designed to achieve that goal. A priority for this year will be the implementation of the new Children Law which will modernise our approach to the issues of custody, care and control of the young.

Another of our key proposals is aimed at expanding the sentencing options available to judges, magistrates and lay justices. We are very keenly aware of the dual obligation that ensures our sentences not only punish the crime but also rehabilitate the offender.

Innovative sentencing options with just those objectives in mind have been identified, and we anticipate that enabling legislation will be prepared during the course of 2000. Much thought and discussion have also been focused on harnessing goodwill in the private sector and the wider community. We have secured the commitment of many willing to lend significant resources to support the efforts of those who may have strayed from the path of rectitude as they strive towards meeting their new goal of redemption in the eyes of their family, friends and the wider society.



The pursuit of excellence in the administration of justice cannot, of course, be limited in scope, important though the treatment of children and the treatment of offenders may be. The focus of our efforts must also be on achieving an efficient rate of disposal of the many

---

[1] Peters, *Thriving on Chaos* (Knopf, 1987)

types of cases presented, varied and difficult though they often are. Towards this goal, as outlined in this report, several innovative and successful measures have resulted in significantly reducing the time between the filing of actions and trial dates; and this result has been achieved on both the criminal and civil sides.

In keeping with this incremental pursuit of excellence, the new millennium finds us at the Courts making suitable changes for an age of increasingly sophisticated technology. Charting our course, we see on the horizon kiosks where first-time traffic offenders can enter guilty pleas, paying fines by debiting their bank accounts; video-links for bail applications from persons in custody as well as for overseas witnesses; electronic transfer and filing of documents.

The nature of our jurisdiction also demands that the Courts maintain and observe a positive international outlook. So often cases that come before our courts involve issues that affect persons and have repercussions far beyond our borders. These are issues that behove our judges and practitioners alike to keep abreast of legal and other changes at home and abroad.

This constantly unfolding landscape of change from within the Courts system, aimed always at efficiency and fairness, fortunately mirrors the efforts of attorneys of both the private and public bars. There is evidence of a keener awareness and observance of deadlines; of the rules for disposal of complex cases; and of the need for clear and early instruction for the proper disposal of criminal cases.



*The Honourable Chief Justice*
*ANTHONY SMELLIE QC, JP*

As Chief Justice I am most encouraged. We have inherited a highly respected judicial system, but we must constantly renew our efforts as we meet new challenges and respond to the continuing task of ensuring justice for all. This is an opportunity for renewing our dedication to the cause in a fresh start – in a new beginning – in which a solid foundation and sound direction are essential factors if excellent standards are to be achieved. "For when the ancients said that a work begun was half done, they meant that we ought to take the utmost pains in every undertaking to make a good beginning." [1]  In the words of John Ruskin, 19th century English art critic and historian, "Quality is never an accident; it is always the result of intelligent effort." [2]

The Cayman Islands judicial system has set its goal as nothing less than this. With such high aspirations, we can be assured that we will, with determination and dedication, continue to succeed at making much in the Cayman Islands a great deal better. Nothing less will do: in the administration of justice excellence must indeed always be a work in progress.

*Anthony Smellie QC, JP*
*Chief Justice*

---

[1] Plutarch, c46 - c. 120, *The Parallel Lives: Pericles*
[2] John Ruskin, 1819-1900, *The Two Paths*

## *The Courts of Justice*

### THE ROLE OF THE JUDICIARY IN THE CONSTITUTIONAL SYSTEM OF THE CAYMAN ISLANDS

The Cayman Islands has enjoyed for more than 40 years a form of fully democratic Government based upon the British Westminster model; expressed and enshrined in Constitutional Order in Council made by her Majesty the Queen in Council in the exercise of powers delegated by the British Parliament through imperial legislation.

This section gives a brief overview of the structure, history and role of the judiciary and Courts as an integral part of that system of Government.

The Judiciary is one of three separate Arms of State. It administers the law independently of the Executive and the Legislative branches, an independence that is safeguarded in the Constitution of the Cayman Islands.

The Hon. Chief Justice is head of the Judiciary.

Because of its historical and constitutional ties to England, the judicial system of the Cayman Islands bears many similarities to, and connections with, the English judicature.

These similarities are perhaps nowhere more evident that in the hierarchy of the courts, with the traditional appellate jurisdiction in the higher courts determining appeals from the lower courts. In addition, the final appellate body of much of the Commonwealth — the Judicial Committee of Her Majesty's Privy Council — hears final appeals from courts in the Cayman Islands.

In ascending order of jurisdiction, the structure of the courts may be represented as follows:

### SUBORDINATE COURTS
#### The Summary Court, Juvenile and Youth Courts and Coroners Court

These courts are each creatures of statute[1] and are presided over chiefly by a legally qualified magistrate or three lay justices appointed under the Summary Jurisdiction Law.

#### Summary Court

The Summary Court exercises jurisdiction over a wide variety of civil and criminal matters. Civil jurisdiction in monetary claims is limited by the amount of the claim, which at present cannot exceed $2,000, but there is a proposal to raise this threshold.

The Summary Court also hears affiliation, maintenance and domestic violence applications.

All criminal cases start in the Summary Court, with more serious cases being committed to the Grand Court for trial on indictment. The Summary Court is empowered to impose sentences of up to four years' imprisonment, and in certain types of drug cases this power is extended to 20 years or, on second or subsequent convictions, 30 years. Customarily, there are three summary court sittings daily, one of which is usually a traffic court, where cases heard comprise mainly traffic matters.

#### Juvenile and Youth Courts

The Juvenile and Youth courts sit on Fridays to hear cases involving young persons under the age of 17 years who are in need of care and protection or who are alleged to have committed criminal offences. Serious charges may be sent to the Grand Court to be heard. In cases where the offence is alleged to have taken place with an adult, the case will be heard in the Summary Court or the Grand Court, depending on the seriousness of the indictment.

A modern law to address childcare issues, the Children Law, is expected to be promulgated in 2000. Under it, jurisdiction will be exercised variously by the Justices of the Peace, Magistrates and Grand Court Judges.

#### Coroners Court

Any unnatural or unusual death is referred to a magistrate acting as Coroner. Where it is necessary to hold an inquest, a jury, directed on the legal issues by the Coroner, determines the cause of death.

---

[1] By the Coroner's Law, 1975, the Juveniles Law (since 1995 re-designated the Youth Justice Law) and the Summary Jurisdiction Law (1995 Revision), respectively.

## SUPERIOR COURTS

### The Grand Court

Apart from when it sits as an appellate court from the lower courts or other tribunals (usually statutory, quasi-judicial), this court is a Superior Court of Record of First Instance, having unlimited jurisdiction in both criminal and civil matters. As such it exercises within the Cayman Islands similar jurisdiction as is vested in or capable of being exercised in England by Her Majesty's High Court of Justice and its divisional courts.

The Grand Court was first created as a court of special limited jurisdiction by statute in 1877[1].

In its present modern form, the Grand Court was established by the Grand Court Law of 1975, and enshrined as a Constitutional Court in 1984[2].



*The Rt. Hon. Justice Edward Zacca, JA, OJ, President of the Court of Appeal*

The Chief Justice has responsibility for "all matters arising in judicature."[3] By this means and by the other statutory and constitutional processes which establish and separate the Courts from the Legislative and Executive arms of Government, the separation of powers and independence of the Judiciary is ensured.

In addition to purely judicial functions, the Chief Justice, or a designated judge acting in an administrative capacity, is also the Central Authority for the purposes of the Mutual Legal Assistance Treaty (MLAT). The treaty was entered into between the United States and the United Kingdom on behalf of the Cayman Islands in 1986.

The Cayman Islands' status as a leading international offshore banking and financial centre often generates actions involving complex issues and substantial assets.

The Grand Court also tries indictable criminal cases including murder, rape and serious assault. For criminal trials, Grand Court judges either sit alone or with a jury of seven (12 for murder trials). When hearing civil matters, judges usually sit alone. The Grand Court hears both civil and criminal appeals from the Summary Court.

Although the Grand Court is in session throughout the year, its formal ceremonial opening takes place on the first Wednesday in January, subsequent sessions being marked by a less formal opening on the first Wednesday of each alternate month.

Jurors are summonsed to serve for a complete session of two months.

### The Court of Appeal

Appeals from the Grand Court go to the Court of Appeal. Like the Grand Court, the Court of Appeal is a Superior Court of Record. Unlike the Grand Court, however, the Court of Appeal does not exercise inherent jurisdiction but is a creature of statute[4] and of the Constitution[5].

This Court is comprised of judges who have held high judicial office for many years in the Cayman Islands and elsewhere in the Commonwealth. Three judges sitting together comprise the Court. There is at present a roster of four or more appellate judges. The current president is the Hon. Edward Zacca, JA, OJ, a former Chief Justice of Jamaica and one of two members of the Cayman Islands Court of Appeal who are members of the Judicial Committee of Her Majesty's Privy Council.

The Cayman Islands Court of Appeal was established in 1984. In preceding years, appeals were heard by the Court of Appeal of Jamaica exercising jurisdiction for the Cayman Islands. Sittings were held either in Grand Cayman or Jamaica.

The Court of Appeal is the final appellate court in the Cayman Islands and comprises the President and two Justices of Appeal. The Court of Appeal hears appeals from the Grand Court in both civil and criminal matters. The Court of Appeal sits three or four times yearly, for sessions of three to four weeks' duration.



---

[1] By the Cayman Islands Grand Court Law of 1877, Law 31 of 1877 of the Jamaica Legislature.
[2] By amendment to the 1972 Constitutional Order in Council.
[3] See the Grand Court Law 1975, section 6.
[4] The Court of Appeal Law, 1975
[5] By amendment to the 1972 Constitutional Order in Council in 1984 (prior to this the Court of Appeal of Jamaica served as the Court of Appeal of the Cayman Islands)

THE JUDICIAL COMMITTEE OF THE PRIVY COUNCIL
This appellate body, often referred to as the Privy Council, was established by the Judicial Committee Act of 1833, an Imperial Act of the British Parliament. As appeals from colonial courts were historically ultimately referred to the Sovereign as the fountain of justice, such appeals were referred to Her Majesty, who considered them upon the advice of Her Privy Council. The Privy Council became formalised as a Judicial Committee in 1833. Since then that final appellate court has comprised members of the Judicial Committee of the House of Lords (the final Appellate Court for the United Kingdom itself) and other eminent jurists appointed from other courts of the Commonwealth.

## *Chief Justices, Presidents, Judges and Magistrates*

### CHIEF JUSTICES OF THE GRAND COURT

There have been seven Chief Justices of the Cayman Islands since the post was instituted to head the local judiciary in 1968. Prior to that time, visiting judges and magistrates of the Jamaican judiciary served in the Cayman Islands courts.

### ROLL OF CHIEF JUSTICES

The Honourable Mr. Justice Geoffrey Horsfall, CBE, 1968-1973
The Honourable Mr. Justice Locksley Moody, CBE, QC, 1973-1977
The Honourable Mr. Justice Sir John Summerfield, CBE, QC, 1977-1987
The Honourable Mr. Justice Gerald Collett, CBE, QC, 1987-1989
The Honourable Mr. Justice Sir Denis Malone, 1990-1993
The Honourable Mr. Justice George Harre, 1993-1998
The Honourable Mr. Justice Anthony Smellie, QC, 1998-

### JUSTICES OF THE COURT OF APPEAL (SINCE ITS ESTABLISHMENT IN 1984)

The Right Honourable Mr. Justice Edward Zacca, JA, OJ, President
The Right Honourable Mr. Justice Telford Georges
The Honourable Mr. Justice Gerald Collett, QC
The Honourable Mr. Justice Ira Rowe, QC
The Honourable Mr. Justice Kenneth Henry (Retired 1995)
The Honourable Mr. Justice James Kerr, QC (Retired 1999)



*The Grand Court hears appeals from the Summary Court and exercises jurisdiction equivalent to that of the High Court of England or Wales.*



*Chief Justice, Judges, and Magistrates*

JUDGES OF THE GRAND COURT (SINCE 1968)

The Honourable Mr. Justice Anthony Smellie, QC, Chief Justice

The Honourable Mr. Justice Henry Graham

The Honourable Mr. Justice Dale Sanderson, QC

The Honourable Mr. Justice Kipling Douglas (Acting)

The Honourable Mr. Justice Geoffrey Horsfall, CBE (retired 1973)

The Honourable Mr. Justice Locksley Moody QC (Retired 1977)

The Honourable Mr. Justice David Hull (Retired 1988)

The Honourable Mr. Justice Derek Schofield (Retired 1996)

The Honourable Mr. Justice David Murphy (Resigned 1999)

MAGISTRATES

Her Honour Mrs. Grace Donalds

Her Honour Mrs. Margaret Ramsay-Hale

Her Honour Ms. Nova Hall

His Honour Mr. Rafael Rattray (1957-1958)

His Honour Mr. James Atwood (1958-1959)

His Honour Mr. Everard Robinson (1959-1961)

His Honour Mr. Robert Laming (1961-1963)

His Honour Mr. Derwent Thacker (1964-1965)

His Honour Mr. Geoffrey Horsfall (1965-1968)

His Honour Mr. Locksley Moody, QC (1971-1973)

His Honour Mr. Frank Field (1974-1975)

His Honour Mr. James Shaw (1975-1977)

His Honour Mr. Charles Graham-Perkins (1977)

His Honour Mr. Wilton Hercules (1977-1983)

His Honour Mr. Kipling Douglas (Senior Magistrate 1983 - 1993)

His Honour Mr. Jeffrey Ramsay (Magistrate 1987 – 1993)

His Honour Mr. Peter Jackson (Magistrate 1993 – 1998)



## History of the Judicial System

### HISTORY OF THE COURTS

The doctrine of Separation of Powers, constituting the Judiciary as one of the three distinct pillars of state, is emphatically enshrined in the Constitution of modern Cayman.

From at least 1798, however, Justices of the Peace, appointed on behalf of the British Crown by the Governor of Jamaica, administered public affairs. In carrying out their duties, these forerunners of today's judiciary functioned under the direction of one of their number who was styled Chief Magistrate or Custos.

The post of Clerk of the Court is one of the oldest in the Islands, being known to have existed since 1811, although carrying today distinctly different responsibilities.

Courts in existence in 1849 were:

- Courts of Summary Jurisdiction (presided over by a Justice of the Peace and trying small debts up to £1)
- Courts of Reconciliation (disputes over land and presided over by a Justice of the Peace with a jury)
- Petty Courts (small debts up to £10 and assault and battery. Presided over by two Justices of the Peace and sitting in each district)
- Grand Court (sat twice yearly with three Justices of the Peace and heard more serious cases, including appeals from the other courts)

In 1898 the powers of the Custos were vested in a Commissioner who combined administrative duties with those of a Judge of the Grand Court. He appointed Justices of the Peace and could try all cases except capital felonies. At that time all the main administrative and judicial powers were vested in one man – the Commissioner.

A Stipendiary Magistrate was appointed in 1957 to perform all judicial and legal functions. He could sit as a Judge of the Grand Court in all but capital offences and could try all cases in the Court of Petty Session.

Further changes took place in 1975 with the appointments of a Judge of the Grand Court (upon the constituting of the Court in its modern form) and a Magistrate. Assigned dual roles, the Magistrate was also appointed Coroner. At the same time, the Grand Court was upgraded to supreme court status, summary courts replaced the petty sessions courts and a Juvenile Court was established. A Chief Justice was appointed the following year under the Grand Court Law of 1975.

The final major change in the constitution of the local courts took place in 1984, with the establishment of the Cayman Islands Court of Appeal to exercise the appellate jurisdiction formerly held by the Jamaican Court. This meant that all judicial proceedings could be heard within the Cayman Islands, subject to a possible final appeal to the Privy Council in London.



*The visit of HRH the Duke of York, CVO, ADC, to the Courts in March 2000 underscores historical and constitutional ties with Britain. H.E. the Governor Peter Smith, CBE (right), accompanied HRH.*

Changes leading up to the separation of powers and responsibilities are depicted in the chart shown below.

## CONSTITUTIONAL STRUCTURE

*1888-1898*
Legislature
Custos is President

Executive Branch
Custos is head

Judiciary
Custos is Chief Judge

*1898-1957*
Legislature
Commissioner is President

Executive Branch
Commissioner is head

Judiciary
Commissioner is Chief Judge

*1957-1967*
Legislature
Commissioner is President

Executive Branch
Administrator[1] is head

Judiciary
Stipendiary Magistrate is Chief Judge (also sits in Legislative Assembly and as a member of Executive Council)

*1967*
Attorney General replaces Stipendiary Magistrate in the Legislative Assembly and on the Executive Council.

*Present Day (from 1972)*
Legislature          Executive Council          Judiciary
The Chief Justice is responsible for all matters in judicature and functions independently of the Legislative Assembly and of the Executive Council.



[1] "Commissioner" became "Administrator" with introduction of first written Constitution on 4th July 1959. Present Constitution was issued in 1972, assigning a higher level of responsibility for local Government to members of Executive Council.

Eleven

## International Outlook

### THE ROLE OF THE COURTS IN INTERNATIONAL LITIGATION AND LEGAL ASSISTANCE

The increasing volume and growing complexity of criminal matters handled by the courts of the Cayman Islands is generally widely recognised. What is not so well known, perhaps, is the mounting importance of the Grand Court as an arbiter of large, multifaceted, and often international civil disputes.

Concomitant to that role, the Court plays a significant part in assuring the competitiveness of the Cayman Islands as a successful financial centre.

There are many reasons for this increased demand for the court's intervention in the area of international finance. The first, of course, is domicile. The many locally registered companies, banks and trusts, insurance and mutual funds entities and numerous other institutions all benefit from the convenience of having their cases heard in their own jurisdiction. Weighing in also on the side of the local jurisdiction is the fact that assets are often present within the jurisdiction and amenable to being restrained pending resolution of cases. The common law limit on punitive damages is also an important factor, while a further key consideration is that local law exclusively governs a busy sector of Cayman's international business — trusts.

In the same vein, it is generally of importance to the international client that the Cayman Islands legal system is similar to that of the United Kingdom.

> As a result of this jurisdictional primacy, the Grand Court has in recent years become a busy hub, resolving disputes among international parties, sometimes with billions and often with hundreds of millions of dollars in assets at stake.

As a result of this jurisdictional primacy, the Grand Court has in recent years become a busy hub, resolving disputes among international parties, sometimes with billions and often with hundreds of millions of dollars in assets at stake. On a more routine basis, but contributing equally to the vitality of the sector, trustees often turn to the Grand Court for guidance in asserting such trusts.

The Grand Court also often tries international commercial disputes and matters involving the reconstruction, amalgamation, as well as liquidation of Cayman Islands companies. A paradigm of this role was the complex transnational insolvency proceedings arising from the collapse of the now-defunct Bank of Credit and Commerce International (BCCI).

In the context of this world-wide liquidation, one aspect in particular of the court's global reach and impact — judicial comity — was greatly strengthened by the work done by the Grand Court in conjunction with other courts abroad. Another significant development was the demonstrated utility of the MLAT in providing evidence for investigation and prosecution of those who perpetrated the fraud that destroyed the bank. The Chief Justice or a judge designated by him serves as the Central Authority for the MLAT.

That bilateral treaty with the U.S., operating since 1986, provides for assistance in the investigation and prosecution of crime, and where appropriate, for the confiscation of proceeds of crime and for asset sharing between the jurisdictions. The treaty covers any crime that carries more than 12 months' imprisonment in the Cayman Islands and the United States, as well as certain specified offences peculiar to American law.

Equipped with that international compass to guide the path to co-operation, the Grand Court has had the distinction of supervising in BCCI the largest restitution to its victims in history, as confirmed by financier Michael Pilling in

a special report dated 10 February 2000. So remarkable was that happy ending in comparison to the originally anticipated legal and financial disaster, that the liquidator noted that the role played by the legal system of the Cayman Islands was one of the most dramatic liquidation stories of our times. It was also, he said, "a watershed in the relationship between the legal systems of the Cayman Islands and the United States."



*The Chief Justice presides in chambers over an international civil dispute.*

That landmark was achieved, Mr. Pilling added, through "extraordinary co-operation," during which the Cayman Islands demonstrated that its legal system is based on "the firm principle of according discretion and privacy to those who conduct their business affairs honestly…." In so doing, he said, Cayman showed itself to be "a strong and co-operative partner in international law enforcement efforts to eliminate the scourges of money laundering, narcotics trafficking and fraud."

But the outlook at the start of the liquidation process was anything but promising. Riddled with fraud, the bank's 1991 collapse was then the largest in history. With an estimated deficit exceeding $10 billion, it initially appeared that creditors would receive no more than 10 cents in the dollar.

As the liquidators attempted to make sense of the chaos, it appeared from an initial global perspective that "the United States would be part of the problem, and not part of the solution."

The liquidator explained: "Although the United States agencies were solvent and all creditors of those agencies would be fully paid, the United States authorities initially took Draconian measures against the now-defunct BCCI." These included a $200 million penalty on indictment in New York, and a Federal indictment with the prospect of forfeiture of all US assets of BCCI, an amount then estimated to be in excess of one billion dollars.

"Despite the fact that the wrongdoers had fled and the companies were in the hands of the courts for the benefit of creditors, doctrines of corporate criminal liability created the unfortunate prospect of severe penalties in the US against a foreign insolvent organisation," the liquidator said.

"Yet from this rather uncompromising start, a very effective working relationship between the United States and Cayman Islands authorities developed. This has resulted in the largest restitution to insolvency victims in history and a return to creditors that will soon pass 60 percent — and is likely to go even higher," the liquidator also noted.

Tracking the wide international co-ordinating effort that was necessary to achieving such a fortuitous resolution, the liquidators' report detailed:

*"In November and December 1991, under the supervision of the Grand Court of the Cayman Islands, the District Court of Luxembourg and the High Court in England, the BCCI liquidators negotiated an historic plea and co-operation agreement with the United States. The agreement was presented to the Grand Court of the Cayman Islands and approved in December 1991.*

*"In accepting this agreement, Judge Joyce Hens Green of the United States District Court for the District of Columbia stated:*

"[T]he Plea Agreement now before the Court reflects on a truly global measure extraordinary efforts and amazing co-operation of a multitude of signatories representing myriad jurisdictions, to fully settle actions against the corporate defendants, which had operated in 69 countries around the globe, and through that plea restitution, to locate and protect all realizable assets of BCCI for the ultimate benefit of the depositors, creditors, United States financial institutions, and other victims of BCCI. The promise of the Plea Agreement is that those extraordinary efforts, that amazing co-operation, should continue."

> While the BCCI case is important because it demonstrates success particular to that case, it is exemplary because it demonstrates the capabilities of the Cayman Islands' judicial system to respond to the demands of international disputes, however complex and difficult.

"Seven and a half years later, as she closed the case, Judge Green found that the promise of the Plea Agreement for unprecedented international co-operation had been realised. She called the agreement a 'partnership between the Department of Justice and the Court Appointed Fiduciaries' and praised the foresight of the official liquidators acting pursuant to the direction of the Cayman Court, stating that 'their efforts on behalf of the victims in this case and beyond have been truly inspirational.' (United States v BCCI Holdings (Luxembourg) SA, 1999 WL 499134, at 27.) In assessing the results of the Plea Agreement, Judge Green called it a 'significant triumph'."

"The hallmarks of the Plea Agreement are principles which should serve to guide the relationship between the two countries in dealing co-operatively with international frauds in the future. These principles are: restitution to victims, co-operation in sharing investigative materials and respect and comity for their respective legal systems."

"At the centre of the agreement was the concept of restitution to victims. While the US government had authority under existing statutes to seize all US assets of BCCI, the agreement established a World wide Victims Fund under the aegis of the Court Appointed Fiduciaries, to which the US Government undertook to remit half of the funds recovered by contractual agreement and to remit additional amounts at the discretion of the US Attorney General."

"In our view, the US Attorney General has shown true global vision in making the interest of innocent creditors paramount. More than $1.2 billion has been remitted to the liquidation estates through the agreement process. In addition the United States has furthered the interest of innocent creditors in a number of important agreements it negotiated with third parties that resulted in hundreds of millions more being remitted to the liquidation estates."

"In addition to restitution, BCCI stands for unprecedented co-operation in the sharing of investigative information. Both the United States and the Cayman Islands wanted to get to the bottom of BCCI and learn its lessons for the future. The agreement provided for co-operation in investigations 'to the fullest extent allowed under applicable United States and foreign law.' That phrase captures well the spirit of aggressive international law enforcement as well as the recognition that international co-operation must always be carried out within the framework of local law. The United States authorities and the Court Appointed Fiduciaries worked together to find solutions that would make information available in a manner that was consistent with Cayman Islands law. Numerous applications pursuant to the MLAT were presented to and approved by the Cayman Authority, which permitted large quantities of information to be shared expeditiously but consistent with Cayman Islands law. That spirit of co-operative inquiry coupled with respect for legal structures yielded excellent results in BCCI while simultaneously providing a blueprint for future co-operation."

While the BCCI case is important because it demonstrates success particular to that case, it is exemplary because it demonstrates the capabilities of the Cayman Islands judicial system to respond to the demands of international disputes, however complex and difficult.

The Courts' calendars have already shown rising numbers of such cases over the years. The prospects for the future are that this trend will certainly continue, presenting a challenge that the judicial services recognise and are determined to meet.

# Reforms

As it grappled with the growing complexity of issues, the judicial system instituted a range of reform measures during the 1999-2000 period. While demonstrating its commitment to doing its part to meet larger societal needs however, the Courts entered the debate with a clear appeal for everyone in the society to seek more fundamental solutions.

This was articulated by the Chief Justice in his remarks at the 2000 formal opening of the legal year during which he stressed that overall efforts should focus on prevention.

"...The criminal justice and penal systems should not be expected to provide the real answers to the problems of crime. The lasting solution is not to punish, but to prevent crime," the Chief Justice said, calling for an examination of the wider social causes.

He said that rapid change could lead to disaffection, and that to insulate itself against further erosion of its social fabric Cayman needed to come to terms with how it perceived and defined itself. "A lack of definition has serious consequences: it gives rise to a sense of separation and division."

The Chief Justice urged Cayman to recapture its sense of community, saying that "...there is a tremendous amount of goodwill to be harnessed in tackling the problems of crime and of youth" in the private sector.

While articulating this call to action by all, the Chief Justice described a range of reforms taking place at the Courts. These included ongoing recommendations to criminal law and procedural reform, with submissions to the Attorney General for legislative change, the drafting and implementing of new rules of court; the work of the Sentencing Advisory Committee, and an effort to create greater public awareness of the activities at, and role of, the Courts.

A synopsis of some legal and procedural reform initiatives at the Courts follows.

## NEW RULES OF COURT

The Court of Appeal (Amendment Rules) 1999 set out procedural changes governing the way in which appeals are presented in that court.

Included in the Grand Court (Amendment) Rules 1999 was authority for a number of procedures to be dealt with administratively. Procedures that previously required judicial action were:

- Uncontested applications to restore a company to the register
- Application for leave to issue summons to examine a judgement debtor
- Judgement by default
- Signing of consent orders.

These rules also permitted affidavits to be sworn before a notary employed in the same firm as an attorney acting for the person swearing the affidavit.

The interest rates on judgement debts are regularly reviewed and were last amended in January 1998.



## NEW FEES

The Court Fees Rules 1999 combined the Grand Court and Court of Appeal Fees Rules and set out revised fees. The Matrimonial Fees Rules were amended in keeping with the revised Grand Court Fees; the Bailiff's Fees were also updated.

## PRACTICE DIRECTIONS

A number of Practice Directions has recently been issued, including:

- Directions regarding document filing. This is to reduce the amount of paperwork on the court file.
- Clarification regarding the procedure for drawing up orders
- Improvement regarding the listing of short summonses
- Directions regarding the presentation of signed indictments by the Attorney General
- Revision of the form of affidavit of means for legal aid applications
- Creation of a new listing form

## INFORMATION LEAFLETS

Production continued on a series of leaflets designed to provide the public with easy to grasp information relating to court practices and procedures. The first three leaflets, touching on the following subjects, were published in 1999.

- *Jurors and Jury Service*
- *Domestic Violence*
- *The Judicial Department*

When summoned for jury service, all new jurors receive leaflets providing concise information on selection procedures and stating what is required of them. The leaflet is supplemented on their first day by a video presentation.



*Mrs. Jennie Pacheco, maintenance officer, consults with a client.*

Data in the domestic violence leaflet explains what can be done for victims through the courts. This information has been supplied to the Women's Resource Centre and other interested organisations and individuals.

The Judicial Department leaflet provides a straightforward explanation of the aims and objectives of the department.

Additional publications planned for 2000 will include topics such as affiliation and maintenance and legal aid.